# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDMAR FINANCIAL COMPANY, LLC, and IRISH BLUE & GOLD, INC., <br><br>               Plaintiffs, <br><br>    vs. <br><br> CURRENEX, INC., GOLDMAN SACHS & CO. LLC, HC TECHNOLOGIES, LLC, STATE STREET BANK AND TRUST COMPANY, and JOHN DOE DEFENDANTS 1-5, <br><br>               Defendants. | Case No. _____ <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ............................................................................4

THE PARTIES.......................................................................................................5

    A.    Plaintiffs ...................................................................................................5

    B.    Defendants ................................................................................................6

BACKGROUND ALLEGATIONS.........................................................................8

    A.    The FX Market Generally.........................................................................8

    B.    The FX OTC Market.................................................................................9

    C.    Currenex's ECN Alternative ...................................................................10

DEFENDANTS' MISCONDUCT.........................................................................11

I.      CURRENEX SECRETLY ABANDONS "FIRST IN FIRST OUT"
       PROCESSING .........................................................................................11

    A.    "First In, First Out" Processing Is A Fundamental Expectation for FX
         Trading Platforms ...................................................................................11

    B.    Contrary to Industry Practices and Currenex's Representations, Currenex's
         Platform Did Not Operate on a True "First in First Out" Basis.............................15

II.    CURRENEX WAS MOTIVATED TO ABANDON "FIRST IN FIRST OUT" TO
       BRIBE IMPORTANT CLIENTELE AND FUNNEL MONEY TO ITS
       CORPORATE PARENT ..........................................................................17

III.   CURRENEX'S ADULTERATION OF "FIRST IN, FIRST OUT" PROCESSING
       HARMED ITS CUSTOMERS ...............................................................19

    A.    Secretly Giving Special Powers Reduced Competition By Key, Large
         Liquidity Providers, Widening Spreads.................................................20

    B.    Secretly Giving Special Powers Allowed the Privileged Liquidity
         Providers to Steal Profits That Would Have Gone to Other Currenex
         Customers ...............................................................................................20

    C.    The Combination of Jump-in-Line and Last Look Further Increased
         Plaintiffs' Execution Costs ....................................................................21

D.      Example Scenarios of Harm ................................................................22

IV.     EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ......................23

V.      CLASS ACTION ALLEGATIONS .................................................................25

CLAIMS FOR RELIEF ...........................................................................................28

FIRST CLAIM FOR RELIEF ........................................................................28

SECOND CLAIM FOR RELIEF ....................................................................31

THIRD CLAIM FOR RELIEF .......................................................................32

FOURTH CLAIM FOR RELIEF ....................................................................32

FIFTH CLAIM FOR RELIEF ........................................................................33

SIXTH CLAIM FOR RELIEF ........................................................................34

SEVENTH CLAIM FOR RELIEF ...................................................................38

PRAYER FOR RELIEF ...........................................................................................39

DEMAND FOR JURY TRIAL .................................................................................40

Plaintiffs Edmar Financial Company, LLC, and Irish Blue & Gold, Inc., individually and on behalf of all persons and entities similarly situated, bring this class action and allege as follows:

## NATURE OF THE ACTION

1.      This case is about a long-running scheme to rig auctions for foreign exchange ("FX") transactions.  Defendant Currenex operates an Electronic Communication Network ("ECN") where banks, corporations, hedge funds, investors, and other traders engage in FX transactions.  Plaintiffs and members of the class often traded on Currenex via its Executable Streaming Prices Trading Model (the "Currenex Platform").  To trade over the Platform, market participants can submit a "bid" price (the level they were willing to buy) or an "ask" price (the level at which they are willing to sell).  Other participants on the Platform can accept these quotes, consummating a trade.  Billions of dollars' of FX transactions are executed in this way on Currenex each day.

2.      A fundamental feature of an ECN is the system by which bids and offers are matched to execute trades.  The industry standard for matching bids and asks is called FIFO, which stands for first in, first out.  FIFO matching gives priority to whichever customer submits the first quote at the best price.  FIFO thus encourages price competition.

3.      At various times during the class period, Currenex expressly represented to Plaintiffs and class members that the Platform's matching algorithm operated on a FIFO basis.  For instance, in 2011, Currenex represented that its Platform had a "matching engine with 'first in, first out' (FIFO) prioritizing."  And again in 2015 Currenex represented:  "The matching priority . . . is based on . . . a 'first in, first out' basis."

4.      These (and other) representations and omissions were in line with the reasonable expectations of Plaintiffs and class members that Currenex would be using the FIFO industry standard.  When Currenex stayed silent, or spoke about any aspect of its Platform *without* disclosing a different matching system, that also confirmed the understanding that the Platform was using FIFO.

5.      Unbeknownst to Plaintiffs and members of the class, instead of operating a true FIFO order book, Currenex operated a rigged auction.  Currenex entered into secret priority agreements with certain privileged liquidity providers—State Street, Goldman Sachs, HC Technologies, and the Doe Defendants (together, the "Trading Defendants")—under which the Trading Defendants could jump in line and consummate a trade without entering a competing quote.

6.      Under these super-priority agreements, transactions were funneled to the Trading Defendants even if they were late to the party, and only submitted quotes that matched what others had previously provided.  Currenex granted this secret power to incentivize the Trading Defendants to trade over the Platform, rather than through other venues.  After it was acquired by State Street in 2007, Currenex continued to grant these priorities in order to funnel profits and opportunities to its new corporate parent.

7.      With these secret agreements in place, the Trading Defendants' incentive to compete for trades was suppressed or removed entirely.  As a result, prices and spreads on Currenex became artificial, and Plaintiffs and members of the class paid too much when buying, and received too little when selling.

8.    Plaintiffs were also harmed by the lost opportunity to be price-makers.  Because the Trading Defendants were allowed to jump to the front of the line, they were able to secure business and profits that should have been given to Plaintiffs and class members instead.

9.    Plaintiffs were also harmed by lost informational advantages.  Knowing what market participants are willing to pay (a form of "price discovery") is a valuable advantage.  This advantage was magnified for those who were matched and thus executed transactions.  As the Currenex algorithm funneled an artificial amount of business to the Trading Defendants, so too was the Trading Defendants' informational advantage artificially widened.

10.    Defendants combined these "jump in line" privileges with another special power: a "last look" right.  This refers to a set time window when the Trading Defendants could unilaterally cancel (in industry parlance, "reject") matched trades.  "Last look" rights essentially gave the Trading Defendants a free option.  The super-powered liquidity providers could use their jump-in-line powers to match the best quote out there, but then turn to use their last look powers to cancel the trade if those terms proved unfavorable.

11.    The existence of "last look" rights was hidden for a large part of the relevant period.  But even when the existence of last look rights *in general* was disclosed in 2015, Plaintiffs were misled as to *how often* their trades would be cancelled pursuant to these "last look" superpowers.  That is, Plaintiffs and members of the class did not know of the "jump in line" right, and thus could not know that an artificially high number of their trades were being funneled to the subset of Platform participants who also had the "last look" rights.  This further increased Plaintiffs' execution costs.

