# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EDMAR FINANCIAL COMPANY, LLC, and
IRISH BLUE & GOLD, INC.

        Plaintiffs,

    v.

CURRENEX, INC., GOLDMAN SACHS & CO.
LLC, HC TECHNOLOGIES, LLC, STATE
STREET BANK AND TRUST COMPANY, and
JOHN DOE DEFENDANTS 1-5,

        Defendants.

Case No. 1:21-cv-06598 (LAK)


**MEMORANDUM OF DEFENDANTS CURRENEX, INC., GOLDMAN SACHS & CO. LLC, HC TECHNOLOGIES, LLC, AND STATE STREET BANK AND TRUST COMPANY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS ALL CLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 5

    A.  FX Trading and the Currenex Platform.......................................... 5

    B.  Defendants...................................................................................... 6

    C.  Plaintiffs ........................................................................................ 7

    D.  The Alleged "Scheme"................................................................... 7

    E.  Currenex's Disclosures................................................................. 9

LEGAL STANDARD ....................................................................................... 10

ARGUMENT ................................................................................................... 10

I.     PLAINTIFFS FAIL TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 1
      OF THE SHERMAN ACT (FIRST CLAIM FOR RELIEF, COMPL. ¶¶ 105–117).......... 10

    A.  Plaintiffs Fail To Plead The Existence Of Any Horizontal Bid-Rigging Scheme
       That Would Constitute A *Per Se* Violation................................. 10

    B.  Plaintiffs Fail To Adequately Plead An Actionable Claim Based On The
       Alleged Vertical Agreements ....................................................... 13

    C.  Plaintiffs Fail To Plead Antitrust Injury..................................... 16

    D.  Plaintiffs' Sherman Act Claim Against Defendant State Street Must Be
       Dismissed As A Matter Of Law ................................................... 18

II.    THE FRAUD CLAIM AGAINST CURRENEX SHOULD BE DISMISSED
      (SECOND CLAIM FOR RELIEF, COMPL. ¶¶ 118–124) ................................. 19

    A.  Plaintiffs Fail To Plead Any Fraudulent Misrepresentations ....................................... 19

       1.  The Complaint Does Not Adequately Allege That Currenex
          Made False Or Misleading Statements ................................. 20

       2.  Plaintiffs Do Not Plead Actual Reliance, Let Alone
          Justifiable Reliance .............................................................. 21

    B.  Plaintiffs Also Fail To Plead Fraud-By-Omission ......................................... 22

       1.  Currenex Had No Duty To Speak ....................................... 22

       2.  The Complaint Fails To Specifically Identify Any Alleged
          Omission, Let Alone Material Omissions ........................... 25

       3.  Plaintiffs Cannot Plead Justifiable Reliance ...................... 26

    C.  Plaintiffs Fail To Plead Direct "Out Of Pocket" Injury ............................................. 27

III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING
      FRAUD AGAINST THE TRADING DEFENDANTS (THIRD CLAIM FOR
      RELIEF, COMPL. ¶¶ 125–128) ......................................................... 28

i

IV.   THE IMPLIED COVENANT CLAIM AGAINST CURRENEX SHOULD BE
      DISMISSED (FOURTH CLAIM FOR RELIEF, COMPL. ¶¶ 129–134) ........................... 30

V.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM AGAINST ALL DEFENDANTS
      IS ALSO DEFICIENT (FIFTH CLAIM FOR RELIEF, COMPL. ¶¶ 135–140) ............... 31

VI.   THE CIVIL RICO CLAIMS AGAINST CURRENEX, STATE STREET, AND HC
      TECH SHOULD BE DISMISSED (SIXTH AND SEVENTH CLAIMS FOR
      RELIEF, COMPL. ¶¶ 141–164) ......................................................................................... 34

      A.   Plaintiffs Fail To Plead The Elements Of RICO Claim Pursuant to 18 U.S.C. §
           1962(c) ............................................................................................................................. 35

           1.   The Complaint Fails To Allege An Actionable RICO
                "Enterprise" ......................................................................................................... 35

                a.   The Allegations Do Not Establish An "Association-In-
                     Fact" Enterprise ......................................................................................... 35

                b.   The Complaint Does Not Plead A "Currenex
                     Enterprise" ................................................................................................... 38

           2.   Plaintiffs Do Not Allege A "Pattern" Of Mail Or Wire
                Fraud ..................................................................................................................... 39

      B.   Plaintiffs Do Not Adequately Allege A RICO Conspiracy Under § 1962(d) ............. 41

VII.  PLAINTIFFS' CLAIMS ARE TIME-BARRED .......................................................... 43

      A.   Plaintiffs Were On Notice Of Their Purported Claims No Later Than April
           2015 ................................................................................................................................. 43

      B.   Each Of Plaintiffs' Claims Is Time-Barred ................................................................ 44

      C.   Plaintiffs' Invocation Of Equitable Tolling Fails To Save Their Claims .................... 47

CONCLUSION ........................................................................................................................... 48

## **TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*,
    731 F.2d 112 (2d Cir. 1984)...................................................................................24

*Abbott Lab'ys v. Adelphia Supply USA*,
    2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) .............................................................37

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997).................................................................31, 32

*Alaska Dep't of Revenue, Treasury Div. v. Manku*,
    2021 WL 3027170 (2d Cir. July 19, 2021)..........................................................16

*Albunio v. Int'l Safety Grp., Inc.*,
    2016 WL 1267795 (S.D.N.Y. Mar. 30, 2016) ......................................................40

*In re Aluminum Warehousing Antitrust Litig.*,
    2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014).....................................................34

*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*,
    2007 WL 1732427 (S.D.N.Y. June 14, 2007) ......................................................22

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)..................................................................34

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*,
    820 F. Supp. 2d 510 (S.D.N.Y. 2011)..................................................................28

*Apt v. Morgan Stanley DW, Inc.*,
    981 N.Y.S.2d 680 (1st Dep't 2014) .....................................................................45

*Arena Riparian LLC v. CSDS Aircraft Sales and Leasing Co.*,
    127 N.Y.S.3d 71 (1st Dep't 2020) .......................................................................28

*Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*,
    933 N.Y.S.2d 202 (1st Dep't 2011) .....................................................................32

*Armstrong v. McAlpin*,
    699 F.2d 79 (2d Cir. 1983)...................................................................................48

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009)..................................................................10

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018)..................................................................28

*In re Bank of New York Mellon Corp. Forex Transactions Litig.*,
   921 F. Supp. 2d 56 (S.D.N.Y. 2013)..............................................................30, 31

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   995 F. Supp. 2d 291 (S.D.N.Y. 2014)............................................................22, 44

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955 (2007).....................................................10, 11, 12

*Boyle v. U.S*,
   556 U.S. 938, 129 S. Ct. 2237 (2009)............................................................35, 37

*Bruno v. Zimmer, Inc.*,
   2017 WL 8793242 (E.D.N.Y. Aug. 11, 2017)....................................................25

*Butala v. Agashiwala*,
   916 F. Supp. 314 (S.D.N.Y. 1996) ....................................................................47

*Cedar Swamp Holdings, Inc. v. Zaman*,
   487 F. Supp. 2d 444 (S.D.N.Y. 2007)................................................................37

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158, 121 S. Ct. 2087 (2001)................................................................39

*City of New York v. Chavez*,
   944 F. Supp. 2d 260 (S.D.N.Y. 2013)................................................................38

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
   277 F. Supp. 3d 483 (S.D.N.Y. 2017)................................................................31

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co.*,
   785 F. Supp. 411 (S.D.N.Y. 1992) ....................................................................27

*Confido Advisors, LLC v. USAA Real Est. Co.*,
   2019 WL 4747705 (S.D.N.Y. Sept. 30, 2019)....................................................25

*Cont. Transp. Servs., Inc. v. New Era Lending LLC*,
   2018 WL 11226077 (S.D.N.Y. Oct. 26, 2018) ...................................................41

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752, 104 S. Ct. 2731 (1984)................................................................18

*Dennis v. JPMorgan Chase Co.*
   343 F. Supp. 3d 122, 185 (S.D.N.Y. 2018)........................................................38

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*,
   810 F.3d 861 (2d Cir. 2015)................................................................................47

*DuBuisson v. Nat'l Union Fire Ins. of Pittsburgh, P.A.*,
   2021 WL 3141672 (S.D.N.Y. July 26, 2021) ........................................................47

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)...............................................................................13

*Elsevier Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010)...............................................................42

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   2020 WL 5518146 (S.D.N.Y. Sept. 14, 2020)...................................................27

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
   368 F. Supp. 3d 681 (S.D.N.Y. 2019).............................................................48

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)............................................................................39

*First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*,
   52 F. Supp. 3d 625 (S.D.N.Y. 2014)....................................................22, 23, 24

*First Nationwide Bank v. Gelt Funding, Corp.*,
   820 F. Supp. 89 (S.D.N.Y. 1993) ....................................................................37

*In re Fyre Festival Litig.*,
   399 F. Supp. 3d 203 (S.D.N.Y. 2019)..............................................................32

*Ga. Malone & Co. v. Rieder*,
   973 N.E.2d 743 (N.Y. 2012).............................................................................34

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011).............................................................................10

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004).............................................................................15

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
   2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)..........................................36, 37, 38

*H.J. Inc., et al. v. Northwestern Bell Tel. Co.*,
   492 U.S. 229, 109 S. Ct. 2893 (1989)..............................................................40

*Halvorssen v. Simpson*,
   807 F. App'x 26 (2d Cir. 2020) ........................................................................41

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018)........................................................................16, 17

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
   230 F.3d 549 (2d Cir. 2000)......................................................................................19

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
   2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ........................................................31

*Hinds Cnty. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009)......................................................................46

*ICD Cap., LLC v. CodeSmart Holdings, Inc.*,
   2020 WL 815733 (S.D.N.Y. Feb. 19, 2020).............................................................29

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
   907 N.E.2d 268 (N.Y. 2009)...............................................................................31, 32

*Ingrami v. Rovner*,
   847 N.Y.S.2d 132 (2d Dep't 2007)...........................................................................46

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)......................................................................34

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
   822 F. Supp. 2d 368 (S.D.N.Y. 2011)......................................................................26

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
   713 F. Supp. 2d 286 (S.D.N.Y. 2010)......................................................................12

*Kaye v. Grossman*,
   202 F.3d 611 (2d Cir. 2000).....................................................................................33

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179, 117 S. Ct. 1984 (1997).......................................................................46

*Knoll v. Schectman*,
   275 F. App'x 50 (2d Cir. 2008) ................................................................................41

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012).....................................................................................45

*Kottler v. Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009)......................................................................45

*Kraft v. Third Coast Mistream*,
   2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) .............................................................20

*Krys v. Pigott*,
   749 F.3d 117 (2d Cir. 2014).....................................................................................29

*Lama Holding Co. v. Smith Barney Inc.*,
    668 N.E.2d 1370 (N.Y. 1996) ........................................................................................27

*Laro, Inc. v. Chase Manhattan Bank*,
    60 F.3d 810 (2d Cir. 1995) ...........................................................................................40

*Laro, Inc. v. Chase Manhattan Bank*,
    866 F. Supp. 132 (S.D.N.Y. 1994) ...............................................................................40

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .............................................................33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877, 127 S. Ct. 2705 (2007) ..........................................................................15

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir.2005)...........................................................................................27

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)..........................................................................................29

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ..............................................................46

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014).............................................................................18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    2021 WL 4142698 (2d Cir. Sept. 13, 2021) ................................................................24

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
    711 F.3d 106 (2d Cir. 2013)..........................................................................................39

*Mandarin Trading Ltd. v. Wildenstein*,
    944 N.E.2d 1104 (N.Y. 2011) .................................................................................19, 33

*MarketShare Corp. v. Transactis, Inc.*,
    2021 WL 1948283 (S.D.N.Y. May 12, 2021) ..............................................................46

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).....................................................................................11, 13

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992)..........................................................................................19

*Moore v. PaineWebber, Inc.*,
    189 F.3d 165 (2d Cir. 1999)..........................................................................................39

*Morin v. Trupin,*
    711 F. Supp. 97 (S.D.N.Y. 1989) .......................................................................29, 40

*Muller-Paisner v. TIAA,*
    289 F. App'x 461 (2d Cir. 2008) ..............................................................................26

*Murray Eng'g P.C. v. Remke,*
    2018 WL 3773991 (S.D.N.Y. Aug. 9, 2018) ...........................................................32

*Myun-Uk Choi v. Tower Rsch. Cap. LLC,*
    165 F. Supp. 3d 42 (S.D.N.Y. 2016).........................................................................33

