## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDMAR FINANCIAL COMPANY, LLC; IRISH BLUE & GOLD, INC.; and XTX MARKETS LIMITED, | Case No. 21-cv-06598 |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| CURRENEX, INC.; GOLDMAN SACHS & CO. LLC; HC TECHNOLOGIES, LLC; STATE STREET BANK AND TRUST COMPANY; STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED; and JOHN DOE DEFENDANTS 1-5, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................6

THE PARTIES.....................................................................................................................8

    A.     Plaintiffs ...........................................................................................................8

    B.     Defendants .....................................................................................................11

BACKGROUND ALLEGATIONS....................................................................................14

    A.     The FX Market Generally...............................................................................14

    B.     The FX OTC Market.......................................................................................15

    C.     Currenex's ECN Alternative...........................................................................16

    D.     State Street's Acquisition of Currenex .............................................................18

DEFENDANTS' MISCONDUCT.......................................................................................20

I.     DEFENDANTS SECRETLY AGREE TO RIG THE CURRENEX AUCTIONS...........20

    A.     Currenex Creates a Secret Tiebreaking Rule Allowing the Trading
            Defendants to Jump in Line ............................................................................20

          1.     Trading platforms are expected to—and do—disclose their
                tiebreaking procedures ..................................................................20

          2.     Currenex purported to be following industry practices by
                disclosing its tiebreaking rules.................................................25

          3.     Currenex fraudulently omitted its secret, primary tiebreaking rule...........29

          4.     Plaintiffs and class members reasonably understood there was no
                "jump in line" secret tiebreaking rule .......................................34

    B.     Currenex Fraudulently Omitted That It Had Given Away Administrator-
            Level Access to Plaintiffs' Highly Sensitive Trading Information ......................36

II.     CURRENEX WAS MOTIVATED TO GIVE SECRET ADVANTAGES TO
    BRIBE IMPORTANT CLIENTELE AND FUNNEL MONEY TO ITS
    CORPORATE PARENT ..................................................................................43

III.   CURRENEX'S GRANT OF SECRET ADVANTAGES HARMED
        CURRENEX'S OTHER CUSTOMERS, PLAINTIFFS AND CLASS
        MEMBERS ..................................................................................................46

        A.    The Hidden Tiebreaking Rule Reduced Competition By Key, Large
              Liquidity Providers, Widening Spreads................................................46

        B.    The Hidden Tiebreaking Rule Allowed the Privileged Liquidity Providers
              to Steal Profits That Would Have Gone to Plaintiffs and Class Members ...........47

        C.    The Hidden Tiebreaking Rule Increased Plaintiffs' Execution Costs
              Because More Trades Were Subject to Cancellation..............................48

        D.    Example Scenarios of Harm .................................................................50

        E.    The Granting of at least HC Tech With Administrator-Level Access
              Further Harmed Plaintiffs and the Class...............................................52

IV.    CURRENEX'S SCHEME IS A *PER SE* VIOLATION OF THE ANTITRUST
        LAWS ........................................................................................................54

V.     EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT .......58

VI.    CLASS ACTION ALLEGATIONS .................................................................61

CLAIMS FOR RELIEF ........................................................................................65

        FIRST CLAIM FOR RELIEF (Fraud) ............................................................65

        SECOND CLAIM FOR RELIEF (Conspiracy to Defraud) ..............................69

        THIRD CLAIM FOR RELIEF (Aiding and Abetting Fraud) ...........................71

        FOURTH CLAIM FOR RELIEF (N.Y. General Business Law, Section 349)................72

        FIFTH CLAIM FOR RELIEF (Section 1 of the Sherman Act) ........................73

        SIXTH CLAIM FOR RELIEF (Unjust Enrichment—Currenex)....................77

        SEVENTH CLAIM FOR RELIEF (Unjust Enrichment—Trading Defendants) .............78

        EIGHTH CLAIM FOR RELIEF (RICO Section 1962(C))................................78

        NINTH CLAIM FOR RELIEF (RICO Section 1962(D)) .................................83

        TENTH CLAIM FOR RELIEF (Tortious Interference with Prospective Economic
              Advantage)..............................................................................................84

        ELEVENTH CLAIM FOR RELIEF (Breach of the Implied Covenant) ........................85

ii

TWELFTH CLAIM FOR RELIEF (Tortious Interference with Contract) .......................86

PRAYER FOR RELIEF ...............................................................................................87

DEMAND FOR JURY TRIAL .....................................................................................88

Plaintiffs Edmar Financial Company, LLC, Irish Blue & Gold, Inc., and XTX Markets Limited, individually and on behalf of all persons and entities similarly situated, bring this class action and allege as follows:

## NATURE OF THE ACTION

1.      This case is about a long-running scheme to rig what amount to auctions for foreign exchange ("FX") transactions.  Currenex, which operates an FX trading platform in conjunction with its parent company State Street, agreed to give a narrow subset of participants unfair bidding advantages—advantages that Plaintiffs and class members were neither informed of nor reasonably expected.  Chief among these was a secret, never-before-seen rule for breaking "tie" bids:  In case of a tie, Currenex operated under secret agreements with a few privileged customers, providing that their bids would always be declared the winner.  Currenex also provided these same privileges to its own parent company, State Street, which operated as one of the largest liquidity providers on the platform.

2.      Currenex also gave at least one customer (HC Tech) administrative-level access to the entire Platform, allowing HC Tech to view *all* orders placed on the Platform—something that no user reasonably expected and that was directly contrary to industry standards.  This was accomplished at one point by a Currenex/State Street executive passing API specifications and username / password credentials to HC Tech.

3.      Currenex and State Street operate an Electronic Communication Network ("ECN") where banks, corporations, hedge funds, investors, and other traders engage in FX transactions.  Plaintiffs and class members often traded on Currenex via its Executable Streaming Prices Trading Model (the "Currenex Platform").  To trade over the Platform, market participants can submit a "bid" price (the level they are willing to buy) or an offer or "ask" price (the level they

are willing to sell).  Other participants on the Platform can accept these quotes, consummating a trade.  Billions of dollars' worth of FX transactions are executed in this way on Currenex each day.

4.      A fundamental feature of an ECN is its matching logic—the method by which bids and offers are matched to execute trades.  The execution methodology sets the rules of the road.  It is imperative that users know what those rules are.  Nobody would participate in billion-dollar auctions without a reasonable understanding of what rules govern.  Nor would anyone tolerate the existence of undisclosed agreements that privilege one set of participants over others.  Only through transparent disclosure of the rules can participants hope to make informed choices about whether, when, and how to trade.

5.      Accordingly, ECN platforms are expected to, and do, disclose all material aspects of their matching logic.  A pivotal aspect of that logic is what to do in case of a "tie" between bids or offers.  One potential rule is the simplest:  first-in, first out, or "FIFO."  A FIFO system dictates that, for two equally priced orders, the platform will give the business to the customer that submitted its bid first.  It is possible for an ECN to use other tiebreaking rules instead of or in addition to FIFO.  But as with any other aspect of the matching logic, such rules should be, and by industry standard are, fully disclosed.

6.      In this case, Currenex and State Street purported to be following the industry norm that material tiebreaking rules would be reasonably disclosed.  For example, at least as early as February 2005, Currenex's website expressly represented that "Limit Orders are filled automatically by the first counterparty bank to stream a price that matches the order."  In other words, FIFO.  Currenex and its parent company State Street made similar statements in a series of marketing materials and conflict-of-interest disclosures.

7.      Later, Currenex and State Street disclosed that its tiebreaking rules would change. Under the new rules, "firm orders (i.e., the price quote is not subject to 'last look' functionality) would be prioritised over Last Look liquidity" and then the time of the offer would control.  In other words, when Currenex modified its tiebreaking rules to consider not just when the offer was made (FIFO) but also whether the trade could be cancelled ("firm" or "last look"), Currenex expressly warned customers ahead of time.

8.      But the Currenex Platform did not implement tiebreaking rules that followed industry norms.  Nor did Currenex or State Street disclose what tiebreaking rules the Platform was using instead.  As a result, most firms trading on the Currenex Platform had no idea that they never stood a fair chance.

9.      This is because, rather than look to the speed or firmness of a quote as to foster merits-based competition, Currenex reached secret agreements with the "Trading Defendants" (Goldman Sachs, HC Tech, State Street, and Doe Defendants) to have their orders jump-in-line. The Platform's actual trump-card tiebreaking rule was that a Trading Defendant would always be declared the winner.

10.     Not only was this rule unfair, it was blatantly anticompetitive.  As the beneficiaries of this secret rule—select Trading Defendants win every tie—the Trading Defendants had no incentive to compete on either on price or the firmness of their quotes. Instead, the Trading Defendants could simply sit back, watch the screen, and then swoop in at the last moment and grab any trade they wanted without ever having to enter a competing bid or offer.  As a result, prices became artificial, and Plaintiffs and class members paid too much when buying, received too little when selling, and incurred increased execution costs.

11.     Plaintiffs were also harmed by the lost opportunity to be price-makers.  Because the Trading Defendants were allowed to jump to the front of the line, they were able to secure business and profits that should have been given to Plaintiffs and class members instead.

12.     It is also difficult to overstate the harm caused by Currenex giving HC Tech administrator-level access to the Platform.  For instance, HC Tech could see its rivals' potential and actual trading patterns—which in many cases were the result of proprietary algorithmic trading systems.  HC Tech could even see the "hidden" orders, allowing it to trade out ahead and make guaranteed profits, at the expense of other users.  Currenex's representations about the basic functionality of its system—including that hidden orders would be *hidden*—were false and misleading for this reason as well.

13.     Plaintiffs were also harmed by lost informational advantages that resulted from the jump-in-line scheme and grant of administrative-level informational access.  Knowing what market participants are willing to pay (a form of "price discovery") is a valuable advantage.  This advantage was magnified for those who were matched and thus executed transactions.  As the Currenex algorithm funneled an artificial amount of business to the Trading Defendants, so too was the Trading Defendants' informational and pricing advantage artificially widened.  And this advantage was even further widened by Currenex's grant of administrative-level access into order flow on the Currenex Platform.

14.     Defendants knew that if the market ever caught wind of the secret agreements, the Platform could collapse, particularly when it was still trying to get off the ground.  No liquidity provider would transact on a platform that was systematically rigged against it, and no price takers would trade on a platform with artificially widened spreads.  Nobody would trade on a

platform that secreted away users' confidential information to competitors.  As a result, Defendants went to great lengths to keep these agreements secret.

15.     This case is not about whether trading platforms must use FIFO, or any other particular matching logic, to break ties.  Rather, this case is about the illegality of platform operators implementing practices that were (a) highly material, (b) adverse to the interests of most users, (c) shocking departures from industry norms, and (d) never disclosed.

16.     Currenex and State Street's representations regarding its tiebreaking rules were false and misleading.  Both of Currenex's disclosed tiebreaking rules (FIFO, later combined with a preference for firm liquidity), were secretly subordinated to the undisclosed rule that a Trading Defendant would always win in the event of a tie.  Indeed, allowing co-conspirators to jump-in-line to benefit from an always-win tiebreaking rule is such a shocking breach of industry norms that it renders *everything Currenex ever said about its Platform* false and misleading.  Even marketing the Platform as running a "limit order book," for instance, was a lie because nobody would reasonably understand a limit order book to use a secret rule that awarded trades to select customers regardless of the merit of their quotes.

17.     Similarly, Currenex and State Street committed fraud by, among other things, failing to disclose that they were giving one user of the Platform a huge informational advantage by way of administrator-level access to other users' data.

18.     These wrongdoings also breached Currenex's implied duty of good faith and fair dealing to its contractual counterparties.  It also unjustly enriched Currenex (by increased fees) and the Trading Defendants (by stolen transactions).  The corruption of the Currenex Platform also violated the federal RICO Act.  The secret arrangements also constituted illegal agreements in restraint of trade, creating artificial prices in violation of the antitrust laws.  Moreover,

Defendants tortiously interfered both with Plaintiffs' contracts with Currenex, as well as Plaintiffs' prospective economic advantage on the Platform.

19.     Plaintiff XTX is among the largest FX spot traders in the world by volume.  It conducted on average $1.5 billion in FX trades *daily* via the Platform during the relevant period. Following publication of the original complaint in this action, XTX first began to realize what had been negatively impacting its performance on the Currenex Platform back for many years. XTX believes in making electronic markets fairer for all market participants.  It has been a leader in improving ethical and conduct standards in the FX industry.  This has included playing an integral part in the development of the *FX Global Code*, and by helping change the market structure for the benefit of all participants.  As a result, it now seeks to be a co-lead class plaintiff to help ensure justice is done for all victims of Defendants' schemes.

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the class arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also bring this action under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962.

21.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  Subject matter jurisdiction is also proper pursuant to 28 U.S.C. §§ 1331 and 1337(a).  This Court also has jurisdiction over this class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $5,000,000, exclusive of interests and costs.

22.     Venue is proper pursuant to 15 U.S.C. §§ 15(a) and 22.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed was carried out in this District.

23.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

24.     The Court has personal jurisdiction over Defendants pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22.  Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States and because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and class members residing in, located in, or doing business throughout the United States.

25.     Defendants are also subject to personal jurisdiction because each, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

26.     Alternatively, to the extent that any Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this Court has personal jurisdiction over the Defendant pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because the Court's exercise of jurisdiction is consistent with the United States Constitution and laws.

## THE PARTIES

### A.   Plaintiffs

27.     Plaintiff Edmar Financial Company, LLC ("Edmar") is a Virginia limited liability company that operated during the relevant period as a foreign limited liability company in Naples, Florida.  During the relevant period, Edmar entered into FX spot transactions and placed numerous orders on both the buy-side (also known as being a price taker) and on the sell-side (also known as being a price maker, or liquidity provider)[1] via the Currenex Platform located in New York.  On July 9, 2010, Edmar Financial Company, LLC signed a contract with Currenex, Inc. titled "Agreement For Currenex Services."

28.     Plaintiff Irish Blue & Gold, Inc. ("IBG") is a Bahamas company with its principal place of business in Nassau, Bahamas.  During the relevant period, Irish Blue & Gold, Inc. entered into FX spot transactions and placed numerous orders on both the buy-side and sell-side via the Currenex Platform located in New York.  On May 30, 2014, IBG signed a contract with Currenex, Inc. titled "Agreement For Currenex Services."

29.     XTX Markets Limited[2] ("XTX") is a private limited company registered in England and Wales with its principal place of business in London, England.  During the relevant period, XTX entered into FX spot transactions and placed numerous orders on both the buy-side and sell-side via the Currenex Platform located in New York.  Indeed, it conducted on average $1.5 billion in FX trades *daily* via the Platform during the relevant period—over $2 trillion

---

[1]   The "buy-side" and "sell-side" terminology are discussed in the Background Allegations Section A.

[2]   For the sake of clarity, XTX brings claims for the trades it entered into in its own name as well as those XTX caused to be entered into even if booked in the name of its predecessor entity, Green Park Trading 1 Ltd.  The profits and losses from certain of those trades were borne by XTX.

dollars' worth to date.  On September 22, 2016, XTX signed a contract with Currenex titled "Agreement for Currenex Services."

30.     XTX is among the largest FX spot traders in the world by volume.  For example, in the annual *Euromoney* FX survey, XTX is consistently ranked in the top three in both spot and electronic spot FX trading globally.  In 2019, XTX was ranked by *Euromoney* as the largest Spot FX trader globally and in 2020 as the largest electronic trader of Spot FX globally.  Also, in 2020, XTX was ranked as the third largest FX trader overall and the second largest in terms of electronic trading of FX across all products globally.

31.     During the relevant period, each Plaintiff transacted and attempted to transact on the Platform.  A set of example transactions completed on the Platform for Edmar is attached as Exhibit A.  A set of example transactions completed on the Platform for IBG is attached as Exhibit B.  A set of example transactions completed on the Platform for XTX is attached as Exhibit C.[3]

32.     These Exhibits include trades where Plaintiffs were on both the buy-side and sell-side (that is, trades where each plaintiff was a liquidity maker and trades where it was a liquidity taker).  To put Exhibit C in perspective, it covers XTX trading for *just one month* on the Platform. Excluded from the Exhibits are the quotes Plaintiffs provided that did not result in a matched trade, including because business was steered towards the Trading Defendants instead.  For XTX, that included hundreds of millions, if not billions, of quotes XTX streamed onto the Currenex Platform.

