**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EDMAR FINANCIAL COMPANY, LLC; IRISH
BLUE & GOLD, INC.; and XTX MARKETS
LIMITED,

                Plaintiffs,

      v.

CURRENEX, INC.; GOLDMAN SACHS & CO.
LLC; HC TECHNOLOGIES, LLC; STATE
STREET BANK AND TRUST COMPANY;
STATE STREET GLOBAL MARKETS
INTERNATIONAL LIMITED; and JOHN DOE
DEFENDANTS 1-5,

                Defendants.

Case No. 1:21-cv-06598 (LAK)

**MEMORANDUM OF DEFENDANTS CURRENEX, INC., GOLDMAN SACHS & CO.
LLC, HC TECHNOLOGIES, LLC, STATE STREET BANK AND TRUST COMPANY,
AND STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED IN
SUPPORT OF THEIR JOINT MOTION TO DISMISS ALL CLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

    A.   Currenex Is One Electronic Platform Within The Broader FX Market ........................ 4

    B.   Plaintiffs Challenge Currenex's Tie-Breaking Rules As Inconsistent With "First In, First Out" ........................................................................................................ 5

    C.   Plaintiffs Do Not Allege That Any Conduct Breached Their Agreements With Currenex ...................................................................................................................... 8

    D.   Currenex Never Claimed That The Platform Followed Strict FIFO For Tie-Breaking ...................................................................................................................... 9

LEGAL STANDARD............................................................................................................... 10

ARGUMENT .......................................................................................................................... 11

I.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT (FIFTH CLAIM FOR RELIEF, AC ¶¶ 267–281).................. 11

    A.   Plaintiffs Fail To Plead The Existence Of Any Horizontal Bid-Rigging Scheme That Would Constitute A *Per Se* Violation................................................................. 11

    B.   Plaintiffs Fail To Adequately Plead The Existence of Actionable Vertical Agreements................................................................................................................. 13

    C.   Plaintiffs Fail To Plead An Unreasonable Restraint Of Trade Under The Rule Of Reason .................................................................................................................. 15

    D.   Plaintiffs Fail To Plead Antitrust Injury..................................................................... 18

II.   THE FRAUD CLAIM AGAINST CURRENEX AND STATE STREET SHOULD BE DISMISSED (FIRST CLAIM FOR RELIEF, AC ¶¶ 226–243) ................................... 20

    A.   The AC Does Not Adequately Allege A False Statement Or An Actionable Omission................................................................................................................... 21

        1.   Plaintiffs Fail To Allege Any False Statement ................................................. 21

        2.   Plaintiffs Fail To Allege Any Actionable Omission.......................................... 23

    B.   The AC Does Not Adequately Allege Reliance .......................................................... 26

        1.   Plaintiffs Do Not Plead Actual Reliance ......................................................... 27

        2.   Plaintiffs Do Not Plead Justifiable Reliance.................................................... 29

    C.   The AC Does Not Adequately Allege Out-Of-Pocket Loss Caused By A Misrepresentation Or Omission.................................................................................. 30

III.  THE IMPLIED COVENANT CLAIM AGAINST CURRENEX SHOULD BE DISMISSED (ELEVENTH CLAIM FOR RELIEF, AC ¶¶ 325–330) .............................. 33

IV.  PLAINTIFFS' SECONDARY LIABILITY CLAIMS SHOULD BE DISMISSED ......... 34

A. Plaintiffs Fail To State A Claim For Conspiracy To Defraud (Second Claim For Relief, AC ¶¶ 244–251) Or For Aiding And Abetting Fraud Against The Trading Defendants (Third Claim For Relief, AC ¶¶ 252–258) ................................... 34

B. Plaintiffs Tortious Interference Claims Fail (Tenth And Twelfth Claims For Relief, AC ¶¶ 319–324, 331-336) ................................................................. 37

    1. The Sub-Class Plaintiffs Fail To Plead The Elements Of Tortious Interference With Contract Against The Trading Defendants ........................................................................................ 37

    2. Plaintiffs Fail To Allege Tortious Interference With Prospective Economic Advantage ........................................................ 38

V. PLAINTIFFS' CIVIL RICO CLAIMS AGAINST EACH OF THE DEFENDANTS SHOULD BE DISMISSED (EIGHTH AND NINTH CLAIMS FOR RELIEF, AC ¶¶ 292–318) ........................................................................................................ 40

A. The Allegations Do Not Establish "Association-In-Fact" Enterprises ........................ 41

B. Plaintiffs Do Not Allege A "Pattern" Of Mail Or Wire Fraud .................................... 45

C. Plaintiffs Do Not Adequately Allege A RICO Conspiracy Under § 1962(D) ............. 47

VI. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS AGAINST CURRENEX AND THE TRADING DEFENDANTS ARE ALSO DEFICIENT (SIXTH AND SEVENTH CLAIMS FOR RELIEF, AC ¶¶ 282–291) ........................................ 49

VII. THE CONSUMER PROTECTION ACT CLAIM (N.Y. GEN. BUS. LAW § 349) AGAINST CURRENEX AND STATE STREET FAILS AS A MATTER OF LAW (FOURTH CLAIM FOR RELIEF, AC ¶¶ 259–266) ........................................ 52

VIII. PLAINTIFFS' CLAIMS FAIL UNDER THE APPLICABLE STATUTE OF LIMITATIONS ................................................................................................ 53

A. Plaintiffs Knew Or Should Have Known That The Platform Was Not Following Strict FIFO By No Later Than February 2005 ............................................ 53

B. Plaintiffs' Claims Are Time-Barred ............................................................................ 54

C. Plaintiffs' Invocation Of Equitable Tolling Fails To Save Their Claims .................... 59

CONCLUSION ................................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015)....................................................................39

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008).......................................................35

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*,
   731 F.2d 112 (2d Cir. 1984).....................................................................25

*Abbott Lab.'s v. Adelphia Supply USA*,
   2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ................................................43

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
   957 F. Supp. 1308 (S.D.N.Y. 1997)....................................................48, 49

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
   2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005).........................................32

*Alarmex Holdings L.L.C. v. Pianin*,
   2006 WL 5376779 (N.Y. Sup. Ct. Oct. 27, 2006) ...................................32

*Albunio v. Int'l Safety Grp., Inc.*,
   2016 WL 1267795 (S.D.N.Y. Mar. 30, 2016) .........................................46

*Allocco Recycling, Ltd. v. Doherty*,
   378 F. Supp. 2d 348 (S.D.N.Y. 2005)......................................................40

*In re Aluminum Warehousing Antitrust Litig.*,
   2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir.
   2016) ......................................................................................................51

*In re Amaranth Nat. Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................................51

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*,
   820 F. Supp. 2d 510 (S.D.N.Y. 2011)......................................................34

*Anctil v. Ally Fin., Inc.*,
   998 F. Supp. 2d 127 (S.D.N.Y. 2014), *aff'd in relevant part*, *rev'd on other
   grounds sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x. 66 (2d Cir.
   2015) ......................................................................................................42

*Andre Strishak & Assocs., P.C. v. Hewlett-Packard Co.*,
   2001 WL 1221649 (N.Y. Sup. Ct. July 13, 2001) ................................................................28

*Apt v. Morgan Stanley DW, Inc.*,
   115 A.D.3d 466 (1st Dep't 2014) .........................................................................................55

*Arena Riparian LLC v. CSDS Aircraft Sales & Leasing Co.*,
   184 A.D.3d 509 (1st Dep't 2020) .........................................................................................31

*Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*,
   89 A.D.3d 454 (1st Dep't 2011) ...........................................................................................49

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983)....................................................................................................59

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009)............................................................................10, 23

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)......................32

*Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank*
   *AG*,
   234 F. Supp. 3d 526 (S.D.N.Y. 2017)..............................................................................51, 52

*Bandler v. DeYonker*,
   174 A.D.3d 461 (1st Dep't 2019) .........................................................................................56

*In re Bank of New York Mellon Corp. Forex Transactions Litig.*,
   921 F. Supp. 2d 56 (S.D.N.Y. 2013).....................................................................................33

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   995 F. Supp. 2d 291 (S.D.N.Y. 2014)....................................................................................55

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955 (2007)................................................................10, 11, 13, 23

*Bonadio v. PHH Mortg. Corp.*,
   2014 WL 522784 (S.D.N.Y. Jan. 31, 2014) .........................................................................48

*Boyle v. U.S.*,
   556 U.S. 938, 129 S. Ct. 2237 (2009)..................................................................................41

*Brady v. Lynes*,
   2008 WL 2276518 (S.D.N.Y. June 2, 2008) ........................................................................56

*Butala v. Agashiwala*,
   916 F. Supp. 314 (S.D.N.Y. 1996) .......................................................................................60

*California Cap. Equity, LLC v. IJKG, LLC*,
  50 Misc. 3d 1215(A), (N.Y. Sup. Ct. 2016), *aff'd*, 151 A.D.3d 650 (1st Dep't 2017) ........................................................................................................................24

*Carvel Corp. v. Noonan*,
  818 N.E.2d 1100 (N.Y. 2004)........................................................................................39

*Cedar Swamp Holdings, Inc. v. Zaman*,
  487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007)...................................................................43

*Century Pac., Inc. v. Hilton Hotels Corp*.,
  528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).....................29

*Choi v. Tower Rsch. Cap. LLC*,
  165 F. Supp. 3d 42 (S.D.N.Y. 2016)..........................................................................50, 51

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*,
  2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016), *aff'd*, 708 F. App'x 29 (2d Cir. 2017) .....................................................................................................................15

*City of New York v. Chavez*,
  944 F. Supp. 2d 260 (S.D.N.Y. 2013)...........................................................................44

*City of New York v. Grp. Health Inc.*,
  2010 WL 2132246 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011) ......................................................................................................................17

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
  277 F. Supp. 3d 483 (S.D.N.Y. 2017)............................................................................34

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co.*,
  785 F. Supp. 411 (S.D.N.Y. 1992) ................................................................................30

*Cont. Transp. Servs., Inc. v. New Era Lending LLC*,
  2018 WL 11226077 (S.D.N.Y. Oct. 26, 2018) ..............................................................46

*Cont'l Petroleum Corp., Inc. v. Corp. Funding Partners, LLC*,
  2012 WL 1231775 (S.D.N.Y. Apr. 12, 2012).................................................................40

*Crabhouse of Douglaston Inc. v. Newsday Inc.*,
  801 F. Supp. 2d 64 (E.D.N.Y. 2011) .............................................................................44

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013)......................................................................................44, 46

*D. Penguin Bros. v. City Nat'l Bank*,
  587 F. App'x 663 (2d Cir. 2014) ...................................................................................41

*D'Andrea v. Rafla-Demetrious*,
    146 F.3d 63 (2d Cir. 1998) (per curiam)......................................................37

*Dennis v. JPMorgan Chase & Co.*
    343 F. Supp. 3d 122 (S.D.N.Y. 2018)........................................................43

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*,
    810 F.3d 861 (2d Cir. 2015).......................................................................59

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*,
    436 F. Supp. 3d 754 (S.D.N.Y. 2020).........................................................40

*DuBuisson v. Nat'l Union Fire Ins. of Pittsburgh*,
    2021 WL 3141672 (S.D.N.Y. July 26, 2021) ..............................................59

*Dulsky v. Worthy*,
    2013 WL 4038604 (S.D.N.Y. July 30, 2013) ..............................................46

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451, 112 S. Ct. 2072 (1992).........................................................17

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)..........................................................................14

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010).........................................................47

*Elsevier, Inc. v. Grossman*,
    199 F. Supp. 3d 768 (S.D.N.Y. 2016).........................................................48

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009)....................................................16, 17

*Feliciano v. Gen. Motors LLC*,
    2016 WL 9344120 (S.D.N.Y. Mar. 31, 2016) ............................................57

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    2020 WL 5518146 (S.D.N.Y. Sept. 14, 2020).............................................30

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019).........................................................59

*First Cap. Asset Mgmt. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004).......................................................................45

*First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*,
    52 F. Supp. 3d 625 (S.D.N.Y. 2014)..............................................23, 24, 26

*Friedman v. Coldwater Creek, Inc.*,
   551 F. Supp. 2d 164 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009)........................39

*In re Fyre Festival Litig.*,
   399 F. Supp. 3d 203 (S.D.N.Y. 2019)..................................................................................49

*Ga. Malone & Co. v. Rieder*,
   973 N.E.2d 743 (N.Y. 2012)..............................................................................................51

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011)...............................................................................................11

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................................14

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)..................................................................................29

*Gray v. Seaboard Sec., Inc.*,
   14 A.D.3d 852 (3d Dep't 2005) .........................................................................................52

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................................14

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009)..........................................................................40, 41

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019)................................................................................35

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
   2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)................................................................41, 43

*Halvorssen v. Simpson*,
   807 F. App'x 26 (2d Cir. 2020) .........................................................................................47

*Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*,
   2012 WL 612358 (S.D.N.Y. Feb. 23, 2012).......................................................................34

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018)..........................................................................................18, 19

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
   230 F.3d 549 (2d Cir. 2000)...............................................................................................21

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
   2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012).....................................................................34

*Hinds Cnty. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)........................................................54

*ICD Cap., LLC v. Codesmart Holdings, Inc.*,
  2020 WL 815733 (S.D.N.Y. Feb. 19, 2020)..............................................36

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
  907 N.E.2d 268 (N.Y. 2009)......................................................................49

*Ingrami v. Rovner*,
  45 A.D.3d 806 (2d Dep't 2007)..................................................................57

*In re Int. Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................51

*In re Int. Rate Swaps Antitrust Litig.*,
  351 F. Supp. 3d 698 (S.D.N.Y. 2018)........................................................39

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
  713 F. Supp. 2d 286 (S.D.N.Y. 2010)........................................................13

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000).......................................................................49

*Kesner v. Dow Jones & Co.*,
  515 F. Supp. 3d 149 (S.D.N.Y. 2021)........................................................35

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006).......................................................................38

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179, 117 S. Ct. 1984 (1997).......................................................54

*Knoll v. Schectman*,
  275 F. App'x 50 (2d Cir. 2008) ..................................................................47

*Koch v. Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012).......................................................................57

*Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*,
  392 F. Supp. 3d 382 (S.D.N.Y. 2019)........................................................32

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009)........................................................55

*Lama Holding Co. v. Smith Barney Inc.*,
  668 N.E.2d 1370 (N.Y. 1996).....................................................................30

*Laro, Inc. v. Chase Manhattan Bank*,
    866 F. Supp. 132 (S.D.N.Y. 1994), *aff'd sub nom. Laro, Inc. v. Chase
    Manhattan Bank*, 60 F.3d 810 (2d Cir. 1995) ..........................................................46

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...........................................................50

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877, 127 S. Ct. 2705 (2007) .......................................................................15

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ......................................................................................35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ............................................................57

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014) .........................................................................19

*Lindberg v. Dow Jones & Co., Inc.*,
    2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ...........................................................37

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...........................................................................26

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .......................................................................14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    2021 WL 4142698 (2d Cir. Sept. 13, 2021) ..............................................................24

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
    711 F.3d 106 (2d Cir. 2013) ......................................................................................45

*Mandarin Trading Ltd. v. Wildenstein*,
    944 N.E.2d 1104 (N.Y. 2011) ........................................................................21, 26, 50

*MarketShare Corp. v. Transactis, Inc.*,
    2021 WL 1948283 (S.D.N.Y. May 12, 2021) ...........................................................58

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .......................................................................27

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir. 2000) .................................................................................51, 52

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ......................................................................................11

*Mazda v. Carfax, Inc.*,
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016), *aff'd sub nom. Maxon Hyundai
   Mazda v. Carfax, Inc.*, 726 F. App'x 66 (2d Cir. 2018) .........................................................17

*Moore v. PaineWebber, Inc.*,
   189 F.3d 165 (2d Cir. 1999)......................................................................................................45

*Morin v. Trupin*,
   711 F. Supp. 97 (S.D.N.Y. 1989) ..............................................................................................36

*Moss v. BMO Harris Bank, N.A.*,
   258 F. Supp. 3d 289 (E.D.N.Y. 2017) .......................................................................................42

*Muller-Paisner v. TIAA*,
   289 F. App'x 461 (2d Cir. 2008) ...............................................................................................26

*Murray Eng'g P.C. v. Remke*,
   2018 WL 3773991 (S.D.N.Y. Aug. 9, 2018) .............................................................................50

*Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.*,
   165 F. Supp. 2d 514 (S.D.N.Y. 2001)..................................................................................45, 48

