USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __5/18/2023__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
EDMAR FINANCIAL COMPANY, LLC, et al.,

                              Plaintiffs,

              v.                                                21-cv-6598 (LAK)

CURRENEX, INC., et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# OPINION


Appearances:

        Daniel L. Brockett
        Christopher M. Seck
        QUINN EMANUEL URQUHART & SULLIVAN, LLP (NYC)

        Jeremy D. Andersen
        QUINN EMANUEL URQUHART & SULLIVAN, LLP (LOS ANGELES)

        Mark Ruddy
        RUDDY GREGORY, PLLC

        *Attorneys for Plaintiffs*

        Peter G. Wilson
        Christian T. Kemnitz
        Elliott M. Bacon
        Hannah O. Koesterer
        KATTEN MUCHIN ROSENMAN LLP
        *Attorneys for Defendant HC Technologies, LLC*

        Carmine D. Boccuzzi Jr.
        Rishi N. Zutshi
        CLEARY GOTTLIEB STEEN & HAMILTON LLP
        *Attorneys for Defendant Goldman Sachs & Co. LLC*

Gregg L. Weiner
Alexander B. Simkin
ROPES & GRAY LLP (NYC)

Robert G. Jones
ROPES & GRAY LLP (BOSTON)

Samer Musallam
ROPES & GRAY LLP (WASHINGTON D.C.)

*Attorneys for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

Table of Contents

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    I.     Foreign Exchange Trading and Limit Order Books . . . . . . . . . . . . . . . . . . . . . 2
          A.     Matching Engines and Tiebreaking Rules . . . . . . . . . . . . . . . . . . . 4
          B.     Confidentiality of User Transaction Information . . . . . . . . . . . . . . . . 5
    II.    Currenex and State Street's Public Representations Regarding the Platform . . . . 6
    III.   Currrenex Allegedly Gave Secret Privileges to Certain Liquidity Providers on the
          Platform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    I.     Fraud Claims Against Currenex and State Street . . . . . . . . . . . . . . . . . . . . . 13
          A.     False Statements and Actionable Omissions . . . . . . . . . . . . . . . . . . 13
               1.     Express Misrepresentations . . . . . . . . . . . . . . . . . . . . 13
               2.     Omission of Material Facts . . . . . . . . . . . . . . . . . . . . . 16
          B.     Reasonable Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          C.     Out-of-Pocket Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    II.    Conspiracy to Defraud and Aiding and Abetting Fraud . . . . . . . . . . . . . . . . . 23
    III.   Antitrust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          A.     Per Se Antitrust Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          B.     Rule of Reason Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                1.     The Relevant Market . . . . . . . . . . . . . . . . . . . . . . . . 29
               2.     Antitrust Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    IV.   RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          A.     Association-in-Fact Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . 34
          B.     Pattern of Mail or Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . 36
          C.     RICO Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    V.    Breach of Implied Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . 40
    VI.   Tortious Interference with Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    VII.  Tortious Interference with Prospective Economic Advantage . . . . . . . . . . . . . 43
    VIII. N.Y. General Business Law § 349 Claims . . . . . . . . . . . . . . . . . . . . . . . . 44
    IX.   Unjust Enrichment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    X.     Statute of Limitations and Equitable Tolling . . . . . . . . . . . . . . . . . . . . . . . 51
    XI.   Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    XII.  Forum Non Conveniens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

LEWIS A. KAPLAN, *District Judge.*

This putative class action involves a widely used foreign exchange trading platform operated by Currenex, Inc. ("Currenex").[1]  Defendant Currenex is accused of conspiring with a narrow subset of participants on the trading platform – Goldman, Sachs & Co. LLC ("Goldman Sachs"), HC Technologies, LLC ("HC Tech"), State Street Bank and Trust Company ("State Street"), and unidentified Doe Defendants (collectively, the "Trading Defendants") – to provide them with secret privileges that enabled them to "rig" auctions for foreign exchange transactions.[2]

All defendants move to dismiss for lack of subject-matter jurisdiction and failure to state a claim.  (Dkt 53) Certain defendants move also to dismiss as to them on the ground of improper venue and for lack of personal jurisdiction.  (Dkt 56)  For the following reasons, defendants' motions each are granted in part and denied in part.

*Background*

Currenex operates a foreign exchange ("FX") trading platform where banks, corporations, hedge funds, investors, and other traders from around the world engage in FX transactions (the "Platform").  Plaintiffs – all of whom "traded on, provided liquidity for, or otherwise attempted to transact FX spot trades" on the Platform during the relevant period – bring

---

[1]

The amended complaint collectively refers to Currenex, Inc. and State Street Global Markets International Limited ("SS Global") as "Currenex."  *See* AC ¶ 39.  Plaintiffs allege that SS Global is an English corporation by which the Currenex trading platform is offered in the "European Economic Area."  AC ¶ 38.  As discussed in more detail below, the Court concludes that it lacks personal jurisdiction over SS Global on the current record.  Accordingly, for purposes of this opinion, "Currenex" will refer only to Currenex, Inc.

Citations to "AC ¶" are to the Amended Class Action Complaint (Dkt 41).

[2]

AC ¶ 1.

2

claims under the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO Act").[3] They sue as well on state law claims for fraud, unjust enrichment, tortious interference, and breach of the implied covenant of good faith and fair dealing.

The following facts are alleged in the amended complaint, the truth of which are assumed when considering a motion to dismiss the amended complaint.[4]

## I.   *Foreign Exchange Trading and Limit Order Books*

In order to understand the claims in this case, it is helpful first to provide some background information on FX trading and "limit order book" systems, like the Platform.

FX trading involves an exchange of one country's currency for that of another.[5] Currencies are traded in pairs, with the Euro/U.S. dollar ("EUR/USD"), U.S. dollar/Japanese Yen ("USD/JPY"), and British pound/U.S. dollar ("GBP/USD") constituting the most commonly traded currency pairs.[6] The value of currency pairs generally are quoted to three or five decimal places.[7] For instance, the EUR/USD rate could be 1.09925, which would mean that one Euro is worth

---

[3]      AC ¶ 214.

[4]
         *See Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chic. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) (applying standard in respect of motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013))).

[5]      AC ¶ 48.

[6]      AC ¶ 49.

[7]      AC ¶ 50.

3

1.09925 U.S. dollars. Thus, if the value of the Euro increases relative to the value of the U.S. dollar, then the value of EUR/USD increases and vice versa.

FX transactions usually are executed over-the-counter ("OTC"), meaning a customer must use a dealer to execute the trade. The dealers traditionally have been known as the "sell-side" of the transaction because they "sell" liquidity – i.e., they "sell" the ability to transact by being willing to deal. The customers, whether buying or selling currency, traditionally have been known as the "buy-side" because they take (or "buy") liquidity. The sell-side/buy-side terminology often is used regardless of whether the party is buying or selling a given currency.[8]

The Platform is a "limit order book" system, which is an electronic alternative to OTC trading on which every Platform user can choose to be on the sell-side (i.e., supplying liquidity) or on the buy-side (i.e., taking liquidity).[9] On limit order book platforms, users can act on the sell-side by posting a "limit order," which indicates to other platform users a "bid" price (the price at which they are willing to buy) or an "ask" price (the price at which they are willing to sell). Thus, a limit order book is a centralized record of outstanding limit orders maintained by the exchange. Limit orders remain on the limit order book until executed or cancelled. Users can act also on the buy-side by submitting a "market order" – i.e., an order indicating the quantity they want to buy or sell at the best available price currently offered on the Platform. Market orders are matched with the limit orders in the book, creating an executed trade.[10]

---

[8]     AC ¶ 51.

[9]     AC ¶ 57.

[10]    AC ¶ 58.

4

*A.*     *Matching Engines and Tiebreaking Rules*

The "matching engine" is the mechanism by which market orders are matched with limit orders in the book. Thus, the rules that govern the matching engine determine the "rules of the 'auction.'"[11] Plaintiffs claim it is industry practice to disclose those rules so that "all auction participants have an equal understanding of what rules govern, so they can make informed decisions about whether to participate and what strategies to adopt to compete for business on the platform."[12] Accordingly, the matching engine is an important feature of FX trading platforms like the Currenex Platform.[13]

The rules governing what to do in the event of a "tie" – i.e., what to do if two platform users submit the same bid price or ask price – are particularly important. An FX marketplace can have multiple tiebreaking rules to determine whose bid or offer should be executed first, such that if one rule fails to resolve a tie, the matching engine can go on to the next tiebreaking rule, and so on, until the tie is broken.[14]

By far the most common tiebreaking rule is referred to as "first in, first out" or "FIFO."[15] Under a FIFO system, the record of outstanding limit orders first is sorted based on price, such that the best-priced limit orders are placed at the front of the queue with the best bid and ask

---

[11]      AC ¶ 69.

[12]      AC ¶ 69.

[13]      AC ¶ 69.

[14]      AC ¶ 70.

[15]      AC ¶ 71.

5

prices referred to as the top of book "quotes." Then, if two limit orders have an identical price, the earlier submitted order will receive priority in the queue.[16]

Another common tiebreaking rule prioritizes "firm orders" over limit orders that are subject to "last look" functionality, which gives liquidity providers the right to accept or reject a trade at a particular price after being matched with a market order.[17] "Last look" functionality acts as a risk control for liquidity providers, protecting them, for instance, from entering into a transaction at a "stale" price or a price that breaches its credit line availability.[18]

### B.    Confidentiality of User Transaction Information

In a limit order book system, like the Currenex Platform, the identity of buy-side and sell-side counterparties typically are kept anonymous unless the counterparties have agreed on a disclosed relationship.[19] While platform users can see the outstanding limit orders in the limit order book, they generally are unable to see *which* users submitted each of the limit orders.[20] Thus, platform users are not able to deduce another user's strategy because the limit order book and executed transactions are anonymous. Consequently, "one would not know if 10 quotes for various prices and volumes were from 10 different traders, 1 trader, or anything in between. And even if

---

[16]

    AC ¶ 71.

[17]

    AC ¶ 160.

[18]

    AC ¶ 160.

[19]

    AC ¶ 58.

[20]

    AC ¶ 130.

6

a user were able to somehow guess that the 10 quotes came from the same trader, it would still not be known *who* that other trader was."[21]  Plaintiffs claim that such anonymity is "a fundamental feature" of limit order book trading.[22]

## II.    Currenex and State Street's Public Representations Regarding the Platform

In the early 2000s, Currenex launched the Platform as an electronic, limit order book style of FX trading platform.  State Street acquired Currenex in 2007 and has acted as a "major liquidity provider" on the Platform ever since.[23]  Currenex remains a wholly owned subsidiary of State Street.

Currenex's website has represented since as early as February 2005 that the Platform used the FIFO tiebreaking rule.[24]  After its acquisition of Currenex, State Street made similar representations regarding the Platform's use of FIFO.[25]  Currenex reiterated the Platform's use of a FIFO tiebreaking system in an April 7, 2015 email to all Platform users (the "2015 Disclosures").[26]

---

[21]     AC ¶ 130 (emphasis in original).

[22]     AC ¶ 131.

[23]     AC ¶ 61.

[24]     AC ¶¶ 6, 86 ("Currenex website's description of its 'Trading Services' represented that the Platform's 'Limit Orders are filled automatically by the first counterparty bank to stream a price that matches the order.' In other words, FIFO.").

