

ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

July 9, 2024

Alexander B. Simkin
T +1 212 596 9744
alexander.simkin@ropesgray.com

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 21B
New York, NY 10007

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

  We write on behalf of Currenex, Inc. ("Currenex") (i) in response to Plaintiffs' July 3, 2024 letter-motion concerning Currenex's production of the underlying computer code that contains the matching algorithm used on its proprietary FX trading platform (the "Platform"), and (ii) to cross-move for an order directing Plaintiffs to produce the algorithms and other trading methodologies *they* used in connection with their FX trading on the Platform and alternative ECNs.

  Plaintiffs' letter unnecessarily burdens this Court with pages of argument about why the Court should order production of source code that ***Currenex has already agreed to provide***.  By purporting to move for the production of information Currenex has already signaled its willingness to provide, Plaintiffs sidestep the real dispute at issue:  Plaintiffs' own refusal to provide reciprocal FX trading algorithms and methodologies, requested months ago by Currenex (along with all other Defendants) that are central to evaluating whether Plaintiffs were impacted (and, if so, whether they benefitted or were harmed) by the Platform's alleged tiebreaking practices.

  Plaintiffs' letter-motion is moot.  Notwithstanding the commercial and technical sensitivities of doing so, Currenex has agreed to produce the requested source code, subject to a discussion among counsel on the details for such a complex undertaking.  As to Currenex' cross-motion, Plaintiffs have no reasonable justification for their continued refusal to produce their FX trading algorithms.  As set forth below, Currenex therefore respectfully asks this Court to enter an order compelling Plaintiffs to produce their FX trading algorithms and methodologies.

  **I.** **The Relevant Discovery Requests and Meet-and-Confer Process**

  Defendants collectively requested that Plaintiffs produce their FX trading algorithms and

ROPES & GRAY LLP

Hon. Lewis A. Kaplan            - 2 -            July 9, 2024

methodologies in October 2023.[1] Plaintiffs initially objected entirely. Following meet-and-confer discussions in December 2023 and January 2024, the parties decided to defer discussion of the production of underlying computer code by both sides (Plaintiffs' trading algorithms and the Platform's matching engine source code) to explore whether there were alternative, less burdensome and complicated ways, to exchange the relevant information.

In connection with those efforts, the parties agreed to a data sampling exercise in order to (among other things) allow Plaintiffs to review how the trading data itself could be used to reconstruct the historical order book (*i.e.* the orders and liquidity that were posted to the Platform, and how trades were executed by matching the two).[2] After Currenex provided an initial trading data sample to Plaintiffs in November 2023, Plaintiffs waited months before seeking a second, broader sample, which Currenex transmitted in May 2024. On June 5, Currenex then provided detailed explanations about approximately 50 different data fields Plaintiffs had questions about. That same day, Plaintiffs announced that they were unwilling to proceed further with the sampling exercise and insisted that Currenex produce the underlying source code (in addition to the data).

Currenex agreed on July 2, 2024 to produce the source code that is the subject of Plaintiffs' Motion and, consistent with prior discussions among the parties, proposed a reciprocal exchange of Plaintiffs' "algorithms and trading methodologies." By email on July 3, 2024 at 5:04 pm, Plaintiffs responded by claiming for the first time that they "do not see the issues of Currenex's source code and Plaintiffs' trading algorithms as related" (even though Plaintiffs themselves had previously linked them). This same correspondence declared "the parties to be at impasse," and announced "we will be filing a motion to compel before Judge Kaplan." Seventeen minutes later, and without waiting for a response, Plaintiffs filed the instant letter-motion.

## II. The Court Should Compel Plaintiffs To Reciprocally Produce Their FX Trading Algorithms And Methodologies

Plaintiffs' refusal even to consider producing their own FX trading algorithms and methodologies denies Defendants any ability to review and evaluate how *Plaintiffs themselves* made FX trades (on Currenex and across the market), and, therefore, impermissibly would restrict Defendants from evaluating and presenting arguments bearing, not only the underlying merits of the

---

[1] Request No. 10 of Defendants' October 10, 2023 document requests seeks: "Documents and Data, including source code, concerning algorithms or other methodologies You used in connection with FX Transactions on the Platform or any other ECN or trading platform, including but not limited to algorithms or methodologies designed to evaluate, route, and/or place orders and/or to select trading platforms on which to place orders."

[2] To use Plaintiffs' analogy, the trading data contains the relevant "formula" *and* the "inputs" and "outputs." This is because the data reflects *how* orders were matched with prices on the Platform. Plaintiffs have never identified any non-duplicative information in the requested computer code—just that they recently came to believe the computer code format will be easier for them to assess.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan                                - 3 -                                July 9, 2024

action (including causation and damages), but also on the issues certain to be joined at the class certification stage. These materials are at the core of Plaintiffs' liability and damages claims. Plaintiffs allege they would have traded differently—both on and outside the Platform—had they known about the alleged tiebreaking rules. *See* SAC ¶ 164 (ECF No. 96) (Plaintiffs "would have stopped trading on the Platform if they had known [how] the Platform was actually being operated"). To assess this claim, Defendants must be able to review the criteria that actually governed Plaintiffs' trading activities, and the criteria that purportedly would have led Plaintiffs to trade differently if they had known about the alleged "secret rules" in the Platform's matching algorithm. Defendants' need for this information is particularly acute with respect to named plaintiff XTX Markets Limited ("XTX"), a "leading algorithmic trading firm which seeks to automate all aspects of [its] business."[3]

