**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7345

WRITER'S EMAIL ADDRESS
danbrockett@quinnemanuel.com

November 19, 2024

**BY ECF**

Honorable Henry J. Ricardo
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl Street
Court Room 21D
New York, NY  10007-1312

Re:    *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Ricardo:

Pursuant to the Court's Individual Rules, we write respectfully on behalf of Plaintiffs to request a pre-motion conference at which Plaintiffs would ask the Court to direct Defendant Currenex, Inc. ("Currenex") to produce transactional data for two years post-dating the filing of the initial complaint.[1]

---

[1] Pursuant to Rule II.B.1 of Your Honor's Individual Rules, Plaintiffs state that the parties have met and conferred regarding this issue for several months but are at impasse.  Plaintiffs have met and conferred with Currenex regarding the production of post-complaint transactional data for several months, both telephonically and over electronic mail.  More recently, the parties met and conferred over Zoom on November 11, 2024.  Present on that call were, for Plaintiffs, Thomas Lepri, Aaron Zigler, Tim Nagle, and Vinay Basti; and for Currenex, Alexander Simkin, Mark Gaioni, and Deanna Beck.  On that call, Plaintiffs informed Currenex that Plaintiffs intended to move to compel unless Currenex agreed to produce the data at issue.  Plaintiffs and Currenex had another Zoom meet-confer on November 13, 2004.  Present on that call were, for Plaintiffs, Thomas Lepri, Aaron Zigler, Tim Nagle, and Vinay Basti; and for Currenex, Alexander Simkin, Mark Gaioni, and Kaitlin O'Donnell.  On that call, Currenex reiterated its position that it would not produce the data in question.  Plaintiffs stated that Plaintiffs would be moving to compel.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Currenex has refused to produce this data on the basis of a remarkable concession: that while Currenex did, in fact, engage in the very conduct at the heart of this case, it purportedly *ceased* that conduct at some unspecified time before Plaintiffs filed this action, thus rendering the production of post-complaint transactional data unnecessary.  As discussed below, Plaintiffs should not be required to accept the representations of counsel as to when Currenex stopped engaging in wrongdoing.  The Court should direct Currenex to produce the requested data.

## Background

Plaintiffs represent a putative class of traders who used Currenex's trading platform.  Users of the platform submit bids and offers, and the platform matches buyers and sellers using a "matching algorithm," which includes instructions about what to do when bids or offers are tied at the same price.  Plaintiffs allege that while Currenex was publicly representing that it was resolving ties using the "first-in, first out" (or "FIFO") system, by which ties are resolved in favor of the customer that submitted its price first, Currenex secretly was giving super-priority privileges to a select group of customers that included State Street Bank, Goldman Sachs, and HC Tech (the "Trading Defendants").  Plaintiffs allege that these privileges allowed the Trading Defendants to jump the line and execute trades without having to provide the most competitive price.

At the outset of discovery, both Plaintiffs and Defendants served document requests seeking transactional data post-dating the filing of the complaint.  Plaintiffs' requests sought transactional data up to the present.  *See* Ex. A at 7 (defining relevant period).  Defendants' requests sought Plaintiffs' transactional data up to July 2023.  *See* Ex. B at 6-7 (defining relevant period for data requests).  The parties subsequently negotiated an agreement to produce their respective transactional data relating to the Currenex platform, beginning at the earliest date for which data are available and running through August 4, 2021.  For Currenex, the agreement included data relating to (i) executed trades on the Currenex platform; (ii) quotes streamed to the Currenex platform; and (iii) "price persistence logs" that Currenex has stated will allow Plaintiffs to reconstruct the order book for the platform.

Currenex has refused to produce the same transactional data for the period *after* the filing of the initial complaint, however.  Specifically, Plaintiffs have sought transactional data running from August 4, 2021—the date the initial complaint (ECF No. 1) was filed—through August 4, 2023.

Plaintiffs initially requested this data for the purpose of performing a "before-and-after" analysis, in which Plaintiffs' experts would compare trading data *within* the alleged conspiracy period (January 1, 2005 to August 4, 2021) with data from *outside* the alleged conspiracy period.  In this analysis, post-complaint trading data would function as a benchmark "clean period," on the assumption that the conduct alleged in the complaint—the use of secret "priority" privileges to break ties in favor of Trading Defendants Goldman Sachs, State Street Bank, and HC Tech—ceased when this case was filed.

Late in the meet-confer process, **Currenex's counsel conceded that Currenex did, in fact, use priority privileges** in its tiebreaking algorithm during the class period.  However, Currenex represented that it ceased this practice some time prior to August 4, 2021.  As a consequence,

Currenex argued, the post-complaint period cannot function as a clean period, thus removing the rationale for why Plaintiffs needed post-complaint data. Currenex further represented that once it produced its main set of transactional data for the class period, it would be clear to Plaintiffs that Currenex stopped using priority privilege to resolve ties at least two years prior to August 4, 2021.

