

ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

November 26, 2024

Alexander B. Simkin
T +1 212 596 9744
alexander.simkin@ropesgray.com

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 21B
New York, NY 10007

Re:    *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

      We write on behalf of Currenex, Inc. ("Currenex") in opposition to Plaintiffs' November 19, 2024 letter-motion (the "Motion"), which asks the Court to compel Currenex to produce nearly two years of completely irrelevant post-complaint trading data from its FX trading platform (the "Platform"). This request would increase the size of Currenex's existing 221 terabyte data production, covering more than a decade's worth of Platform trading activity, by a staggering additional 55 terabytes (the data equivalent of over 700 *million* emails). For the reasons explained herein, this post-complaint data is irrelevant, unduly burdensome and not remotely proportional to the needs of the case, and its production would pose a significant risk of harm to Currenex and its non-party customers. Accordingly, Currenex respectfully requests that the Court deny the Motion.

**I.   Post-Complaint Trading Data Is Irrelevant**

      Plaintiffs' primary basis for seeking two years of post-complaint trading data is their supposition that the post-complaint period is "clean" and the pre-complaint period is "dirty."[1] The uncontroverted evidence is that at least *6 years* of pre-complaint trading data is "clean" even under Plaintiffs' definition. *See* Ex. A (Declaration of Gregory P. Fortuna, dated Nov. 26, 2024) at ¶ 4. In

---

[1] Plaintiffs also gesture at an argument that *maybe* the post-complaint data will constitute a "dirty period" but there is no evidence to support that suggestion and it is contrary to Plaintiffs' own allegations. *See* SAC ¶ 164 n.18 ("Plaintiffs expect the wrongful behavior to have ceased with the filing of this action."). Indeed, if Plaintiffs really believed that was a reasonable possibility, they would not be continuing to trade on the Platform as they do. *See* SAC ¶ 164.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan — - 2 - — November 26, 2024

other words, after a lengthy review brought on by Plaintiffs' complaint, the evidence shows that no priority settings were used to break ties for at least 6 years prior to the complaint. *See id.*[2]

Plaintiffs offer <u>no</u> argument for why post-complaint data is relevant in the face of this uncontroverted evidence about how the Platform operated pre-complaint. Instead, they argue they "should not be required to accept the representations of counsel." Motion at 2. This argument is a complete red herring. The way the Platform operated pre-complaint is evidenced in the pre-complaint data that has been produced or will be produced.[3] Plaintiffs need not rely on any representation.[4]

Moreover, Plaintiffs' Motion misleadingly omits that Currenex offered to produce, and is producing, *some* post-complaint trading data so that Plaintiffs can verify for themselves that nothing changed after the complaint was filed. Specifically, the complaint was filed on August 4, 2021, and Currenex offered to provide post-complaint trading data through December 31, 2021 (a nearly five-month period). The offer was unconditional. This post-complaint trading data is included in the data that is being transferred to Plaintiffs. Plaintiffs' Motion also fails to disclose that Plaintiffs have not produced any of their own post-complaint trading data.

Plaintiffs' assertion that Currenex has "all but admitted" it "engaged in fraud" because, in the early days of the Platform, some Platform users may have received some level of priority in certain tiebreaking scenarios, Motion at 3, is not an accurate (let alone complete) recitation of the evidence. Plaintiffs' Motion does not address what priority settings existed, for whom, when, in what contexts, and also if and when those settings implicated trades or the operation of the Platform during the proposed class period, all of which will need to be carefully evaluated and addressed at the appropriate stage of this case. Putting aside both the wide range of unanswered factual questions and the untimeliness of claims based on long-stopped conduct, there are many pro-competitive, pro-consumer reasons why certain levels of priority may have been used in certain circumstances on the Platform, including the reason affirmatively alleged in the complaint of increasing liquidity on a nascent online trading platform (among many others). *See, e.g.*, SAC ¶ 155 (alleging that "[b]y granting super-priority rights . . . Currenex hoped to ensure that its trading venue would get off the ground, then thrive, by securing the support of large liquidity providers"). Tellingly, while Plaintiffs seek to demonize the practice of "using priority" in connection with tiebreaking, Motion at 3, they do not

---

[2] Since at least 2015, the Platform has prioritized "firm" price quotes (*i.e.*, the price quote is not subject to "last look" functionality) over price quotes that are subject to "last look" functionality.

[3] At the time Plaintiffs filed the Motion, they had not provided Currenex with identifying information for their cloud storage bucket (like an address) to receive the pre-complaint data. Ex. B at 11/21/2024 D. Beck Email. They purported to do so since then, but when Currenex's vendor attempted to make the transfer on November 25, the relevant bucket did not exist. *Id.* at 11/25/2024 Emails.

[4] Plaintiffs also mention that the "relevant time period" in Defendants' document requests went through July 7, 2023 (the date the operative SAC was filed), but in doing so, admit that the parties subsequently reached an agreement to produce data through when each party first joined the lawsuit.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan - 3 - November 26, 2024

disclose the uncontroverted fact that ***lead plaintiff XTX Markets Limited itself received some level of priority in numerous historical tiebreaking scenarios***, Ex. A at ¶ 6, which raises the question of whether XTX is more properly characterized as a John Doe Defendant than a Plaintiff. *See* SAC ¶ 46 (alleging the "John Doe Defendants" to be "other liquidity providers . . . [with] priority rights on the Platform"). More relevant for this Motion, however, Plaintiffs' claim that the Platform historically utilized priority settings in some unspecified way has no bearing on whether post-complaint trading data is relevant, many years after such conduct conclusively stopped.

