# Exhibit A

quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S EMAIL ADDRESS
**danbrockett@quinnemanuel.com**

December 2, 2024

**BY ECF**

Honorable Henry J. Ricardo
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl Street
Court Room 21D
New York, NY  10007-1312

Re:     *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Ricardo:

Plaintiffs respectfully request the Court consider this brief submission by way of reply to Plaintiffs' pending motion to compel.  ECF No. 151.  Plaintiffs' motion seeks transactional data from August 2021 through August 2023.  Currenex does not appear to dispute that this trade data would normally be discoverable.  Rather, Currenex argues that the requested discovery is disproportional to the needs of the case only because Defendants' fraud supposedly ceased already.  ECF No. 154.  According to Currenex, the Court should believe that assertion because of a conclusory declaration seen by Plaintiffs for the first time with Currenex's opposition papers.  The Court should refrain from resolving the disputed issue of when the fraud ceased, even if doing so for the limited purpose of the current discovery request.

As an initial matter, Currenex's opposition focuses entirely on when Currenex supposedly stopped offering "priority" access to Trading Defendants Goldman Sachs, HC Tech, and likely other liquidity providers.  This alone is fatal to Currenex's opposition, as Currenex ignores that there was another part of its fraud—namely, that Currenex *also* hid that it was giving out special "see-all" access, whereby certain traders were secretly empowered to see the highly proprietary data streams of rival trading firms.  *See* ECF No. 96 ("SAC") ¶¶ 138-54.  Tellingly, Currenex makes no mention of whether or when that practice ceased.  Nor should Plaintiffs have to presume that the ways in which the platform departed from Currenex's public statements is limited only to those instances that could be identified in pre-complaint investigations.  In other

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

words, discovery may well uncover *additional* ways the platform departed from Currenex's public representations, which would further confirm the relevance of the requested discovery. The proffered declaration is silent on this as well.

But even if the relevant inquiry were limited only to the issue of "prioritization"—that is, the practice by which Currenex allowed the Trading Defendants to jump to the front of the line without being the first to submit the best prices—Plaintiffs' motion should still be granted, for the additional reasons below.

Currenex *admits it committed a fraud for many years* by (a) representing that orders were prioritized on a "first in, first out" basis (SAC ¶¶ 6-8), but (b) instead giving "priority" to privileged trading firms (*id.* ¶¶ 10-11, 113-25). In other words, Currenex admits that the complaint in this action brought to light a massive fraud.[1] Currenex resists discovery of later-year transactional data solely on the assertion that there is "uncontroverted evidence" that its transactional data is "clean" for "at least 6 years" prior to the initial complaint. ECF No. 154 at 1-2.

But Plaintiffs and the Court are left guessing what that "uncontroverted evidence" is. Currenex makes vague assertions to what "has been *or will be* produced"—a tacit admission that Currenex is relying on *unidentified* information *that Plaintiff have not even seen yet*, let alone had a chance to analyze.[2] But even if all the information Currenex is relying on had already been produced, whether it shows a clear cessation of wrongdoing will likely be a disputed fact. That Currenex failed to identify what evidence is it relying on, and explain why that evidence supports the conclusion its fraud ceased long ago, leads to only one reasonable conclusion: The evidence does not exist, or even if it does, it is far from as clear-cut as Currenex now posits. In other words, it is likely to be still disputed even after Currenex produces its supposedly exculpatory evidence.

It appears that, instead of *actual* evidence, Currenex asks the Court to rely entirely on the declaration of Gregory Fortuna. But that declaration simply states that a State Street Bank investigation has concluded that the fraud ceased sometime before August 4, 2021. *See* ECF No. 154-1 ¶ 4. Given that Currenex admits to committing fraud before that date, and given that how

---

[1] While purporting to deny it committed *fraud*, Currenex argues that its actions had "pro-competitive" benefits. ECF No. 154 at 2. But that is, of course, sleight of hand—pro-competitive benefits may be relevant to an antitrust claim, but not to fraud. Currenex does not and cannot square its public representations about how the platform worked with its now-confessed system of pay-to-play prioritization.

[2] After more than a year of discovery, and more than four months after it agreed to produce the source code for its matching algorithm, Currenex, on the same day it filed its opposition, began the process of producing its source code and pre-complaint transactional data by way of an electronic data transfer. Even if that transfer contains the supposed "evidence" Currenex is intending to rely on—the declaration does not say—a meaningful review is likely to take time, particularly since Currenex is silent as to which parts of that or future productions it is relying upon for its defense.

the Currenex system worked is at the core of this case, the Court should not accept such a conclusory declaration as relevant, let alone dispositive. What investigation was conducted? What information was reviewed? What information supported the conclusion that the prioritization scheme existed prior to 2021? What information supported the conclusion it ceased thereafter? Perhaps even more troubling, why does *Currenex* rely on a *State Street Bank* investigation at all, rather than a declaration from someone with personal knowledge? The mysteries surrounding this conclusory, concocted declaration should lead to its rejection.

Finally, a special note should be made with respect to the assertion that XTX "received some level of priority." ECF No. 154 at 3; ECF No. 154-1 at 6. As an initial matter, Currenex does not even try to tie that assertion to anything relevant to the pending motion to compel. It is instead a naked attempt to distract with some vague notion of false equivalence. But to be clear, whatever Currenex is referring to, XTX emphatically denies getting "prioritization" as used in the complaint in this action. XTX certainly never paid for, nor knew it received, any special treatment. To the contrary, XTX joined this case as a plaintiff after it struggled—inexplicably—to perform as well on the Currenex platform, as on other trading venues. SAC ¶ 21.[3]

Plaintiffs thus respectfully request the Court to direct Currenex to produce, for the period running from August 4, 2021 to August 4, 2023, the same data it has agreed to produce for the pre-complaint period.

Respectfully submitted,

 /s/ Daniel L. Brockett

  Daniel L. Brockett

cc: Counsel of Record

---

[3] XTX's recent struggles on the platform are further reason to doubt that the real story is as simple as Currenex presents—i.e., that the Currenex platform went fully legitimate at some point in 2015 after having been previously engaged in a massive fraud.