# Exhibit A

CONFIDENTIAL

Page 1

1              C O N F I D E N T I A L

2           PURSUANT TO PROTECTIVE ORDER

3           UNITED STATES DISTRICT COURT

4           SOUTHERN DISTRICT OF NEW YORK

5                Case No. 21-cv-06598

6    ------------------------------------

7    EDMAR FINANCIAL COMPANY, LLC; IRISH

8    BLUE & GOLD, INC.; XTX MARKETS LIMITED;

9    and DSQUARE TRADING LIMITED,

10             Plaintiffs,

11   v.

12   CURRENEX, INC.; GOLDMAN SACHS & CO, LLC; HC

13   TECHNOLOGIES, LLC; STATE STREET

14   BANK AND TRUST COMPANY; STATE STREET

15   GLOBAL MARKETS INTERNATIONAL LIMITED; and

16   JOHN DOE DEFENDANTS 1-5,

17             Defendants.

18   ------------------------------------

19       Deposition of NICK BURRLOCK, taken by AILSA

20    WILLIAMS, Certified Court Reporter, held at the

21    offices of Quinn Emanuel Urquhart & Sullivan LLP,

22   London, United Kingdom, on 31 July, 2025 at 9:00 a.m

23

24

25

Page 46

1  fact?
2       A   I am a witness, so as part of that.
3       Q   So my question was before the
4  complaint was filed in this case, were you aware
5  that there was a complaint that was being prepared
6  for filing?
7       A   Yes.
8       Q   How did you become aware of that
9  fact?
10      A   Through conversations with the legal
11 team.
12      Q   When you say the legal team, who do
13 you mean by that?
14      A   The legal team preparing the case.
15      Q   So counsel for the plaintiffs in
16 this case?
17      A   Yes.
18      Q   Who specifically?
19      MR. BROCKETT:  Counsel, before you go
20 any further, I am going to allow you to question
21 him about any conversations he had with
22 plaintiff's counsel in preparation for the
23 deposition, but I am going to ask Mr. Burrlock to
24 respect our privilege with respect to our pre-suit
25 investigation.  So to the extent you are asking

```
 1   him about conversations with the legal team that
 2   constitutes part of our pre-suit investigation,
 3   I am going to ask Mr. Burrlock not to provide
 4   information responsive to those questions.
 5            MR. GAIONI:  So it is plaintiffs'
 6   position that you are instructing Mr. Burrlock not
 7   to answer any questions relating to your
 8   conversations with him, other than conversations
 9   in preparation specifically for today's
10   deposition.
11            MR. BROCKETT:  First of all, I am not
12   instructing Mr. Burrlock to do anything.  Mr.
13   Burrlock isn't represented by Quinn Emanuel.  I am
14   asking Mr. Burrlock to respect the confidentiality
15   of those communications, yes.
16            MR. GAIONI:  On what basis?
17            MR. BROCKETT:  On the basis of work
18   product and potentially attorney/client privilege.
19            MR. GAIONI:  Mr. Burrlock, you are not
20   represented by Quinn Emanuel, are you?
21        A   No.
22        Q   And you are not represented by any
23   of the other firms that represent plaintiffs in
24   this case, are you?
25        A   No.
```

1           Q    Could the court reporter read back
2     the question.
3                (Question read back)
4           A    Yes, if I believe that they would
5     not respect privacy around what plaintiffs'
6     lawyers have suggested.
7           Q    So you are not agreeing to answer
8     questions relating to your conversations with
9     plaintiffs' counsel on the basis of Mr. Brockett's
10    request to you?
11          A    A lot of it depends on what those
12    questions are.  Ask me a question and I will
13    determine whether or not I think I can answer it
14    or not.
15               MR. BROCKETT:  I also would intervene
16    and explain what I believe to be a question that
17    pierces our privilege or a question that does not.
18               MR. GAIONI:  So you are going to be
19    instructing Mr. Burrlock on which questions you
20    think he --
21               MR. BROCKETT:  Look, counsel, we are
22    done.  You just ask your questions.  I am not
23    going to have any more dialogue with you on this.
24    I told you my position.  It is clear.
25               MR. GAIONI:  When did you first have

