# Exhibit B

                                                               1

2      **exhibits produced

3              THE VIDEOGRAPHER:  Good morning.  We

4      are going on the record at 9:11 a.m. on

5      August 6, 2025.

6              Please note that microphones are

7      sensitive and may pick up whispering and

8      private conversations.  Please mute your

9      phones at this time and place them away

10     from the microphones as they can interfere

11     with the audio.  Audio and video recording

12     will continue to take place unless all

13     parties agree to go off the record.

14             This is media unit one of the video

15     recorded deposition of Jermaine Harmon in

16     the matter of Edmar Financial Company, LLC

17     et al. versus Currenex Inc. et. al. filed

18     in the United States District Court,

19     Southern District of New York, 21-cv-6598.

20             The location of this deposition is

21     Quinn Emanuel 295 Fifth Avenue, New York,

22     New York.

23             My name is Phil Glauberson

14      Mr. Harmon, I'm going to ask you not to
15      disclose the contents of our
16      communications. You can disclose the
17      general subjects of what we discussed, you
18      can disclose where we met, what we had for
19      food, things of that kind, but not the
20      contents of the communications.
21      Q.    Mr. Harmon, are you going to answer
22  my questions regarding what was discussed,
23  whether you discussed this litigation during
24  your lunch with plaintiffs' counsel?
25      A.    No, I'm not going to answer the

                                                        22

2   questions.
3       Q.    Are you refusing to answer based on
4   the instruction provided by plaintiffs' counsel
5   today?
6           MR. BROCKETT:  Excuse me counsel.
7       Objection. I didn't give any instruction.
8       I requested that Mr. Harmon respect our
9       legal privilege.
10      Q.    Are you refusing to answer based on

11    the request by plaintiffs' counsel here today?

12        A.    Yes.

13        Q.    You said that you had lunch with

14    Mr. Brockett. Who else was at that lunch?

15        A.    Casper Marney was at that lunch.

16        Q.    Was there anyone else at that lunch?

17        A.    No.

18        Q.    What is your understanding of Casper

19    Marney's relationship with plaintiff, if any?

20        A.    I don't have any understanding of

21    what their relationship is.

22        Q.    Do you understand that Casper Marney

23    was working with plaintiffs in connection with

24    this litigation?

25        A.    I believe so, yes.

                                                    23

2         Q.    And why do you believe so?

3         A.    Because he took me to lunch with

4     Mr. Brockett. So my assumption was they were

5     working together.

6         Q.    And you discussed this litigation at

7     that lunch; is that correct?

```
 8            MR. BROCKETT:  You can answer that
 9      yes or no.
10            MR. WILSON:  Is that an instruction
11      or a request.
12            MR. BROCKETT:  That's a request.
13            MR. ZUTSHI:  Mr. Brockett, there is
14      no basis under the rules for you to
15      interject requests or instructions to a
16      witness who you don't represent in this
17      proceeding.  It's completely improper and
18      I'm just going to say right now, on behalf
19      of our client, that we reserve the right
20      if the witness is impede in giving
21      truthful testimony in response to
22      questions in any way whatsoever to seek
23      any sanctions appropriate, including going
24      to the court and asking Judge Kaplan to
25      order the witness to come back here and to
```

                                                        24

```
 2      pay our costs and to have you pay our
 3      costs for any motion practice and any
 4      repeat appearance here.
```

43

```
 2    counsel.  Who reached out to set up that lunch?
 3         A.   I believe it was Mr. Marney.
 4         Q.   What was your understanding of why
 5    that lunch was being set up?
 6         A.   I didn't really have an
 7    understanding.  Casper reached out and said he
 8    wanted to have lunch with an attorney and I
 9    have known Casper for a while before that.
10         Q.   So what, so you took the lunch with
11    Mr. Marney and Mr. Brockett because he had a
12    prior relationship with Mr. Marney and he asked
13    you to take the lunch; is that correct?
14         A.   Yes.
15         Q.   And what did Mr. Marney say was the
16    purpose of the lunch?
17         A.   I don't remember him saying what the
18    purpose was.
19         Q.   Did you have any understanding of
20    what that lunch was set up for?
21         A.   Going into the lunch, no, I don't
22    believe so.
```

23      Q.      So why did you take the lunch?

24      A.      Because he asked me to.

25      Q.      You said that you had known

44

2       Mr. Marney prior to that lunch; is that

3       correct?

4       A.      Correct.

5       Q.      How did you come to know Mr. Marney?

6       A.      So the firm I worked for Alpari US

7       were part of a class action lawsuit and I

8       represented the owners of Alpari US in that

9       suit to recover the settlement.

10      Q.      Can you talk a little bit more about

11      that lawsuit?  What were the alleges in

12      connection with that lawsuit?

13      A.      I think it had something to do with,

14      I want to say last look and at the time Alpari

15      was a significant FX trading partner and so

16      they were, the owners of Alpari which was

17      closed down at that point, the owners of the

18      firm were due a payout from that settlement.

19      Q.      Do you recall when the Alpari