

**ROPES & GRAY LLP**
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 10, 2025

Alexander B. Simkin
T +1 212 596 9744
alexander.simkin@ropesgray.com

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Court Room 21B
New York, NY 10007-1312

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

We write on behalf of Defendants to respectfully request that the Court compel the production of (i) Named Plaintiff XTX Markets Limited's ("XTX") automated trading code, sometimes referred to as a "smart order router" (the "Automated Trading Code"); (ii) data from XTX's price generation source code that reflects XTX intentionally widened its spreads to reduce its trading volume (the "Protective Measure Data"); and (iii) the code for and emails generated by XTX's Automated Liquidity Management System (the "Liquidity Management System").

XTX alleges that it decided to trade on the Currenex Platform because of assumptions it made about how the Platform broke ties. Defendants long ago sought production of XTX's trading code that would show why orders were, *in fact*, routed to the Currenex Platform. When Currenex moved to compel this information in July 2024, XTX claimed that Currenex was "misguided" in its request and that "the source code cannot have any relevant information about routing trades as between platforms, because that is simply not how XTX's trading programs work." ECF No. 141 at 2 (claiming "no source code decides as between two platforms"). XTX's corporate representative, Jeremy Smart (who was also XTX's declarant opposing Currenex's motion to compel), recently testified to the *exact opposite* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 3 (XTX 30(b)(6) Tr.) at 7:14–24; *see also* Ex. 1 (Smart Aug. 27 Tr.) at 71:11–17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Promptly after Mr. Smart's deposition, Defendants requested the production of this newly disclosed computer code and data from Plaintiffs. Yesterday, Plaintiffs refused, arguing that the requested materials would be unduly burdensome to collect at this stage of fact discovery. While the Court should be skeptical of XTX's claims given their prior concealment, to the extent the requested

ROPES & GRAY LLP

- 2 -                                                                                          September 10, 2025

production is burdensome at this stage, the late hour is entirely the result of Plaintiffs' July 2024 misdirection. Nevertheless, in an attempt to accommodate Plaintiffs' burden claims, Defendants are willing to limit their requests for source code to relevant excerpts thereof.

I. **XTX's Misdirection Concerning Their Computer Code**

Defendants' Second RFPs, dated October 10, 2023 broadly requested documents and data concerning the algorithms or other methodologies XTX used in connection with its FX trading.[1] On July 9, 2024, Currenex moved to compel XTX to produce "the algorithms and other trading methodologies they used in connection with their FX trading on the Platform and alternative ECNs." ECF No. 134 at 1 (the "Motion"). Currenex's filing explained that "[k]nowing *why* Plaintiffs traded on Currenex (vs other platforms) for any particular trade is key to evaluating whether the Platform's tiebreaking rules had any impact on them at all." *Id.* at 3. Currenex also detailed the need to understand "[h]ow Plaintiffs evaluated their own execution quality on the Platform (e.g., bid-ask spread, fill rate, time to execution, frequency of last look rejection) and how that evaluation impacted Plaintiffs' subsequent order routing." *Id.*

On July 17, 2024, Plaintiffs opposed the Motion and submitted a supporting declaration from Mr. Smart (the "Smart Declaration"). The Smart Declaration defined XTX's "source code" as "computer programs . . . to assist [XTX] in trading" and claimed that its source code provided no "relevant insights" into the topics Currenex identified, including how XTX "profited from the conduct alleged," "assesse[d] the execution quality of different platforms," and "evaluate[d] spreads," or the "factors XTX uses in deciding whether to trade by way of a given platform." ECF No. 139 at 2–3. Notably, in responding to Currenex's argument that the sought-after discovery was needed to understand why any particular order was routed to Currenex, XTX represented that "the source code cannot have any relevant information about routing trades as between platforms" because "[t]he algorithms work on each trading venue separately; no source code decides as between two platforms." ECF No. 141 at 2. That representation was plainly important to Judge Ricardo's ruling, which found that Currenex's argument "ignores the Smart Declaration, which denies that XTX's algorithms operated across platforms." ECF No. 146 at 14. As Mr. Smart's recent deposition testimony demonstrates, however, that denial was at best a misleading half-truth. Mr. Smart testified to the ████████████████████████████████████████████████████████████████████████████████ Neither the Smart Declaration nor Plaintiffs' briefing on the subject, nor any of the parties' meet-and-confer discussions, made any mention of the Automated Trading Code, Protective Measure Data, or Liquidity Management System.

---

[1] Document Request No. 10 seeks: "Documents and Data, including source code, concerning algorithms or other methodologies You used in connection with FX Transactions on the Platform or any other ECN or trading platform, including but not limited to algorithms or methodologies designed to evaluate, route, and/or place orders and/or to select trading platforms on which to place orders."

ROPES & GRAY LLP

- 3 -                                                                September 10, 2025

## II. The Requested Information is Relevant and Discoverable

### A. The Automated Trading Code is Relevant and Discoverable

Mr. Smart testified to XTX's use of the Automated Trading Code— ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 1 at 72:4–10. This functionality falls squarely within Defendants' prior document request and Motion, which Plaintiffs dismissed off hand, claiming that such code did not exist. See ECF No. 139 at ¶ 5. Yet Mr. Smart's own testimony is unequivocal: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* at 97:18-23; Ex. 2 (Smart Aug. 28 Tr.) at 239:21–23. Mr. Smart further testified that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 2 at 239:13–15, 256:7–11.

