quinn emanuel trial lawyers | new york

295 Fifth Avenue, New York, New York 10016 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S EMAIL ADDRESS
**danbrockett@quinnemanuel.com**

September 19, 2025

<u>VIA ECF</u>

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
Court Room 21D
New York NY 10007-1312

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan,

Plaintiffs respectfully request that Defendants Currenex, State Street Bank, and State Street Global ("Currenex") be compelled to produce additional "source code" information, as well as to provide supplemental document and data productions regarding two basic features of the Platform—fees charged, and daily volume.

## The OXOTA Source Code

At the heart of this case is how the Currenex FX trading Platform operated—how it decided which buyers would be matched with which sellers.  That includes not just the (undisputed) fact that Currenex secretly assigned priority numbers to users, but the (potentially, disputed) fact that Currenex also took arbitrage opportunities for itself or its designees "off the top."  As the complaint alleges:  "Currenex exploited its own see-all access to conduct 'triangular arbitrage,' where it would compare the available prices on at least three overlapping FX trades (e.g., EUR-USD, USD-JPY, EUR-JPY) in order to capture the arbitrage profits before regular customers trading on the affected pairs."  ECF 184 at 49, n. 13.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Plaintiffs previously were forced to move to compel the Platform's "source code." Magistrate Judge Ricardo granted that request: "Currenex is directed to produce the source code containing its matching algorithm and related documents as described in Request 49." ECF 146 at 18.[1]

It now appears that Currenex withheld responsive and relevant parts of the code. Specifically, former Currenex employee Nick Burrlock confirmed that ███████████████████████████████████████████████████████████████. *See* Ex. 1 at 41:4-42:20. Immediately after that testimony, Plaintiffs sought confirmation whether the code underlying this arbitrage-stealing functionality had been produced.

Instead, Plaintiffs learned that Currenex was taking the position that "OXOTA is not, and was not, a component of the Platform's matching engine, and had no impact on the way that ties were broken on the Platform." Currenex's excuse thus appears to be that, because Currenex matched itself on these trades *off-the-top*, regardless of price, the trades never got to any "tiebreaking" system at all. Even if that semantic trick were accepted with respect to "ties," failing to disclose that you are diverting trading opportunities off the top is still wrongful. And because completing a triangular arbitrage set of trades literally requires matching Currenex as the counterparty on three trades, it indisputably involves "matching" in any reasonable sense.[2] Thus, if this functionality exists, this part of the Platform's code is discoverable and should have been produced. And even if it were somehow deemed outside the prior requests and the Magistrate's order, shortly after Burrlock's testimony confirming the code's existence, Plaintiffs served a new document request directly on point.[3]

During conferrals, Currenex suggested the request came too late. But, as noted above, the request was made long ago. Currenex did produce source code and massive amounts of data, to be sure. But unpacking it and understanding it took time. And when Burrlock testified that in his view ████████████████████████████████████████████████████████████████████████ ████████████████ Ex. 1 at 43:19-44:12, Plaintiffs immediately asked Currenex to confirm how it treated this ████████ in its prior production. Thus, it was not until after Burrlock's deposition and its aftermath that it was revealed Currenex believed it necessary for Plaintiffs to serve a new, separate document request more specifically asking for *this* set of code. When Currenex refused to produce the code in response to that timely, on-point document request, this motion followed.

During conferrals, Currenex also labeled Burrlock's testimony "speculation." But when a Rule 30(b)(6) witness was put under oath and asked whether the system resulted in the pre-price diversion of trades, the witness could only say ███████████████████████████████████████ ████████████████ *See* Ex. 2 at 140:19-141:2. This half-denial also leaves unexplained why, for

---

[1] Request 49 sought "Documents sufficient to show the features and operation of the matching and Tiebreaking Rules implemented on the Currenex Platform, including: (a) the Source Code…"

[2] Currenex may argue the functionality was made available to others beyond Currenex/State Street. Even if Currenex allowed *others* to take trades off the top, too, the system would still be wrongful, and discoverable, including because it was not disclosed.

[3] E.g., Request 124: "To the extent not already produced, the source code for the OXOTA functionality on the Platform."

2

instance, internal Currenex documentation refers to this type of trading as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[4]

Because there appears to be a bona fide dispute over whether this functionality—i.e., a functionality that allowed for the diversion of trades that present arbitrage opportunities *before* the quotes went into the normal tiebreaking system—exists, this is a live issue and the code should be produced. Of course, the dispute might be resolved if Currenex simply stipulated to the existence of this functionality. Currenex also might provide clear declarations detailing a fulsome investigation and its conclusions as to this functionality for Plaintiffs to consider. Otherwise, Plaintiffs see no other way of resolving the bona fide dispute of how the "OXOTA" system actually operated, except to have that code produced.

