

**ROPES & GRAY LLP**
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 22, 2025

Alexander B. Simkin
T +1 212 596 9744
alexander.simkin@ropesgray.com

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Court Room 21B
New York, NY 10007-1312

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

      We write on behalf of Defendants to reply to Plaintiffs' opposition (ECF No. 247) to Defendants' motion to compel the production of highly relevant XTX trading source code and data (ECF No. 230).[1] Plaintiffs' opposition is replete with semantic games (again). The bottom line is that XTX's heavily prepared 30(b)(6) designee testified in detail to the existence and use of certain tools that materially impacted XTX's trading on the Platform. Defendants are simply seeking sufficient discovery to understand how these tools, whatever one calls them, impacted XTX's trading on the Platform. Plaintiffs' only real response is that XTX's performance on the Platform is categorically irrelevant because Plaintiffs now claim that they wouldn't have traded on the Platform at all had they known that certain institutional liquidity providers (including XTX itself) received tie-breaking priority. But that claim is belied by the fact that XTX *still trades on the Platform to this day*, and transaction data produced in discovery shows that XTX did ▇▇▇▇ in trading on the Platform in 2022 (nearly ▇▇ of the Platform's total volume), the year *after* XTX learned of the allegations in the 2021 original complaint but *before* it learned in discovery that Currenex has not used priority in tiebreaking since 2015 at the latest (*i.e.*, during a period when Plaintiffs mistakenly believed the Platform was still using priority to break ties). Nor is Plaintiffs' relevance argument consistent with the Complaint, which alleges that XTX was harmed because it received "worse prices"

---

[1] Plaintiffs accuse Defendants of failing to meet and confer and for moving to compel information they were told does not exist. Neither claim is true. In the meet and confer, Plaintiffs conceded ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Ex. 1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Plaintiffs also conceded ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Plaintiffs also assert that Defendants' motion is not tied to any document request. Not so. *See* Mot. at 2 (explaining that the requested materials are responsive to Defendants' RFP No. 10).

ROPES & GRAY LLP

- 2 -                                                                      September 22, 2025

and experienced "reduced volumes" on the Platform due to the Platform's approach to tiebreaking. *See* TAC ¶ 329. The code and data Defendants seek go squarely to those allegations.[2]

**Automated Trading Code**. Defendants sought production of the Automated Trading Code that XTX's corporate designee explained ████████████████████████████████ ████████████████████████████████████████ Ex. 2 (Aug. 27 Tr.) at 71:11-17, 97:18-23. Plaintiffs concede that something along these lines exists, but that it is "intertwined" with other code and "evolving." ECF No. 247, at 2, n.1. That is true for virtually all source code and is not a basis to deny the motion. XTX also argues that it trades with its own money and therefore does not have a "best execution" mandate, but that is irrelevant to the process by which XTX routes its orders and its incentive to route them to whatever platform has the best price, as it alleges in the TAC and as Mr. Smart confirmed. TAC ¶ 227 ("Plaintiffs . . . endeavored to obtain the best prices available for their spot trades"); Ex. 2 (Aug. 27 Tr.) at 96:4-12 (████████████████████████████ ████████████████████████████). The Court also should not credit XTX's attempt to recast algorithmic trading as decisions by human beings simply because human beings created the computer code. Indeed, XTX advertises that "***XTX's trading is fully automated. It has no human discretionary traders***." Ex. 4 (XTX Disclosures on eFX Trading Practices) (emphasis added).

**Protective Measure Data**. Plaintiffs again resort to semantic games, stating that "no such *discrete dataset* exists." ECF No. 247, at 3 (emphasis added). But Mr. Smart's supplemental declaration and his 30(b)(6) testimony make clear that the *data does exist*. ECF No. 248 at ¶ 13 ("What exists . . . are raw numerical entries reflecting manual adjustments to spreads." In other words, data.); Ex. 3 (Aug. 28 Tr.) at 117:23-118:4 (████████████████████). Plaintiffs' argument that data may reflect spread widening for many reasons just reinforces the relevance of the data because the listed examples are all exculpatory—none are attributable to the Platform's tiebreaking. *Cf.* TAC ¶ 172 (alleging that tiebreaking rules caused "an artificial widening of bid-ask spreads"). Plaintiffs' conclusory statement that producing this data would take "hundreds" of hours and be a "long stream of numbers" should carry little weight in a case where Plaintiffs seek "potentially billions of dollars in damages," ¶ 290, and where Defendants' employees have had to spend almost 1,000 hours compiling more than 236 terabytes of data for production (much longer "streams of numbers"), *see* ECF No. 154-1 at ¶ 10, to say nothing of time spent extracting source code for the Platform's matching engine and answering Plaintiffs' dozens of questions about that data and code.

**Liquidity Management System**. Because Plaintiffs do not oppose Defendants' request for the automated emails generated by Liquidity Management System, the Court should order production of those materials. As to the code, Plaintiffs do not meaningfully contest that it is relevant. Instead, they make a burden argument, which should be rejected for the same reasons discussed above.

---

[2] Plaintiffs' observation that the requested materials, like much discovery in this case, are trade secrets is addressed by the Confidentiality Order providing enhanced protections for trade secret materials. *See* ECF 113 at 2-3 ("Highly Confidential" designation protects "trade secrets").

ROPES & GRAY LLP

Respectfully Submitted,

| ROPES & GRAY LLP | KATTEN MUCHIN ROSENMAN LLP |
|---|---|
| /s/ Alexander B. Simkin | /s/ Peter G. Wilson |
| Gregg L. Weiner | Peter G. Wilson |
| Alexander B. Simkin | Elliott M. Bacon |
| 1211 Avenue of the Americas | 525 W Monroe Street |
| New York, New York 10036 | Chicago, IL 60661 |
| Telephone: (212) 596-5000 | Telephone: (312) 902-5200 |
| Facsimile: (212) 596-9090 | Email: peter.wilson@katten.com |
| Email: gregg.weiner@ropesgray.com | Email: elliott.bacon@katten.com |
| Email: alexander.simkin@ropesgray.com | |
| | *Counsel for Defendant HC Technologies, LLC* |
| Robert G. Jones (*pro hac vice*) | |
| 800 Boylston Street | |
| Boston, Massachusetts 02199 | CLEARY GOTTLIEB STEEN & HAMILTON LLP |
| Telephone: (617) 951 7000 | |
| Facsimile: (617) 951 7050 | |
| Email: robert.jones@ropesgray.com | /s/ Carmine D. Boccuzzi Jr. |
| | Carmine D. Boccuzzi Jr. |
| Samer Musallam (*pro hac vice*) | Rishi N. Zutshi |
| 2099 Pennsylvania Avenue NW | One Liberty Plaza |
| Washington, DC 20006 | New York, NY 10006 |
| Telephone: (202) 508-4600 | Telephone: (212) 225-2000 |
| Facsimile: (202) 508-4650 | Email: cboccuzzi@cgsh.com |
| Email: samer.musallam@ropesgray.com | Email: rzutshi@cgsh.com |
| *Counsel for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited* | *Counsel for Defendant Goldman Sachs & Co. LLC* |