

ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 26, 2025

Alexander B. Simkin
T +1 212 596 9744
alexander.simkin@ropesgray.com

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street, Court Room 21B
New York, NY 10007-1312

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

      We write on behalf of Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited in opposition to Plaintiffs' September 19, 2025 letter motion (the "Motion") (ECF No. 259), which asks the Court to compel Currenex to produce irrelevant additional source code, as well as brokerage fee and trading volume information that Plaintiffs already have. For the reasons explained herein, the Court should deny the Motion.

    **I.**    **The OXOTA Source Code Is Irrelevant**

      Because their claims concern the alleged use of priority settings to manage order execution on the Currenex Platform, Plaintiffs have taken exhaustive discovery concerning the Platform's matching engine, including the production of the Platform's matching engine's source code and Platform trading data covering more than a decade. But the particular feature of the Currenex Platform at issue in this Motion—OXOTA (order-crossing-order triangular arbitrage)—had nothing to do with the Platform's matching engine, has not been used since 2012, and at its peak, never accounted for more than a tiny fraction of trading on the Platform. The OXOTA tool was a software offering that allowed Platform users to pursue triangular arbitrage opportunities—that is, trades designed to capitalize on pricing discrepancies between multiple currency pairs based on information that appeared on the order book available to all users. *See* Declaration of Brian Kelly, filed contemporaneously herewith, ("Kelly Decl.") at ¶¶ 4-5. The tool also increased liquidity for certain less-liquid currency pairs by placing resting limit orders in those pairs, thereby facilitating trades that might not otherwise occur. *Id*. at ¶ 6. Plaintiffs and their consulting witnesses have known about the pro-competitive, pro-consumer OXOTA tool since years before this lawsuit started and yet the term "OXOTA" does not appear anywhere in Plaintiffs' fourth attempt at a complaint (with the term "triangular arbitrage" only appearing in a footnote). It simply is not a part of this case.[1]

---

[1] Plaintiffs claim they discovered the existence of the OXOTA source code during July 2025 testimony of Nick Burrlock. But Mr. Burrlock is Plaintiffs' own consulting witness ▬▬▬▬

ROPES & GRAY LLP

- 2 -                                                       September 26, 2025

     Plaintiffs' Motion is an apparent tit-for-tat response to Defendants' motion to compel XTX's long-concealed trading code. Plaintiffs argue that the historic OXOTA source code should have been produced in response to Magistrate Judge Ricardo's October 11, 2024 order directing Currenex to produce the source code *for the Platform's matching engine*, ECF No. 146 at 18, which Currenex did in early December 2024. But OXOTA source code was not included in that production because ***it is not a component of the Platform's matching engine***. Kelly Decl. at ¶ 8. Trades executed via the tool were completed by submitting orders that would only then be subject to the Platform's matching engine, just as if they had been placed without the OXOTA tool. Ex. B (Sept. 16, 2025 email from M. Gaioni to T. Lepri).[2] In other words, orders placed using the OXOTA tool were subject to the exact same tiebreaking rules as any other order. Kelly Decl. at ¶¶ 7-8. Contrary to Plaintiffs' mischaracterization of the facts, the OXOTA tool did not allow triangular arbitrage opportunities to be taken before they reached the order book. *Id.* at ¶ 7.

     Plaintiffs claim that they would be satisfied with a clear explanation of the OXOTA tool's operation, but that offer rings hollow where their Motion takes pains to obscure that they have had Currenex's explanation for a week. That said, taking Plaintiffs at their word, the attached declaration of Brian Kelly provides the requested explanation and should moot their Motion. Plaintiffs can also ask appropriate questions at the forthcoming deposition of Currenex's corporate representative, Mr. Kelly, scheduled for October 9, 2025 (rescheduled from September 11, 2025 at Plaintiffs' request). No further relief is needed, or warranted.[3]

---

[redacted] Ex. A (Burrlock Tr.) at 115:8-22.

[2] For this reason, any trades executed through use of the OXOTA tool would be reflected in the trading data produced to Plaintiffs in this case; the issue in this Motion is limited to whether Currenex must undertake the burden of producing source code for a tool that has no bearing on whether, how, and when any priority settings were in use.

[3] Plaintiffs claim testimony from "a Rule 30(b)(6) witness" supports their allegations. But that is not true. Plaintiffs are referring to Jim Foster, who testified on behalf of *State Street Bank's eFX trading desk, not on behalf of Currenex*. Mr. Foster testified that he has [redacted] . *See* Ex. C (State Street Bank 30(b)(6) Rough Tr.), at 58:19-24; 139:15-23; ECF No. 259-2, at 140:25-141:2. Moreover, Mr. Foster's testimony was that he [redacted] Mot. at 2. Plaintiffs also point to an "IPS User Guide" as supposedly suggesting that the OXOTA tool was "for Currenex use only." But that guide does not reference the OXOTA tool, which in any event, was available to and used by Platform participants. Kelly Decl. at ¶ 9.

