UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDMAR FINANCIAL COMPANY, LLC; IRISH BLUE & GOLD, INC.; XTX MARKETS LIMITED; and DSQUARE TRADING LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>CURRENEX, INC.; GOLDMAN SACHS & CO. LLC; HC TECHNOLOGIES, LLC; STATE STREET BANK AND TRUST COMPANY; STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED; and JOHN DOE DEFENDANTS 1-5,<br><br>Defendants. | Case No. 1:21-CV-06598 (LAK) |

**DECLARATION OF BRIAN KELLY IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF OXOTA SOURCE CODE AND FEE AND VOLUME INFORMATION**

Pursuant to 28 U.S.C. § 1746, I, Brian Kelly declare as follows:

1. I am over 18 years of age, and I understand the obligations of an oath.

2. I am the Global Head of Product Management at Currenex, Inc. ("Currenex").

3. I make this Declaration in support of Currenex's opposition to Plaintiffs' letter-motion to compel Currenex to produce (i) the source code related to the order crossing order triangular arbitrage ("OXOTA") tool that was historically available to participants on the Currenex Platform; (ii) information regarding brokerage fees that Currenex Platform participants paid in exchange for Currenex's services; and (iii) information regarding the trading volume on the Currenex Platform during the 2005 to August 2021 time period. The statements herein are based

-2-

upon my personal knowledge and belief, and based upon information conveyed to me by other employees of Currenex and State Street Bank and Trust Company.

### A. The OXOTA Tool Does Not Implicate The Platform's Matching Engine

4. The OXOTA tool on the Currenex Platform was a specialized software application that assisted Platform participants in identifying and/or executing triangular arbitrage opportunities within the Platform.

5. Currenex's records reflect that the OXOTA tool was utilized on the Platform during the period of 2006 through 2012. During that time, the OXOTA tool operated on the Platform by receiving a feed of the same order book (*i.e.* the information on resting limit orders posted by other Platform participants) that would otherwise be available to the participant whether or not that participant was using the tool. The tool would analyze available pricing information across this market data and identify potential arbitrage opportunities that could be executed on within the Platform. Once an opportunity was identified, the tool would, based on configurations implemented by the Platform participant, place orders in the Currenex order book to try to capitalize on that perceived opportunity.

6. The OXOTA tool also served to increase liquidity for certain less-liquid currency pairs. This is because one function of the tool was to allow users to place resting limit orders across often less-liquid currency pairs based on its identification of pricing discrepancies in the market data it ingested. Those resting limit orders could be traded against by other Platform participants, increasing liquidity for the less-liquid currency pair and enabling trades that would not otherwise be available.

7. I am aware that Plaintiffs in this Action have alleged that the OXOTA tool enabled those using it to identify and trade on triangular arbitrage opportunities by analyzing resting limit

orders before they entered into the Platform's order book. This allegation is not true. As described above, the inputs for the OXOTA tool were the resting limit orders that had already been posted to the Platform's order book. Those orders were equally available to participants using the OXOTA tool and to those who were not (assuming, that is, that those participants all had access to that liquidity in the ordinary course based on their own respective counterparty relationships and liquidity settings). Those using the OXOTA tool had no advantage over other participants with respect to when and how they could see or place and fill orders against that liquidity.

8. The OXOTA tool identified trades for execution in the manner described above, and its output was orders that then flowed into the Platform's matching engine to determine whether or not they would be filled, in the same manner as any other order placed on the Platform. Once those orders were submitted, they were subject to the Platform's matching engine just like any other participant's order placed without use of the OXOTA tool (including with any other triangular arbitrage tool). The Platform's matching engine did not distinguish between orders submitted using the OXOTA tool and those submitted by other means. Put differently, orders placed using the OXOTA tool were not prioritized above or treated differently from orders placed in any other manner. As such, the source code for the OXOTA tool was not part of the source code for the Platform's matching engine.

9. The Currenex "IPS User Guide" attached to Plaintiffs' Motion (ECF No. 259-3) is an external user guide for Currenex's Intelligent Pricing Server ("IPS"). Similar to the OXOTA tool, IPS can be used to create synthetic pairs to increase liquidity, albeit by virtue of streaming prices rather than submitting orders. Both IPS and the OXOTA tool were available to and used by Platform participants.

### B. Brokerage Fee Information

10. As a matter of corporate practice, Currenex enters into written service agreements with clients who sign up to use the Currenex Platform. Those agreements generally include, among other things, a fee schedule setting out what the client will pay Currenex in exchange for services it receives in connection with the client's use of the Platform, typically denominated in dollars per million brokerage amounts (*i.e.*, the fees that client will pay for each million dollars worth of the relevant activity the client transacts on the Platform).

11. The fee schedules appended to these service agreements are the official and definitive source for each client's dollars per million brokerage rates.

12. Once a new agreement (or an amendment to an existing agreement) is executed, the associated fee information is transmitted to members of Currenex's billing team. Those team members enter the new (or updated) fee information into Currenex's electronic billing system, which is then used to calculate brokerage fees incurred and to issue invoices.

13. The electronic billing system utilized by Currenex for this purpose reflects existing fee arrangements with existing clients. The system does not retain historical fee information that can be queried to generate a report of the fees that were in place during prior periods. That historical fee information would instead be available in the relevant service agreements.

### C. Trading Volume Information

14. In connection with this Action, Currenex has extracted and produced to Plaintiffs the historical trading data from the Platform that is currently available. This production includes approximately 221 terabytes of data from the period prior to August 2021, and approximately 18 terabytes of data from the period from August 2021 through August 2022.

15. The produced trading data reflects the activity on the Currenex Platform during the period for which the trading data is available. As a result, this data reflects and can be used to calculate the total trading volume on the Platform during that time period, as well as the types of trading activities that volume is associated with (e.g., executed and unexecuted trades, or trades made pursuant to white label accounts).

16. I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on September 26, 2025.

_____
Brian Kelly