**quinn emanuel** trial lawyers | new york

295 Fifth Avenue, New York, New York 10016-7103 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S EMAIL ADDRESS
**danbrockett@quinnemanuel.com**

September 30, 2025

**BY ECF**

The Honorable Lewis A. Kaplan
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Court Room 21B
New York, NY 10007

Re:   *Edmar Financial Company, LLC et al v. Currenex, Inc. et al*, Case No. 21-cv-06598

Dear Judge Kaplan:

Plaintiffs respectfully request the Court consider this reply in further support of their motion to compel OXOTA-related source code and centrally located fee and volume data, ECF 259. Defendants do not object to Plaintiffs' filing of a reply request.  *See* ECF 262.

**OXOTA source code.**[1]  Currenex does *not* resist production on trade secret or burden grounds.  It argues only relevance, relying on a declaration that merely sets up factual disputes between Currenex employees—Brian Kelly and Nick Burrlock—about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  *See* Ex. 1 at 41:4–42:20.  Kelly's declaration also contradicts contemporaneous documents or is silent where the record is clear.  For example, State Street's 30(b)(6) witness, Jim Foster, admitted in emails that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  *See* Exs. 2-3.  Finding arbitrage opportunities ▓▓▓▓▓▓▓▓▓▓ means unfairly finding arbitrage opportunities ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  By way of another example, Kelly suggests "participants" (plural) could use the functionality.  *See* Kelly Dec. (ECF 290) ¶¶ 5, 7.  But Kelly does not identify a *single party* other than State Street or Currenex with access to the OXOTA tool.  *Id.*  Nor does Currenex identify where this supposedly open-to-all functionality was disclosed to Currenex customers.  In fact, Currenex appears to have had

---

[1]  The request is timely.  Currenex cannot have it both ways: it claims OXOTA has "never been part of the case," yet also insists Plaintiffs' request is untimely because OXOTA has supposedly been at issue for years.  In fact, manipulation of arbitrage opportunities was part of the original complaint, ECF 1 ¶ 69; Currenex should have produced the OXOTA source code long ago; Plaintiffs only later discovered it was not in the production; and Plaintiffs made a timely, separate request more than a month before fact discovery closed.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Ex. 4. Also ignored by Kelly is the evidence *Currenex* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Exs. 5-6. Platform operators should not be trading on their own platform. Kelly further conflicts with the record about when the functionality existed.[2] And he is silent on whether OXOTA functionality came bundled with special "priority" rights.

There are thus bona fide disputes about what Kelly opines on, and other problems with the OXOTA system that he ignores. Currenex's attempt to trivialize its decision to nonetheless withhold the source code by characterizing this motion as "tit-for-tat" is baseless. Defendants' own demand for XTX's source code was frivolous: XTX established that the functionality Defendants hypothesized did not exist, and even if it had, it would be an irrelevant trade secret requiring *thousands* of hours to extract. *See* ECF 247, 248, 271. By contrast, Plaintiffs have demonstrated relevance here, Currenex admits OXOTA exists, does not claim trade secret protection, and has offered no evidence that producing the code would be burdensome.

***Brokerage fee information.*** Currenex argues it need not produce fee *data* because it produced some *paper contracts*. But if Currenex maintained fee data in a central database, it would have an obligation to produce that data *in addition to* whatever paper contracts it decided—using still-unknown criteria—to produce. After months of dodging the question,[3] Currenex admits it does keep and can pull fee data, it just has been overwriting that data during the lifetime of this case. Putting aside the spoliation issue created by that admission, Currenex should produce its centrally maintained fee data. Even if some customers may have recently agreed to updated terms, others may not have. And generally, even "current" data may still be circumstantial evidence putting into context, for instance, Goldman's agreement to pay ▇▇▇▇▇▇▇▇▇ for a prioritized stream.[4] Currenex does not argue it would be burdensome to produce this data.

***Volume information.*** Kelly does not dispute that Currenex has centralized volume information. Kelly does not dispute that Currenex can, and does, regularly use its centralized systems to understand volume on the Platform. Currenex should thus be ordered to produce *all* volume-related data, including if necessary by using whatever data systems it itself uses to monitor Platform volume, to produce a comprehensive report (or set of reports) on Platform volume here. Currenex cannot avoid such obligation by telling Plaintiffs it is theoretically possible for Plaintiffs to instead manually add up every individual transaction amongst 239 terabytes of individual transaction data. Nor can Currenex avoid its obligation by producing what scattershot emails about "volume" it happened to locate using search terms. Currenex does not argue it would be burdensome to produce this data.

---

[2] *See* Ex. 7 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); Ex. 8 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).
[3] Plaintiffs adequately conferred. The requests for brokerage fee information were made in May, yet right up until the fact discovery deadline Currenex's repeated position was that it was "still investigating,"
[4] Defendants cite testimony for the fact ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ But having a generic ends in mind (making money) does not excuse every chosen means (robbing a bank). That brokerage fees purportedly fluctuate with expected ▇▇▇▇▇ thus does not excuse the still-undisputed fact that Goldman paid ▇▇▇▇▇▇▇ for a stream that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *E.g.*, Ex. 9 at 130:14-131:8.

Respectfully submitted,

 /s/ *Daniel L. Brockett*

  Daniel L. Brockett

cc: Counsel of Record

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2025, I served a true and correct copy of the foregoing by electronic mail transmission on all counsel of record.

                                                  */s/ Daniel L. Brockett*
                                                  Daniel L. Brockett