12.    Currenex's silence on its grant of priority rights constituted fraud-by-omission, and its express representations concerning its use of FIFO constituted affirmative fraud.  The

abandonment of FIFO also breached Currenex's implied duty of good faith and fair dealing to its contractual counterparties (Plaintiffs and class members), and it unjustly enriched the Trading Defendants.  The corruption of the Currenex Platform also violated the federal RICO Act.  And the secret arrangements also constituted illegal agreements in restraint of trade, creating artificial prices in violation of the antitrust laws.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the class arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also bring this action under the Racketeer Influenced and Corrupt Organizations ("RICO") Act , 18 U.S.C. § 1962.

14.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  Subject matter jurisdiction is also proper, pursuant to 28 U.S.C. §§ 1331 and 1337(a).  This Court also has jurisdiction over this class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs are citizens of different states than Defendants and the amount in controversy exceeds $5,000,000.

15.     Venue is proper pursuant to 15 U.S.C. §§ 15(a) and 22.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed was carried out in this District.

16.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

17.     The Court has personal jurisdiction over Defendants pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22.  Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States and because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and class members residing in, located in, or doing business throughout the United States.

18.     Defendants are also subject to personal jurisdiction because each, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this district, that was directly related to the claims at issue in this action.

19.     Alternatively, to the extent that any Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this Court has personal jurisdiction over the Defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because the Court's exercise of jurisdiction is consistent with the United States Constitution and laws.

## THE PARTIES

### A.     Plaintiffs

20.     Plaintiff Edmar Financial Company, LLC is a Virginia limited liability company that operated during the relevant period as a foreign limited liability company in Naples, Florida. During the relevant period, Edmar Financial Company, LLC entered into FX spot transactions and placed numerous orders via the Currenex Platform located in New York.  On July 9, 2010, Edmar Financial Company, LLC signed a contract with Currenex, Inc. titled "Agreement For Currenex Services," which included an agreement that the contract would be governed by New

York law, and that New York state and federal courts would have exclusive jurisdiction for any dispute arising under the contract.

21.     Plaintiff Irish Blue & Gold, Inc. is a Bahamas company with its principal place of business in Nassau, Bahamas.  During the relevant period, Irish Blue & Gold, Inc. entered into FX spot transactions and placed numerous orders via the Currenex Platform located in New York. On May 30, 2014, Irish Blue & Gold, Inc. signed a contract with Currenex, Inc. titled "Agreement For Currenex Services," which included an agreement that the contract would be governed by New York law, and that New York state and federal courts would have exclusive jurisdiction for any dispute arising under the contract.

22.     Though the Platform does not identify for Plaintiffs their matched counterparties, given Plaintiffs' trading volume and the amount of liquidity provided to the Platform by the Trading Defendants, on information and belief both Plaintiffs were matched with each of the Trading Defendants on FX trades executed on the Currenex Platform during the relevant period. For instance, during the relevant period, Plaintiffs transacted thousands of times.  As discussed below, HC Tech provided approximately 10% of the liquidity on the Platform, while Goldman and State Street were among the largest providers on the Platform.

**B.     Defendants**

23.     Whenever reference is made to any Defendant entity, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

24.     Defendant Currenex, Inc. ("Currenex") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York. Currently, Currenex is a wholly owned subsidiary of State Street.  Currenex has offices in New York and California as well as in London and Singapore.

25.     Defendant Goldman, Sachs & Co. LLC ("Goldman Sachs") is a company organized and existing under the laws of the State of New York with its principal place of business in New York, New York.  Goldman Sachs was one of the liquidity providers which entered into a secret agreement with Currenex to secure priority trading rights on the Platform. During the relevant period, Goldman Sachs entered into FX spot transactions with class members via the Currenex Platform in New York.

26.     Defendant HC Technologies, LLC (f/k/a Henning-Carey Proprietary Trading, LLC) ("HC Tech") is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  HC Tech is an algorithmic and proprietary trading firm.  HC Tech has offices in Chicago, New York, and London, and regularly traded on the Currenex Platform located in New York.  HC Tech was one of the liquidity providers which entered into a secret agreement with Currenex to secure priority trading rights on the Platform.  During the relevant period, HC Tech entered into FX spot transactions with class members via the Currenex Platform in New York.

27.     Defendant State Street Bank and Trust Company ("State Street") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts.  State Street has substantial offices in New York City and carries out substantial business in this District, including its operation of and trading on the Currenex Platform located in New York.  State Street was one of the liquidity providers

which entered into a secret agreement with Currenex to secure priority trading rights on the Platform.  During the relevant period, State Street entered into FX spot transactions with class members via the Currenex Platform in New York.

28.     In 2007, State Street bought Currenex for $564 million to add online foreign exchange trading services.  After the acquisition, State Street continued to act as a liquidity provider with priority trading rights on the Currenex Platform.  State Street executives occupy four of the five positions on Currenex's senior management team.  In September 2017, the Securities and Exchange Commission ("SEC") fined State Street for misrepresentations about liquidity-provider privileges it provided on GovEx, its U.S. treasury securities trading platform.

29.     The John Doe Defendants are other liquidity providers that traded regularly on the Currenex Platform and that entered into secret agreements with Currenex to secure priority rights on the platform.  At present, while Plaintiffs have reason to believe there were others, Plaintiffs do not know the names or identities of the other liquidity providers who were given super-priority rights on the Platform.  Plaintiffs expect to be able to identify the Doe Defendants during discovery.

## BACKGROUND ALLEGATIONS

### A.     The FX Market Generally

30.     FX trading involves an exchange of one country's currency for another.  The FX market is the largest in the financial system, accounting for over a trillion dollars a *day* in the United States alone.

31.     Currencies are traded in pairs, with the Euro/U.S. dollar ("EUR/USD"), U.S. dollar/Japanese Yen ("USD/JPY"), and British pound/U.S. dollar ("GBP/USD") constituting the top three pairs.  The U.S. dollar is the world's dominant currency, making up one side of most FX trades.

32.     Exchange rates on Currenex used to be quoted to two or four decimal places, depending on the currency pair.  The final digit was referred to as one Price Increment Point or "pip."  Currencies are now generally quoted to three or five decimal places.  For instance, the EUR/USD rate could be 1.22265.  A pip is still typically understood to be the second or fourth decimal place, depending on the currency pair.  A change in the EUR/USD rate from 1.222<u>65</u> to 1.222<u>75</u> would be one pip change.

**B.     <u>The FX OTC Market</u>**

33.      FX spot transactions[1] are generally executed over-the-counter ("OTC"), meaning a customer must use a dealer to execute the trade.  The dealers have traditionally been known as the "sell-side" of the transaction because they sell liquidity.  The customers, whether buying or selling currency, have traditionally been known as the "buy-side" because they take (or "buy") *liquidity* whether they are buying or selling the currency at prices offered by someone else.