*N. Y. Auto. Ins. Plan v. All Purpose Agency and Brokerage, Inc.,*
    1998 WL 695869 (S.D.N.Y. Oct. 6, 1998) ..............................................................37

*Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.,*
    165 F. Supp. 2d 514 (S.D.N.Y. 2001)..................................................................40, 42

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.,*
    420 F. Supp. 2d 253 (S.D.N.Y. 2006).......................................................................42

*Onel v. Top Ships, Inc.,*
    806 F. App'x 64 (2d Cir. 2020) ................................................................................48

*In re Optimal U.S. Litig.,*
    813 F. Supp. 2d 351 (S.D.N.Y. 2011).......................................................................30

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n,*
    2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) .........................................................31

*Planetarium Travel, Inc. v. Altour Int'l, Inc.,*
    97 F. Supp. 3d 424 (S.D.N.Y. 2015).........................................................................15

*In re Platinum-Beechwood Litig.,*
    377 F. Supp. 3d 414 (S.D.N.Y. 2019).......................................................................32

*In re Platinum-Beechwood Litig.,*
    427 F. Supp. 3d 395 (S.D.N.Y. 2019).......................................................................42

*Prestandrea v. Stein,*
    692 N.Y.S.2d 689 (2d Dep't 1999)...........................................................................45

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*
    30 F.3d 339 (2d Cir. 1994)........................................................................................39

*Roberts v. Weight Watchers Int'l, Inc.,*
    217 F. Supp. 3d 742 (S.D.N.Y. 2016).......................................................................31

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)......................................................................................5

*Ruotolo v. Fannie Mae*,
  933 F. Supp. 2d 512 (S.D.N.Y. 2013).....................................................................11

*Ruzhinskaya v. Healthport Techs., LLC*,
  311 F.R.D. 87 (S.D.N.Y. 2015) ..............................................................................46

*Salinas v. United States*,
  522 U.S. 52, 118 S. Ct. 469 (1997).........................................................................41

*Seagrape Invs. LLC v. Tuzman*,
  2020 WL 5751232 (S.D.N.Y. Sept. 25, 2020).........................................................27

*Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*,
  222 F.3d 63 (2d Cir. 2000)......................................................................................21

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016)......................................................................46

*Solutia Inc. v. FMC Corp.*,
  456 F. Supp. 2d 429 (S.D.N.Y. 2006)......................................................................23

*Spool v. World Child Int'l Adoption Agency*,
  520 F.3d 178 (2d Cir. 2008)....................................................................................41

*In re SSA Bonds Antitrust Litig.*,
  2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018).........................................................16

*Sullivan v. Barclays PLC*,
  2017 WL 685570 (S.D.N.Y. Feb. 21, 2017).......................................................40, 41

*Terra Sec. Asa Konkursbo v. Citigroup, Inc.*,
  740 F. Supp. 2d 441 (S.D.N.Y. 2010)......................................................................26

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)......................................................................................18

*Town of W. Hartford v. Operation Rescue*,
  915 F.2d 92 (2d Cir. 1990)......................................................................................35

*U1IT4less, Inc. v. Fedex Corp.*,
  871 F.3d 199 (2d Cir. 2017)....................................................................................39

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)..................................................................11, 12, 15, 18

*United States v. Shellef,*
   507 F.3d 82 (2d Cir. 2007)..................................................................39

*Vedder Software Grp. Ltd. v. Ins. Servs. Off., Inc.,*
   545 F. App'x 30 (2d Cir. 2013) ........................................................14

*Walker v. Jastremski,*
   430 F.3d 560 (2d Cir. 2005)..............................................................47

*Warren v. John Wiley & Sons, Inc.,*
   952 F. Supp. 2d 610 (S.D.N.Y. 2013)...............................................25

*Weaver v. Chrysler Corp.,*
   172 F.R.D. 96 (S.D.N.Y. 1997) .........................................................25

*Weshnak v. Bank of Am., N.A.,*
   451 F. App'x 61 (2d Cir. 2012) .........................................................29

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.,*
   328 F. App'x 695 (2d Cir. 2009) .......................................................45

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.,*
   530 F. Supp. 2d 486 (S.D.N.Y. 2007)...............................................34

*Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.,*
   2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) ...................................41

## Statutes

15 U.S.C. § 15b ............................................................................................45

18 U.S.C. § 1962(c) ........................................................................34, 35, 45

18 U.S.C. § 1962(d) ........................................................................34, 41, 45

## Other Authorities

N.Y. C.P.L.R. 213(8) ...................................................................................44

N.Y. C.P.L.R. 213(2) ...................................................................................46

Fed. R. Civ. P. 9(b) ............................................................................. *passim*

Defendants Currenex, Inc. ("Currenex"), Goldman Sachs & Co. LLC ("Goldman" or "Goldman Sachs"), HC Technologies, LLC ("HC Tech"), and State Street Bank and Trust Company ("State Street," and, collectively with Goldman Sachs and HC Tech, the "Trading Defendants") respectfully submit this memorandum in support of their joint motion to dismiss, with prejudice, the Complaint, filed against them by Plaintiffs Edmar Financial Company, LLC ("Edmar Financial") and Irish Blue & Gold, Inc. ("Irish Blue & Gold, Inc.," and, together with Edmar Financial, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs assert a grab bag of federal statutory and state common-law claims based on the trading mechanics of Currenex, an electronic foreign exchange (FX) trading platform. Plaintiffs generically claim that, at unspecified times during a 16-year period, certain liquidity providers, including the Trading Defendants, each entered into an agreement with Currenex giving them the ability to execute trades with other Currenex participants as long as they matched the best price available on the platform, even if their quote was submitted slightly later in time. In substance, Plaintiffs allege, in the most superficial terms, separate vertical agreements between a platform operator (Currenex) and its suppliers (the Trading Defendants), while also explicitly conceding that each party had an independent and differing economic motive to enter these alleged "priority" agreements: Currenex, to attract liquidity to its platform so it could provide competitive pricing to customers; and the Trading Defendants to compete for FX trades. *See, e.g.*, Compl. ¶ 65. For the reasons set forth below, each of Plaintiffs' claims fail.

*First,* Plaintiffs invoke the specter of "bid-rigging," a "*per se*" antitrust violation. But *per se* bid-rigging requires a horizontal agreement between competitors and no such agreement is alleged to exist among the Trading Defendants. Indeed, apart from a benign reference to meals in

Chicago and New York between mostly unnamed representatives of Currenex and one or more Trading Defendant at some unspecified point in the 16-year class period that supposedly began in 2005, and noting that certain individuals worked for one or more defendants since 2005, nothing in the Complaint suggests any communications among the Trading Defendants at all, let alone any motive one of the Trading Defendants would have had to enter such an agreement.

Nor can Plaintiffs fall back on a "rule of reason" claim by invoking the individual agreements that Currenex has with the Trading Defendants, three of the many liquidity providers on the platform. The Complaint does not contain any particularized facts—including answers to the basic who, when, and where questions—that plausibly support the existence of the alleged vertical agreements, much less any facts that would make such agreements unreasonable or actionable. Finally, Plaintiffs also do not plausibly plead any injury as a result of the alleged agreements. Indeed, Plaintiffs themselves concede that "liquidity begets liquidity," Compl. ¶ 64, and the liquidity Currenex allegedly obtained through its agreements with each of the Trading Defendants would have benefitted those (like Plaintiffs) who traded on the Currenex platform. As a result, Plaintiffs have not identified, and cannot identify, a single "price fixed" FX transaction that they entered into on the platform, much less a trade in which they were harmed by any Trading Defendant. Accordingly, Plaintiffs do not satisfy the pleading requirements for antitrust standing under the well-settled law of this Circuit. *See infra* Section I.

*Second*, Plaintiffs do not adequately plead a common law fraud claim. The Complaint does not identify any affirmative statement by Currenex that the platform was employing a "true" (or strict) FIFO order book, and Currenex's own referenced disclosures are inconsistent with such a suggestion. It also fails to allege that either Plaintiff actually received any alleged misstatement, let alone that they reasonably relied on such statement in deciding to trade on the platform. Nor do

Plaintiffs plead an actionable fraud-by-omission claim, because Currenex had no duty to disclose the allegedly concealed facts, and Plaintiffs do not identify any specific representation from which Currenex omitted the allegedly concealed facts, or any trades they made in reliance on the alleged omissions. Finally, the Complaint does not plead loss causation. *See infra* Section II.

*Third*, the aiding and abetting claim against the Trading Defendants fails, not only because of the defects in the primary fraud claim, but also because Plaintiffs cannot, and do not, plead that the Trading Defendants knew about the alleged fraud or "substantially assisted" it. There is no allegation that the Trading Defendants had anything to do with any Currenex disclosure or other statements concerning the platform. Nor does simply transacting on the platform—which, as Plaintiffs note, facilitates billions of dollars of FX transactions daily—constitute substantial assistance or provide a basis for imputing knowledge to the Trading Defendants of communications between Currenex and third parties. *See infra* Section III.

*Fourth*, Plaintiffs' claim against Currenex for breach of the implied covenant of good faith and fair dealing does not state an actionable claim because the allegations establish that Plaintiffs received the benefit of the bargain for which they negotiated as sophisticated trading entities. *See infra* Section IV.

*Fifth*, Plaintiffs' unjust enrichment claim against all Defendants, a quasi-contract theory of recovery, also fails, because allegations in the Complaint confirm the existence of enforceable contracts between Currenex and each Plaintiff covering the subject matter of this dispute. The claim also fails because of Plaintiffs' failure to plead any underlying conduct that would render Defendants' purported enrichment unjust. *See infra* Section V.

*Sixth*, the Complaint fails to adequately plead the elements of the two civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claims. The pleadings fail to allege an

"association-in-fact" enterprise, because (i) they fail to allege a common purpose, and (ii) they merely allege a quintessential "hub-and-spoke" structure that courts routinely find inadequate. The alternatively-alleged "Currenex Enterprise" fails under black letter law holding that a single entity cannot be both the defendant and the enterprise. Plaintiffs also do not plead any mail or wire fraud, let alone the required multiple acts of mail or wire fraud by each of the RICO defendants sufficient to establish a "pattern of racketeering activity." Because Plaintiffs' underlying substantive RICO claim fails, so, too, does their RICO conspiracy claim. *See infra* Section VI.

Finally, even if Plaintiffs' claims were to survive the many defects outlined above—and they cannot—all of Plaintiffs' claims fail for the independent reason that they are time-barred because (i) there is no alleged misstatement within the six years before the Complaint was filed or any allegation of "discovery" within the preceding two years, (ii) the alleged underlying wrong— at best, nothing more than a departure from what Plaintiffs describe as how "most" electronic FX platforms "typically" order trades—was disclosed in the April 2015 disclosure cited in the Complaint, and (iii) there is no allegation that Plaintiffs traded on the platform in the four years before the Complaint was filed. *See infra* Section VII.

# BACKGROUND[1]

Plaintiffs claim that their case is "about a long-running scheme to rig auctions for [FX] transactions." Compl. ¶ 1. According to Plaintiffs, Currenex's platform did not use a "true FIFO order book," but instead provided the Trading Defendants with so-called "jump in line" and "last look" privileges that gave them competitive advantages over other platform participants. *Id.* ¶¶ 5, 10. Although the Complaint is bereft of any transaction information at all, Plaintiffs claim the "adulterated" FIFO order book harmed them and other platform participants because they transacted at "artificial" prices, "lost [the] opportunity to be price-makers," and "lost informational advantages." *Id.* ¶¶ 7–9.

## A.      FX Trading and the Currenex Platform

FX transactions involve "an exchange of one country's currency for another." *Id.* ¶ 30. Currencies trade in pairs, the most common of which are the Euro/U.S. dollar, U.S. dollar/Japanese Yen, and British pound/U.S. dollar. *Id.* ¶ 31. FX spot transactions are typically traded over-the-counter, meaning a customer executes the trade with a dealer. *Id.* ¶ 33.

The trading at issue here took place on Currenex's Electronic Communication Network ("ECN"), specifically its "Executable Streaming Prices Trading Model" (the "Platform"), an electronic platform "where banks, corporations, hedge funds, investors, and other traders engage in FX transactions." *Id.* ¶ 1. To trade on the Platform, market participants can submit a "bid" (a price at which they are willing to buy) or an "ask" (a price at which they are willing to sell). *Id.*

---

[1]      Unless indicated otherwise, all internal quotation marks and citations are omitted and all emphasis is added.  Citations to "Ex." are to the exhibits attached to the Declaration of Gregg L. Weiner, filed herewith. This background statement is based on the Complaint's allegations and the materials cited therein, which can be considered on a motion to dismiss. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (courts may consider "any statements or documents incorporated" into the complaint "and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit").