---

[3]   Listed buy-side trades with a "filled amount" of 0 were eventually rejected by way of last-look rights.  Last-look rights are explained in Section II.C below.  All or at least some of these orders would have fully executed but-for Defendants' wrongdoing.

33. Each of the trades in the Exhibits, and many, many more, were impacted by Defendants' wrongdoing. This is because, among other reasons, (a) Plaintiffs would not have transacted on the Platform as they did, and would not have been willing to pay Currenex's fees, if they had known Currenex was giving other users secret advantages, (b) the prices Plaintiffs received on the transactions were less favorable because the secret advantages reduced competition on the Platform, including on price; and (c) the execution costs of the transactions were artificially increased. As also discussed in Section III below, the harm felt by Plaintiffs and class members also includes harm when Plaintiffs attempted to engage in other transactions, but the business was instead steered to the Trading Defendants.

34. Plaintiffs were matched with each of the Trading Defendants on FX trades executed on the Currenex Platform during the relevant period. Plaintiffs also attempted to enter into trades on the sell-side via the Platform but were thwarted from doing so by Defendants' wrongdoing. Although the Currenex Platform is anonymous, Trading Defendants were the responsible for a large portion, if not a majority, of the trading volume on the Currenex Platform. State Street is one of Currenex's largest liquidity providers. HC Tech is reported to have accounted for 10% of the liquidity on the platform. And Goldman is another of the largest providers on the Currenex Platform. Plaintiffs' allegation that they were matched with each of the Trading Defendants, and had trades stolen by the Trading Defendants, is also plausibly supported by the nature of the wrongdoing at issue. That is, the wrongdoing at issue was designed specifically to steer business to the Trading Defendants.

35. Plaintiffs' matching allegation is also supported by the sheer volume of trades relevant to this case. As most of the liquidity on the Platform is provided by a handful of users, it is practically impossible that a trader of any size could avoid running into the Trading

Defendants.  For context, XTX averaged approximately $1.5 *billion* in *daily* trading via the Platform, far more than necessary to make it a statistical certainty not only that XTX matched with each of the Trading Defendants, but that XTX matched with them regularly.

**B.     Defendants**

36.     Whenever reference is made to any Defendant entity, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

37.     Defendant Currenex, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  Currently, Currenex, Inc. is a wholly owned subsidiary of State Street.  Currenex, Inc., together with its parent company State Street, operate and manage the Currenex Platform.

38.     Defendant State Street Global Markets International Limited ("State Street Limited") is a corporation organized and existing under the laws of England.  According to Currenex and State Street's disclosures, State Street Limited is the entity by which the Currenex Platform is "offered" in the European Economic Area.  But, regardless of which entity formally "offered" the Platform, all trades were executed on the same Platform, and the decision-makers regarding the operation of the Currenex Platform are the same people.

39.     Currenex, Inc. and State Street Limited are thus referred to collectively in this Complaint as "Currenex."

40.     Many of those acting on State Street Limited's behalf when engaging in the acts relevant to this action—including deciding what contracts to enter into, how to operate the

Platform, whether to give secret advantages to other customers, what representations to make (or not make), were made by State Street Limited's representatives acting in the United States and within this District.  Indeed, those acting on State Street Limited's behalf were often also employees of Currenex, Inc. and/or State Street, operating out of the United States and in this District.  By way of example, State Street Limited's agents drafted many of the fraudulent marketing materials and disclosures at issue on State Street Limited's behalf in the United States and in this District, and U.S. employees such as Beverley Dougherty signed user agreements for the Currenex Platform on State Street Limited's behalf.  State Street Limited also "offered" the Currenex Platform, located in the United States and in this District, which matched and executed trades in the United States and in his District.  Plaintiffs' claims thus arise out of and relate to State Street Limited's activities in the United States and in this District.

41.     State Street Limited is also subject to personal jurisdiction by way of the acts and contacts of its agents, co-conspirators, and alter-ego entities within the United States.  For instance, State Street, whether directly or through its affiliates, owns 100% of State Street Limited.  In connection with the offering of the Currenex Platform, State Street disregarded the corporate formalities of State Street Limited, including signing customer contracts on State Street Limited's behalf and issuing conflict-of-interest disclosures on State Street Limited's behalf.  State Street Limited employees also had Currenex, Inc. e-mail domains, and State Street Limited was marketed under the "State Street Global Markets" monitor, the trademarked brand name for State Street's trading execution business in the U.S. and abroad.  Many State Street officers and employees acted as officers, employees, and agents of State Street Limited, including David Newns and Beverly Dougherty.  State Street intermingled itself and Currenex with State Street Limited as part of the wrongdoing at issue in this action.

12

42.     State Street Limited had knowledge, awareness, and understanding of the conspiracy's effects in New York and this District.  This included knowledge that the class members to whom State Street offered the Currenex Platform would likely be matched with U.S. counterparties through the Platform's server located in this District.  The New York activity of State Street Limited's co-conspirators were to the benefit of State Street Limited.  These co-conspirators acted at the request and on behalf of State Street Limited, including without limitation by issuing State Street Limited's fraudulent misrepresentations, operating or providing substantial liquidity to the Currenex Platform, and implementing the fraudulent and anticompetitive scheme in this District.

43.     Defendant State Street Bank and Trust Company ("State Street") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts.

44.     State Street has substantial offices in New York City and carries out substantial business in this District, including its operation of and trading on the Currenex Platform located in New York.  State Street was one of the liquidity providers that entered into a secret agreement to secure priority trading rights on the Currenex Platform.  During this time, State Street entered into FX spot transactions with class members, including Plaintiffs, via the Currenex Platform in New York.  Currenex's marketing materials and disclosures regarding the Platform were also often issued under the name of State Street.

45.     Defendant Goldman, Sachs & Co. LLC ("Goldman Sachs") is a company organized and existing under the laws of the State of New York with its principal place of business in New York, New York.  Goldman Sachs was one of the liquidity providers that entered into a secret agreement with Currenex to secure priority trading rights on the Platform.

During the relevant period, Goldman Sachs entered into FX spot transactions with class members, including Plaintiffs, via the Currenex Platform in New York.

46.    Defendant HC Technologies, LLC (f/k/a Henning-Carey Proprietary Trading, LLC) ("HC Tech") is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  HC Tech is an algorithmic and proprietary trading firm.  HC Tech has offices in Chicago, New York, and London, and regularly traded on the Currenex Platform located in New York.  HC Tech was one of the liquidity providers that entered into a secret agreement with Currenex to secure priority trading rights on the Platform.  During the relevant period, HC Tech entered into FX spot transactions with class members, including Plaintiffs, via the Currenex Platform in New York.

47.    The John Doe Defendants are other liquidity providers that traded regularly on the Currenex Platform and that entered into secret agreements with Currenex to secure priority rights on the Platform.  At present, while Plaintiffs have reason to believe there were others, Plaintiffs do not know the names or identities of the other liquidity providers who were given super-priority rights on the Platform.  Plaintiffs expect to be able to identify the Doe Defendants during discovery.

## **BACKGROUND ALLEGATIONS**

### A.    **The FX Market Generally**

48.    FX trading involves an exchange of one country's currency for another.  The FX market is the largest in the financial system, accounting for over a trillion dollars a day in the United States alone.

49.    Currencies are traded in pairs, with the Euro/U.S. dollar ("EUR/USD"), U.S. dollar/Japanese Yen ("USD/JPY"), and British pound/U.S. dollar ("GBP/USD") constituting the

14

top three pairs.  The U.S. dollar is the world's dominant currency, making up one side of most FX trades.

50.     Exchange rates used to be quoted to two or four decimal places, depending on the currency pair.  The final digit was referred to as one Price Increment Point or "pip."  Currencies are now generally quoted to three or five decimal places.  For instance, the EUR/USD rate could be 1.22265.  A pip is still typically understood to be the second or fourth decimal place, depending on the currency pair.  A change in the EUR/USD rate from 1.222<u>65</u> to 1.222<u>75</u> would be one pip change.

**B.     The FX OTC Market**

51.      FX spot transactions[4] are generally executed over-the-counter ("OTC"), meaning a customer must use a dealer to execute the trade.  The dealers have traditionally been known as the "sell-side" of the transaction because they sell liquidity—generally speaking, they are selling the ability to transact by being willing to deal.  The customers, whether buying or selling currency, have traditionally been known as the "buy-side" because they take (or "buy") liquidity. The sell-side/buy-side terminology is often used regardless of whether the party is buying or selling a given currency.

52.     To initiate an OTC transaction, a customer contacts a dealer, indicating the currency and quantity she wishes to trade.  The dealer responds with the prices at which it is willing to buy or sell that currency.  One way the dealer makes money is by way of the gap between the quoted buy and sell prices—known as the "bid/ask spread."  All else equal, the

---

[4]  A spot transaction is the exchange of two currencies between counterparties at an agreed-to rate for the spot value date of typically two days or less—as opposed to a forward contract where delivery occurs at some time further in the future.

wider the spread the more the client pays the dealer to complete the transaction.  Likewise, one way dealers compete on price is through the bid/ask spread.

53.     In practice, several factors historically served to limit the vibrancy of this competition.  For one, OTC markets are opaque.  In theory, the end user can contact other dealers.  But it takes time to establish the necessary relationships with each dealer, including investments in different documentation and the establishment of credit lines and accounts with each additional dealer—who could always switch off pricing at any time or just unilaterally end the relationship.  And even once the relationships are established, asking for multiple quotes puts the end-user at risk both in terms of information leakage, and in terms of the market moving against it in the meantime.

54.     The FX OTC market also suffers from extreme information asymmetry.  Because FX salespeople have strong institutional relationships and keep track of clients' order histories, they are often able to predict client trades even before an order is placed.  Throughout the order process salespeople are in regular contact with traders.  They inform the traders of incoming potential orders, confirm bid and ask prices, and ultimately convey placed orders to the trading desk for processing.  The system creates a playing field where customers are dependent on their dealers for information, and the cost and resourcing in replacing dealers or adding additional dealers can further prevent users from effectively price-shopping.

**C.      Currenex's ECN Alternative**

55.     Currenex, Inc. was founded in 1999 by a group of investors to purchase Waldron Management, a company that had been developing a multibank trading service.  Soon thereafter, Currenex, Inc. launched the first request-for-quote ("RFQ") service in the FX spot markets for end-customers.  In a RFQ system, rather than having to call individual banks in sequence, customers using these platforms can send a request for a quote to multiple dealers.  They can

then select which institution to trade with based on these quotes, lowering the cost of price discovery.  The limitation of these platforms, however, is still that only a set number of dealers can act as market makers.  They are effectively an electronic version of the "OTC" system.

56.    In response to the emergence of ECN platforms, many of the largest financial institutions formed FXAll,[5] an RFQ-style platform, to create a venue they could control. Antitrust authorities began investigating whether the banks had set up the joint venture for anticompetitive ends.  FXAll (now known as Refinitiv) continues to capture the largest share of RFQ trading volume.

57.    In the early 2000s, Currenex, Inc. launched its limit order book type of system, the Currenex Platform.  In such a system, every user can choose to be on the sell-side and supply liquidity or on the buy-side and take liquidity.

58.    To simplify, on a limit order book style of ECN like the Currenex Platform, subscribers can act on the sell-side by posting a "limit order," which indicates at what bid or ask price they would be willing to transact (also known as being a liquidity provider).[6]  Orders remain on the limit order book until executed or cancelled.[7]  Market orders are matched with the limit orders in the book, creating an executed trade.  The identity of the buy and sell-side counterparties are usually anonymous, unless the counterparties have agreed on a disclosed relationship.

---

[5]  John R. Wilkes, *U.S. Probes Whether Big Banks Stifled Rival in Currency Trade*, Wall Street Journal (May 15, 2002), https://www.wsj.com/articles/SB1021421905951110240.

[6]  For administrative purposes, some platforms informally designate larger sell-side participants as "Liquidity Providers," even though anyone can act as one on any given trade.

[7]  A limit order book is a record of outstanding limit orders maintained by the exchange. Subscribers can also decide to trade by being a liquidity taker, such as placing "market orders."

59.     In order for a limit order book platform to be successful, there needs to be a critical mass of customers to ensure there is sufficient liquidity to allow trades to get done in a timely and efficient manner.  This is particularly true at the outset of the platform.  Thus, although limit-order markets allow end-customers to make prices, ECNs still need backing from larger sell-side institutions, like Goldman Sachs and State Street.  Proprietary firms such as HC Tech also regularly act as sell-side subscribers on the Currenex Platform.  During the class period, HC Tech often comprised around 10% or more of the Platform's trading volume.

### D.     State Street's Acquisition of Currenex

60.     In 2007, State Street bought Currenex, Inc. for $564 million.  News reports from the time indicate that the market was stunned as to the amount State Street paid—28 to 30 times Currenex's earnings.

61.     Since its acquisition of Currenex, Inc. in 2007, State Street has acted as a major liquidity provider, if not the largest, on the Currenex Platform.  As discussed below, State Street gave itself jump-in-line rights.

62.     For many class members, State Street Limited and Currenex, Inc. together are the nominal contracting entities through which such class members subscribed to the Currenex Platform.  For instance, David Newns, Global Head of the Currenex Platform, signed XTX's agreement on behalf of both State Street Limited and Currenex, Inc.  Beverley Doherty, COO and North American Head of GlobalLink (the brand name for State Street's suite of e-trading platforms), signed two amendments to XTX's agreement on behalf of both Currenex, Inc. and State Street Limited.

63.     Since its acquisition of Currenex, Inc., State Street has closely monitored and actively managed the operation of the Currenex Platform as part of GlobalLink, State Street's

suite of e-trading platforms.  State Street's Compliance Department also monitored the Currenex Platform.

64.     Sometime after the acquisition, the Platform Employee (defined below) raised with State Street senior management the issue of improper secret advantages being given to privileged customers.  But senior management did nothing and the behavior continued.

65.     State Street executives occupy four of the five positions on Currenex's senior management team.  State Street executives also actively implemented the jump-in-line scheme, including David Newns, Global Head of Currenex and then head of GlobalLink.

66.     State Street also had a direct hand in crafting Currenex's misrepresentations regarding the Platform.  As detailed below, State Street issued several of the fraudulent marketing materials and conflict-of-interest disclosures that purported to disclose the tiebreaking rules the Platform followed.

67.     In December 2016, the Securities and Exchange Commission ("SEC"), the Department of Justice, and the Department of Labor together fined State Street $382.4 million for misleading clients by applying hidden markups to FX trades.  This included misleading clients about how State Street priced their trades, "tucking" its actual practices "into a corner" where nobody would notice.

68.     In September 2017, the SEC fined State Street for misrepresentations about liquidity-provider privileges it provided on GovEx, its U.S. treasury securities trading platform. State Street was fined for failing to disclose the existence of last look rights on this platform despite purporting to issue detailed descriptions of the execution procedures on GovEx, and for misrepresenting to certain customers that no users had last look rights on the GovEx platform.

Several of the State Street and Currenex employees, such as David Newns, served in senior roles for the GovEx platform as well.  HC Tech was the largest liquidity provider on GovEx.

**DEFENDANTS' MISCONDUCT**

I.     **DEFENDANTS SECRETLY AGREE TO RIG THE CURRENEX AUCTIONS**

    A.     **Currenex Creates a Secret Tiebreaking Rule Allowing the Trading Defendants to Jump in Line**

        1.     Trading platforms are expected to—and do—disclose their tiebreaking procedures

69.     The most important attribute of a trading platform is the mechanism by which orders are matched.  The matching mechanism spells out the rules of the "auction."  Orders need to be matched in some sort of a merit-based fashion, or no one will trade.  Of equal, if not greater, importance, is that these rules must be disclosed.  And by industry practice and reasonable expectation, they are disclosed.  That way, all auction participants have an equal understanding of what rules govern, so they can make informed decisions about whether to participate and what strategies to adopt to compete for business on the platform.