*Nat'l Grp. for Commc'ns & Computs. Ltd. v. Lucent Techs. Inc.*,
   420 F. Supp. 2d 253 (S.D.N.Y. 2006)........................................................................................47

*Nguyen v. FXCM Inc.*,
   364 F. Supp. 3d 227 (S.D.N.Y. 2019)........................................................................................52

*Noskov v. Roth*,
   2020 WL 4041125 (S.D.N.Y. July 17, 2020) ...........................................................................57

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)...............................................................................................................17

*Onel v. Top Ships, Inc.*,
   806 F. App'x 64 (2d Cir. 2020) .................................................................................................60

*In re Optimal U.S. Litig.*,
   813 F. Supp. 2d 351 (S.D.N.Y. 2011)........................................................................................36

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
   2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) ..........................................................................34

*Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*,
   80 A.D.3d 453 (1st Dep't 2011) ................................................................................................37

*Pittman v. Grayson*,
   149 F.3d 111 (2d Cir. 1998)......................................................................................................35

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
    97 F. Supp. 3d 424 (S.D.N.Y. 2015)....................................................................15

*In re Platinum-Beechwood Litig.*,
    377 F. Supp. 3d 414 (S.D.N.Y. 2019)................................................................49

*In re Platinum-Beechwood Litig.*,
    427 F. Supp. 3d 395 (S.D.N.Y. 2019)................................................................48

*POSCO Energy Co. v. FuelCell Energy, Inc.*,
    2021 WL 4224956 (S.D.N.Y. Sept. 16, 2021)..............................................38, 39

*Prestandrea v. Stein*,
    262 A.D.2d 621 (2d Dep't 1999).......................................................................55

*Redwoodventures Ltd. v. ETG Cap. Advisors LLC*,
    2020 WL 70395 (N.Y. Sup. Ct. Jan. 06, 2020)................................................29

*In re Refco Inc. Sec. Litig.*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2011).....................................................37, 38, 39

*Roberts v. Weight Watchers Int'l, Inc.*,
    217 F. Supp. 3d 742 (S.D.N.Y. 2016)................................................................34

*Rosemeier v. Schenker Int'l, Inc.*,
    895 F. Supp. 65 (S.D.N.Y. 1995) .....................................................................56

*Rosenshein v. Meshel*,
    688 F. App'x 60 (2d Cir. 2017) .........................................................................58

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................4

*Ruotolo v. Fannie Mae*,
    933 F. Supp. 2d 512 (S.D.N.Y. 2013)................................................................11

*Ruzhinskaya v. Healthport Techs., LLC*,
    311 F.R.D. 87 (S.D.N.Y. 2015) ........................................................................57

*Salinas v. United States*,
    522 U.S. 52, 118 S. Ct. 469 (1997)...................................................................47

*Sardanis v. Sumitomo Corp.*,
    279 A.D.2d 225 (1st Dep't 2001) ......................................................................31

*Schinella v. Soyer*,
    2021 WL 4255055 (S.D.N.Y. Sept. 16, 2021)...................................................37

*Seagrape Invs. LLC v. Tuzman,*
   2020 WL 5751232 (S.D.N.Y. Sept. 25, 2020).......................................................................31

*Sec. Inv. Prot. Corp. v. BDO Seidman, LLP,*
   222 F.3d 63 (2d Cir. 2000)....................................................................................................27, 28

*Segal v. Gordon,*
   467 F.2d 602 (2d Cir. 1972)..................................................................................................21, 23

*Shak v. JPMorgan Chase & Co.,*
   156 F. Supp. 3d 462 (S.D.N.Y. 2016)......................................................................................57

*Solutia Inc. v. FMC Corp.,*
   456 F. Supp. 2d 429 (S.D.N.Y. 2006)......................................................................................23

*In re SSA Bonds Antitrust Litig.,*
   2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018)..........................................................................18

*Stamm v. Barclays Bank of New York,*
   153 F.3d 30 (2d Cir. 1998)......................................................................................................21

*Sullivan v. Barclays PLC,*
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)...........................................................................45, 48

*Taboola, Inc. v. Ezoic Inc.,*
   2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020)..........................................................................37

*In re Term Commodities Cotton Futures Litig.,*
   2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013)..........................................................................48

*Tops Mkts., Inc. v. Quality Mkts., Inc.,*
   142 F.3d 90 (2d Cir. 1998)......................................................................................................20

*Town of W. Hartford v. Operation Rescue,*
   915 F.2d 92 (2d Cir. 1990)......................................................................................................41

*U1it4less, Inc. v. FedEx Corp.,*
   871 F.3d 199 (2d Cir. 2017)....................................................................................................44

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,*
   216 F. Supp. 2d 198 (S.D.N.Y. 2002).....................................................................................23

*United States v. Apple, Inc.,*
   791 F.3d 290 (2d Cir. 2015)..................................................................................................12, 15

*United States v. Bank of New York Mellon,*
   941 F. Supp. 2d 438 (S.D.N.Y. 2013)......................................................................................30

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007)..................................................................45

*Vandashield Ltd. v. Isaacson*,
  146 A.D.3d 552 (1st Dep't 2017) ........................................................32

*Vigoda v. DCA Prods. Plus Inc.*,
  293 A.D.2d 265 (1st Dep't 2002) ........................................................40

*Walker v. Jastremski*,
  430 F.3d 560 (2d Cir. 2005)..................................................................59

*Walsh v. Rigas*,
  2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) ..................................26, 28

*Weshnak v. Bank of Am., N.A.*,
  451 F. App'x 61 (2d Cir. 2012) ...........................................................35

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
  328 F. App'x 695 (2d Cir. 2009) ....................................................54, 57

*Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*,
  2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) .....................................47

*In re Zinc Antitrust Litigation*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016)..................................................12

**Statutes**

15 U.S.C. § 15b..........................................................................................54

18 U.S.C. § 1962(c) ...................................................................................40

18 U.S.C. § 1962(d) .............................................................................40, 47

N.Y. Gen. Bus. Law § 349...........................................................52, 56, 57, 58

**Other Authorities**

Fed. R. Civ. P. 9(b) .......................................................................... *passim*

N.Y. C.P.L.R. 213(2) .................................................................................59

N.Y. C.P.L.R. 213(8) .................................................................................55

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c, at 190 (3d ed.
  2011) ....................................................................................................17

Defendants Currenex, Inc. ("Currenex"), State Street Global Markets International Limited ("SS Global"), Goldman Sachs & Co. LLC ("Goldman"), HC Technologies, LLC ("HC Tech"), and State Street Bank and Trust Company ("State Street," and, together with Goldman and HC Tech, the "Trading Defendants") respectfully submit this memorandum in support of their joint motion to dismiss, with prejudice, the Amended Complaint ("AC"), filed by Plaintiffs Edmar Financial Company, LLC ("Edmar"), Irish Blue & Gold, Inc. ("IBG," and, together with Edmar, the "Sub-Class Plaintiffs"), and XTX Markets Limited ("XTX," and, together with Edmar and IBG, "Plaintiffs").

## PRELIMINARY STATEMENT

Despite amending their complaint, Plaintiffs have done nothing to cure the fundamental defects in their grab bag of federal statutory and state common-law claims. Each should be dismissed with prejudice.

Plaintiffs are three professional foreign exchange ("FX") trading firms that at various times executed FX spot transactions on Currenex, an electronic FX trading platform. They complain that Currenex surreptitiously used a "tie-breaking" preference on its platform: if a Trading Defendant or other preferred liquidity provider placed a limit order for a currency pair at the *exact* same price (down to multiple decimal places) as another user on the platform, Plaintiffs allege that Currenex broke the "tie" in favor of the preferred liquidity provider, even if its quote was submitted slightly later in time. Plaintiffs try to dress up the alleged tie-breaking preference as a bid-rigging conspiracy—a *per se* antitrust violation—but they fail to allege any evidence of a horizontal agreement among the Defendants, which is the essential ingredient for a bid-rigging claim. To the contrary, new allegations in the AC that Currenex granted different preferences to different Trading Defendants effectively concede that the Trading Defendants were in competition with one another, underscoring the implausibility of the alleged conspiracy. *See infra* Section I.A.

Plaintiffs also do not even come close to satisfying the pleading burden for a "rule of reason" antitrust claim. Not only do they fail to identify the allegedly offensive vertical agreements between Currenex and each Trading Defendant, they also fail to identify any plausible basis to infer that the alleged tie-breaking provisions had any material impact on pricing in the global FX spot market. By Plaintiffs' own definition, any "tie-breaking" rules applied only to a subset of transactions on one of many platforms for FX spot trading in a market that Plaintiffs describe as "the largest in the financial system." AC ¶ 48. In addition, Plaintiffs concede that Currenex had an independent and pro-competitive economic rationale to grant tie-breaking preferences to select liquidity providers: namely, to attract liquidity to its platform so it could provide competitive pricing to platform users. *See id.* ¶ 65. As the AC states, "liquidity begets liquidity." *Id.* ¶ 143. *See infra* Sections I.B and I.C.

Plaintiffs also do not—and cannot—plausibly plead any antitrust injury resulting from the alleged tie-breaking agreements. They have not identified a single "price fixed" transaction they entered into on the platform, much less one in which a Defendant harmed them by causing them to pay more or receive less. Instead, they speculate that the Trading Defendants *might* have been willing to pay a better price for certain trades but for the alleged tie-breaking rules. But this conjecture is contradicted by Plaintiffs' allegations that Currenex used these agreements to attract liquidity to its platform from the Trading Defendants, who were under no obligation to trade on the platform and who competed against each other. The hypothetical harm alleged does not satisfy the pleading requirements for antitrust standing under this Circuit's well-settled law. *See infra* Section I.D.

Nor do Plaintiffs adequately plead common-law fraud. Plaintiffs concede they had no right to demand that Currenex use their preferred tie-breaking procedures, which would universally

favor the user who bid first (*i.e.*, "strict FIFO"). *See* AC ¶ 82. Instead they allege that the platform's supposed use of strict FIFO tie-breaking procedures was so critical to their trading decisions that these professional currency traders would not have traded on the platform *even when it offered the best price* and that they were somehow harmed by trading on the platform *even when it offered the best price*. But the AC does not—and cannot—allege any false statement or any actionable omission by Currenex claiming that the platform was employing a "strict FIFO" order book, any actual or justifiable reliance on such alleged misstatement or omission, or any resulting out-of-pocket loss recoverable in fraud. To the contrary, Plaintiffs admit that "throughout the relevant time period," Currenex disclosed that its platform was not following strict FIFO and was instead providing priority to certain institutional liquidity providers by "expressly" stating on its website that "'Limit Orders are filled automatically by the first counterparty *bank* to stream a price that matches the order.'" *See infra* Section II.

Given the fundamental defects in Plaintiffs' primary liability theories, the AC's hodgepodge of secondary liability claims—aiding and abetting fraud, conspiracy, and tortious interference—also fail. Tellingly, Plaintiffs do not allege any breach of an actual contractual provision by Currenex (and resort to pleading an unjust enrichment claim despite acknowledging the existence of governing contracts). Having now had ample opportunity to identify facts supporting these claims, Plaintiffs still have not pleaded that the Trading Defendants even knew of Currenex's representations or contractual arrangements with its customers, much less that they did anything to substantially assist any violation of them. The RICO claims flounder because Plaintiffs have not identified any actual fraud, and because the Trading Defendants' alleged conduct lacked the common purpose with Currenex or each other necessary for any purported RICO "enterprise" to exist. *See infra* Sections III through VII.

Finally, almost all of Plaintiffs' claims fail for the independent reason that they are time-barred: (i) Plaintiffs were on actual or constructive notice of their purported claims by no later than February 2005, and (ii) no Plaintiff alleges any trade on the platform in the three years preceding the Complaint (and no Sub-Class Plaintiff alleges any trade on the platform in the four years preceding the Complaint). *See infra* Section VIII.

## BACKGROUND[1]

### A.   Currenex Is One Electronic Platform Within The Broader FX Market

FX spot transactions involve "an exchange of one country's currency for another." AC ¶ 48. Currencies trade in pairs, the most common of which are the Euro/U.S. dollar, U.S. dollar/Japanese Yen, and British pound/U.S. dollar. *Id.* ¶ 49. FX spot transactions are typically traded over-the-counter ("OTC"), meaning a customer executes the trade with a dealer. *Id.* ¶ 51.

The trading at issue here took place on Currenex's Electronic Communication Network ("ECN"), specifically its "Executable Streaming Prices Trading Model" (the "Platform"), an electronic platform "where banks, corporations, hedge funds, investors, and other traders engage in FX transactions." *Id.* ¶ 3. Plaintiffs allege that Currenex operates the Platform in conjunction with its parent company, State Street. *Id.* ¶¶ 1, 37. Currenex has been a wholly owned subsidiary of State Street since its acquisition in 2007. *Id.* ¶¶ 37, 61. SS Global, an English corporation, is the "entity by which the Currenex Platform is 'offered' in the European Economic Area." *Id.* ¶ 38.

---

[1]   Unless indicated otherwise, all internal quotation marks and citations are omitted and all emphasis is added. Citations to "Ex." are to the exhibits attached to the Declaration of Gregg L. Weiner, filed herewith. Citations to "AC ¶" are to the Amended Class Action Complaint, Dkt. No. 41. This background statement is based on the AC's allegations and the materials cited therein, which can be considered on a motion to dismiss. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (courts may consider "any statements or documents incorporated" into the complaint "and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit").

The Platform is an "alternative" to request-for-quote ("RFQ") platforms, which provide another option for traders "rather than having to call individual banks in sequence" for FX trading. *Id.* ¶¶ 55-59. It is also only one of many FX ECNs, with approximately 75% of FX ECN spot volume being executed on other platforms. *Id.* ¶ 192. To trade on the Platform, participants can submit a "bid" (a price at which they are willing to buy) or an "ask" (a price at which they are willing to sell). *Id.* ¶¶ 3, 58. Other market participants can consummate a trade by accepting these posted offers to buy or sell (*i.e.*, bids or asks). *Id.* In any given transaction, participants can choose to provide or take liquidity. *Id.* ¶ 57. A participant can provide liquidity by posting a "limit order" to buy or sell at a certain price. *Id.* ¶ 58. Limit orders remain on the Platform's order book until executed or cancelled. *Id.* Participants can take liquidity by entering "market orders" that match with posted limit orders. *Id.* FX trading on the Platform is anonymous, so parties do not know the identity of their trading counterparties or against whom they are bidding. *Id.* ¶¶ 34, 58.

FX trading platforms must attract liquidity to succeed. *See id.* ¶ 59. State Street (before and after its acquisition of Currenex), Goldman, HC Tech, and unnamed John Doe Defendants traded FX on the Platform as liquidity providers. *Id.* ¶¶ 43–47, 61, 114.

## B.   Plaintiffs Challenge Currenex's Tie-Breaking Rules As Inconsistent With "First In, First Out"

According to Plaintiffs, trading platforms commonly use a "price/time priority" or "first in, first out" ("FIFO") system to match limit orders with market orders. *Id.* ¶¶ 70-71. Platforms that use FIFO systems organize outstanding limit orders by price, placing the best-priced orders at the front of the queue (sometimes called the "top of book"). *Id.* ¶ 71. If two or more limit orders have the same price, the order submitted first is matched first. *Id.* If a market order is larger than the top-of-book limit order, the remaining quantity is matched with the next-best limit order (at

the same price if there are multiple orders posted at that price level, or at the next-best price if there are not) until the entire market order is filled. *Id.*

Plaintiffs contend that Currenex entered into separate (but unidentified) secret agreements with each Trading Defendant granting them "tie-breaking" advantages in circumstances where they matched the best price being offered on the Platform. *Id.* ¶¶ 44-46; *see also id.* ¶ 271.[2] Despite having the opportunity to amend their complaint after purportedly obtaining information from multiple confidential witnesses, Plaintiffs do not allege any particularized facts answering basic questions about these alleged agreements, such as when, where, or how during the proposed 16-year class period Trading Defendants entered into them. *Id.* ¶ 105 ("According to Plaintiffs' sources, secret agreements were negotiated by senior salespeople at Currenex/State Street and senior personnel at the Trading Defendants, often over dinners and lunches in major cities like Chicago and New York.").

The AC contains no factual allegations regarding the alleged agreement between Currenex and Goldman. *Id.* ¶¶ 107, 150. Indeed, as to Goldman, the AC adds nothing material to the minimal Goldman-specific allegations in the initial pleading. A reference to a single Goldman employee simply notes that at some unidentified point during the employee's decade-long tenure at Goldman he was "responsible for negotiating" the alleged "super-priority" rights, and that in 2014 (some seven years before this action commenced) he left Goldman for State Street. *Id.* ¶ 103. The Court is left with the charge that Goldman provided liquidity to the Platform via its FX trading, and that it allegedly benefited from the tie-breaking rules (with no allegation of any knowledge on

---

[2]     The AC explicitly describes the Currenex-HC Tech agreement and Currenex-Goldman agreement as "independent antitrust violation[s]." AC ¶ 271.