[25]     AC ¶ 87 (State Street distributed a "product profile" to Platform users and potential users representing that the Platform had a "[l]ow-latency matching engine with 'first in, first out' (FIFO) prioritizing").

[26]     AC ¶¶ 88-89.

Until September 3, 2015, FIFO was the Platform's only publically disclosed tiebreaking rule.  On that date, Currenex emailed updated disclosures under State Street's letterhead to all Platform users (the "Revised 2015 Disclosures") informing them that effective September 13, 2015, "the FIFO prioritisation process within Currenex [would] change such that firm orders (i.e., the price quote is not subject to 'last look' functionality) [would] be prioritised over Last Look liquidity."[27]  In other words, in September 2015, Currenex and State Street represented that they had replaced the Platform's single-rule tiebreaking system (FIFO) with a two-rule tiebreaking system, whereby the matching engine first considered whether limit orders with identical prices were both firm orders or could be withdrawn subject to "last look" functionality, and then considered the time at which the limit orders were submitted.[28]  Currenex and State Street again represented that the Platform used a two-rule tiebreaking system (FIFO and firm-liquidity) in disclosures published on July 27, 2017 (the "2017 Disclosures").[29]  Plaintiffs claim that they relied on Currenex and State Street's representations regarding the Platform's tiebreaking rules.

Additionally, since at least 2005 and throughout the relevant period, Currenex repeatedly marketed the Platform as "fully anonymous."[30]  Currenex represented that it "implement[ed] comprehensive security measures at every step of the trading process to ensure the

---

[27]     AC ¶ 90.

[28]     AC ¶ 92.

[29]     AC ¶ 93.

[30]     AC ¶ 132.

8

complete protection of user data and full member confidentiality."[31]  At various times, Currenex

publically stated that the Platform offered "complete anonymity" along with an "anonymous central

counterparty service."[32]  Similarly, Currenex and State Street's public disclosures included express

representations that user transaction information would remain anonymized, stating in relevant part:

> "We keep confidential any information that shows the nature, number or volume of
> transactions entered into by a particular subscriber through the electronic trading
> platform and the identity of any counterparty to the subscriber in such
> transactions."[33]

Plaintiffs contend that they relied on Currenex and State Street's representations that their activity

on the Platform would be viewable by rival users only in certain, limited ways.[34]

III.    *Currrenex Allegedly Gave Secret Privileges to Certain Liquidity Providers on the Platform*

Plaintiffs allege that Currenex and State Street's public representations were

knowingly false and concealed a conspiracy with each Trading Defendant to give it "unfair bidding

advantages" on the Platform.[35]  These secret privileges allegedly harmed the Platform's

non-privileged users, including plaintiffs.

Plaintiffs contend that, in order to succeed, limit order book platforms like the

Currenex Platform require sufficient liquidity and customers to ensure that FX trades will be

---

[31]
    AC ¶ 132.

[32]
    AC ¶ 132.

[33]
    AC ¶ 134.

[34]
    AC ¶ 142.

[35]
    AC ¶ 1.

executed in a timely and efficient manner.  Thus, although FX markets like the Platform allow end-users to act on the sell-side by submitting limit orders, they nevertheless require support from larger sell-side institutions, like Goldman Sachs, State Street, and HC Tech.[36]  Plaintiffs claim that Currenex conspired with each Trading Defendant to provide it with secret privileges on the Platform in order to incentivize the Trading Defendants to bring more liquidity to the Platform.[37]

  *First*, Currenex allegedly conspired with each of the Trading Defendants to adopt a secret tiebreaking rule that trumped the Platform's publically disclosed FIFO and "last look" rules. Under the secret rule, limit orders submitted by the Trading Defendants were prioritized over identically priced orders by all non-privileged users, regardless of when the Trading Defendants' orders were submitted or the firmness of their quotes.[38]  Plaintiffs refer to this secret tiebreaking rule as the "Trading-Defendants-always-win" rule.[39]  Plaintiffs allege that Currenex provided this secret benefit to State Street both before and after it acquired Currenex in 2007.[40]  Moreover, plaintiffs allege that Currenex sometimes matched State Street with market orders even when its limit order was at a price worse than the top of book quote, thereby jettisoning all tiebreaking rules including

---

[36]  AC ¶ 59.

[37]  AC ¶ 1.

[38]  AC ¶ 9.

[39]  *See* Dkt 64, at 1.

[40]  *See* AC ¶ 60, 271.

the "Trading-Defendants-always-win" rule.[41]  In other words, plaintiffs claim that "State Street did

not even have to 'tie' before being declared the winner under the supposed 'tiebreaking' rules."[42]

     *Second*, Currenex allegedly conspired with HC Tech to provide it with

"administrator-level" access to the Platform.[43]  Specifically, plaintiffs claim that Currenex's former

Global Head of Sales provided HC Tech with his personal log-in credentials to the Platform, which

allowed HC Tech to see "basically [] everything," including "*all* quotes on a *non-*

*anonymized* basis."[44]

     Plaintiffs claim that they were harmed as a consequence of the secret privileges

granted to the Trading Defendants.  They assert that, due to the Trading-Defendants-always-win

rule, the Trading Defendants "had no incentive to compete on either price or the firmness of their

quotes" because they could "grab any trade they wanted without ever having to enter a competing

bid or offer."[45]  Consequently, plaintiffs allege that prices on the Platform became artificial, and

plaintiffs "paid too much when buying, received too little when selling, and incurred increased

execution costs."[46]  Plaintiffs claim that they were harmed also by the "lost opportunity . . . to secure

---

[41]     AC ¶ 110.

[42]     AC ¶ 110.

[43]     AC ¶¶ 126-142.

[44]     AC ¶ 142 (emphasis in original).

[45]     AC ¶ 10.

[46]     AC ¶ 10.

11

business and profits" that should have been given to them rather than to the Trading Defendants.[47] The alleged provision of administrator-level access to HC Tech also harmed plaintiffs by allowing HC Tech to see plaintiffs' "potential and actual trading patterns – which in many cases were the result of proprietary algorithmic trading systems."[48]

Plaintiffs claim that defendants knew their conduct was improper and actively sought to conceal it, in part, by way of the aforementioned public representations.[49]   Moreover, plaintiffs contend that they could not have discovered the existence of defendants' misconduct until it was "revealed recently" by former company insiders at Currenex and State Street.[50]

*Discussion*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."[51]  This standard is met where the "pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[52]  The Court accepts as true all well-pleaded factual allegations and

---

[47]    AC ¶ 11.

[48]    AC ¶ 12.

[49]    AC ¶ 211.

[50]    AC ¶ 211.

[51]    *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 570 (2007).

[52]    *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

12

"draw[s] all reasonable inferences in the plaintiffs' favor."[53]  However, this tenet is "inapplicable

to legal conclusions" and to "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements."[54]

       At the motion to dismiss stage, courts may consider "the complaint in its entirety, as

well as . . . documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice."[55]  Judicial notice may be taken of documents "integral to the complaint,"[56]

as well as of certain matters of public record, such as agency rules and regulations.[57]

       For claims governed by Rule 9(b), the "circumstances constituting fraud" must be

stated with "particularity," but "knowledge[] and other conditions of a persons' mind may be alleged

generally."[58]  The other elements of a fraud claim must satisfy only the lower plausibility standard.[59]

---

[53]

    *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

[54]

    *Iqbal*, 556 U.S. at 678.

[55]

    *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[56]

    *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019).

[57]

    *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972).

[58]

    Fed. R. Civ. P. 9(b).

[59]

    *See Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 516-17 (S.D.N.Y. 2016) (noting that
complaint must "state with particularity the circumstances of the fraud under Rule 9(b) and
contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that
are facially plausible under Rule 8(a)(2)").

13

*I.     Fraud Claims Against Currenex and State Street*

To state a claim for fraud, a plaintiff must allege "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[60]

Defendants argue that plaintiffs' fraud claims fail because "they do not adequately allege: (i) the existence of any false statement or actionable omission; (ii) actual or justifiable reliance on any alleged misrepresentation or omission; or (iii) any out-of-pocket loss caused by any alleged misrepresentation or omission."[61]  All of defendants' arguments are meritless.

*A.     False Statements and Actionable Omissions*

*1.     Express Misrepresentations*

Plaintiffs adequately allege that State Street and Currenex made affirmative misstatements regarding (i) the Platform's tiebreaking rules and (ii) the confidentiality of user transaction information that are incompatible with the alleged Trading-Defendants-always-win rule and the alleged provision of administrator-level access to HC Tech, respectively.[62]  These alleged

---

[60]

*First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir.2001); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (same).

[61]

Dkt 54, at 21.

[62]

*See* AC ¶¶ 126-142, 230.

14

misrepresentations include statements in website postings since February 2005, product profiles since 2011, the 2015 Disclosures, the Revised 2015 Disclosures, and the 2017 Disclosures.[63]

Plaintiffs allege, for example, that in April 2015, Currenex publically represented to Platform users that prioritization of quotes was "based on price and, if prices are identical, then on a 'first in, first out' basis."[64] Then, in September 2015, Currenex publically disclosed a departure from the standard FIFO system, such that firm orders (i.e., orders for which the price quote is not subject to "last look" functionality) would be prioritized over quotes with "last look" functionality.[65]

Plaintiffs claim that those representations, among others, were knowingly false because State Street sometimes gave its limit orders priority over those submitted by other Platform users, even when its competing limit order was at a worse price.[66] Thus, State Street could circumvent entirely its publically disclosed tiebreaking rules by prevailing with an inferior price. Moreover, under the alleged Trading-Defendants-always-win rule, the quotes submitted by Trading Defendants were prioritized over those of other Platform users at the same price even when the Trading Defendants' quotes were submitted at a later time or reserved the right to cancel the trade.[67] The amended complaint alleges in detail that high-level executives at State Street and Currenex were involved in the negotiation and implementation of these departures from the Platform's publically

---

[63]    *See* AC ¶ 230.

[64]    *See* AC ¶ 89.

[65]    *See* AC ¶¶ 7, 90-92; *see also* AC ¶ 230 (describing other similar misrepresentations allegedly made by Currenex and State Street regarding the Platform's tiebreaking rules).

[66]    AC ¶ 110.

[67]    AC ¶¶ 102-14.

disclosed tiebreaking rules.[68]  Accordingly, plaintiffs have pleaded adequately a misrepresentation by Currenex and State Street that was knowingly false.[69]

Plaintiffs allege also misrepresentations in Currenex and State Street's public disclosures relating to the confidentiality of user transaction information.   These alleged misrepresentations described the Platform as an "anonymous bilateral trading service" and stated that the companies "ke[pt] confidential any information that show[ed] the nature, number or volume of transactions entered into by a particular subscriber . . . and the identity of any counterparty to the subscriber in such transactions."[70]  Those statements were false, plaintiffs claim, because defendants provided HC Tech with the log-in credentials of a Currenex executive, thereby granting HC Tech administrator-level access to the Platform and "an exclusive live feed from *all* orders on the Platform."[71]

Defendants argue that plaintiffs have not pleaded adequately that those statements were false because the Amended Complaint does not allege that HC Tech "received access to the

---

[68]

See AC ¶¶ 102-13, 126-28.