Production of Plaintiffs' FX trading algorithms and methodologies is likely the *only way* for Defendants to meaningfully assess *why* Plaintiffs traded they way they did and how they would have traded in certain counter-factual worlds they imagine. Plaintiffs' algorithms will also show:

- The criteria Plaintiffs used to select trading venues. Knowing *why* Plaintiffs traded on Currenex (vs other platforms) for any particular trade is key to evaluating whether the Platform's tiebreaking rules had any impact on them at all (and, if so, how to measure that impact).

- Whether Plaintiffs pursued trading strategies that would have enabled them to *profit* from the conduct they allege (*e.g.,* by seeking to exploit allegedly larger spreads they claim existed on the Platform).

- How Plaintiffs evaluated their own execution quality on the Platform (*e.g.,* bid-ask spread, fill rate, time to execution, frequency of last look rejection) and how that evaluation impacted Plaintiffs' subsequent order routing. For example, if Plaintiffs' algorithms would have diverted order flow away from the Platform if execution quality was poor (as is alleged), their continued participation on the Platform would be evidence that their execution quality was good.

- Whether Plaintiffs' trading algorithms evaluated spreads across platforms on a real-time basis. If Plaintiffs' algorithms were comparing spreads across platforms on a real-time basis, that would be compelling evidence that Plaintiffs did not rely on guesses about where spreads would be most competitive based on assumptions about how tiebreaking rules would impact spreads.

- Whether Plaintiffs actually missed out on trades they otherwise would have consummated based on the Platform's tiebreaking rules, as they allege. If they did miss out on such trades, assessing any impact would require individualized inquiry into how Plaintiffs would have

---

[3] XTX Markets Homepage, https://www.xtxmarkets.com (last visited July 9, 2024). XTX's trading algorithm(s) may be the only one(s) at issue, since Plaintiffs have previously stated that neither of the other two named plaintiffs maintained *any* records of their FX trading.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan                       - 4 -                       July 9, 2024

exited the hypothetical positions that they would have acquired in the but-for world. Plaintiffs' algorithms and trading methodologies are required to conduct this individualized inquiry.

- Whether Plaintiffs were harmed as a result of a Trading Defendant using "last look" to reject a trade. If Plaintiffs' algorithms automatically routed rejected trades to other trading venues, for example, then prices on those subsequent trades would need to be evaluated to determine whether Plaintiffs were harmed (or benefited) by the rejection.

Plaintiffs' FX trading algorithms and methodologies are thus directly relevant to whether Plaintiffs' trades would have been impacted, and to what extent, had they possessed more information about the Platform's tiebreaking protocols. Plaintiffs should not be permitted to avoid producing documents that would allow Defendants to see whether and how Plaintiffs were actually impacted. Indeed, the very cases Plaintiffs rely upon render their refusal untenable. *See, e.g.*, *Dynamic Microprocessor Assocs. v. EKD Computer Sales*, 919 F. Supp. 101, 105 (E.D.N.Y. 1996) (instructing plaintiffs to produce source code because it was relevant to defendants' defenses); *see also Moog, Inc. v. Skyryse, Inc.*, 2022 WL 16852364 at *3 (W.D.N.Y., July 22, 2022) (granting motion to compel because "fairness requires" plaintiff to provide defendants source code "to enable them to prepare a defense").

This discovery, of course, is also central to class certification questions of typicality and predominance. These materials might reveal that Plaintiffs pursued some idiosyncratic trading methodology that renders their claims atypical, or that their algorithms caused them to minimize or avoid any actual harm as a result of the alleged tiebreaking rules, thereby subjecting them to unique defenses. *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (reiterating that a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are subject to unique defenses).

Discovery is a two-way street.[4] Currenex has agreed to the production of its Platform matching engine source code, despite the burden it will impose. Plaintiffs' FX trading algorithms and methodologies are squarely relevant to Currenex's defense against Plaintiffs' claims, for many of the same reasons that Plaintiffs repeatedly have insisted that Currenex's trading data and source code is relevant to Plaintiffs' prosecution of those claims. For these reasons, Currenex respectfully moves the Court to enter an order compelling Plaintiffs to produce their FX trading algorithms and methodologies as called for by Request No. 10.

---

[4] It is not clear that Plaintiffs are committed to their side of the discovery exchange. They delayed engaging with Defendants' requests for their algorithms and other disputed document requests for months, waiting until May 17, 2024 to provide a written response to deficiency letters Defendants sent on *December 19, 2023*, February 16, 2024, and March 13, 2024. Defendants wrote back on June 12, and Plaintiffs only just responded today. Moreover, Plaintiffs have not agreed to custodians or search terms, let alone produced their own trading data, and as of the date of this letter, have produced only two documents total among the three named plaintiffs.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan                                                                    July 9, 2024

Respectfully submitted,

*Alexander B. Simkin*

Alexander B. Simkin

cc: Counsel of record (via ECF)