This operates as a concession as to the merits of Plaintiffs' claims, because Currenex represented to users that it was using one set of tiebreaking procedures, while secretly using a different set of rules. In other words, **counsel has all but admitted that Currenex engaged in fraud**, but now expects Plaintiffs to "trust us" when they say the fraud ceased at some unidentified point in the past.

Believing they were not required to accept Currenex's representation about when it stopped using priority privilege in tiebreaking or what will be "clear" from Currenex's pre-complaint transactional data, Plaintiffs reiterated their request that Currenex produce post-complaint data. Currenex refused to do so and this motion followed.

## Argument

Under Federal Rule of Civil Procedure 26, "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevance has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *5 (S.D.N.Y. Apr. 10, 2023) (emphasis added and internal citation omitted). After relevance is established, the party objecting to the discovery bears the burden of showing why the discovery should be denied. *See, e.g.*, *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 2015 WL 4033019, at *14 (S.D.N.Y. June 26, 2015). "Specifically, the resisting party must show how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant, or how each request is overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence revealing the nature of the burden." *Id.*; *see also Hicks v. Leslie Feely Fine Art, LLC*, 2021 WL 3617208, at *4 (S.D.N.Y. Aug. 13, 2021) (same).

The case for relevance is strong. Before-and-after analyses have long been a standard way to prove impact and damages in cases, such as here, involving antitrust conspiracy claims.[2] Accordingly, parties in such cases routinely agree to produce data from years outside the main conspiracy period, and where they do not agree, courts routinely grant requests for such data.

---

[2] *See, e.g.*, *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *3 (E.D.N.Y. Feb. 21, 2019) ("[A] before-and-after analysis . . . is a standard methodology for computing antitrust damages"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996) (identifying "before and after" method as an accepted methodology for measuring damages in antitrust cases) (quoting ABA Antitrust Section, Antitrust Law Developments, 669-73 (3d ed. 1992)); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (the "before and after" method "is broadly accepted for proving antitrust damages").

*See, e.g., In re Peanut Farmers Antitrust Litig.*, 2020 WL 9216019, at *2 (E.D. Va. July 24, 2020) (granting plaintiffs' motion to compel three years of information pre-dating class period); *Kleen Prod. LLC v. Packaging Corp. of Am.*, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (granting motion to compel pre- and post-conspiracy data).[3]

If, as it represented in meet-confers, Currenex *did* stop granting priority privileges for purposes of tiebreaking, the additional data requested by Plaintiffs will provide Plaintiffs' experts with a more robust set of data for purposes of comparing the effects of Currenex's conduct during the period when priority privileges were used and after they were no longer used.  If, on the other hand, Currenex did *not* stop granting priority privileges, then the post-complaint data would be relevant as an extended "dirty period" that continued running past the filing of the initial complaint, thus expanding the class.  Either way, post-complaint data is relevant.

Plaintiffs should not be required to forgo this limited additional discovery based simply on vague assurances from Currenex's counsel in discovery conferrals that Defendants' conduct changed at some unidentified point in the past.  When, exactly, did Currenex stop granting priority privileges?  Did it adopt some other way of allowing the Trading Defendants to jump in line that did not conform to Currenex's public representations that it was adhering to FIFO?  These and many other questions remain unanswered.

The burden of the requested discovery is minimal.  In meet-confers, Currenex has not articulated any specific burden associated beyond the general complaint that producing *any* additional data is inherently burdensome.  Yet Plaintiffs seek a mere two years of the most recent data in Currenex's possession—the least burdensome period of data available.  Producing that data will not present Currenex with any of the difficulties associated with accessing and collecting data from many years in the past, such as resuscitating from cold storage or navigating disused legacy systems.

Plaintiffs thus respectfully request the Court to direct Currenex to produce, for the period running from August 4, 2021 to August 4, 2023, the same data it has agreed to produce for the pre-complaint period.[4]

---

[3]  *See also New Park Entm't, LLC v. Elec. Factory Concerts, Inc.*, 2000 WL 62315, *3 (E.D. Pa. Jan. 13, 2000) (permitting discovery seven years prior to alleged class period in antitrust monopolization case); *Quonset Real Estate Corp. v. Paramount Film Distr. Corp.*, 50 F.R.D. 240, 241 (S.D.N.Y. 1970) (allowing discovery for a period of 10 years prior to earliest possible wrong); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985) ("The cases clearly establish that the temporal scope of discovery in antitrust cases should not be confined to the limitations period of the antitrust statutes."); *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 309 (S.D.N.Y. 1982) (permitting discovery of transactional data up to four years after date the conspiracy was alleged to have ended in government indictment in order to permit plaintiffs to establish a before and after model to prove their antitrust damages).

[4]  As discussed above, this means data relating to trades executed on the platform, quotes streamed to the platform, and price persistence logs.

Respectfully submitted,

/s/ Daniel L. Brockett

Daniel L. Brockett

cc: Counsel of Record