Because Plaintiffs have not met their burden of demonstrating that they seek discovery relevant to the claims or defenses in this litigation, the Court should deny the Motion. *See* Fed. R. Civ. P. 26(b)(1) (only relevant materials are discoverable); *see also Surles v. Air France*, 2001 WL 1142231, at *2 (S.D.N.Y. Sept. 27, 2001) (information "does not become relevant merely because [a party] speculates that it might reveal useful material").

## II. Production of Two Years of Post-Complaint Trading Data Is Unduly Burdensome

Plaintiffs' statement that they seek a "mere two years" of additional trading data is a gross understatement of the burden associated with their request, which is appropriately contextualized by reference to the burden that Currenex has already incurred in producing the pre-complaint trading data Plaintiffs requested (and the agreed nearly five-months of post-complaint trading data).

### a. Existing Pre-Complaint Data Production

Currenex's existing production of over a decade's worth of trading data consists of 221 terabytes of data. Ex. A at ¶ 8. For comparison, the entire printed collection of the United States Library of Congress has been estimated at approximately 10 terabytes.[5] Put another way, if the *55 trillion* (55,000,000,000,000) lines of data in the existing production were printed on standard 8.5" x 11" sheets of paper and laid end-to-end, they would extend 170 million miles—from the Earth to the Sun and nearly back. Plaintiffs' additional request would extend almost halfway back to the Sun again. Plaintiffs themselves have acknowledged the enormity of the pre-complaint data. In requesting an extension of the discovery schedule, Plaintiffs told this Court that the volume of structured data at issue "is substantially greater than in comparable cases," observing that Platform data for a *one-week*, *one currency pair* sample alone consisted of over 864 *million* rows of data and that Currenex's full production will be "orders of magnitude larger." ECF No. 142 at 1.

Currenex has undertaken enormous effort and expense to engage in this unprecedented data production. At least seven of Currenex's most senior-level employees—the same individuals who would be responsible for the additional data collection—collectively devoted hundreds of hours of their time to the existing collection and production. *See* Ex. A at ¶¶ 10-11. These individuals, who lead Currenex's development, technical operations, product management, and network infrastructure

---

[5] *Data Size Matters*, UC Berkeley School of Information, Nov. 6, 2013, https://ischoolonline.berkeley.edu/blog/big-data-infographic/

ROPES & GRAY LLP

Hon. Lewis A. Kaplan                      - 4 -                      November 26, 2024

teams, among others, spent weeks away from their business responsibilities (that Platform users, including Plaintiffs, rely on them to do) to respond to Plaintiffs' requests. *Id*. Vendor costs alone associated with the existing production have, to date, totaled approximately $900,000. *Id*. at ¶ 16. Plaintiffs offer no justification for imposing considerable additional strain upon the business. *See In re Gen. Motors LLC Ignition Switch Litig*., 80 F. Supp. 3d 521, 534 (S.D.N.Y. 2015) (denying plaintiffs' request for additional discovery "in light of the extensive—indeed, vast—universe of documents that [Defendant] has disclosed or will be disclosing in the coming months").

      **b.**   *Requested Additional Post-Complaint Data Production*

The additional post-complaint data production that Plaintiffs seek to compel is approximately 55 terabytes of additional data (or approximately five-and-a-half Libraries of Congress). Ex. A at ¶ 17. This is in no way "minimal." Indeed, the volume of this additional data is *almost three times the size* of Plaintiffs' *entire* anticipated data production, none of which has been transferred to date, but which Plaintiffs have estimated at around 20 terabytes. *See* Ex. B at 11/8/2024 Email.

In order to do what Plaintiffs now ask, Currenex expects that many of the same senior-level employees involved with the pre-complaint production would once again have to divert time away from their important business responsibilities. *See* Ex. A at ¶ 18. Collecting and producing this massive amount of additional data would also require Currenex to incur additional and substantial costs associated not only with transferring and storing 55 terabytes of additional data for the pendency of this litigation, but also with the legal and expert work that would be required to scope, process, and prepare the data for production, and to field questions on that data from Plaintiffs. *See id*. Currenex's data vendor estimates that its quality control process for this volume of data could alone total hundreds of thousands of dollars. *See id*. at ¶ 19. Such quality control checks are both necessary and burdensome with a production of this nature: as a point of comparison, Plaintiffs have reported experiencing substantial delays with their much smaller production as a result of technical issues that are apparently requiring a long time to resolve. *See* Ex. B at 11/7/2024 Email.

In addition to the burdens of time, distraction, and costs, the production of more recent trading data poses an increased risk to Currenex's business and its customers. In particular, the production of more recent data is more likely to expose the current trading strategies of Platform participants, nearly all of whom are not parties to this litigation. The potential exposure of this more recent data, including to a sophisticated algorithmic trader such as XTX, increases the risk of harm to other Platform participants and, ultimately, to Currenex. *See* Ex. A at ¶ 20.[6]

Thus, even if Plaintiffs could show some minimal hypothetical relevance of the requested data (they cannot), it would be far outweighed by the extreme burden and business risk that the supplemental production of 55 terabytes of post-complaint trading data would impose upon Currenex (and non-party Platform users) such that the Court should still deny Plaintiffs' Motion.

---

[6] Given the vastness of the data, it is not practical for Currenex to try to anonymize the data.

ROPES & GRAY LLP

Hon. Lewis A. Kaplan                                                                                              November 26, 2024

Respectfully submitted,

*/s/ Alexander B. Simkin*
Alexander B. Simkin

cc: Counsel of record (via ECF)