Page 51

1     contact with plaintiffs' counsel about the
2     allegations in this case?
3            A    I do not recall precise dates.  This
4     was some time after 2016 and prior to it being
5     filed.
6            Q    Who reached out to you?
7            A    I am going to not answer that in
8     terms of I don't think that is ...
9            MR. GAIONI:  Is it plaintiffs' position
10    that the identity of the lawyer who reached out to
11    Mr. Burrlock --
12           MR. BROCKETT:  You can answer.  Just
13    give him the answer, if you recall, as to who you
14    spoke with.
15           A    I have spoken to you, definitely.  I
16    do not recall -- so to make it clear, I have
17    spoken to Dan.  I do not recall precise dates but
18    I have definitely spoken to Dan.
19           Q    Was Mr. Brockett the first person
20    who reached out to you?
21           MR. BROCKETT:  You can answer that.
22           A    I do not recall exactly, to be
23    honest.  So I cannot really give a clear answer on
24    that.
25           Q    Other than Mr. Brockett, which other

CONFIDENTIAL

Page 58

1    exact time.  Apologies.
2            Q   Did you meet with them in any of
3    your meetings, do you recall -- strike that.
4            Do you recall any of your meetings
5    lasting more than an hour?
6            A   Not specifically, but I would
7    imagine then yes, that some would have been,
8    because just there is a fair amount to discuss.
9            Q   Did you ever provide any documents
10   to plaintiffs prior to this case being filed?
11           A   Not to my recollection.
12           Q   Did you bring any documents to your
13   meetings with plaintiffs?
14           A   Not to my recollection.
15           Q   Did you ever communicate with anyone
16   associated with plaintiffs or plaintiffs' counsel
17   by email?
18           MR. BROCKETT:  That is a "yes" or "no".
19           A   Yes.  I mean, in terms like have I
20   ever, yes, obviously, I forwarded to you emails
21   around communications around arranging this
22   deposition, for example, and historically I am
23   fairly sure there would have been some emails
24   around potentially arranging meetings, but I have
25   no record or copy of those.

Page 59

1      Q    So you do recall having email
2   communications with plaintiffs' counsel prior to
3   the complaint being filed in this case?
4      A    Not specifically.  I don't recall
5   specific emails, but I am fairly confident that
6   there would have been some emails.
7      Q    Do you recall communicating with
8   plaintiffs or their counsel by text message?
9      A    No, not text, no, really.
10     Q    What about by messaging app?
11     A    More phone calls, to be honest,
12  really.
13     Q    What about any other written
14  communications in any other form?
15     A    No, definitely.  I can't remember
16  the last time I wrote a letter, sorry.
17     Q    Did you provide plaintiffs' counsel
18  with any audio or video recordings?
19     A    Audio recordings, other than them
20  potentially recording a conversation I had with
21  them, or did I give them a tape of something
22  that's previously recorded.
23     Q    The latter.  Did you give them any
24  previous recording?
25     A    No.

1   that might actually try to get an answer across
2   that I have no documents.  I appreciate this has
3   probably gone the other way and given you cause to
4   believe that I have actually kept something, but
5   that was not the intention.
6           Q   Did you write this email or did
7   someone write it for you?
8           A   I wrote this email.
9           Q   All of these words are your words?
10          A   Yes.
11          Q   Did you speak with plaintiffs'
12  counsel about our request for documents?
13          A   I spoke with --
14          MR. BROCKETT:  Well, I think that is --
15  well, I will let him answer it.  Go ahead.  Sure.
16          A   I spoke with a friend.  I then said
17  "I am thinking of replying with this", and yes,
18  that is what I reply.
19          Q   Who did you speak to?
20          A   A long-standing friend from the
21  foreign exchange market.
22          Q   Who is that?
23          A   Caspar Marney.
24          Q   Who is Mr. Marney?
25          A   He is someone I have known a number