The Automated Trading Code bears on issues at the core of Plaintiffs' liability and damages claims. Plaintiffs allege they would have traded differently on the Platform and elsewhere had they known more about the alleged pre-2015 tiebreaking rules. Knowing *why* XTX placed a given trade on Currenex as opposed to other FX trading platforms is relevant to assessing Plaintiffs' claim that the alleged tiebreaking rules and last look rejection caused them to trade at "worse prices" (including how Plaintiffs assessed what a "worse price" was)— ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 1 at 96:7–12. Such information is also central to class certification, as it might reveal (for instance) that XTX employed a unique trading methodology that renders their claims atypical. In their opposition to the Motion, Plaintiffs did not (because they could not) deny the relevance of this information. Instead, they claimed that the information Defendants sought was not included in any code—while staying silent as to the existence of the Automated Trading Code. Plaintiffs cannot now claim that this code is irrelevant or disproportionate to the needs of the case.

### B. The Protective Measure Data is Relevant and Discoverable

According to Mr. Smart, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 3 at 113:7–114:5. ▉▉▉▉▉▉▉▉▉ Mr. Smart explained, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

This Protective Measure Data is relevant to the question of whether Plaintiffs suffered any harm as a result of the alleged tiebreaking rules, and if so, how to quantify that harm. Plaintiffs allege that the Platform's alleged "priority system" harmed them because they "paid too much when buying, received too little when selling, and incurred increased execution costs." TAC ¶ 12. Despite XTX's prior representation that "execution-quality analysis is not part of any algorithm/ source code," Mr. Smart testified that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

ROPES & GRAY LLP

- 4 -                                                             September 10, 2025

██████████████████████████████████████████████████████████ Ex. 2 at 261:2–3. ██████████████████████████████████████████████████ Ex. 3 at 113:7–114:5. This data is relevant given Plaintiffs' allegations that *the alleged tiebreaking rules* reduced their trading volume on the Platform. Whether and when XTX took steps to *affirmatively adjust its own trading volume* by widening (or tightening) its own spreads on the Platform based on signals it was (or was not) seeing in its performance is thus at the core of Plaintiffs' theory of harm.[2] Mr. Smart made clear that production of this data would not require XTX to produce the price generation source code itself, obviating the concerns raised in Plaintiffs' prior opposition.

### C. The Liquidity Management System is Relevant and Discoverable

Mr. Smart also testified about XTX's use of an automated "Liquidity Management System" ████████████████████████████████████████████████████████████████████ Ex. 3 at 124:6–19.[3] Mr. Smart described the Liquidity Management System as ████████████████████████████████████████████ *Id.* at 121:14–122:2. ████████████████████ *Id.* at 124:6–23. Defendants have not located such emails in Plaintiffs' production (let alone a complete set), and Plaintiffs' have not identified any.

Because the Liquidity Management System is probative of what performance metrics XTX relied on and how it used information about its performance to alter its trading, its code is relevant to Defendants' ability to test XTX's claim that Defendants' alleged conduct in this case (and not some other factor) caused its trading volumes on the Platform to be allegedly reduced. *See* TAC at ¶ 329 (alleging Plaintiffs "suffered reduced volumes at desired prices"). Mr. Smart testified that ███████████████████████████████████████████████████████████████████████████ Ex. 3 at 122:18–22. Thus, the only way to access this information is through production of the code itself.

---

[2] Plaintiffs may argue that this data does not provide the reasons for the spread adjustments. Even if that were true, the data is still relevant because it will show *when* and *how frequently* Plaintiffs widened their spreads as a protective measure.

[3] Plaintiffs may claim that this system is not relevant because it post-dates 2015, but Plaintiffs have not dismissed their claims with respect to that time period and so they must participate in discovery for that period.

ROPES & GRAY LLP

Respectfully Submitted,

| ROPES & GRAY LLP | KATTEN MUCHIN ROSENMAN LLP |
|---|---|
| /s/ Alexander B. Simkin | /s/ Peter G. Wilson |
| Gregg L. Weiner | Peter G. Wilson |
| Alexander B. Simkin | Elliott M. Bacon |
| 1211 Avenue of the Americas | 525 W Monroe Street |
| New York, New York 10036 | Chicago, IL 60661 |
| Telephone: (212) 596-5000 | Telephone: (312) 902-5200 |
| Facsimile: (212) 596-9090 | Email: peter.wilson@katten.com |
| Email: gregg.weiner@ropesgray.com | Email: elliott.bacon@katten.com |
| Email: alexander.simkin@ropesgray.com | |
| | *Counsel for Defendant HC Technologies, LLC* |
| Robert G. Jones (*pro hac vice*) | |
| 800 Boylston Street | |
| Boston, Massachusetts 02199 | CLEARY GOTTLIEB STEEN & HAMILTON LLP |
| Telephone: (617) 951 7000 | |
| Facsimile: (617) 951 7050 | |
| Email: robert.jones@ropesgray.com | /s/ Carmine D. Boccuzzi Jr. |
| | Carmine D. Boccuzzi Jr. |
| Samer Musallam (*pro hac vice*) | Rishi N. Zutshi |
| 2099 Pennsylvania Avenue NW | One Liberty Plaza |
| Washington, DC 20006 | New York, NY 10006 |
| Telephone: (202) 508-4600 | Telephone: (212) 225-2000 |
| Facsimile: (202) 508-4650 | Email: cboccuzzi@cgsh.com |
| Email: samer.musallam@ropesgray.com | Email: rzutshi@cgsh.com |
| | |
| *Counsel for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited* | *Counsel for Defendant Goldman Sachs & Co. LLC* |