### "Dollars Per Million" Brokerage Fees

Documents show Goldman paid ▮ per million on a stream it knew was getting special priority treatment.[5] HC Technologies paid brokerage amounts as high as ▮ per million.[6] These amounts were significantly higher than average brokerages, and were higher than where the Trading Defendants were not getting priority.[7] The trier of fact will be entitled to infer that the reason the Trading Defendants paid these amounts is because they knew they were getting favorable priority treatment. The trier of fact will also be entitled to infer that Currenex granted and adjusted priorities numbers not for the betterment of users, but to enrich itself.[8] And fees paid are also potentially relevant to many other issues, such as disgorgement, unjust enrichment, or other damages theories.

Unsurprisingly, then, Currenex does not and cannot contest the relevancy of discovery regarding fees paid, including on a comparable (per million traded) basis.[9] Instead, this motion exists because Currenex ran out the clock.

In response to Plaintiffs' request for fee-related discovery, Currenex has produced *individual contracts* that (sometimes) contain this information.[10] But it is difficult to believe that the only way Currenex tracked its fee structure was by individual paper files or emails. Currenex almost certainly has databases or other centralized ways of pulling fee data in an organized and more comprehensive format, which would also ensure the production is not the result of "cherry-

---

[4] Ex. 3 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[5] Ex. 4 at 111:9-11, 129:4-129:8, 130:14-130:23; Ex. 5.
[6] *See also* Ex. 6 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and Ex. 7 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[7] *See, e.g.*, Ex. 4 at 129:12-129:13 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 2 at 46:11-16 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[8] *See* Ex. 2 at 42:16-43:4 (noting a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[9] That is, in contrast to *total* fees paid, which could be different between Platform users merely because one trades a lot more.
[10] E.g., Request 104: "Documents regarding any Agreements for brokerage fees paid in 'dollars per million' or 'dpm' in exchange for access to specific price maker streams, liquidity pools, hubs, or views."

picking" sources or contracts. During conferrals, Currenex promised it was investigating making productions from centralized sources, but never confirmed it had or would do so.[11]

As fact discovery is closing and Currenex has been supposedly looking into this for months, it is time for action, not investigation. Currenex should be ordered to produce responsive data or other information from centralized sources, not just individual contracts. Alternatively, Currenex should submit a declaration detailing the investigation it promised to do over the last few months, explain the investigation's findings, and explain how it could possibly be that Currenex has no way to know what it charges users other than to manually read individual contracts. And Defendants should be barred from using undisclosed information to attack Plaintiffs' forthcoming views on what normal fees are in this industry.

### Volume and Related Information

Similarly, Currenex should be compelled to produce centrally located data regarding the Platform's average daily volume. Volume on the Platform relates directly to damages, among other things. And it may not just be total overall volume that matters, but also *what type* of volume. That is, Defendants may eventually argue that certain volume should not "count" in the damages calculus. Accordingly, Plaintiffs served discovery requests asking for basic volume-related information about the Platform.[12]

As with fee information discussed above, the relevance of this information is not disputed. Also as with the fee information, this data is almost certainly something Currenex, as the Platform operator, regularly tracks and has access to. And as with fee information, Currenex promised it was investigating making productions from centralized sources, but never confirmed it had or would do so.

Thus, Currenex should be ordered to produce responsive data or other information from centralized sources. Alternatively, Currenex should submit a declaration detailing the investigation it promised to do over the last few months, explain what that investigation found, and explain how it could possibly be that Currenex has no way of tracking volume. And Defendants should be barred from using undisclosed information to attack Plaintiffs' forthcoming views of the Platform's volume.

---

[11] E.g., Request 104 ("Documents regarding any Agreements for brokerage fees paid in 'dollars per million' …"). Similar information is being sought by Interrogatories, but Defendants treated nearly all Interrogatories as "contention" interrogatories, the final answers for which are still forthcoming.

[12] E.g., Request 13 ("Documents concerning the Currenex Platform's volume and market share, including its daily trading volume and share of the daily trading volume of FX transactions"), Request 109 ("Documents regarding the requested and filled Average Daily Volume ('ADV') on a yearly basis …"). As with brokerage fees, similar information is being sought by Interrogatories, but Defendants treated nearly all Interrogatories as "contention" interrogatories, the final answers for which are still forthcoming.

Respectfully submitted,

*/s/ Daniel L. Brockett*

Daniel L. Brockett

cc: Counsel of Record