ROPES & GRAY LLP

- 3 -                                                                              September 26, 2025

## II. Plaintiffs Already Have Documents Showing The Brokerage Fee Information They Seek

Plaintiffs have also unnecessarily burdened this Court with a request to compel production of brokerage fee information that *Currenex already produced to Plaintiffs* well before the close of fact discovery.[4] Indeed, Plaintiffs do not dispute that the requested information has been produced. Nor could they. Contrary to Plaintiffs' contention that Currenex "ran out the clock" on this issue, by August 20, 2025, Currenex had produced over two thousand non-privileged service agreements between Currenex and Platform participants from the relevant period that were identified as a result of a reasonable search—over a thousand of which were produced nearly eight months earlier.[5] As evident from the exhibit that Plaintiffs themselves attach to their Motion, *see* Exhibit 5 at GS-EDMAR-00920854, those service agreements contain the exact information that Plaintiffs seek: fee schedules showing the dollars per million brokerage fees that Platform participants agreed to pay in exchange for Currenex's services. Indeed, these documents are the definitive source for this information, as they are the binding contracts setting out the terms on which participants agreed to use the Platform. Kelly Decl. at ¶¶ 10-11.

In an apparent effort to avoid the work associated with reviewing the agreements that Plaintiffs requested and that Currenex expended considerable time and resources to gather and produce, Plaintiffs seek the production of this already-produced information in a more "organized" manner from "centralized sources" that they surmise (without any factual basis) must exist. While Currenex has repeatedly explained to Plaintiffs that the produced service agreements are the source of historic brokerage fee information, Currenex nevertheless agreed in early August 2025 to investigate whether such fee information might *also* be maintained in a centralized database. On August 29, Currenex informed Plaintiffs that it was continuing to look into this question. To Currenex's understanding,

---

[4] This discovery has made clear that Plaintiffs will be unable to support their speculative theory that Platform participants paid higher brokerage fees in exchange for priority. *See, e.g.*, Ex. D (Goldman 30(b)(6) Rough Tr.) at 92:7-10 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■). Currenex also rejects the baseless suggestion that it has "cherry picked" agreements for production. Mot. at 3–4. Plaintiffs offer no support for this accusation, which plainly reflects their ongoing disappointment and regret that the actual facts do not support their imagined claims.

[5] Currenex has timely responded to Plaintiffs' various requests for fee information. Plaintiffs originally requested the production of brokerage invoices for the Trading Defendants. In response to that request, Currenex produced approximately 7,000 brokerage invoices by December 30, 2024. Five months later, on May 7, 2025, Plaintiffs served a new document request for agreements for brokerage fees paid in "dollars per million." In response, Currenex directed Plaintiffs to the over 1,000 service agreements it had already produced and, following further discussions, Currenex agreed to make a supplemental production of service agreements, which was completed by August 20, 2025.

**ROPES & GRAY LLP**

- 4 -                                                                September 26, 2025

the parties were not at any impasse, as its investigation continued and the undersigned heard nothing further from Plaintiffs until they unexpectedly filed this Motion.

Had Plaintiffs conferred prior to filing this Motion, they would have learned that Currenex's investigation, which included discussions with relevant billing department employees, confirmed that Currenex's electronic billing system reflects *current* brokerage rates with existing clients, and does not retain historical fee information that can be queried to generate the report that Plaintiffs seek. Kelly Decl. at ¶ 13. Accordingly, Currenex's billing system does not allow it to pull historical information about brokerage fees during the almost 17-year class period. *Id.* Such historical information is documented in the agreements themselves. We believe this explanation resolves Plaintiffs' Motion on this point, but they can also ask appropriate questions to Mr. Kelly at his forthcoming October 9 deposition.

### III.  Plaintiffs Already Have Documents And Data Evidencing The Platform's Trading Volume

Plaintiffs again seek information that has already been produced by Currenex long ago. Plaintiffs needlessly ask this Court to compel Currenex to "produce responsive data or other information from centralized sources" reflecting the Platform's trading volume. But Plaintiffs have had over a decade's worth of Platform trading data from the proposed class period—221 terabytes in total—for nearly a year, as Currenex produced that information to them in December 2024. This data shows the activity and volume on the Platform during that time. No additional centrally maintained transactional data reflecting Platform volume exists. Kelly Decl. at ¶¶ 14-15.

While the already-produced trading data fully addresses Plaintiffs' request for this information, Currenex also conducted an extensive custodial review, searching literally millions of documents using the parties' agreed-upon search terms, such as "daily trading volume," among others, aimed at Plaintiffs' request for volume information. In addition, at Plaintiffs' request, Currenex supplemented its initial custodial review with additional search terms aimed at identifying certain daily volume reports that were mentioned during a deposition, and produced over 3,000 additional documents based on this search (with over 1,000 produced by September 19, 2025 and an additional approximately 2,000 produced on September 25, 2025). Had Plaintiffs met and conferred with Currenex before filing their letter-motion, they would have realized that there was no need to involve the Court in this wholly manufactured—and now completely moot—dispute.

*        *        *

For the foregoing reasons, Plaintiffs' Motion should be denied.

ROPES & GRAY LLP

Respectfully Submitted,

ROPES & GRAY LLP

*/s/ Alexander B. Simkin*
Gregg L. Weiner
Alexander B. Simkin
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-5000
Facsimile: (212) 596-9090
Email: gregg.weiner@ropesgray.com
Email: alexander.simkin@ropesgray.com

Robert G. Jones (*pro hac vice*)
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951 7000
Facsimile: (617) 951 7050
Email: robert.jones@ropesgray.com

Samer Musallam (*pro hac vice*)
2099 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
Email: samer.musallam@ropesgray.com

*Counsel for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

ROPES & GRAY LLP

## CERTIFICATE OF SERVICE

      I hereby certify that on September 26, 2025, I served a true and correct copy of the foregoing by electronic mail transmission on all counsel of record.

                                                                                      */s/ Alexander B. Simkin*
                                                                                       Alexander B. Simkin