34.     To initiate an OTC transaction, a customer contacts a dealer, indicating the currency and quantity she wishes to trade.  The dealer responds with the prices at which it is willing to buy or sell that currency.  One way that the dealer makes money is by way of the gap between the quoted buy and sell prices—known as the "bid/ask spread."  All else equal, the wider the spread the more the client pays the dealer to complete the transaction.  Likewise, one way dealers compete on price is through the bid/ask spread.

35.     In practice, several factors historically served to limit the vibrancy of this competition.  For one, OTC markets are opaque.  In theory, the end user can contact other

---

[1]  A spot transaction is the exchange of two currencies between counterparties at an agreed-to rate for the spot value date of typically two days—as opposed to a forward contract where delivery occurs at some time in the future.

dealers.  But this takes time and puts the end user at risk if the market moves against it in the meantime.

36.     The FX OTC market also suffers from extreme information asymmetry.  Because FX salespeople have strong institutional relationships and keep track of clients' order histories, they are often able to predict client trades even before an order is placed.  Throughout the order process salespeople are in regular contact with traders.  They inform the traders of incoming potential orders, confirm bid and ask prices, and ultimately convey placed orders to the trading desk for processing.  This system creates a playing field where customers are dependent on their dealers for information.  The premium on client relationships fostered by this system also made it costlier for customers to switch dealers.

C.     **Currenex's ECN Alternative**

37.     Currenex was founded in 1999 by a group of investors to purchase Waldron Management, a company that had been developing a multibank trading service.  Soon thereafter, Currenex launched the first request-for-quote service in the FX spot markets for end-customers.[2] In response to the emergence of ECN platforms, many of the largest financial institutions formed FXAll[3] to create a venue they could control.  Antitrust authorities began investigating whether the banks had set up the joint venture for anticompetitive ends.

38.     Though for administrative purposes some platforms designate certain traders as "Liquidity Providers," on an ECN anyone can make prices and thus provide liquidity.  Every

---

[2]   In a "request for quote" system, rather having to call individual banks in sequence, customers using these platforms could send a request-for-quote to multiple dealers simultaneously, lowering search costs associated with finding the best quote or lowest spread. The limitation of these platforms, however, was still that only a set number of dealers were designated market makers.  It thus in many ways just is an electronic version of the "OTC" system.

[3]   John R. Wilkes, *U.S. Probes Whether Big Banks Stifled Rival in Currency Trade*, Wall Street Journal (May 15, 2002), https://www.wsj.com/articles/SB1021421905951110240.

user can technically either choose to be on the sell-side and supply liquidity or be on the buy-side and take liquidity.

39.     To simplify, on an ECN like the Currenex Platform, subscribers can, among other things, post a "limit order," which indicates at what bid or ask price they would be willing to transact at, acting as a liquidity provider.  Orders remain on the limit order book until executed or cancelled.[4]  Market orders are matched with the limit orders in the book, creating an executed trade.  The identity of the buy and sell-side counterparties are usually anonymous, unless the counterparties have agreed on a disclosed relationship.

40.     For an ECN to be successful, there needs to be a critical mass of customers to ensure there is sufficient liquidity to allow trades to get done in a timely and efficient manner.  This is particularly true at the outset of the platform.  Thus, although limit-order markets allow end-customers to make prices, ECNs need backing from larger sell-side institutions, like Goldman Sachs and State Street.  Proprietary firms, such as HC Tech, also regularly act as sell-side subscribers on the Currenex Platform.  During the class period, HC Tech often comprised around 10% or more of the trading volume on the Currenex Platform.

## DEFENDANTS' MISCONDUCT

I.     **CURRENEX SECRETLY ABANDONS "FIRST IN FIRST OUT" PROCESSING**

    A.     **"First In, First Out" Processing Is A Fundamental Expectation for FX Trading Platforms**

41.     The most important attribute of an ECN is the mechanism by which orders are matched.  Trading platforms typically execute orders on a "price/time priority" or "first in, first out" system.

---

[4]  A limit order book is a record of outstanding limit orders maintained by the exchange. Subscribers can also decide to trade by being a liquidity taker, such as placing "market orders."

42.     Under a FIFO system, the record of outstanding limit orders is managed first based on price; the best-priced limit orders are placed at the front of the queue (the best bid and ask prices are called the top of book "quotes").  If two limit orders have an identical price, the one that was submitted first is matched first.  If the market order is bigger than the best-price limit order, then the remaining quantity is matched with the next-best limit order, and so on, until the entire market order is filled.

43.     To demonstrate, below is an example of a limit order book on the Currenex Platform, where the best price in GBP/USD in GBP 1 million has been shown.  The best bid for GBP 1 million is 1.60302:  "1.60" seen at the top, the next two decimals of "30" the two large bold numbers on the left above the "bid" column, and the final digit of "2" coming from the small number next to the larger numbers.



44.     One can see that there are also bids for 1.60299, and -298, -296, and -294, which represent inferior offers to buy British Pounds, but provide information to traders about the depth of the book, which is important to know what prices would be needed to sell in larger quantities than the top bidder would be willing to buy for.  For instance, here the best bid is 1.60302, the top of the column on the left.  But that trader only is willing to buy GBP 1.5 million.  The depth of the book informs a trader who would like to sell more than that amount.  To sell GBP 2.5

million, for instance, the remainder of the order would be matched with the second-best price of 1.60299.

45.     Presume a trader seeing the above order book wanted to make prices by providing limit orders for GBP 1 million.  If the bidder only submitted a bid of 1.60302, under a FIFO system that trader would not be matched with a market order for GBP 1 million, because someone else has already stated a willingness to buy GBP 1.5 million at that price.  A FIFO system thus encourages traders to bid aggressively.  A sell-side liquidity provider who provides quotes cannot simply match the going prices—those who were there first instead get the deals, the profits, and the valuable information to be learned from the trade.

46.     Throughout the class period, Plaintiffs and class members reasonably understood that the Currenex Platform operated on a FIFO basis.  Given the fundamental importance of the matching system, and the industry norms, when Currenex stayed silent about its Platform, Currenex knew and intended that Plaintiffs and class members would understand this to mean that the Platform would be following FIFO processing.

47.     When Currenex spoke about any aspect of the Platform, but continued to fail to disclose that FIFO was not being followed, those representations were all also false and misleading because they did not disclose that the Platform was not following FIFO principles.  Currenex knew and intended that Plaintiffs and class members would mistakenly understand that Currenex's decision to speak about the Platform without addressing FIFO would serve as implicit confirmation that FIFO was being followed.

48.     Put another way, FIFO is considered a key industry standard, and Currenex never disclosed that it was departing from this industry standard.  To the contrary, when Currenex expressly addressed the issue, it represented that it was following FIFO.  For instance,

13

Currenex's 2011 product profile, titled "Currenex for Active Traders," expressly stated that Currenex had a "[l]ow-latency matching engine with 'first in, first out' (FIFO) prioritizing."

49.     By way of another example, on April 1, 2015, Currenex released a disclosure entitled "Description Of Services And Conflicts Of Interest."  In this document, Currenex devoted a section (titled "How Do Price and Time Priority Matching Work?") to its matching priority system:

> We provide central limit order book and request for quote style price discovery and matching as part of our anonymous bilateral trading service.  In the central limit order book, the electronic trading platform comingles participants' resting orders (e.g., orders crossing orders) with executable streaming price quotes submitted from certain liquidity providers, which as described above will vary from subscriber to subscriber.  ***The matching priority with respect to an acceptance of any price quote is based on price and, if prices are identical, then on a "first in, first out" basis***.