Other market participants can consummate a trade by accepting these posted offers to buy or sell (*i.e.*, bids or asks). *Id.* In any given transaction, Platform participants can choose to provide or take liquidity. *Id.* ¶ 38. A Platform participant can provide liquidity by posting a "limit order" to buy or sell at a certain price. *Id.* ¶ 39. Limit orders allegedly remain on the Platform's order book until they are executed or cancelled. *Id.* Participants can take liquidity by entering "market orders," which are matched with posted limit orders. *Id.*

According to Plaintiffs, trading platforms typically use a "price/time priority" or "first in, first out" ("FIFO") system to match limit orders with market orders. *Id.* ¶ 41. As such, outstanding limit orders are organized by price, with the best-priced orders placed at the front of the queue (also called the top of book "quotes"). *Id.* ¶ 42. If two or more limit orders have the same price, the order that was submitted first is matched first. *Id.* If the market order is larger than the top-of-book limit order, the remaining quantity is matched with the next-best limit order(s) (at the same price, if there are multiple orders posted at that price level, or at the next-best price, if there are not) until the entire market order is filled. *Id.* FX trading on the Platform is anonymous, so parties do not know the identity of their trading counterparties or who they are bidding against. *Id.* ¶¶ 22, 39.

### B.    Defendants

Currenex operates the Platform. *Id.* ¶ 1. Currenex has been a wholly owned subsidiary of State Street since its acquisition in 2007. *Id.* ¶¶ 24, 28. State Street continued trading FX on Currenex after the acquisition. *Id.*

State Street, Goldman Sachs, and HC Tech traded FX on the Platform as liquidity providers. *Id.* ¶¶ 25–27. Plaintiffs also bring claims against other unnamed John Doe Defendants who also traded and provided liquidity on the Platform. *Id.* ¶¶ 5, 29.

### C.      Plaintiffs

Plaintiffs Edmar Financial and Irish Blue & Gold each entered into a contract with Currenex entitled "Agreement For Currenex Services" on July 9, 2010 and May 30, 2014, respectively (individually, the "Agreement" and together, the "Agreements"). *Id.* ¶¶ 20, 21. While not identical, the Agreements set forth in detail the Platform services Plaintiffs agreed to use to conduct transactions, the terms and conditions they agreed to follow, and the fees they agreed to pay Currenex for such services. *See generally*, Exs. A-B.

The Agreements expressly disclaimed all implied warranties, which include the implied covenant of good faith and fair dealing. Both Agreements provide, in relevant part, that:

> Currenex makes no warranties and the client receives no warranties, whether express, implied or statutory, regarding or relating to the services and the subject matter hereof and Currenex hereby specifically disclaims, overrides and excludes, to the fullest extent permitted by law, all implied warranties of merchantability, satisfactory quality, fitness for a particular purpose and all other warranties, conditions, other contractual terms, representations, indemnities and guarantees with respect to the services, whether express, implied or statutory, arising by law, custom, prior oral or written statements by Currenex or any of its agents or affiliates or otherwise (including but not limited to, as to title, satisfactory quality, accuracy, completeness, uninterrupted use, non-infringement, timeliness, truthfulness, sequence and any implied warranties, conditions and other contractual terms arising from transaction usage, course of dealing or course of performance).

Ex. A § 15(a); Ex. B § 15(a).

In 2016, Edmar Financial Services filed for articles of cancelation in Virginia, only to file for reinstatement in 2021 shortly before this suit was filed. *See* Exs. E-F.

### D.      The Alleged "Scheme"

Plaintiffs contend that the Defendants conspired to rig the Platform by exercising certain order-matching priority rights, resulting in a platform that "was not a true FIFO-based order book." Compl. ¶¶ 54–55. They allege that Currenex granted the Trading Defendants so-called "jump in

line" rights, allowing the Trading Defendants' orders to match another participant's quote even if the Trading Defendant's order was not the first one entered. *Id.* They further allege that Currenex granted the Trading Defendants "last look" rights, allowing the Trading Defendants to reject or cancel a matched trade before it was executed. *Id.* ¶¶ 10, 77. Plaintiffs acknowledge that the existence of last look rights was widely publicized by Currenex in 2015. *Id.* ¶ 11.

According to Plaintiffs, Currenex granted these order-matching priority rights to attract users and liquidity to the Platform. *Id.* ¶¶ 6, 64. The Trading Defendants, in turn, were supposedly motivated to exercise their priority rights to transact on more favorable terms. *Id.* ¶ 65. Plaintiffs allege that Currenex granted these rights under separate (but unidentified) agreements with each Trading Defendant. *Id.* ¶¶ 25–27; *see also id.* ¶ 106.[2] They do not assert any well-pleaded factual allegations to support a reasonable inference that any Trading Defendant was aware of any other Trading Defendant's agreement with Currenex. Nor do they allege any agreements, coordination, or communication between the Trading Defendants.

Plaintiffs allege they were harmed by paying "artificially high prices (when buying)" and receiving "artificially low prices (when selling)" on the Platform. *Id.* ¶ 75. But they fail to explain why they traded on a Platform that allegedly provided them with inferior prices when the Complaint alleges the existence of other alternate platforms, "most" of which are alleged to "typically" employ Plaintiffs' preferred trading approach. *Id.* ¶¶ 41, 53, 119. Plaintiffs then speculate, without any factual basis, that they "could have provided liquidity," but that the Trading Defendants prevented them from "provid[ing] liquidity and earn[ing] more profits from their trades." *Id.* ¶ 76. Plaintiffs do not identify when they learned about the so-called FIFO

---

[2]     Paragraph 106 notes, "[f]or the sake of clarity" and as an example, that the Currenex-HC Tech agreement and Currenex-Goldman Sachs agreement are separate antitrust violations. *Id.* ¶ 106.

"adulterations," instead asserting that unspecified former insiders "recently" revealed unspecified information to "Plaintiffs' counsel." *Id.* ¶ 92.

### E.   Currenex's Disclosures

Plaintiffs briefly cite two alleged statements by Currenex that the Platform operated on a "true" FIFO basis—one from 2011 and another from April 2015. *Id.* ¶¶ 48–50. Plaintiffs do not allege that they ever received either of the documents they cite. The first is an 8-page 2011 product profile, entitled "Currenex For Active Traders," (the "2011 Product Profile"), *id.* ¶ 48, which contains a section explaining that the Platform was capable of providing a "[l]ow-latency order matching engine with 'first in, first out' (FIFO) prioritizing." Ex. C at 2. The 2011 Product Profile, which stated that it did not "purport to be comprehensive," *id.* at 8, also explained that the Platform was highly customizable and allowed customers to match with their "chosen counterparties" and deploy orders "based on parameters [they] define." *Id.* at 4, 6. It also expressly stated that potential customers "should not place any reliance" on the information therein. *Id.* at 8.

The second is a 16-page disclosure entitled "Description of Services and Conflicts of Interest," purportedly "released" on April 1, 2015 (the "2015 Conflict Disclosure"), Compl. ¶ 49, which contains a sentence stating that in the Platform's central limit order book, "matching priority with respect to an acceptance of any price quote is based on price and, if prices are identical, then on a 'first in, first out' basis." Ex. D at 10. The immediate following section, entitled "Do You Make Available 'Last Look' Functionality To Sell-Side Subscribers?," states, in part:

> ***Yes. We make available to sell-side subscribers a "last look" functionality***. This functionality is available to sell-side subscribers in all direct trading models (e.g., Request for Quote and Executable Streaming Prices). ***The term "last look" refers to functionality whereby a sell-side subscriber is provided the opportunity, after a buy-side subscriber has accepted a price quote, to confirm that it remains willing to execute a transaction at that quoted rate.*** The sell-side subscriber generally has no more than eight seconds, or such other shorter period of time determined from time to time by

> us with respect to a particular trading model, to either confirm or reject the acceptance of the foreign exchange transaction at the quoted rate. If the sell-side subscriber rejects or does not otherwise confirm acceptance of the transaction within this period, the electronic trading platform will not execute a transaction between the two subscribers.

*Id.*

## LEGAL STANDARD

"To survive a motion to dismiss," a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. Although a court should assume the truth of factual allegations that are "well-pleaded," it should not accept as true any "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678–79, 129 S. Ct. at 1949–50. Complaints containing "conclusory, vague, or general allegations," supported by only "speculation and conjecture," "cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368–69 (2d Cir. 2011).

## ARGUMENT

I.  **PLAINTIFFS FAIL TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT (FIRST CLAIM FOR RELIEF, COMPL. ¶¶ 105–117)**

   A.  **Plaintiffs Fail To Plead The Existence Of Any Horizontal Bid-Rigging Scheme That Would Constitute A *Per Se* Violation**

Plaintiffs label the alleged agreements between Currenex and each of the Trading Defendants "a bid-rigging scheme" to dress up their claim as "a *per se* violation of the antitrust laws" and avoid having to plead particularized facts that plausibly allege an illegal restraint of trade or actual effect on competition in a properly defined market. Compl. ¶ 73; *see also id.* ¶ 1

("This case is about a long-running scheme to rig auctions for foreign exchange ('FX') transactions."). But after *Twombly*, "labels and conclusions," 550 U.S. at 555, 127 S. Ct. at 1965, that certain conduct "amounts to a bid-rigging scheme," Compl. ¶ 109, and other similar "legal conclusions couched as factual allegations," are insufficient to state a claim. *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).

The scant factual allegations in the Complaint do not amount to bid-rigging, which is defined as an "agreement *between competitors* pursuant to which contract offers are to be submitted to or withheld from a third party." *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 521 (S.D.N.Y. 2013) (emphasis in original). The Complaint does not include any allegations of a horizontal agreement—or even any interactions whatsoever—between the Trading Defendants. Nor do Plaintiffs allege any coordination among the Trading Defendants concerning whether to "submit" or "withhold" quotes from the Platform. Instead, they allege merely a series of separate and unconnected vertical agreements between Currenex and each Trading Defendant, and concede that Currenex offered favorable terms independently to different suppliers to attract liquidity to its Platform. *See, e.g.*, Compl. ¶ 65; *Ruotolo*, 933 F. Supp. 2d at 521 (holding that the alleged conspiracy could not be characterized as bid rigging because it included a defendant that had a buyer-seller, vertical relationship with the other defendants).

If there could be any doubt, Plaintiffs ultimately give up the game by explicitly admitting that they have only alleged separate, independent vertical agreements. Compl. ¶ 106 ("Plaintiffs allege that the Currenex-HC Tech agreement is an independent antitrust violation, for example, from the Currenex-Goldman agreement."). Allegations of multiple, independent agreements between entities such as Currenex and the Trading Defendants, which are "at different levels of [a] market structure," do not support an inference of a horizontal arrangement. *See United States*

11

*v. Apple, Inc.*, 791 F.3d 290, 313–14 (2d Cir. 2015) (alteration in original). This is particularly true where a plaintiff fails to plead facts showing that a horizontal competitor would only be incentivized to enter into the vertical agreement if its horizontal competitors did the same. *Id.* at 316. Plaintiffs allege no facts to show concerted action by the Trading Defendants, any incentive for joint effort by the Trading Defendants, or even that any Trading Defendant was aware of the existence of an alleged agreement between Currenex and another Trading Defendant.

By Plaintiffs' own allegations, the existence of any horizontal agreement is facially implausible because it would have run counter to the self-interest of each Trading Defendant to have entered into one. *See Twombly*, 550 U.S. at 554, 127 S. Ct. at 1964 ("showing parallel conduct or interdependence, without more," is inadequate, as it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"). This is because each alleged agreement between a Trading Defendant and Currenex would have become *less* valuable as Currenex entered into similar agreements with others. Although Plaintiffs allege that the Trading Defendants had priority rights over non-privileged market participants—and "were each aware that they had been given secret bid-rigging benefits"— they do not, nor could they sensibly, allege that the Trading Defendants had any priority rights over each other. Compl. ¶ 110. Under such circumstances, the purported existence of multiple vertical agreements not only fails to suggest a horizontal agreement among the Trading Defendants, but actually supports the contrary inference. *See Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 297 (S.D.N.Y. 2010) ("Repeating the assertion that the [defendants] 'agreed' and characterizing the conduct as a horizontal conspiracy does not, without more, pass muster under *Twombly*.").