70.     An important part of the matching protocols is what to do in the event of a "tie."  A platform could have multiple tiebreaking rules to determine whose bid or whose offer should be executed first.  If one rule fails to resolve the tie, the matching engine would go on to the next rule, and so on, until the tie is broken.

71.     An example of a tiebreaking rule—by far the most common, and what the industry expects in a central limit order book—is a "price/time priority" or "first in, first out" ("FIFO") system.  Under a FIFO system, the record of outstanding limit orders is managed first based on price; the best-priced limit orders are placed at the front of the queue (the best bid and ask prices are called the top of book "quotes").  If two limit orders have an identical price, the one that was submitted first is matched first.  If the market order is bigger than the best-price

limit order, then the remaining quantity is matched with the next-best limit order, and so on, until

the entire market order is filled.  In this manner, identically priced orders are matched in the

sequence in which they were received.

72.     To demonstrate, the screenshot below is an example of a limit order book on the

Currenex Platform, where the best price in GBP/USD in GBP 1 million has been shown.  The

best bid for GBP 1 million is 1.60302:  "1.60" is seen at the top, the next two decimals of "30"

are the two large bold numbers on the left above the "bid" column, and the final digit of "2"

comes from the small number next to the larger numbers.



73.     One can see that there are also bids for 1.60299, and -298, -296, and -294, which

represent inferior offers to buy British Pounds, but provide information to traders about the depth

of the book.  This depth is important to know what prices would be needed to sell in larger

quantities than the top bidder would be willing to buy for.  For instance, here the best bid is

1.60302, the top of the column on the left.  But that trader is willing to buy only GBP 1.5 million.

The depth of the book informs a trader who would like to sell more than that amount.  To sell

GBP 2.5 million, for instance, the remainder of the order would be matched with the second-best

price of 1.60299.

74.     Presume a trader seeing the above order book wanted to make prices by providing

limit orders for GBP 1 million.  If the bidder only submitted a bid of 1.60302, under a FIFO

system that trader would not be matched with a market order for GBP 1 million, because someone else has already stated a willingness to buy GBP 1.5 million at that price. A FIFO system thus encourages traders to bid aggressively. A sell-side liquidity provider who provides quotes cannot simply match the going prices—those who were there first instead get the deals, the profits, and the valuable information to be learned from the trade.

75.     All FX spot platforms comprehensively disclose their tiebreaking rules. The vast majority use FIFO or a close variant. Plaintiffs are not aware of any platform other than Currenex that has agreed—let alone secretly—to give certain traders favoritism to select liquidity providers and automatically match their orders over all equally priced ones.

76.     For instance, Electronic Broking Service, an FX platform, publishes its "Dealing Rules." Rule 2.8.2 describes the EBS Matching Process: "Once an Order is submitted, EBS Market will immediately attempt to Match the instruction with a Bid/Offer of better or equal price. Each Match attempt is prioritised in shown price, time priority order . . . ."

77.     Cboe FX (formerly known as Hotspot), another FX platform, likewise discloses that it uses the FIFO industry standard. As Cboe FX stated in a press release: "The order matching mechanics of Cboe FX Central are consistent with other central limit order books in the FX market. All orders in the book . . . are executed on a price (displayed then hidden) / time priority."

78.     Cboe FX's current Operating Procedures likewise disclose a close variant of FIFO that prioritizes orders according to the following characteristics: "(i) price, (ii) firm (provided, however, that a firm order that constitutes an Iceberg order which is indicated as having zero notional amount visible shall be considered after all other displayed firm orders), (iii) non-firm (see Section 9), (iv) time."

79.     ParFX's 2015 Trading Platform Rulebook also discloses that:  "The Matching Engine will display all prices and match trades between bidders and offerors, with, until further notice, the Matching Engine automatically selecting the best price in terms of highest bid and lowest offer prices (with priority being strictly given to the earlier price submitted to the Matching Engine if there are two identical bid or offer prices)."

80.     GTX's Trading Policies and Procedures states:  "Eligible Orders and Feeds are matched first by price, then by Order Placement Time or the equivalent Feed update time."

81.     The importance of tiebreaking rules, and the FIFO default, is further underscored by the definition of a central limit order book given by the Markets Committee for the Bank of International Settlements:  "a trading protocol in which outstanding offers to buy or sell are stored in a queue and are filled in a priority sequence, usually by price and time of entry."  Similarly, the Securities Industry and Financial Markets Association ("SIFMA"), a leading industry group, defines "the central limit order book (CLOB) trading method" as "an automated system which uses an algorithm to match customer orders on a price time priority basis (no negotiation)."  The financial markets trade journal Risk similarly defines a "central limit order book" as an "exchange-style execution method . . . that matches all bids and offers according to price and time priority."

82.     This is not to say an ECN has to use FIFO, or even FIFO variants, to break ties. Rather, it is to say that fully disclosing all material tiebreaking rules is of the utmost importance in running a trading platform—the tiebreaking rules are literally part of how industry parlance defines things like what is a "limit order book."  It is also to say that where an ECN is silent about its tiebreaking procedures, market participants would reasonably assume the platform uses

FIFO or some close variant.  No reasonable trader would ever presume the existence of secret tiebreaking rules declaring certain privileged customers the winner.

83.     Demonstrating the importance of disclosing departures from industry norms, FastMatch, which is known across the market as having its own customized matching order called "Flexible Matching," issued disclosures in 2016 that "prioritizes order driven liquidity [i.e., *firm orders*] over the quote driven liquidity [i.e., last look] at the same price.  FastMatch's 'Flexible Matching' logic also prioritizes order driven liquidity over quote driven liquidity in certain circumstances, even when the quote driven liquidity is a better price, if the execution quality of the quote driven liquidity is historically sub-optimal quality."   FastMatch (now Euronext Fx) then directs users to its website, where it includes a comprehensive discussion of its Flexible Matching Rules.

84.     The *FX Global Code* is a common set of guidelines to promote the integrity and effective functioning of the wholesale foreign exchange market.  The *FX Global Code* states that market participants are expected to "handle orders with fairness and transparency," which includes "clear standards in place that strive for a fair and transparent outcome for the Client."  This includes making clients aware of such factors as "how orders are handled and transacted, including whether orders are aggregated or time prioritized," "the various factors that may affect the execution policy, which would typically include positioning," and "the basis on which trade requests and/or orders might be rejected."  The *FX Global Code* also lists other principles that emphasize transparency and fairness.[8]

---

[8]  For instance, the *FX Global Code* also notes that market participants are required to "act fairly, dealing with Clients . . . in a consistent an appropriately transparent manner; and [to] act with integrity, particularly in avoiding questionable practices and behaviours"; they ought to "identify and address conflicts of interest" including where "the interests of one Client may conflict with those of another"; and that "[w]here it is concluded that a specific conflict of

85.     The *FX Global Code* and its updates are drafted and reviewed by global Central

Bank FX Committees, which include central bank representatives as well as private market

participants.  Both State Street and Currenex were involved in the review and publication of the

code.  Both State Street and Currenex issued a "Statement of Commitment" to this code,

affirming they would handle their FX activities "consistent with the principles of the Code."

Each also affirmed it had "taken appropriate steps . . . to align its Activities with the principles of

the Code."

> 2.     Currenex purported to be following industry practices by disclosing its
> tiebreaking rules

86.     At least by February 2005, Currenex website's description of its "Trading

Services" represented that the Platform's "Limit Orders are filled automatically by the first

counterparty bank to stream a price that matches the order."  In other words, FIFO.  Currenex's

website continued to contain similar representations throughout the relevant period, at least in the

years 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and 2014.

87.     Currenex's 2011 product profile, issued by State Street, was entitled "Currenex

for Active Traders," which was distributed to Currenex users and potential users, expressly

stated that Currenex had a "[l]ow-latency matching engine with 'first in, first out' (FIFO)

prioritizing."

88.     On April 7, 2015, Currenex e-mailed Platform users informing them that it had

created risk and conflict-of-interest disclosures regarding the Currenex Platform (the "2015

Disclosures").  The e-mail was entitled "NOTE TO CLIENTS:  Description Of Services And

Conflicts Of Interest."  In the e-mail, Currenex stressed how the purpose of the disclosures were

---

interest cannot reasonable be avoided or effectively managed," market participants should
"disclose sufficient details of the conflict to enable the affected parties to decide beforehand
whether or not they wish to proceed with the transaction or service."

to "foster transparency and encourage active communication" about the Platform.  This included a "goal" to "describe generally the services offered through the Currenex electronic trading platform, certain potential risks related to the use of the electronic trading platform, and actual or potential conflicts of interest that we have identified that may arise between Currenex or State Street and any subscribers to the electronic trading platform."  Currenex also noted that this disclosure document was available on its website and provided a link, which was later maintained so that future users could also access the same representations.

89.     The 2015 Disclosures included a section entitled "How Do Price and Time Priority Matching Work?"  Currenex described the Platform's "central limit order book" as using a "matching priority" based on a "first in, first out basis":

> We provide central limit order book and request for quote style price discovery and matching as part of our anonymous bilateral trading service.  In the central limit order book, the electronic trading platform comingles participants' resting orders (e.g., orders crossing orders) with executable streaming price quotes submitted from certain liquidity providers, which as described above will vary from subscriber to subscriber.  The matching priority with respect to an acceptance of any price quote is based on price and, if prices are identical, then on a "first in, first out" basis.

90.     Currenex even purported to be following the industry practice of disclosing departures from a basic FIFO system.  For example, on September 3, 2015, Currenex e-mailed clients with the subject line "NOTE TO CLIENTS - Matching Priority."  In the e-mail, Currenex reaffirmed its representation from April 2015 disclosures:  "Within Currenex, the matching priority with respect to an acceptance of any price quote is based on price and, if prices are identical, then on a 'first in, first out' (FIFO) basis."  However, the e-mail warned of a future change in its matching logic:  "Effective 13 September 2015, the FIFO prioritisation process within Currenex will change such that firm orders (i.e., the price quote is not subject to 'last look' functionality) will be prioritised over Last Look liquidity."

91.    Currenex provided a link where the "updated Currenex disclosure could be viewed in full."  The updated disclosures (the "Revised 2015 Disclosures") were published under State Street's letterhead, but otherwise were virtually identical except that in the "How Do Price and Time Priority Matching Work?" section, Currenex amended its description to account for the fact Currenex would start considering an additional factor in its tiebreaking processes:

> We provide central limit order book and request for quote style price discovery and matching as part of our anonymous bilateral trading service.  In the central limit order book, the electronic trading platform comingles participants' resting orders (e.g., orders crossing orders) with executable streaming price quotes submitted from certain liquidity providers, which as described above will vary from subscriber to subscriber.  The matching priority with respect to an acceptance of any price quote is based on price and, if prices are identical, then on a "first in, first out" basis depending on whether the price quote is "firm" (i.e., the price quote is not subject to "last look" functionality) or subject to "last look" functionality.  Those price quotes that are "firm" take priority in the "first in, first out" determination over price quotes that are subject to last look functionality.

92.    In other words, in the Revised 2015 Disclosures, Currenex represented that it had replaced its single-rule tiebreaking system (FIFO) with a two-rule tiebreaking system where the engine first considered whether the tying quotes were both firm commitments or could be withdrawn, and then considered time.

93.    At least by July 27, 2017, Currenex published new disclosures (the "2017 Disclosures") under State Street's letterhead, which were amended to include disclosures regarding Currenex's new FX swaps and forwards platform.  Yet again, Currenex expressly represented it had two tiebreaking rules (FIFO and firm-liquidity):

> The Currenex Original Platform provides central limit order book and request for quote style price discovery and matching as part of its anonymous bilateral trading service.  In the central limit order book, the Currenex Original Platform commingles participants' resting orders (e.g., orders crossing orders), other than mid-match orders, with streaming price quotes submitted from certain liquidity providers, which as described above will vary from subscriber to subscriber.  The matching priority with respect to an acceptance of any price quote in this liquidity is based on price and, if prices are identical, then on a "first in, first out" basis depending on whether the price quote is "firm" (i.e., the price quote is not subject

to "last look" functionality) or subject to "last look" functionality.  Those price quotes that are "firm" take priority in the "first in, first out" determination over price quotes that are subject to last look functionality.

94.     Currenex emailed the 2015 Disclosures, the Revised 2015 Disclosures, and the 2017 Disclosures, and other representations to its customers, and posted them on its website, in order to attract customers.

95.     As discussed in Sections I.A.3 and I.A.4 below, all of these representations—and more—were materially false and misleading because Currenex in fact had as its first tiebreaking rule that a Trading Defendant would always win.  Such a system was not only an extreme departure from industry norms, but directly contrary to Currenex's express representations above. The secret, primary tiebreaking rule meant that, when a Trading Defendant was involved, neither of the two disclosed tiebreaking rules mattered at all.

96.     Plaintiffs received, read, discussed, and relied upon Currenex's representations about its Platform, including with respect to its tiebreaking procedures.  Such disclosures were read and received in the ordinary course of Plaintiffs' business.

97.     Edmar and IBG received Currenex's 2015 Disclosures and Revised 2015 Disclosures, and reviewed them in the ordinary course of business, which included opening, reading, reviewing, saving, and filing the disclosures in specific folders.  Edmar and IBG also actively used Currenex's website including to review for updates and Platform features.

98.     XTX received the April 7, 2015, e-mail from Currenex providing the 2015 Disclosures above.  It was sent to and reviewed by numerous XTX employees.  XTX received the September 2, 2015, e-mail from Currenex circulating the Revised 2015 Disclosures.  It was sent to and reviewed by numerous XTX employees.  XTX also received and reviewed the 2017 Disclosures.  XTX employees also were aware of Currenex's website, and certain employees reviewed it as part of the ongoing relationship with Currenex.  All of these disclosures were

28

reviewed and discussed internally by XTX and relied upon when deciding to trade on the Platform.

99.     Indeed, XTX even affirmatively inquired about Currenex's matching engine.  But it was fed the same lies.

100.    For instance, in May 2016, XTX emailed Currenex wanting to know how XTX could do more business on the Platform.  XTX posed several questions on the rules surrounding the Platform's matching engine.  The questions included asking for information on the typical Currenex liquidity provider response times, whether Currenex offered "market maker rebate programs," and about "unknown unknowns . . . . is there anything we are missing?"  XTX stated that it understood, based on the 2015 Revised Disclosures, that Currenex switched "from FIFO to prioritising firm orders" in September 2015, and specifically asked if there were other features the engine also considered.

101.    In response, Currenex simply pointed XTX to the Disclosures discussed above. This led XTX to again review the Disclosures discussed above.  Currenex also tried to shift blame to XTX itself, saying XTX should be using a different way of interfacing with Currenex's systems if it wanted to perform better.[9]  Currenex's responses to XTX's inquiries were false and misleading and were intended to help conceal the fact that Currenex's secret tiebreaking rule, discussed below, was the real reason XTX was not more successful on the Platform.

     3.     <u>Currenex fraudulently omitted its secret, primary tiebreaking rule</u>

102.    Contrary to Currenex's representations, Plaintiffs' reasonable expectations, and industry norms, Currenex's FX auction Platform in fact used a secret, corrupt tiebreaking rule: the Trading Defendants would win every tie on every trade in which they were involved.  That is,

---

     [9]  XTX made the adjustments Currenex recommended, but they had no material impact on the volume of business XTX was able to achieve on the Platform.

Currenex rigged the system by entering into secret agreements with large liquidity providers, the Trading Defendants, in order to steer them a greater share of FX trades without the Trading Defendants ever having to compete against other bidders.

103.    The plausibility and existence of this conspiracy is supported by substantial evidence and numerous sources.  These sources, all with first-hand knowledge of the fraudulent scheme, include:  (i) a long-term senior Currenex/State Street salesperson ("the Salesperson"), who has direct knowledge of the events herein, including by way of interactions with Russell Sears, Cary Rosenwald, Sean Gilman, other senior employees who negotiated and implemented the secret agreements, and the Trading Defendants; (ii) a long-term senior Currenex/State Street employee ("the Platform Employee"), who has direct knowledge of the events herein, the inner-workings of the Platform, and had conversations with the senior employees involved including David Newns and Russell Sears; and (iii) a long-term senior Currenex/State Street employee ("the Executive"), who has direct knowledge of the events herein, including by way of interactions with other Currenex/State Street employees, the Trading Defendants, and the Executive's own role in negotiating the agreements at issue.