Goldman's part of how Currenex ran the Platform or communicated with its subscribers). *See, e.g.*, *id.* ¶ 149.

Nor do Plaintiffs make any well-pleaded factual allegations suggesting that any Trading Defendant was aware of any other Trading Defendant's agreement with Currenex. And there are no allegations of any agreements, coordination, or communication among the Trading Defendants. According to Plaintiffs, Currenex provided the Trading Defendants with tie-breaking advantages to attract users and liquidity to the Platform. *Id.* ¶ 143. The Trading Defendants, in turn, were supposedly motivated to use these advantages to transact on more favorable terms. *Id.* ¶ 144.

While asserting that the alleged agreements allowed the Trading Defendants to "win every tie on every trade in which they were involved," *id.* ¶ 102, Plaintiffs do not allege how frequently ties occurred between a Trading Defendant and a Plaintiff. Nor do they allege any agreement regarding how to break ties among the Trading Defendants and any of the John Doe Defendants. To the contrary, Plaintiffs allege that an unidentified person told them State Street at times gave its own orders priority over better-priced orders. *Id.* ¶ 110. Plaintiffs further allege that Currenex gave HC Tech access to certain information about other market participants' orders by granting undisclosed access rights. *Id.* ¶ 126.

Plaintiffs allege they paid "artificially high prices (when buying)" and received "artificially low prices (when selling)" on the Platform. *Id.* ¶ 157. According to Plaintiffs, they continued trading on the Platform, oblivious that they were paying artificial prices due to the "opaque and fragmented" nature of the FX ECN Market. *Id.* ¶ 203. Plaintiffs do not reconcile this contention with their admission that XTX "was ranked by Euromoney as the largest Spot FX trader globally and in 2020 as the largest electronic trader of Spot FX globally," ensuring that it had extensive market visibility. *Id.* ¶ 30. Plaintiffs also speculate that they "could have provided liquidity and

earned more profits from their trades," but that the Trading Defendants prevented them from doing so by "jump[ing] in line and st[ealing] the business for themselves." *Id.* ¶ 158. Plaintiffs do not identify when they learned about the Trading Defendants' so-called "secret advantages," instead asserting that unspecified former insiders "recently" revealed unspecified information to "Plaintiffs' counsel." *Id.* ¶¶ 33, 211.

### C.   Plaintiffs Do Not Allege That Any Conduct Breached Their Agreements With Currenex

Edmar,[3] IBG, and XTX,[4] each entered into an "Agreement For Currenex Services" with Currenex on July 9, 2010, May 30, 2014, and September 22, 2016, respectively (individually, the "Agreement" and together, the "Agreements"). *Id.* ¶¶ 27–29. While not identical, the Agreements detail the Platform services Plaintiffs agreed to use to conduct transactions, the terms and conditions they agreed to follow, and the fees they agreed to pay. *See generally*, Exs. A-C.[5] The Agreements do not require Currenex to use strict FIFO as a tie-breaker, or to follow any particular approach to prioritizing offers among users who bid the exact same price.

The Agreements also expressly disclaim any express, implied, or statutory warranties. Specifically, the Sub-Class Plaintiffs' Agreements state: "Currenex makes *no* warranties and the client receives *no* warranties, *whether express, implied or statutory*, regarding or relating to the

---

[3]   Edmar filed articles of cancellation in Virginia in 2016, only to file for reinstatement in 2021, shortly before it filed this suit. *See* Exs. I, J.

[4]   XTX also purports to bring claims on behalf of its predecessor entity, Green Park Trading 1 Ltd. AC ¶ 29 n.2.

[5]   XTX's Agreement provides that the Agreement "will be governed by and construed in accordance with English law," and that "[t]he parties agree to submit to the exclusive jurisdiction of the English courts for the adjudication of any case or controversy arising under th[e] Agreement." Ex. C § 23. The effect of that provision is the subject of Currenex and SS Global's concurrently filed Motion To Dismiss Based On *Forum Non Conveniens* And Lack Of Personal Jurisdiction (the "*Forum Non Conveniens* Motion").

services and the subject matter hereof." Ex. A § 15(a); Ex. B § 15(a) (substantively identical).

They continue: "Currenex hereby specifically disclaims, overrides and excludes, to the fullest

extent permitted by law, all implied warranties of merchantability, satisfactory quality, fitness for

a particular purpose *and all other warranties*, conditions, other contractual terms, representations,

indemnities and guarantees with respect to the services, *whether express, implied or statutory,*

*arising by law,* custom, prior oral or written statements by Currenex or any of its agents or affiliates

or otherwise." Ex. A § 15(a); Ex. B § 15(a) (substantively identical). XTX's Agreement includes

substantively identical disclaimers. Ex. C § 15(a).

Despite the obvious relevance of the Agreements to this case, Plaintiffs do not assert any

breaches of contract among their twelve claims.

### D.  Currenex Never Claimed That The Platform Followed Strict FIFO For Tie-Breaking

Plaintiffs cite a handful of partial statements Currenex allegedly made that generically refer

to FIFO buried in multi-page documents dating back to 2005 (most of which Plaintiffs do not

allege they actually saw). Plaintiffs argue that these statements constitute extra-contractual

representations that the Platform used strict FIFO as its tie-breaking rule. AC ¶¶ 86–93. Contrary

to Plaintiffs' claim, none of these disclosures state the Platform used strict FIFO and several of

them expressly disclosed that the Platform was *not* operating exclusively on a strict FIFO basis.

For example, a disclosure allegedly published on Currenex's website from February 2005

"throughout the relevant period" states that the Platform's "Limit Orders are filled automatically

by the ***first counterparty <u>bank</u>*** to stream a price that matches the order." *Id.* ¶ 86; *see also* Ex. D.

This bank priority disclosure makes clear that the Platform was providing priority to banks and not

following strict FIFO. AC ¶ 86; *see also* Ex. D. Likewise, two disclosures, purportedly emailed to

Currenex users on April 7, 2015 (the "2015 Disclosure") and September 3, 2015 (the "Updated

2015 Disclosure"), as well as a disclosure allegedly published by Currenex in July 2017 (the "2017 Disclosure"), identical in relevant part, confirm that the Platform did not employ strict FIFO by clearly disclosing that certain benefits were provided to sell-side "price making liquidity providers" and that, as a result, "buy-side subscribers from time to time [will] be[] unable to execute at one or more prices quoted on [the Platform]." *Id.* ¶¶ 88-91, 93; *see also* Ex. F at 11; Ex. G at 14; Ex. H at 18. The 2015 and 2017 disclosures also clearly state that they "describe[] generally the services offered through the [Platform]" and that "[t]he particular services you use and your specific contractual arrangements with Currenex will also affect your trading on the [Platform] and your relationship with Currenex, and your contractual arrangements may differ materially from the description in this document." Ex. F at 1; Ex. G at 4; Ex. H at 4 (containing substantively identical language); *see also* AC ¶ 87; Ex. E at 4, 6, 8 (8-page product profile, entitled "Currenex For Active Traders" and issued in 2011, stating that the Platform was highly customizable and allowed customers to match with their "chosen counterparties" and deploy orders "based on parameters [they] define," and that the product profile did not "purport to be comprehensive," and that potential customers "should not place any reliance" on the information therein) (the "2011 Product Profile").

## LEGAL STANDARD

"To survive a motion to dismiss," a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. Although courts should assume the truth of "well-pleaded factual allegations," they should not accept as true any "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678–79, 129 S. Ct. at 1949–50.

Complaints containing "conclusory, vague, or general allegations," supported only by "speculation and conjecture," "cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368–69 (2d Cir. 2011).

**ARGUMENT**[6]

I.   **PLAINTIFFS FAIL TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT (FIFTH CLAIM FOR RELIEF, AC ¶¶ 267–281)**

    A.   **Plaintiffs Fail To Plead The Existence Of Any Horizontal Bid-Rigging Scheme That Would Constitute A *Per Se* Violation**

Plaintiffs label the alleged agreements between Currenex and each of the Trading Defendants "a bid-rigging scheme" to dress up their claim as "a *per se* violation of the antitrust laws" and avoid having to plead particularized facts that plausibly allege an illegal restraint of trade or an actual effect on competition in a properly defined market. AC ¶ 153; *see also id.* ¶ 1. But after *Twombly*, "labels and conclusions," 550 U.S. at 555, 127 S. Ct. at 1959, that certain conduct "amounts to a bid-rigging scheme," AC ¶ 273, and other similar "legal conclusion[s] couched as a factual allegation," are insufficient to state a claim. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).

The scant factual allegations do not amount to bid-rigging, which is defined as an "agreement *between competitors* pursuant to which contract offers are to be submitted to or withheld from a third party," *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 521 (S.D.N.Y. 2013) (brackets omitted) (emphasis in original). The AC does not include any allegations necessary to establish a horizontal agreement—or even any interactions whatsoever—between the Trading

---

[6]    It is unclear whether Plaintiffs assert causes of action against SS Global. *See* AC ¶ 39 (purporting to define "Currenex" to include SS Global). To the extent they do, the Court must dismiss SS Global because Plaintiffs fail to adequately allege that SS Global did *anything at all* beyond signing a services agreement with XTX to provide services in the "jurisdiction" of the "United Kingdom." Ex. C at "Exhibit C – Jurisdictions."

11

Defendants.[7] Nor do Plaintiffs allege any coordination among the Trading Defendants concerning pricing, let alone whether to submit or withhold quotes from the Platform. Instead, they allege a series of separate and unconnected vertical agreements between Currenex and each of the Trading Defendants, and concede that Currenex offered favorable terms independently to different suppliers to attract liquidity to its Platform. *See, e.g.*, AC ¶ 105. As Plaintiffs acknowledge: "[T]he Currenex-HC Tech agreement is an independent antitrust violation, for example, from the Currenex-Goldman agreement." AC ¶ 271.

Allegations of multiple, independent agreements between entities such as Currenex and the Trading Defendants, operating "at different levels of [a] market structure," do not support an inference of a horizontal arrangement. *See United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) (alteration in original); *see also In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other."). This is particularly true where a plaintiff fails to plead facts showing that a horizontal competitor (here, each Trading Defendant) would only be incentivized to enter into the vertical agreement if its horizontal competitors (the other Trading Defendants) did the same. *See Apple*, 791 F.3d at 316. Plaintiffs allege no facts showing concerted action by the Trading Defendants, or even that any Trading Defendant was aware of the existence of an alleged agreement between Currenex and another Trading Defendant.

---

[7]     Plaintiffs' allegation that Currenex employees' "operat[ion] under the banner of State Street," or State Street's ownership of Currenex and the "unity of interest" between the two, transformed the alleged secret agreements between Currenex and the Trading Defendants into "naked horizontal agreement[s] between competitors" is unavailing and unsupported. AC ¶ 184. The alleged secret agreements are plainly vertical. Each relates to alleged rights the Platform operator granted to a user, not to how two users allegedly agreed to operate on the Platform.

In fact, by Plaintiffs' own allegations, the existence of any horizontal agreement is facially implausible because it would have run counter to the self-interest of each Trading Defendant to enter into one. *See Twombly*, 550 U.S. at 554, 127 S. Ct. at 1958–59 ("showing parallel conduct or interdependence, without more," is inadequate, as it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."). This is because each alleged vertical agreement between a Trading Defendant and Currenex would become *less* valuable as Currenex entered into similar agreements, and would *dis*-incentivize the Trading Defendants from supporting such agreements. Although Plaintiffs allege that the Trading Defendants had priority rights over non-privileged market participants—and "were each aware that they had been given secret bid-rigging benefits," AC ¶ 274—they do not, nor could they sensibly, allege that the Trading Defendants had any priority rights over each other or the John Doe Defendants. Under such circumstances, the purported existence of multiple vertical agreements between Currenex and liquidity providers who would compete with each other on pricing is irreconcilable with any notion that those liquidity providers were parties to a horizontal agreement. *See Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 297 (S.D.N.Y. 2010) (Plaintiffs' repetition of "the assertion that the [defendants] 'agreed' and characterizing the conduct as a horizontal conspiracy does not, without more, pass muster under *Twombly*.").

### B.   Plaintiffs Fail To Adequately Plead The Existence of Actionable Vertical Agreements

Plaintiffs have not alleged sufficient particularized facts that plausibly show that Currenex entered into any vertical agreements granting any Trading Defendant "super-priority" rights. The AC does not identify any direct evidence that Defendants ever agreed to the challenged provisions. Although Plaintiffs assert that these "secret agreements" were "negotiated by senior salespeople

at Currenex/State Street and senior personnel at the Trading Defendants, often over dinners and lunches in major cities like Chicago and New York," AC ¶ 105, such "averments of agreements made at some unidentified place and time . . . are insufficient to establish a plausible inference of agreement, and therefore to state a claim." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Plaintiffs do not allege when, where, or how during their purported 16-year class period any of the alleged agreements with "super-priority" terms were made, and they cannot cure these deficiencies merely by attributing generic allegations "unmoored in time" to confidential witnesses. *Gregory v. ProNAi Therapeutics Inc*., 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018); *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799–801 (S.D.N.Y. 2020); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011).

What remains are general accusations that a few employees changed employment among some Defendants over the 16-year class period, and that senior personnel from Currenex and the Trading Defendants had dinners and lunches in "major cities." AC ¶ 150 (employee who was purportedly "responsible for negotiating Goldman['s] super-priority rights" left Goldman in 2014 (nearly a decade after the beginning of the class period) and began working at State Street); *id.* ¶ 147 (three former Currenex employees later employed by HC Tech); *id.* ¶ 105 (agreements allegedly negotiated "over dinners and lunches in major cities like Chicago and New York"). These allegations are insufficient, and Plaintiffs do not explain who continued to effectuate these purported "secret" agreements *after* the departure of the scheme's alleged perpetrators. Finally, the allegation that Currenex adopted specific trading protocols to incentivize certain liquidity providers to use the Platform is not a sufficient basis to infer that these protocols resulted from agreements with the Trading Defendants, particularly because Plaintiffs concede that Currenex had an economically rational motive to implement these mechanics independent of any agreement.

14

**C.** **Plaintiffs Fail To Plead An Unreasonable Restraint Of Trade Under The Rule Of Reason**

Even if Plaintiffs had plausibly alleged the existence of vertical "super-priority" agreements (and they have not), such agreements would only be unlawful restraints of trade if deemed so under the rule of reason. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882, 127 S. Ct. 2705, 2710 (2007) ("[V]ertical price restraints are to be judged by the rule of reason."); *Apple*, 791 F.3d at 313–14 (vertical agreements violate the Sherman Act "only if an assessment of market effects, known as a rule-of-reason analysis, reveals that they unreasonably restrain trade"). "At the pleading stage, the rule of reason requires a plaintiff to allege facts showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 2016 WL 5719790, at *4 (S.D.N.Y. Sept. 29, 2016) (emphasis in original), *aff'd*, 708 F. App'x 29 (2d Cir. 2017).

Where, as here, a plaintiff has not alleged particularized facts showing an actual adverse effect on competition, it must plead "that the defendant has sufficient market power to reduce competition market-wide and there is reason to believe that the defendant will, in fact, harm competition." *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 431 (S.D.N.Y. 2015). But the allegations in the AC refute the notion that Defendants had sufficient power in any properly defined relevant market to reduce competition across the entire FX spot market:

- "The FX market is the largest in the financial system, accounting for over a trillion dollars a *day* in the United States alone." AC ¶ 48.[8]

- There are many ways for consumers to execute FX spot transactions, including over-the-counter and through ECN platforms, RFQ platforms, and bilateral trading channels. *Id.* ¶¶ 51–59.

---

[8]     The global market is necessarily even larger and Plaintiffs—the largest of which is a foreign entity—do not and cannot allege any basis to restrict the relevant market geographically.

- Currenex is one of several ECN platforms, accounting for only about 25% of the average daily trading volume of FX spot transactions on ECN platforms. *Id.* ¶ 192; ¶¶ 76–80 (identifying several other ECN operators).

- The Trading Defendants provided only a portion of the liquidity available on Currenex. *Id.* ¶ 34 (alleging that HC Tech provided approximately 10% of the liquidity on Currenex and generically alleging that Goldman and State Street were among the largest liquidity providers on the Platform).