[69]

Defendants' contrary arguments rely on a mischaracterization of plaintiffs' allegations – that is, defendants mistakenly contend that plaintiffs' fraud claims require a misrepresentation by Currenex and State Street that the Platform adhered to a "strict FIFO" tiebreaking system, rather than a variation on "strict FIFO" that granted certain priorities to banks and other liquidity providers.  Moreover, defendants argue that plaintiffs' fraud claims fail because they do not identify "any statement where Currenex (or anyone else) represented that the first bidder *always* won a tie." Dkt 73, at 11 (emphasis in original).  But plaintiffs' fraud claims plainly do not rely on such misrepresentations.   Rather, they rely on multiple alleged misstatements in the amended complaint that are incompatible with the undisclosed Trading-Defendants-always-win rule.  Defendants' contrary arguments are red herrings.

[70]

AC ¶ 134.

[71]

AC ¶ 126 (emphasis in original).

16

*identity*" of any Platform user.[72]  But plaintiffs have raised a plausible inference that the public

disclosures regarding the Platform's confidentiality were false even if HC Tech's administrator-level

access included anonymized user data showing the nature, number, or volume of transactions.

Moreover, while the amended complaint does not allege specifically that HC Tech had access to the

identities of Platform users, it does allege that HC Tech "basically saw everything" due to its

administrator-level access, which "may have even included access to trader codes that would have

allowed HC Tech to determine who was behind each quote."[73]  At the pleading stage, the details of

precisely what information HC Tech could have seen with administrator-level access is a matter

peculiarly within the defendants' knowledge.  Accordingly, plaintiffs adequately have alleged facts

that defendants' statements regarding the confidentiality of user transaction information were false.[74]

2.    *Omission of Material Facts*

Plaintiffs separately allege fraud claims based upon Currenex and State Street's

omission of material facts.  To state a material omission theory of fraud, a plaintiff must allege that

---

[72]

Dkt 54, at 22-23 (emphasis in original).

[73]

AC ¶ 127.

[74]

*See Goldrich v. Masco Corp.*, No. 22-cv-3769 (KMK), 2023 U.S. Dist. LEXIS 52095, at *28 (S.D.N.Y. Mar. 27, 2023) (fraud can be "alleged upon information and belief as to facts peculiarly within the opposing party's knowledge," so long as those allegations are "accompanied by a statement of the facts upon which the belief is based"); *Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986) (Rule 9(b)'s pleading standards are relaxed when matters are peculiarly within the opposing party's knowledge).

the defendant had a "duty to disclose material information."[75]   Such a duty arises in three circumstances: (1) "the parties are in a fiduciary relationship," (2) "under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge," or (3) "where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure."[76] Plaintiffs argue that defendants had a duty to disclose the Trading-Defendants-always-win rule and the administrator-access practices based both on the special facts doctrine and on partial or ambiguous statements made by defendants.

*First*, plaintiffs pleaded sufficiently the materiality of the alleged omissions. Defendants argue that the alleged omissions were immaterial because plaintiffs do not allege plausibly that the tiebreaking rule favoring the Trading Defendants adversely impacted pricing on the Platform.[77] Yet, plaintiffs plainly allege that the secret tiebreaking rule harmed plaintiffs in multiple ways, including causing them to "pa[y] artificially high prices (when buying) and receive[] artificially low prices (when selling)."[78] They plausibly allege that reasonable investors would have considered the Trading-Defendants-always-win rule material, as evidenced by the alleged

---

[75]

    *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (citing *Nealy v. U.S. Surgical Corp.*, 587 F.Supp.2d 579, 585 (S.D.N.Y.2008)).

[76]

    *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir.2005) (citations and internal quotation marks omitted).

[77]

    Dkt 73, at 11.

    Defendants do not contest the materiality of the administrator-level access allegedly provided to HC Tech.

[78]

    AC ¶ 157.

18

"significant uproar in the industry" following the filing of plaintiffs' original complaint in August 2021.[79]  Accordingly, plaintiffs have alleged sufficiently the materiality of the alleged omissions.

*Second*, plaintiffs adequately pleaded a duty to disclose under the special facts doctrine.  The amended complaint contains detailed allegations regarding the two alleged schemes central to plaintiffs' claims – i.e., the secret Trading-Defendants-always-win rule and the provision of  administrator-level access to certain Platform users.   There is no dispute that defendants possessed superior knowledge regarding those alleged internal practices of Currenex and State Street, nor can there be serious dispute that such knowledge was not readily available to others. Defendants argue that plaintiffs could have discovered that the Platform did not follow "strict FIFO" to break ties by reviewing Currenex and State Street's public disclosures.[80]  That is beside the point. There was no public disclosure that would have alerted plaintiffs to the alleged schemes, nor were plaintiffs under any obligation, as defendants contend, to ask defendants about schemes that were peculiarly within their knowledge.[81]  In all events, plaintiff XTX Markets Limited ("XTX") did inquire about the rules governing the Platform's matching engine, but was "fed the same lies" allegedly contained in defendants' public disclosures.[82]  Plaintiffs allege that defendants concealed the  Trading-Defendants-always-win  rule  and  the  administrator-access  practices  while

---

[79]     AC ¶¶122-24.

[80]     Dkt 54, at 24-25.

[81]     *See Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992) ("[W]hen matters are peculiarly within the knowledge of the defendant, a plaintiff may rely on defendant's representations without prosecuting an investigation, as he has no independent means of ascertaining the truth.").

[82]     AC ¶¶ 99-101.

19

simultaneously marketing the Platform to induce reliance on defendants' misleading public disclosures. Hence, plaintiffs have alleged sufficiently that Currenex and State Street possessed superior knowledge regarding the companies' secret tiebreaking rules and administrator-access practices, that information was not available to plaintiffs, and defendants knew plaintiffs would act on the basis of inaccurate information contained in defendants' public disclosures.

*Third*, plaintiffs have pleaded sufficiently that defendants had a duty to disclose based on their partial statements about tiebreaking protocols and confidentiality of user information. Plaintiffs allege several public statements by defendants regarding the Platform's publically disclosed tiebreaking rules – FIFO and "Last Look."[83] But those disclosures could not be understood fully without knowledge of the rule that trumped all others – the Trading-Defendants-always-win rule. Similarly, defendants made multiple statements about the confidentiality of user transaction information on the Platform that could not be understood fully without knowledge of HC Tech's administrator-level access to the Platform.[84] Thus, defendants had a duty to disclose arising from their partial and ambiguous statements.

B.    *Reasonable Reliance*

Defendants argue that plaintiffs' fraud claims fail because plaintiffs did not plead actual reliance on any of the alleged misrepresentations or material omissions and, in the alternative, any such reliance was not "objectively reasonable or justifiable."[85]

---

[83]    *See* AC ¶¶ 86-94.

[84]    AC ¶¶ 130-41.

[85]    Dkt 54, at 27-30.

20

Defendants confine their first argument to plaintiffs Edmar Financial Company, LLC ("Edmar") and Irish Blue & Gold, Inc. ("IBG," and, together with Edmar, the "Sub-Class Plaintiffs") and do not challenge the actual reliance of XTX on defendants' alleged misrepresentations and omissions.[86] They argue that the Sub-Class Plaintiffs fail to plead reliance because "they do not allege that they did *anything* differently in reliance on [defendants'] disclosures after receiving them."[87] The amended complaint alleges, however, that the Sub-Class Plaintiffs "received, read, discussed, and relied upon Currenex's representations about its Platform," including the 2015 Disclosures and Revised 2015 Disclosures. Moreover, plaintiffs allege that the Sub-Class Plaintiffs "actively" monitored Currenex's website to "review for updates and Platform features."[88] Construing the pleadings in the light most favorable to plaintiffs, those allegations are sufficient to raise a plausible inference that they relied upon defendants' misrepresentations and omissions of material fact.[89]

Defendants argue in the alternative that any reliance by plaintiffs was objectively unreasonable because it would have been unreasonable to believe that the Platform operated on a

---

[86]

See AC ¶ 98; Dkt 54, at 27.

[87]

Dkt 54, at 27 (emphasis in original).

[88]

AC ¶¶ 96-98.

[89]

Defendants argue also that the Sub-Class Plaintiffs did not rely on the alleged misrepresentations in the 2015 disclosures because they did not "trade [] differently" after those disclosures. *See* Dkt 54, at 28. To the extent the Sub-Class Plaintiffs' trading behavior did not change, that behavior is consistent with plaintiffs' fraud claims – i.e., that defendants concealed the material information that would have changed plaintiffs' trading behavior and therefore plaintiffs continued to use the Platform in detrimental reliance on defendants' misrepresentations regarding the Platform's tiebreaking rules and the confidentiality of transaction information.

"strict FIFO" system and because plaintiffs' "lack of diligence [was] also objectively unreasonable."[90] The Court already has rejected defendants' first argument because plaintiffs' fraud claims do not rely on any belief that the Platform used a "strict FIFO" tiebreaking procedure. Furthermore, plaintiffs' claims are not defeated by a lack of diligence. The alleged misrepresented facts were peculiarly within the knowledge of the defendants and therefore it was objectively reasonable for plaintiffs to rely on defendants' public representations.[91] Accordingly, plaintiffs sufficiently pleaded reasonable reliance on the alleged misrepresentations and omissions of material fact.

### C.    *Out-of-Pocket Losses*

Defendants contend that plaintiffs' fraud claims fail also because plaintiffs do not allege any "out-of-pocket" loss – and therefore any injury – caused by defendants' alleged misrepresentations or omissions.[92]

Under the "out-of-pocket" rule, fraud claims may compensate a plaintiff only "for what was lost because of the fraud, not . . . for what might have been gained."[93] Thus, damages for

---

[90]

Dkt 73, at 14.

[91]

*See Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) (quoting *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03-cv-3748, 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006)) ("[E]ven a sophisticated party may rely on the representations of another where the facts misrepresented were 'peculiarly within the Defendants' knowledge.'").

[92]

*See* Dkt 54, at 30-31.

[93]

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-cv-7372 (LJL), 2020 WL 5518146, at *98 (S.D.N.Y. Sept. 14, 2020) (citing *Lama Holding Co. v. Smith Barney Inc.*,

22

fraud claims are determined by calculating the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain."[94] The rule requires plaintiffs to show that defendants' misrepresentations or omissions "directly and proximately caused" their losses.[95]

The amended complaint alleges multiple theories of harm that support a plausible inference that plaintiffs suffered out-of-pocket losses. Plaintiffs allege that State Street "often gave itself priority over limit orders [submitted by plaintiffs], even though State Street's competing quote was at a *worse* price."[96] In such circumstances, plaintiffs would have suffered out-of-pocket losses that can be calculated by the difference between the price plaintiffs received from State Street and the "top of book" price that they otherwise would have received from another Platform user but-for State Street's self-prioritization. Furthermore, plaintiffs allege that the Trading-Defendants-always-win rule artificially widened bid-ask spreads across the Platform such that plaintiffs paid higher prices for FX trades when buying (and received lower prices when selling) than they otherwise would have in the absence of fraud.[97] Accordingly, plaintiffs' allegations raise a plausible inference that they suffered out-of-pocket losses and plaintiffs' fraud claims are well pled.

---

[94]   668 N.E.2d 1370, 1374 (N.Y. 1996)).