CONFIDENTIAL

Page 112

1    of years.
2            Q    Where does he work?
3            A    For himself.
4            Q    How do you know him?
5            A    He has been in the foreign exchange
6    industry for a number of years and I have
7    worked -- done some work with him historically.
8            Q    Why did you reach out to him?
9            A    He is a friend.
10           Q    Why specifically Mr. Marney?
11           A    Because he is a friend who has --
12   who would have knowledge of legal frameworks a
13   little bit more.
14           Q    Why would he have knowledge of legal
15   frameworks?
16           A    Because I believe he did some
17   original law, legal related work many years ago.
18           Q    And it was Mr. Marney who advised
19   you to frame your email in this way?
20           A    I wouldn't say he advised me.  It
21   was more of a generic kind of conversation.
22           Q    Had you written this email in draft
23   form before you spoke with Mr. Marney?
24           A    Pretty much, yes.
25           Q    And it is your email that your

```
 1    that you spoke with plaintiffs' expert about a
 2    subpoena, weren't you?
 3              A    Not specifically, no.
 4              Q    You can see how someone might get
 5    that impression?
 6              MR. BROCKETT:  Excuse me, objection.
 7              A    Not really.  Sorry.
 8              Q    How many times have you spoken with
 9    Mr. Marney about this litigation?
10              MR. BROCKETT:  You can say how many
11    times but I would ask you to not disclose the
12    content of any communications you have had with
13    Caspar Marney about this case.
14              A    I couldn't give you an exact number
15    but a few, a good few conversations.
16              Q    More than 10?
17              A    Most likely, yes.
18              Q    More than 20?
19              A    It would be speculation again, but
20    definitely more than 10.
21              Q    Potentially more than 20?
22              A    Potentially, yes.
23              Q    In your conversations with Mr.
24    Marney -- strike that.
25              Have you spoken with Mr. Marney about
```

Page 127

1    what I call discretionary packages.
2         Q    Did you convey to plaintiffs the
3    information in this paragraph, the allegation that
4    many of the secret priority agreements were
5    negotiated by Russell Sears, as quoted in
6    paragraph 121?
7         A    I believe I would have stated that
8    any agreements would have been involving Russell
9    because he was the head of sales, and yes.
10        Q    So what you told plaintiffs was that
11   Mr. Sears was involved in negotiating agreements
12   with customers?
13        A    Correct.
14        Q    Not specifically that he negotiated
15   "secret priority agreements".  Is that right?
16        A    Well, the point is he was
17   agreeing -- he would have been involved in the
18   financial agreements with the clients, and
19   therefore, by extension, if there were any
20   priority agreement, that would have been generally
21   part of that.
22        Q    But you do not know for a fact
23   whether there were any priority agreements, do
24   you?
25        A    No, I do not.  I was not privy to

Page 128

1    those conversations.
2         Q    So the scope of your knowledge is
3    that you know Mr. Sears negotiated agreements with
4    customers, but you don't know whether those
5    agreements said anything about priority or not,
6    right?
7         A    Correct.
8         Q    Paragraph 121 goes on to say:
9         "Currenex executives, Sears, Gilman and
10   Rosenwald, all had close relationships with HC
11   Tech and were involved in negotiating the secret
12   deals."
13        Do you see that?
14        A    I do.
15        Q    Is that an allegation that you
16   conveyed to plaintiffs?
17        A    I believe so because -- yes.
18        Q    And the reference here to
19   "negotiating the secret deals", is that again a
20   reference just to the fact that there were
21   commercial agreements between HC Tech and
22   Currenex?
23        A    No.  There was also the fact that
24   Gilman and Rosenwald actually went and worked for
25   HC Tech, and Russell was the person speaking to