50.     Currenex emailed these and other representations to its customers and posted them on its website in order to attract customers.

51.     Other major ECN FX trading venues similarly follow a FIFO trading protocol. For instance, Electronic Broking Service ("EBS"), a large FX trading platform, publishes its "Dealing Rules."  Rule 2.8.2 describes the EBS Matching Process:

> Once an Order is submitted, EBS Market will immediately attempt to Match the instruction with a Bid/Offer of better or equal price.  ***Each Match attempt is prioritised in shown price, time priority order*** ….

52.     Cboe FX (formerly known as Hotspot), another large FX trading platform, likewise uses the FIFO industry standard, stating in a recent press release:

> The order matching mechanics of Cboe FX Central are consistent with other central limit order books in the FX market.  All orders in the book … are executed on a price (displayed then hidden) / time priority.

53.     That FIFO is the industry standard is also confirmed by the Securities Industry and Financial Markets Association ("SIFMA"), a leading industry group.  In its electronic

trading primer, SIFMA states: "Most futures exchanges (and some other markets) use the central limit order book (CLOB) trading method—or matching engines in the equities world—an automated system which uses an algorithm to match customer orders on a price time priority basis (no negotiation)."

### B.   Contrary to Industry Practices and Currenex's Representations, Currenex's Platform Did Not Operate on a True "First in First Out" Basis

54.     Contrary to Currenex's representations and Plaintiffs' reasonable expectations, Currenex's FX auction Platform was rigged to favor a discrete set of its preferred clientele. Currenex rigged the system by entering into secret agreements with large liquidity providers, including State Street, HC Tech, Goldman Sachs, and the Doe Defendants. These Defendants conspired with Currenex to covertly manipulate the auction process in order to steer a greater share of FX trades towards the Trading Defendants.

55.     These secret and undisclosed agreements gave the Trading Defendants the ability to "jump in line" without entering a more-competitive quote. Specifically, if the Trading Defendants merely *matched* the quote of another trader, the business would be sent to one of these preferred liquidity providers, even if the other trader provided the quote first. In other words, Currenex's platform was not a true FIFO-based order book; it was a manipulated order book where certain privileged traders could jump to the top of the book.

56.     The plausibility and existence of this conspiracy to rig Currenex's matching algorithms is supported by substantial evidence and numerous sources. Currenex was granting clientele super-priority rights at least as of 2005. The decision makers in entering into these agreements were Currenex executives Cary Rosenwald and Sean Gilman. They helped create the system where privileged liquidity providers' orders would be placed ahead of non-privileged customers' orders.

57.     These secret agreements were negotiated by senior people at Currenex and the Trading Defendants, often over dinners and lunches in major cities like Chicago and New York. The priority rights were given to ensure a steady stream of liquidity by the Trading Defendants. As discussed below, HC Tech and Currenex had a particularly close relationship due to a history of overlapping personnel.  Currenex and HC Tech employees even had regular meals during which they would discuss the jump-in-line system.

58.     Privileged liquidity providers like HC Tech received the majority of trades for which it had made offers, even though there were many other traders, some with faster technology than HC Tech.  HC Tech got an outsized share of the trades because of its secret priority agreements with Currenex.  Currenex knew this skew was because of its prioritization scheme.

59.     Russell Sears, Currenex's former Global Head of Sales, negotiated many of the secret priority agreements and received additional compensation that was pegged to the clients' trade volume.  Sears and Rosenwald (another senior Currenex executive) both had close relationships with HC Tech and were involved in negotiating the secret deals.  Thus, Currenex's top employees were incentivized to grant super-priority rights to privileged liquidity providers.

60.     The misconduct occurring on the Currenex Platform was sufficiently widespread that the compliance departments of Currenex and State Street were tipped off as to what was occurring.  Nevertheless, State Street continued acting as one of Currenex's main liquidity providers with the understanding that it would receive jump-in-line rights like the other Trading Defendants.  In fact, State Street often gave itself priority over limit orders, even though State Street's competing quote was at a *worse* price.  This was particularly the case for smaller order sizes.

61.     Currenex maintained a detailed system where it assigned internal tracking codes ("CXB" or "CXMM," eventually aggregated into "LM") for various liquidity providers (e.g., LM02 for HC Tech, LM14 for State Street).  Knowing the identity of the liquidity provider for each code would have unmasked the super-priority outliers in Currenex's internal logs, and so records of this accounting were probably deleted.

62.     State Street and Currenex also conducted prioritization experiments, often directed by David Newns, Global Head of Currenex.  In these experiments, Currenex compared the fill ratios (i.e., the rate at which customer orders are filled) for orders where neither party had prioritization privileges (i.e., "OXO" or "Order Crosses Order") over orders where one party had prioritization privileges (i.e., "OXP" or "Order Crosses Price").

63.     Currenex also compared its current system of priority based on the identity of the market maker to one based on the market maker's yield and fill ratio.  In this manner, Currenex collected data on the impact of its prioritization experiments, all without its customers' knowledge.

## II.     CURRENEX WAS MOTIVATED TO ABANDON "FIRST IN FIRST OUT" TO BRIBE IMPORTANT CLIENTELE AND FUNNEL MONEY TO ITS CORPORATE PARENT

64.     It has often been said that "liquidity begets liquidity."  By granting super-priority rights, Currenex hoped to ensure that its trading venue would get off the ground, then thrive, by securing the support of large liquidity providers.  Currenex, of course, makes more money as more trades are executed on its Platform.  Currenex charged the buy-side subscriber typically $5 per $1 million worth of transactions.

65.     For their part, the Trading Defendants were motivated for the obvious reason that it allowed them to avoid having to compete on fair terms with other traders.  They could reap supra-competitive profits merely by matching the quotes from others, and then cancelling trades

they ended up not liking.  Indeed, the Trading Defendants compensated Currenex in exchange for being granted jump-in-line rights, including by providing liquidity on the platform.

66.     Beyond this, Currenex was motivated to grant these super-priority rights because of who the primary recipients were.  For most of the relevant period, State Street was Currenex's corporate parent and owner.  State Street was not only aware of the fraudulent scheme being run on Currenex; it deliberately used and supported Currenex in order to further this scheme to increase its own profits.  Indeed, State Street continued supporting the fraudulent scheme even after its compliance department was made aware of the misconduct.  The benefits to State Street were substantial.  State Street steered to itself as much as three times the trading volume as the next-highest liquidity maker, even though it was cancelling a substantial portion of its quotes.

67.     Though not a corporate parent, HC Tech also enjoyed a cozy relationship with Currenex.  One major partner at HC Tech, Sean Gilman, was formerly the chief technology officer of Currenex, and claims to have been "instrumental in the platform's growth and eventual sale to State Street."[5]  Another HC Tech partner, Cary Rosenwald, was formerly "head of strategy at Currenex, where he helped create one of the world's leading currency exchanges."[6]  Similarly, the chief architect of FX proprietary trading at HC Tech, Romain Rossier, was a former director at Currenex and a senior software engineer.