**B.     Plaintiffs Fail To Adequately Plead An Actionable Claim Based On The Alleged Vertical Agreements**

As for the supposed vertical agreements, Plaintiffs have not even alleged sufficient particularized facts that plausibly show that Currenex entered into any vertical agreements that granted any Trading Defendant "super-priority" rights or "last look" privileges, much less that such agreements were unlawful restraints of trade.

To begin, the Complaint nowhere alleges direct evidence that the challenged provisions existed in any of these alleged agreements. Plaintiffs assert that "[t]hese secret agreements" were "negotiated by senior people at Currenex and the Trading Defendants, often over dinners and lunches in major cities like Chicago and New York." Compl. ¶ 57. However, "averments of agreements made at some unidentified place and time . . . are insufficient to establish a plausible inference of agreement, and therefore to state a claim." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Plaintiffs do not allege when, where, or how during their purported 16-year class period any of the alleged agreements with super-priority terms were made.

Plaintiffs likewise fail to plead conscious parallel acts, together with "circumstantial evidence and plus factors," sufficient to infer the existence of agreements with such terms. *Mayor & City Council of Baltimore*, 709 F.3d at 136. "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* But such factors are entirely absent from the Complaint and are indeed negated by Plaintiffs' allegations.

*First*, Plaintiffs' allegations run counter to the existence of "a common motive to conspire." As discussed above, by Plaintiffs' own allegations, the motivation of a Trading Defendant to enter into an agreement with "super-priority" rights (*i.e.*, to compete for FX trades) would have been

13

entirely different from the motivation of Currenex (*i.e.*, to attract liquidity to its platform so that it could provide competitive pricing to customers). Accordingly, no common motive was possible.

*Second*, Plaintiffs do not identify any parallel acts that "were against the apparent individual economic self-interest of the alleged conspirators." To the contrary, Plaintiffs allege discrete agreements between the Platform operators and its suppliers in which each was negotiating independently for its own economic benefit. Plaintiffs explicitly admit that the alleged agreements that form the basis for their claims would be separately economically beneficial to Currenex, which sought to obtain liquidity for its Platform, and to each Trading Defendant, which sought to earn a profit from providing liquidity on the Platform. *See, e.g.*, Compl. ¶ 64 ("By granting super-priority rights, Currenex hoped to ensure that its trading venue would get off the ground, then thrive, by securing the support of large liquidity providers.").

*Third*, far from alleging "a high level of interfirm communications," Plaintiffs do not allege *a single* interfirm communication. Plaintiffs are left with general accusations that a few employees changed employment among the Defendants over the course of the 16-year class period. Compl. ¶ 71 (employee who was purportedly "responsible for negotiating Goldman Sachs's super-priority rights" left Goldman in 2014 (nearly a decade after the beginning of the class period) and began working at State Street); *id.* ¶ 67 (three former Currenex employees were later employed by HC Tech). Aside from the clear insufficiency of these allegations, Plaintiffs do not explain how these purported "secret" agreements continued at Currenex *after* the departure of the alleged perpetrators of the scheme.

Accordingly, while Plaintiffs claim that each of Goldman and HC were "large-scale" liquidity providers to the Platform, Compl. ¶¶ 71, 75, with no "plus" factors sufficient to infer any agreements with super-priority rights, the Sherman Act claim fails. *Vedder Software Grp. Ltd. v.*

*Ins. Servs. Off., Inc.*, 545 F. App'x 30, 33 (2d Cir. 2013) (affirming dismissal of Sherman Act claim "[b]ecause the allegations only infer the mere possibility of misconduct").

Finally, even if Plaintiffs could plausibly allege the existence of vertical "super-priority" agreements (and they have not), such agreements would only be unreasonable restraints of trade if deemed so under the rule of reason. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882, 127 S. Ct. 2705, 2710 (2007) ("[V]ertical price restraints are to be judged by the rule of reason."); *Apple*, 791 F.3d at 313–14 (explaining that vertical agreements violate the Sherman Act "only if an assessment of market effects, known as a rule-of-reason analysis, reveals that they unreasonably restrain trade"). But Plaintiffs do not even try to plead the elements of a rule-of-reason case, and their own allegations make clear that they cannot do so. Under a rule-of-reason analysis, a plaintiff must demonstrate an "*actual* adverse effect" on competition in the relevant market before the "burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.,* 386 F.3d 485, 506–07 (2d Cir. 2004) (emphasis in original). Where, as here, a plaintiff cannot allege particularized facts showing an actual adverse effect on competition, it must at least plead "that the defendant has sufficient market power to reduce competition market-wide and there is reason to believe that the defendant will, in fact, harm competition." *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 431 (S.D.N.Y. 2015). But Plaintiffs' own allegations refute the notion that Defendants had sufficient power in any properly defined relevant market to reduce competition across the entire FX spot market. Specifically, the Complaint makes clear that "[t]he FX market is the largest in the financial system, accounting for over a trillion dollars a *day* in the United States alone," Compl. ¶ 30 (emphasis in original), that Currenex is only one of many ECN platforms, *id.* ¶ 37, and that the Trading Defendants provided only a portion of the liquidity available on

Currenex, *id.* ¶ 22 (alleging that HC Tech provided approximately 10% of the liquidity on Currenex and only generically alleging that "Goldman and State Street were among the largest providers on the Platform"). Those facts cannot plausibly be reconciled with a rule-of-reason claim.

### C.    Plaintiffs Fail To Plead Antitrust Injury

Plaintiffs have also failed to satisfy their burden to plausibly allege a concrete injury giving rise to antitrust standing. To plead actual injury under the Sherman Act, a plaintiff must plausibly allege "(1) that she transacted in at least one [FX instrument] at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 112 (2d Cir. 2018); *see also In re SSA Bonds Antitrust Litig.*, 2018 WL 4118879, at *6 (S.D.N.Y. Aug. 28, 2018) ("[A]bsent other allegations showing injury, courts have found no injury where the plaintiffs failed to allege any specific transactions that they entered into that harmed them through the defendants' misconduct."). As the Second Circuit has explained: "The 'actual injury' analysis looks very similar to the 'injury in fact' analysis used to determine constitutional standing," except that to plead actual injury, "[i]njury must be plausible, not just colorable." *Total Gas*, 889 F.3d at 111–12. Here, Plaintiffs fail to plead concrete and particularized harm, offering only hypotheticals of how an injury might have conceivably occurred.

Plaintiffs assert that Currenex subscribers suffered harm by "pa[ying] too much when buying, and receiv[ing] too little when selling," Compl. ¶ 7, but they do not actually identify a single transaction entered into by Plaintiffs that was executed at a "rigged price," much less a rigged price attributable to any Trading Defendant. *See Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) (upholding dismissal of a complaint because plaintiffs "fail[ed] to link each of the defendants individually to specific acts of

16

anticompetitive conduct in furtherance of the conspiracy"). The Complaint accordingly contravenes the requirement that a plaintiff must plead "that she transacted in at least one [FX instrument] at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations." *Total Gas*, at 112.

Instead, all Plaintiffs allege is that the Trading Defendants could transact on the Platform if they submitted a price that, at a minimum, "matched the quote of another trader." Compl.. ¶ 55. But this is not a substitute for properly alleging an actual impacted trade. And because Plaintiffs cannot allege that the purported agreement resulted in Plaintiffs actually paying a worse price, they are left speculating about how it *could* have done so. *Id.* ¶¶ 80–86. But the extended hypothetical Plaintiffs include in the Complaint depends entirely on the assumption that a Trading Defendant *would have* transacted on the Platform at a price even more favorable to other Currenex customers without the alleged priority it received from Currenex. That assumption contradicts Plaintiffs' own allegations that the alleged agreements were necessary for Currenex to obtain greater liquidity in the first instance. *See, e.g.*, *id.* ¶ 40 ("For an ECN to be successful, there needs to be a critical mass of customers to ensure there is sufficient liquidity to allow trades to get done in a timely and efficient manner. . . . ECNs need backing from larger sell-side institutions, like Goldman Sachs and State Street."); *id.* ¶ 65.

In other words, Plaintiffs' own allegations and basic economics make clear that without these alleged agreements, the Trading Defendants might not have transacted on the Platform at all, causing Currenex's customers to receive even less favorable prices. Such speculative injury does not give rise to antitrust standing. *Total Gas*, 889 F.3d at 112–13, 115 (affirming dismissal for lack of standing where the "complaint provides just as much support for the proposition that [Plaintiffs] were *benefited* by Total Gas's trading as for the proposition that they were *harmed* by it")

(emphasis in original); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) (plaintiffs' "damages are merely conceivable," and so are "insufficiently pled").[3]

> **D.    Plaintiffs' Sherman Act Claim Against Defendant State Street Must Be Dismissed As A Matter Of Law**

Plaintiffs allege that Defendant State Street conspired with its wholly-owned subsidiary, Currenex, in violation of Section 1 of the Sherman Act. Compl. ¶¶ 24, 27, 106. It is well-established, however, that a corporate parent and its wholly owned subsidiary are incapable of conspiring in violation of Section 1 of the Sherman Act as a matter of law, and their "coordinated activity . . . must be viewed as that of a single enterprise." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771, 777, 104 S. Ct. 2731, 2741–42, 2745 (1984) ("Indeed, the very notion of an 'agreement' in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning."). Because State Street and Currenex cannot conspire in violation of Sherman Act §1 as a matter of law, Plaintiffs' Sherman Act post-2007 claim against State Street must be dismissed.

---

[3]     To the extent that Plaintiffs seek to rely on an alternative theory of harm based on the notion that, but for the alleged agreements, they might have competed with the Trading Defendants, *see, e.g.*, Compl. ¶ 76, such a theory would not state an antitrust claim, as the Sherman Act does not require a company to deal with all its suppliers on the same terms. *See Apple*, 791 F.3d at 332 (holding that the antitrust laws protect against harm to competition, not a loss by a competitor). The requirement to "show that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market" rather than merely "prov[ing that a plaintiff] has been harmed as an individual competitor . . . ensures that otherwise routine disputes between business competitors do not escalate to the status of an antitrust action." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (emphasis in original). In any event, Plaintiffs have not even pleaded the baseline facts to suggest that they ever traded on the Platform as suppliers (or liquidity providers), rather than as paying subscribers.

## II.   THE FRAUD CLAIM AGAINST CURRENEX SHOULD BE DISMISSED (SECOND CLAIM FOR RELIEF, COMPL. ¶¶ 118–124)

Plaintiffs' fraud claim alleges both that Currenex made *affirmative statements* (citing disclosures in 2011 and 2015) claiming that the Platform operated "a true FIFO order book," and that it fraudulently *omitted* that its Platform used "an adulterated FIFO system." Compl. ¶¶ 5, 120. Plaintiffs allege only two deviations (or "adulterations") from a so-called "true" FIFO order book: that certain liquidity providers allegedly contracted to receive (i) "priority" over other liquidity providers, and (ii) "last look" functionality. Plaintiffs' fraud claim—whether based on affirmative misstatements or fraud-by-omission—should be dismissed, because the Complaint fails to meet the heightened pleading standards applicable to fraud allegations under Rule 9(b).[4]

### A.   Plaintiffs Fail To Plead Any Fraudulent Misrepresentations

Fraud requires a plaintiff to allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011). Fraud must be pled with particularity under Federal Rule of Civil Procedure 9(b), which requires that the complaint "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992). Plaintiffs fail to adequately plead that Currenex made

---

[4]   Plaintiffs' state law claims are analyzed under New York law in accordance with the choice of law provision in the Agreements. *See* Ex. A § 23; Ex. B § 23; *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

the false statements alleged in the Complaint, much less that they reasonably relied on, or even saw, either of the alleged statements.

          **1.**        **The Complaint Does Not Adequately Allege That Currenex Made False Or Misleading Statements**

The heart of Plaintiffs' contention is that Currenex's disclosures amounted to a representation that all FX spot transactions conducted on the Platform strictly follow FIFO, with no exceptions (*i.e.,* with no "priority" and no "last look"). *See* Compl. ¶¶ 5, 120 (alleging that Currenex engaged in fraud by using "an adulterated FIFO system" rather than a "true FIFO order book"). But the actual disclosures make no such promise. For example, the Complaint cites a statement from the 2015 Conflict Disclosure without properly crediting sections from the rest of the document, which discloses in clear terms that the Platform offered "last look" functionality to sell-side subscribers. *See* Ex. D at 10−11; *see also* Compl. ¶ 11. The detailed description of "last look" functionality, which the Complaint refers to as an "adulteration" of "true" FIFO, explains that sell-side subscribers may have the opportunity to reject the transaction *after* the buy-side subscriber has accepted a price quote. *See* Ex. D at 10. This disclosure makes clear to buy-side subscribers that their transactions would not be executed according to strict FIFO rules in all instances: the existence of "last look" rights necessarily means that bids that are otherwise matched with offers (by first in, first out order matching or otherwise) and then accepted by a buy-side subscriber may nonetheless not be completed. Thus, when the 2015 Conflict Disclosure is read in full, the statement lifted by Plaintiffs in isolation from the document cannot bear the weight of the allegation they attach to it. *See Kraft v. Third Coast Mistream,* 2021 WL 860987, at *13 (S.D.N.Y.