104.    According to these sources, Currenex granted select clientele super-priority rights via the secret tiebreaking rule at least as of 2005.  Defendants' wrongdoing at issue continued into 2021.  Indeed, prior to the filing of the action, the Executive confirmed the Executive's belief that the scheme was continuing and noted that Currenex would have no reason to stop. The Salesperson identified the key "decision makers" in entering into these agreements as senior Currenex executives Cary Rosenwald and Sean Gilman.  They helped create the system where privileged liquidity providers' orders were placed ahead of non-privileged customers' orders. The Salesperson also identified Sears as having direct knowledge of and involvement in the

scheme, as well as possibly Cliff Lewis, Currenex's former CEO.  These facts were confirmed by the Platform Employee.

105.    According to Plaintiffs' sources, secret agreements were negotiated by senior salespeople at Currenex/State Street and senior personnel at the Trading Defendants, often over dinners and lunches in major cities like Chicago and New York.  These special rights were handed out to ensure a steady stream of liquidity by the Trading Defendants.  As discussed below, HC Tech and Currenex had a particularly close relationship due to their history of overlapping personnel.  Currenex and HC Tech employees even had regular meals during which they would discuss the jump-in-line system.  Many of these were attended by the Salesperson and included "HC Tech's owners."  At these dinners, Currenex and HC Tech would often make a point to only allude to the super-priority scheme (rather than discuss it expressly) because both knew of its illicit nature.

106.    Privileged liquidity providers received an outsized share of trades because of their secret priority agreements with Currenex/State Street.  For instance, according to the Salesperson, HC Tech received the majority of trades for which it had made offers, even though there were "faster shops," i.e., firms with faster execution technology than HC Tech.  And the Platform Employee revealed that HC Tech was responsible for 10% of Currenex's trading volume.  Internally, Currenex and State Street knew these figures were inflated by the prioritization scheme, but, according to the Salesperson, "nobody batted any eyelashes."

107.    According to the Platform Employee, many of the secret priority agreements were negotiated by Russell Sears, Currenex's former Global Head of Sales.  The Platform Employee explained that Sears had a "generous" package that incentivized Sears according to the brokerage generated by his clients trading on the Platform.  Currenex executives Sears, Gilman, and

Rosenwald all had close relationships with HC Tech and were involved in negotiating the secret deals. The Salesperson also said Currenex negotiated Goldman Sachs' superpriority privileges with Goldman Sachs senior employee and head of eFx sales, Rick Schonberg. Mr. Schonberg later left Goldman Sachs in 2014 to take a senior position at State Street that primarily entailed overseeing the Currenex Platform and other e-trading venues owned by State Street. Thus, Currenex's top employees were incentivized to grant super-priority rights to privileged liquidity providers with whom they had a close relationship.

108.    State Street actively participated in and benefitted from the jump-in-line scheme both by its perpetuating the fraud and directly receiving superpriority when trading on the Currenex Platform. State Street not only failed to rein in Currenex, but in fact actively participated in Currenex's wrongdoing. Many of the top-level Currenex executives, including those who carried out the scheme, held corresponding senior positions in State Street, such as David Newns, who was (i) chief operating officer in State Street's financial markets business in 2011-2014,[10] (ii) Global Head of Currenex in 2014-2017, and (iii) the head of Execution Services for Global Link, the brand name for State Street's broader suite of e-trading platforms from 2017 to 2021. In addition, many of the Currenex's fraudulent misrepresentations were issued by State Street on Currenex's behalf.

109.    Before and after its acquisition of the Currenex Platform, State Street acted as one of Currenex's main liquidity providers (potentially even the largest) with the understanding that it would receive jump-in-line rights. The acquisition was principally negotiated on the Currenex side by Cliff Lewis, who, according to the Salesperson, personally received roughly $50 million in connection with the sale. After the acquisition, State Street managed the Platform as part of

---

[10]   Newns was the COO of State Street Global Markets, which State Street describes as the brand name for its financial markets business.

its broader suite of trading platforms but did so by bringing many of the Currenex executives in-house under the State Street banner.

110.    In fact, according to the Executive, State Street often gave itself priority over limit orders, even though State Street's competing quote was at a *worse* price.  This was particularly the case for smaller order sizes.  In other words, State Street did not even have to "tie" before being declared the winner under the supposed "tiebreaking" rules.

111.    According to the Platform Employee, Currenex and State Street maintained a detailed system where it assigned internal tracking codes for various liquidity providers (e.g., LM02 for HC Tech, LM14 for State Street).  Knowing the identity of the liquidity provider for each code would have unmasked the Trading Defendants in Currenex's internal logs.

112.    This same senior official at State Street witnessed State Street and Currenex conducted prioritization experiments, often directed by David Newns.  In these experiments, Currenex compared the fill ratios (i.e., the rate at which customer orders are filled) for orders where neither party had prioritization privileges (i.e., "OXO" or "Order Crosses Order") over orders where one party had prioritization privileges (i.e., "OXP" or "Order Crosses Price").

113.    Currenex also compared its secret priority system to one based on the market maker's yield and fill ratio.  In this manner, Currenex collected data on the impact of its tiebreaking prioritization experiments, all without its customers' knowledge.  These experiments showed that it led to detrimental results for customers across key metrics such as fill ratios.

114.    According to Plaintiffs' sources, Currenex's scheme extended to select clientele other than just HC Tech, State Street, and Goldman Sachs—that is, the Doe Defendants.

4. <u>Plaintiffs and class members reasonably understood there was no "jump in line" secret tiebreaking rule</u>

115.    Plaintiffs and class members reasonably understood that the Currenex Platform did *not* have its primary tiebreaking rule that the Trading Defendants always won.  This is not just because Currenex expressly represented it used FIFO to break ties, as discussed above.  It is also because Currenex's actual tiebreaking rule was a shocking departure from industry norms.  Plaintiffs would not have reasonably believed such a system existed, let alone that it was put into practice without crystal-clear warnings.  Nobody goes to an auction expecting the auctioneer to have already declared a winner.

116.    Given the fundamental importance of the matching system, even when Defendants stayed silent, Defendants knew and intended that Plaintiffs and class members would understand this to mean the Platform was following industry norms.  That included at the most basic level that Currenex would not be relying on material, undisclosed tie-breaking procedures.

117.    For similar reasons, when Currenex or State Street spoke about *any* aspect of the Platform—through their websites, brochures, and disclosures, everywhere—every single representation about how the Platform worked was false and misleading because they failed to disclose the secret tiebreaking rule that pre-declared a Trading Defendant the winner.  Even Currenex presenting itself as having a limit-order book style of execution without saying more was false and misleading because its customers would reasonably understand that to mean the Platform was using use industry-standard tie-breaking procedures—which would exclude the system Currenex was actually using.

118.    Defendants knew and intended that Plaintiffs and class members would mistakenly understand that Currenex's and State Street's decision to speak about the Platform

without addressing the existence of its hidden tiebreaking rule would be understood as confirmation that industry-standard tiebreaking procedures were being used.

119.   For instance, at least as of July 27, 2010, Currenex marketed its Platform, stating: "Liquidity providers - expand your customer base and deal flow substantially, reduce your dealing costs and enhance your customer relationship management (CRM) capabilities in a secure, efficient, online trading environment." Currenex's current website similarly profiles the Current Platform as being a "real marketplace with hundreds of market participants and diverse liquidity sources." And in its pitch to hedge funds, Currenex claimed that "deep pools of liquidity from the thousands of market participants who access our technology globally encourages competitive rates." In marketing its Platform to price takers, Currenex lists one of the main features of its Platform as "High fill ratios. Our sophisticated technology and depth of liquidity can help you achieve consistent fills of orders."

120.   By way of another example, pursuant to its legal and regulatory obligations, State Street purported to disclose its own conflicts of interest. In the March 2015 version of such disclosures, State Street purported to address the issue that it owned Currenex but also traded on the Platform. Nowhere in those disclosures, however, did State Street indicate its trades were the result of secret advantages given to it by the Platform. Nor did State Street do so in any other of its "conflict of interest" disclosures.

121.   In addition, State Street actively promotes Currenex as part of State Street's offerings of trading venues for various financial instruments. State Street markets Currenex as providing "best-in-class client service experience" and "delivering market-leading solutions that increase transparency, improve trading efficiency and aim to deliver the best execution on behalf of our clients globally."

122.     With these and countless other general remarks about the Platform, Currenex and State Street knew and intended that their customers and prospective customers would assume that Currenex, like any other FX Platform, operated a tiebreaking system that followed reasonable industry norms that had been materially disclosed.  But the truth was to the contrary. Currenex did not follow industry norms, and it failed to disclose the most material tiebreaking rule.

123.     As a result, it is no surprise that the filing of this action caused a significant uproar in the industry.  Eight days after its filing, State Street announced that Newns would be departing the company and ceasing responsibilities over State Street's global suite of FX platforms.

124.     State Street also recently announced it was rebranding its Currenex Platform offering.  Going forward, the Currenex Platform would be marketed in conjunction with State Street's other FX trading platforms, as GlobalLink FX.

125.     Newns' replacement also began calling Currenex's major clients—including XTX—to try to convince them to keep using the Platform, even while refusing to comment on the specific allegations in this case.

## B.     Currenex Fraudulently Omitted That It Had Given Away Administrator-Level Access to Plaintiffs' Highly Sensitive Trading Information

126.     Demonstrating the depth of the corruption that flowed through the close relationships among Defendants, Currenex, through Sears, Gilman (who moved to HC Tech in 2010), and Rosenwald (who moved to HC Tech in 2011), created a new system whereby at least HC Tech was given an exclusive live feed from *all* orders on the Platform.  This contravened basic expectations of how ECNs operate, and gave HC Tech a huge, secret advantage that it could use to exploit Plaintiffs and class members.

127.    These facts were witnessed by the Platform Employee.  He stated that this preferential system was carried out at one point at least by Currenex simply giving HC Tech Sears' personal API log-in username and password.  As a result, HC Tech "basically saw everything."  This may have even included access to trader codes that would have allowed HC Tech to determine *who* was behind each quote.

128.    This shocking breach of trust came to the attention of the Platform Employee, who discovered that the market always moved in a way that exploited "hidden" orders, and that the mysteriously prescient and exploitive trades were being done via an IP address that was identical to the IP address Sears was supposedly logged in from—HC Tech's.  To be clear, Plaintiffs and class members never learned about any of this until recently, by way of their counsel's investigation, nor were the victims ever informed.

129.    It is difficult to understate how serious of a breach of trust this conduct was, or how much harm Defendants caused.  One could analogize to a "silent" auction where the auctioneer was bribed into allowing one participant to secretly bid last, after also being allowed to see the other bids.  But even this analogy falls short, because even knowing *when and how* FX traders operate is itself highly confidential, incredibly valuable, sensitive information.  High-frequency trading firms and many other active traders jealously guard their trading algorithms as core intellectual property—which Currenex threatened by allowing a competitor to watch them in action.[11]

130.    In the normal functioning of a limit order book, while users can see the top of the book and the depth of the book, they cannot know where quotes are coming from as the

---

[11]    Currenex exploited its own see-all access to conduct "triangular arbitrage," where it would compare the available prices on at least three overlapping FX trades (e.g., EUR-USD, USD-JPY, EUR-JPY) in order to capture the arbitrage profits before regular customers trading on the affected pairs.

counterparties are undisclosed.  Thus, even looking at the limit order book does not allow one user to deduce another's strategy.  To give a stylized example, one would not know if 10 quotes for various prices and volumes were from 10 different traders, 1 trader, or anything in between.  And even if a user were able to somehow guess that the 10 quotes came from the same trader, it would still not be known *who* that other trader was.  Indeed, limit order books typically operate to keep the parties anonymous even after they are matched on a specific trade, unless the parties agree otherwise.

131.    In fact, anonymity is a fundamental feature of a limit book order trading.  It is part of what differentiates this trading protocol from the OTC market.  If the system operated otherwise, users would be forced to reveal their trading strategies to the entire market.  This would be an even worse prospect than revealing one's trading strategy to a single dealer (who generally has confidentiality obligations) by transacting in the bilateral OTC market.

132.    Unsurprisingly, then, continually throughout the relevant period, Currenex marketed its Platform as fully anonymous.  As far back as 2005, Currenex's website stated that "technology" was "Currenex's core competency."  It calls its systems "state-of-the-art systems" and represented that they "implement[] comprehensive security measures at every step of the trading process to ensure the complete protection of user data and full member confidentiality."

133.    The first page of Currenex's product profile promotes its Platform as one in which users can have confidence their orders will remain confidential and anonymized.  It states this is in part because of Currenex's "trusted trading technology with complete confidentiality."  Currenex offers its Executable Streaming Price model as part of its liquidity pool that offers "diverse liquidity and complete anonymity" along with an "anonymous central counterparty service."

134.    Similarly, all of the Currenex and State Street's disclosures discussed above describe the Executable Streaming Pricing model as part of their "anonymous bilateral trading service."  They further state this Platform has a "functionality" that enables Currenex to "display resting orders input into the electronic trading platform by other subscribers on an *anonymous* basis."  These disclosures also include an express representation that users' orders will remain anonymized:

> *We keep confidential any information that shows the nature, number or volume of transactions* entered into by a particular subscriber through the electronic trading platform and the identity of any counterparty to the subscriber in such transactions.

135.    The Platform's user interface also stressed confidentiality and anonymity.  For example, Currenex's product profile provides the legend below for its Executable Streaming Price portal for market orders.  As seen below, a Currenex user can only see the total quantity of limit orders streamed to that user for each price level of a given currency pair.  The user cannot see another user's full set of quotes, even on an anonymized basis.  The counterparty field (denoted as "cpty") is also always blank on the Platform.  This specifically contrasts the Platform with other Currenex offerings, where this field is filled in.  This is because these other products (not at issue) were specifically designed and disclosed not to be anonymous.



136.     As another example, Currenex and State Street represented—most basically by way of the Platform interface itself, which allowed such requests to be made—that the Platform would allow users to keep their quotes hidden from other users, even when they otherwise would have appeared at the "top of the book."  The Platform thus had a function to "tag" specific users and to prevent them from seeing quotes posted by the liquidity provider who activated the tag. This is basic ECN functionality.  Again, that the Platform's user interface allowed for the "tags" was itself a representation that the feature existed and would operate as a normal user would expect.

137.     By way of a final example, consider a market participant who wants to place a large order for a particular currency pair.  Such a trader faces a dilemma:  the act of submitting a large market order could itself cause prices to change.  Traders that see a large buy order sitting there unfilled can anticipate that the large buyer will drive prices up.  Knowing there is a large buy order in the system, a trader could front run the order —buying first and then selling after the large purchaser's order has moved the market.

138.    In order to solve this issue, many platforms offer a feature that allows all or part of a participant's order to remain hidden from the market.  This goes beyond anonymization—even the order itself is not supposed to be viewable by other participants.  These features are commonly known as "hidden" or "iceberg" orders.  A hidden order is a type of order where the amount is hidden from the market.  An iceberg order is one where a portion (as specified by the user) is visible to the market.  After the visible portion is matched and executed, another portion becomes visible, and so on until the full order is filled.  Iceberg orders, in effect, automate the process of submitting smaller orders sequentially, so that the market does not know there is a large buyer (or seller) looking to be active.

139.    Currenex marketed its Platform as offering these features.  For instance, Currenex's 2011 product profile states that Currenex's diversity of order types "enable you to define your own trading parameters."  It then lists the various order types purportedly offered on the Currenex Platform.  Among these order types are "hidden" orders (defined as a "limit order where the total amount is hidden from the market") and "iceberg" orders (defined as a "limit order where a user-defined portion is shown to the market.  When the order is matched, the next portion is submitted.  That continues until the remaining quantity of the original order is complete.")[12]  In large part because of the purposed availability of hidden and iceberg orders, Currenex, including in its product profile for active traders, markets one of the central benefits of its Platform as providing "trading strategies" that allow users to "optimize trades *while minimizing market impact*."