In other words, by Plaintiffs' own admission, the scope of the alleged agreements could affect, at most, only a narrow portion of the trading on one of many ECNs, which are but one of many different ways for market participants to exchange one currency for another. And because the allegedly anticompetitive feature of the agreements is a tie-breaking rule for one order type, the effect is further limited to a subset of transactions on the Platform where one Trading Defendant matched the price of another party. The notion that agreements this limited in scope could harm competition in the largest market in the financial system is implausible on its face.

Plaintiffs cannot escape this conclusion by proposing an overly narrow definition of the relevant market. Failure to allege a relevant product market is grounds for dismissal of an antitrust complaint, most notably "[w]here the plaintiff fails to define its proposed relevant market with a reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 346 (S.D.N.Y. 2009) (alteration in original).

Here, Plaintiffs artificially define the relevant market as "electronic platforms that use a limit-order book style of matching to execute FX spot trades." AC ¶ 186. Despite invoking the term "reasonably interchangeable" to defend that definition, *id.*, Plaintiffs fail to allege any facts relevant to establishing that FX spot transactions on ECNs are not reasonably interchangeable with FX spot transactions executed in any one of the myriad other ways identified in the AC. *See supra*

16

at Background, Section A. For example, Plaintiffs do not allege—because they cannot—that there is low cross-elasticity of demand across different FX trading platforms, *i.e.*, that pricing changes across different platforms are not highly correlated. *See Emigra*, 612 F. Supp. 2d at 346; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469, 112 S. Ct. 2072, 2083 (1992) (defining cross-elasticity of demand as "the extent to which consumers will change their consumption of one product in response to a price change in another.").[9] In fact, Plaintiffs explicitly describe the Platform as an "alternative" to other forms of FX spot trading. *See* AC ¶¶ 55–59 (explaining that RFQ platforms are "effectively an electronic version of the 'OTC' system," and that ECNs were created as an alternative to RFQ platforms). Because "courts should 'combin[e]' different products or services into 'a single market' when 'that combination reflects commercial realities,'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (alteration in original), this Court should reject Plaintiffs' artificially limited market definition.[10]

---

[9]     Plaintiffs' allegations about why particular entities might prefer executing FX spot transactions on ECN platforms rather than through other means—*e.g.*, because they offer anonymity, the ability to act as a liquidity provider, access to a wider and more diverse range of counterparties, and operational simplicity—are irrelevant to defining the relevant market. AC ¶¶ 187, 191. "[T]he test for a relevant market is *not commodities reasonably interchangeable by a particular plaintiff*, but commodities reasonably interchangeable by consumers for the same purposes." *City of New York v. Grp. Health Inc.*, 2010 WL 2132246, at *3 (S.D.N.Y. May 11, 2010) (emphasis in original), *aff'd*, 649 F.3d 151 (2d Cir. 2011).

[10]     Even if one were to credit Plaintiffs' artificially restrictive definition of the relevant market as the market for ECN platforms, Currenex only has 25% of that market, and thus Plaintiffs are below any threshold suggesting sufficient market power to support a rule-of-reason claim. *See Mazda v. Carfax, Inc.*, 2016 WL 7231941, at *4 (S.D.N.Y. Dec. 9, 2016) (in the exclusive dealing context, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent."), *aff'd sub nom. Maxon Hyundai Mazda v. Carfax, Inc.*, 726 F. App'x 66 (2d Cir. 2018); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c, at 190 (3d ed. 2011) ("Picking the correct number is somewhat arbitrary, but single-firm foreclosure percentages of less than 30 or 40 percent . . . would seem to be harmless to competition.").

### D.        Plaintiffs Fail To Plead Antitrust Injury

To plead actual injury under the Sherman Act, a plaintiff must plausibly allege "(1) that she transacted in at least one [FX instrument] at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 112 (2d Cir. 2018); *see also In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018) ("absent other allegations showing injury, courts have found no injury where the plaintiffs failed to allege any specific transactions that they entered into that harmed them through the defendants' misconduct"). This analysis "looks very similar to the 'injury in fact' analysis used to determine constitutional standing," except that to plead actual injury, "[i]njury must be plausible, not just colorable." *Total Gas*, 889 F.3d at 111–12. Here, Plaintiffs, who offer only hypothetical examples of injury, fail to plead concrete and particularized harm.

To begin, Plaintiffs themselves acknowledge that the challenged agreements required a Trading Defendant to at least match the best price that was otherwise available on the Platform before it could execute a transaction. AC ¶ 156. They do not claim to have received any worse prices in their (unspecified) trades with the Trading Defendants. They base their theory of harm therefore on the speculative premise that a Trading Defendant *may* have in some cases been willing to pay an *even better* price, instead of just matching the price posted by another participant. *Id.* ¶¶ 168–175. Nor do any allegations suggest in any way that for any trades that Plaintiffs executed— with any of the Trading Defendants or other parties—the price was not at a competitive, market-clearing level. Plaintiffs do not allege that better prices were available on any of the many other platforms or venues for executing FX spot transactions. This is unsurprising, because if better prices been available elsewhere, the only logical inference to draw is that sophisticated FX traders

like Plaintiffs—which, by their own admission, include one of "the largest FX spot traders in the world by volume," *id*. ¶ 19—would have voted with their feet and executed elsewhere.

Far from presuming better prices would have been available absent Currenex's tie-breaking protocols, Plaintiffs concede that the alleged agreements were necessary for Currenex to obtain greater liquidity. *See, e.g.*, *id*. ¶ 59 ("In order for a limit order book platform to be successful, there needs to be a critical mass of customers to ensure there is sufficient liquidity to allow trades to get done in a timely and efficient manner. . . . ECNs still need backing from larger sell-side institutions, like Goldman . . . and State Street."). Their own allegations and basic economics thus make clear that without these agreements the Trading Defendants might not have transacted on the Platform at all, causing Currenex's customers to receive even less favorable prices. *Total Gas*, 889 F.3d at 112–13, 115 (affirming dismissal for lack of standing where the "complaint provides just as much support for the proposition that [Plaintiffs] were *benefited* by Total Gas's trading as for the proposition that they were *harmed* by it."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) (plaintiffs' "damages are merely conceivable," and so are "insufficiently pled").[11]

Plaintiffs' conclusory assertion that the alleged priority agreements dis-incentivized each of the Trading Defendants from "compet[ing] on either on [sic] price or the firmness of their quotes," AC ¶ 10, is not a well-pled allegation of injury, and in all events, Plaintiffs' own allegations contradict it. Plaintiffs allege that Currenex gave the same purported "super-priority" rights not just to one liquidity provider but to many different liquidity providers—including each

---

[11]     Plaintiffs cannot satisfy the pleading requirements under *Total Gas* simply by alleging that XTX executed a large volume of transactions on the Platform. AC ¶ 35. There are no allegations to show whether any trades matched with a Trading Defendant and involved tie-breaking, let alone whether that Trading Defendant would have provided a better price but for the alleged agreement. *See Total Gas*, 889 F.3d at 112.

of the three named Trading Defendants and multiple other John Doe Defendants—whom Plaintiffs allege were "responsible for a large portion, if not a majority, of the trading volume on the Currenex Platform." By Plaintiffs' own logic, each Trading Defendant had an incentive to compete on price at all times because none could know whether any other parties on the anonymized Platform had "super-priority" rights and had submitted a competing bid.

As a secondary theory of harm, Plaintiffs claim that the alleged agreements thwarted them from consummating trades and providing liquidity on the Platform. *Id.* ¶ 158. This is not the type of injury the antitrust laws redress. As the Second Circuit explained, the requirement to "show that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market" rather than merely "prov[ing that a plaintiff] has been harmed as an individual competitor . . . ensures that otherwise routine disputes between business competitors do not escalate to the status of an antitrust action." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (emphasis in original). In any case, Plaintiffs do not plead any facts showing that they lost specific trades because of the alleged agreements.[12]

## II. THE FRAUD CLAIM AGAINST CURRENEX AND STATE STREET SHOULD BE DISMISSED (FIRST CLAIM FOR RELIEF, AC ¶¶ 226–243)

To state a claim for fraud under New York law, a plaintiff must allege, with the particularity required by Federal Rule of Civil Procedure 9(b), "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or

---

[12]   Plaintiffs cannot mask these pleading defects simply by pointing to yet more alternative theories of harm, such as that Plaintiffs may have conceivably paid higher execution costs as a result of last-look practices or suffered theoretical harm from the alleged grant of administrator-level access to HC Tech. *See* AC ¶¶ 159–80. These alternative theories are also too speculative to constitute a cognizable antitrust injury and, in any event, are completely attenuated from the alleged conspiracy on which Plaintiffs' Sherman Act claim is premised.

material omission, and injury." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011); *see also Segal v. Gordon*, 467 F.2d 602, 606 (2d Cir. 1972). Here, Plaintiffs' fraud claims fail because they do not adequately allege: (i) the existence of any false statement or actionable omission; (ii) actual or justifiable reliance on any alleged misrepresentation or omission; or (iii) any out-of-pocket loss caused by any alleged misrepresentation or omission.[13]

### A. The AC Does Not Adequately Allege A False Statement Or An Actionable Omission

#### 1. Plaintiffs Fail To Allege Any False Statement

Plaintiffs contend that Currenex and State Street misrepresented that the Platform was following strict FIFO, when it was instead granting priority to banks and other liquidity providers. *See* AC ¶¶ 86–93. Yet Plaintiffs do not identify a single statement by either of them claiming that the Platform followed strict FIFO. To the contrary, Plaintiffs concede that "*at least as early as February 2005*," *id.* ¶ 6, and "*throughout the relevant period*," Currenex disclosed on its website that its Platform was giving priority to the "*first counterparty bank* to stream a price that matches the order.*" Id.* ¶ 86. Despite Plaintiffs' efforts to mischaracterize this language, it makes clear that the Platform in fact was giving priority to certain counterparties, but not all, and thus, while it was

---

[13]     New York law governs the Sub-Class Plaintiffs' state law claims in accordance with the choice of law provision in their respective Agreements. *See* Ex. A § 23; Ex. B § 23; *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."). XTX's fraud claim should be dismissed for the reasons set forth in the *Forum Non Conveniens* Motion. In all events, English law governs XTX's fraud claim. *See* Ex. C § 23; *see also Stamm v. Barclays Bank of New York*, 153 F.3d 30, 33 (2d Cir. 1998) (affirming dismissal of fraud claim on *forum non conveniens* grounds and enforcing contractual English forum selection and choice-of-law provisions).

following first-in-time rules with regard to certain categories of counterparties, it was not following *strict* FIFO in all respects.

While Plaintiffs never say whether they read the website disclosure, they do acknowledge receipt of Currenex's 2015 disclosures. Those disclosures amplified the earlier ones, reiterating that the Platform deviated from strict FIFO, and did so by providing certain benefits to sell-side "price making liquidity providers" with the result being that "buy-side subscribers from time to time [will] be[] unable to execute at one or more prices quoted on [the Platform]." Ex. F at 11; *see also* Ex. G at 14 (same); Ex. H at 18 (same). Currenex's own disclosures defy any suggestion of it having a nefarious purpose in designing its trading protocols. Indeed, the AC acknowledges the legitimate reasons for *why* Currenex deviated from strict FIFO to prioritize banks and other liquidity providers: "[i]n order for a limit order book platform to be successful, there needs to be a critical mass of customers to ensure there is sufficient liquidity to allow trades to get done in a timely and efficient manner" and, therefore, the platform "need[s] backing from larger sell-side institutions, like Goldman . . . and State Street." AC ¶ 59. Indeed, Plaintiffs allege that Currenex originally created the Platform as an alternative to "having to call individual *banks* in sequence." *Id*. ¶ 55. In other words, Plaintiffs acknowledge that banks and other institutional liquidity providers are crucial to the Platform's success.

Plaintiffs also do not allege that Currenex's or State Street's purported statements about the Platform's anonymity, *id.* ¶¶ 132-136, were false: there is no well-pleaded allegation that HC Tech received access to the *identity* of any Platform participant. Instead, the best Plaintiffs can muster is the speculative claim that HC Tech "*may*" have received "access to trader codes," which might have allowed HC Tech to determine "who was behind each quote." *Id*. ¶ 127. Plaintiffs' speculative allegation is not entitled to the presumption of truth on a motion to dismiss even under

a more lenient pleading standard, let alone Rule 9(b). *See Iqbal*, 556 U.S. at 681, 129 S. Ct. at 1951; *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1959 ("Factual allegations must be enough to raise a right to relief above the speculative level."); *see also Segal*, 467 F.2d at 606 (holding that "distorted inferences and speculations" could not meet Rule 9(b)'s requirements); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002) ("[A]llegations of fraud cannot ordinarily be based 'upon information and belief.' . . . [P]laintiff still must allege facts.").

### 2.    Plaintiffs Fail To Allege Any Actionable Omission

Apparently recognizing that Currenex and State Street made no affirmative misrepresentations, Plaintiffs alternatively try to plead by omission. That gambit also fails because, to proceed on that basis, Plaintiffs must plead a duty to disclose any purported omissions, in addition to the other elements of a fraud claim. *See First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (explaining that fraud-by-omission requires allegations of a duty to disclose the allegedly concealed fact). Under New York law, a duty to disclose only arises where: (1) the parties have a fiduciary relationship; (2) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge;" or (3) a party has made a partial or ambiguous statement "whose full meaning will only be made clear after complete disclosure." *Id*. Plaintiffs do not allege any such circumstances with respect to the Platform's order-matching system.

*First*, the AC makes no claim of a fiduciary relationship between each Plaintiff and Currenex or State Street. To the contrary, the Agreements state the opposite: "*neither Currenex nor any of its affiliates is acting, in any capacity, as a fiduciary*" with respect to any of the transactions conducted on the Platform. Ex. A § 4(d); Ex. B § 4(e); Ex. C § 4(e). Plaintiffs allege no other relationship that would give rise to a fiduciary duty. *See Solutia Inc. v. FMC Corp.*, 456

F. Supp. 2d 429, 447 (S.D.N.Y. 2006) (New York law does not recognize the existence of a fiduciary duty between sophisticated commercial entities contracting at arm's length).

*Second*, even presuming Currenex or State Street had superior knowledge, Plaintiffs do not (and cannot) allege that they knew that Plaintiffs were acting based on "mistaken knowledge." While Plaintiffs sheepishly avoid saying they read all of the disclosures they acknowledge Currenex made, AC ¶ 86, it was their obligation to do so. Sophisticated trading parties like Plaintiffs cannot claim fraud by omission when they could have discovered information through the "exercise of ordinary intelligence." *First Hill*, 52 F. Supp. 3d at 638; *see also California Cap. Equity, LLC v. IJKG, LLC*, 50 Misc. 3d 1215(A), at *5 (N.Y. Sup. Ct. 2016) (no superior knowledge where sophisticated investor had a duty to exercise ordinary diligence and conduct an independent risk appraisal but failed to do so), *aff'd*, 151 A.D.3d 650 (1st Dep't 2017). This is especially so here, where Plaintiffs, all of whom traded in the FX markets, concede that ECNs like the Platform do not have to follow strict FIFO or any particular purported industry norm to break ties. *Id*. ¶ 82. All of this was plainly enough to require asking those questions, and Plaintiffs' own Agreements accorded them appropriate access. Indeed, the detailed Agreement between IBG and Currenex, for example, confirms that Currenex agreed to provide "all information reasonably requested by the Client relating to the Services." Ex. B § 2; *see also* Ex. C § 2 (same); Ex. A § 2 (Currenex agrees to provide "necessary information relating to the Services"). Having failed to ask reasonable questions, Plaintiffs cannot now claim fraud.[14] *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2021 WL 4142698, at *12 (2d Cir. Sept. 13, 2021) (no duty to disclose

---

[14]    Plaintiffs claim that XTX inquired into the Platform's order-matching system in May 2016 after purportedly receiving the two 2015 disclosures. However, this allegation does nothing to save their claim, because XTX failed to inquire further or alter its conduct in any way after allegedly being referred back to the very disclosures that spurred its initial inquiry. *See id*. ¶¶ 100, 101.

where a sophisticated plaintiff with access to relevant information and reason to inquire failed to ask defendant about the allegedly concealed fact); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) (a party's knowledge is not "superior" where the relevant information was not pursued by plaintiffs).