[95]   *Glob. Granite Sales Corp. v. Sabovic*, 166 A.D.3d 587, 589 (N.Y. App. Div. 2018).

       *See Seagrape Invs. LLC v. Tuzman*, No. 19-cv-9736 (RA), 2020 WL 5751232, at *17 (S.D.N.Y. Sept. 25, 2020) (citing *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 775 (S.D.N.Y. 2011)); *Laub v. Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534, 537 (N.Y. App. Div. 1st Dep't 2002).

[96]   AC ¶ 110 (emphasis in original).

[97]   AC ¶¶ 153-57.

23

II.      *Conspiracy to Defraud and Aiding and Abetting Fraud*

Plaintiffs bring claims for conspiracy to defraud against all defendants as well as claims for aiding and abetting fraud against the Trading Defendants. Defendants move to dismiss these claims on four grounds, all of which are without merit.

*First*, defendants argue that plaintiffs have not pleaded adequately an underlying fraud claim and thus their conspiracy and aiding and abetting claims also must fail.[98] The Court already has concluded that plaintiffs' fraud claims are well pled and defendants' argument therefore fails at the gate.

*Second*, defendants argue that plaintiffs have not pleaded sufficient facts showing that the Trading Defendants had "actual knowledge" of Currenex's alleged fraud. To be liable for acting in concert with a primary tortfeasor (i.e., Currenex) under a theory of either conspiracy or aiding and abetting, the secondary tortfeasors (i.e., the Trading Defendants) "must know the wrongful nature of the primary actor's conduct."[99] The amended complaint contains ample allegations that senior personnel at each of the Trading Defendants negotiated their secret privileges directly with Currenex, "often over dinners and lunches," and that the Trading Defendants knowingly concealed those secret agreements from the marketplace.[100] For example, plaintiffs claim that at dinners

---

[98]

Dkt 54, at 34-35.

[99]

*Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (citing *National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 147 (App. Div. 1st Dep't); *see also Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 62 (2d Cir. 2012) (quoting *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009)) (aiding and abetting a fraud "require[s] the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance").

[100]

*See* AC ¶¶ 105, 143-50, 246-48, 253-56.

attended by senior personnel of Currenex and HC Tech, they "would often make a point to only allude to the super-priority scheme (rather than discuss it expressly) because both knew of its illicit nature."[101] Accordingly, the amended complaint pleads sufficient facts to support a strong inference that the Trading Defendants had actual knowledge of Currenex's alleged fraud.

  *Third*, defendants argue that plaintiffs' aiding and abetting claim must be dismissed because the amended complaint does not plead plausibly that the Trading Defendants "substantially assisted" Currenex in furtherance of the alleged fraud.[102] To state a claim for aiding and abetting fraud, a plaintiff must allege, *inter alia*, "that the defendant provided substantial assistance to advance the fraud's commission."[103] The "substantial assistance" element requires plaintiffs to show that the Trading Defendants' participation was the proximate cause of their injury.[104] Such substantial assistance "can take many forms," including "[e]xecuting transactions, even ordinary course transactions, [which] can constitute substantial assistance . . . where there is an extraordinary economic motivation to aid in the fraud."[105] In this case, Currenex allegedly defrauded plaintiffs by providing the Trading Defendants with secret privileges on the Platform and making alleged misrepresentations or omissions of material fact relating to those privileges. The Trading

---

101

  *See* AC ¶ 105.

102

  Dkt 54, at 36.

103

  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)).

104

  *Silvercreek Mgmt. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (citing *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003)).

105

  *See Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).

Defendants' execution of FX trades on the Platform was the proximate and but-for cause of plaintiffs' alleged injuries, which flowed directly from Currenex's allegedly fraudulent conduct. In other words, there was "an extraordinary economic motivation" for the Trading Defendants to aid in the fraud by taking advantage of their secret Platform privileges, executing FX transactions on the basis of those privileges, and keeping their arrangements with Currenex secret from plaintiffs. At the pleading stage, such allegations are sufficient to raise a plausible inference that the Trading Defendants provided substantial assistance to advance the fraud's commission.

*Fourth*, and finally, defendants contend that plaintiffs' claim for conspiracy to defraud is not pleaded adequately "because Plaintiffs do not allege a sufficient linkage among the Trading Defendants and Currenex to defraud Plaintiffs."[106] To state their claim for conspiracy to defraud, plaintiffs must allege: (1) "an agreement between two or more parties," (2) "an overt act in furtherance of the agreement," (3) "the parties' intentional participation in the furtherance of a plan or purpose," and (4) "resulting damage or injury."[107] As discussed in more detail below, plaintiffs plausibly plead the existence of multiple conspiracies between Currenex and each of the Trading Defendants. Plaintiffs identify senior personnel at Currenex and each of the Trading Defendants that were involved in the negotiation of the secret agreements to defraud plaintiffs and the concealment of those agreements. The amended complaint alleges also that each Trading Defendant acted in furtherance of the conspiracy by using its secret privileges to execute FX trades

---

[106]    Dkt 54, at 35.

[107]    *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 191 (S.D.N.Y. 2021) (quoting *Cohen Bros. Realty Corp. v. Mapes*, 181 A.D.3d 401, 404 (App. Div. 1st Dep't 2020)).

26

to plaintiffs' detriment.   Accordingly, the amended complaint plausibly pleads all elements of plaintiffs' conspiracy claim.

## III.   Antitrust Claims

Plaintiffs allege both horizontal and vertical conspiracies in violation of Section 1 of the Sherman Act.   Whereas horizontal agreements to fix prices involve "coordination 'between competitors at the same level of [a] market structure,'" vertical agreements on pricing "are created between parties 'at different levels of [a] market structure.'"[108]   For the reasons set forth below, plaintiffs have presented a plausible claim of a vertical, but not a horizontal, antitrust conspiracy.

### A.   Per Se Antitrust Violation

Plaintiffs claim to have alleged a "bid-rigging scheme," which would constitute a *per se* violation of the Sherman Act.[109]   Bid-rigging is "a species" of horizontal price fixing among competitors.[110]   But the structure of the alleged secret agreements is plainly vertical.   Each agreement relates to special privileges granted by the Platform operator (i.e., Currenex) to certain

---

108

   *United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir.2012)).

109

   *See* Dkt 64, at 29.

110

   *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 521 (S.D.N.Y. 2013); *see also Philip Morris Inc. v. Heinrich*, No. 95-cv-328 (LMM), 1996 WL 363156, at *9 (S.D.N.Y. June 28, 1996) ("Courts have specifically classified bid-rigging as a form of price fixing that constitutes a per se violation.").

users of the Platform – entities operating "at different levels of [a] market structure."[111]  There are no allegations that any of the Trading Defendants coordinated among themselves on how they would operate in the marketplace.  Indeed, accepting the plaintiffs' allegations as true, there is no basis to conclude that one Trading Defendant, such as Goldman Sachs, even was aware of the alleged secret privileges granted to another Trading Defendant, like HC Tech.  Rather, plaintiffs allege several unconnected vertical agreements between Currenex and each of the Trading Defendants to provide the latter with secret privileges on the Platform to attract liquidity to the Platform.[112]

Plaintiffs essentially argue that following State Street's acquisition of Currenex there was a "complete unity of interest" between the two companies such that they must be viewed as a single enterprise.[113]  Plaintiffs claim that, following the acquisition, State Street became a party to the secret Currenex-HC Tech agreement as well as the Currenex-Goldman Sachs agreement, thereby converting the vertical agreements into horizontal agreements between State Street and each of the other Trading Defendants.[114]  This hub-and-spoke theory fails because it "is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other."[115]  Accordingly, plaintiffs fail to plead a plausible *per se* violation of the Sherman Act.

---

[111]        *See Apple, Inc.*, 791 F.3d at 313 (alteration in original).

[112]        *See, e.g.*, AC ¶ 105.

[113]        AC ¶ 270; Dkt 64, at 30.

[114]        AC ¶ 271; *see also* Dkt 64, at 30-31.

[115]        *See In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016).

*B.*     *Rule of Reason Violation*

Plaintiffs alternatively argue that they plausibly plead a vertical price-fixing arrangement.[116] Vertical restraints on trade are evaluated according to the "rule of reason."[117] Under that analysis, plaintiffs bear the burden at the pleading stage of "showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market."[118]

To state a legally sufficient claim under the rule of reason, plaintiffs must "(1) define the relevant market, (2) allege an antitrust injury, and (3) allege conduct in violation of the antitrust laws."[119]   Plaintiffs must allege facts which, assuming their truth and drawing from them all reasonable and favorable inferences, would suffice to permit a finding of relevant market or markets and an antitrust injury.  To satisfy the requirement of pleading conduct in violation of the antitrust laws, they must allege also the concerted action essential to stating a Sherman Act Section 1 claim, which they have done – alleging that defendants' secret agreements violated the antitrust laws – and which defendants do not dispute.

---

[116]     AC ¶¶ 185-199; Dkt 64, at 35.

[117]     *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881 (2007).

[118]     *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021).

[119]     *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (internal citation omitted).

1.    *The Relevant Market*

A plaintiff bringing a claim under the rule of reason must plead facts that plausibly support its proposed definition of the relevant market.[120]  A relevant market has two components: a relevant product and a relevant geographic scope.[121]  The boundaries of the alleged product market must be rationally related to an "analysis of the interchangeability of use or the cross-elasticity of demand."[122]  A geographic market is normally the geographic "area of effective competition," which courts measure "by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."[123]  Market definition is a "deeply fact-intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market."[124]  This Court nonetheless should dismiss plaintiffs' claims if their proposed market definition is not plausible.

Plaintiffs claim that the relevant market is "that for electronic platforms that use a limit-order book style of matching to execute FX spot trades (the 'ECN FX Market')," which they allege "is not reasonably interchangeable with other forms of FX trading."[125]  The Currenex Platform

---

[120]

    *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018).

[121]

    *Concord Assocs.*, 817 F.3d at 52 (citing *Bayer Schering Pharma AG v. Sandoz*, Inc., 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)).

[122]

    *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal citation omitted).

[123]

    *Concord Assocs.*, 817 F.3d at 53 (internal citations omitted).

[124]

    *Todd*, 275 F.3d at 199 (internal citation omitted).

[125]

    AC ¶ 186.

30

has approximately a 25 percent market share in the ECN FX Market.[126]  Defendants argue that plaintiffs' antitrust claims should be dismissed because they propose an "overly narrow" definition of the relevant market, which "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor."[127]  But plaintiffs allege several reasons why the ECN FX Market is not interchangeable with other forms of FX trading, like OTC or bilateral trading channels, including anonymity, the ability to act as a liquidity provider, access to a wider and more diverse range of counterparties, and operational simplicity.[128]  Drawing all reasonable inferences in their favor, plaintiffs have proposed a plausible market definition.

### 2.    Antitrust Injury

Defendants argue also that plaintiffs have failed to plead antitrust injury and thus lack antitrust standing.  Courts evaluating antitrust standing must determine that a plaintiff plausibly has alleged (a) antitrust injury, (b) injury in fact, and (c) that it is an acceptable plaintiff to pursue the violation, or, in other words, that it would be an efficient enforcer of the antitrust laws.[129]

---

[126]      AC ¶ 192.

[127]      Dkt 54, at 16 (quoting *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 346 (S.D.N.Y. 2009)).