68.     In short, there was a close relationship at the senior management level between Currenex and HC Tech that was used to exploit the FX market.  For example, around 2011, Currenex even created a new system whereby HC Tech was given an exclusive live feed from *all* orders on the Platform, in addition to being able to jump the line merely by matching existing

_____

[5]   https://www.hctech.com/about ("Prior to HC Tech, [Gilman] was CTO of the FX trading venue Currenex and was instrumental in the platform's growth and eventual sale to State Street Bank in 2007.").

[6]   https://www.hctech.com/about.

bids or offers.  Thus, unlike Plaintiffs and class members, or even other liquidity providers, HC Tech basically saw everything, including all hidden orders, and could use the information to trade.

69.     This gave HC Tech unique insight into the market.  HC Tech essentially had a live feed from Currenex showing it all orders on the book and allowing HC Tech simply to match an existing bid or offer from a client at the top of the book, thus jumping the queue.  This was highly detrimental to the client with the initial firm interest (if the market moved sharply they could even reject the trade as they had last look privileges).  Currenex itself exploited its own similar see-all access to conduct "triangular arbitrage," where it would compare the available prices on at least three overlapping FX trades (e.g., EUR-USD, USD-JPY, EUR-JPY) in order to capture the arbitrage profits before regular customers trading on the affected pairs.

70.     Providing HC Tech with access to all orders gave HC Tech a window into the depth of orders at a particular price; this information provided exclusive insight into the underlying market, and made it even easier for HC Tech to cancel trades via its last look rights if it saw an unfavorable shift in the market.

71.     Goldman Sachs was a large-scale liquidity provider responsible for a significant portion of Currenex's trading volume.  This made Goldman Sachs another natural participant and beneficiary of Currenex's scheme.  Rick Schonberg, the Global Head of Electronic FX Sales and Product Development, was responsible for negotiating Goldman Sachs's super-priority rights.  In 2014, Schonberg left Goldman Sachs to help run State Street's electronic trading venues.

## III.   CURRENEX'S ADULTERATION OF "FIRST IN, FIRST OUT" PROCESSING HARMED ITS CUSTOMERS

72.     These super-priority, jump-in-line rights contravene industry norms and expectations, as well as Currenex's express representations.  Had Currenex publicly disclosed its

scheme with the Trading Defendants and the secret agreements made regarding prioritization, Plaintiffs and members of the class would not have traded on the Currenex Platform as they did. The scheme harmed Plaintiffs and class members in many ways.

**A.** **Secretly Giving Special Powers Reduced Competition By Key, Large Liquidity Providers, Widening Spreads**

73.     By secretly changing the rules governing the auction-like process, Currenex was in effect engaged in a bid-rigging scheme, a *per se* violation of the antitrust laws designed to steer business to preferred insiders.  Like in any other bid-rigging schemes, those with the inside track know they do not actually need to compete on price—so they do not.

74.     In a properly functioning FIFO exchange, the liquidity providers need to beat the prevailing quote (and quickly) in order to get their trades executed.  But Currenex's system of super-priority rights eliminated this incentive.  Rather, the Trading Defendants only needed to match the current bid-ask quotes already seen on the Platform, knowing their orders would jump to the head of the line.

75.     Again, the Trading Defendants are not just any platform participants.  For example, as of 2018, HC Tech was ranked as the "largest spot FX liquidity provider by market share in the Americas, ahead of global currency behemoth JP Morgan."[7]  Giving such large auction participants bid-rigging powers thus seriously distorted competition within the system. The result was an artificial widening of bid-ask spreads.  Thus, whenever Plaintiffs and class members acted as the liquidity taker on a transaction, they paid artificially high prices (when buying) and received artificially low prices (when selling).

**B.** **Secretly Giving Special Powers Allowed the Privileged Liquidity Providers to Steal Profits That Would Have Gone to Other Currenex Customers**

---

[7]   Eva Szalay, *HC Tech: it's time to speak up*, FX WEEK (Jun. 26, 2018), https://www.fx-markets.com/technology/algorithmic-trading/3642351/hc-tech-its-time-to-speak-up.

76.     Under a limit order book system, any participant can provide limit-order quotes that other customers can "hit" to consummate a trade.  Though most liquidity comes from a small group of Platform participants—including the Trading Defendants—Plaintiffs and class members could have provided liquidity and earned more profits from their trades.  They were thwarted in doing so, however, as the Trading Defendants jumped in line and stole the business for themselves.

C.     **The Combination of Jump-in-Line and Last Look Further Increased Plaintiffs' Execution Costs**

77.     Though it was an "executable" stream of quotes provided on the Platform, certain participants were given a window of time after a deal was consummated to cancel the trade.  The risk was asymmetrical.  The trader that lacked the last look power was locked into the transaction. But the trader that had the last look power could wait to see what direction the market was moving, and only then decide whether to execute the transaction.

78.     Last look increases the cost of execution for those who do not have such powers. It is a one-way ratchet.  In a stylized example, consider a "buy side" trader ("Customer X") who agrees to buy a widget for $10 from a counterparty ("Provider Y") who, as it turns out, has the last look power.  If during the last look window the prevailing price for a widget drops to $9, the Customer X is still stuck with the deal, having to pay $10 for the widget.  Provider Y can execute the transaction, buy a widget in the open market for $9 and sell it to Customer X for $10, realizing an immediate $1 profit.  But if during the last look window the prevailing price for buying a widget increases to $11, Customer X does not get the benefit of the bargain.  Provider Y could just reject the transaction—why would it sell a $11 widget for only $10?  After cancellation, the buyer has to start the entire process over, likely eventually transacting at the new (less favorable) market price of $11.

79.     Even if participants on the Currenex Platform understood their "executable" trades could be cancelled in this way—which they did not, at least for most of the class period—Plaintiffs and class members were misled as to *how often* they would be subject to this risk. Without the jump-in-line power, traders like State Street, HC Tech, and Goldman would be matched by the algorithm *far less* often than they were.  That means that in the but-for world without jump-in-line super-priority rights, Plaintiffs and class members would have seen far more of their transactions executed at the agreed-upon terms, rather than having the deals cancelled and rebooked at new, less-favorable terms.

### D.     Example Scenarios of Harm

80.     To see some of the above concepts in play, consider a base scenario where the "top of book" for EUR/USD has a "bid" price of 1.1827 and an "ask" price of 1.1830.  If Customer A enters a market order to buy, in a normally functioning FIFO system, Customer A would be matched with whoever first provided the 1.1830 ask quote, in this hypothetical Customer B.

81.     Consider instead that State Street would like to make an offer to sell EUR/USD as a liquidity provider.  In a normal FIFO environment, it would see the "top of book" "ask" at 1.1830 and know it would have to show a better ask price to be matched with any market orders. State Street would have to make a more-aggressive ask.  If State Street submitted a better ask in order to secure the business, Customer A would get a better price on its market order.