Mar. 8, 2021) (Plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud").[5]

Similarly, the Complaint cites a single statement from the 2011 Product Profile, noting that "Currenex had a 'low-latency matching engine with 'first in, first out' (FIFO) prioritizing.'" Compl. ¶ 48. Even taken in isolation, the statement does not promise that all trades will be matched *solely* according to first in, first out ordering (*i.e.*, the so-called "true" FIFO), but rather states only that trades will be "prioritized" on a first in, first out basis. The Complaint concedes that Currenex did use first in, first out prioritization. *See, e.g.*, *id.* ¶ 120 (describing the Platform as "an adulterated FIFO system"). The 2011 Product Profile makes clear that the Platform is highly customizable, allowing customers to be matched with their "chosen counterparties" and to deploy orders "based on parameters [they] define." Ex. C at 4, 6.

## 2. Plaintiffs Do Not Plead Actual Reliance, Let Alone Justifiable Reliance

Plaintiffs do not allege that they ever received or reviewed, let alone relied on, the 2011 Product Profile or the 2015 Conflict Disclosure. Instead, the Complaint sidesteps the issue by claiming that "Currenex emailed these and other representations to its customers and posted them on its website in order to attract customers." Compl. ¶ 50. Plaintiffs must allege facts, with particularity, showing that they actually, and justifiably, relied on the alleged misrepresentations. This allegation falls well short. *See Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 71–73 (2d Cir. 2000) (affirming dismissal of fraudulent misrepresentation claim because courts "will not presume" that plaintiffs "actually relied" on alleged misrepresentations where the complaint is

---

[5]     The Complaint cites the language disclosing "last look" functionality in the 2015 Conflict Disclosure, but only in an attempt to minimize and explain it away. Plaintiffs never acknowledge that the disclosure (*i.e.*, that trades that are matched and accepted may nonetheless be cancelled at the counterparty's discretion) provides plain notice that the Platform's order book is managed in manner other than "a true FIFO order book."

"devoid of any allegation that [plaintiffs] ever received this information"); *Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, 2007 WL 1732427, at *9–10 (S.D.N.Y. June 14, 2007) (dismissing fraud claims predicated on alleged misstatements because the "complaint conspicuously fails to allege that plaintiffs read the allegedly misleading [documents], or even that they knew of their existence"). Put simply, Plaintiffs could not have been defrauded by documents they never saw.

The Complaint also fails to identify a single trade by either Plaintiff made in reliance on any alleged misstatement (or omission). *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 312–13 (S.D.N.Y. 2014) (holding plaintiff failed to adequately plead reliance for its common law fraud claim where it did "not allege that it actually purchased any particular Bear Stearns securities on any particular date in reliance on any particular alleged" misrepresentations or omissions).

### B. Plaintiffs Also Fail To Plead Fraud-By-Omission

Plaintiffs' fraud-by-omission allegations, which attempt to provide a basis for extending the proposed class period to as early as 2005, also fail to plead a cognizable claim. First, Plaintiffs do not adequately allege that Currenex had any duty to disclose the allegedly concealed fact. Second, the allegations do not establish that the purported omissions were material. Third, Plaintiffs fail to plead that they justifiably relied on the alleged concealment in deciding to become buy-side subscribers and trade on the Platform.

#### 1. Currenex Had No Duty To Speak

In addition to the traditional elements for a fraud claim, a plaintiff pleading fraud-by-omission must allege that the defendant had a duty to disclose the allegedly concealed fact. *See First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014). Under New York law, a duty to disclose only arises where: (1) the parties have a fiduciary relationship; (2) "one party possesses superior knowledge, not readily available to the other, and

knows that the other is acting on the basis of mistaken knowledge;" or (3) a party has made a partial or ambiguous statement, "whose full meaning will only be made clear after complete disclosure." *Id*. None of these circumstances is alleged here.

*First*, the Complaint makes no claim, even in conclusory terms, of a fiduciary relationship between Plaintiffs and Currenex. In any event, each Agreement between Currenex and Plaintiffs states that "*neither Currenex nor any of its affiliates is acting, in any capacity, as a fiduciary*" with respect to any of the transactions conducted on the Platform. Ex. A § 4(d); Ex. B § 4(e). Plaintiffs allege no other relationship that would give rise to a fiduciary duty. *See Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429 (S.D.N.Y. 2006) (New York law does not recognize the existence of a fiduciary duty between sophisticated commercial entities contracting at arm's length).

*Second*, Plaintiffs do not (and cannot) allege that Currenex had superior knowledge and knew that the Plaintiffs were acting on the basis of "mistaken knowledge." Plaintiffs insist they were acting on the understanding that the Platform operated its order book on a first in, first out basis, because, the Complaint claims, "most" trading platforms "typically" follow that protocol. Compl. ¶¶ 41, 53, 119. But this formulation amounts to little more than an admission that Plaintiffs knew that *some* trading platforms *did not* strictly follow first in, first out ordering. Even as pleaded, the Complaint does not establish that Plaintiffs acted reasonably on the basis of a mistaken belief, let alone that Currenex had a duty to make disclosures in hopes of correcting their understanding.

Plaintiffs also have not adequately alleged that Currenex possessed "superior knowledge." To do so, they would need to plead that the allegedly omitted fact was information they could not have discovered through the "exercise of ordinary intelligence." *First Hill Partners, LLC*, 52 F. Supp. 3d at 637. As admittedly sophisticated trading parties, Plaintiffs carry a high burden of showing that the information was not available to them through the "exercise of ordinary

intelligence." Here, the Complaint fails to allege that the purported deviation from "true" FIFO was unavailable through the exercise of even minimal diligence. The detailed Agreement between Plaintiff Irish Blue & Gold and Currenex, for example, confirms that Currenex agreed to provide "all information reasonably requested by the Client relating to the Services." Ex. B § 2; *see also* Ex. A § 2 (Currenex agrees to provide "necessary information relating to the Services"). But the Complaint contains no allegation that either Plaintiff made *any* inquiry of Currenex regarding the Platform's order matching system (despite acknowledging their awareness that not all trading platforms operate on a first in, first out matching basis). *See* Compl. ¶¶ 41, 53, 119. Especially where sophisticated parties are concerned, fraud cannot be based on a failure to make simple inquiries. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2021 WL 4142698, at *12 (2d Cir. Sept. 13, 2021) (finding no duty to disclose where plaintiff was a sophisticated party with access to relevant information and reason to make an inquiry, yet failed to ask defendant about the allegedly concealed fact); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) (a party's knowledge is not "superior" where the relevant information was not pursued by plaintiffs).

*Third*, Plaintiffs have not alleged a duty to disclose on the basis that Currenex made a partial or ambiguous statement, "whose full meaning will only be made clear after complete disclosure." *First Hill Partners, LLC.*, 52 F. Supp. 3d at 637. Plaintiffs' fraud-by-omission claim relies solely on Currenex's unspecified and generically-alleged "silence" as to the Platform's prioritization. *See, e.g.,* Compl. ¶ 119 ("Currenex's silence . . . constituted fraud by omission."). Indeed, the Complaint does not identify any particular "partial or ambiguous statement" made to Plaintiffs that could have given rise to an obligation to speak. Where the pleading fails to identify specific statements that are alleged to have been rendered false when made by the omission of

24

additional information, such allegations are "not sufficient to establish a duty to speak under a partial or ambiguous statements theory." *Confido Advisors, LLC v. USAA Real Est. Co*., 2019 WL 4747705, at *3 (S.D.N.Y. Sept. 30, 2019) (finding that plaintiff did not allege a statement that gave "only half the truth," but rather alleged that the statement was false).

### 2. The Complaint Fails To Specifically Identify Any Alleged Omission, Let Alone Material Omissions

Plaintiffs generally allege that "*all* of Currenex's representations to customers about the Currenex Platform" were actionably misleading absent "clear disclosure that it was using an adulterated FIFO system." Compl. ¶ 120 (emphasis in original). But where the alleged fraud consists of an omission, as here, "the Complaint must still allege what the omissions were, the person responsible for failing to disclose, the context of the omission and the manner in which it misled Plaintiff, and what Defendant obtained through the fraud." *See Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 101 (S.D.N.Y. 1997). As a result, the Complaint falls short of Rule 9(b)'s particularity requirements by failing to allege any specific representation made by Currenex that omitted the concealed fact, let alone the specific context of, or any person at Currenex responsible for, such omission. *See id.* (holding that plaintiff did not meet Rule 9(b)'s requirements where he failed to specify the time, place, and content of the defendant's representations, advertisements, and promotional materials that allegedly omitted certain concealed facts); *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 621 (S.D.N.Y. 2013) (same, where plaintiff failed to specify the particular omissions allegedly made by the company and the persons responsible for the omissions); *Bruno v. Zimmer, Inc*., 2017 WL 8793242, at *10 (E.D.N.Y. Aug. 11, 2017) (same, where the allegations lacked detail as to, among other things, the exact nature of the alleged omissions and the specific individual of the entity responsible for the omissions).

But even if the Complaint more specifically identified an alleged omission, Plaintiffs cannot allege a *material* omission. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 464 (2d Cir. 2008) (applying this standard to common law fraud claim). But, Plaintiffs' own allegations do not suggest that they behaved as if the first in, first out prioritization was material to the decision to trade on the Platform. For example, Edmar Financial signed a contract with Currenex that was completely silent as to FIFO before any alleged statements concerning FIFO had been made, Compl. ¶ 20, and Plaintiffs concede that only *some* platforms followed FIFO, while others did not, *id.* ¶ 41. The Complaint also pleads that both Plaintiffs continued trading *after* the referenced 2015 "last look" disclosure. *Id.* ¶ 11. Thus, whether the Platform strictly adhered to first in, first out principles in all instances was not a material consideration in the decision to trade on the Platform.

### 3.    Plaintiffs Cannot Plead Justifiable Reliance

For the reasons stated in Section II.A.2, *supra*, Plaintiffs also fail to adequately plead justifiable reliance for their fraud-by-omission theory. *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (plaintiffs must show actual reliance for both misrepresentations and omissions). The generic assertion that absent the alleged omission, "Plaintiffs and members of the class would not have traded on the Currenex Platform as they did," Compl. ¶ 72, fails to satisfy Rule 9(b).

Moreover, where a sophisticated party knows it could acquire additional information but does not inquire, the failure to exercise minimal diligence renders the party's reliance unreasonable under New York law. *See Terra Sec. Asa Konkursbo v. Citigroup, Inc.,* 740 F. Supp. 2d 441, 450 (S.D.N.Y. 2010) (no reasonable reliance where sophisticated investors failed to provide any

indication that the allegedly concealed information was inaccessible), *aff'd*, 450 F. App'x 32 (2d Cir. 2011). Plaintiffs concede they are sophisticated parties who knew the Platform might deviate from a "true FIFO order book" and could have acquired the allegedly omitted information before trading, yet fail to describe any effort they made to learn such information. *See* Ex. A § 2 (information rights); Ex. B § 2 (same).  Plaintiffs' apparent lack of inquiry makes their purported reliance on any omission unreasonable. *See Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992) (holding that plaintiff cannot establish justifiable reliance where "there is no basis to dispute that [plaintiff] had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, [plaintiff] would have been able to discover the alleged misrepresentations [or omissions]").

## C.     Plaintiffs Fail To Plead Direct "Out Of Pocket" Injury

Plaintiffs' fraud claim also fails because it does not allege facts establishing "that the misrepresentations [or omissions] directly caused the loss about which plaintiff complains (loss causation)." *Seagrape Invs. LLC v. Tuzman*, 2020 WL 5751232, at *17 (S.D.N.Y. Sept. 25, 2020). "To plead loss causation, the complaint[] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 (2d Cir.2005).