---

[12]   A limit order is defined as an "order that will execute at a specified limit rate or better.  The order will rest on the book until it is fully matched, expired or canceled."  This is as opposed to a market order which is "immediately executed at the current market rate."

140.    The Currenex website similarly markets its Platform as offering hidden and iceberg orders.[13]  It also boasts of the Platform's "ability to easily utilize various order types."[14]  The Platform began to market the availability of these order types as early as 2006 when it made the following announcement on its website in bold:  "New Order Types are available: Iceberg and Hidden Orders."  On this webpage, Currenex explained the main utility of these "new" order types was their ability to shield a users' order size from the marketplace:

> The iceberg and hidden order types allow a trader to place a large order without alerting the marketplace of the true size of their order.  With an iceberg order, you specify exactly how much of your order you want to display.  With a hidden order, while your order is still in the market, no part of the order is visible to any of the market participants.

> These new order types are available on the Spot ESP Market page.

141.    Currenex's trading portal also displays an option for hidden and iceberg orders.  A screenshot is included below:

---

[13]  https://www.currenex.com/our-offering/order-types-and-algos.

[14]  https://www.currenex.com/clients.



142.     Plaintiffs and class members reasonably relied on the expectation that their activity on the Platform would only be viewable by rival users in certain, limited ways. Currenex and State Street fraudulently omitted that instead a rival user was able to see *all* quotes on a *non-anonymized* basis.

## II.    CURRENEX WAS MOTIVATED TO GIVE SECRET ADVANTAGES TO BRIBE IMPORTANT CLIENTELE AND FUNNEL MONEY TO ITS CORPORATE PARENT

143.     It has often been said that "liquidity begets liquidity."  By granting super-priority rights via a secret tiebreaking rule and giving away administrator-level passwords, Currenex hoped to ensure that its trading venue would get off the ground, then thrive, by securing the support of large liquidity providers.  Currenex, of course, makes more money as more trades are executed on its Platform.  Currenex charged subscribers typically $5 per $1 million worth of

transactions.  Certain Currenex employees—including Sears, who shared his password with HC Tech—received additional personal compensation pegged to the clients' trade volume.

144.    For their part, the Trading Defendants were motivated for the obvious reason that the scheme was anticompetitive—it allowed them to win trades without having to compete on fair terms with other traders.  They could reap supra-competitive profits merely by matching the quotes from others, and then cancelling trades they ended up not liking.  Indeed, the Trading Defendants compensated Currenex in exchange for being granted jump-in-line rights, including by providing liquidity on the Platform.

145.    Beyond this, Currenex was motivated to grant these special rights because of the role each Trading Defendant played.  For most of the relevant period, State Street was Currenex's corporate parent and owner.  State Street was not only aware of the fraudulent scheme being run on Currenex; it knowingly participated in the scheme in order to increase its own profits.  The benefits to State Street, who was one of the largest liquidity providers on the Platform, were substantial.  As discussed above, State Street paid a 28 to 30 times earnings premium to acquire Currenex.

146.    Though not a corporate parent, HC Tech enjoyed a cozy relationship with Currenex.  Numerous senior Currenex officials, including several of the individuals pegged by the sources discussed above as being responsible for running the Platform as main architects of the superpriority scheme, moved to HC Tech, which enabled the two companies to safely negotiate their secret agreements to rig the auction, and to continue to collude through the individuals who served as common employees.

147.    One major partner at HC Tech, Sean Gilman, was formerly the Chief Technology Officer of Currenex, and claims to have been "instrumental in the platform's growth and

eventual sale to State Street Bank in 2007."[15]  Another HC Tech partner, Cary Rosenwald, was

formerly "head of strategy at Currenex, where he helped create one of the world's leading

currency exchanges."[16]  Similarly, the chief architect of FX proprietary trading at HC Tech,

Romain Rossier, was a former director at Currenex and a senior software engineer.

148.    In short, there was a close relationship at the senior management level between

Currenex and HC Tech, and that relationship facilitated the secret agreements at issue.  That

Currenex gave HC Tech administrative access is testament to the tight bonds between the

Defendants.

149.    Goldman Sachs was a large-scale liquidity provider responsible for a significant

portion of Currenex's trading volume.  This made Goldman Sachs another natural participant in

and beneficiary of Currenex's scheme.  Indeed, it was one of the earliest big-name liquidity

providers on the Platform.  Its early support was because of the secret advantages it was given,

and its loyalty was rewarded by the continuation of those advantages.

150.    Rick Schonberg was at Goldman Sachs for a decade, beginning as a Vice

President and head of FX e-commerce sales in 2005.  He was then promoted to Managing

Director with primary responsibility for the sales, strategy and product development of Goldman

Sachs' global eFX franchise.  The Salesperson recalls that Schonberg was responsible for

negotiating Goldman Sachs's super-priority rights.  In 2014, Schonberg left Goldman Sachs for a

senior position at State Street as the Senior Managing Director responsible for the strategy and

development of State Street's suite of e-trading platforms, including Currenex.

---

[15]  https://www.hctech.com/about.

[16]  https://www.hctech.com/about.

III.  **CURRENEX'S GRANT OF SECRET ADVANTAGES HARMED CURRENEX'S OTHER CUSTOMERS, PLAINTIFFS AND CLASS MEMBERS**

151.   The use of a secret tiebreaking rule that allowed the Trading Defendants to jump in line regardless of merit contravened industry norms and expectations, as well as Currenex's express representations.  So, too, did the grant of administrator-level access to competing trading firms, allowing them to see data from competing firms that was supposed to be kept confidential.

152.   Had Currenex publicly disclosed how its tiebreaking rules actually worked, or that it was allowing the Trading Defendants to view even hidden or iceberg orders, Plaintiffs and class members would not have traded on the Currenex Platform as they did.  Indeed, Plaintiffs and class members would have stopped trading on the Platform if they had known the Platform was actually being operated.[17]  The scheme harmed Plaintiffs and class members in many ways.

A.   **The Hidden Tiebreaking Rule Reduced Competition By Key, Large Liquidity Providers, Widening Spreads**

153.   By secretly changing the auction rules, Defendants were in effect engaged in a bid-rigging scheme, a *per se* violation of the antitrust laws.  Indeed, having the auctioneer *pre-declare* who would win is the most direct and condemnable way of bid-rigging imaginable.

154.   Like in any other bid-rigging schemes, those with the inside track know they do not actually need to compete on price or other material terms—so they do not.

155.   Under a properly functioning ECN, the rules are set up so that liquidity providers are incentivized to give their best possible quotes.  They compete on the merits, including on price.  That is why Currenex specifically touted its FIFO-based system, and then went out of its way to highlight a change to give preference to "firm" orders.  The disclosed rules, if actually

---

[17]   Plaintiffs expect the wrongful behavior to have ceased with the filing of this action.

followed, would have incentivized sell-side customers to compete more vigorously, especially on price.

156.    The use of a tiebreaking rule always favoring the Trading Defendants eliminated the very incentives the disclosed tiebreaking rules were supposed to create.  The Trading Defendants only needed to match the current quotes already on the Platform, knowing their orders would jump to the head of the line.  They thus did not have to compete on price.[18]

157.    Again, the Trading Defendants are not just any platform participants.  For example, as of 2018, HC Tech was ranked as the "largest spot FX liquidity provider by market share in the Americas, ahead of global currency behemoth JP Morgan."[19]  Giving such large auction participants bid-rigging powers thus seriously distorted competition within the system.  The result was an artificial widening of bid-ask spreads across the Platform.  Thus, whenever Plaintiffs and class members acted as the liquidity taker on a transaction, they paid artificially high prices (when buying) and received artificially low prices (when selling).

**B.    The Hidden Tiebreaking Rule Allowed the Privileged Liquidity Providers to Steal Profits That Would Have Gone to Plaintiffs and Class Members**

158.    Under a limit order book system, any participant can provide limit-order quotes that other customers can "hit" to consummate a trade.  Though most liquidity comes from a small group of Platform participants—including the Trading Defendants—Plaintiffs and class members could have provided liquidity and earned more profits from their trades.  They were

---

[18]   The secret tiebreaking rule also meant the Trading Defendants did not have to make "firm" offers to be matched.  They did not have to compete on that term, either.  As discussed below in Section III.C, the tiebreaking rule thus also caused an increase in execution costs.

[19]   Eva Szalay, *HC Tech: it's time to speak up*, FX WEEK (Jun. 26, 2018), https://www.fx-markets.com/technology/algorithmic-trading/3642351/hc-tech-its-time-to-speak-up.

thwarted in doing so, however, as the Trading Defendants jumped in line and stole the business for themselves.

**C.**     **The Hidden Tiebreaking Rule Increased Plaintiffs' Execution Costs Because More Trades Were Subject to Cancellation**

159.     For the sake of clarity, this action is *not* about whether "last look" was disclosed or represents an acceptable platform feature in the abstract. That does not mean, however, that Currenex's grant of last-look rights is irrelevant to this action. The potential that certain liquidity providers could exercise last-look rights relates to Plaintiffs' damages flowing from the wrongdoing discussed in Section I above. This is because the secret tiebreaking rule increased Plaintiffs' execution costs, as their matched trades were cancelled far more often than if the disclosed tiebreaking rules had been followed instead.

160.     A last look right refers to a right of a liquidity provider to accept or reject the trade request submitted by the price taker to trade at the displayed price. Once a liquidity provider receives a trade request, it will perform "last look checks" which include checking whether it, or the price taker, has the credit lines availability to enter into the transaction and checking whether the price displayed has not gone "stale," i.e., does it remain within a certain tolerance of the current market price. Where the checks are applied without delay and are used correctly, they act as risk controls for the liquidity provider, in order to protect it from entering into a transaction which breaches its credit or operational limits and to protect it from entering into a transaction at a stale price.

161.     However, where the checks are applied after an artificially applied period of time, it can be open to abuse by liquidity providers. They can use that time to see how the market price changes and then reject all transactions they judge to be unprofitable. This can increase the

costs of execution for price-takers whose trades are rejected and who must then go back in the market and attempt to re-trade.

162.     It is broadly a one-way ratchet.  In a stylized example, consider a "buy side" trader ("Customer X") who agrees to buy a widget for $10 from a counterparty ("Provider Y") who, as it turns out, has the last look power and applies it after a period of time.  If during the last look window the prevailing market price for a widget drops to $9, the Customer X is still stuck with the deal, having to pay $10 for the widget.  Provider Y can execute the transaction, buy a widget in the open market for $9 and sell it to Customer X for $10, realizing an immediate $1 profit.  But if during the last look window the prevailing price for buying a widget increases to $11, Provider Y has the practical opportunity to reject the transaction—why would it sell a $11 widget for only $10?  After cancellation, the buyer has to start the entire process over, likely transacting at the new (less favorable) market price of $11.

163.     In the but-for world where Currenex's disclosed tiebreakers governed, Plaintiffs and class members would have experienced far fewer cancelled trades than they did in the real world, where Currenex instead allowed the Trading Defendants to jump in line.

164.     Under a regime where FIFO was the only tiebreaking rule, the Trading Defendants would be matched by the algorithm far less often than they were.  The Trading Defendants would also not be so emboldened as to cancel as many of the trades as they did, without assurance they could be quickly re-matched at a better (for them) price.  Thus, in the but-for world without a tiebreaking rule giving all the business to the Trading Defendants, Plaintiffs and class members would have seen far more of their transactions executed at the agreed-upon terms.  They also would have experienced far fewer matched deals cancelled by Trading Defendants and rebooked at new, less-favorable terms.

165.    The increase in execution costs caused by the secret rule is even worse in light of the change supposedly made to the tiebreaking rules in late 2015.  As discussed in Section I.A.2 above, Currenex represented that the matching engine would as of September 2015 start prioritizing "firm" quotes.  But instead of steering traders *away* from quotes that could be cancelled as represented, Currenex's actual tiebreaking rules steered Plaintiffs and class members *towards* quotes that could be (and were) cancelled.

166.    This further increased Plaintiffs' execution costs, not to mention the gap between their reasonable expectations and the reality Currenex created.  This is because Currenex matched Plaintiffs with the Trading Defendants' last-look quotes when it should have matched Plaintiffs with a firm quote provided by someone else.  It is also because the Trading Defendants provided last-look quotes far more often than they would have in the but-for world.  Secure in the knowledge that Currenex's actual tiebreaking rules gave a Trading Defendants "last look" quote priority even over a "firm" quote by someone else, there was *no* incentive for Trading Defendants to provide firm liquidity.  That is the exact opposite incentive structure the disclosed tiebreaking rules were designed to create.

167.    Plaintiffs and class members were thus harmed by way of fraudulently inflated execution costs and reduced competition because of the secret tiebreaking rule favoring the Trading Defendants.

### D.    Example Scenarios of Harm

168.    To see some of the above concepts in play, consider a base scenario where the "top of book" for EUR/USD has a "bid" price of 1.1827 and an "ask" price of 1.1830.  If Customer A enters a market order to buy, under Currenex's pre-2015 disclosure that it followed a FIFO-based tiebreaking system, Customer A would be matched with whoever first provided the 1.1830 ask quote, in this hypothetical Customer B.

169.     Consider instead that State Street would like to make an offer to sell EUR/USD as a liquidity provider.  In a normal FIFO environment, it would see the "top of book" "ask" at 1.1830 and know it would have to show a better ask price to be matched with any market orders. State Street would have to make a more-aggressive ask.  If State Street submitted a better ask in order to secure the business, Customer A would get a better price on its market order.

170.     But with the secret tiebreaking rule in its favor, State Street need only match Customer B's "ask."  In this scenario, Customer A would instead be matched with State Street. Customer B is also now worse off—it would have secured a trade on terms it viewed as favorable, as well as gained knowledge about the "flow."  This, even though Customer B was first-in with the 30 ask (with "30" here being the industry parlance referring to the last two digits in 1.18*30*).

171.     The insertion of the jump-in-line tiebreaking rule thus harms Customer A (by way of paying more than it would have) and Customer B (by way of having Customer A's business steered to State Street).

172.     Consider now the impact that State Street—but not Customer B—has been given "last look" rights which it applies after a period of time.  Whereas without prioritization rights Customer A would have consummated a firm-commitment to deal at 30 with Customer B, instead now Customer A is matched with State Street who is given an opportunity to cancel the trade.

173.     Customer A thus may get hit with a double-whammy.  State Street now has what amounts to a free option of dealing with Customer A at 30.  If during its last look window it can find somewhere to buy for less than 30, it can do so, then turn and sell to Customer A for 30, and secure a risk-free profit.  But if during State Street's last look window it determines the market

has moved against it such that it now costs 31 to buy, it could exercise its last look power to reject the trade.

174.    Using the last look power in this manner thus creates a one-way ratchet effect.  If the market moves in favor of Customer A, the deal will be cancelled and Customer A will have to re-enter the market, which means here trying to buy at 31 instead of 30 (and then hoping to not get "last looked" again).  But if the market moves against Customer A, the deal will go through anyway, which means here Customer A will end up paying 30 even though in theory the new market price is only 29.

175.    The above scenarios presume the only tiebreaking rule was FIFO.  As discussed in Section I.A.2 above, however, Currenex's Revised 2015 Disclosures indicated Currenex would start considering whether a quote was "firm" versus being subject to last-look cancellation. This only exacerbated the problem of increased execution costs.  In the above scenario under the tiebreaking rules as Currenex represented them to be, State Street should have been triply out of the running if it was (1) not first, (2) not submitting an ask better than 30, that (3) was not "firm." But under Currenex's secret tiebreaking hidden rule number one, State Street did not have to compete on time, price, or reliability.  This not only hurt Plaintiffs and class members by way of inferior prices, but by way of increased execution costs because far more trades were cancelled than ever could have been possible if the disclosed tiebreaking rules were actually implemented.