Moreover, there is no allegation in the AC that Currenex or State Street knew that Plaintiffs believed the Platform was following strict FIFO, let alone that Plaintiffs were making trading decisions based on that putative belief. To the contrary, each Plaintiff's Agreement compels the exact opposite conclusion. For instance, each Plaintiff represented that it "agrees that each Counterparty . . . may engage in transactions . . . before, after or simultaneously with any entry of an order by the Client and/or at different prices from those provided through the Services to the Client." Ex. A § 1; *see also* Ex. B § 1; Ex. C § 1. Similarly, while Plaintiffs claim they participated on the Platform without knowing that another user had access to additional (yet unspecified) trading information, Plaintiffs' Agreements, as well as certain of Currenex's disclosures, made clear that each user potentially had access to different information. *See* Ex. A § 4(a) ("The Client understands and acknowledges that it will have the ability to interact only with a Counterparty through such specific aspects of the Services as may be agreed from time to time by Currenex and the applicable Counterparty."); Ex. B § 4(a) (same); Ex. C § 4(a) (same); *see also* Ex. F at 1 (explaining that the document "describes generally the services offered" through the Platform, and that the "particular services you use and your specific contractual arrangements with Currenex will also affect your" relationship with Currenex and trading on the Platform and that "your contractual arrangements may differ materially from the description in this document"); Ex. G at 4 (same); Ex. H at 4 (same). Even as pleaded, the AC does not establish that Plaintiffs acted reasonably based on a mistaken belief, let alone that Currenex or State Street knew they were doing so.

*Third*, Plaintiffs have not alleged a duty to disclose on the basis that Currenex or State Street made a partial or ambiguous statement "whose full meaning will only be made clear after complete disclosure." *First Hill*, 52 F. Supp. 3d at 637. As discussed above, *supra* Section II.A.1, the AC admits that, as early as February 2005, Currenex disclosed that the Platform's order-matching system was prioritizing banks and not following strict FIFO. Likewise, Plaintiffs do not allege that Currenex did not operate the Platform anonymously, because there is no well-pleaded allegation that HC Tech had access to any information that identified users. Accordingly, the alleged statements do not contain any half-truths regarding the Platform's order-matching system or anonymity as to render them impartial or ambiguous. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016) (finding that the complaint failed to allege "half-truths" because defendants did not "selectively disclose[] information and omit[] known adverse facts" and instead adequately disclosed those facts).

Plaintiffs' claim fails for the additional reason that they cannot allege a *material* omission. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 464 (2d Cir. 2008) (applying this standard to common-law fraud claim); *Walsh v. Rigas*, 2019 WL 294798, at *13 (S.D.N.Y. Jan. 23, 2019) (same). As discussed *supra*, Plaintiffs have not alleged any specific facts indicating that the tie-breaking rules adversely affected the prices available to them, nor have they explained why Plaintiffs would not have simply traded on a different venue had that been the case.

## B.    The AC Does Not Adequately Allege Reliance

The Court must also dismiss Plaintiffs' fraud claim for the independent reason that Plaintiffs fail to plead actual or justifiable reliance on any alleged misstatement or omission. *See Mandarin Trading Ltd.* 944 N.E.2d at 1108.

26

### 1.      Plaintiffs Do Not Plead Actual Reliance

With respect to the alleged tie-breaking rule, the AC identifies allegedly false statements in five documents: (i) the 2005-2014 Website, (ii) the 2011 Product Profile, (iii) the 2015 Disclosure, (iv) the Updated 2015 Disclosure, and (v) the 2017 Disclosure. *See* AC ¶¶ 86–93. As set forth below, the AC fails to allege that the Sub-Class Plaintiffs actually relied on any of those documents either because (i) the AC lacks allegations that they received three of them (the 2005-2014 Website, the 2011 Product Profile, or the 2017 Disclosure), *see Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 71–73 (2d Cir. 2000) (affirming dismissal of fraudulent misrepresentation claim because courts "will not presume" that plaintiffs "actually relied" on alleged misrepresentations where the complaint is "devoid of any allegation that [plaintiffs] ever received this information"); and (ii) the Sub-Class Plaintiffs were both already trading on the Platform before Currenex issued the 2015 Disclosure and the Updated 2015 Disclosure, and they do not allege that they did *anything* differently in reliance on such disclosures after receiving them.[15]

*2005-2014 Website*. The generic allegation that the Sub-Class Plaintiffs "actively used Currenex's website" at some unspecified time, AC ¶ 97, fails to plead with the requisite specificity that either Plaintiff ever saw the purported misstatement, let alone that they read or relied on it before deciding to trade on the Platform. *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493, 495 (S.D.N.Y. 2006) (dismissing fraud claim for failure to adequately plead actual reliance where plaintiffs failed to allege that they "personally read specific actionable

---

[15]      The AC alleges that XTX received the two 2015 disclosures and the 2017 Disclosure. *See* AC ¶ 98. However, each of these documents was published by Currenex and, as set forth in the *Forum Non Conveniens* Motion, XTX's English law fraud claim against Currenex cannot properly be brought in this court.

misstatements . . . and then purchased or sold securities in reliance on those misstatements"); *see also Andre Strishak & Assocs., P.C. v. Hewlett-Packard Co.*, 2001 WL 1221649, at *2 (N.Y. Sup. Ct. July 13, 2001) (no reliance where plaintiffs failed to allege that they actually read the alleged misrepresentation on the company's website before making their purchase).

*2011 Product Profile*. Plaintiffs allege that the 2011 Product Profile was "issued by State Street" and "distributed to Currenex users," AC ¶ 87, but they do not allege that any Plaintiff ever received or read, let alone relied on, the document. This is plainly insufficient to establish actual reliance. *See Sec. Inv. Prot. Corp.*, 222 F.3d at 71–73.

*2017 Disclosure*. The AC alleges that Currenex emailed the 2017 Disclosure to "its customers[] and posted them on its website." AC ¶ 94. However, there is no allegation that the Sub-Class Plaintiffs ever received or read the 2017 Disclosure, and for good reason: there is no well-pleaded allegation that either of them traded on the Platform or otherwise remained a Currenex customer any time after 2016 (or that Edmar even *existed* in 2017). The AC is therefore devoid of any allegation that either of the Sub-Class Plaintiffs traded on the Platform after the 2017 Disclosure was released.

*2015 Disclosure and Updated 2015 Disclosure*. While the Sub-Class Plaintiffs allege each received the 2015 Disclosure and Updated 2015 Disclosure, they each admittedly traded on the Platform *before* these disclosures existed and fail to allege that they traded on the Platform differently in any way in reliance on these disclosures after receiving them. *See* AC ¶¶ 27–28; Exs. A, B; *see also Rigas*, 2019 WL 294798, at *7, *13 (plaintiff cannot plead reliance on representations or omissions in making an investment decision that plaintiff only saw post-investment).

With respect to Currenex's alleged false statements relating to HC Tech's purported access to additional information, Plaintiffs generically allege that Currenex marketed its Platform as anonymous and confidential, but they fail to specify a particular misstatement received and reviewed by any particular Plaintiff prior to that Plaintiff's decision to trade on the Platform. For the reasons set forth above, this is likewise insufficient to plead actual reliance.

### 2.    Plaintiffs Do Not Plead Justifiable Reliance

Even had Plaintiffs pleaded actual reliance (they have not), any such reliance was not objectively reasonable or justifiable. *See Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007) ("[A] plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it."), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Where sophisticated parties are involved, a lack of due diligence or further scrutiny "belies any representation that [the sophisticated parties'] reliance on [the alleged misstatements or omissions] was justifiable or reasonable." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998) (dismissing fraud claim for failure to plead reasonable reliance).

As discussed above in Section II.A.1, Currenex disclosed that the Platform was not following strict FIFO and was instead offering priority to banks, and Plaintiffs understood why Currenex would reasonably prioritize banks and other institutional liquidity providers. It would therefore be objectively unreasonable for Plaintiffs to understand isolated references to FIFO as superseding Currenex's clear disclosure about bank priority, let alone to base trading decisions on that putative understanding. *See Redwoodventures Ltd. v. ETG Cap. Advisors LLC*, 2020 WL 70395, at *7 (N.Y. Sup. Ct. Jan. 06, 2020) (dismissing fraud claim because it was "unreasonable" to allege that a sophisticated plaintiff relied on defendant's general statements in the face of its "clear statement" to the contrary). But despite the purported importance of tie-breaking rules, and

Plaintiffs' admitted awareness that not all trading platforms use the same order-matching system and that each user's experience on the Platform varied, *see* AC ¶¶ 81, 82, the AC fails to describe *any* effort made by either Sub-Class Plaintiff to learn additional information regarding the Platform's order-matching, or the information available to other users, rendering any purported reliance unreasonable.[16] *See Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992) (no justifiable reliance where "there is no basis to dispute that [plaintiff] had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, [plaintiff] would have been able to discover the alleged misrepresentations").

### C. The AC Does Not Adequately Allege Out-Of-Pocket Loss Caused By A Misrepresentation Or Omission

New York follows the "out-of-pocket" rule, which limits fraud damages to "compensat[ing] a plaintiff for what was lost because of the fraud, *not to compensate for what might have been gained*." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *98 (S.D.N.Y. Sept. 14, 2020); *see also Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996) (rejecting fraud claim that plaintiff was deprived of the opportunity to gain even more profits through an alleged alternative contractual bargain because "the loss of the

---

[16]     The AC's allegations regarding the May 2016 email exchange between XTX and Currenex further undermine any claim of reasonable reliance, as XTX's purported email asking about "the Platform's matching engine" makes clear that it understood that the 2015 Disclosure and the Updated 2015 Disclosure did not contain comprehensive representations about every aspect of how order-matching worked on the Platform. *See* AC ¶ 100. And the fact that XTX alleges it continued to trade on the Platform *after* Currenex allegedly failed to share additional information about the Platform's order-matching system without any follow-up reinforces the logical inference that XTX traded based on which platform offered the best price, and not which platform offered its preferred tie-breaking rules. *See United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 483 (S.D.N.Y. 2013) (noting that "[w]here a merchant chooses not to provide [] transparency, a customer is free to take its business elsewhere," and holding that "[i]f the customer chooses to remain and the merchant does not mislead or lie, there typically is no basis for finding fraud").

bargain was undeterminable and speculative"). Plaintiffs are also required to plead facts establishing "that the misrepresentations [or omissions] *directly caused* the loss about which [P]laintiff[s] complain[] (loss causation)." *Seagrape Invs. LLC v. Tuzman*, 2020 WL 5751232, at *17 (S.D.N.Y. Sept. 25, 2020). Plaintiffs' fraud claim fails to allege actionable out-of-pocket loss, let alone loss caused by a misrepresentation or omission.

Plaintiffs allege that the "secret tie-breaking rule" (i) artificially widened the Platform's bid-ask spreads, such that Plaintiffs contend they could have gotten better prices under a different tie-breaking rule; (ii) "thwarted" Plaintiffs from earning more from additional potential trades because others "jumped" them in line; and (iii) caused them to lose potentially profitable trades by increasing the likelihood that their trades would be cancelled. *See* AC ¶¶ 157–159. These speculative lost opportunities are not out-of-pocket losses and are not actionable in fraud. Even if Plaintiffs did not understand how the Platform's tie-breaker operated, they suffered no out-of-pocket loss by trading on the Platform when it provided the best price available. As discussed in Section I.D above, Plaintiffs do not allege that better prices were available on other FX venues. Plaintiffs cannot allege an out-of-pocket loss based on conjecture that they might have received an *even better price* if the Platform operated with different hypothetical rules. *See Arena Riparian LLC v. CSDS Aircraft Sales & Leasing Co.*, 184 A.D.3d 509, 510 (1st Dep't 2020) (dismissing fraud-based claims because "plaintiffs seek to recover lost profits they would have realized if they successfully completed the purchase of the aircrafts," but "plaintiffs cannot be compensated . . . for what they might have gained"); *Sardanis v. Sumitomo Corp.*, 279 A.D.2d 225, 230 (1st Dep't 2001) (dismissing fraud claim where alleged loss based on "[t]he fact that an even greater profit might have been realized had [Plaintiff] not been caused to sell to [Defendant]" was "speculative," holding that "[w]ithout proof of an out-of-pocket loss, plaintiff cannot recover in fraud").

Plaintiffs' allegation that HC Tech—another Platform user—had greater access to information than them fares no better. Even if Plaintiffs had adequately alleged that they lost a potentially profitable transaction to HC Tech (which they have not), that missed opportunity is a quintessential lost profit not actionable in fraud. *See, e.g.*, *Alarmex Holdings L.L.C. v. Pianin*, 2006 WL 5376779, at *4 (N.Y. Sup. Ct. Oct. 27, 2006) (no cognizable injury caused by alleged fraud where "lost earnings including the loss of an alternative bargain overlooked in favor of the fraudulent one, [was] inherently speculative and d[id] not satisfy the 'out of pocket' injury rule").[17]

Plaintiffs also fail to plausibly allege that their claimed loss was *caused* by any alleged misstatement or omission. At best, Plaintiffs claim they would not have used the Platform had they known about the allegedly concealed facts, but that is insufficient to establish loss causation under New York law. *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 760–61 (S.D.N.Y. 2018) (no loss causation where plaintiffs "allege simply that they would not have purchased common stock had they known the facts" and where "it [i]s not at all clear" they will "receive even one cent less" for their stock because of the alleged misrepresentations), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2005 WL 2385854, at *11, *16 (S.D.N.Y. Sept. 26, 2005) (allegation that plaintiffs "would not have purchased the securities if they had known [certain] facts" inadequate to plead proximate cause); *Vandashield Ltd. v. Isaacson*, 146 A.D.3d 552, 553–54 (1st Dep't 2017) (no loss causation where plaintiffs failed to allege that purported losses were caused by defendant's alleged misrepresentations).[18]

---

[17]   Plaintiffs' alleged "lost information advantages," AC ¶ 13, does nothing to save their claim because such losses are, without more, non-pecuniary. *See Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 398 (S.D.N.Y. 2019) (explaining that "out-of-pocket rule limits damages for fraud-based claims to the actual pecuniary loss sustained as the direct result of the wrong").

[18]   While Plaintiffs fail to establish loss causation in connection with *any* of the alleged misstatements or omissions, their failure is particularly apparent with regard to their allegation that

Moreover, as explained in connection with the discussion of Plaintiffs' antitrust claims, the allegations in the AC fail to support an inference that they would have received a below-market price on the Platform even if it operated as Plaintiffs allege. *See* Section I.D.

## III. THE IMPLIED COVENANT CLAIM AGAINST CURRENEX SHOULD BE DISMISSED (ELEVENTH CLAIM FOR RELIEF, AC ¶¶ 325–330)

The Sub-Class Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing because their allegations establish that they received the benefit of the bargain for which they negotiated.[19] The Sub-Class Plaintiffs do not allege (nor could they) that their Agreements contained *any* provision relating to FIFO order prioritization or how the Platform would break ties if multiple users offered the exact same price down to the last decimal place. Nor do they identify any provision in their Agreements stating that all users of the Platform would have access to the exact same information. To the contrary, the Sub-Class Plaintiffs expressly "acknowledge[d] and agree[d] that each Counterparty . . . may engage in transactions . . . before, after or simultaneously with any entry of an order by the Client and/or at different prices from those provided through the Services to the Client." Ex. A § 1; Ex. B § 1.

This Court has explained that the "purpose of the implied covenant is to prevent a party from making an agreement and then acting in such a way as to prevent the other party from receiving its fruits. But this merely begs the question: for what did [Plaintiffs] bargain?" *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56, 80 (S.D.N.Y. 2013)

---

Currenex's and State Street's representations regarding "hidden" and "iceberg" orders were false, because HC Tech purportedly could see the orders. *See, e.g.,* AC ¶¶ 12, 138. Critically, the AC does not allege that Plaintiffs placed *any* hidden or iceberg order on the Platform, and, therefore, Plaintiffs have failed to allege that any purported false statement regarding such orders caused them any economic loss.

[19]     In an effort to try to escape the forum-selection provision in XTX's English-law contract, Plaintiffs selectively pled this claim on behalf of the Sub-Class Plaintiffs only.

(interpreting analogous implied covenant of good faith and fair dealing under Pennsylvania law). Since Currenex's Agreements with the Sub-Class Plaintiffs did not expressly mention order matching on a FIFO basis, or any other particular tie-breaking rules, the Sub-Class Plaintiffs "had no claim to it as a fruit of the contract." *Id.*; *see also Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *7 (S.D.N.Y. Aug. 15, 2012) ("[A] court cannot imply a covenant inconsistent with the terms expressly set forth in the contract, and a court cannot employ an implied covenant to supply additional terms for which the parties did not bargain.").