[128]      AC ¶ 187.

[129]      See *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983).

Defendants do not challenge whether plaintiffs are "efficient enforcers" of the antitrust laws and therefore the Court does not address it.

In deciding whether the plaintiff has pleaded antitrust injury, the Second Circuit requires that we

> "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury. First, the party asserting that it has been injured by an illegal anticompetitive practice must 'identify[] the practice complained of and the reasons such a practice is or might be anticompetitive.' *Port Dock* [*& Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007)]. Next, we identify the 'actual injury the plaintiff alleges.' *Id.* This requires us to look to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977). Finally, we 'compar[e]' the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.' *Port Dock*, 507 F.3d at 122. It is not enough for the actual injury to be 'causally linked' to the asserted violation. *Brunswick*, 429 U.S. at 489 . . . . Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.' *Daniel* [*v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)] (internal quotation marks omitted)."[130]

Defendants contend that plaintiffs "offer only hypothetical examples of injury" and therefore "fail to plead concrete and particularized harm."[131]

In the amended complaint, plaintiffs claim that they paid supracompetitive prices for FX transactions because the Trading-Defendants-always-win rule and the administrator-access practices distorted competition on the Platform, impacting spreads and execution costs.[132] In other words, plaintiffs allege they paid too much when buying and received too little when selling due to defendants' anticompetitive conduct, which widened spreads.[133] Such injury is "of the type the

---

[130]

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

[131]

Dkt 54, at 18.

[132]

See AC ¶ 276.

[133]

See AC ¶ 10.

32

antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[134] Thus, plaintiffs have pleaded a sufficiently plausible antitrust injury.

Defendants implicitly argue also that plaintiffs failed to plead a plausible injury in fact.[135] To the contrary, plaintiffs plausibly plead that defendants' anticompetitive conduct had a continuous effect of widening spreads, such that they were harmed by supracompetitive prices every time they traded on the Platform during the class period.[136] Plaintiffs allege that they "often traded" on the Currenex Platform during the class period and thus were harmed.[137] Accordingly, the Court determines that plaintiffs plausibly have pleaded adverse effects in the relevant market and injuries in fact.

For the foregoing reasons, the Court finds that plaintiffs have presented a plausible claim of a vertical conspiracy under Section 1 of the Sherman Act and defendants' motion to dismiss plaintiffs' antitrust claims is denied.

---

134

    *Brunswick*, 429 U.S. at 489.

135

    *See* Dkt 54, at 18-20.

136

    AC ¶ 157 ("[W]henever Plaintiffs and class members acted as the liquidity taker on a transaction, they paid artificially high prices (when buying) and received artificially low prices (when selling) every time they traded on the Platform.")

137

    AC ¶ 3 ("Plaintiffs and class members often traded" on the Currenex Platform).

*IV.*     *RICO Claims*

      Plaintiffs assert two RICO claims against all named defendants: a substantive RICO violation predicated on a pattern of mail or wire fraud and a conspiracy to violate the RICO Act. 18 U.S.C. § 1962(c) makes it unlawful:

> "[F]or any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[138]

It is unlawful also "for any person to conspire to violate [Section 1962(c)]."[139]

      "Racketeering activity" includes violations of the mail or wire fraud statutes,[140] which make it unlawful for anyone "having devised or intending to devise any scheme or artifice to defraud" to use the mail or any interstate wire, radio, or television communication "for the purpose of executing such scheme or artifice."[141]

      An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal

---

[138]

    18 U.S.C. § 1962(c).

[139]

    18 U.S.C. § 1962(d).

[140]

    *See id.* § 1961(1)(B) (incorporating by reference 18 U.S.C. §§ 1341, 1343).

[141]

    *See id.* §§ 1341, 1343.

34

entity."[142]  A "pattern" of racketeering activity requires at least two acts of racketeering activity to have been committed within ten years of one another.[143]

To state a claim for a violation of RICO, a plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."[144]

Defendants move to dismiss plaintiffs' RICO claims on three grounds: (1) plaintiffs' allegations do not establish "association-in-fact" enterprises, (2) plaintiffs do not allege a "pattern" of mail or wire fraud, and (3) plaintiffs do not allege adequately a RICO conspiracy.[145]  The Court addresses each of these arguments in turn.

### A.      Association-in-Fact Enterprises

"[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."[146]  Such an enterprise "must have a 'structure' exhibiting three features: a purpose, relationships among the individuals associated with the enterprise, and longevity sufficient

---

[142]      *Id.* § 1961(4).

[143]      *Id.* § 1961(5).

[144]      *Town of West Hartford*, 915 F.2d at 100 (quoting 18 U.S.C. § 1962(a)-(c) (1976)).

[145]      *See* Dkt 54, at 40-48.

[146]      *Boyle v. United States*, 556 U.S. 938, 948 (2009).

to permit the associates to pursue the purpose of the enterprise."[147]  "'[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'"[148]

Plaintiffs allege the existence of three association-in-fact enterprises: (i) a "Currenex-HC Tech Enterprise," (ii) a "Currenex-Goldman Enterprise," and (iii) a "Currenex-State Street Enterprise."[149]  Defendants assert that, with respect to all three enterprises, the amended complaint fails to allege either a common purpose or a sufficient relationship between the alleged RICO enterprise participants.[150]  The Court disagrees.

Each of the three structural requirements for an association-in-fact enterprise is satisfied.  The amended complaint alleges that the "purpose of each enterprise was to steer non-privileged customers into trading at worse prices, through the grant of secret advantages to benefit the privileged liquidity providers at the expense of other traders on the platform."[151]  The common purpose of the alleged enterprises was to increase profits for all enterprise participants by secretly steering business away from plaintiffs to the Trading Defendants, resulting in "illicit trading

---

[147]
    *Elsvier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 305-06 (S.D.N.Y. 2010).

[148]
    *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *First Capital Asset Mgmt., Inc.*, 385 F.3d at 174); *see also Elsevier Inc.*, 692 F. Supp. 2d at 306-07 (discussing the "relationship requirement" for an association-in-fact).

[149]
    AC ¶¶ 294-96.  Plaintiffs allege that State Street also is associated with the Currenex-Goldman Enterprise and the Currenex-HC Tech Enterprise by virtue of State Street's unity of interest with Currenex after the acquisition.  *See id.*

[150]
    *See* Dkt 54, at 41.

[151]
    AC ¶ 297.

36

profits" for the Trading Defendants and "a more-successful Platform and thus higher fees" for Currenex.[152] This is sufficient to satisfy the first of the three structural requirements.

The amended complaint alleges also that the participants in each of the three enterprises associated with one another at least by secretly agreeing to provide the Trading Defendants with special privileges on the Platform.[153] This satisfies the second structural requirement.

Finally, with respect to the longevity of the enterprises, which defendants do not contest, the amended complaint alleges that the illicit activities underpinning the enterprises were ongoing during the duration of the class period.[154] The amended complaint thus sufficiently alleges that defendants formed RICO enterprises.

B.      *Pattern of Mail or Wire Fraud*

Defendants challenge plaintiffs' RICO claims on the additional basis that plaintiffs fail to allege a pattern of racketeering.

The mail and wire fraud statutes prohibit any use of the mails or interstate or foreign wires in furtherance of any fraudulent scheme.  There are three elements of a mail or wire fraud violation: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use

---

[152]     AC ¶ 297.

[153]     See AC ¶¶ 297-99.

[154]     *See* AC ¶¶ 104, 214.

of the wires [or mails] to further the scheme."[155]  Because the predicate acts alleged in the amended complaint are mail and wire fraud, plaintiffs' RICO claims are subject to the heightened pleading standard under Rule 9(b).[156]  Accordingly, a RICO plaintiff "must plead the alleged mail [or wire] fraud with particularity, and establish that the mailings [or wire communications] were in furtherance of a fraudulent scheme."[157]

Defendants argue that plaintiffs' RICO claims must be dismissed because they fail to allege with the necessary particularity that each of the defendants engaged in a "pattern" of mail or wire fraud.[158]  Defendants contend also that the RICO claims fail as to HC Tech and Goldman because the amended complaint does not allege any use of the mails or wires by them.[159]  Defendants' argument is without merit.

---

[155]

*See Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 137 (2d Cir. 2018).

[156]

*See, e.g., Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999).

[157]

*Lundy*, 711 F.3d at 119 (citing *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992)).

[158]

*See* Dkt 54, at 45-47 (citing *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013)).

Defendants argue also that because plaintiffs failed to plead common law fraud, they have failed also to plead *wire* fraud.  This argument fails in view of the Court's conclusion above that plaintiffs adequately pleaded their fraud claims.

[159]

Dkt 54, at 46.

The amended complaint alleges that each defendant conspired to defraud plaintiffs and reasonably knew that the mails or wires would be used in furtherance of that scheme.[160]  It alleges also several specific misrepresentations and omissions of material fact, such as those contained in the 2015 Disclosures and the Revised 2015 Disclosures, that were disseminated using the mails and wires and were made in furtherance of the RICO enterprises' scheme to defraud plaintiffs.  There is no requirement that every participant in a RICO enterprise predicated on mail or wire fraud must use the mails or wires.[161] It is sufficient that plaintiffs specifically pleaded multiple uses of the mails and wires by Currenex and State Street and that HC Tech and Goldman "knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme."[162]  Accordingly, plaintiffs plausibly plead a pattern of mail or wire fraud sufficient to survive defendants' motion to dismiss.

---

[160]

*See* AC ¶ 309.

[161]

*See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249-50 (S.D.N.Y. 2012) ("scheme to defraud" has been construed liberally; "[t]here is no requirement that the defendant him or herself use the mails").

[162]

*See* AC ¶¶ 306-08; *see also United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986) ("sufficient that appellants knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme"); *United States v. Bortnovsky*, 879 F.2d 30, 39 (2d Cir.1989) ("defendant need not actually intend, agree to or even know of a specific mailing to 'cause' mail to be sent as long as he or she 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen'" (internal quotation marks and citation omitted)).

C.      *RICO Conspiracy*

Defendants next argue that plaintiffs have failed to state a claim for a Section 1962(d) RICO conspiracy because the amended complaint does not allege the existence of an agreement to violate RICO's substantive provisions.[163]

"The core of a RICO conspiracy is an agreement to commit predicate acts, and a RICO civil conspiracy complaint must specifically allege such an agreement."[164]  Allegations of a conspiracy:

> "must set forth specific facts tending to show that each of the defendants entered into an agreement to conduct the affairs of a particular, identified enterprise through a pattern of racketeering activity – not simply that each defendant committed two or more acts that would qualify as predicate acts, without regard to whether those acts were committed in furtherance of the activity of the enterprise."[165]

In this case, plaintiffs allege that Currenex and each of the Trading Defendants negotiated, agreed to, and carried out the scheme to provide the Trading Defendants with secret privileges on the Platform to ensure they supplied "a steady stream of liquidity."[166]  Plaintiffs allege that defendants knew that the mails and wires were being used to advance the overall purpose of executing the scheme to defraud by way of misrepresentations or omissions of material fact to plaintiffs, as well as by reasonably foreseeable use of the mails and wire to "transmit[] and request[]

---

[163]

See Dkt 54, at 47 (citing *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020)).