82.     But with prioritization rights, State Street need only match Customer B's "ask." In this scenario, Customer A would instead be matched with State Street.  Customer B is also now worse off—it would have secured a trade on terms it viewed as favorable, as well as gained knowledge about the "flow."  This, even though Customer B was first-in with the 30 ask (with "30" here being the industry parlance referring to the last two digits in 1.18*30*).

83.     The insertion of prioritization rights thus harms Customer A (by way of paying more than it would have) and Customer B (by way of having Customer A's business steered to State Street).

84.     Consider now the impact that State Street—but not Customer B—has been given "last look" rights.  Whereas without prioritization rights Customer A would have consummated a firm-commitment to deal at 30 with Customer B, instead now Customer A is matched with State Street who is given an opportunity to cancel the trade.

85.     Customer A thus may get hit with a double-whammy.  State Street now has what amounts to a free option of dealing with Customer A at 30.  If during its last look window it can find somewhere to buy for less than 30, it can do so, then turn and sell to Customer A for 30, and secure a risk-free profit.  But if during State Street's last look window it determines the market has moved against it such that it now costs 31 to buy, it could exercise its last look power to reject the trade.

86.     The last look power thus creates a one-way ratchet effect.  If the market moves in favor of Customer A, the deal will be cancelled and Customer A will have to re-enter the market, which means here trying to buy at 31 instead of 30 (and then hoping to not get 'last looked' again).  But if the market moves against Customer A, the deal will go through anyway, which means here Customer A will end up paying 30 even though in theory the new market price is only 29.

## IV.     EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

87.     Plaintiffs and class members were unaware that the Currenex Platform was giving jump-in-line powers to the Trading Defendants.  Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were harmed by the jump-in-line scheme.

88.     Currenex did not disclose to its customers that super-priority rights had been given to privileged liquidity providers.

89.     Defendants actively and effectively concealed their collusion.  For instance, as discussed above Currenex affirmatively represented the Platform matched on a FIFO basis.

90.     Defendants' conspiracy was also self-concealing.  The success of the conspiracy depended on the counterparties' unawareness of the super-priority provided to certain liquidity providers.  Defendants executed their conspiracy through non-public methods of communication to conceal their agreements from Plaintiffs and the class.

91.     The Currenex Platform's algorithm for assigning trades between customers and liquidity providers is opaque and nonpublic.  Even information about counterparties for trades executed via the Currenex Platform is generally unavailable.  Unlike most other multilateral FX platforms, Currenex does not even disclose its daily trading volume.  Because the Currenex Platform is anonymous, Plaintiffs and the class would have no way of knowing who their counterparties were, making it impossible for them to observe that Defendants' prices were being prioritized over everyone else's.  Currenex also typically only informs its customers when a trade has been executed, not when a trade has been rejected.

92.     Because Defendants employed acts and techniques that were calculated to conceal the existence of such illegal conduct, Plaintiffs could not have discovered the existence of this unlawful conduct through their exercise of due diligence until it was revealed recently by former insiders to Plaintiffs' counsel.

93.     Plaintiffs, either directly or through professional investment advisors and/or managers they hired, regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct throughout the class period.  Plaintiffs have

24

engaged in reasonable due diligence under the circumstances.  Plaintiffs regularly monitored

pricing for the FX spot transactions they entered into on the Currenex Platform.  Through these

efforts, Plaintiffs endeavored to obtain the best prices possible for their spot trades.

94.     For the forgoing reasons, any applicable statute of limitations affecting or limiting

the rights of action have been tolled.

## V.     CLASS ACTION ALLEGATIONS

95.     Plaintiffs, on behalf of themselves and those similarly situated, seek damages

against Defendants based on the allegations contained herein.

96.     Plaintiffs bring this action on behalf of themselves and as a class action under

Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary

damages on behalf of the following class:

> All persons and entities who traded on, provided liquidity for, or otherwise
> attempted to transact FX spot trades on Currenex, Inc.'s Executable Streaming
> Prices Trading Model (or similar functioning platforms operating under different
> names) from January 1, 2005 to the present.

> Excluded from the class are Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, whether or not named in this Complaint, and the
> United States government.

97.     *Numerosity*.  Members of the class are so numerous that joinder is impracticable.

Plaintiffs do not know the exact size of the class, but believe that there are several hundred and

potentially thousands of class members geographically dispersed throughout the United States.

98.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the class.

Plaintiffs and all members of the class were damaged by the same wrongful conduct of

Defendants.  For example, Defendants' wrongdoing caused Plaintiffs and members of the class

to pay inflated bid/ask spreads on the Currenex Platform.  Plaintiffs and members of the class

also paid Currenex transaction fees in reliance on its fraudulent misrepresentations.

99.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the class. Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

100.     ***Adequacy of Representation***.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, including particularly antitrust and similar cases arising out of financial services.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the class.

101.     ***Commonality***.  There are questions of law and fact common to the class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise artificially inflate bid/ask spreads on FX spot transactions in violation of the Sherman Act;

(b)     the identity of the participants in the conspiracy;

(c)     the duration of the conspiracy;

(d)     the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)     whether Currenex made material misrepresentations or omissions about its Currenex Platform;

(f)     whether Defendants aided and abetted fraudulent conduct;

(g)     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the class;

(h)     whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the class;

(i)     whether Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;

(j)     the appropriate injunctive and equitable relief for the class;

(k)     whether Defendants were unjustly enriched at the expense of Plaintiffs and the class; and

(l)     the appropriate measure of damages sustained by Plaintiffs and other members of the class.

102.   *Predominance*.  During the relevant period, Plaintiffs entered into agreements with Currenex containing materially similar obligations, and their interests are coincident with and not antagonistic to those of the other members of the class.  Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire class, thereby making a common methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

103.   *Superiority*.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action.  The class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

104.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Conspiracy to Restrain Trade in Violation of Violation of Section 1 of the Sherman Act, against all Defendants)**

105.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

106.    Currenex and each of the Trading Defendants entered into and engaged in a combination and conspiracy in restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*  For the sake of clarity, Plaintiffs allege that the Currenex-HC Tech agreement is an independent antitrust violation, for example, from the Currenex-Goldman agreement.

107.    At least in the period prior to its acquisition by State Street, State Street and Currenex were separate entities, whereby Currenex's agreement with State Street itself represented an illegal, anticompetitive agreement.  To the extent Currenex and State Street rely on their alleged unity of interest after the corporate acquisition to argue they cannot "conspire" together, then for that later period, State Street is liable for the illegal agreements Currenex entered into with the other Trading Defendants.  After acquiring Currenex, State Street deliberately engaged in specific acts in furtherance of Currenex's super-priority scheme.  Among

28

other acts, State Street, with full awareness of Currenex's jump-in-line scheme, dictated and encouraged this conduct by providing significant liquidity to the Currenex platform with the understanding that State Street would receive jump-in-line super-priority along with the other Trading Defendants and furthering the relationship between Currenex and other Trading Defendants through additional acts, including the hiring of a key executive of a Trading Defendant who was responsible for negotiating the jump-in-line privileges of that Defendant.