New York follows the "out-of-pocket" rule, which limits fraud damages to "compensat[ing] a plaintiff for what was lost because of the fraud, not to compensate for what might have been gained." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *98 (S.D.N.Y. Sept. 14, 2020); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996) (rejecting claim that plaintiff was deprived of the opportunity to gain even

more profits through an alleged alternative contractual bargain because "the loss of the bargain was undeterminable and speculative"). Here, Plaintiffs allege only in conclusory terms that they were harmed because Currenex allegedly offered "priority" and "last look" deviations from "true" FIFO, *see* Compl. ¶¶ 72–86, and that had Plaintiffs known this, they "would not have traded on the Currenex Platform as they did," *id.* ¶ 72. This generic, conclusory, and speculative statement falls far short of specifically alleging any "out-of-pocket" injury. Indeed, as explained in connection with the discussion of Plaintiffs' antitrust claims, Plaintiffs do not allege that they suffered *any* injury; they merely speculate, without any factual or logical explanation, that they could have gotten a better price on the Platform absent the alleged agreements. Plaintiffs' entirely speculative assertion falls short of satisfying both Rule 9(b) and the "out-of-pocket" loss requirement. *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 761 (S.D.N.Y. 2018) (dismissing fraud claim for failure to adequately allege loss causation where plaintiffs "allege simply that they would not have purchased common stock had they known the facts" and where "it [i]s not at all clear" that plaintiffs will "receive even one cent less" for their stock as a result of the alleged misrepresentations), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *Arena Riparian LLC v. CSDS Aircraft Sales and Leasing Co.*, 127 N.Y.S.3d 71, 73 (1st Dep't 2020) (dismissing fraud-based claims because "plaintiffs seek to recover lost profits they would have realized if they successfully completed the purchase of the aircrafts").

## III. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD AGAINST THE TRADING DEFENDANTS (THIRD CLAIM FOR RELIEF, COMPL. ¶¶ 125–128)

Plaintiffs' claim against the Trading Defendants for aiding and abetting fraud fails for similar reasons. Beyond their failure to state a fraud claim, a necessary predicate to aiding and abetting, *see, e.g.*, *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 539 (S.D.N.Y. 2011), Plaintiffs have not alleged with particularity either that the Trading Defendants

had actual knowledge or that they provided substantial assistance in furtherance of the putative fraud. *See ICD Cap., LLC v. CodeSmart Holdings, Inc.*, 2020 WL 815733, at *6 (S.D.N.Y. Feb. 19, 2020) (requiring aiding and abetting fraud to be pleaded with particularly); *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (requirements of Rule 9(b) apply to aiding and abetting fraud).

As to knowledge, Plaintiffs plead no facts to support any plausible inference that the Trading Defendants had the requisite "actual knowledge" of Currenex's alleged fraud. *See Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 61–62 (2d Cir. 2012); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (plaintiff must plead knowledge on part of alleged aider and abettor "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness"). Instead, the totality of their allegations consist of the conclusion that the Trading Defendants "knew that the super-priority matching system of the Currenex Platform was a fraud being perpetrated on Plaintiffs and class members." Compl. ¶ 126. That is not enough. *See Lerner*, 459 F.3d at 293 (dismissing aiding and abetting claim where plaintiffs "conclusorily allege that [defendants] had actual knowledge").

Plaintiffs' allegations of substantial assistance fare no better. "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *ICD Cap., LLC*, 2020 WL 815733, at *6. Where, as here, the alleged primary fraud is the making of false statements by Currenex, substantial assistance "must relate to the preparation or dissemination of the [statements] itself." *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989).  There is no allegation that the Trading Defendants helped make or disseminate any of Currenex's disclosures.

Plaintiffs are left with the conclusory assertion that the Trading Defendants "provided substantial assistance" to the alleged fraud by "directing a large amount of their FX business to the Currenex Platform." Compl. ¶ 127. But simply doing business with an alleged fraudster is not enough to satisfy the "substantial assistance" prong for aiding and abetting fraud. *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 381–83 (S.D.N.Y. 2011) (dismissing claims against a defendant doing business with the principal of the fraud where the complaint made no allegations that the defendant's business activities were directed at defrauding plaintiffs). "In the absence of any allegations rendering plausible the inference that the plaintiffs' injury was a direct or reasonably foreseeable result of defendants' conduct," the claim must be dismissed. *Id.* at 383.

## IV.    THE IMPLIED COVENANT CLAIM AGAINST CURRENEX SHOULD BE DISMISSED (FOURTH CLAIM FOR RELIEF, COMPL. ¶¶ 129–134)

Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing because the allegations establish that Plaintiffs received the benefit of the bargain for which they negotiated. Specifically, the Complaint does not allege an actionable breach of any implied covenant with respect to the Platform's order-matching practices because a reasonable construction of the circumstances laid out in the pleadings shows that Plaintiffs received the benefit of the bargain for which they, as sophisticated trading entities, negotiated with Currenex when they elected to become buy-side subscribers on the Platform. Plaintiffs do not allege (nor could they) that the Agreements they signed contain *any* provision relating to FIFO order prioritization. This Court has explained that the "purpose of the implied covenant is to prevent a party from making an agreement and then acting in such a way as to prevent the other party from receiving its fruits. But this merely begs the question: for what did [Plaintiffs] bargain?" *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56, 80 (S.D.N.Y. 2013) (interpreting analogous implied covenant of good faith and fair dealing under Pennsylvania law). Since order

matching on a first-in, first-out basis did not form any part of the agreement between Currenex and

Plaintiffs, and therefore was not any part of an express term of the Agreements, Plaintiffs "had no

claim to it as a fruit of the contract." *Id.*; *see also Hildene Cap. Mgmt., LLC v. Friedman, Billings,*

*Ramsey Grp., Inc.*, 2012 WL 3542196, at *7 (S.D.N.Y. Aug. 15, 2012) ("[A] court cannot imply

a covenant inconsistent with the terms expressly set forth in the contract, and a court cannot employ

an implied covenant to supply additional terms for which the parties did not bargain.").[6]

## V. PLAINTIFFS' UNJUST ENRICHMENT CLAIM AGAINST ALL DEFENDANTS IS ALSO DEFICIENT (FIFTH CLAIM FOR RELIEF, COMPL. ¶¶ 135–140)

Plaintiffs' unjust enrichment claim must be dismissed for three reasons.

*First*, an unjust enrichment claim is unavailable as a matter of law where the subject matter

of the claim is covered by an express contract. *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F.

Supp. 1308, 1333–34 (S.D.N.Y. 1997) ("Unjust enrichment is a quasi-contractual remedy, so that

such a claim is ordinarily unavailable when a valid and enforceable written contract governing the

same subject matter exists."). Here, the transactions on the Platform are covered by express

contracts between Currenex and the Platform users, *see, e.g.*, Compl. ¶¶ 20, 21, so Plaintiffs

cannot pursue a quasi-contract claim based on those transactions. *See IDT Corp. v. Morgan Stanley*

---

[6]    Plaintiffs' claim against Currenex for a breach of the implied covenant of good faith and fair dealing independently fails because it is expressly disclaimed by the Agreements they signed. Courts in this district have recognized that, "[e]very contract is assumed to incorporate a covenant of good faith and fair dealing *unless such obligation is expressly disclaimed*." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) (alteration in original); *see also Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 1169515, at *10 (S.D.N.Y. Mar. 22, 2016) (same). As evidenced by the Agreements that each of the Plaintiffs signed (and incorporated by reference into the Complaint), Section 15(a) of the Currenex contracts expressly disclaimed the implied covenant of good faith and fair dealing. *See* Ex. A § 15(a); Ex. B § 15(a). As a result, Plaintiffs' implied covenant claim must be dismissed as a matter of law. *See Commerzbank AG*, 277 F. Supp. 3d at 498; *Phoenix Light*, 2016 WL 1169515, at *10; *see also Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (implied covenant cannot be invoked to "erase or otherwise vary the [Agreements'] disclaimer of warranties").

*Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."). Plaintiffs' claim that Currenex "receiv[ed] more transaction fees" than Plaintiffs bargained for as a result of the Platform's alleged prioritization, Compl. ¶ 137; *see also id.* ¶ 64, is governed by contract, not unjust enrichment. *See* Exs. A-B; Compl. ¶¶ 20, 21, 130; *see also IDT Corp.*, 907 N.E.2d at 274 (dismissing unjust enrichment claim seeking return of fees where the parties executed a valid and enforceable written contract governing the services generating such fees); *In re Platinum-Beechwood Litig.*, 377 F. Supp. 3d 414, 427 (S.D.N.Y. 2019) (holding that plaintiff cannot state a claim for unjust enrichment based on the payment of contractually-owed performance fees); *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 222 (S.D.N.Y. 2019) (same, where claim was based on the payment of contractually-owed ticket fees). The result is no different for the Trading Defendants. *See ABF Cap. Mgmt.*, 957 F. Supp. at 1334 (unjust enrichment claim cannot be brought "whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract"); *see also Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*, 933 N.Y.S.2d 202, 203 (1st Dep't 2011) (dismissing unjust enrichment claim against an individual who was not a party to the governing contract).

*Second*, even were there not a contract covering the dispute, Plaintiffs fail to plead the required elements of unjust enrichment consistent with the heightened pleading requirements of Rule 9(b). *See Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at *15 (S.D.N.Y. Aug. 9, 2018) (unjust enrichment claims grounded in fraud must be pled with particularity). Under New York law, an unjust enrichment claim requires a plaintiff to show that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other

party] to retain what is sought to be recovered." *Mandarin Trading Ltd.*, 944 N.E.2d at 1110 (alteration in original).

As to the elements of the claim, the "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). As a result, courts require proof that the defendant received a "specific and direct benefit" from the property sought to be recovered, rather than an "indirect benefit." *Id.*; *see also Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 165 F. Supp. 3d 42, 51 (S.D.N.Y. 2016) (dismissing unjust enrichment claim "based on market manipulation" where plaintiffs did not allege a specific trade with defendants).

Here, the Complaint contains no allegations of specific and direct benefits received at Plaintiffs' expense. Plaintiffs allege that "[t]he Trading Defendants were unjustly enriched at the expense of Plaintiffs and members of the class when they paid these Defendants more than they otherwise would have in the form of bid/ask spreads as a result of Defendants' scheme." Compl. ¶ 138. But Plaintiffs merely allege, on information and belief, that "given Plaintiffs' trading volume and the amount of liquidity provided to the Platform by the Trading Defendants," Plaintiffs *probably* "were matched with each of the Trading Defendants on FX trades executed on the Currenex Platform during the relevant period." *Id.* ¶ 22. This conclusory allegation falls short of pleading facts demonstrating the necessary "direct relationship." *See Tower Rsch. Cap. LLC*, 165 F. Supp. 3d at 51 ("[A]lthough Plaintiffs argue . . . that there is a high likelihood that some members of the purported class engaged in direct dealing with the Defendants . . . a 'mathematical probability' that some Plaintiffs transacted with Defendants is not sufficient to show the direct relationship necessary to support a claim for unjust enrichment."); *see also Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *13–14 (S.D.N.Y. Mar. 28, 2014) (conclusory assertions that

defendants "financially benefited from the unlawful manipulation" and that "[t]hese unlawful acts caused [p]laintiff . . . to suffer injury" were insufficient to state a claim for unjust enrichment) (first alteration in original); *In re Amaranth Nat. Gas Commodities Litig.,* 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008) (dismissing unjust enrichment claim based on alleged market manipulation that had an impact on the price of natural gas futures contracts because plaintiffs did not "allege[] any direct relationship, trading or otherwise, between themselves and any [defendant]"); *Ga. Malone & Co. v. Rieder,* 973 N.E.2d 743, 747 (N.Y. 2012) (where plaintiff and defendant "simply had no dealings with each other," their relationship was "too attenuated" to support an unjust enrichment claim).

*Third,* to the extent that the antitrust and fraud claims are found deficient, the unjust enrichment claims must also fail. *See In re Int. Rate Swaps Antitrust Litig.,* 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) (unjust enrichment claim must be dismissed when there is no "viable underlying claim of illegality"); *see also In re Aluminum Warehousing Antitrust Litig.,* 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014) (dismissing unjust enrichment claim because it was "predicated on defendants' alleged violations of antitrust or consumer protection laws"), *aff'd,* 833 F.3d 151 (2d Cir. 2016).

## VI.   THE CIVIL RICO CLAIMS AGAINST CURRENEX, STATE STREET, AND HC TECH SHOULD BE DISMISSED (SIXTH AND SEVENTH CLAIMS FOR RELIEF, COMPL. ¶¶ 141–164)

Plaintiffs' sixth and seventh causes of action assert claims against Currenex, State Street and HC Tech (the "RICO Defendants") pursuant to 18 U.S.C. § 1962(c) (the "RICO claim") and 18 U.S.C. § 1962(d) (the "RICO conspiracy claim"). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *World Wrestling Ent., Inc. v. Jakks Pac., Inc.,* 530 F. Supp. 2d 486, 496 (S.D.N.Y. 2007), *aff'd,* 328 F. App'x 695 (2d Cir.