E.    **The Granting of at least HC Tech With Administrator-Level Access Further Harmed Plaintiffs and the Class**

176.    The fraudulent provision of administrator-level, see-all access further harmed Plaintiffs and class members.  It is a shocking breach of trust, and gave HC Tech a huge, unfair, secret advantage.

177.    For example, the Currenex Platform is used by, among other players, high-frequency traders, proprietary trading firms, hedge funds, and leading liquidity providers.  All these users take great steps to keep their trading strategy and net currency positions confidential.  Currenex's secretly giving at least HC Tech (and maybe others) unfettered access to competing firms' real-time business thus put those competing firms' entire business models at risk.

178.    By way of another example, HC Tech could determine, by seeing competitors' full stream of quotes, what other user's mid-points and bid/offer spreads were.  Knowing this information would enable HC Tech to shape its own trading / pricing strategy, creating a gap in prices between the actual and but-for worlds.  Indeed, HC Tech would be able to beat rival firms without actually competing with them—particularly given the jump-in-line secret advantage it held.  HC Tech's could "win" business without having to quote aggressively, either on price or firm liquidity.

179.    By way of another example, consider the "hidden" order discussed above.  If HC Tech knew there was a large sell order—but nobody else did—then HC Tech could trade out ahead of that order.  This would unfairly raise the price for traders that legitimately expected the placement of a large sell order would be kept hidden specifically to avoid that from happening.  It also gave HC Tech an unfair advantage over other liquidity providers who had to compete without that knowledge.

180.    Put simply, all class members were harmed by Currenex's grant of administrator-level access to HC Tech.  Effectively, the other Platform users were being spied upon by a competitor.  HC Tech wanted to spy for the obvious reason that it hoped to, and did, get a valuable advantage by doing so.  HC Tech's spying secretly placed all other Platform users at an informational and pricing disadvantage.  This disadvantage is sufficiently material that Plaintiffs

and class members would have never used the Currenex Platform if Currenex's grant of administrator-level access had been disclosed.

**IV.**   **CURRENEX'S SCHEME IS A *PER SE* VIOLATION OF THE ANTITRUST LAWS**

181.   Defendants' conduct constitutes a *per se* violation of the antitrust laws.

182.   The "auctions" on the Platform were supposed to be—and were understood by market participants as being—a reliable and competitive process for determining the price for FX transactions.  But the agreements at issue restrained competition by reducing the incentives of key Platform participants—the Trading Defendants—from competing on important terms, such as price, time, and firm liquidity.  Because the Trading Defendants did not have to compete on those terms, they did not.  As a result of this reduction in competition, Plaintiffs and class members were harmed.

183.   An agreement between the auctioneer and a specific auction participant damages the integrity of competition within the market just as much—if not more so—than an agreement between two bidders.  So, too does the allowance of one auction participant to see all the confidential information submitted by the would-be competitors.  The agreements at issue here are so inherently anti-competitive that they warrant condemnation without further inquiry.

184.   Moreover, after State Street acquired Currenex, the two shared a unity of interest. Numerous employees held titles at both State Street and Currenex.  For instance, David Newns was Global Head of Currenex, Russell Sears was the Global Head of Currenex Sales, and Cary Rosenwald was Head of Strategy at Currenex.  But all of these also operated under the banner of State Street, as formal employees of State Street, and on the payroll of State Street.  Because State Street was also acting as a competitor to the other Trading Defendants, this was not just a bid-rigging scheme, but also a naked horizontal agreement between competitors regarding price

and market allocation.  State Street agreed to give secret advantages to select other traders in exchange for their continued support of a trading Platform where State Street (a) itself also had a secret advantage, and (b) profited off the transaction fees by way of Currenex.

185.    In the alternative, Defendants' conduct also violates the rule of reason.

186.    To the extent necessary to define a specific market—which Plaintiffs do not concede—the relevant market is that for electronic platforms that use a limit-order book style of matching to execute FX spot trades (the "ECN FX Market").  FX trading on these platforms is not reasonably interchangeable with other forms of FX trading.  For instance, it is not reasonably interchangeable with over-the-counter trading, because trading there is bilateral and thus requires individualized documentation, credit line agreements, and other specifications.  The dealers also know your identity in the OTC market, which exposes clients to risk of, among other things, dealers using client information to inform their pricing and information leakage.

187.    Customers select ECNs over OTC or bilateral trading channels for a multitude of reasons, including (but not limited to) anonymity, the ability to act as a liquidity provider, access to a wider and more diverse range of counterparties, and operational simplicity.  Currenex's marketing materials highlights each of these factors as a reason to select their platform.

188.    In particular, anonymity is of the utmost importance to most potential customers. Trading on ECNs like Currenex is anonymous, where liquidity providers do not know a trader's identity even after the trade is consummated.  If it were not for the anonymity offered by ECNs, details of the customers trading strategy, current inventory/position, and history of trading could be exploited by other market participants in ways that directly cost the customer.

189.    For many participants in the ECN FX market (such as particular active proprietary traders and high-frequency or other algorithmic-based traders) trading on ECN platforms

represents their only viable option.  Among other reasons, active and algorithmic traders require multilateral venues with significant price discovery to inform their models.  Trading on an OTC or a single-dealer venue, would be untenable for their trading strategies.

190.    ECN platforms, and in particular Currenex, on the other hand, are tailored to meet the needs of these traders.  In its marketing efforts, Currenex targeted active traders, and its product profile was specifically addressed to them.  Currenex introduced its ECN Platform as its offering that allows "active environment for trading and tracking positions" by providing "real-time executable bids and offers for high-frequency trading" and "continuous price feeds for fast execution on chosen currency pairs."  This is in direct contrast to the OTC market and RFQ platforms, where dealers can choose not to provide any pricing to the other counterparty, at any time.

191.    The ECN FX Market is also not reasonably interchangeable with RFQ platforms, either.  In a RFQ protocol, customers use electronic platforms to send a request-for-quote to multiple dealers simultaneously and select which institution to trade with based on these quotes.  The RFQ protocol does not allow customers to act as liquidity providers, the trading is fully disclosed, and it does not provide the price transparency and competition that one typically finds with ECN trading.

192.    To the extent necessary to allege market power—which Plaintiffs do not concede—Defendants had sufficient market power to influence prices and spreads in the relevant market.  The Currenex Platform is a market leader in the ECN FX Market with substantial pricing power.  During the relevant period, Currenex Platform captured a substantial market share in the ECN FX Market, including 25% or more of the average daily trading volume of FX spot transactions in the ECN FX Market.

193.   Currenex's market power is bolstered by the high barriers to entry that exist in the ECN FX Market.  FX trading on electronic platforms requires sophisticated technology and proprietary algorithms designed to permit the tailored execution of FX trades.  Currenex, for instance, developed patented technology, such as its OneOrder routing technology, over the course of multiple decades.  This routing technology is, according to Currenex's product profile, "at the heart" of its "streaming technology."  It also "shrinks the order book to a single execution venue to promote optimal execution performance by limiting slippage while providing you with access to multiple liquidity pools."  Currenex's routing technology has been widely recognized in FX trade journals as standing apart from Currenex's competitors for its ability to deliver high-speed execution.

194.   The high network efforts that are characteristic of the ECN FX Market further increase these barriers to entry.  The deeper the pool of liquidity on a trading platform, the more valuable the platform.  Accordingly, the inherent characteristics of the market favor incumbent, large-scale players at the expense of new entrants.  Indeed, Currenex's website boasts its "unparalleled liquidity."

195.   The Currenex Platform's market power is strengthened by State Street's ownership, a corporate relationship that effectively guarantees a steady stream of liquidity from one of the largest liquidity providers in the FX industry.  Currenex's anticompetitive agreements with select liquidity providers, all of whom make up a substantial portion of the FX spot trading volume, cemented Currenex's dominant position in the ECN FX Market by locking in these sources of liquidity.

196.   To the extent necessary—which Plaintiffs do not concede—the anticompetitive effects of the Currenex agreements outweigh any potential procompetitive benefits.  The purpose

and effect of the agreement to use a secret tiebreaking rule declaring a Trading Defendant the winner no matter what was to reduce the incentive of major liquidity providers to compete on time, price, or quote firmness.  There is no pro-competitive benefit to having such a tiebreaking rule.  There is particularly no pro-competitive benefit to having such a rule *in secret*, which deprived Plaintiffs and class members of the opportunity to choose how to trade FX on a fully informed basis.

197.    The purpose and effect of the agreement to give at least HC Tech administrator-level access was to allow HC Tech to steal other customer's confidential information and use that information to trade against their interests.  There is no pro-competitive benefit to the secret sharing of administrator passwords with select platform clients.

198.    To the extent the Defendants identify any pro-competitive benefits, they are outweighed by the anticompetitive harm of the conspiracy.

199.    Absent an agreement between the relevant parties, the acts here would have been against their respective self-interest.  For instance, Currenex would have no reason to render its own disclosures false and misleading by installing a secret tiebreaking rule that favored a few clients to the detriment of everyone else, unless it expected something in return.  Nor would a Currenex employee loan out his administrative password unless without some expectation of the favor being returned.

## V.    EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

200.    Plaintiffs and class members were unaware of Currenex's secret agreements.

201.    Plaintiffs and class members were unaware that the Currenex Platform was using a tiebreaking rule that allowed the Trading Defendants to jump in line.  Plaintiffs and class members were unaware that a competing trading firm was being given administrator-level access to the Platform.

202.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were harmed by the scheme to advantage the Trading Defendants at the expense of other Currenex customers.  Currenex did not disclose to its customers that its actual first tiebreaking rule was that a Trading Defendant would win every tie or that Currenex was giving administrator-level view of the system to a Trading Defendant.  In fact, Defendants went to great pains to keep it secret, and covered up the scheme with a continuing stream of false assertions designed to assuage concerns about the Platform.

203.    Plaintiffs' inability to reasonably discover the scheme is also because of Currenex's market power.  No FX trader could be reasonably expected to try to gather the world's ECN FX data to try to reverse-engineer, in real-time, whether a particular trading platform's FX prices were artificial.  It would not be only be an enormous undertaking to do so, but likely would not have been possible to do using the publicly available data.  The FX ECN Market is opaque and fragmented.  A 2019 study found that there were an increasing number of venues for trading FX, but that the greater internalization of customer flow by dealers has *reduced* the amount of visibility by market participants.  By contrast, in the equities market there is a central reporting "tape" where all trades are reported in a transparent fashion.  There is no such central reporting mechanism for FX trades.

204.    The relative opacity makes it impractical, if not impossible, to "compare" prices in real time based on public data alone.  This is particularly true with respect to *spreads*—the amount above the mid-point buyers are charged and the amount below the mid-point that sellers receive.  While there are other ECNs, they each have their own rules as to how orders interact, the size of orders, or other protocols, complicating the ability to supposedly "compare" across the many ways of trading FX.

205.    Each liquidity provider may also apply different spreads in different venues because of these differences, or due to differing order sizes, latencies, or other reasons.  For many reasons, then, FX traders are not reasonably expected to, and could not reasonably have, uncovered the price artificiality at issue in this case in the course of ordinary due diligence.

206.    Defendants actively and effectively concealed their collusion.  Not only did Currenex's representations hide the scheme, but Currenex's behavior was so shocking, unique, and out of step with industry norms, that Plaintiffs could not have reasonably anticipated any ECN operator would have acted this way.

207.    Even when Plaintiffs tried to make inquiries about the Platform, Currenex obfuscated and hid the truth.  As discussed in Section I.A.2 above, XTX sought Currenex's assistance in understanding the engine and how it might relate to XTX trading volume.  Currenex concealed the truth by directing XTX to Currenex's disclosures discussed above.  No such disclosure revealed the tiebreaking rule favoring the Trading Defendants.  Currenex also tried to deflect attention by citing how XTX connected to Currenex's systems as being the reason for XTX performance.

208.    By way of another example, while other platforms were transparent with XTX with regard to the percentage of XTX's quotes that were not getting filled despite being at market rates, Currenex refused to provide that data even when requested.

209.    Defendants' conspiracy was also self-concealing.  The success of the conspiracy depended on the counterparties' unawareness of the advantages given to certain competing traders.  Defendants executed their conspiracy through non-public methods of communication to conceal their agreements from Plaintiffs and class members.

210.    The Currenex Platform's algorithm for assigning trades between customers and liquidity providers is opaque and nonpublic.  Even information about counterparties for trades executed via the Currenex Platform is generally unavailable.  Unlike most other multilateral FX platforms, Currenex does not even disclose its daily trading volume.  Because the Currenex Platform is anonymous and prices and trades are opaque, Plaintiffs and class members would have no way of knowing who their counterparties were, making it impossible for them to observe that Defendants were receiving priority.  Currenex also typically only informs its customers when a trade has been executed, not when a trade has been rejected.

211.    Because Defendants employed acts and techniques that were calculated to conceal the existence of such illegal conduct, Plaintiffs could not have discovered the existence of this unlawful conduct through their exercise of reasonable due diligence until it was revealed recently by former insiders to Plaintiffs' counsel.

212.    Plaintiffs and class members, either directly or through professional investment advisors and/or managers they hired, regularly monitored their investments and conducted due diligence to try to avoid being harmed by financial misconduct throughout the class period. Plaintiffs and class members have engaged in reasonable due diligence under the circumstances. Plaintiffs regularly monitored pricing for the FX spot transactions they entered into on the Currenex Platform.  Through these efforts, Plaintiffs and class members endeavored to obtain the best prices possible for their spot trades.

## VI.    CLASS ACTION ALLEGATIONS

213.    Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

214.     Plaintiffs bring this action on behalf of themselves and as a class action under

Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary

damages on behalf of the following class (the "class"):

> All persons and entities who traded on, provided liquidity for, or otherwise
> attempted to transact FX spot trades on Currenex, Inc.'s Executable Streaming
> Prices Trading Model (or similar functioning platforms operating under different
> names) from January 1, 2005, to August 4, 2021.

> Excluded from the class are Defendants and their employees, affiliates, parents,
> subsidiaries, and co-conspirators, whether or not named in this Complaint, and the
> United States government.

215.     Edmar and IBG bring certain additional claims on behalf of themselves and as a

class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking

monetary damages on behalf of the following class (the "New York subclass"):

> All persons and entities who (1) traded on, provided liquidity for, or otherwise
> attempted to transact FX spot trades on Currenex, Inc.'s Executable Streaming
> Prices Trading Model (or similar functioning platforms operating under different
> names) from January 1, 2005 to August 4, 2021, and (2) entered into agreements
> with Currenex regarding such trading that are governed by New York law.

> Excluded from the subclass are Defendants and their employees, affiliates,
> parents, subsidiaries, and co-conspirators, whether or not named in this
> Complaint, and the United States government

216.     *Numerosity*.  Members of the classes are so numerous that joinder is

impracticable.  Plaintiffs do not know the exact size of the classes but believe that there are

several hundred and potentially thousands of class members geographically dispersed throughout

the United States, and around the world, in both the class and the New York subclass.

217.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the class.

Edmar and IBG's claims are typical of the claims of the members of the New York subclass.

218.     Plaintiffs and all members of the class were damaged by the same wrongful

conduct of Defendants.  For example, Defendants' wrongdoing caused Plaintiffs and class

members to pay inflated bid/ask spreads on the Currenex Platform.  Plaintiffs and class members also paid Currenex transaction fees in reliance on its fraudulent misrepresentations.

219.    Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the class. Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

220.    Edmar and IBG will fairly and adequately protect and represent the interests of the New York subclass.  Their interests are coincident with, and not antagonistic to, those of the subclass.  Accordingly, by proving their own claims, Edmar and IBG will prove other subclass members' claims as well.

221.    ***Adequacy of Representation***.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, including particularly antitrust and similar cases arising out of financial services.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the classes and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the classes.