The breach of the implied covenant of good faith and fair dealing claim against Currenex independently fails because the Agreements the Sub-Class Plaintiffs signed expressly disclaimed them. *See* Ex. A § 15(a); Ex. B § 15(a). Courts in this district have recognized that, "[e]very contract is assumed to incorporate a covenant of good faith and fair dealing *unless such obligation is expressly disclaimed.*" *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) (alteration in original); *see also Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 1169515, at *10 (S.D.N.Y. Mar. 22, 2016) (same). Because the Sub-Class Plaintiffs disclaimed any implied covenant of good faith, the claim must be dismissed. *See Commerzbank AG*, 277 F. Supp. 3d at 498; *Phoenix Light*, 2016 WL 1169515, at *10; *see also Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (implied covenant cannot be invoked to "erase or otherwise vary the [Agreements'] disclaimer of warranties").

## IV.    PLAINTIFFS' SECONDARY LIABILITY CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Fail To State A Claim For Conspiracy To Defraud (Second Claim For Relief, AC ¶¶ 244–251) Or For Aiding And Abetting Fraud Against The Trading Defendants (Third Claim For Relief, AC ¶¶ 252–258)

As a preliminary matter, Plaintiffs' failure to plead an underlying fraud claim is fatal to Plaintiffs' conspiracy and aiding and abetting claims. *See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*, 2012 WL 612358, at *12 (S.D.N.Y. Feb. 23, 2012); *Amusement Indus., Inc.*

*v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 539 (S.D.N.Y. 2011). Beyond that fundamental failure, additional pleading defects compel dismissal of those claims.

*First*, Plaintiffs fail to plead particularized facts showing that the Trading Defendants had "actual knowledge" of Currenex's alleged fraud, an essential element of both conspiracy and aiding-and-abetting claims. *See Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (holding that "the defendant must know the wrongful nature of the primary actor's conduct" when another actor's tort is the subject of a claim for conspiracy or aiding and abetting); *Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 61–62 (2d Cir. 2012) (same for aiding and abetting). That "[e]ach Trading Defendant had actual knowledge of its own" trading agreement, AC ¶ 253, is not equivalent to the Trading Defendants "knowing" that Currenex allegedly defrauded other Platform participants. Likewise, Plaintiffs' conclusory allegations that the Trading Defendants had some expectations of confidentiality say nothing of what any Trading Defendant actually knew about Currenex's agreement with any other Platform participant. AC ¶ 255. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006) (finding plaintiffs did not adequately plead actual knowledge where defendant banks allegedly knew that a client engaged in "improper conduct that would warrant discipline" but did not aver facts giving rise to the "'strong inference,' required by . . . Rule 9(b), of actual knowledge of his outright looting of client funds").

*Second*, the conspiracy claim fails because Plaintiffs do not allege a sufficient linkage among the Trading Defendants and Currenex to defraud Plaintiffs. *See In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364–65 (S.D.N.Y. 2019); *see also Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 191–92 (S.D.N.Y. 2021). Plaintiffs fail to identify any facts suggesting that the Trading Defendants agreed to *defraud Plaintiffs*, or any involvement by the Trading Defendants in the alleged conspiracy beyond their alleged separate priority agreements with Currenex. *See* AC

¶¶ 105–07; *see also 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231–32 (S.D.N.Y. 2008) (dismissing conspiracy claim against a defendant who allegedly knew of "accounting improprieties" and was even "actively involved in negotiating an illicit side deal" in one transaction because these allegations were insufficient to allege that the defendant "conspired with others to commit the fraud"). Indeed, there is no suggestion that any of the Trading Defendants had any inkling that each purportedly was accorded "tie-breaking" privileges, or that Goldman had knowledge of other alleged advantages purportedly accorded to HC Tech, or vice-versa.

Finally, Plaintiffs' aiding and abetting claim fails for the independent reason that the AC does not adequately allege that the Trading Defendants substantially assisted Currenex in furtherance of the putative fraud. "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *ICD Cap., LLC v. Codesmart Holdings, Inc.*, 2020 WL 815733, at \*6 (S.D.N.Y. Feb. 19, 2020). Where, as here, the alleged fraud consists of false statements by Currenex, substantial assistance "must relate to the preparation or dissemination of the [statement] itself." *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989). There are no allegations of that sort, and Plaintiffs' allegations that the Trading Defendants substantially assisted the alleged fraud simply by trading on the Platform, AC ¶ 257, fall short of the mark. *See Morin*, 711 F. Supp. at 113. Doing business with an alleged fraudster is not enough to satisfy the "substantial assistance" prong. *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 381–83 (S.D.N.Y. 2011) (dismissing claims against a defendant doing business with the principal of the fraud where the complaint failed to allege that the defendant's business activities were directed at defrauding plaintiffs).

**B.**     **Plaintiffs Tortious Interference Claims Fail (Tenth And Twelfth Claims For Relief, AC ¶¶ 319–324, 331-336)**

    **1.**     **The Sub-Class Plaintiffs Fail To Plead The Elements Of Tortious Interference With Contract Against The Trading Defendants**

A tortious interference with contract claim requires allegations of "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's *intentional inducement* of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011) (emphasis in original). Here, the Sub-Class Plaintiffs' claim that the Trading Defendants "disrupted and interfered with" their contracts with Currenex fails. AC ¶ 333.

*First*, Plaintiffs do not claim a breach of their contracts with Currenex. *Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*, 80 A.D.3d 453, 454 (1st Dep't 2011); *see also, e.g.*, *D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) (per curiam) ("Because there was no breach of contract in the instant case, [plaintiff's] tortious interference with contractual relations claim must fail."); *Lindberg v. Dow Jones & Co., Inc.*, 2021 WL 3605621, at *11 (S.D.N.Y. Aug. 11, 2021) (dismissing tortious interference claim for failing to identify specific contract provisions breached). Nor can Plaintiffs cure that failure by pointing to an alleged breach of the implied covenant of good faith and fair dealing. *See* AC ¶ 333. Tortious interference with the implied covenant of good faith and fair dealing is not a recognized claim under New York law, *Schinella v. Soyer*, 2021 WL 4255055, at *6 (S.D.N.Y. Sept. 16, 2021), even if Plaintiffs had a basis to pursue an underlying breach of implied covenant claim (which they do not, as discussed *supra* Section III).

Equally problematic for Plaintiffs, implied terms not found in a contract are irreconcilable with the requirement that a tortious interference claim involve "actual knowledge" by the defendant of the breached contract terms. While Plaintiffs say the Trading Defendants "knew that

[Plaintiffs] had valid agreements with Currenex," AC ¶ 334, mere knowledge of the existence of a contract is not enough—a complaint must contain allegations showing a defendant's "actual knowledge of the terms of the contract[s] and of the contractual obligation that was allegedly breached." *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020).

Finally, the tortious interference with contract claim fails because Plaintiffs do not plead any non-conclusory allegations that the Trading Defendants "intentionally induced" Currenex to breach its contracts with Plaintiffs. *In re Refco*, 826 F. Supp. 2d at 521. Indeed, the AC lacks any allegations providing even a modicum of information about what the Trading Defendants supposedly did to cause Currenex to breach the unspecified contracts, beyond repeated, vague claims of "interfere[nce]." *See* AC ¶¶ 331–336. That does not suffice. *See In re Refco*, 826 F. Supp. 2d at 521.

### 2.      Plaintiffs Fail To Allege Tortious Interference With Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage, Plaintiffs must allege: (1) they had a business relationship with a third party; (2) Defendants knew of that relationship and intentionally interfered with it; (3) Defendants acted solely out of malice, or used dishonest, unfair, or improper means; and (4) Defendants' interference injured the relationship. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). Plaintiffs fail to plead each element.

*First*, Plaintiffs fail to identify any "*specific* third party" relationship with which Defendants supposedly interfered. *POSCO Energy Co. v. FuelCell Energy, Inc.*, 2021 WL 4224956, at *9 (S.D.N.Y. Sept. 16, 2021) (emphasis in original). Here, Plaintiffs vaguely allege that Defendants interfered with Plaintiffs' relationships "with other users of the Platform." AC ¶ 321. The court in *POSCO* rejected this same pleading approach. In that case, the plaintiff argued

that it should not be required to identify specific third parties because trading on securities exchanges "definitionally [] involves anonymous third-party purchasers." *Id.* The Court rejected this argument, explaining "[t]here is no general exemption to the identification requirement for securities trading." *Id.* Just so here: Plaintiffs' generic reference to other users is not enough. *See POSCO*, 2021 WL 4224956, at *9; *see also In re Int. Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 709–10 (S.D.N.Y. 2018) (allegation of interference with relationships with "numerous buy-side customers, including Buy Side Client 1 through 16" too vague to survive motion to dismiss).

*Second*, Plaintiffs must allege that Defendants' conduct "target[ed] some activities toward the third party and convince[d] the third party not to enter into a business relationship." *In re Refco*, 826 F. Supp. 2d at 520. According to Plaintiffs, Defendants entered "secret agreements for super-priority and administrative-level access" to the Platform to ensure that they would win trades. AC ¶ 322. But these allegations, even if true, do not evince any effort by any of the Trading Defendants directed at any third party to convince such party not to do business with Plaintiffs. At most, any alleged "lost economic advantage was only a collateral effect" of Defendants' agreements, which does not rise to the level of tortious interference. *In re Refco*, 826 F. Supp. 2d at 522.

*Third*, because Plaintiffs have failed to state primary claims of antitrust violations or common-law fraud for the reasons set out above, they cannot satisfy the pleading requirement of alleging a separate "crime or [] independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1102 (N.Y. 2004). Plaintiffs' failure to plead that Defendants committed any independent torts dooms their tortious interference claim. *See Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164,

170–71 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009) (rejecting tortious interference

claim because alleged misrepresentations did not amount to an independent tort).[20]

Finally, Plaintiffs do not adequately allege that, but for Defendants' conduct, they would

have entered into an economic relationship with these unspecified third parties. *Downtown Music*

*Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 766–67 (S.D.N.Y. 2020). Beyond a

single conclusory phrase in the AC, *see* AC ¶ 323, Plaintiffs do not allege that Defendants' "secret

agreements" were the but-for cause of Plaintiffs' purported injuries—nor could they, without

identifying any specific third parties in the first place. *See Allocco Recycling, Ltd. v. Doherty*, 378

F. Supp. 2d 348, 375 (S.D.N.Y. 2005) (plaintiff cannot plead but-for causation without identifying

specific business relationships); *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265, 267 (1st Dep't

2002) ("As plaintiffs cannot name the parties to any specific contract they would have obtained . .

. they have failed to satisfy the 'but for' causation require[ment]").

## V.  PLAINTIFFS' CIVIL RICO CLAIMS AGAINST EACH OF THE DEFENDANTS SHOULD BE DISMISSED (EIGHTH AND NINTH CLAIMS FOR RELIEF, AC ¶¶ 292–318)

Plaintiffs' eighth and ninth causes of action purport to assert claims against Currenex, State

Street, Goldman, and HC Tech pursuant to 18 U.S.C. § 1962(c) (the "RICO claim") and 18 U.S.C.

§ 1962(d) (the "RICO conspiracy claim"). "[C]lose scrutiny of RICO claims based on [mail and

wire] fraud," as is the case here, "is merited," *Cont'l Petroleum Corp., Inc. v. Corp. Funding*

*Partners, LLC*, 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012), because "the potential for

---

[20]     *Carvel* recognizes a single narrow exception to this rule, which allows a plaintiff to satisfy this element if it pleads that defendant acted "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel*, 818 N.E.2d at 1103. That exception does not apply here, because Plaintiffs repeatedly allege that Defendants acted in their own economic self-interest (*see, e.g.*, AC ¶¶ 143-145, 297). *Id.*; *see also 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (when a defendant acts out of "normal economic self-interest, wrongful means have not been shown").

transforming garden-variety common law actions into federal cases is greater if grounded entirely on these predicates," *Gross v. Waywell*, 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009). Plaintiffs' failure to adequately plead the requisite elements of a RICO claim—an enterprise, a pattern of racketeering activities, or an agreement[21]—requires dismissal of these claims.

### A.      The Allegations Do Not Establish "Association-In-Fact" Enterprises

To plead an "association-in-fact" enterprise, a plaintiff must allege that the enterprise has: (1) a common purpose; (2) sufficient relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. U.S.*, 556 U.S. 938, 946, 129 S. Ct. 2237, 2244 (2009). Here, the AC purports to allege three "association-in-fact" enterprises: (i) a "Currenex-HC Tech Enterprise"; (ii) a "Currenex-Goldman Enterprise"; and (iii) a "Currenex-State Street Enterprise." AC ¶¶ 294–96. But Plaintiffs fail to allege either a common purpose or a sufficient relationship between the alleged RICO enterprise participants. These deficiencies are fatal to Plaintiffs' claims.[22]

*First*, courts consistently hold that there is no "common purpose" where, as here, Plaintiffs allege the "enterprise members" were acting on behalf of themselves, in furtherance of their own interests. *See, e.g.*, *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (no RICO enterprise where "the complaints fail to provide a plausible basis for inferring that

---

[21]      To state a civil RICO claim under § 1962(c), Plaintiffs must plead "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).

[22]      Plaintiffs' allegation that State Street is part of both the "Currenex-HC Tech Enterprise" and the "Currenex-Goldman Enterprise" by virtue of its "unity of interest" with Currenex is contrary to Plaintiffs' allegation that Currenex and State Street are separate companies who constitute a "Currenex-State Street Enterprise." In the event the Court considers State Street as a separate part of either of these enterprises, the arguments as to the other Trading Defendants would be equally applicable to it.

[defendants] acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests" (second alteration and emphasis in original)); *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd*., 2016 WL 6110565, at *8 (S.D.N.Y. Aug. 4, 2016) (no association-in-fact enterprise where plaintiff failed to plead that defendants had a common purpose when selling counterfeit goods online); *Waywell*, 628 F. Supp. 2d at 496 (no association-in-fact enterprise where defendants engaged in theft through mail and wire fraud "to advance the purposes and personal gains of each of the [defendants] individually rather than to promote the shared objectives of the common racketeering enterprise"); *Moss v. BMO Harris Bank, N.A*., 258 F. Supp. 3d 289, 304 (E.D.N.Y. 2017) (no RICO enterprise where complaint fails to allege that defendants "acted on behalf of the *enterprise* as opposed to on behalf of [themselves]" (alteration and emphasis in original)).

Here, the AC makes clear that Currenex and each of the Trading Defendants had separate purposes, each acting in its own self-interest. According to Plaintiffs, Currenex "hoped to create and maintain a more-successful Platform," while the Trading Defendants hoped to earn "trading profits." AC ¶ 297. That is to say, Currenex provided a trading venue to FX market participants and each of the Trading Defendants were among the many participants trading in that (and other) venues in the ordinary course of business. Plaintiffs concede that Currenex and the Trading Defendants acted for their own individual self-interest, which precludes a finding of a common purpose. Plaintiffs cannot erase this common-sense reality via the conclusory assertion that the "purpose of each enterprise was to steer non-privileged customers into trading at worse prices," particularly given the lack of well-pleaded allegations that any action by Defendants resulted in worse prices for the supposedly "non-privileged" customers. *Id.*

*Second*, the AC also fails to plausibly establish that either the "Currenex-HC Tech Enterprise" or the "Currenex-Goldman Enterprise" "functioned as a unit." *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 141 (S.D.N.Y. 2014) (no RICO enterprise where alleged members did not "function[] as a unit"), *aff'd in relevant part*, *rev'd on other grounds sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x. 66, 68 (2d Cir. 2015). The AC contains none of the required allegations as to the "hierarchy, structure, or organization of the so-called enterprise[s]." *Id.*; *see also Gucci Am., Inc.*, 2016 WL 6110565, at *6. At most, Plaintiffs plead a quintessential rimless "hub-and-spoke" formation in which "the spokes are separate, distinct and unassociated and whose actions are uncoordinated," which have repeatedly been found to fall short of satisfying the *Boyle* standard for pleading an "association-in-fact" enterprise. *Id.* at *5; *Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 57802, at *5 (E.D.N.Y. Jan. 4, 2017) ("The parallel conduct of a number of 'spokes,' even through a central 'hub,' is not a RICO enterprise without more—that is, without a 'rim' that connects the spokes."); *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) (hub-and-spoke structure insufficient to satisfy the enterprise element of a RICO claim); *see also* Section I.A.