[164]

*Elsevier Inc.*, 692 F. Supp. 2d at 313 (citing *Hecht*, 897 F.2d at 25).

[165]

*Id.* (emphasis omitted).

[166]

See AC ¶ 105.

40

the execution of various trades."[167]   The amended complaint identifies specific individuals at

Currenex, State Street, Goldman, and HC Tech that allegedly negotiated and implemented the secret

agreements, "often over dinners and lunches in major cities like Chicago and New York."[168]   These

allegations amount to a plausible claim that the defendants were part of the three alleged RICO

conspiracies.   Accordingly, plaintiffs' RICO conspiracy claims also are sustained against the

defendants.[169]

## V.    *Breach of Implied Covenant of Good Faith and Fair Dealing*

Edmar and IBG bring claims for breach of the implied covenant of good faith and

fair dealing against Currenex on behalf of the "New York Subclass," which is said to consist of all

Platform users "who (1) traded on, provided liquidity for, or otherwise attempted to transact FX spot

trades on [the Platform] from January 1, 2005 to August 4, 2021, and (2) entered into agreements

with Currenex regarding such trading that are governed by New York law."[170]   The amended

---

[167]

AC ¶ 309.

[168]

*See* AC ¶¶ 103, 105, 107, 126.

[169]

In a footnote within the RICO conspiracy section of defendants' merits brief, defendants bury an entirely separate extra-territoriality argument seeking dismissal of XTX's RICO claims because it "is located in England and therefore traded outside the United States." Dkt 54, at 48 n.27. "It is well settled, however, that a court need not consider arguments relegated to footnotes[.]" *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014). In all events, the amended complaint states a plausible domestic RICO claim and the Court is not now in a position to dismiss XTX's RICO claims as extraterritorial.

[170]

*See* AC ¶¶ 215, 325-330.

41

complaint alleges that the New York Subclass entered into binding contracts with Currenex in connection with their use of the Currenex Platform.[171]

> "[I]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. . . .  Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included. This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[172]

Currenex argues that plaintiffs' claims for breach of the implied covenant of good faith and fair dealing fail because the agreements signed by the New York Subclass "expressly disclaimed them."[173]  Currenex's contracts with Edmar and IBG each provide in pertinent part:

> "Currenex hereby specifically disclaims, overrides and excludes, to the fullest extent permitted by law, all implied warranties of merchantability, satisfactory quality, fitness for a particular purpose and all other warranties, conditions, other contractual terms, representations, indemnities and guarantees with respect to the Services, whether express, implied or statutory, arising by law, custom, . . . or otherwise."[174]

---

[171]

   *See* AC ¶ 326.

[172]

   *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (internal quotation marks and citations omitted); *see also Skillgames, LLC v. Brody*, 1 A.D.3d 247, 252 (N.Y. App. Div. 1st Dept. 2003) ("Implicit in every contract is a promise of good faith and fair dealing, which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." (internal quotation marks and citations omitted)).

[173]

   Dkt 54, at 34.

[174]

   *See* Weiner Decl. Ex. A § 15(a); *id.* Ex. B § 15(a).

42

The Court concludes that – in these provisions – plaintiffs "expressly disclaimed" any implied covenant of good faith and fair dealing and thereby expressly waived any implied covenant claim.[175] Accordingly, plaintiffs' implied covenant claims will be dismissed.

## VI.    *Tortious Interference with Contract*

Edmar and IBG assert also claims for tortious interference with contract against the Trading Defendants on behalf of the New York Subclass.

To state a claim for tortious interference with contract, plaintiffs must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."[176]

The Court already has held that plaintiffs have not pleaded a plausible claim for breach of the implied covenant of good faith and fair dealing. It is uncontested that plaintiffs do not allege any other breach of their contracts with Currenex. Plaintiffs thus fail to allege an actual breach of contract that could support their claims for tortious interference by the Trading

---

[175]    *See Emigrant Bank v. SunTrust Bank,* No. 20-cv-2391 (PGG), 2023 WL 2647648, at *18 (S.D.N.Y. Mar. 27, 2023); *see also Commerzbank AG v. U.S. Bank Nat'l Ass'n.,* 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017); *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-cv-10116 (KBF), 2016 WL 1169515, at *10 (S.D.N.Y. Mar. 22, 2016).

[176]    *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (internal quotation marks omitted).

43

Defendants.   Accordingly, plaintiffs' claims for tortious interference with contract will be dismissed.[177]

VII.     *Tortious Interference with Prospective Economic Advantage*

Plaintiffs bring claims for tortious interference with prospective economic advantage against all defendants.

To state such a claim, plaintiffs must allege that (1) they had a business relationship with a third party, (2) defendants knew of that relationship and intentionally interfered with it, (3) defendants acted solely out of malice, or used dishonest, unfair, or improper means, and (4) defendants' interference caused injury to the relationship.[178]

Defendants argue that plaintiffs fail to allege the first element because they do not identify any "*specific* third party" relationship with which defendants allegedly interfered.[179] Instead, plaintiffs generally allege that they had business relationships with "other users of the Currenex Platform."[180] Plaintiffs counter that they are not required to plead specific Platform users with which they would have traded but for defendants' alleged misconduct, particularly because the

---

[177]

    *See D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) (per curiam) ("Because there was no breach of contract in the instant case, [plaintiff's] tortious interference with contractual relations claim must fail.").

[178]

    *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir.2008)).

[179]

    Dkt 54, at 38-39 (quoting *POSCO Energy Co. v. FuelCell Energy, Inc.*, No. 20-cv-7509 (MKV), 2021 WL 4224956, at *9 (S.D.N.Y. Sept. 16, 2021) (emphasis in original)).

[180]

    AC ¶ 320.

44

identities of such third parties are known only to defendants and will be identified in discovery.[181]
Yet courts in this district have rejected that same argument, holding that "where a party cannot
identify specific third party relationships that were disrupted, a tortious interference claim cannot
lie."[182] This Court concurs. Accordingly, because plaintiffs have not identified any specific third
party relationships with which defendants allegedly interfered, plaintiffs' claims for tortious
interference with prospective economic advantage will be dismissed.

## VIII.    *N.Y. General Business Law § 349 Claims*

Plaintiffs allege that Currenex and State Street violated New York's Consumer
Protection Act, N.Y. Gen. Bus. Law § 349.

Section 349(a) declares unlawful all "[d]eceptive acts or practices in the conduct of
any business, trade or commerce or in the furnishing of any service" in the state of New York.[183]
To state a claim under Section 349, plaintiffs must allege: (1) the defendants' conduct was
consumer-oriented, (2) the defendants' act or practice was deceptive or misleading in a material

---

181

    Dkt 64, at 52-53.

182

    *See Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, No. 16-cv-9918 (ER),
2018 WL 1027754, at *5 (S.D.N.Y. Feb. 20, 2018) (collecting cases); *see also Evliyaoglu
Tekstil A.S. v. Turko Textile LLC*, No. 19-cv-10769 (LJL), 2020 WL 7774377, at *2
(S.D.N.Y. Dec. 30, 2020) (same). *Cf. POSCO Energy Co. v. FuelCell Energy, Inc.*, No.
20-cv-7509 (MKV), 2021 WL 4224956, at *9 (S.D.N.Y. Sept. 16, 2021) (rejecting plaintiff's
argument that trading on securities exchanges "definitionally [] involves anonymous
third-party purchasers" because "[t]here is no general exemption to the identification
requirement for securities trading").

183

    N.Y. Gen. Bus. Law § 349.

45

way, and (3) plaintiffs suffered an injury as a result of the deception.[184]  "[A]s a threshold matter, plaintiffs claiming the benefit of section 349 – whether individuals or entities – must charge conduct of the defendant that is consumer-oriented."[185]

Defendants cite to multiple cases from this district for the proposition that FX trading is not consumer-oriented conduct and therefore cannot serve as the basis for a Section 349 claim.[186] Yet those decisions relied on interpretations of New York law that were overruled by the New York Court of Appeals in *Himmelstein, McConnel, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*[187]

Prior to *Himmelstein*, New York courts limited "consumers" for the purposes of Section 349 to those "who purchase goods and services for personal, family, or household use"[188] and excluded "[t]ransactions between businesses or sophisticated parties that do not affect average

---

[184]

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176 (2021) (citing N.Y. Gen. Bus. Law § 349(h); *Plavin v. Group Health Inc.*, 35 N.Y.3d 1, 10 (2020)).

[185]

*Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 241 (S.D.N.Y. 2019).

[186]

*See Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 241 (S.D.N.Y. 2019) ("[F]orex trading is not consumer-oriented conduct."); *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) ("Electronic FX trading is not consumer-oriented conduct.").

[187]

37 N.Y.3d 169 (2021).

[188]

*See Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 176-77 (2021) (quoting *Himmelstein v. Matthew Bender & Co. Inc.*, No. 650932/2017, 2018 WL 984850, at *5 (N.Y. Sup. Ct. Feb. 06, 2018)).

46

consumers."[189]   New York courts held also that investment transactions, such as securities transactions, were not consumer-oriented because "individuals do not generally purchase securities in the same manner as traditional consumer products."[190]  Accordingly, based on the then prevailing interpretation of Section 349 by New York's appellate courts, courts in this district soundly determined that FX trading was not consumer-oriented conduct because "[i]ndividuals do not trade FX the way they purchase traditional consumer products" and FX is traded "as investments, not as goods to be 'consumed' or 'used.'"[191]

In *Himmelstein*, the New York high court clarified "there is no textual support in General Business Law § 349 for a limitation on the definition of 'consumer' based on use" and rejected such a reading as "contrary to the legislative intent to protect the public against all forms of deceptive business practices."[192] The Court of Appeals held that the "consumer-oriented element" did not depend on the use of a good or service – i.e., whether the good or service was for personal use or business use – nor did it require that the good or service "be directed to *all* members of the public."[193]  Rather, "what matters is whether the defendant's allegedly deceptive act or practice is

---

[189]

*Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) (collecting cases).

[190]

*Gray v. Seaboard Sec., Inc.*, 14 A.D.3d 852 (App. Div. 3d Dep't 2005).

[191]

*Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) (quoting *Gray*, 788 N.Y.S.2d at 472).

[192]

*Himmelstein*, 37 N.Y.3d at 177.

[193]

*Id.* at 178 (quoting *Plavin*, 35 N.Y.3d at 13).

47

directed to the consuming public and the marketplace."[194]  In holding that the defendant's allegedly deceptive acts were consumer-oriented, the *Himmelstein* court emphasized that the defendant "relie[d] on a form contract with its customers" and that the defendant's allegedly deceptive business practices applied to all of defendant's customers and not the narrow subset of customers that were before the court.[195]

In this case, Currenex and State Street furnished a service in the state of New York in the form of an electronic FX trading platform.  In doing so, Currenex entered into form contracts with Platform users for the services.[196]  Currenex and State Street's allegedly deceptive business practices affected all Platform users alike, with the exception of the few Platform users that allegedly conspired with Currenex and State Street to manipulate the Platform's FX marketplace.[197] Thus, plaintiffs plausibly plead that Currenex and State Street's conduct was consumer-oriented. [198] For the reasons already articulated with respect to plaintiffs' common law fraud claims, plaintiffs

---

[194]   *Id.* at 178.

[195]   *Id.*

[196]   *See, e.g.*, Weiner Decl. Ex. A; *id.* Ex. B.