108.    Each of the jump-in-line agreements as set forth above inflicted severe financial harm on Plaintiffs and class members, and restrained competition in the market for FX trades.

109.    The Trading Defendants were able to avoid competition with other potential liquidity providers because of their respective jump-in-line agreements.  They were direct beneficiaries of what amounts to a bid-rigging scheme, a *per se* violation of the Sherman Act. Whereas the order book was supposed to effectuate a fair and open "auction" among participants for FX trades, in fact the "bids" were rigged with business being steered to Currenex's preferred participants.  Currenex facilitated and implemented this scheme by reaching separate prioritization agreements with each of the Trading Defendants and implementing them on its platform.

110.    The Trading Defendants were each aware that they had been given secret bid-rigging benefits, and that Currenex was reaching agreements with a select few other privileged liquidity providers.  Indeed, they compensated Currenex in exchange for being granted jump-in-line rights, including by way of increased liquidity on the Platform.

111.    Defendants injured Plaintiffs and class members through their respective schemes, resulting in hundreds of millions and potentially billions of dollars in damages.  Instead of competing with each other to provide more competitive prices for FX trades, the Trading

Defendants instead relied heavily on their super-priority privileges, where they could "jump the line" and enjoy fully-executed orders merely by matching prevailing prices rather than providing better ones.

112.   Each scheme alleged herein had and is having the following effects, among others:

(a)   The bid/ask spreads and prices paid by Plaintiffs and class members have been fixed or stabilized at artificially inflated levels;

(b)   Plaintiffs and class members were deprived of entering into market-rate FX spot transactions due to the distortion of priority rights on the Currenex Platform;

(c)   Plaintiffs and class members have been deprived of the benefits of free, open, and unrestricted competition; and

(d)   Competition in establishing bid/ask spreads paid in the United States by FX spot traders has been unlawfully restrained, suppressed, and eliminated.

113.   All these damages were exacerbated by the last look rights provided to super-priority liquidity providers, as discussed above.

114.    By restraining competition among horizontal competitors for the supply of FX spot liquidity, Defendants' schemes constitute a violation of Section 1 of the Sherman Act. Plaintiffs and class members have sustained injury to their businesses or property of the type that the antitrust laws were meant to punish and prevent.

115.   As a direct, material, and proximate result of Defendants' violations of §1 of the Sherman Act, Plaintiffs and members of the class have suffered injury to their businesses and property, within the meaning of §4 of the Clayton Act, throughout the class period.

116.   Plaintiffs and class members are entitled to treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

117.     Plaintiffs and class members are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above, under §16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF
### (Fraud, against Currenex)

118.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

119.     Due to the fundamental understanding that ECNs operate on a FIFO basis, Customers who subscribed to the Currenex Platform reasonably relied upon the expectation of a FIFO-based trading platform.  Within the FX market, FIFO is considered a key industry standard, because most trading platforms execute orders on a FIFO system.  FIFO is considered a normal attribute of a fair and efficient exchange, enabling equal opportunity to traders based on price/spread competition and fast liquidity provision, as opposed to preferences geared towards a specific market maker.  Currenex's silence as to the presence of prioritization agreements constituted fraud by omission.

120.     For similar reasons, when Currenex spoke about any aspect of its Platform *without* disclosing a different matching system, that only further cemented the understanding that the Platform was using FIFO.  Thus, *all* of Currenex's representations to customers about the Currenex Platform, and indeed even the operation of the Currenex Platform itself, were actionably misleading in the absence of clear disclosures that it was using an adulterated FIFO system.

121.     Moreover, as set forth above, Currenex expressly represented on multiple occasions that it would operate the Platform on a FIFO basis.

122.     Currenex's secret practice of granting jump-in-line powers to privileged liquidity providers—which were taking place while the above representations to customers were being

made—rendered Currenex's silence, all of its representations about the Platform, and its express representations false and misleading.

123.    Currenex's representations and omissions were material to traders and buy-side firms and would have impacted their decision to participate on the Currenex Platform.

124.    Plaintiffs and class members reasonably relied upon Currenex's representations and omissions in deciding to subscribe and use the Currenex Platform.

### THIRD CLAIM FOR RELIEF
**(Aiding and Abetting Fraud, against the Trading Defendants)**

125.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

126.    The Trading Defendants knew that the super-priority matching system of the Currenex Platform was a fraud being perpetrated on Plaintiffs and class members.

127.    The Trading Defendants aided and abetted this fraud, providing substantial assistance to the scheme by directing a large amount of their FX business to the Currenex Platform and knowingly participating in and benefitting from the super-priority system.

128.    But for this substantial assistance, the fraudulent scheme would not have been able to be carried out, and Plaintiffs and class members would not have suffered damages described above.

### FOURTH CLAIM FOR RELIEF
**(Breach of Implied Covenant of Good Faith and Fair Dealing, against Currenex)**

129.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

130.    Plaintiffs and class members entered into valid and enforceable agreements with Currenex before trading on the Currenex Platform.

131.    Plaintiffs and class members have fully performed their obligations under these agreements.

132.    Implicit in all contracts governed by New York law is a covenant of good faith and fair dealing in the course of contract performance.  The covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

133.    In breach of this implied covenant, Currenex sought to withhold the benefits of its agreements with Plaintiffs and class members by manipulating its platform to secretly and intentionally harm Plaintiffs and class members in order to benefit a few select users of the Platform and itself.

134.    As direct and proximate result of Currenex's breach of the covenant of good faith and fair dealing, Plaintiffs and class members suffered harm as expounded upon above.

**FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment, against all Defendants)**

135.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

136.    Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs and class members.  As described above, Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiffs and members of the class by conspiring to maintain artificially inflated bid/ask spreads, in conscious or reckless disregard for class members' rights.

137.    Currenex, in its capacity as operator of the Platform, knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiffs and members of the class by receiving

more transaction fees as a result of the super-priority it provided to the other Defendants at the expense of class members.

138.    The Trading Defendants were unjustly enriched at the expense of Plaintiffs and members of the class when they paid these Defendants more than they otherwise would have in the form of bid/ask spreads as a result of Defendants' scheme.

139.    Plaintiffs and class members have no adequate remedy at law for these misappropriated gains.  The Court should issue a constructive trust compelling Defendants to disgorge to Plaintiffs and class members all unlawful or inequitable proceeds Defendants received, and all funds Defendants unjustly retained that should have been paid to Plaintiffs and members of the class.  Plaintiffs and class members are also entitled to rescission of the transactions or rescissory damages.

140.    Plaintiffs and class members seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

## SIXTH CLAIM FOR RELIEF
### (Civil RICO, 18 U.S.C. § 1962(c), against Currenex, State Street, and HC Tech)

141.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

142.    Defendants Currenex, State Street, and HC Tech are corporate entities, and therefore "persons" under 18 U.S.C. § 1961(3) as well as 1 U.S.C. § 1.