2009). Both claims should be dismissed, because the Complaint fails to adequately plead a RICO enterprise, a pattern of racketeering activities, an agreement between and among the three RICO Defendants, and other required elements.

### A.  Plaintiffs Fail To Plead The Elements Of RICO Claim Pursuant to 18 U.S.C. § 1962(c)

To state a civil RICO claim under § 1962(c), Plaintiffs were required to plead "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990). Because the Complaint fails to allege any actionable enterprise or any sufficient pattern of racketeering activity, the Court should dismiss this claim.

#### 1.  The Complaint Fails To Allege An Actionable RICO "Enterprise"

The Complaint purports to allege both an "association-in-fact" enterprise "created by the relationships between those who used the Platform to trade FX" or, in the alternative, a "Currenex Enterprise," consisting "of Currenex, whose employees and agents operated the Platform." Compl. ¶ 143. Both alternative formulations fail to adequately plead a RICO enterprise, warranting dismissal of the claim.

##### a.  The Allegations Do Not Establish An "Association-In-Fact" Enterprise

To plead the existence of an "association-in-fact" enterprise, Plaintiffs must allege that the enterprise has each of the following required features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. U.S*, 556 U.S. 938, 946, 129 S. Ct. 2237, 2244 (2009). But the Complaint does not adequately plead a common purpose among the RICO Defendants, nor does

it establish the necessary relationships among the RICO Defendants to plausibly allege that an associate-in-fact enterprise was formed.

A common purpose among the alleged RICO enterprise participants is essential to establishing the existence of that enterprise. *See Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *8 (S.D.N.Y. Aug. 4, 2016) (finding no association-in-fact enterprise where plaintiff failed to plead that trading merchants had a common purpose when selling counterfeit goods on an online platform). Here, Plaintiffs fail to plausibly plead any common purpose between the RICO Defendants. Instead, the Complaint assigns different purposes to various parties—it claims, on the one hand, that the enterprise's purpose was to "to steer non-privileged customers into trading at worse prices," Compl. ¶ 144, but also says that *Currenex* itself had a different purpose: "to incentivize the Trading Defendants to trade over the Platform, rather than through other venues" and "to ensure a steady stream of liquidity" because "ECNs need backing from larger sell-side institutions, like Goldman Sachs and State Street," *id*. ¶¶ 6, 40, 57. In other words, according to the Complaint, Currenex's purpose for granting priority rights to liquidity providers was to strengthen the performance and competitive positioning of the Platform that it managed, while also suggesting, at best, that *the Trading Defendants* benefited from obtaining favorable "prices." Nor can Plaintiffs allege a common purpose between State Street and HC Tech. As discussed in Section I.A., *supra,* the most reasonable reading of the Complaint is that liquidity providers like HC Tech and State Street sought out "priority" rights to better compete against each other and other liquidity providers. *See* Compl. ¶ 5 (each Trading Defendant sought to "jump in line and consummate a trade without entering a competing quote"). Because the Complaint fairly ascribes different purposes and goals to the different RICO Defendants, it fails to allege any common purpose among them. *See Gucci Am., Inc.*, 2016 WL 6110565, at *7 (finding no

association-in-fact enterprise because plaintiffs failed to "plausibly allege that [] competing Merchants worked together to achieve [fraudulent] purposes").

The Complaint fails to establish an "association-in-fact" enterprise for a second reason: as discussed in Section IA., *supra*, the Complaint fails to suggest any horizontal agreements and Plaintiffs plead a quintessential rimless "hub-and-spoke" formation in which "the spokes are separate, distinct and unassociated and whose actions are uncoordinated." *Gucci Am., Inc.*, 2016 WL 6110565, at *5. Courts in the Second Circuit have repeatedly found that "hub-and-spoke" enterprise allegations fall short of satisfying the *Boyle* standard for pleading an "association-in-fact" enterprise. *See Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 57802, at *5 (E.D.N.Y. Jan. 4, 2017) ("The parallel conduct of a number of 'spokes,' even through a central 'hub,' is not a RICO enterprise without more—that is, without a 'rim' that connects the spokes."); *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) (finding that plaintiffs' allegation that defendants' enterprise operated according to a hub-and-spoke structure "is precisely the kind of structure that the *New York Automobile* and *First Nationwide Bank* courts held is insufficient to satisfy the enterprise element of a RICO claim") (citing *N. Y. Auto. Ins. Plan v. All Purpose Agency and Brokerage, Inc.*, 1998 WL 695869 (S.D.N.Y. Oct. 6, 1998) and *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89 (S.D.N.Y. 1993)).

The Complaint plainly hopes to create the impression of a connection among the various Trading Defendants by including allegations that certain HC Tech employees formerly worked at Currenex (at an unspecified time), *see* Compl. ¶ 67, and that HC Tech employees had a "close relationship" with a Currenex employees, *id.* ¶ 68. While these allegations do some work to allege a further connection between Currenex and HC Tech (the "hub" and a "spoke"), they do nothing to establish the requisite link (the "rim") between HC Tech and State Street as separate liquidity

providers on the Platform (the "spokes"). None of the employees cited is alleged to have had any involvement in State Street's trading activity on the Platform, for example. The allegations fall well short of establishing that the RICO Defendants were "dependent on one another" or "joined together as a group" or that they were "necessary and symbiotic to one another." *City of New York v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013) (finding no association-in-fact because "when all the evidence shows is a series of similar but essentially separate frauds carried out by related entities . . . then no RICO enterprise exists").

Because the purported members of the claimed association-in-fact are engaged in parallel activity, the alleged "enterprise" here is materially different than the one alleged in *Dennis v. JPMorgan Chase Co*. The plaintiffs in *Dennis* alleged "that defendants associated with one another by sharing information and providing one another with Prime Bank Bills ahead of the Fixing Window to permit large trades," thus establishing as a matter of pleading that each of the alleged members of the enterprise were working in concert with one another. 343 F. Supp. 3d 122, 185 (S.D.N.Y. 2018). Here, by contrast, the Complaint offers no similar allegations about information sharing or coordination between the "spokes" of the alleged enterprise. Instead, Plaintiffs allege repeatedly that the Platform was "anonymous," Compl. ¶ 91, and the Complaint offers no allegation that would explain how one liquidity provider would know that another firm even was a participant on the Platform, let alone whether or when another liquidity provider was trading or how it was trading. *See Gucci Am., Inc.*, 2016 WL 6110565, at *7 (finding that plaintiffs failed to allege an enterprise where there was no indication of "even how [defendants] knew each other").

### b.      The Complaint Does Not Plead A "Currenex Enterprise"

Plaintiffs also fail to adequately plead an actionable enterprise by alleging the existence of a "Currenex Enterprise." The Complaint describes the "Currenex Enterprise" as an association of Currenex and its "employees and agents." Compl. ¶ 143. But for RICO purposes, allegations of an

enterprise require "the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62, 121 S. Ct. 2087, 2088 (2001). A single defendant entity cannot also be the RICO enterprise: the Second Circuit has held that "a plaintiff may not circumvent the distinctness requirement by 'alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant.'" *U1IT4less, Inc. v. Fedex Corp.,* 871 F.3d 199, 205–06 (2d Cir. 2017) (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)). The alternative "enterprise" posited by Plaintiffs as the "Currenex Enterprise" runs squarely counter to this established rule.

### 2.      Plaintiffs Do Not Allege A "Pattern" Of Mail Or Wire Fraud

Because the predicate acts alleged in the Complaint are wire and mail fraud, Plaintiffs' RICO claims are subject to the heightened pleading standard under Rule 9(b). *See, e.g., Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999). Plaintiffs' RICO claim should be dismissed for the additional reason that the Complaint does not properly allege—in compliance with Rule 9(b) or otherwise—that each of the RICO Defendants engaged in a "pattern" of mail or wire fraud, which is the predicate racketeering activity cited in the Complaint.[7]

---

[7]      The wire fraud statute prohibits any use of interstate wires in furtherance of any fraudulent scheme. There are three elements of a wire fraud violation: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007).

To successfully plead a RICO claim against the RICO Defendants, Plaintiffs were required to allege with particularity a "pattern" that includes "at least two predicate acts" and "conduct that amounts to a pattern of racketeering activity . . . as to each individual defendant." *Sullivan v. Barclays PLC*, 2017 WL 685570, at *35 (S.D.N.Y. Feb. 21, 2017). The allegations also must establish that the "pattern" of activity on the part of each defendant is "continuous," which means that it is either "'a closed period of repeated conduct, or [ ] past conduct that by its nature projects into the future with a threat of repetition.'" *Albunio v. Int'l Safety Grp., Inc.*, 2016 WL 1267795, at *5 (S.D.N.Y. Mar. 30, 2016) (citing *H.J. Inc., et al. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S. Ct. 2893, 2902 (1989)).

As set forth in Sections II and III, *supra*, Plaintiffs' common law fraud allegations against Currenex and their aiding and abetting allegations against the Trading Defendants fall well short of pleading an actionable fraud. Their mail and wire fraud allegations fail for the same reasons. *See Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 537 (S.D.N.Y. 2001) (dismissing RICO claim premised on mail and wire fraud because plaintiffs failed to state a claim for common law fraud) (citing *Morin v. Trupin*, 711 F.Supp. 97, 105 (S.D.N.Y.1989) ("Where [a] fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall."); *see also Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y. 1994) (dismissing RICO claim against bank because plaintiff failed to allege that the bank aided and abetted fraud), *aff'd sub nom. Laro, Inc. v. Chase Manhattan Bank*, 60 F.3d 810 (2d Cir. 1995).

In any event, Plaintiffs do not allege the requisite two acts of mail or wire fraud for any RICO Defendant, let alone all of them. The Complaint does not allege that Plaintiffs actually received or reviewed either disclosure through the mail or wires. It merely alleges that "these and

other representations" were emailed to "customers" and posted on Currenex's website. Compl. ¶ 50. This generic allegation does not establish that Plaintiffs ever saw the purportedly fraudulent statements, let alone plead a "pattern" of mail or wire fraud by each RICO Defendant in compliance with Rule 9(b)'s particularity requirements. *See Sullivan*, 2017 WL 685570, at *34 (plaintiffs failed to adequately plead acts of wire fraud because the complaint failed to identify the participants to the communications); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) ("Allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, [and] where and when they took place . . . .").

Moreover, Plaintiffs' generic allegation that they made "thousands" of transactions on the Platform on unspecified dates at unspecified prices with unspecified counterparties for unspecified purchases or sales fails to adequately implicate any RICO Defendant in any mail or wire fraud. *See Cont. Transp. Servs., Inc. v. New Era Lending LLC*, 2018 WL 11226077, at *3 (S.D.N.Y. Oct. 26, 2018) (finding failure to plead wire and mail fraud because "Plaintiffs have failed to identify which Defendant sent which particular mailings or wires as well as where and when the transmissions were made").

For these reasons, Plaintiffs fail to plead a pattern of racketeering activity.

### B.      Plaintiffs Do Not Adequately Allege A RICO Conspiracy Under § 1962(d)

Because Plaintiffs fail to plead an underlying substantive RICO violation, their RICO conspiracy claim also fails. *See Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.,* 2016 WL 1298987, at *12 (S.D.N.Y. Mar. 31, 2016); *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008).

In addition, Plaintiffs' RICO conspiracy claim fails because they do not allege "the existence of an agreement to violate RICO's substantive provisions." *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020); *see also Salinas v. United States*, 522 U.S. 52, 54, 118 S. Ct. 469,

471 (1997) (the conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"). "[T]hese allegations may not be conclusory, but must set forth specific facts tending to show that each of the defendants entered into an agreement *to conduct the affairs of a particular, identified enterprise through a pattern of racketeering activity*—not simply that each defendant committed two or more acts that would qualify as predicate acts . . . ." *Elsevier Inc. v. W.H.P.R., Inc*., 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010) (emphasis in original); *see also Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc*., 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) ("While [plaintiff] repeatedly states that defendants 'conspired' or 'agreed' with one another, the complaint fails to set forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement.").