222.    ***Commonality***.  There are questions of law and fact common to the class that relate to the existence of the fraud and the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    whether Defendants' representations and omissions were false and misleading;

(b)    whether Defendants' representations and omissions were material;

(c)      whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or otherwise artificially inflate bid/ask spreads on FX spot transactions in violation of the Sherman Act;

(d)      the identity of the participants in the conspiracy;

(e)      the duration of the conspiracy;

(f)      the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(g)      whether Currenex made material misrepresentations or omissions about its Currenex Platform;

(h)      whether Defendants aided and abetted fraudulent conduct;

(i)      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other class members;

(j)      whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and class members;

(k)      whether Defendants were unjustly enriched at the expense of Plaintiffs and the class; and

(l)      the appropriate measure of damages sustained by Plaintiffs and other class members.

223.      ***Predominance***.  During the relevant period, Plaintiffs entered into agreements with Currenex containing materially similar obligations, and their interests are coincident with and not antagonistic to those of the other members of the class or subclass.  Questions of law and fact common to the members of the class and subclass predominate over questions that may affect only individual class members because Defendants have acted on grounds generally

applicable to the entire class and/or entire subclass, thereby making a common methodology for determining damages appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct with respect to both the class and the subclass.

224.    *Superiority*.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action.  The class and subclass both have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

225.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action with respect to either the class or the subclass.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF (Fraud)
**(on behalf of the class, against Currenex and State Street)**

226.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

227.    Customers who subscribed to the Currenex Platform reasonably relied on the expectation that Currenex was operating its Platform in a transparent and fair manner. Customers had a reasonable expectation that Currenex would disclose all relevant rules on how

its Platform operates, including, but not limited to, how "ties" would be handled, and what information would be viewable by competing firms.

228.   Instead, Currenex and State Street systematically rigged the auction at the expense of Plaintiffs' and class members' and for the benefit of a few, select liquidity providers.  The secret, primary tiebreaking rule was that a Trading Defendant would always win.  And Currenex even gave one Trading Defendant, HC Tech, administrator access to the Platform.

229.   Customers were entitled to relevant disclosures about the Platform, including because Defendants had exclusive control and knowledge of how the Platform was really being run and who was being allowed to use administrator log-in credentials.

230.   Currenex and State Street made express misrepresentations about the Platform's tiebreaking rules.  These included, but are not limited to, website postings since at least February 2005, product profiles since at least 2011, the 2015 Disclosures, the Revised 2015 Disclosures, and the 2017 Disclosures as discussed in Section I.A.2 above.  Those express representations were false and misleading.  The Platform used a secret tiebreaking rule that not only contradicted customers' reasonable expectations, but rendered the tiebreaking rules Currenex did disclose meaningless whenever a Trading Defendant was involved.

231.   Currenex and State Street also expressly represented that the Platform would keep certain user information confidential.  These express representations include, but are not limited to, Currenex's website description of order types, and the order screen used on the Platform itself as discussed in Section I.B above.  These representations were false and misleading.  Currenex and State Street gave at least one Trading Defendant, HC Tech, administrator-level access to the Platform, allowing it to improperly see highly commercially sensitive data.

232.    Currenex and State Street also made innumerable express representations that Currenex was operating a limit-book-style of trading Platform.  These express representations include, but are not limited to, representations made on its website as discussed in Section I.A.4 above.  Every one of those representations—including those that have consistently appeared on Currenex's website for over a decade—were false and misleading because they were calculated to conceal the Platform's use of a secret tiebreaking rule that went against all customer expectations and industry norms.  The representations were also all false and misleading for not disclosing that traders' data would be subject to review by competitors using administrator-level access.

233.    In fact, every statement made by Currenex and State Street in their offering and marketing of the Platform—including without limitation through their websites, brochures, and disclosures—were, at a minimum, ambiguous insofar as they did not include the truth about the Platform's secret tiebreaking rule or Currenex's sharing of administrator-level access.  Currenex and State Street knew and intended that Plaintiffs and class members would mistakenly understand that Currenex's decision to continually speak about the Platform without ever addressing a jump-in-line rule or the grant of administrator-level access to a rival user of the Platform would serve as implicit confirmation that such practices did not exist.

234.    Currenex and State Street also committed fraud by omission.  Currenex's act of offering an FX trading Platform implied that it would operate within certain industry-standard parameters.  That is not to say all platforms must use the same exact rules.  But it is to say that the platform operator could not, *without disclosure*, fairly implement a tiebreaking rule that pre-declared a winner.  Nor could the platform operator, *without disclosure*, give out administrator-level access to the platform.

235.    Currenex and State Street had a duty to disclose that the Platform's primary tiebreaking rule was that a Trading Defendant would always win, and that Currenex was giving Plaintiffs' competitors administrative-level access to the Platform.

236.    Currenex and State Street, as operators of the Platform, had superior knowledge regarding the Currenex Platform's operation, including its tiebreaking rules and what level of access customers were given to other people's information.

237.    Currenex and State Street did not make readily available any information allowing customers to learn of the secret tiebreaking rule or allowing customers to learn that Currenex was giving away administrator-level access to the Platform.

238.    Currenex and State Street's wrongdoing was such a shocking departure from industry norms that Plaintiffs and class members would not reasonably have understood such practices existed.  Nor would Platform users be reasonably expected to need to ask Platform operators if the operator plans to share administrator passwords with rival firms.  But even when XTX did make inquiries about the Platform, Currenex deflected and denied.

239.    Currenex and Street knew that Plaintiffs and class members were acting on the mistaken belief that the relevant tiebreaking rules had been disclosed.  Currenex and State Street also knew that Plaintiffs and class members were acting on the mistaken belief that rival trading firms were not being given administrator-level access to the Platform.

240.    The Currenex Platform's secret practice of using a hidden tiebreaking rule and the grant of administrator-level access rendered Currenex's silence, *all* of its representations about the Platform, and *all* of its express representations discussed above false and misleading.  The full meaning of every word Currenex and State Street ever said about the Platform was, at a minimum, ambiguous and materially lacking because they did not include a complete disclosure

of these hidden practices, which were material departures from industry norms and reasonable expectations.

241.     Currenex and State Street's representations and omissions were material to traders and buy-side firms and would have impacted their decision to participate on the Currenex Platform.

242.     Plaintiffs and class members reasonably relied upon Currenex and State Street's representations and omissions in deciding to subscribe and use the Currenex Platform.

243.     Plaintiffs and class members incurred out-of-pocket losses because of the fraud. Without limitation, Plaintiffs paid more than they should have when buying, and received less than they should have when selling, on the Platform.  Plaintiffs also suffered out-of-pocket losses by incurring fees on transactions done via the Platform, essentially paying for a service that they never received because the Platform was not as advertised.

**SECOND CLAIM FOR RELIEF (Conspiracy to Defraud)**
**(on behalf of the class, against all Defendants)**

244.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

245.     Currenex and State Street conspired with each Trading Defendant by entering into a series of corrupt agreements to provide secret trading advantages, each of which was specifically designed to defraud other users of the Currenex Platform.

246.     The Trading Defendants each had actual knowledge that their own super-priority rights were designed to be secret from the marketplace (and any of such Defendants who had administrative-level access to the Platform also knew that such access would have to remain secret from the marketplace).  Among other reasons, each of these Defendants knew that, if other

Plaintiffs and class members discovered the existence of these privileges, trading volume on the Platform would plummet, defeating the purpose and benefit of these privileges altogether.

247.    The Trading Defendants, therefore, ensured that these privileges would remain secret from the marketplace as a whole, including by not disclosing these privileges to Plaintiffs and class members.

248.    The Trading Defendants each had actual knowledge that their own respective secret agreements with Currenex were contrary to the reasonable reliance of Plaintiffs and class members and would be harmful to Plaintiffs and class members.

249.    The Trading Defendants each intentionally took independent actions in furtherance of, and knowingly participated in, a scheme to defraud Currenex users, including by negotiating and securing secret advantages, providing substantial liquidity to the Currenex Platform, and ensuring that these agreements would remain secret and undisclosed to the rest of the marketplace.

250.    The nature of the wrongdoing here was an ongoing scheme to manipulate the operation of a trading Platform.  The scheme's execution goes beyond the mere making of false statements and fraudulent omissions—it also required the knowing participation of the Trading Defendants on the Platform.  If the Trading Defendants had not traded, then the existence of the secret tiebreaking rule would have been moot.  The Trading Defendants thus furthered the conspiracy to defraud and knowingly participated in the fraudulent scheme, committing overt acts by, among other things, directing a large amount of their FX business to the Currenex Platform, knowingly participating in and benefitting from these secret advantages, and remaining silent on the existence of their secret advantages.

251.    In so doing, the Trading Defendants are liable as co-conspirators for the fraud perpetrated by way of the false representations and omissions made by Currenex and State Street, discussed above.

### THIRD CLAIM FOR RELIEF (Aiding and Abetting Fraud)
#### (on behalf of the class, against the Trading Defendants)

252.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

253.    Each Trading Defendant had actual knowledge of its own secret agreement with Currenex.  As the beneficiary of the rule, each Trading Defendant had actual knowledge that Currenex had granted it a jump-in-line right by way of an undisclosed tiebreaking rule.

254.    Similarly, each Trading Defendant that received administrator-level access to the Platform also necessarily had knowledge Currenex did so.  Thus, for example, HC Tech plainly knew HC Tech had been secretly and wrongfully given a Currenex executive's log-on information.

255.    Each Trading Defendants had actual knowledge and an expectation that the secret advantages it had been granted were not being disclosed and would remain concealed from the majority of customers.  Each Trading Defendant thus knew that Currenex was committing fraud-by-omission to other Platform participants.

256.    Each Trading Defendant also received the same disclosures Currenex gave to Plaintiffs and class members.  Each Trading Defendant had actual knowledge that Currenex's representations were false and misleading, and profited from the majority of customers being misled.

257.    The nature of the wrongdoing here was an ongoing scheme to manipulate the operation of a trading Platform.  The scheme's execution goes beyond the mere making of false

statements and fraudulent omissions—it also required the knowing participation of the Trading Defendants on the Platform.  If the Trading Defendants had not traded, then the existence of the secret tiebreaking rule would have been moot.  The Trading Defendants thus aiding and abetted and knowingly participated in the fraudulent scheme, providing substantial assistance by directing a large amount of their FX business to the Currenex Platform, knowingly participating in and benefitting from these secret advantages, and remaining silent on the existence of their secret advantages.

258.    But for this substantial assistance, the fraudulent scheme would not have been successful, and Plaintiffs and class members would not have suffered damages as described above.  Again, if the Trading Defendants did not exercise and illicitly profit from their tiebreaking rights, then the existence of the secret tiebreaking rule in Currenex's algorithm would not have ever caused Plaintiffs' harm.

### FOURTH CLAIM FOR RELIEF (N.Y. General Business Law, Section 349)
**(on behalf of the class, against Currenex and State Street)**

259.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

260.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

261.    "[A]ny person injured by reason of any violation of this section may bring an action in his own name to . . . recover his actual damages or fifty dollars, whichever is greater, or both such actions."  N.Y. Gen. Bus. Law § 349(h).

262.    Currenex and State Street violated New York General Business Law Section 349 by using deceptive acts and practices in the offering of the Currenex Platform located in New York.

263.    Currenex and State Street committed the deceptive acts and practices willfully and knowingly.

264.    Defendants' conduct was consumer-oriented and has a broad impact on the public at large.

265.    These practices included providing secret priority privileges to State Street and the other Trading Defendants and providing administrative-level access to the Platform's limit-order book.  In order to conceal these practices and induce Plaintiffs and class members to trade and continue trading on the Currenex Platform, Currenex and State Street willfully and knowingly made a series of material misrepresentations and omissions described with particularity above.

266.    As a direct and proximate result of Currenex and State Street's deceptive practices, Plaintiffs and class members have suffered actual injury and damages.  Without limitation, Plaintiffs paid more than they should have when buying, and received less than they should have when selling, on the Platform.  Plaintiffs also incurred transactions done via the Platform, essentially paying for a service that they never received because the Platform was not as advertised.  Plaintiffs also suffered damages in the form of lost trades that Currenex and State Street's deceptive practices steered to the Trading Defendants.

## FIFTH CLAIM FOR RELIEF (Section 1 of the Sherman Act)
### (on behalf of the class, against all Defendants)

267.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

268.    Currenex and each of the Trading Defendants entered into and engaged in a combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

269.    For the post-2007 period after the acquisition, State Street is liable in this count due to its unity of interest with Currenex, which made it not just a Trading Defendant but also effectively a party to the illegal agreements with HC Tech, Goldman Sachs, and the Doe Defendants.  Not only did State Street have a unitary interest with Currenex generally but, as discussed above, numerous employees wore multiple "hats" because they worked for both State Street and Currenex, and thus acted on behalf of both entities simultaneously.  For instance, David Newns was Global Head of Currenex, Russell Sears was the Global Head of Currenex Sales, and Cary Rosenwald was Head of Strategy at Currenex, but all these individuals were officially employed by State Street and were on State Street's payroll.

270.    After acquiring Currenex, State Street engaged in specific acts in furtherance of Currenex's super-priority scheme.  Among other acts, State Street, with full awareness of Currenex's scheme to advantage the other Trading Defendants, facilitated this conduct by providing significant liquidity to the Currenex platform with the understanding that State Street would continue to enjoy the secret advantages.  State Street also facilitated by issuing false and misleading statements about the Platform, as discussed above.  State Street also helped solidify the relationships between Defendants through additional acts, including the hiring of a key executive (Rick Schonberg) of a Trading Defendant who was responsible for negotiating the jump-in-line privileges of that Defendant (Goldman Sachs).  Thus, for the period after the agreement, Currenex and State Street shared a unity of interest.

271.    For the sake of clarity, Plaintiffs allege that the Currenex-HC Tech agreement is an independent antitrust violation, for example, from the Currenex-Goldman agreement.  State Street was a party to both such illegal agreements for the period after it acquired Currenex, for the reasons discussed above.  As discussed above in Section IV, this means for most of the class period both of these agreements were between horizontal competitors.  In addition, the Currenex-State Street agreement represents a third unlawful agreement at least for the period prior to Currenex's acquisition.

272.    Each agreement to provide special advantages in the auction inflicted severe financial harm on Plaintiffs and class members, and restrained competition in the market for FX trades, including the ECN FX Market.

273.    The Trading Defendants were able to avoid competition with other potential liquidity providers because of their respective agreements.  They were direct beneficiaries of what amounts to a bid-rigging scheme, a *per se* violation of the Sherman Act.  Whereas the order book was supposed to be a fair and open "auction" among participants for FX trades, in fact the "bids" were rigged with business being steered to Currenex's preferred participants.  Currenex and State Street facilitated and implemented this scheme by reaching separate agreements with each of the Trading Defendants and implementing them on its platform.

274.    The Trading Defendants were each aware that they had been given secret bid-rigging benefits through their agreements with Currenex, none of which was disclosed to Plaintiffs or class members.  Indeed, the Trading Defendants compensated Currenex in exchange for being granted privileges such as the jump-in-line rights, including by way of increased liquidity on the Platform.  State Street and Currenex were aware of all the agreements.

275.     Defendants injured Plaintiffs and class members through their respective schemes, resulting in hundreds of millions and potentially billions of dollars in damages.  Instead of competing with each other to provide more competitive prices or terms (such as "firm" offers) for FX trades, the Trading Defendants instead relied heavily on their secret advantages, "jumping the line" with late and inferior offers and abusing their secret access to highly sensitive data.

276.     Each scheme alleged herein had and is having the following effects, among others:

(a)     The bid/ask spreads and prices paid by Plaintiffs and class members have been fixed or stabilized at artificially inflated levels;

(b)     Plaintiffs and class members were deprived of entering into market-rate FX spot transactions due to the distortion of priority rights on the Currenex Platform;

(c)     Plaintiffs and class members have been deprived of the benefits of free, open, and unrestricted competition; and

(d)     Competition in establishing bid/ask spreads paid in the United States by FX spot traders has been unlawfully restrained, suppressed, and eliminated.

277.     All these damages were exacerbated by the last look rights provided to super-priority liquidity providers, as discussed above.  They were also exacerbated by at least HC Tech's improper access to the highly sensitive data of Plaintiffs and class members.