Given the lack of concerted activity, the alleged "enterprises" here are materially different from the one this Court considered in *Dennis v. JPMorgan Chase & Co*. 343 F. Supp. 3d 122, 185 (S.D.N.Y. 2018). The plaintiffs in *Dennis* alleged "that defendants associated with one another by sharing information and providing one another with Prime Bank Bills ahead of the Fixing Window to permit large trades," thus establishing as a matter of pleading that each of the alleged members of the enterprise were working in concert with one another. *Id.* Here, by contrast, the AC offers no similar allegations about information sharing or coordination between the "spokes" of the alleged enterprises. Instead, Plaintiffs allege repeatedly that the Platform was "anonymous," AC ¶¶ 34,

210, and make no allegation that the Trading Defendants were coordinating or otherwise working together on their trades. *See Gucci Am., Inc.*, 2016 WL 6110565, at *7 (plaintiffs failed to allege an enterprise where there was no indication of "even how [defendants] knew each other"). Indeed, the Court in *Dennis* dismissed multiple defendants, whereas, like the Trading Defendants here, there were "no well-pled factual allegations in the amended complaint that [the defendants] acted with specific intent to engage in the alleged fraudulent scheme." *Dennis*, 343 F. Supp. 3d at 187.

Plaintiffs' allegations therefore fall well short of establishing that the alleged members of the "Currenex-HC Tech Enterprise" and the "Currenex-Goldman Enterprise" were "dependent on one another" or "joined together as a group" or that they were "necessary and symbiotic" to one another, as required. *City of New York v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013) (finding no association-in-fact because "when all the evidence shows is a series of similar but essentially separate frauds carried out by related entities . . . then no RICO enterprise exists"). Thus, these purported enterprises must fail.

Finally, the "Currenex-State Street Enterprise" fails because there cannot be a RICO enterprise between a parent company and its wholly owned subsidiary. *See also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (no RICO enterprise between a parent company and its wholly-owned subsidiary because they were "alleged to operate as part of a single, unified corporate structure and are, as such, not sufficiently distinct to demonstrate the existence of a RICO enterprise"); *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 206–08 (2d Cir. 2017) (a purported RICO enterprise composed of a parent company and a subsidiary company violated the distinctiveness requirement); *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 78 (E.D.N.Y. 2011) ("[W]holly owned subsidiaries are not distinct from their parent company for

the purposes of alleging a RICO enterprise."). The AC plainly alleges that "Currenex, Inc. is a wholly owned subsidiary of State Street." AC ¶ 37.[23]

Plaintiffs seek to escape this black-letter law by alleging that the "Currenex-State Street Enterprise" relates to the period "prior to Currenex's acquisition by State Street" in 2007. AC ¶¶ 60, 296. But Plaintiffs do not allege *any* non-conclusory allegations about a relationship between Currenex and State Street prior to 2007, let alone establish that they jointly engaged in racketeering activity for a common purpose. To the contrary, Plaintiffs affirmatively plead that State Street *gave itself* jump-in-line rights *after the acquisition*. *See id.* ¶ 61. Because there are no pleadings supporting the existence of a pre-2007 "Currenex-State Street Enterprise," this enterprise also fails.

### B.   Plaintiffs Do Not Allege A "Pattern" Of Mail Or Wire Fraud

Plaintiffs fail to allege with the necessary particularity that each of the Defendants engaged in a "*pattern*" of mail or wire fraud, the predicate racketeering activity cited in the AC.[24] *See, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (Rule 9(b)'s heightened pleading standard applies to predicate acts premised on allegations of wire and mail fraud); *First Cap. Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999). For "each individual defendant" the pattern must include "at least two predicate acts." *Sullivan v. Barclays PLC*, 2017 WL 685570, at *35 (S.D.N.Y. Feb. 21, 2017).

---

[23]   In the event SS Global is improperly considered, Plaintiffs' similarly allege that "State Street . . . owns 100% of [SS Global]." AC ¶ 41.

[24]   The wire fraud statute prohibits any use of interstate wires in furtherance of any fraudulent scheme. There are three elements of a wire fraud violation: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007).

As set forth in Sections II and IV.A, *supra*, Plaintiffs' (i) common-law fraud allegations against Currenex, and their (ii) conspiracy and aiding and abetting allegations against the Trading Defendants fall well short of pleading an actionable fraud. Their mail and wire fraud allegations fail for the same reasons. *See Nasik Breeding & Rsch. Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 537–38 (S.D.N.Y. 2001) (dismissing RICO claim premised on mail and wire fraud because plaintiffs failed to state a claim for common-law fraud) (citing *Morin v. Trupin*, 711 F. Supp. at 105 ("Where [a] fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall.")); *see also Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y. 1994) (dismissing RICO claim against bank because plaintiff failed to allege that the bank aided and abetted fraud), *aff'd sub nom. Laro, Inc. v. Chase Manhattan Bank*, 60 F.3d 810 (2d Cir. 1995).

Moreover, as to HC Tech and Goldman, Plaintiffs do not allege *any* predicate acts of mail or wire fraud. They do not allege that either HC Tech or Goldman made *any* disclosures through the mail or wires. Plaintiffs' generic allegation that they made "thousands of uses of the mails and wires as part of the scheme" by trading on unspecified dates at unspecified prices with unspecified counterparties for unspecified purchases or sales, AC ¶ 310, fails to comply with Rule 9(b). *See Cont. Transp. Servs., Inc. v. New Era Lending LLC*, 2018 WL 11226077, at *3 (S.D.N.Y. Oct. 26, 2018) (allegations that defendants "conducted multiple acts of mail and wire fraud" were insufficient because "[p]laintiffs have not set forth, with adequate particularity, the specific circumstances of how the mail and wire fraud of each defendant advanced the larger fraudulent scheme"); *Dulsky v. Worthy*, 2013 WL 4038604, at *4 (S.D.N.Y. July 30, 2013) ("Because

plaintiffs fail to separate these defendants with specific allegations of [mail and wire fraud] as to each one of them, the [complaint] does not pass muster under Rule 9(b).").[25]

For these reasons, Plaintiffs fail to plead a pattern of racketeering activity.[26]

### C.     Plaintiffs Do Not Adequately Allege A RICO Conspiracy Under § 1962(D)

Because Plaintiffs fail to plead any underlying substantive RICO violation, their RICO conspiracy claim also fails. *See Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, 2016 WL 1298987, at \*12 (S.D.N.Y. Mar. 31, 2016); *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008).

Even if Plaintiffs had adequately stated an underlying substantive RICO violation to support a RICO conspiracy claim, that claim still fails because they do not allege "the existence of an agreement to violate RICO's substantive provisions." *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020); *see also Salinas v. United States*, 522 U.S. 52, 65, 118 S. Ct. 469, 477 (1997) (the conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"). "[T]hese allegations may not be conclusory, [and] must set forth specific facts tending to show that *each of the defendants* entered into an agreement *to conduct the affairs of a particular, identified enterprise through a pattern of racketeering activity*—not simply that each defendant committed two or more acts that would qualify as

---

[25]     Because the RICO claim fails against HC Tech and Goldman, it also necessarily fails against Currenex and State Street, as Currenex cannot be in a RICO enterprise solely with itself or with its parent company. *See supra* Section V.A; *see also FXDirectDealer, LLC*, 720 F.3d at 120–21 (finding no RICO enterprise between a parent and its wholly owned subsidiary).

[26]     To state a valid RICO claim, a plaintiff must also allege that the pattern of racketeering activity had "continuity." *Albunio v. Int'l Safety Grp., Inc*., 2016 WL 1267795, at \*5 (S.D.N.Y. Mar. 30, 2016). There are two distinct types of RICO continuity: "open-ended" and "closed-ended." *Id.* Plaintiffs' allegation that they satisfy "open-ended" continuity, AC ¶ 300, is expressly foreclosed by their admission elsewhere in the AC that "the wrongful behavior . . . ceased with the filing of this action." AC ¶ 152, n.17; *see also Albunio*, 2016 WL 1267795, at \*6 (no open-ended continuity where "it is plain that this [fraudulent] scheme had . . . a clear end").

predicate acts . . . ." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010) (second emphasis in original); *see also Nat'l Grp. for Commc'ns & Computs. Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) ("While [plaintiff] repeatedly states that defendants 'conspired' or 'agreed' with one another, the complaint fails to set forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement.").

The generic "secret agreements" each of the Trading Defendants allegedly entered into with Currenex do not establish any agreement to conduct the affairs of a particular, identified enterprise, let alone through a pattern of racketeering activity. *See Elsevier Inc.*, 692 F. Supp. at 313. At most, the AC alleges that each of the Trading Defendants independently reached agreements with Currenex for their own business interests—not pursuant to any RICO enterprise, and much less, pursuant to any agreement to conspire with all members of the purported enterprises. AC ¶¶ 9, 105, 107. Plaintiffs also fail to set forth any well-pleaded allegations of predicate racketeering acts that each of the Trading Defendants agreed to commit, which is fatal to their RICO conspiracy claim. *See Bonadio v. PHH Mortg. Corp.*, 2014 WL 522784, at *3 (S.D.N.Y. Jan. 31, 2014) (RICO conspiracy claim failed because "the amended complaint does not identify any predicate acts [that other RICO] conspirators agreed to commit."). Even if Plaintiffs contend that any of the Trading Defendants knew about the purported misrepresentations that are allegedly part of the scheme, "[m]ere knowledge of a scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy." *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 439 (S.D.N.Y. 2019); *see also Nasik Breeding & Rsch. Farm Ltd.,* 165 F. Supp. 2d at 541.[27]

---

[27]     This Court should also dismiss XTX's RICO claims for the independent reason that XTX is located in England and therefore traded outside the United States. AC ¶¶ 29–30. RICO claims may not be predicated on such foreign conduct. *See, e.g., Sullivan v. Barclays PLC*, 2017 WL

## VI.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS AGAINST CURRENEX AND THE TRADING DEFENDANTS ARE ALSO DEFICIENT (SIXTH AND SEVENTH CLAIMS FOR RELIEF, AC ¶¶ 282–291)

The Court must dismiss Plaintiffs' unjust enrichment claims for three reasons.

*First*, an unjust enrichment claim is unavailable as a matter of law where, as here, an express contract covers the subject matter of the claim. *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *27 (S.D.N.Y. Dec. 20, 2013) ("Federal courts in the Second Circuit have routinely held the existence of a valid and enforceable contract can preclude an unjust enrichment claim relating to the subject matter of the contract."); *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1333–34 (S.D.N.Y. 1997) ("Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists."). Here, because the Agreements expressly cover transactions on the Platform, *see, e.g.*, AC ¶¶ 27–29, Plaintiffs cannot pursue a quasi-contract claim based on them. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."). Plaintiffs' allegations that "increased transaction fees" unjustly enriched Currenex, AC ¶ 284, plainly refer to transaction fees they paid pursuant to the Agreements and are not actionable in quasi-contract. *See* Ex. A § 8, "Exhibit D – Fees"; Ex. B § 8, "Exhibit D – Fees"; Ex. C § 8, "Exhibit D – Fees"; *see also IDT Corp.*, 907 N.E.2d at 274 (dismissing unjust enrichment claim seeking return of fees where the parties

---

685570, at *33 ("[T]he wire fraud statute does not have extraterritorial application and may not serve as a predicate act for a RICO claim premised on foreign-based activities."); *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 783 (S.D.N.Y. 2016) ("[M]ail fraud statute only applies domestically").

executed a contract governing the services generating such fees); *In re Platinum-Beechwood Litig.*, 377 F. Supp. 3d 414, 427 (S.D.N.Y. 2019) (dismissing unjust enrichment claim based on contractually-owed performance fees); *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 222 (S.D.N.Y. 2019) (same, where claim was based on the payment of contractually-owed ticket fees). The result is the same for the Trading Defendants. *See ABF Cap. Mgmt.*, 957 F. Supp. at 1334 (unjust enrichment claim cannot be brought "whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract"); *see also Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*, 89 A.D.3d 454, 455 (1st Dep't 2011) (dismissing unjust enrichment claim against an individual who was not a party to the governing contract).

*Second*, Plaintiffs fail to plead any particularized allegations that the defendant received a "specific and direct benefit" from the property sought to be recovered, rather than an "indirect benefit." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000); *see also Choi v. Tower Rsch. Cap. LLC*, 165 F. Supp. 3d 42, 51 (S.D.N.Y. 2016) (dismissing unjust enrichment claim "based on market manipulation" where plaintiffs did not allege a specific trade with defendants); *Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at *15–16 (S.D.N.Y. Aug. 9, 2018) (applying heightened pleading requirements of Rule 9(b) to unjust enrichment claim).[28] Here, the AC's general allegations that Currenex received additional fees and that "[t]he Trading Defendants were unjustly enriched at the expense of Plaintiffs" because Plaintiffs "paid the Trading Defendants more when buying from the Trading Defendants, and received less when selling to the Trading Defendants,

---

[28]     The elements of an unjust enrichment claim are "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd.*, 944 N.E.2d at 1110 (alteration in original).

than they would have absent Defendants' scheme," AC ¶ 289, fail. These allegations—including that the Trading Defendants were responsible for a "large portion" of the trades on the Platform, from which they hypothesize that Plaintiffs probably "were matched with each of the Trading Defendants on FX trades executed on the Currenex Platform during the relevant period," *id.* ¶ 34— are entirely conclusory. Plaintiffs further speculate that they were possibly "thwarted" from "enter[ing] into trades on the sell-side." *Id.* These conclusory allegations do not adequately plead the necessary "direct relationship." *See Tower Rsch. Cap. LLC*, 165 F. Supp. 3d at 51 ("[A] 'mathematical probability' that some Plaintiffs transacted with Defendants is not sufficient to show the direct relationship necessary to support a claim for unjust enrichment."); *see also Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *13–14 (S.D.N.Y. Mar. 28, 2014) (conclusory assertions that defendants "financially benefited from the unlawful manipulation" and that "[t]hese unlawful acts caused [p]laintiff . . . to suffer injury" were insufficient to state a claim for unjust enrichment) (first and third alterations in original); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008) (dismissing unjust enrichment claim based on alleged market manipulation because plaintiffs did not "allege[] any direct relationship, trading or otherwise, between themselves and any [defendant]"); *Ga. Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012) (where plaintiff and defendant "simply had no dealings with each other," their relationship was "too attenuated" to support an unjust enrichment claim).

*Third*, to the extent that the Court concludes the antitrust and fraud-based claims are deficient, the unjust enrichment claims must also fail. *See In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) (unjust enrichment claim must be dismissed when there is no "viable underlying claim of illegality"); *see also In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014) (dismissing unjust enrichment claim

because it was "predicated on defendants' alleged violations of antitrust or consumer protection laws"), *aff'd*, 833 F.3d 151 (2d Cir. 2016).

## VII.   THE CONSUMER PROTECTION ACT CLAIM (N.Y. GEN. BUS. LAW § 349) AGAINST CURRENEX AND STATE STREET FAILS AS A MATTER OF LAW (FOURTH CLAIM FOR RELIEF, AC ¶¶ 259–266)

Plaintiffs' Consumer Protection Act claim fails. As a preliminary matter, a claim for deceptive trade practices under Section 349 of the Consumer Protection Act requires, among other elements, that "the defendant's deceptive acts were directed at consumers," *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000), meaning the conduct at issue must have a "broader impact on consumers at large," *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017). "Transactions between businesses or sophisticated parties that do not affect average consumers do not constitute consumer-oriented conduct," *Axiom*, 234 F. Supp. 3d at 537, and "the clear weight of authority is that claims arising out of securities transactions are not the type of consumer transactions for which General Business Law § 349 was intended to provide a remedy," *Gray v. Seaboard Sec., Inc.*, 14 A.D.3d 852, 853–54 (3d Dep't 2005).

"FX trading on . . . ECNs is not consumer-oriented conduct." *Axiom*, 234 F. Supp. 3d at 536. As the *Axiom* court recognized, the "average consumer is even less likely to transact in FX than in some securities" since "the counterparties in FX transactions are sophisticated market participants—large banks on the sell side and institutional investors, asset managers, corporations, hedge funds, and wealthy private investors on the buy side." *Id.* at 537; *see also Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 241 (S.D.N.Y. 2019) (dismissing Section 349 claim predicated on allegedly deceptive acts by foreign exchange trading platform because "forex trading is not consumer-oriented conduct"). Plaintiffs' allegations here are no different. They center on Currenex's operation of an ECN where banks, corporations, high-frequency traders, proprietary

trading firms, hedge funds, and leading liquidity providers engage in FX transactions. AC ¶¶ 3, 177. For this reason alone, Plaintiffs' Consumer Protection Act claim must be dismissed. *See Axiom*, 234 F. Supp. 3d at 536–37.

Even if Plaintiffs had identified consumer oriented conduct, the claim nonetheless fails. For the same reasons applicable to the fraud and antitrust claims, *see supra* Sections I, II, Plaintiffs fail to plead the remaining elements of the claim: acts that are materially misleading or injury. *See Maurizio*, 230 F.3d at 521.