[197]   *See, e.g.*, AC ¶ 218.

[198]   Defendants cite two post-*Himmelstein* cases from this district that, according to defendants, hold that Section 349 does not apply to (i) securities or commodities investments or (ii) transactions between businesses or sophisticated parties that do not affect average consumers.  Dkt 73, at 27-28 (citing *In re Tether & Bitfinex Crypto Asset Litig.*, No. 19-cv-9236 (KPF), 2021 WL 4452181, at *51 n.54 (S.D.N.Y. Sept. 28, 2021); *Northwell Health, Inc. v. Illinois Union Ins. Co.*, No. 20-cv-6893 (LTS) (OTW), 2022 WL 912929, at *9 (S.D.N.Y. Mar. 29, 2022)).  Defendants overstate the holdings of those cases, citing to dicta in both instances.  Nevertheless, to the extent those decisions so hold, this Court respectfully disagrees for the reasons set forth above.

48

sufficiently allege also that the defendants' acts were "deceptive or misleading in a material way" and that plaintiffs "suffered an injury as a result of the deception."[199]   Accordingly, plaintiffs' Section 349 claims are sustained against defendants Currenex and State Street.

IX.    *Unjust Enrichment Claims*

Plaintiffs assert unjust enrichment claims against all named defendants, alleging that Currenex was enriched unjustly by way of "ill-gotten fees" paid by plaintiffs, while the Trading Defendants allegedly were enriched unjustly by overcharging plaintiffs on FX transactions.[200]

To state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"[201]   "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"[202]   Accordingly, "courts require proof that the defendant received a 'specific and direct benefit' from the property

---

[199]    *Himmelstein*, 37 N.Y.3d at 176.

[200]    *See* AC ¶¶ 282-87 (claim against Currenex); 288-91 (claims against Trading Defendants).

[201]    *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481 (App. Div. 2d Dep't 2004); *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629 (App. Div. 3d Dep't 2007)).

[202]    *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 574 (S.D.N.Y. 2016) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

sought to be recovered, rather than an 'indirect benefit,'"[203] which in turn requires that a plaintiff allege some kind of relationship or connection to that defendant.[204]

Defendants move to dismiss the unjust enrichment claims on several grounds. First, they argue that plaintiffs' contracts with Currenex cover the subject matter of their unjust enrichment claims and therefore preclude their claims.[205] That is so, defendants claim, because plaintiffs paid the allegedly improper transaction fees to Currenex pursuant to their contracts therewith.[206] Yet a contract will displace an unjust enrichment claim only if the subject matter of the dispute is within the scope of the agreement.[207] As defendants acknowledge, the alleged

---

[203]

 *Id.* (quoting *Kaye*, 202 F.3d at 616).

[204]

 *See Mandarin Trading Ltd.*, 16 N.Y.3d at 182; *see also FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *16 ("While a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, there must exist a relationship or connection between the parties that is not too attenuated." (quoting *Georgia Malone & Co.*, 19 N.Y.3d at 516) (internal quotation marks omitted)).

[205]

 Dkt 54, at 49.

[206]

 Dkt 54, at 49-50; *see also ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1333-34 (S.D.N.Y. 1997) ("Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists. . . . This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." (internal citations omitted)).

[207]

 *See Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 433 (S.D.N.Y. 2020) (emphasis in original) ("A valid contract defines the obligations of the parties as to *matters within its scope*, displacing to that extent any inquiry into unjust enrichment." (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2 (2011)); *see also Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter"); *Murray Eng'g P.C. v. Remke*, No. 17-cv-6267, 2018 WL 3773991, at *11 (S.D.N.Y. Aug. 9, 2018) ("Dismissal of an unjust enrichment claim for duplication is only warranted where

50

misconduct by Currenex and the Trading Defendants – i.e., the manipulation of the Platform's FX trading market via the undisclosed tiebreaking rules and provision of administrator-level access – is not within the scope of plaintiffs' agreements with Currenex.[208]  Thus, the service agreements between plaintiffs and Currenex do not preclude their unjust enrichment claims as to any defendant.

   Second, defendants argue that plaintiffs fail to plead sufficiently that the defendants received a "specific and direct benefit" from the property sought to be recovered, rather than an "indirect benefit."[209]  To so plead, plaintiffs must allege some kind of relationship or connection to each defendant.  Plaintiffs have done so.  Plaintiffs plead that they were traders on the Platform and, as such, they paid fees that enriched Currenex.[210]  Moreover, the amended complaint plausibly alleges that plaintiffs "were matched with each of the Trading Defendants on FX trades executed on the Currenex Platform during the relevant period."[211]  Accordingly, construing the allegations in the light most favorable to plaintiffs, they plausibly plead that defendants received a specific and direct benefit from the misconduct alleged.

---

'the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties[.]'" (quoting *Clark-Fitzpatrick*, 516 N.E.2d at 193)).

[208]

 *See* Dkt 54, at 33; *see also Allianz Glob.*, 463 F. Supp. 3d at 433 ("[W]here Plaintiffs allege a manipulation of the [foreign exchange] market overall, such conduct is not governed by [the contracts] because it does not arise out of the subject matter of the agreements.").

[209]

 Dkt 54, at 50 (quoting *Kaye*, 202 F.3d at 616).

[210]

 *See* AC ¶¶ 27-30, 218.

[211]

 AC ¶ 34.

51

Finally, defendants assert that "to the extent that the antitrust and fraud-based claims are deficient," the unjust enrichment claims must fail also. The Court has held that plaintiffs' antitrust and fraud-based claims are legally sufficient and accordingly defendants' argument is moot.

Plaintiffs plausibly plead all elements of their claims for unjust enrichment, and defendants' motion to dismiss those claims is denied.


X.      *Statute of Limitations and Equitable Tolling*

Defendants move to dismiss all of plaintiffs' claims on the additional basis that they are time-barred "with the limited exception of (i) the portion of Plaintiffs' fraud claims premised on alleged statements or omissions made after August 4, 2015 and (ii) the portion of XTX's antitrust claim based on trading after August 4, 2017."[212] That is so, defendants claim, because plaintiffs were or should have been on notice of their claims as early as February 2005.[213] The Court is not persuaded.

At the pleading stage, the Court will dismiss plaintiffs' claims on statute of limitations grounds only if the "complaint clearly shows the claim[s] [are] out of time."[214] The doctrine of equitable tolling "'may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely

---

[212]    Dkt 54, at 53.

[213]    *Id.* at 53-54.

[214]    *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

52

action.'"[215]  "Generally, a litigant seeking equitable tolling bears the burden of establishing two

elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way."[216]

In this case, the amended complaint plausibly alleges that defendants'

misrepresentations and omissions of material fact concealed the alleged misconduct underpinning

plaintiffs' claims: the secret tiebreaking rule privileging the Trading Defendants and the provision

---

[215]

*In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2021 U.S. Dist. LEXIS 122484, at *7-8 (S.D.N.Y. June 30, 2021) (quoting *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).

"New York courts and the courts of this Circuit variously use the terms 'fraudulent concealment,' 'equitable tolling,' and 'equitable estoppel,' not always with clear delineation." *Koral v. Saunders*, 36 F.4th 400, 409 (2d Cir. 2022) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 81-83 (2d Cir. 2002)). For purposes of this motion, the analysis under the federal doctrine of equitable tolling and New York's equitable estoppel doctrine are substantially the same, such that the Court considers them together. *Compare Pearl*, 296 F.3d at 82 (under New York law, "equitable estoppel" is applicable "[1] where the defendant conceals from the plaintiff the fact that he has a cause of action [and] [2] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired") *with id.* (Second Circuit has "used 'equitable tolling' to mean fraudulent concealment of a cause of action that has in some sense accrued earlier, and to mean fraudulent concealment that postpones the accrual of a cause of action"). "Because [plaintiffs] casts [their] argument in terms of 'equitable tolling,' by which [they] mean[] fraudulent concealment of a cause of action, [the Court] will use that phrase in discussing all aspects of [their] contention." *See id.* at 84.

[216]

*Watson v. United States*, 865 F.3d 123, 132 (2d Cir. 2017) (quoting *Mottahedeh v. United States*, 794 F.3d 347, 352 (2d Cir. 2015)); *see also Koral v. Saunders*, 36 F.4th 400, 409-10 (2d Cir. 2022); *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) ("[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part.").

of administrator-level access to at least one Platform user.[217]  Plaintiffs plausibly plead also that their ignorance of defendants' alleged misconduct was not attributable to a lack of due diligence on their part.  Indeed, plaintiffs claim that Currenex directed XTX to the same alleged misrepresentations when it directly asked Currenex if the Platform considered any factors other than FIFO and firm versus last-look liquidity when prioritizing identically priced limit orders.[218]

Plaintiffs do not specify when they discovered defendants' alleged misconduct, instead claiming that it was "revealed recently" to plaintiffs' counsel by former company insiders at Currenex and State Street.[219]  Thus, even assuming the truth of the allegations in the amended complaint, it cannot be determined whether plaintiffs discovered their causes of action at some point within the relevant limitations periods.  Still, the amended complaint does not show clearly that the claims are out of time, and the Court is not now in a position to dismiss plaintiffs' claims as time-barred.[220]  It is plausible that plaintiffs will succeed in relying on fraudulent concealment to defeat the statute of limitations, and plaintiffs thus are "entitled to an opportunity to prove fraudulent concealment at trial or, at least, adduce a fuller record on a motion for summary judgment."[221]

---

[217]    *See* AC ¶ 201.

[218]    See AC ¶¶ 100-101.

[219]    AC ¶¶ 128, 211.

[220]    *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

[221]    *Dennis v. JPMorgan Chase & Co.*, 345 F. Supp. 3d 122, 196 (S.D.N.Y. 2018).

54

*XI.*    *Personal Jurisdiction*

Defendant SS Global moves to dismiss all claims against it for lack of personal jurisdiction.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists."[222]  "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant."[223]  In determining whether the requisite showing has been made, the Court "construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs."[224]

Based on the scant allegations in the amended complaint regarding SS Global, the Court concludes that it lacks personal jurisdiction.  The amended complaint scarcely mentions SS Global, which is an English company that is wholly owned by State Street and allegedly offers the Platform "in the European Economic Area."[225]  Indeed, the amended complaint does not allege plausibly any facts about SS Global that would support a *prima facie* showing that jurisdiction exists.

---

[222]

    *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)) (internal quotation marks omitted).

[223]

    *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010)) (internal quotation marks omitted).

[224]

    *Licci ex rel. Licci*, 732 F.3d at 167 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).

[225]

    AC ¶ 38.

Instead, plaintiffs rely heavily on factual allegations regarding the conduct of "Currenex" – a term that the amended complaint uses to refer collectively to both Currenex, Inc. and SS Global.[226] This group pleading – which conflates the alleged actions of the two entities – fails to establish personal jurisdiction over "each defendant."[227] Although plaintiffs conclusorily allege that the conduct of Currenex, Inc. can be attributed to SS Global, and vice-versa, the amended complaint fails to allege adequately that corporate formalities have been ignored such that the Court should disregard the legal separateness of the affiliated entities.[228]

---

[226]  AC ¶ 39.