143.    *The Enterprises.*  The "ECN Enterprise" consists of the association-in-fact created by the relationships between those who used the Platform to trade FX.  In the alternative, the "Currenex Enterprise" consists of Currenex, whose employees and agents operated the Platform.

144.     Either way the enterprise is defined, its purpose was the same:  to steer non-privileged customers into trading at worse prices, through the grant of secret line-jumping rights to benefit the privileged liquidity providers at the expense of other traders on the platform.

145.     Currenex provided the platform and made false representations to customers that trades would be cleared on a FIFO basis, while arriving at secret agreements with the Trading Defendants to give them super-priority rights in dealing with customers.  Neither enterprise could accomplish its purpose without coordinated activity among Currenex, State Street, and HC Tech.

146.     ***Pattern of Racketeering Activity.***  For many years, the enterprises were engaged in, and continue to be engaged in, activities that affect interstate commerce.  The unlawful enterprises in violation of RICO have been and remain longstanding, continuous, and open-ended.

147.     The RICO defendants, individually and as part of the enterprises, have engaged, and continue to engage, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  The RICO defendants, acting individually and as part of the enterprises, devised the scheme in order to defraud and to obtain money or property by means of false or fraudulent pretenses and representations.  Each Defendant's participation is crucial to the racketeering activity.

148.     Currenex enabled, conducted, and maintained the scheme by knowingly making materially false and misleading statements to customers through the mail or wires, to induce customers to purchase services on the Currenex Platform and to conceal the true nature of the services.  Indeed, as discussed above, in the absence of a clear disclaimer about the presence of

the adulterated FIFO system, all of Currenex's communications with clients were fraudulently misleading.

149.     State Street and HC Tech enabled, conducted, and maintained the scheme by knowingly operating and executing the scheme by negotiating, securing, and exercising their line-jumping powers on the platform at the expense of non-privileged customers.

150.     Currenex, State Street, and HC Tech, individually and as part of the enterprises, have used the mails and wires to be used, or reasonably knew the mails and wires would be used, to knowingly make fraudulent misrepresentations and omissions.  Each use of the mails and wires has furthered the scheme and enabled the RICO defendants to take money and property from non-privileged customers and putative class members through false pretenses and material false statements or omissions.

151.     Senior employees at Currenex, including David Newns (Global Head of Currenex), Russell Sears (Global Head of Sales), and other senior salespeople, such as Cary Rosenwald and Sean Gilman, controlled and managed the enterprises by negotiating and implementing the superiority agreements with Trading Defendants.

152.     State Street, by way of its senior FX trading employees and agents on its behalf, controlled and managed the enterprises by insisting on, negotiating, securing, and exercising jump-the-line powers when it knew or reasonably knew that the mail and wires would be used to knowingly make fraudulent misrepresentations and omissions.

153.     HC Tech, by way of its senior FX trading employees and agents on its behalf including Cary Rosenwald and Sean Gilman, controlled and managed the enterprises by insisting on, negotiating, securing, and exercising jump-the-line powers when it knew or reasonably knew

that the mail and wires would be used to knowingly make fraudulent misrepresentations and omissions.

154.    The RICO defendants have specific knowledge that the mails and wires are being used to advance the overall purpose of executing the scheme to defraud, or it was reasonably foreseeable that the mails and wires would be used because executing their scheme depends on calling or emailing customers, and transmitting and requesting the execution of various trades by the mails and wires.

155.    Each of the thousands of uses of the mails and wires as part of the scheme, spanning a period of no fewer than three years, constitutes a separate instance of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, and thus is a predicate act.  These predicate acts constitute "a pattern of racketeering activity" under 18 U.S.C. §§ 1961 and 1962.

156.    As part of this scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq.  The acts of racketeering are an ongoing part of the RICO defendants' regular way of doing business.  This scheme is ongoing, and the RICO defendants each benefit from the continued operation of the scheme.

157.    ***Relationship of Pattern of Racketeering Activity to the Enterprises.***  Under either definition, the goal of the enterprises is to fraudulently force non-privileged customers to execute FX trades at worse prices, due to privileged liquidity providers having super-priority rights.

158.    This pattern of racketeering activity described above is integral to the scheme. Without engaging in mail and wire fraud, the RICO defendants would have been unable to procure the trades (or in the case of Currenex, commissions and fees) that they seek.

159.     Each RICO defendant, individually and as a member of the enterprise, conducted or participated in the racketeering activity described above, thus violating 18 U.S.C. § 1962(c).

160.     As a direct and proximate result of the RICO violations described in this complaint, Plaintiffs and class members have suffered substantial and concrete injury because they were caused to unknowingly trade on the Currenex Platform at worse prices, or suffer reduced volumes at desired prices.  These harms constitute injuries to Plaintiffs' property under 18 U.S.C. § 1964.

161.     The RICO defendants' conduct has involved and continues to pose a threat of long-term illegality since it is believed to have commenced many years ago and has actively continued to the present.  The pattern of racketeering activity has been directed towards thousands of persons, including Plaintiffs, and the pattern has spanned many years.  Because of the aforementioned violations of 18 U.S.C. § l962(c), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## SEVENTH CLAIM FOR RELIEF
### (Civil RICO, 18 U.S.C. § 1962(d), against Currenex, State Street, and HC Tech)

162.     In violation of 18 U.S.C. § 1962(d), Currenex, State Street, and HC Tech conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of an enterprise through the pattern of racketeering activity described above.  The volume and frequency of the fraudulent activity, and the continuance of the scheme for over many years and continuing to this day, could not have occurred without the consent and knowing collusion of the RICO defendants.

163.     As part of, and to advance, their conspiracy, the RICO defendants agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity.  As part of and to

advance their conspiracy, each RICO Defendant agreed to and did commit at least two predicate acts of racketeering.

164.    Plaintiffs' and class members' property interests have been injured by, and as a direct and proximate result of the violations of 18 U.S.C. § 1962(d).  Because of the violations of 18 U.S.C. § 1962(d), Plaintiffs and class members are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

## PRAYER FOR RELIEF

165.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed class, respectfully request that the Court:

(a)    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Plaintiffs as the representatives of the class;

(b)    Adjudge and decree that the unlawful conduct alleged herein violates Sections 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

(c)    Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26;

(d)    Award Plaintiffs and class members damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

(e)    Award Plaintiffs and class members treble damages, pursuant to RICO, 18 U.S.C. § 1964;

(f)     Award Plaintiffs and class members damages against Defendants for their fraudulent misrepresentation, fraudulent omission, and breach of the duty of good faith and fair dealing;

(g)     Award reasonable attorneys' fees and costs;

(h)     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

(i)     Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and class members;

(j)     Direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

DATED:  New York, New York
        August 4, 2021

RUDDY GREGORY, PLLC

By: */s/ Mark Ruddy*____
Mark Ruddy
1225 15th Street NW
Washington, DC 20005
Telephone: (202) 797-0762
Fax: (202) 318-0543
mruddy@ruddylaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Daniel L. Brockett*____
Daniel L. Brockett
Steig D. Olson
Christopher M. Seck
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
christopherseck@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*
forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Counsel for Plaintiffs and the Proposed Class*