Plaintiffs here merely allege generic "secret agreements" negotiated by "people" in "major cities" "often over dinners and lunches," which does not establish an agreement to conduct the affairs of a particular, identified enterprise, let alone through a pattern of racketeering activity. Compl. ¶ 57. As discussed in Sections I.A. and VI. A.1.a., *supra*, the Complaint at most alleges that State Street and HC Tech each independently reached "priority" and "last look" agreements with Currenex—not that they reached any agreement with each other. Even if Plaintiffs contend that State Street and HC Tech knew about the purported misrepresentations, "mere knowledge of a scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy." *In re Platinum-Beechwood Litig*., 427 F. Supp. 3d 395, 439 (S.D.N.Y. 2019); *see also Nasik Breeding & Rsch. Farm Ltd.,* 165 F. Supp. 2d at 541.

## VII.   PLAINTIFFS' CLAIMS ARE TIME-BARRED

### A.   Plaintiffs Were On Notice Of Their Purported Claims No Later Than April 2015

As set forth above, Plaintiffs' hodgepodge of claims is principally based on their allegations that Currenex and the Trading Defendants entered into "priority" and "last look" agreements that resulted in Currenex operating an "adulterated" rather than a "true" FIFO order book, and which could theoretically have prevented Plaintiffs from obtaining better pricing on the Platform. Even if Plaintiffs had adequately pleaded any of their claims—and they have not—each of those claims is time-barred and must be dismissed as a matter of law. As the allegations in the Complaint make clear, Plaintiffs, institutional traders in the FX market, either knew or should have reasonably discovered that Currenex was not operating "a true FIFO order book" by no later than April 1, 2015, when Plaintiffs concede that Currenex disclosed "last look"—one of the two alleged deviations from (or "adulterations" of) so-called "true" FIFO that form the basis of Plaintiffs' claims. Compl. ¶¶ 5, 11, 49.

The Complaint myopically focuses on a snippet of a single sentence in the 2015 Conflict Disclosure as the basis for Plaintiffs' alleged belief that the Platform followed "true" (strict) FIFO. However, the entirety of that disclosure plainly reveals that the Platform did not follow what Plaintiffs describe as a "true FIFO" model. In addition to referencing first in, first out principles, the 2015 Conflict Disclosure prominently described the "last look functionality" that Currenex offered to sell-side liquidity providers (such as State Street, Goldman Sachs and HC Tech), which allowed them an opportunity to review accepted trades after-the-fact and to cancel those trades at their option. *See* Ex. D at 10 ("Do you make available 'last look' functionality to sell-side subscribers? Yes. We make available to sell-side subscribers a 'last look' functionality."); *see also* Compl. ¶ 11 ("[T]he existence of last look rights in general was disclosed in 2015."). By alleging

the existence of last look rights for liquidity providers, Plaintiffs admit that the Platform was not strictly following "a true FIFO order book," because even trades prioritized according to FIFO in the first instance were subject to cancellation and might not be completed. *See id.* ¶¶ 77–79. In this way, the disclosure cited in the Complaint conclusively establishes that sophisticated investors like Plaintiffs had at least constructive, if not actual, notice that the Platform deviated from "a true FIFO order book" by no later than April 1, 2015. For this reason and those described more fully below, all of Plaintiffs' purported claims are time-barred under the applicable statute of limitations.

### B.  Each Of Plaintiffs' Claims Is Time-Barred

***Common Law Fraud and Aiding and Abetting Fraud***. The relevant limitations period for fraud under New York law is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." *See* N.Y. C.P.L.R. 213(8); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 309–10 (S.D.N.Y. 2014) (dismissing as untimely fraud claims premised on statements made before the six-year statute of limitations). Plaintiffs contend there are two statements where Currenex represented that it was following "true" FIFO, but both of these statements were made more than six years before the Complaint was filed.  *See* Compl. ¶ 48 (statement made sometime in 2011); *id.* ¶ 49 (statement made on April 1, 2015).[8] Plaintiffs do not allege that they discovered the so-called FIFO "adulterations" within the past two years (indeed, at least one Plaintiff was seemingly dissolved and re-formed in anticipation of this litigation, *see* Exs. E-F) and merely assert that unspecified former insiders "recently" revealed unspecified information to "Plaintiffs' counsel," Compl. ¶ 92. In any event, the existence of the 2015 Conflict Disclosure precludes Plaintiffs from

---

[8]     Plaintiffs also do not identify any specific alleged omission in the past six years (or ever).

availing themselves of the two-year discovery rule. *See, e.g.*, *Prestandrea v. Stein*, 692 N.Y.S.2d 689, 690 (2d Dep't 1999) ("The test as to when a plaintiff should have discovered an alleged fraud is an objective one."); *see also Apt v. Morgan Stanley DW, Inc.*, 981 N.Y.S.2d 680, 681–82 (1st Dep't 2014) (fraud claim time-barred where plaintiff could have discovered facts based on her receipt of documents). Accordingly, Plaintiffs' fraud claims, including the claim for aiding and abetting fraud, which are premised on Plaintiffs' purported lack of awareness that the Platform did not operate "a true FIFO order book," are untimely.  *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (statute of limitations for aiding and abetting fraud is the same as for fraud).

   ***Civil RICO***. Civil RICO claims pursuant to Sections 1962(c) and (d) are governed by "a four-year statute of limitations," which "begins to run [] when the plaintiff discovers—or should have reasonably discovered—the alleged injury." *World Wrestling Ent., Inc. v. Jakks Pac., Inc*., 328 F. App'x 695, 696–97 (2d Cir. 2009). The statute of limitations for RICO claims "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *Id.* at 697; *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012) ("Such storm warnings . . . need not detail every aspect of the alleged fraudulent scheme."). For the reasons discussed above (and similar to Plaintiffs' fraud claims), Plaintiffs were on notice by April 1, 2015 that the Platform did not operate as "a true FIFO order book," and their civil RICO claims are thus time-barred.

   ***Sherman Act***. Plaintiffs' Sherman Act claim is subject to a four-year statute of limitations, 15 U.S.C. § 15b, which begins to run "when a defendant commits an act that injures a plaintiff's business," *World Wrestling Ent., Inc.*, 328 F. App'x at 698. Where allegations center around a conspiracy to manipulate prices, a plaintiff may not recover damages based on "acts that do not

fall within the limitations period." *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189, 117 S. Ct. 1984, 1990–91 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."). Plaintiffs filed the Complaint on August 4, 2021, meaning the claim must be based on conduct that took place on or after August 4, 2017. Because Plaintiffs do not (and cannot) allege that they made a single trade on the Platform after August 4, 2017, their claim is untimely.

*Unjust Enrichment*. The same is true for Plaintiffs' unjust enrichment claim, which has a three-year statute of limitations, running from "the occurrence of the wrongful act giving rise to the duty of restitution." *See Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (2d Dep't 2007) (under New York law, statute of limitations for unjust enrichment is three years if plaintiffs seek monetary damages); *see also Ruzhinskaya v. Healthport Techs., LLC*, 311 F.R.D. 87, 109 (S.D.N.Y. 2015) (three-year statute of limitations for unjust enrichment claim where plaintiff sought repayment of fees paid).[9]

*Implied Covenant.* Finally, the statute of limitations for a breach of the implied covenant of good faith and fair dealing is six years, N.Y. C.P.L.R. 213(2), and the claim "accrues when the alleged breach occurs." *MarketShare Corp. v. Transactis, Inc.*, 2021 WL 1948283, at *5 (S.D.N.Y.

---

[9]      Plaintiffs' attempt to frame their remedy as equitable by asking for a "constructive trust" of money rather than money damages does not change the result, since courts will "look beyond the form and to the substance of the sought-after remedy." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479–80 (S.D.N.Y. 2016); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *175, n.201 (S.D.N.Y. Oct. 20, 2015) ("A plaintiff may not sidestep the statute of limitations by requesting a constructive trust instead of damages."). In any event, even if the longer six-year statute of limitations applicable to equitable relief applied, *see In re LIBOR*, 2015 WL 6243526, at *175, n.201, the claim is still barred as Plaintiffs do not allege any actionable conduct within six years prior to when the Complaint was filed.

May 12, 2021). Plaintiffs allege that Currenex breached the implied covenant in their Agreements by deviating from "true" FIFO. *See* Compl. ¶¶ 5, 133. Accordingly, Plaintiffs' claim accrued on the day they signed their respective Agreements (July 9, 2010 for Edmar Financial and May 30, 2014 for Irish Blue & Gold, *id.* ¶¶ 20, 21), because a "representation of present fact is either true or false—and the contract therefore performed or breached—if the underlying fact was true or false at the time the representation [or omission] was made." *See Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 866 (2d Cir. 2015). Both Agreements were executed more than six years before the Complaint was filed, rendering Plaintiffs' claim untimely.

### C.      Plaintiffs' Invocation Of Equitable Tolling Fails To Save Their Claims

Plaintiffs cannot rely on principles of equitable tolling or fraudulent concealment to save their time-barred claims because the Complaint does not plausibly allege that Currenex "wrongfully concealed material facts, which prevented [Plaintiffs'] discovery of the nature of the claim[s]" and also fails to establish that Plaintiffs "exercised due diligence in pursuing the discovery of the claim[s] during the period [Plaintiffs] seek[] to have tolled." *DuBuisson v. Nat'l Union Fire Ins. of Pittsburgh*, 2021 WL 3141672, at *9 (S.D.N.Y. July 26, 2021); *see also Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) ("We have applied equitable tolling only in rare and exceptional circumstances . . . ."). While Plaintiffs offer a litany of generic allegations about "concealment" in a section addressed to "Equitable Tolling," *see* Compl. ¶¶ 87–94, they fail to allege *any* of the requisite particularized facts actually showing that Defendants wrongfully concealed material facts or that Plaintiffs engaged in *any* diligence on these matters during the relevant period. Indeed, at least one of the Plaintiffs does not seem to have been in existence for at least part of the relevant period and appears to have been reconstituted in anticipation of this litigation. *See* Exs. E-F. Moreover, Plaintiffs fail to allege with particularity how Defendants' purported conspiracy was "self-concealing." *Butala v. Agashiwala*, 916 F. Supp. 314, 320

(S.D.N.Y. 1996) ("[M]erely stat[ing] in a conclusory fashion that the defendants' fraud was self-concealing . . . without alleging how any of the aspects of the defendants' misrepresentations obscured their fraud" is insufficient to plead fraudulent concealment with the particularity required by Rule 9(b)). Simply stating that the alleged conspiracy's success depended on secrecy is not enough. Without any particularized facts making such a showing, "generalized and conclusory allegations of fraudulent concealment" are insufficient to toll the statute of limitations. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *see also Fire & Police Pension Ass'n of Colorado v. Bank of Montreal,* 368 F. Supp. 3d 681, 703 (S.D.N.Y. 2019) ("A claim of fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Federal Rule of Civil Procedure 9(b).").

## CONCLUSION

For these reasons, the Defendants respectfully request that the Court dismiss the Complaint and grant such other relief as is just and proper. Dismissal should be with prejudice given, as set forth above, Plaintiffs' claims suffer from inherent and irreparable defects under binding Second Circuit precedent. *See Onel v. Top Ships, Inc.*, 806 F. App'x 64, 69 (2d Cir. 2020) (affirming dismissal with prejudice where "any amendment would be futile" because "the flaw in Plaintiffs' claim . . . could not be readily remedied via amendment").

Dated:  October 13, 2021

Respectfully submitted,

ROPES & GRAY LLP

/s/ *Gregg L. Weiner*
Gregg L. Weiner
Alexander B. Simkin
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-5000
Facsimile: (212) 596-9090
Email: gregg.weiner@ropesgray.com
Email: alexander.simkin@ropesgray.com

ROPES & GRAY LLP
Robert G. Jones (*pro hac vice*)
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951 7000
Facsimile: (617) 951 7050
Email: robert.jones@ropesgray.com

ROPES & GRAY LLP
Samer Musallam (*pro hac vice*)
2099 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
Email: samer.musallam@ropesgray.com

*Counsel for Defendants Currenex, Inc. and State Street Bank and Trust Company*

KATTEN MUCHIN ROSENMAN LLP

/s/ *Peter G. Wilson*
Peter G. Wilson
Christian T. Kemnitz (*pro hac vice forthcoming*)
Elliott M. Bacon (*pro hac vice*)
Hannah O. Koesterer (*pro hac vice forthcoming*)
525 W Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Email: peter.wilson@katten.com
Email: christian.kemnitz@katten.com
Email: elliott.bacon@katten.com
Email: hannah.koesterer@katten.com

*Counsel for Defendant HC Technologies, LLC*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ *Carmine D. Boccuzzi Jr.*
Carmine D. Boccuzzi Jr.
Rishi N. Zutshi
One Liberty Plaza, 1 Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Email: cboccuzzi@cgsh.com
Email: rzutshi@cgsh.com

*Counsel for Defendant Goldman Sachs & Co. LLC*