278.      By restraining competition among horizontal competitors for the supply of FX spot liquidity, Defendants' schemes constitute a violation of Section 1 of the Sherman Act. Plaintiffs and class members have sustained injury to their businesses or property of the type that the antitrust laws were meant to punish and prevent.

279.     Defendants' conduct has directly affected and foreseeably restrained the interstate and foreign commerce of the United States.

280.     As a direct, material, and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and class members have suffered injury to their businesses and property, within the meaning of Section 4 of the Clayton Act, throughout the class period.

281.     Plaintiffs and class members are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Act under Section 4 of the Clayton Act.

### SIXTH CLAIM FOR RELIEF (Unjust Enrichment—Currenex)
### (on behalf of the class, against Currenex)

282.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

283.     Currenex, in its capacity as operator of the Platform, knowingly acted in an unfair, unconscionable, and oppressive manner towards Plaintiffs and class members, and in conscious or reckless disregard for class members' rights.

284.     Currenex was enriched by increased transactions fees.  If Currenex's actual Platform practices had been known, Plaintiffs and class members would not have traded on the Platform as they did.  The Currenex Platform would thus have generated substantially less in fees for Currenex if the actual features had been fully disclosed.

285.     Put another way, Plaintiffs paid for a service—participation in a fair auction—they certainly did not receive.  And they paid for a service they would not have signed up for if they knew the truth.  Currenex was unjustly enriched by those fees.

286.     Plaintiffs and class members have no adequate remedy at law for these misappropriated gains.  The Court should issue a constructive trust compelling Currenex to disgorge to Plaintiffs and class members all unlawful or inequitable proceeds Currenex received, and all funds Currenex unjustly retained that should have been paid to Plaintiffs and class members.

287.     Plaintiffs and class members seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

### SEVENTH CLAIM FOR RELIEF (Unjust Enrichment—Trading Defendants)
### (on behalf of the class, against the Trading Defendants)

288.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

289.     The Trading Defendants were unjustly enriched at the expense of Plaintiffs. Without limitation, Plaintiffs paid the Trading Defendants more when buying from the Trading Defendants, and received less when selling to the Trading Defendants, than they would have absent Defendants' scheme.

290.     Plaintiffs and class members have no adequate remedy at law for these misappropriated gains.  The Court should issue a constructive trust compelling the Trading Defendants to disgorge to Plaintiffs and class members all unlawful or inequitable proceeds that the Trading Defendants received, and all funds the Trading Defendants unjustly retained that should have been paid to Plaintiffs and class members.

291.     Plaintiffs and class members seek restoration of the monies of which they were unfairly and improperly deprived, as described herein.

### EIGHTH CLAIM FOR RELIEF (RICO Section 1962(C))
### (on behalf of the class, against Currenex, State Street, Goldman, and HC Tech)

292.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

293.     Defendants Currenex, State Street, Goldman, and HC Tech are corporate entities, and therefore "persons" under 18 U.S.C. § 1961(3) as well as 1 U.S.C. § 1.

294.     ***The Enterprises.***  The "Currenex-HC Tech Enterprise" consists of the of the association-in-fact created by the relationships between Currenex, HC Tech, and their employees

and agents who operated and used the Platform to trade FX.  State Street and its employees and agents are a part of the Currenex-HC Tech Enterprise, and State Street is liable as a "person" in connection with the Currenex-HC Tech Enterprise, by way of State Street's unity of interest with Currenex after the acquisition, as discussed above.

295.    The "Currenex-Goldman Enterprise" consists of the of the association-in-fact created by the relationships between Currenex, Goldman, and their employees and agents who operated and used the Platform to trade FX.  State Street and its employees and agents are a part of the Currenex-Goldman Enterprise, and State Street is liable as a "person" in connection with the Currenex-Goldman Enterprise, by way of State Street's unity of interest with Currenex after the acquisition, as discussed above.

296.    The "Currenex-State Street Enterprise" consists of the of the association-in-fact created by the relationships between Currenex, State Street, and their employees and agents who operated and used the Platform to trade FX prior to Currenex's acquisition by State Street.

297.    The purpose of each enterprise was to steer non-privileged customers into trading at worse prices, through the grant of secret advantages to benefit the privileged liquidity providers at the expense of other traders on the platform.  In so doing, Currenex hoped to create and maintain a more-successful Platform and thus higher fees, while the Trading Defendants hoped to gain illicit trading profits.  These two mechanisms for illicit profits cannot exist without each other.  The illicit transactions drove Currenex's fees and the Trading Defendants' profits alike.  Which is to say, again, that all parties within each enterprise had a common purpose of making more money off the corrupt Currenex Platform.

298.    As discussed above, Currenex and State Street made false representations and fraudulent omissions regarding the Platform, even while arriving at secret agreements with the

Trading Defendants to give them secret advantages.  The Trading Defendants substantially assisted in that fraud.

299.    The enterprises could not accomplish their purpose without coordinated activity among their respective members.  It takes a corrupt Platform operator to create a secret tiebreaking rule, and a corrupt Trading Defendant to take advantage of it, for the scheme to work.

300.    ***Pattern of Racketeering Activity.***  For many years, the enterprises were engaged in activities that affect interstate commerce.  The unlawful RICO enterprises were longstanding, continuous, and open-ended.

301.    The RICO defendants, individually and as part of the enterprises, engaged directly or indirectly in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  The RICO defendants, acting individually and as part of the enterprises, devised the scheme in order to defraud and to obtain money or property by means of false or fraudulent pretenses and representations.  Each Defendant's participation was crucial to the racketeering activity.

302.    Currenex and State Street enabled, conducted, and maintained the scheme by knowingly making materially false and misleading statements to customers through the mail or wires, to induce customers to purchase services on the Currenex Platform and to conceal the true nature of the services.  Indeed, as discussed above, in the absence of a clear disclaimer about the presence of a rigged auction caused by secret, undisclosed agreements, all of Currenex's and State Street's communications regarding the Platform were fraudulently misleading.

303.    The Trading Defendants enabled, conducted, and maintained the scheme for each of their respective enterprises by knowingly operating and executing their respective schemes by negotiating, securing, and exercising their own line-jumping powers on the Platform at the

expense of non-privileged customers.  HC Tech also profited from its ability to commercially

sensitive information regarding Plaintiffs and class members that HC Tech had no right to see.

304.    Each of the Defendants individually and as part of the enterprises have used the

mails and wires to be used, or reasonably knew the mails and wires would be used, to knowingly

make fraudulent misrepresentations and omissions.  Each use of the mails and wires has

furthered the scheme and enabled the RICO defendants to take money and property from non-

privileged customers and putative class members through false pretenses and materially false

statements or omissions.

305.    Senior employees at Currenex and State Street, including David Newns (Global

Head of Currenex, then Head of State Street's GlobalLink), Russell Sears (Global Head of Sales),

and other senior salespeople, such as Cary Rosenwald and Sean Gilman, controlled and managed

all three of the enterprises by negotiating and implementing the secret, undisclosed agreements

with Trading Defendants.

306.    State Street, by way of its senior FX trading employees and agents on its behalf,

controlled and managed all three enterprises by insisting on, negotiating, securing, and

exercising jump-the-line powers when it knew or reasonably knew that the mail and wires would

be used to knowingly make fraudulent misrepresentations and omissions.  It also helped

negotiate and implement the secret, undisclosed Currenex-HC Tech and Currenex-Goldman

agreements.

307.    HC Tech, by way of its senior FX trading employees and agents on its behalf

including Cary Rosenwald and Sean Gilman, controlled and managed the Currenex-HC Tech

enterprise by insisting on, negotiating, securing, and exercising jump-the-line powers when it

knew or reasonably knew that the mail and wires would be used to knowingly make fraudulent misrepresentations and omissions.

308.    Goldman, by way of its senior FX trading employees and agents on its behalf such as Rick Schonberg, controlled and managed the Currenex-Goldman enterprise by insisting on, negotiating, securing, and exercising jump-the-line powers when it knew or reasonably should have known that the mail and wires would be used to knowingly make fraudulent misrepresentations and omissions.

309.    The RICO defendants had specific knowledge that the mails and wires were being used to advance the overall purpose of executing the scheme to defraud, or it was reasonably foreseeable that the mails and wires would be used because executing their scheme depends on calling or emailing customers, and transmitting and requesting the execution of various trades by the mails and wires.

310.    Each of the thousands of uses of the mails and wires as part of the scheme, spanning a period of many years, constitutes a separate instance of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, and thus is a predicate act.  These predicate acts constitute "a pattern of racketeering activity" under 18 U.S.C. §§ 1961 and 1962.

311.    As part of this scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq.  The acts of racketeering were a part of the RICO defendants' regular way of doing business.  The RICO defendants each benefitted from the operation of the scheme.

312.    ***Relationship of Pattern of Racketeering Activity to the Enterprises.***  This pattern of racketeering activity described above is integral to the scheme for the enterprises, as discussed

above.  Without engaging in mail and wire fraud, the RICO defendants would have been unable to procure the trades that they sought.

313.    Each RICO defendant, individually and as a member of the enterprises, conducted or participated in the racketeering activity described above, thus violating 18 U.S.C. § 1962(c).

314.    As a direct and proximate result of the RICO violations described in this complaint, Plaintiffs and class members have suffered substantial and concrete injury.  Without limitation, Plaintiffs and class members, because of their ignorance of the secret agreements, unknowingly traded on the Currenex Platform at worse prices, suffered reduced volumes at desired prices, and incurred Currenex fees for services that were materially reduced in value by the secret agreements.  These harms, and others, constitute injuries to Plaintiffs' property under 18 U.S.C. § 1964.

315.    The RICO defendants' conduct involved a threat of long-term illegality since it commenced many years ago and continued for many years.  The pattern of racketeering activity had been directed towards thousands of persons, including Plaintiffs.  Because of the aforementioned violations of 18 U.S.C. § 1962(c), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

### NINTH CLAIM FOR RELIEF (RICO Section 1962(D))
**(on behalf of the class, against Currenex, State Street, Goldman, and HC Tech)**

316.    In violation of 18 U.S.C. § 1962(d), Currenex, State Street, Goldman, and HC Tech conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of an enterprise through the pattern of racketeering activity described above.  The volume and frequency of the fraudulent activity, and the continuance of the scheme for over many years and continuing to this

day, could not have occurred without the consent and knowing collusion of the RICO Defendants.

317.    As part of, and to advance, their conspiracy, the RICO Defendants agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity.  As part of and to advance their conspiracy, each RICO Defendant agreed to and did commit at least two predicate acts of racketeering.

318.    Plaintiffs' and class members' property interests have been injured by, and as a direct and proximate result of the violations of 18 U.S.C. § 1962(d).  Because of the violations of 18 U.S.C. § l 962(d), Plaintiffs and class members are entitled to compensatory and treble damages in an amount to be determined at trial, as well as costs and fees.

### TENTH CLAIM FOR RELIEF (Tortious Interference with Prospective Economic Advantage)
### (on behalf of the class, against the Defendants)

319.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

320.    Plaintiffs and class members each had business relations with other users of the Currenex Platform.

321.    Plaintiffs and class members each had prospective economic advantages in those relations with other users of the Platform, including without limitation when Plaintiffs sought to act as liquidity providers to other users who were seeking to place market orders.

322.    Each Defendant's fraudulent and unlawful conduct described above, including granting (Currenex/State Street) and securing (the Trading Defendants) secret agreements for super-priority and administrative-level access to the Currenex Platform, was an intentional

interference with Plaintiffs' and class members' business relations with other users of the

Platform.  Trading Defendants disrupted and interfered with those relationships by corruptly and

fraudulently ensuring that they would be matched with other users ahead of Plaintiffs and class

members.  Currenex and State Street disrupted and interfered with those relationships by

empowering and then allowing the Trading Defendants to do so through its operation of the

Platform.  All Defendants also disrupted and interfered by way of the fraudulent representations

and omissions described above.

321.     As described above, the Defendants knew that Plaintiffs and class members had

these business relations and that their actions would, by design, disrupt these relations.

Defendants acted intentionally and with knowledge that their misconduct and wrongful acts

would interfere with Plaintiffs and class members' business relations.

324.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and class

members have suffered damages.

### ELEVENTH CLAIM FOR RELIEF (Breach of the Implied Covenant)
#### (on behalf of the New York subclass, against Currenex)

325.     Edmar and IBG hereby incorporate each preceding and succeeding paragraph as

though fully set forth herein.

326.     Edmar, IBG, and subclass members entered into valid and enforceable agreements

with Currenex before trading on the Currenex Platform.

327.     Edmar, IBG, and subclass members have fully performed their obligations under

these agreements.

328.     Implicit in all contracts governed by New York law is a covenant of good faith

and fair dealing in the course of contract performance.  The covenant of good faith and fair

dealing provides that a party shall not do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

329.     In breach of this implied covenant, Currenex sought to withhold the benefits of its agreements with Edmar, IBG, and subclass members by manipulating its Platform to secretly and intentionally harm class members in order to benefit a few select users of the Platform and itself.

330.     As direct and proximate result of Currenex's breach of the covenant of good faith and fair dealing, Edmar, IBG, and subclass members suffered harm as expounded upon above.

### TWELFTH CLAIM FOR RELIEF (Tortious Interference with Contract)
**(on behalf of the New York subclass, against the Trading Defendants)**

331.     Edmar and IBG hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

332.     Edmar, IBG, and subclass members each had valid, enforceable contracts with Currenex.

333.     Each Trading Defendant's fraudulent and unlawful conduct described above, including securing secret agreements for super-priority and administrative-level access to the Currenex Platform, was an intentional interference with Plaintiffs' and class members' contracts with Currenex.  The Trading Defendants disrupted and interfered with these contracts by causing Currenex to deprive the Plaintiffs and class members of the fruits of their bargained-for exchange to use the Currenex Platform, among other things, in violation of Currenex' implied covenant of good faith and fair dealing.

334.     As described above, the Trading Defendants knew that Edmar, IBG, and subclass members had valid agreements with Currenex to use the Currenex Platform.  They also knew that the secret advantages the Trading Defendants secured from Currenex contradicted the fundamental purpose of Currenex's contracts with other users.

86

335.    Defendants acted intentionally and with knowledge that their misconduct and wrongful acts would interfere with Edmar, IBG, and the subclass members' contracts.

336.    As a direct and proximate result of Trading Defendants' misconduct, Edmar, IBG, and the subclass members have suffered damages.

## **PRAYER FOR RELIEF**

337.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed class, respectfully request that the Court:

(a)    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Plaintiffs as the representatives of the class;

(b)    Award Plaintiffs and class members damages against Defendants for their fraudulent misrepresentations and fraudulent omission;

(c)    Adjudge and decree that the unlawful conduct alleged herein violates Sections 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

(d)    Award Plaintiffs and class members damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

(e)    Award Plaintiffs and class members treble damages, pursuant to RICO, 18 U.S.C. § 1964;

(f)    Award Plaintiffs and class members damages against Defendants for their and breach of the duty of good faith and fair dealing;

(g)    Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and class members;

(h)     Award Plaintiffs and class members damages against Defendants for their interreferences with Plaintiffs' and class members' contracts and prospective economic advantages;

(i)     Award reasonable attorneys' fees and costs;

(j)     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

(k)     Including because Defendants wrongful actions were willful, wanton, egregious, and part of a pattern directed at the public users of the Platform, an award of punitive damages; and

(l)     Direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

DATED:   New York, New York
         January 6, 2022

RUDDY GREGORY, PLLC                QUINN EMANUEL URQUHART &
                                   SULLIVAN, LLP

By: */s/ Mark Ruddy*               By: */s/ Daniel L. Brockett*
Mark Ruddy                         Daniel L. Brockett
1225 15th Street NW                Steig D. Olson
Washington, DC 20005               Christopher M. Seck
Telephone: (202) 797-0762          51 Madison Avenue, 22nd Floor
Fax: (202) 318-0543                New York, New York 10010
mruddy@ruddylaw.com                Telephone:  (212) 849-7000
                                   Fax:  (212) 849-7100
                                   danbrockett@quinnemanuel.com
                                   steigolson@quinnemanuel.com
                                   christopherseck@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Counsel for Plaintiffs and the Proposed Class*