## VIII.  PLAINTIFFS' CLAIMS FAIL UNDER THE APPLICABLE STATUTE OF LIMITATIONS

### A.  Plaintiffs Knew Or Should Have Known That The Platform Was Not Following Strict FIFO By No Later Than February 2005

As set forth above, Plaintiffs' hodgepodge of claims is principally based on their allegations that (i) Currenex and each of the Trading Defendants entered into a "secret" agreement that prioritized the Trading Defendants' orders in the event of a tied bid rather than following strict FIFO tie-breaking procedures, and (ii) HC Tech had access to more information than Plaintiffs. Even if Plaintiffs had adequately pleaded any of their claims—and they have not—each of those claims is time-barred as a matter of law, with the limited exception of (i) the portion of Plaintiffs' fraud claims premised on alleged statements or omissions made after August 4, 2015 and (ii) the portion of XTX's antitrust claim based on trading after August 4, 2017.

The allegations in the AC show that Plaintiffs were sophisticated institutional traders in the FX market that were or should have been on notice of their claims long before they instituted this action in August 2021. The disclosures acknowledged in the AC make this clear:

- Plaintiffs concede that by February 2005 and "throughout the relevant period," Currenex expressly disclosed on its website that "Limit Orders are filled automatically by the first counterparty *bank* to stream a price that matches the order." AC ¶ 86.

- The two 2015 disclosures and the 2017 Disclosure also make clear that Currenex was not following strict FIFO by prominently describing the "last look functionality" that Currenex offered to sell-side liquidity providers (such as State Street, Goldman, and HC Tech) and expressly stating that sell-side "price making liquidity providers" received certain benefits, such that "buy-side subscribers from time to time [will] be[] unable to execute at one or more prices quoted on [the Platform]." *Id.* ¶¶ 88-91, 93; *see also* Ex. F at 11; Ex. G at 14; Ex. H at 18.

In sum, the disclosures cited in the AC conclusively establish that sophisticated investors like Plaintiffs had at least constructive, if not actual, notice by February 2005 that the Platform was not following strict FIFO, and was instead clearly granting priority rights to at least banks. That Plaintiffs long had access to information that would have revealed their claims is further confirmed by their acknowledgment that Platform users had access to different, and potentially additional, trading information at the time that each Plaintiff signed its relevant Agreement with Currenex. *See, e.g.,* Ex. A § 4(a) (transactions with counterparties); Ex. B § 4(a) (same); Ex. C § 4(a) (same). The 2011 Product Profile reiterated this point by emphasizing that the Platform was highly customizable and allowed customers to match with their "chosen counterparties" and deploy orders "based on parameters [they] define," disclosing to sophisticated parties like Plaintiffs that other users potentially had a broader overview of the market. Ex. E at 4, 6; *see also* Ex. F (disclosing to users that the "particular services you use and your specific contractual arrangements with Currenex will also affect your trading" on the Platform).

## B. Plaintiffs' Claims Are Time-Barred

***Sherman Act***. Plaintiffs' Sherman Act claim is subject to a four-year statute of limitations, 15 U.S.C. § 15b, which begins to run "when a defendant commits an act that injures a plaintiff's business." *World Wrestling Ent., Inc. v. Jakks Pac., Inc*., 328 F. App'x 695, 698 (2d Cir. 2009). Where allegations center on a conspiracy to manipulate prices, a plaintiff may not recover damages based on "acts that do not fall within the limitations period." *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 519 (S.D.N.Y. 2009); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189,

117 S. Ct. 1984, 1990–91 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."). Plaintiffs commenced this action on August 4, 2021, meaning they must base the claim on conduct that took place on or after August 4, 2017. The Sub-Class Plaintiffs do not (and cannot) allege that they made a single trade on the Platform after August 4, 2017, and therefore, their claim is entirely untimely. *See* AC Ex. A (listing trades alleged by Edmar from August 2014 to October 2015); AC Ex. B (listing trades alleged by IBG from August 2014 to April 2016). XTX cannot recover under this claim for any trading conduct that occurred prior to August 4, 2017.

**Common-Law Fraud, Conspiracy to Commit Fraud, and Aiding and Abetting Fraud.** The relevant limitations period for fraud under New York law is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." *See* N.Y. C.P.L.R. 213(8); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 995 F. Supp. 2d 291, 309–10 (S.D.N.Y. 2014) (dismissing as untimely fraud claims premised on statements made before the six-year statute of limitations). All of the allegedly false statements except for (i) the Updated 2015 Disclosure and (ii) the 2017 Disclosure (which no Plaintiff other than the improperly joined XTX alleges it received) were made more than six years before the initial complaint was filed on August 4, 2021, and are therefore time-barred under New York law.

Plaintiffs do not allege that they discovered the "secret tiebreaking rule" or supposed "administrator-level access" within the past two years (indeed, at least one Plaintiff seemingly dissolved and re-formed in anticipation of this litigation, *see* Exs. I, J), and merely assert that unspecified former insiders "recently" revealed unspecified information to "Plaintiffs' counsel," AC ¶ 211. In any event, the existence of the bank priority disclosure on Currenex's website as

early as February 2005 precludes Plaintiffs from availing themselves of the two-year discovery rule with respect to the so-called "secret tie-breaking rule" since they clearly knew, or should have known, that the Platform was not following strict FIFO tie-breaking rules. *See, e.g.*, *Prestandrea v. Stein*, 262 A.D.2d 621, 622 (2d Dep't 1999) ("The test as to when a plaintiff should have discovered an alleged fraud is an objective one."); *see also Apt v. Morgan Stanley DW, Inc.*, 115 A.D.3d 466, 467 (1st Dep't 2014) (fraud claim time-barred where plaintiff could have discovered facts based on her receipt of documents). So, too, do Plaintiffs' relevant Agreements from 2010, 2014, and 2016, which reinforced the obvious notion that different users had access to different information on the Platform. Accordingly, Plaintiffs' fraud claims, including the claims for aiding and abetting and conspiracy, premised on alleged misstatements or omissions prior to August 4, 2015, are untimely. *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (statute of limitations for aiding and abetting fraud is the same as for fraud); *see also Brady v. Lynes*, 2008 WL 2276518, at *9 (S.D.N.Y. June 2, 2008) ("The statute of limitations for civil conspiracy is the same as that for the underlying tort.").

**Tortious Interference with Prospective Economic Advantage, Tortious Interference with Contract, Unjust Enrichment, and Consumer Protection Act (N.Y. Gen. Bus. Law § 349)**. Because the AC does not include any well-pleaded allegations identifying any trades by Plaintiffs on the Platform after August 3, 2018, these claims, all of which are subject to a three-year statute of limitations, are untimely. *See* AC Ex. A (purported Edmar trades from August 2014 to October 2015); AC Ex. B (purported IBG trades from August 2014 to April 2016); AC Ex. C (purported XTX trades from December 1, 2017 to December 29, 2017).

The tortious interference with prospective economic advantage claim brought by all Plaintiffs and the tortious interference with contract claim brought by the Sub-Class Plaintiffs are

both subject to a three-year statute of limitations that began to run when the Sub-Class Plaintiffs

sustained injuries. *See Bandler v. DeYonker*, 174 A.D.3d 461, 462 (1st Dep't 2019); *see also*

*Rosemeier v. Schenker Int'l, Inc.*, 895 F. Supp. 65, 66 (S.D.N.Y. 1995) ("The cause of action

accrues at the time the injury is sustained, rather than the date of defendant's alleged wrongful act

or the date of discovery of the injury by the plaintiff."). With regard to their claim of tortious

interference with prospective economic advantage, Plaintiffs claim injury because the alleged

secret agreements disrupted and interfered with their business relations with other Platform users.

AC ¶ 322. As to their claim of tortious interference with contract, the Sub-Class Plaintiffs assert

injury because the Trading Defendants interfered with their Agreements by causing Currenex to

"deprive" them "of the fruits of their bargained-for exchange" to use the Platform. *Id.* ¶ 333.

Plaintiffs' unjust enrichment claims also are subject to a three-year statute of limitations,

running from "the occurrence of the wrongful act giving rise to the duty of restitution." *See Ingrami*

*v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007) (three-year statute of limitations for unjust

enrichment if plaintiffs seek monetary damages); *see also Ruzhinskaya v. Healthport Techs., LLC*,

311 F.R.D. 87, 109 (S.D.N.Y. 2015) (three-year statute of limitations for unjust enrichment claim

where plaintiff sought repayment of fees paid).[29]

Plaintiffs' Section 349 claim similarly has a three-year statute of limitations, running from

the date they were allegedly "injured by a deceptive act or practice violating section 349." *Noskov*

*v. Roth*, 2020 WL 4041125, at *6 (S.D.N.Y. July 17, 2020). Claims of "allegedly deceptive

---

[29]     Plaintiffs' attempt to frame their remedy as equitable by asking for a "constructive trust" of money rather than money damages does not change the result, since courts will "look beyond the form and to the substance of the sought-after remedy." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479–80 (S.D.N.Y. 2016); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *175, n.201 (S.D.N.Y. Oct. 20, 2015) ("A plaintiff may not sidestep the statute of limitations by requesting a constructive trust instead of damages.").

advertising and marketing of [a defendant's] services" accrue when a plaintiff utilizes the relevant services. *See id.* (Section 349 claim accrued when plaintiff invested based on deceptive legal advice, not when plaintiff learned of the deception); *see also Feliciano v. Gen. Motors LLC*, 2016 WL 9344120, at \*10 (S.D.N.Y. Mar. 31, 2016) ("[A]ccrual is not dependent upon any date when discovery of the alleged deceptive practice is said to occur.").

*Civil RICO*. Civil RICO claims under Sections 1962(c) and (d) are governed by "a four-year statute of limitations," which "begins to run [] when the plaintiff discovers—or should have reasonably discovered—the alleged injury." *World Wrestling*, 328 F. App'x at 696–97. The statute of limitations for a RICO claim "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *Id.* at 697; *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012) ("Such storm warnings . . . need not detail every aspect of the alleged fraudulent scheme."). For the reasons discussed above, Plaintiffs were on inquiry notice since February 2005 that Currenex's tie-breaking rules did not follow strict FIFO. In addition, Plaintiffs should have been on inquiry notice of their alleged injury (receiving less favorable prices when they bought and sold) well before August 4, 2017. *See* AC ¶ 19 (XTX "conducted on average $1.5 billion in FX trades *daily* via the Platform during the relevant period") (emphasis in original); AC Ex. A (depicting multiple transactions by Plaintiff Edmar from August 2014 to October 2015); AC Ex. B (depicting multiple transactions by Plaintiff IBG from August 2014 to April 2016). Indeed, in an acknowledgement that there were at least "storm warnings" by May 2016, XTX alleges it posed detailed questions to Currenex about the Platform's tie-breaking system, was referred back to the Updated 2015 Disclosure, and decided to continue trading regardless. *See* AC ¶¶ 100–01, AC Ex. C (depicting multiple transactions by Plaintiff XTX from December 1, 2017 to December 29, 2017); *Rosenshein*

*v. Meshel*, 688 F. App'x 60, 64 (2d Cir. 2017) (Plaintiff was on inquiry notice where a "cascade of setbacks that the investment suffered would have caused a reasonable investor to suspect fraud and make further inquiries into the accuracy of defendants' representations").

**Implied Covenant.** The statute of limitations for a breach of the implied covenant of good faith and fair dealing is six years, N.Y. C.P.L.R. 213(2), and the claim "accrues when the alleged breach occurs." *MarketShare Corp. v. Transactis, Inc.*, 2021 WL 1948283, at *5 (S.D.N.Y. May 12, 2021). The Sub-Class Plaintiffs (the only Plaintiffs to assert this claim) allege that Currenex breached the implied covenant in their Agreements by deviating from the "industry norms" for "tiebreaking rules." *See* AC ¶¶ 8, 329**.** They also allege that Currenex granted "select clientele super-priority rights via the secret tiebreaking rule at least as of 2005." *Id.* ¶ 104. Accordingly, their claim accrued on the day they signed their respective Agreements (July 9, 2010 for Edmar and May 30, 2014 for IBG, *id.* ¶¶ 27, 28), because a "representation of present fact is either true or false—and the contract therefore performed or breached—if the underlying fact was true or false at the time the representation [or omission] was made." *See Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 866 (2d Cir. 2015). Both Agreements were executed more than six years before the initial Complaint was filed, rendering their claim untimely.

## C.    Plaintiffs' Invocation Of Equitable Tolling Fails To Save Their Claims

Apparently recognizing that the applicable limitations periods significantly curtail the AC, Plaintiffs invoke principles of equitable tolling or fraudulent concealment to save their time-barred claims. *See* AC ¶¶ 200-212. Their gambit does not work here. To avoid limitations on these grounds, Plaintiffs were required to plead that Defendants "wrongfully concealed material facts, which prevented [Plaintiffs'] discovery of the nature of the claim[s]" and that Plaintiffs "exercised due diligence in pursuing the discovery of the claim[s] during the period [Plaintiffs] seek[] to have tolled." *DuBuisson v. Nat'l Union Fire Ins. of Pittsburgh*, 2021 WL 3141672, at *9 (S.D.N.Y. July

26, 2021); *see also Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) ("We have applied equitable tolling only in rare and exceptional circumstances . . . ."). "[G]eneralized and conclusory allegations of fraudulent concealment" are insufficient to toll the statute of limitations. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *see also Fire & Police Pension Ass'n of Colorado v. Bank of Montreal,* 368 F. Supp. 3d 681, 703 (S.D.N.Y. 2019) ("A claim of fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Federal Rule of Civil Procedure 9(b).").

Instead of pleading particularized facts, Plaintiffs offer generic allegations about "concealment" in a section entitled "Equitable Tolling." *See* AC ¶¶ 200-212. Those allegations contain *none* of the requisite particularized facts suggesting that Defendants wrongfully concealed material facts that would have prevented discovery of the claims, let alone assert any diligence on Plaintiffs' part during the relevant period.[30] Simply stating, as Plaintiffs do, that Defendants' purported conspiracy was "self-concealing," is not enough. *Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) ("[M]erely stat[ing] in a conclusory fashion that the defendants' fraud was self-concealing . . . without alleging how any of the aspects of the defendants' misrepresentations obscured their fraud" is insufficient to plead fraudulent concealment with the particularity required by Rule 9(b)).

## CONCLUSION

For these reasons, the Defendants respectfully request that the Court dismiss the AC and grant such other relief as is just and proper. Dismissal should be with prejudice given, as set forth above, Plaintiffs' claims suffer from inherent and irreparable defects under binding Second Circuit

---

[30]     Indeed, at least one of the Plaintiffs does not seem to have been in existence for at least part of the relevant period and the only diligence it seems to have shown is reconstituting itself for purposes of this litigation. *See* Exs. I, J.

precedent. *See Onel v. Top Ships, Inc.*, 806 F. App'x 64, 69 (2d Cir. 2020) (affirming dismissal with prejudice where "any amendment would be futile" because "the flaw in Plaintiffs' claim . . . could not be readily remedied via amendment").

Dated: March 18, 2022

Respectfully submitted,

ROPES & GRAY LLP

/s/ *Gregg L. Weiner*
Gregg L. Weiner
Alexander B. Simkin
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-5000
Facsimile: (212) 596-9090
Email: gregg.weiner@ropesgray.com
Email: alexander.simkin@ropesgray.com

ROPES & GRAY LLP
Robert G. Jones (*pro hac vice*)
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951 7000
Facsimile: (617) 951 7050
Email: robert.jones@ropesgray.com

ROPES & GRAY LLP
Samer Musallam (*pro hac vice*)
2099 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
Email: samer.musallam@ropesgray.com

*Counsel for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

KATTEN MUCHIN ROSENMAN LLP

/s/ *Peter G. Wilson*
Peter G. Wilson
Christian T. Kemnitz (*pro hac vice*)
Elliott M. Bacon (*pro hac vice*)
Hannah O. Koesterer (*pro hac vice*)
525 W Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Email: peter.wilson@katten.com
Email: christian.kemnitz@katten.com
Email: elliott.bacon@katten.com
Email: hannah.koesterer@katten.com

*Counsel for Defendant HC Technologies, LLC*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ *Carmine D. Boccuzzi Jr.*
Carmine D. Boccuzzi Jr.
Rishi N. Zutshi
One Liberty Plaza, 1 Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Email: cboccuzzi@cgsh.com
Email: rzutshi@cgsh.com

*Counsel for Defendant Goldman Sachs & Co. LLC*