[227]  See *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (requirements of personal jurisdiction "must be met as to each defendant"); *In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021) (citing *Famular v. Whirlpool Corp.*, No. 16-cv-944 (VB), 2017 WL 2470844, at *2 (S.D.N.Y. June 7, 2017) ("To allege personal jurisdiction over a defendant, group pleading is not permitted. Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant."); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, NA.*, No. 16-cv-5263 (AKH), 2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017) (holding that personal jurisdiction was lacking because plaintiffs did not "specify which of the three Barclay defendants" were involved in alleged acts).

[228]  See AC ¶¶ 40-41; *see also FrontPoint Asian Event Driven Fund*, No. 16-cv-5263 (AKH), 2017 WL 3600425, at *6 ("For purposes of alleging that there is personal jurisdiction over each Foreign Defendant, plaintiffs may not refer to affiliated defendants by a conclusory collective name unless plaintiffs adequately allege that the conduct of one affiliate is attributable to another.").

Furthermore, it is unreasonable and internally inconsistent to interpret all references in the amended complaint to "Currenex" as referring to both Currenex, Inc. and SS Global.  For example, plaintiffs' eleventh claim for relief (breach of the implied covenant of good faith and fair dealing) alleges that Edmar, IBG, and the New York Subclass "entered into valid and enforceable agreements *with Currenex* before trading on the Currenex Platform." AC ¶¶ 325-30 (emphasis added).  Yet only Currenex, Inc., and not SS Global, is a party to the contracts with Edmar and IBG, and plaintiffs argue in their opposition brief that the implied covenant claim does not include SS Global. *See* Dkt 65, at 3 & n.3.

Plaintiffs rely also on several alternative theories of personal jurisdiction based on *alter ego*, agency, and conspiracy, all of which fails.

*First,* plaintiffs conclusorily allege that SS Global is subject to personal jurisdiction based on the acts of its alleged "alter-ego" parent corporation, State Street.[229]  But the amended complaint "offers little more than bare allegations of control" and says little about the management of the defendants, their relationships with each other, and what role, if any, SS Global played in State Street's operations.[230]  Accordingly, plaintiffs fail to plead adequately an alter ego theory of personal jurisdiction.

*Second*, plaintiffs allege that SS Global is subject to personal jurisdiction by way of the "acts and contacts of its agents" State Street and Currenex.[231]  This agency theory of jurisdiction likewise fails because plaintiffs do not allege that SS Global exercised control over either State Street or Currenex.[232]

---

[229]

    AC ¶ 41.

[230]

    *City of Long Beach*, 465 F. Supp. 3d at 438; *see also Laydon*, 2017 WL 1113080, at *7 ("Allegations of common ownership, without more, are insufficient to establish jurisdiction through an alter ego theory.").

[231]

    AC ¶ 41.

[232]

    *See In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475 (ALC), 2017 WL 2535731, at *8 (S.D.N.Y. June 8, 2017), *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir. 2019) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)) (agency theory of jurisdiction requires plaintiff to "demonstrate that the foreign defendant exerted control over the domestic entity"); *see also Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 341 (S.D.N.Y. 2016) ("[T]o establish an agency relationship for jurisdictional purposes, Plaintiffs must show that the Foreign Defendants both received a benefit from, and exercised control over, [the domestic defendants].").

*Finally*, plaintiffs allege that this Court may exercise personal jurisdiction over SS Global because it "was part of a conspiracy and its co-conspirators committed torts in New York."[233] To establish a conspiracy theory of jurisdiction, plaintiffs must allege that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."[234]

Although the Court has found that plaintiffs sufficiently pleaded the existence of antitrust and RICO conspiracies, *see supra* Sections III.B, IV.C, plaintiffs have not alleged adequately that SS Global participated in any conspiracy. The amended complaint generally asserts that SS Global participated in the conspiracy, vaguely claiming that some of the "acts relevant to this action[,] including deciding what contracts to enter into, how to operate the Platform, whether to give secret advantages to other customers, what representations to make (or not make), were made by [SS Global's] representatives acting in the United States and within this District."[235]  Plaintiffs rely also on allegations regarding the conspiratorial conduct of "Currenex" – a term that includes both SS Global and Currenex, Inc.  Without greater specificity, the amended complaint lacks sufficient non-conclusory and fact-specific allegations regarding the participation of SS Global in the alleged conspiracy to exercise conspiracy jurisdiction.[236]

---

[233]

Dkt 65, at 29.

[234]

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).

[235]

AC ¶ 40.

[236]

See *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 414 (S.D.N.Y. 2020) (citing *Jazini*, 148 F.3d at 185; *Schwab*, 883 F.3d at 86).

*XII.    Forum Non Conveniens*

Currenex moves to dismiss XTX's claims against it for *forum non conveniens* on the basis of a forum selection clause in their "Agreement for Currenex Services" that states in relevant part: (i) the "parties agree to submit to the exclusive jurisdiction of the English courts for the adjudication of any case or controversy arising under this Agreement," and (ii) the "Agreement will be governed by and construed in accordance with English law."[237]

The Second Circuit has established a four-part analysis to determine whether dismissal on the ground of *forum non conveniens* is appropriate under such circumstances:

> "We ask: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, i.e., . . . whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause. If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable. A party can overcome this presumption only by (4) making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."[238]

XTX does not challenge the validity of its agreement with Currenex.  Nor does it contest that the agreement's forum selection clause was communicated reasonably to it, and that it is mandatory in effect.  XTX argues, however, that its claims against Currenex do not constitute a "case or controversy arising under [the] Agreement," and therefore are not governed by the forum

---

[237]

Simkin Decl., Ex. A § 23.

SS Global also moves to dismiss XTX's claims against it for *forum non conveniens*, but that motion is mooted by this Court's dismissal of all claims against SS Global for lack of personal jurisdiction.

[238]

*Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (internal citations and quotation marks omitted).

59

selection clause.  It argues also that forcing it to litigate its claims against Currenex in England "would result in inefficiencies, inequities and inconsistencies."  Those arguments, however, need not be reached as XTX's claims do not "arise under" the agreement.[239]

The agreement provides that it must be construed in accordance with English law. The scope of the forum selection clause – i.e., whether XTX's claims are subject to that clause – therefore is governed by English law.[240]  English courts have held that forum selection clauses, such as the provision at issue here, should be construed "widely and generously."[164]  Even so, the U.K. Court of Appeal has held that a forum selection clause did not apply in circumstances similar to those in this case.

In *Ryanair Ltd v. Esso Italiana Sri*, Ryanair filed suit in England for violations of the European Union's antitrust statutes, alleging that Esso, an Italian company, had participated in an unlawful cartel for the sale of jet fuel at Italian airports.[165]  Ryanair invoked the jurisdiction of the English court solely on the basis of the contract under which it bought fuel, which contained a

---

239

    *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 435 (S.D.N.Y. 2020).

240

    *See Martinez*, 740 F.3d at 224 ("[Q]uestions about the meaning and scope of a forum selection clause . . . are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause.").

164

    *See Martinez*, 740 F.3d at 224 (citing *UBS AG v. HSH Nordbank AG*, [2009] EWCA (Civ) 585, [82]); *see also AMTO, LLC v. Bedford Asset Mgmt.*, LLC, 168 F. Supp. 3d 556, 566 (S.D.N.Y. 2016) (same).

165

    *Rio Tinto PLC v. Vale S.A.*, 2014 U.S. Dist. LEXIS 174336, at *38 (S.D.N.Y. Dec. 17, 2014) (citing *Ryanair Ltd v. Esso Italiana Sri*, [2013] EWCA (Civ) 1450).

non-exclusive English forum selection clause.  There, the Court of Appeal held that the forum selection clause did not apply to Ryanair's statutory claim, stating, in relevant part:

> "[R]ational businessmen would be surprised to be told that a non-exclusive jurisdiction clause bound or entitled the parties to that sale to litigate in a contractually agreed forum an entirely non-contractual claim for breach of statutory duty pursuant to [the EU's antitrust statutes], the essence of which depended on proof of unlawful arrangements between the seller and third parties with whom the buyer had no relationship whatsoever, and the gravamen of which probably affected many other potential claimants, with whom such a buyer might very well wish to link itself."[166]

Similarly here, XTX's claims, and those of the other plaintiffs, depend upon "proof of unlawful arrangements among [Currenex] and third parties with whom [XTX] had no relationship whatsoever" and that are not subject to any relevant forum selection clause.[165]  Currenex contends that XTX's claims are "all fundamentally premised on the assertion that XTX received different services than it believed it should have received pursuant to the Agreement."[166]  But XTX's claims do not "relate in a meaningful way to the terms, validity, or enforceability" of the services agreement.[167]  Rather, XTX's claims arise from rights and duties independent of the services agreement.[168]  The gravamen of XTX's claims is that Currenex misrepresented how the Platform operated and plaintiffs, including XTX, detrimentally relied on those misrepresentations, which

---

[166]

  *Ryanair*, [2013] EWCA (Civ) 1450 [46].

[165]

  *Rio Tinto PLC v. Vale S.A.*, 2014 U.S. Dist. LEXIS 174336, at *39 (S.D.N.Y. Dec. 17, 2014).

[166]

  Dkt 57, at 8.

[167]

  *Rio Tinto PLC v. Vale S.A.*, 2014 U.S. Dist. LEXIS 174336, at *37 (S.D.N.Y. Dec. 17, 2014).

[168]

  *See Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 391 (2d Cir. 2007).

61

concealed a wide-ranging conspiracy to defraud plaintiffs and secretly institute anti-competitive practices for the benefit of the Platform operators and the Trading Defendants.[169]  Accordingly, as in *Ryanair*, XTX's claims do not arise under the "Agreement for Currenex Services," and therefore are not subject to the forum selection clause.

## Conclusion

Defendants' motions to dismiss each are granted in part and denied in part, as follows:

A.      The motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim (Dkt 53) is granted to the following extent:

(1)      The claims for breach of the implied covenant of good faith and fair dealing brought by Edmar and IBG are dismissed;

(2)      The claims for tortious interference with contract brought by Edmar and IBG are dismissed;

(3)      The claims for tortious interference with prospective economic advantage are dismissed, and

It is denied in all other respects.

B.      The motion to dismiss by SS Global and Currenex (Dkt 56) is granted to the extent that the action is dismissed as to SS Global for lack of personal jurisdiction.  It is denied in all other respects.

---

169      *See Allianz Global Investments GmbH v. Bank of America Corp.*, 463 F. Supp. 3d 409, 434-36 (S.D.N.Y. 2020) (Sherman Act allegations that defendants engaged in "an international conspiracy . . . relating to the foreign exchange market" did not relate to or arise under "contracts governing the terms of foreign exchange transactions between the parties" because plaintiffs' claims did not "depend on the existence of a contractual relationship between the parties"); *In re Optimal U.S. Litigation*, 813 F. Supp. 2d 351 (S.D.N.Y.), *on reconsideration in part*, 813 F. Supp. 2d 383 (S.D.N.Y. 2011) (plaintiff's "right to sue on these [fraud] claims does not originate from, and therefore 'arise out of' the [agreement]," but rather from the defendants' "extra-contractual duties" to make accurate representations).

62

Any motion for leave to amend must be made no later than thirty (30) days after the date of entry hereof.

SO ORDERED.

Dated:    May 18, 2023

_____
Lewis A. Kaplan
United States District Judge