**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EDMAR FINANCIAL COMPANY, LLC;
IRISH BLUE & GOLD, INC.; XTX
MARKETS LIMITED; and DSQUARE
TRADING LIMITED,

                          Plaintiffs,

        vs.

CURRENEX, INC.; GOLDMAN SACHS &
CO. LLC; HC TECHNOLOGIES, LLC;
STATE STREET BANK AND TRUST
COMPANY; STATE STREET GLOBAL
MARKETS INTERNATIONAL LIMITED;
and JOHN DOE DEFENDANTS 1-5,

                        Defendants.

Case No. 21-cv-06598

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS**
**CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ................................................................................2

    A.    General Industry Background ................................................................2

    B.    Evidence of the Common Scheme ........................................................4

    C.    Currenex Disclosures and Omissions ..................................................6

LEGAL STANDARD ................................................................................8

ARGUMENT ................................................................................9

I.      THE PROPOSED CLASS SATISFIES RULE 23(A) ...................................9

    A.    The Proposed Class Meets the Numerosity Requirement.......................9

    B.    The Proposed Class Meets the Commonality Requirement ..................10

    C.    The Proposed Class Representatives Meet the Typicality Requirement ..............10

    D.    The Proposed Class Representatives and Counsel Meet the Adequacy Requirement ................................................................10

II.    THE PROPOSED CLASS SATISFIES RULE 23(B)(3) ............................13

    A.    Common Questions of Law and Fact Predominate ............................13

        1.    Extensive Common Evidence of Defendants' Priority Scheme Overwhelmingly Supports Predominance .................................14

            (a)    Common evidence will show that Currenex secretly assigned numbers to break ties ....................................14

            (b)    Common evidence will show Currenex gave improper access to Trading Defendant HC Tech ...........................16

            (c)    Common evidence will show the wrongful acts were never disclosed and Currenex misrepresented its trading protocols ........17

            (d)    Common evidence will show that the Trading Defendants knowingly exploited the system ....................................18

                 (i)    State Street Bank .......................................................18

                 (ii)    Goldman Sachs ........................................................19

                 (iii)    HC Tech ..................................................................20

         2.    Injury and Damages Can Be Shown on a Classwide Basis .....................21

            (a)    All class members were harmed by unjustly imposed fees ..........22

            (b)    All class members were harmed by decreased competition and increased adverse selection costs ...........................23

(c)    All class members were harmed by increased costs of rejections ...................................................................26

3.    Common Evidence Can Satisfy the Elements of Plaintiffs' Claims..........27

(a)    Fraud .............................................................................27

(b)    Conspiracy to defraud and aiding and abetting fraud ...................30

(c)    N.Y. General Business Law § 349................................30

(d)    Antitrust claims.............................................................31

(e)    Unjust enrichment ........................................................34

(f)    RICO Claims.................................................................34

4.    The Expected Statute of Limitations Defense Changes Nothing..............35

B.    Resolving the Dispute as a Class Action Is Superior to Any Alternative.............39

III.    THE COURT SHOULD APPOINT QUINN EMANUEL AND RUDDY GREGORY AS CO-LEAD COUNSEL ..........................................................40

CONCLUSION....................................................................................40

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Actos Antitrust Litig.*,
  2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024)...................................................................9, 36, 38

*In re Actos Antitrust Litig.*,
  2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024).........................................................................35

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).....................................................................31, 40

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591, 117 S. Ct. 2231 (1997).....................................................................................39

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455, 133 S. Ct. 1184 (2013).....................................................................................2, 9

*In re Amla Litig.*,
  282 F. Supp. 3d 751 (S.D.N.Y. 2017)......................................................................................13

*In re Auction Houses Antitrust Litig.*,
  193 F.R.D. 162 (S.D.N.Y. 2000) .............................................................................................11

*Axiom Inv. Advisors, LLC v. Barclays Bank PLC and Barclays Cap., Inc.*,
  No. 1:15-cv-09323 (S.D.N.Y. Nov. 25, 2015).........................................................................38

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...............................................................................................21

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022) .......................................................................................................8

*Black v. Occidental Petroleum Corp.*,
  69 F.4th 1161 (10th Cir. 2023) ................................................................................................31

*Bridge v. Phoenix Bond & Indemnity Co.*,
  553 U.S. 639, 128 S. Ct. 2131 (2008).....................................................................................34

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 1720468 (N.D. Ill. May 27, 2022)...........................................................................24

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015)..........................................................................................31

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................................8

*City of Philadelphia v. Banc of Am. Sec. LLC*,
  2025 WL 2180607 (2d Cir. Aug. 1, 2025) (Summary Order) ............................9, 26

*Comcast Corp. v. Behrend*,
  569 U.S. 27, 133 S. Ct. 1426 (2013) ...................................................................33

*In re Coordinated Title Ins. Cases*,
  784 N.Y.S.2d 919 (Sup. Ct. 2004) ......................................................................29

*In re: Credit Default Swaps Antitrust Litig.*,
  13-MD-2476 (April 15, 2016), Dkt. No. 563 ........................................................39

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ..........................................................................31

*De Sole v. Knoedler Gallery, LLC*,
  137 F. Supp. 3d 387 (S.D.N.Y. 2015) .................................................................30

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015) ..................................................................9, 33, 39

*In re: Domestic Drywall Antitrust Litig.*,
  322 F.R.D. 188 (E.D. Pa. 2017) .....................................................................23, 39

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
  2023 WL 3570017 (S.D.N.Y. May 18, 2023) ................................................7, 30, 31

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .......................................................23

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
  902 F.3d 132 (2d Cir. 2018) ...............................................................................34

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ..........................................................................23

*F.T.C. v. Indiana Fed'n of Dentists*,
  476 U.S. 447, 106 S. Ct. 2009 (1986) .................................................................32

*Ge Dandong v. Pinnacle Performance Ltd.*,
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ...................................................27, 28

*Guenther v. Sedco, Inc.*,
  866 F. Supp. 786 (S.D.N.Y. 1994) ......................................................................39

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258, 134 S. Ct. 2398 (2014) ...........................................................35, 38

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251, 92 S. Ct. 885 (1972) .........................................................................39

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) .........................................................11

*Irvin v. Harris*,
    944 F.3d 63 (2d Cir. 2019) .....................................................................................10

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557, 101 S. Ct. 1923 (1981) ....................................................................34

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) .....................................................................................9

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    399 F. Supp. 3d 120 (S.D.N.Y. 2019) ...................................................................37

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) ...................................................................................11

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) .............................................................................31

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ..............................................................................21

*In re Magnetic Audiotape Antitrust Litig.*,
    2001 WL 619305 (S.D.N.Y. June 6, 2001) ..........................................................33

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173, 944 N.E.2d 1104 (2011) ..............................................................34

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ...................................................................................10

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ...................................................................................27

*Meredith Corp. v. SESAC LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015) ...............................................................14, 31

*Mirkin v. XOOM Energy, LLC*,
    2023 WL 5622099 (E.D.N.Y. Aug. 31, 2023) ......................................................36

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................11, 36

*In re Nassau Cnty. Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006).................................................................................35

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .........................................................................11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022)...........................................................................23, 25

*Osberg v. Foot Locker, Inc.*,
   2014 WL 5800501 (S.D.N.Y. Nov. 7, 2014)..................................................27, 35

*Paramount Media Group, Inc. v. Village of Bellwood*,
   929 F.3d 914 (7th Cir. 2019) ..............................................................................32

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   714 F. Supp. 3d 65 (E.D.N.Y. 2024) ..............................................................31, 33

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)......................................................................9, 13, 38

*Ramirez v. Riverbay Corp.*,
   39 F. Supp. 3d 354 (S.D.N.Y. 2014)...................................................................13

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)................................................................................13

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)................................................................................10

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .........................................................................29

*Sykes v. Mel Harris & Assocs., LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .......................................................................10

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)..............................................................................10, 34

*Tevra Brands LLC v. Bayer HealthCare LLC*,
   2024 WL 2261946 (N.D. Cal. May 16, 2024) ....................................................32

*Titan Grp., Inc. v. Faggen*,
   513 F.2d 234 (2d Cir. 1975)................................................................................29

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)..................................................................................33

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ...........................................................................32

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442, 136 S. Ct. 1036 (2016).............................................9, 10, 13, 26

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)...............................................................................34

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100, 89 S. Ct. 1562 (1969).................................................................33

## <u>Rules</u>

Fed. R. Civ. P. 23 ................................................................................... *passim*

## <u>Other Authorities</u>

6 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:1 (6th ed. 2025) .....................................39

## PRELIMINARY STATEMENT

At the center of this case lies a simple undisclosed practice: Currenex management secretly assigned numbers (priority values) to determine winners and losers on its electronic FX order book trading system (the "Platform").  Defendant Goldman summarized the scheme bluntly: ██ ████████████████████████████████████████████████ Defendant HC Tech echoed the same point, complaining it had been "████████████████████ ████████████████████████████████████████" Currenex, for its part, admits the practice existed, but tries to take refuge in the notion that it stopped in 2014.

No rational trader would use a trading venue where the operator's employees could secretly tilt the playing field at their whim.  Had users known such a system existed, they would have abandoned the Platform, and Currenex would have collapsed.  To prevent that, Defendants concealed the assigned-priority system.  When internal pressures for transparency became insurmountable, Currenex shut the system down rather than reveal it—recognizing disclosure would destroy the Platform's viability.

Common questions plainly predominate in this case.  Virtually every issue can be litigated with evidence that is common to the class.  How the system operated, why it violated every reasonable expectation for how a trading platform should function, Currenex's duty to disclose it, and other liability issues are all common to the class.  Resolution of these issues turns on what the Defendants did, not the Plaintiffs.

Common evidence—including witness testimony, documents, the expert report of Dr. Craig Pirrong (a world-leading economist at the University of Houston), and the expert report of Mr. David Woolcock (a longstanding FX professional who helped publish industry codes of conduct)—can show impact and damages to the class.  At a minimum, all class members deserve refunds of the brokerage fees they paid to the corrupt Platform operator and these are

1

demonstrable through common evidence.  Dr. Pirrong shows, using common evidence—trading data and a standard "before/after" pricing regression—how the scheme increased the cost of trading in other ways as well.

Because a class action is the method "best suited to adjudication of the controversy fairly and efficiently," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460, 133 S. Ct. 1184, 1191 (2013), Plaintiffs seek certification under Rule 23(b)(3) of the following class:[1]

> All persons and entities who completed at least one spot foreign exchange trade on the anonymous portion of Currenex, Inc.'s platform using the PROD stack from January 1, 2005, to July 21, 2014, or the PRET stack from July 1, 2007 to September 11, 2015.

## FACTUAL BACKGROUND

### A.    General Industry Background

This case concerns the market for foreign exchange ("FX") electronic order-book platforms that were directly accessible by buy-side traders.[2]  FX trading involves exchanging one currency for another—for example, U.S. dollars for Japanese yen (USD/JPY).  Participants trade FX for a variety of reasons, including to hedge exposures or to speculate on currency movements.

---

[1] Excluded from the class are Defendants, including their parents, subsidiaries, wholly owned affiliates, and those who are majority owners or holds a majority beneficial interest.  The term "Defendant" does not encompass a Defendant acting as an agent or on behalf of an unrelated entity.  Also not excluded as "Defendants" are investment company or pooled investment funds in which any Defendant has or may have a direct or indirect interest, or as to which its affiliates may act as investment advisors, unless the Defendant or any of its affiliates is a majority owner or holds a majority beneficial interest in the fund.  Also not excluded as "Defendants" are any "John Doe Defendants"; Plaintiffs are not pursuing claims against any John Doe Defendants.  Also excluded are the dismissed-with-prejudice entities of Edmar Financial Company, LLC and Irish Blue & Gold, Inc.

[2] Ex. 1 (Pirrong Rpt.) ¶¶ 220, 244.  "Ex. __" refers to the exhibits attached to the Declaration of Daniel L. Brockett filed herewith.

Much FX trading occurs over-the-counter ("OTC").  In OTC markets, customers contact known FX dealers—typically major banks—to request quotes for buying or selling a currency pair.  The dealer provides a quote, which the customer may accept or reject.

By contrast, order book platforms, such as the order book offered by Currenex, enable electronic execution through automated systems.[3]  Platform trading involves many distinct features and attributes from OTC trading.[4]  Participants on an order book can instantly accept or reject offers, as there will be "resting bids and offers available on the platform without request."[5]  Trading is also typically anonymous:[6] unlike OTC trading, counterparties on an order book often do not know each other's identities.[7]  Order books also allow participants to act as both price-makers (posting prices) and price-takers (accepting prices).[8]  These features make order-book trading distinct and not interchangeable with OTC execution or RFQ execution.[9]

Currenex was one of the earliest and most prominent order-book platforms for FX trading.  Defendant State Street acquired Currenex in 2007 for $564 million, reflecting its dominance at the time.[10]  Currenex's primary rival, Hotspot, was acquired in the same year for under $78 million.[11]  During the early years of the class period, Currenex often had more than *double* the average daily volume of Hotspot.[12]

---

[3]  Ex. 1 (Pirrong Rpt.) ¶¶ 30, 232.

[4]  *Id.* ¶¶ 221-231.

[5]  *Id.* ¶ 229.

[6]  Ex. 2 (Woolcock Rpt.) ¶ 42; Ex. 1 (Pirrong Rpt.) ¶ 231.

[7]  Ex. 1 (Pirrong Rpt.) ¶¶ 38-45, 231-235.

[8]  *Id.* ¶¶ 72-74.

[9]  *Id.* ¶¶ 221-235.

[10]  Ex. 3 (CXSSB00049646) at '647.

[11]  Ex. 4 (2006 Finextra Article titled: "Knight Capital buys Hotspot FX for $77.5m").

[12]  Ex. 1 (Pirrong Rpt.) ¶¶ 241-242.

Currenex describes the Platform as the "[P]roprietary [E]xecutable [S]treaming [P]rice" product, marketed as providing "high-speed trading, diverse liquidity, and complete anonymity."[13]  This product displayed bids and offers for FX pairs in a visible limit order book. In such a book, price-makers post bids or offers and price-takers accept them.  When users post identical prices, Currenex's tie-breaking rules determine which order executes first.

### B.     Evidence of the Common Scheme

For many years, Currenex secretly used manually-assigned priority numbers—controlled by senior sales and strategy personnel—to break pricing ties on its FX order book.[14]  Currenex witnesses admitted that the liquidity providers with more favorable priority values would win trades at the same price.[15]  The system was embedded in the source code (e.g., as a "getPriority" call function), and the central decision-makers—primarily then-Currenex employees Cary Rosenwald (Head of Strategy), Russell Sears (Head of Sales), and Sean Gilman (Chief Technology Officer)—unilaterally set or altered priority rankings, often without required documentation.[16] ███████████████████████████████,[17] but the records of changes were largely missing due to both poor record-keeping and a ████████████████ that

---

[13]  Ex. 5 (CXSSB00001181) at '182.

[14]  *See* Ex. 6 (CXSSB00899734) ██████████████████████████████████████████ ████████████████); Ex. 7 (CXSSB00571709) (████████████ ████████████████).

[15]  *See* Ex. 8 (Harmon Tr.) at 16:14-17:2 (admitting that "even though [the Currenex FX Platform] advertised that every order was first in/first out," liquidity providers with "priority" would "beat orders to the book"); Ex. 9 (Rosenwald Tr.) at 65:25-66:8 (████████████████ ████████████████████████████████; Ex. 10 (CXSSB00271742) (████████████ ████████████████████████████ .

[16]  Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 21:2-8 (████████████ ████████████████████████████); Ex. 6 (CXSSB00899734); Ex. 7 (CXSSB00571709); Ex. 12 (CXSSB00220161) at '163.

[17]  Ex. 12 (CXSSB00220161) at '161, '163.

wiped critical evidence.[18]  Meanwhile, key witnesses—including Rosenwald and Gilman—were evasive, claiming broad memory lapses even when confronted with documents, undermining their credibility.[19]

While the priority system was hidden from ordinary users, the three Trading Defendants knew about and benefited from it.  State Street received favorable priority on its trading streams and ██████████████████████████████████████████████.[20]  Goldman negotiated privately with Rosenwald and paid substantially higher brokerage fees (e.g., ████ per million) to obtain queue priority, reflecting clear knowledge of and participation in the scheme.[21]  Goldman documents and testimony confirm it understood ███████████████████████ ██████████████.[22]

HC Tech likewise enjoyed "very favorable" priority settings and paid increased fees as part of a pay-for-play arrangement.[23] ████████████████████████ ████████████████████████████████████████████████████ ████.[24] ████████████████████████████████████████████

---

18  *See* Ex. 13 (Currenex and State Street 30(b)(6) (Fortuna) Tr.) at 35:19-36:8 (████████ ████████████████████████████████); Ex. 12 (CXSSB00220161) at '163; Ex. 14 (Defendants' Supplemental Responses and Objections to Interrogatory No. 9) at 11-12.

19  *See, e.g.*, Ex. 9 (Rosenwald Tr.) at 172:10-14, 170:4-11; Ex. 15 (Gilman Tr.) at 162:12-14.

20  *See* Ex. 16 (State Street Bank 30(b)(6) (Foster) Tr.) at 49:20-50:8, 110:18-111:17.

21  *See* Ex. 17 (Schonberg Tr.) at 91:15-24, 129:4-13; Ex. 18 (GS-EDMAR-00920851) at '854 (████████████████████████████); Ex. 19 (GS-EDMAR-00002650) at '650-652.

22  Ex. 17 (Schonberg Tr.) at 83:2-4, 94:2-25.

23  Ex. 20 (Burrlock Tr.) at 16:24-17:3; Ex. 21 (CXSSB00754381); *see also* Ex. 6 (CXSSB00899734); Ex. 22 (HCTECH_0174870).

24  Ex. 22 (HCTECH_0174870); Ex. 23 (HCTECH_0174871).

███████████████████████████████.[25]  Former Currenex employee Burrlock testified

that he caught HC Tech using a log-in credential belonging to Currenex executive Russell Sears

to front-run another user.[26]  Contemporaneous documents refer to HC Tech having ███

██████████████████████████████.[27]

## C.    Currenex Disclosures and Omissions

Currenex disclosed nothing about the scheme allowing employees to assign prioritization

numbers, and the disclosures it did make were false and misleading.  Multiple Currenex

executives, including its 30(b)(6) witnesses, ███████████████████████████

███████████████████████████████████████████.[28]

No witness was able to identify any Currenex user to whom they disclosed the system, either in

writing or even orally (other than the Trading Defendants of course).  ████████████████

████████████████████████████████████████████

█████████████████.[29]

Disclosure of tie-breaking rules on an electronic platform is particularly important.  This

is confirmed by, among other evidence, the expert report of David Woolcock, an industry expert

with decades of experience in FX trading markets.  Mr. Woolcock explains the industry norm is

to disclose tie-breaking rules, with the default being a transparent "FIFO" (first-in, first-out)

---

[25]    Ex. 24 (HCTECH_0030378); Ex. 25 (HCTECH_0090647); Ex. 26 (CXSSB00899625).

[26]    *See* Ex. 20 (Burrlock Tr.) at 27:25-32:1.

[27]    Ex. 27 (CXSSB00214236) at '240; *see also* Ex. 28 (GS-EDMAR-00336920).

[28]    *See* Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 40:9-19; Ex. 15 (Gilman Tr.) at 67:19-68:8 ██████████████ ████████████████████████████████); Ex. 29 (Liconte Tr.) at 134:20-135:24 (same); Ex. 9 (Rosenwald Tr.) at 183:5-21 (same).

[29]    *See* Ex. 30 (CXSSB00261652); Ex. 31 (CXSSB00719802) at '807.

rule.[30]  Under a FIFO tie-breaking system, the first liquidity provider to offer the best price wins

the trade.  There are variations on FIFO, but those variations are *disclosed*.[31]

To be clear, this case is not about whether Currenex operated a "strict FIFO" matching

system, a point this Court has already recognized.  *Edmar Fin. Co., LLC v. Currenex, Inc.*, 2023

WL 3570017, at *8 (S.D.N.Y. May 18, 2023) (rejecting argument that Plaintiffs could have

discovered the platform "did not follow 'strict FIFO'").  Rather, it is about an undisclosed

employee-assigned ranking and password-sharing system that no reasonable trader would have

tolerated.  As XTX CEO Alex Gerko testified, ██████████████████████████████

████████████████████████████ [32]  All other fact witnesses agreed that no

rational trader would accept the system Currenex was using.[33]  It did not just make the playing

field un-level; it left open the possibility the tilt could be changed at any moment at the whims of

---

[30]  Ex. 2 (Woolcock Rpt.) ¶ 36; *see also* Ex. 32 (Gerko Tr.) at 202:1-8 (██████████
████████████████); Ex. 33 (Clarke Tr.) at 84:4-13 (██████████
███████████); Ex. 34 (Smart (Aug. 27, 2025) Tr.) at 115:20-22.

[31]  Ex. 2 (Woolcock Rpt.) ¶¶ 36-40.

[32]  Ex. 32 (Gerko Tr.) at 203:22-24.

[33]  Ex. 35 (Smart (Day 2) Tr.) at 233:4-11 ████████████████

████████████████████████████████████

█████████████████████████████); Ex. 36 (Amrolia Tr.) at 62:22-63:2

(████████████████████████████; Ex. 33 (Clarke Tr.) at 59:8-18, 108:19-109:7 (████

████████████████████████████████; Ex. 37 (Smart

(30(b)(6)) Tr.) at 181:9-12██████████████████████████; Ex. 35 (Smart (Day 2) Tr.) at 232:17-233:11

███████████████████████████████████████  Ex.

38 (DSquare 30(b)(6) Tr.) at 319:25-320:5

██████████████████████████████████; Ex. 32 (Gerko Tr.) at

203:22-24██████████████████████

██████; Ex. 37 (Smart (30(b)(6)) Tr.) at 172:6-15██████

████████████████████████████████; Ex. 55 (Mitchell Tr.) at 158:4-22

██████████████████████████████████████████

████████████████████).

Currenex employees.  In the words of Mr. Woolcock, the system used *here* was "so unprecedented, bizarre, and unfair, that any rational trader would have expected disclosure."[34] So, too, was Currenex's sharing of employee passwords a "shocking departure from industry norms."[35]

Defendants' fraud was thus complete with their silence.  But they also issued outright lies and falsehoods.  As early as February 2005, Currenex's website represented: "Limit Orders are filled automatically by the first counterparty bank to stream a price that matches the order"—in other words, FIFO.[36]  Currenex's website included similar representations in numerous later years, including in the 2006 through 2014 period.[37]  A 2011 product profile issued by Currenex—"Currenex for Active Traders"—represented that Currenex used a "[l]ow-latency matching engine with 'first in, first out' (FIFO) prioritizing."[38]  Such disclosures cannot be squared with a system where Currenex employees could secretly declare winners and losers.

## LEGAL STANDARD

"The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions."  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020). As such, district courts should err on the side of granting class certification, and the Second Circuit gives "greater deference to district court decisions granting class certification than to decisions declining to certify a class."  *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022).

---

[34]    Ex. 2 (Woolcock Rpt.) ¶ 37; *see also* Ex. 1 (Pirrong Rpt.) ¶ 56.

[35]    Ex. 2 (Woolcock Rpt.) ¶ 3.

[36]    ECF 55-4.

[37]    *Id.*

[38]    Ex. 5 (CXSSB00001181) at '182.

Plaintiffs must satisfy Rule 23's standard only by a preponderance of the evidence. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

Plaintiffs need not prove the merits. *Amgen*, 568 U.S. at 459, 133 S. Ct. at 1191. What matters is that the claims are *capable* of resolution through common proof. *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015). When expert testimony is involved, "[t]he Supreme Court has said that '[o]nce a district court finds [expert] evidence to be admissible,' a district court can deny class certification based on the persuasiveness of the expert evidence only if 'no reasonable juror could have believed' the expert evidence." *City of Philadelphia v. Banc of Am. Sec. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) (Summary Order) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459, 136 S. Ct. 1036, 1049 (2016)).

## ARGUMENT

## I.      THE PROPOSED CLASS SATISFIES RULE 23(A)

### A.      The Proposed Class Meets the Numerosity Requirement

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "In the Second Circuit, numerosity is presumed when a class consists of 40 members or more." *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *15 (S.D.N.Y. Aug. 9, 2024). Currenex's own trade data confirms this threshold is easily surpassed, with hundreds of class members.[39] Class membership is ascertainable because it is defined using "objective criteria"—participation on the Platform during a specified period. *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017).

---

[39]    Ex. 1 (Pirrong Rpt.) ¶ 244.

**B.        The Proposed Class Meets the Commonality Requirement**

Commonality exists where "plaintiffs' grievances share a common question of law or of

fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997); *Tyson Foods*, 577 U.S. at 453,

136 S. Ct. at 1045 (commonality requires the putative class's claims to present an issue that is

"susceptible to generalized, class-wide proof").  "[E]ven a single common question will suffice."

*Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 286 (S.D.N.Y. 2012).  Here, numerous

issues are common, including without limitation: whether Currenex used employee-assigned

numbers to break ties; whether Currenex employees gave away passwords; whether Defendants

omitted to disclose such acts; whether the disclosures and omissions were material; whether the

Trading Defendants knew and exploited the practice; whether the scheme entitles users to

refunds; and whether the scheme raised class members' trading costs.

**C.        The Proposed Class Representatives Meet the Typicality Requirement**

Typicality is satisfied when "each class member's claim arises from the same course of

events and each class member makes similar legal arguments to prove the defendant's liability."

*Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).  Here, the named Plaintiffs traded FX on

Currenex during the class period and allege harm arising from the same undisclosed practices as

every other class member.

**D.        The Proposed Class Representatives and Counsel Meet the Adequacy
        Requirement**

To be adequate, the named plaintiffs must be free from fundamental conflicts of interest

and possess the ability and incentive to vigorously prosecute the action.  *Irvin v. Harris*, 944 F.3d

63, 71 (2d Cir. 2019).  Adequacy exists unless the named plaintiffs' "interests are antagonistic to

the interest of other members of the class."  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70,

90 (2d Cir. 2015).  "Not every conflict among subgroups of a class will prevent class

certification—the conflict must be 'fundamental' to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). Adequacy exists here.

*First*, the named Plaintiffs and class members are aligned in interest. Like other class members, they traded on the Platform both as a "taker" (generally, accepting someone else's price) and as a "maker" (generally, offering prices for someone else to accept). The named Plaintiffs assert the same causes of action, seek identical relief, and share an interest with all class members in proving Defendants' conduct and maximizing aggregate recovery.

*Second*, there are no disabling conflicts within the class. Defendants can be expected to argue that there are intra-class conflicts between makers and takers, who stand on different sides of FX trades. Courts have rejected this logic. In *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 513 (S.D.N.Y. 1996), the court dealt with a case also involving a class of both buyers and sellers. Defendants argued there were fundamental conflicts, but the court determined what mattered more was the shared interest of the class in "maximizing the aggregate amount of classwide damages." *Id.* Any tension between buyers and sellers "relates only to the apportionment of the damages," which was "not sufficient to defeat class certification." *Id.* at 513-515. In the ongoing stock loan litigation, which involves lenders and borrowers in the same class, Judge Failla similarly ruled that: "the presence of entities that are on opposite sides of a market in a class does not create a *per se* fundamental conflict" and alleged conflicts that "relate to damages allocation" do "not preclude certification." *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *9 (S.D.N.Y. Dec. 6, 2024).[40]

---

[40]    *See also In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000) ("Both buyers and sellers who have used defendants' services allegedly have been impacted by

The logic of these cases applies with equal, if not greater, force here. There is indisputably no conflict with respect to fees paid, for example—both makers and takers unjustly paid fees, enriching Currenex. That alone creates a unified interest in proving aggregate damages of *at least* $1.35 billion for fees alone.[41] Moreover, class members are unified in interest because *anyone could be a maker or a taker* on the Platform—the named Plaintiffs are prime examples of that. There is thus far more tying the buying and selling class members here together than dividing them.

Defendants can be expected to argue that intra-class conflicts exist because when a taker pays "too much" on a given trade, the maker gets "too much." This relates to Plaintiffs' allegations that the wrongdoing increased the adverse selection costs of class members. Again, that is just a portion of the damages being pursued. But even as to this category of damages sought, there is no conflict. As Dr. Pirrong explains, in a competitive market higher prices are not necessarily good or bad for price-makers; the effect depends on why prices moved.[42] Here, spreads widened because class members who provided liquidity *were themselves being saddled with higher trading costs* due to the scheme.[43]

This measure is thus just the portion of the extra adverse selection costs imposed on class members that manifested in form of observably wider spreads. Dr. Pirrong demonstrates that makers were harmed even more by adverse selection costs, in ways that are not observable in the

---

the artificial inflation of both buyers' and sellers' commissions pursuant to the conspiracy. Any distinctions between the two groups are of no moment at this stage of the litigation and pose no bar to class certification."); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) ("the mere presence of purchasers and sellers in a given class does not provide a basis for denying class certification").

[41]  Ex. 1 (Pirrong Rpt.) ¶¶ 2, 214, 244.

[42]  *Id.* ¶¶ 130-133.

[43]  *Id.* ¶¶ 131-133, 177-180; *see also* Ex. 37 (Smart 30(b)(6) Tr.) at 169:18-171:5.

spread data.[44]  That is, the scheme *did not* benefit class members, even those acting as liquidity providers, because the costs of providing liquidity were raised by *more than* what could even possibly be recovered with wider spreads.  This, among other reasons, is why all class members were harmed and why they all have a united interest in proving the scheme existed and in maximizing the aggregate recovery.[45]  It is also why, at a minimum, all class members should at least get their fees back, even on "making" trades.  For many reasons, the maker-taker issue at most raises issues for the plan of distribution.

*Finally*, Quinn Emanuel Urquhart & Sullivan, LLP and Ruddy Gregory PLLC are experienced in complex class actions and have devoted substantial resources to this case.  *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 365 (S.D.N.Y. 2014).  They are fully capable of representing the class.

## II.     THE PROPOSED CLASS SATISFIES RULE 23(B)(3)

### A.     Common Questions of Law and Fact Predominate

The predominance inquiry asks whether Rule 23(a)(2)'s common questions "are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson Foods*, 577 U.S. at 453, 136 S. Ct. at 1045.  Predominance is satisfied when the common, classwide issues are "more substantial than the issues subject only to individualized proof."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).  Predominance is a qualitative assessment—"not bean counting."  *In re Amla Litig.*, 282 F. Supp. 3d 751, 767 (S.D.N.Y. 2017); *see also In re Petrobras Sec.*, 862 F.3d at 271.

---

[44]   Ex. 1 (Pirrong Rpt.) ¶¶ 142-148.
[45]   Ex. 1 (Pirrong Rpt.) ¶¶ 2, 207-211.

Here, the proof is classwide.  Every claim turns on Defendants' uniform scheme to

secretly manipulate order execution through undisclosed priority assignments and preferential

data access.  Those issues will be proven with the same core body of evidence—internal

documents, testimony, source code, audit findings, and Defendants' own admissions.  *See, e.g.*,

*Meredith Corp. v. SESAC LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015) ("The central issue . . .

is whether [defendants] engaged in anti-competitive conduct proscribed by § 1 or § 2 of the

Sherman Act.  Resolution of this issue 'will not vary among class members.'").  No

individualized inquiry is needed to establish whether the scheme existed, how it functioned, or

whether it distorted market outcomes.  The common issues dwarf any individual ones, which are

peripheral and do not undermine the efficient classwide adjudication of liability.

  1. <u>Extensive Common Evidence of Defendants' Priority Scheme
Overwhelmingly Supports Predominance</u>

   (a) *Common evidence will show that Currenex secretly assigned
numbers to break ties*

Documents, testimony, and source code uniformly demonstrate that Currenex █████

████████████████████████████████████████████████████.[46] ████████

████████████████████████████████████████████████.[47]  Internal

correspondence confirms the scheme prioritized revenue over fairness.  For example, former

employee Nick Burrlock sounded an alarm to numerous Currenex and State Street executives:

"████████████████████████████████████████████████████████

---

[46]  *See* Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 21:2-8; Ex. 10
(CXSSB00271742) at '743; Ex. 31 (CXSSB00719802) at '807.

[47]  *See* Ex. 6 (CXSSB00899734) ██████████████████████████████████
████████████████████████; Ex. 7 (CXSSB00571709) (███████
████████████████████████████).



.[51] That decision—ending the program instead of explaining it to subscribers—is telling evidence of a uniform, inherently deceptive practice, provable through common evidence.

Common testimony reinforces this point. Currenex witnesses all admitted the scheme existed, but none could coherently explain why the priority function was created, how it operated, or why it ended. Gilman—the CTO—suggested he ███████ invented it because he had a ███████[52] Rosenwald, the key figure in numerous documents, professed near-total amnesia.[53] And CEO Cliff Lewis, for his part, claimed ignorance of the entire affair,[54] despite evidence showing otherwise.[55] The Trading Defendants, confronted with clear evidence that they purchased preferential treatment, shifted positions between claiming ignorance and

---

[48]   Ex. 30 (CXSSB00261652) (March 2014 email).

[49]   *See* Ex. 39 (CXSSB00572158) at '160; Ex. 40 (CXSSB00256122) at '124.

[50]   *See* Ex. 31 (CXSSB00719802) at '807.

[51]   *See* Ex. 39 (CXSSB00572158) at '160 (███████████████████████████
████████████████████████████████████████████████); Ex. 12
(CXSSB00220161) at '161, 163 (████████████████████████████████████████
██████); ); Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 41:10-22 (███████████
███████).

[52]   Ex. 15 (Gilman Tr.) at 58:22-59:1.

[53]   *See, e.g.*, Ex. 9 (Rosenwald Tr.) at 47:15-48:2, 48:14-22, 49:3-13, 67:3-8, 85:5-23, 86:3-13.

[54]   *See* Ex. 41 (Lewis Tr.) at 35:3-19, 48:12-16, 59:12-17.

[55]   *See* Ex. 9 (Rosenwald Tr.) at 98:12-15.

asserting they bought merely a "package" of rights,[56] as if buying legitimate goods as part of a "package" that included illegal drugs could somehow legitimize the overall transaction. These credibility issues go to common proof and common liability, not to individualized questions.

Currenex's own interrogatory responses——further corroborate the inference of concealment.[57] .[58]

.[59] Those admissions, too, are common evidence.

> (b) *Common evidence will show Currenex gave improper access to Trading Defendant HC Tech*

Former Currenex employee Burrlock testified that he discovered Defendant HC Tech using a log-in credential belonging to Currenex executive Russell Sears to front-run another user.[60] Contemporaneous emails confirm HC Tech enjoyed unusual visibility: one Currenex executive described

."[61] State Street Bank's corporate representative (Jim Foster) commented

"[62] As one Goldman executive put it,

---

56  *See* Ex. 17 (Schonberg Tr.) at 94:2-25, 95:20-96:3.
57  Ex. 14 (Defendants' Supplemental Responses and Objections to Interrogatory No. 9) at 11-12.
58  *See* Ex. 13 (Currenex and State Street 30(b)(6) (Fortuna) Tr.) at 54:3-23.
59  Ex. 13 (Currenex and State Street 30(b)(6) (Fortuna) Tr.) at 35:19-36:17; Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 21:5-8 (                              ); *id.* at 41:10-22 (                              ).
60  *See* Ex. 20 (Burrlock Tr.) at 27:25-32:1.
61  *See* Ex. 42 (HCTECH_0174508).
62  *See* Ex. 27 (CXSSB00214236) at '240.

HC Tech knew ███████████████████████████████████[63]  Whether HC

Tech received improper access is a classwide question proved with uniform evidence.

> (c)    *Common evidence will show the wrongful acts were never*
> *disclosed and Currenex misrepresented its trading protocols*

Every defense witness ████████████████████████████████

██████████████████████████████████.[64] ████████████

████████████████████████████.[65]  Similarly, Currenex

never disclosed that it granted HC Tech passwords or internal IDs belonging to its own

executives.

Instead, class members received uniform misrepresentations and omissions—also

provable with common evidence.  Currenex publicly stated for years that limit orders are

"automatically filled by the first counterparty bank."[66]  The website said this roughly between

2005 and at least 2013.  Currenex also published a product profile in 2011 representing that

Currenex has a "low-latency first-in, first out ("FIFO")" matching engine.[67]  These omissions

and misstatements, made to the market at large, are inherently classwide.

Defendants may flag how some die-hard defense witnesses tried vaguely to assert that

this was somehow "known" to the market anyway.  But, when pressed, not a single witness

could identify a single conversation indicating such knowledge, or identify a single class member

---

[63]    Ex. 28 (GS-EDMAR-00336920).

[64]    *See*, *e.g.*, Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 40:9-19; Ex. 9
(Rosenwald Tr.) at 182:5-21; Ex. 15 (Gilman Tr.) at 67:19-21.  Currenex's Rule 30(b)(6) witness
████████████████████████████████████████████████████ Ex.
11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 40:9-19.

[65]    *See*, *e.g.*, Ex. 15 (Gilman Tr.) at 67:19-68:8 ████████████████
█████████████████████████████; Ex. 29
(Liconte Tr.) at 134:20-135:24 (same); Ex. 9 (Rosenwald Tr.) at 183:5-21 (same).

[66]    *See* ECF 55-4.

[67]    Ex. 5 (CXSSB00001181) at '182 (2011 product profile).

who supposedly was told of the priority system.  Nor did Currenex produce any documents in discovery indicating disclosure to any class member.  Thus, vague assertions that ███████████████ ████████████████████████████████████ lack any credibility.[68]  In any event, the credibility of such self-serving, vague, and unsubstantiated assertions represents just another common issue for trial.

> (d)  *Common evidence will show that the Trading Defendants knowingly exploited the system*
>
> (i)  *State Street Bank*

As parent of Currenex, State Street Bank learned of the priority system at least during acquisition diligence and through executives serving dual roles at both firms.  ██████████████ ████████████████████████████████████████████████████.[69] ████ ████████████████████████████████████████████████████ ██████████.[70]

---

[68]  Ex. 17 (Schonberg Tr.) at 119:9-19 (██████████████████████████████ ████████████████████████), 120:2-14 (███████████████████████ ████████████████████████████████████; Ex. 9 (Rosenwald Tr.) at 181:19-184:40 ████████████████████████████████████████ ████████████████████████.

[69]  Ex. 39 (CXSSB00572158) at '160.

[70]  *See* Ex. 16 (State Street Bank 30(b)(6) (Foster) Tr.) at 110:18-111:17 █████████████ ████████████████████████████████████████████████████); *see also* Ex. 43 (CXSSB00571894) (████████████████████████████ ████████████████████████); Ex. 29 (Liconte Tr.) at 164:21-166:12 (████ ████████████████████████████).  *E.g.*, Ex. 44 (CXSSB00546068) (████████████████████████████████████████ ████████████).

*(ii)    Goldman Sachs*

Common evidence shows Goldman ██████████████████████████████

████.[71]  Goldman Managing Director Rick Schonberg testified that "████████████

█████████████████████████████████████████████████████████████.[72]

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████.".[73]  Goldman paid markedly higher

brokerage fees for its priority streams (███ per million) versus only a fraction of that for its

ordinary streams (███ per million),[74] and contemporaneous emails ████████████████████

████████████.[75]  Indeed, the connection between fees and priority treatment need not be

inferred; Goldman laid it out in black and white.  As Schonberg put it: "██████████████

████████████████████████████████████████████████████████████████████

████[76]  Even as far back as 2006, Goldman internally acknowledged: "████████████████

████████████████████████████████████████████████████████████████[77]

---

[71]  *See* Ex. 17 (Schonberg Tr.) at 130:14-131:11 (████████████████████████████
████████████████████████).

[72]  *Id.* at 83:2-4.

[73]  Ex. 19 (GS-EDMAR-00002650) at '651-2.

[74]  Ex. 17 (Schonberg Tr.) at 129:4-13; Ex. 18 (GS-EDMAR-00920851) at '854
(████████████████████████████████████████); Ex. 17 (Schonberg Tr.) at 91:15-24
(████████████████████████████████████████████████████████████████████████);
*id.* at 93:24-94:25 (████████████████████████████████████████████████).

[75]  *See* Ex. 45 (GS-EDMAR-00001574); Ex. 46 (GS-EDMAR-00827316); Ex. 18 (GS-
EDMAR-00920851) at '854.

[76]  Ex. 47 (GS-EDMAR-00368325) (████████████████████████████████) (emphasis
added).

[77]  Ex. 45 (GS-EDMAR-0001574) (████████████████████████████████████)
(emphasis added).

Goldman's own words confirm the pay-to-play scheme. But Plaintiffs' expert, Mr. Woolcock, confirms that ███ per million is an absurdly high brokerage rate, and that the rate is indicative that Goldman was knowingly paying for special privileges.[78]

> (iii)    *HC Tech*

HC Tech likewise knew of and exploited the system.[79] Internal emails called ████████ ████████████████████████████████████████.[80] The common evidence will also show that these favorable priority assignments were no accident.

HC Tech began trading on Currenex in early 2009, paying ██ per million in brokerage fees. By August 2009, its brokerage fees had jumped to ███ per million[81] after negotiating a "████ ████████████████████████████████████████████████ ███. HC Tech then hired away key Currenex personnel—Rosenwald, Gilman, and Rossier— who brought inside knowledge to HC Tech of the priority system.

By 2010, ████████████████████████████████████ ████████████████████████,"[83] ██████████████████████████████████████

---

[78]    Ex. 2 (Woolcock Rpt.) ¶¶ 45-48.

[79]    *See* Ex. 20 (Burrlock Tr.) at 16:24-17:3; Ex. 23 (HCTECH_0174871).

[80]    Ex. 21 (CXSSB00754381); *see also* Ex. 6 (CXSSB00899734) (██████████ ████████████████████████████████████████; Ex. 7 (CXSSB00571709) ██████████████████████████████████.

[81]    Ex. 48 (CXSSB00985671) at '684; *see also* Ex. 49 (CXSSB00409793) at '794.

[82]    ████████████████████████████████████████████. *See* Ex. 11 (Currenex and State Street 30(b)(6) (Kelly) Tr.) at 63:6-19. ████████████████████████████████████████. *See* Ex. 41 (Lewis Tr.) at 73:12-21, 77:18-78:14.

[83]    Ex. 22 (HCTECH_0174870).



Rosenwald at deposition claimed ████████████████████████.[87]  This

purported lack of understanding lacks credibility.  █████████████████████

████████████████████████████████████████████████.  The

evidence shows ███████████████████████████.[88]  It is clear HC

Tech knew it was paying for a favorable priority setting, and jealously guarded that right.  To the

extent HC Tech, incredibly, still maintains otherwise, that would just represent yet another

common issue of fact and witness credibility for the jury to decide.

> ### 2.    <u>Injury and Damages Can Be Shown on a Classwide Basis</u>

Plaintiffs will show injury and damages to all class members mainly through the

testimony of Dr. Craig Pirrong, a world-leading economist at the University of Houston.  His

report demonstrates how impact and damages can be demonstrated through common evidence—

primarily, Currenex's trading data.  At the class certification stage, "[p]laintiffs may rely on an

*unexecuted damages model* to demonstrate that damages are susceptible to common proof."

*Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1031-33 (9th Cir. 2024) (emphasis added); *see*

*also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) ("plaintiffs are not

required to establish loss causation—let alone proffer a damages model—on class certification").

---

[84]    Ex. 50 (CXSSB00899614).
[85]    Ex. 22 (HCTECH_0174870).
[86]    Ex. 23 (HCTECH_0174871).
[87]    *See* Ex. 9 (Rosenwald Tr.) at 260:11-20.
[88]    *See* Ex. 50 (CXSSB00899614); Ex. 22 (HCTECH_0174870); Ex. 23 (HCTECH_0174871).

Dr. Pirrong takes this many steps further by actually demonstrating how the common methodology could work in practice and how damages can be calculated. In so doing,[89] Dr. Pirrong estimates classwide damages are over $2.4 billion—$1.35 billion in fraudulently collected fees, $668.14 million in artificially inflated adverse selection costs, and $391.28 million in artificially inflated trade rejection costs.[90] These three categories of damages are described below.[91]

*(a)    All class members were harmed by unjustly imposed fees*

Dr. Pirrong provides a common, conservative estimate for damages incurred by all class members: the brokerage fees they paid to Currenex. As no rational user would have used the Platform if these deceptive, unfair practices had been known,[92] everyone is entitled, at a minimum, to refunds and Defendants should disgorge their ill-gotten gains. This confirms that all class members were injured at least once, and provides a baseline level of damages that can be shown through common evidence.

Dr. Pirrong demonstrates how a fees-paid measure can be determined with common evidence. Fees are paid based on a per-million-traded basis, and thus the amount can be derived by taking a median brokerage fee, and multiplying it by the class wide volume of relevant commerce. This is a common measure of damages—all class members paid fees to Currenex for

---

[89]    The Currenex Platform had multiple "stacks." To provide preliminary damages estimates, Dr. Pirrong did not just describe how a common damages methodology could be used, but actually deployed it on the PROD stack. For this and other reasons, the damages figures herein are preliminary estimates proffered to confirm the common methodology exists. With additional time working with the data, the final demands at trial are likely to be bigger.

[90]    Ex. 1 (Pirrong Rpt.) ¶¶ 2, 207-211.

[91]    While Dr. Pirrong provides preliminary damages estimates, his methodologies can be adjusted as the facts and arguments leading into trial require. *Id.* ¶ 206. This further confirms that these issues are resolvable using common evidence.

[92]    *See supra* note 33 and accompanying text (gathering citations); *infra* Section II.A.3(a) (discussing issue in connection with reliance element of fraud claim).

their trading activity, whether as "price-taker" or "price-maker." Dr. Pirrong estimates that fees paid to Currenex represent a baseline measure of aggregate harm of $1.35 billion in unjustly imposed fees alone.

> (b)    All class members were harmed by decreased competition and increased adverse selection costs

In FX trading, the "spread" refers to the price that a "price-taker" must pay when wanting to buy or sell. Wider bid-ask spreads mean that the price-taker must pay more when buying and receive less when selling as compared to a narrower spread around the same market mid-point. Wider spreads thus represent an out-of-pocket cost to the price-taker. Dr. Pirrong explains how Defendants' tilting of the playing field would both reduce competition and raise adverse selection costs for Class members when providing liquidity.[93] Market structure economics predicts that this would lead to wider spreads, and thus worst prices/higher trading costs for price takers.[94]

Dr. Pirrong demonstrates this empirically by using a standard before-and-after regression. This well-accepted method has been approved in numerous cases.[95] As one court has explained, "[t]he benchmark period has been conceptually defined as 'normal' years against which an antitrust plaintiff compares alleged 'conspiracy years' to show the impact of the conspiracy." *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 224 (E.D. Pa. 2017). "Plugging in known

---

[93]    Ex. 1 (Pirrong Rpt.) ¶¶ 107-118.

[94]    *Id.* ¶¶ 107-118, 124, 244.

[95]    *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique."); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *9 (S.D.N.Y. Mar. 28, 2014) (accepting model using the "widely-used 'before and after' approach"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 97, 103 (D. Conn. 2009) (certifying the class in a price-fixing case where plaintiff showed impact could be demonstrated through model comparing class-period prices to "benchmark period" prices).

prices [i.e., rates] and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the portion of price not accounted for by the market factors." *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *12 (N.D. Ill. May 27, 2022).

Because Currenex ceased using the priority system and stopped sharing employee passwords in 2014, Dr. Pirrong is able to use a dirty/clean analysis. He thus compares a "dirty" class period (2005 to July 2014), when the priority scheme was in operation, to a "clean" benchmark period (after July 2014), when the system stopped, while controlling for market variables.[96] He finds that during the dirty period, bid-ask spreads widened considerably—for instance, for the GBPUSD (Pound/Dollar) spreads were wider by about .148 basis points, amounting to a 37.6% overcharge.[97]

All class members that acted as price-takers on at least one trade during the class period were injured by increased artificially inflated adverse selection costs.[98] Because of the scheme's common impact on spreads, price-takers seeking to purchase FX paid more, while those seeking to sell FX received less. This analysis is confirmed by the numerous robustness checks Dr. Pirrong carried out, such as by looking across different years, currency pairs, and users.[99]

Defendants are likely to stress that numerical rankings were not given out to *just* the Trading Defendants. As an initial matter, as Dr. Pirrong shows, to say non-Defendant makers got "a" number is a red herring, as the playing field was still heavily tilted in the Trading

---

[96] Ex. 1 (Pirrong Rpt.) ¶¶ 170-180.

[97] *Id.*

[98] *Id.* ¶¶ 1, 128-130.

[99] *Id.* ¶¶ 165-166, 175-188, 194-206.

Defendants' favor.[100]  More fundamentally, the problematic conduct was the *ranking system itself*.  Dr. Pirrong discusses how economic theory predicts wider spreads even if the priority-assignment system was not binary, and even though non-Defendant makers did not know the system even existed.[101]  Dr. Pirrong tests this theory empirically, finding that *even though* priority "numbers" were given out to non-Defendants, and *even though* the assignments changed across time, the priorities system still increased the cost of trading on the Platform, just as the economic theory predicts.[102]

Defendants may relatedly again argue that, if a "taker" paid too much, then a "maker" necessarily received too much, suggesting the scheme somehow *benefited* class members.  But discussed above in Section I.D, that simplistic framing ignores basic market economics.  Spreads became wider because the cost of providing liquidity was higher.  Thus, artificially wide spreads did not benefit makers; it injured them.[103]  Wider spreads, *at best*, only *partially* offset the artificially high costs of providing liquidity.[104]  Again, this is at most a plan-of-distribution question that has no bearing on predominance or certification.

More fundamentally, if the system truly benefited users, Currenex would have disclosed it.  Instead, the record shows Currenex shut the program down rather than reveal it.

Defendants are also likely to argue that because Dr. Pirrong reports an average spread-effect, his regression does not show individualized injury for each class member.  Each class member paid fraudulent fees at least once, as discussed above in Section II.A.2.a, so establishing

---

100  *Id.* ¶¶ 143-146.
101  *Id.* ¶¶ 191-206.
102  *Id.*
103  *Id.* ¶¶ 129-133.
104  *Id.*

a baseline injury for every class member is trivial. Even so, there is no issue with using "averaging assumptions" that are inherent in regression analysis approach. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022); *see also Tyson Foods*, 577 U.S. at 459, 136 S. Ct. at 1049 (explaining that whether a representative or statistical approach is probative of a legal element is "the near-exclusive province of the jury").

Dr. Pirrong's regression provides a reasonable estimate of the increased adverse selection costs imposed on class members. To convert this to a damages estimate, Dr. Pirrong multiplies the measured spread-widening effect by the relevant volume of commerce—again using common Currenex trading data. Dr. Pirrong's analysis yields a preliminary damages estimate of $668.14 million in inflated adverse selection trading costs, observable in part by way of higher spreads.[105]

In short, a reasonable juror could conclude that Dr. Pirrong's regression shows (i) each class member was injured at least once by increased adverse selection costs, and (ii) classwide damages for this category of harm, too, can be reasonably estimated—sufficient for certification. *City of Philadelphia*, 2025 WL 2180607 (Summary Order), at *3. And because this is only one category of damages, the case for certification is all the stronger.

        *(c)*    *All class members were harmed by increased costs of rejections*

Not all preliminarily-matched trades ultimately execute. When a trade fails, or is rejected, the trader is harmed—particularly if the market midpoint has moved adversely in the meantime.[106] Again using a standard before/after pricing regression, Dr. Pirrong demonstrates that, while the prioritization scheme was in effect, trading costs were significantly higher due to

---

[105]  Ex. 1 (Pirrong Rpt.) ¶¶ 191-194.

[106]  *Id.* ¶¶ 155-158, 160, 244.

increased rejection costs, as compared to the period after the scheme ended.[107]  Dr. Pirrong

describes a common methodology for measuring this form of harm.[108]  Although not required for

certification, he further applies that methodology to arrive at a preliminary estimate of an

additional $391.3 million in damage to class members from artificially inflated rejection costs.[109]

> ### 3.    *Common Evidence Can Satisfy the Elements of Plaintiffs' Claims*
>
> ### (a)    *Fraud*

Fraud requires "(1) a misrepresentation or omission of material fact; (2) which the

defendant knew to be false; (3) which the defendant made with the intention of inducing

reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the

plaintiff."  *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *8 (S.D.N.Y. Oct.

17, 2013).

The first three elements are resolvable by common evidence of Currenex's undisclosed

practices and Defendants' knowledge of those practices.  There is ample such evidence, as

discussed in Section II.A.1 above.  And injury can readily be shown on a classwide basis through

fraudulently procured trading fees and inflated trading costs, as discussed in Section II.A.2

above.

Reliance can be shown on a classwide basis because the omissions and

misrepresentations were uniform and about fundamental product features to all class members.

*Osberg v. Foot Locker, Inc.*, 2014 WL 5800501, at *5-6 (S.D.N.Y. Nov. 7, 2014).  Indeed, in the

financial context, reliance is easier to show, where personal preferences are less likely to come

into play.  *Id.* at *4.  Courts have even found that the act of payment to a defendant—here, the

---

[107]    *Id.* ¶¶ 163, 170-171, 190-194.

[108]    *Id.* ¶¶ 2, 244.

[109]    Ex. 1 (Pirrong Rpt.) ¶¶ 2, 244.

act of actually using the Platform—itself constitutes "circumstantial proof of reliance upon a financial representation." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008) (abrogated on other grounds by *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008)). "[R]eliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product." *Ge Dandong*, 2013 WL 5658790, at *9.

Such is the case here. Every trader testified they would have ceased trading on Currenex had they known certain members of management could alter queue priority.[110] Alex Gerko, XTX's founder, put it plainly:



[111] XTX's

And DSquare executive

"[113] Defendants themselves knew this, too—when Currenex came under internal pressure to increase its transparency, it ceased the challenged practices, rather than disclose them.

Expert testimony forms still more common evidence on this issue. Mr. Woolcock explains, among other things, how the industry expects disclosed rules and level playing

---

[110] *See supra* note 33 and accompanying text (gathering citations).
[111] Ex. 32 (Gerko Tr.) at 203:22-24.
[112] Ex. 35 (Smart (Day 2) Tr.) at 233:4-11.
[113] Ex. 55 (Mitchell Tr.) at 158:4-22.

fields.[114]  Indeed, according to Woolcock, the particular things Defendants did here are "so unprecedented, bizarre, and unfair, that any rational trader would have expected disclosure."[115] And he confirms that, in his view, if the practices had been disclosed, the Platform would have collapsed because no rational trader would engage with such a system.[116]  Dr. Pirrong agrees.[117]

That this case is in part about *omissions* further confirms that reliance can be demonstrated on a classwide basis.  *See, e.g.*, *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) ("[I]n instances of total non-disclosure . . . it is of course impossible to demonstrate reliance[.]"); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) ("reliance is presumed when it would be impossible to prove"); *In re Coordinated Title Ins. Cases*, 784 N.Y.S.2d 919 (Sup. Ct. 2004) ("the issue of reliance may be presumed" in a case involving material omissions).  Users never had a chance *not* to rely on Currenex's omissions, because they could not have plausibly known the information Currenex *omitted to tell them*. Instead, all users relied on Currenex's implied representation that, at a minimum, its matching engine operated within reasonable industry norms, which it certainly did not.  The fraud was complete even if Defendants did not speak at all about Currenex's tie-breaking system or password-sharing policies.

But Defendants *did* speak, in common communications such as its website[118] and other common materials.[119]  Those disclosures, describing a FIFO matching process, reinforced the

---

[114]  Ex. 2 (Woolcock Rpt.) ¶¶ 32-40.

[115]  *Id.* ¶ 37.

[116]  *Id.* ¶ 39.

[117]  Ex. 1 (Pirrong Rpt.) ¶ 209.

[118]  The Currenex website represented: "Limit Orders are filled automatically by the first counterparty bank to stream a price that matches the order."  ECF 55-4.

[119]  As noted above, Currenex issued a 2011 product profile representing that Currenex used

expectation that the Platform was staying within reasonable industry norms. They thus confirm this is a common issue.

(b)    *Conspiracy to defraud and aiding and abetting fraud*

A party alleging conspiracy must allege the following four elements: (1) "a corrupt agreement between two or more persons"; (2) "an overt act in furtherance of the agreement"; (3) "the parties' intentional participation in the furtherance of a plan or purpose"; and (4) "resulting damage or injury." *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 414 (S.D.N.Y. 2015). Aiding and abetting fraud has three elements: "(1) that an independent wrong exist[s]; (2) that the aider or abettor know[s] of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong." *Id.* at 411.

All of these elements can readily be shown on a classwide basis using common evidence. Here, the common evidence shows all Trading Defendants knowingly participated in and profited from the scheme. Each Trading Defendant knew of the employee-assigned tie-breaking system and actively traded on the Platform, earning illicit profits. Under this Court's prior ruling, the "substantial assistance" prong is met by Trading Defendants' "execution of FX trades on the Platform" with knowledge of the "secret privileges." *Edmar Fin. Co.*, 2023 WL 3570017, at *10-11.

(c)    *N.Y. General Business Law § 349*

New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Reliance is not an element, making it clearer that, for the same

---

a "[l]ow-latency matching engine with 'first in, first out' (FIFO) prioritizing." Ex. 5 (CXSSB00001181) at '182.

reasons supporting the fraud claim, the uniform omissions and misrepresentations satisfy Section 349. *Edmar Fin. Co.*, 2023 WL 3570017, at *20.

> (d)    *Antitrust claims*

An antitrust violation requires a prohibited restraint; injury and causation; and damages. *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010). Whether a restraint is "prohibited" can involve sub-issues, also discussed below.

*First*, the core question of liability—did Currenex operate an anticompetitive scheme—is "indisputably common." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014); *see also Meredith Corp. v. SESAC LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015). As discussed above in Section II.A.1, there is ample common evidence of Defendants' scheme, readily showing a prohibited restraint.

*Second*, the rule of reason requires a court to "conduct a fact-specific assessment of market power." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 82 (E.D.N.Y. 2024). That said, issues of market definition and market power are common, and can be resolved with classwide evidence. *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007).[120] The "process" of deciding a relevant market "will clearly be predominated by common questions of law and fact." *Id.*

The record shows that Currenex could, and did, artificially inflate its customers' trading costs. Dr. Pirrong explains how the results of his regression model constitute direct evidence

---

[120]    *See also Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1178 (10th Cir. 2023) (no abuse of discretion in district court's conclusion that market definition and power "presents a common question susceptible to generalized class-wide proof"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015) ("Defining the relevant market focuses on common data, expert analysis, and economic tests; such proof generally does not vary by class member.").

that the challenged conduct had anticompetitive effects to the detriment of all class members.[121]

This common *direct* evidence of market power and anticompetitive effects is alone sufficient.

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) ("The Supreme Court has made it

clear that there are two ways of proving market power.  One is through direct evidence of

anticompetitive effects.").  *See also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61,

106 S. Ct. 2009, 2019 (1986) ("failure to engage in detailed market analysis is not fatal to [a]

finding of a violation of the Rule of Reason" where there is direct evidence of anticompetitive

effects); *Paramount Media Group, Inc. v. Village of Bellwood*, 929 F.3d 914, 921-22 (7th Cir.

2019) (at summary judgment, one way a plaintiff "can establish that the defendant has monopoly

power in a relevant market is by providing 'direct evidence of anticompetitive effects'").

      Though unnecessary, there is also common *indirect* evidence of market power.  Dr.

Pirrong first applies the well-known "*Brown Shoe*" factors to reach an opinion on the relevant

market in this case, and finds that the relevant market is FX electronic order-book platforms that

were directly accessible by buy-side traders.[122]  *See, e.g.*, *Tevra Brands LLC v. Bayer

HealthCare LLC*, 2024 WL 2261946, at *3 (N.D. Cal. May 16, 2024) (denying *Daubert* when

expert deployed a "qualitative hypothetical monopolist test").  Dr. Pirrong explains the "foreign

exchange industry recognizes a distinct market for buy-side accessible order-book FX trading

platforms" and that "Currenex itself explicitly acknowledged that EBS and Reuters were

'interdealer platforms,' distinguishing them from buy-side accessible platforms like

Currenex."[123]  Moreover, Currenex itself identified other buy-side accessible order book

---

[121]    Ex. 1 (Pirrong Rpt.) ¶¶ 2, 244.

[122]    *Id.* ¶¶ 219-235.

[123]    *Id.* ¶¶ 221-225.

platforms—Hotspot and Fastmatch—as its "direct competitors," providing further evidence that this is the relevant market.[124]

Within that relevant market,[125] Currenex was dominant during the class period—its market share ranged from 70% to 80%.[126]  This is strong, additional, common evidence of market power.  *See, e.g.*, *In re Payment Card*, 714 F. Supp. 3d at 99 (finding market power when defendant's share of the market was roughly 25%); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) ("We have held that a market share of over 70 percent is usually 'strong evidence' of monopoly power.").

*Third*, Plaintiffs also show class members suffered *some* injury—"inquiry beyond this minimum point goes only to the amount and not the fact of damage."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S. Ct. 1562, 1572 (1969).  As discussed in Section II.A.2 above, *all class members* were injured by at least some amount—most simply, by paying fees to a corrupt Platform.  When, as here, classwide impact is "capable of proof at trial," the predominance requirement is almost always met.  *Dial Corp.*, 314 F.R.D. at 114-15.  "[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact *could* prove such impact, not whether plaintiffs in fact can prove class-wide impact."  *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001) (emphasis added).

*Finally*, as to damages, the calculation of damages is a low bar and "need not be exact."  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S. Ct. 1426, 1433 (2013).  The Supreme Court recognizes that "[t]he vagaries of the marketplace usually deny us sure knowledge of what

---

[124]  *Id.* ¶ 227.
[125]  Pirrong also finds the relevant market is worldwide.  *Id.* ¶ 220.
[126]  *Id.* ¶¶ 241-243.

plaintiff's situation would have been in the absence of the defendant's antitrust violation."

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S. Ct. 1923, 1929 (1981).

As discussed in Section II.A.2 above, Plaintiffs easily clear that low bar.

> (e)    *Unjust enrichment*

Unjust enrichment claims require that Defendants benefited at Plaintiffs' expense and

that equity demands restitution. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944

N.E.2d 1104, 1110 (2011). The same facts that prove Defendants' wrongdoing establish this

claim: Currenex retained fees paid by users of a misrepresented platform, and Trading

Defendants retained profits earned through that concealed privilege. Those enrichment flows are

documented in common evidence.

> (f)    *RICO Claims*

Plaintiffs' RICO claims are also amenable to classwide resolution. The elements of a

RICO claim are "(1) a scheme to defraud, (2) money or property that is the object of the scheme,

and (3) use of the wires to further the scheme." *Empire Merchants, LLC v. Reliable Churchill*

*LLLP*, 902 F.3d 132, 137 (2d Cir. 2018). RICO claims are frequently certified for class

treatment in this Circuit. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 112

(2d Cir. 2013); *Sykes*, 780 F.3d at 75.

Each element of RICO can be proven with the same common evidence showing

Defendants' fraudulent scheme and the electronic operation of the Platform. Reliance is not an

element, making certification straightforward.[127] The technical RICO requirements do not

---

[127]    *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 661, 128 S. Ct. 2131, 2145 (2008) ("[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations.").

suggest otherwise.  For instance, proof of a RICO "enterprise" focuses exclusively on

Defendants' conduct, not on Plaintiffs'.  Similarly, issues such as Defendants' intent will likely

not be in dispute, but in any event would be resolved with the common evidence showing that

Currenex and the Trading Defendants knew about and benefited from the illicit scheme.  Nor

will the fact that Currenex—an electronic trading platform—used wires as part of the scheme

likely be disputed, but in any event that, too, will be a common issue.

4.    <u>The Expected Statute of Limitations Defense Changes Nothing</u>

Defendants will inevitably raise counter-arguments and defenses.  None have merit, and

none comes close to outweighing the strong predominance of common issues, including liability,

impact, and damages.  Although "a defense may arise and may affect different class members

differently, this occurrence does not compel a finding that individual issues predominate over

common ones."  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006).

Specifically, Defendants bear the burden of showing not just that any individualized

defense has merit, but also that the individualized defenses "are more substantial" than the

common issues.  *Osberg v. Foot Locker, Inc.*, 2014 WL 5800501, at *2 (S.D.N.Y. Nov. 7, 2014).

This "analysis is more qualitative than quantitative and must account for the nature and

significance of the material common and individual issues in the case."  *In re Actos Antitrust

Litig.*, 2024 WL 4345568, at *9 (S.D.N.Y. Sept. 30, 2024).

Thus, even if Defendants identify a handful of individual issues they wish to raise at trial,

those individualized inquiries will not defeat predominance.  *See Halliburton Co. v. Erica P.

John Fund, Inc.*, 573 U.S. 258, 276, 134 S. Ct. 2398, 2412 (2014) ("That the defendant might

----

attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."); *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *36 (potential individualized issue as to injury for seven class members would not defeat predominance).

This issue will most likely arise in the context of the statute of limitations for the fraud claim. This fails to defeat predominance out of the gates because such an argument would ignore the many other claims with a limitations period long enough to moot Defendants' arguments. Even that aside, whether the wrongdoing was disclosed or concealed is itself a common question as discussed above in Section II.A.3(a). Because the commonality of Currenex's suppression of the truth focuses on Defendants' conduct, courts have "overwhelmingly held that . . . the common question of whether Defendants successfully concealed the existence of the alleged [wrongdoing] predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs." *NASDAQ*, 169 F.R.D. at 520 (S.D.N.Y. 1996).

Defendants will likely attempt to portray XTX or DSquare as possessing *unique* knowledge. They do not. Witness testimony confirms ████████████████████████ ████████████████████████████████.[128] To suggest otherwise, Defendants resort to arguments that could apply equally to any class member, further confirming this defense, while meritless, supports predominance. *See, e.g.*, *Mirkin v. XOOM Energy, LLC*, 2023 WL 5622099, at *7 (E.D.N.Y. Aug. 31, 2023) (explaining that the common defense will cause

---

[128]  Ex. 37 (Smart (30(b)(6)) Tr.) at 184:19-24; Ex. 38 (DSquare 30(b)(6) Tr.) at 28:4-24, 29:23-30:4.

the class to either "fail together" or "prevail together" and thus "[e]ither way, the outcome will be determined by common evidence").

For instance, Defendants point to meetings between DSquare or XTX and Currenex representatives. But Currenex sales staff undoubtedly routinely met with many Platform users—that was their job. Similarly, Defendants ████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████.[129] Or Defendants may raise that ██████████████████████████████████████████ ██████████████████████████.[130] Defendants' reliance on evidence that could apply to virtually any class member (████████████████████████████████████████ ██████████████████) only underscores that fraudulent concealment is an issue common to the class.

Defendants have also previously emphasized that a Currenex employee ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ But the lit-or-dark distinction was a known industry feature, and

---

[129] Ex. 51 (XTX0618894).

[130] Velador is a legal consulting firm that Defendants allege had investigated the claims at issue outside the limitations period. Velador's knowledge cannot, by law, be imputed until there is an actual engagement with the particular party. *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 137 (S.D.N.Y. 2019). For XTX and DSquare, ████████. Ex. 37 (Smart (30(b)(6)) Tr.) at 129:15-25, 184:19-24; Ex. 38 (Mitchell (30(b)(6)) Tr.) at 28:4-24, 29:23-30:4.

[131] Defendants, to distract, stress that the words "████████████" are used. But every platform has *a* system of ████████████, in the uselessly abstract sense that ties must be broken somehow. This case is about the specific process of doing so using discretionary, secret, employee-assigned numbers. As discussed above, ████████████████████████████ ████████████████████████████████ █

[132] *See* Ex. 32 (Gerko Tr.) at 17:1-18:15.

███████████████████████████████████████████████.[133]  So once again, this at most

raises a common issue, and in truth, no issue at all.

Finally, Defendants have also tried to conflate Plaintiffs' knowledge of Currenex's "last

look" functionality with knowledge of the wrongdoing alleged here.  Substantively, the argument

is baseless—this case is about the secret assignment of priority numbers.  That the ability to

cancel trades exacerbated damages does not transmogrify this case into one about when people

knew that "last look" even existed.[134]  If there were any doubt on this, to be clear: *Plaintiffs do

not dispute* that they, and the market, knew of "last look" functionality outside the limitations

period.  Indeed, Currenex *publicly* disclosed "last look" functionality in 2015,[135] and *public*

records show that last look litigation began around the same time.[136]  For many reasons, then,

even if knowledge of "last look" is relevant to the statute of limitations defense—again, it is

not—it would indisputably be a common issue.

In short, Defendants' statute-of-limitations defenses will fail.  They will fail based on

common evidence.  But even if Defendants somehow muster a scintilla of evidence in favor of

statute-of-limitations as to a few class members, any legitimate issues supposedly raised thereby

would be greatly outweighed by the far more critical common issues at play.  *See In re Petrobras

Sec.*, 862 F.3d at 271 (the predominance analysis "must account for the nature and significance

of the material common and individual issues in the case"); *see also Halliburton*, 573 U.S. at

276, 134 S. Ct. at 2412; *In re Actos*, 2024 WL 4251891, at *36.

---

[133]    *See* Ex. 32 (Gerko Tr.) at 234:13-25.

[134]    ECF 184 at ¶¶ 174-177.

[135]    *See* Ex. 52 (CXSSB00088874).

[136]    *See, e.g.*, *Axiom Inv. Advisors, LLC v. Barclays Bank PLC and Barclays Cap., Inc*., No.
1:15-cv-09323 (S.D.N.Y. Nov. 25, 2015).

**B.    Resolving the Dispute as a Class Action Is Superior to Any Alternative**

Class certification is also far superior to any alternative method for adjudicating this case. *See* Fed. R. Civ. 23(b)(3). *First*, as the Supreme Court has recognized, a "core" purpose of class actions is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246 (1997). That purpose is clearly served for a case of this scale and complexity, where prosecuting these claims requires many millions of dollars. *Second*, while superiority might be lessened based on "the extent of any independent litigation already begun by class members," *In re Domestic Drywall*, 322 F.R.D. at 200, no class members have brought independent litigation here. *Third*, as compared to the hypothetical alternative of individual actions by class members, "class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency." *Dial Corp.*, 314 F.R.D. at 121. *Fourth*, no inherent difficulties undermine the maintenance of this case as a class action.

Courts recognize that "[a]ntitrust violations go to the heart of our economy. Our economic health and stability as a nation depend on the rule of law and trust in the fairness and transparency of our marketplace." Final Approval Hr'g Tr., *In re: Credit Default Swaps Antitrust Litig.*, 13-MD-2476 (April 15, 2016), Dkt. No. 563. Class actions play a vital role in private enforcement of these, and other, laws as well. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266, 92 S. Ct. 885, 893 (1972); 6 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:1 (6th ed. 2025); *see also Guenther v. Sedco, Inc.*, 866 F. Supp. 786, 788 (S.D.N.Y. 1994) (holding that fraud class action was "not simply the 'superior' means of resolving [the] dispute fairly and efficiently but the *only* means of doing so"). Without this action, it is possible that there would be *no* private challenge to Defendants' fraud, RICO, and antitrust violations, meaning that Defendants would effectively escape civil liability for a massive scheme to rig the Currenex

trading platform in their favor. The need for the private enforcement strongly favors class certification.

### III.    THE COURT SHOULD APPOINT QUINN EMANUEL AND RUDDY GREGORY AS CO-LEAD COUNSEL

Finally, Plaintiffs request the appointment of Quinn Emanuel Urquhart & Sullivan, LLP and Ruddy Gregory PLLC as co-lead class counsel.

Rule 23(g)(1)(A) identifies four factors used to determine lead counsel, namely "the work counsel has done . . . [,] counsel's experience . . . [,] knowledge of the applicable law[, and] resources that counsel will commit." *In re Air Cargo*, 2014 WL 7882100, at *66. *See also* Fed. R. Civ. P. 23(g)(1)(B).

Each of these factors favor appointment of these firms as co-lead counsel for the class. These top-tier firms bring extensive experience and expertise in antitrust class actions, have worked extensively investigating and prosecuting this case, and have already committed substantial resources. Plaintiffs' counsel have committed many thousands of hours and many millions of dollars investigating, developing, and litigating this matter. As discussed in the attached firm resumes, these firms have ably served as lead class counsel in many major class actions in this district and nationwide, recovered billions of dollars in damages, and received awards recognizing the quality of our work. They are apt counsel for the class.[137]

### CONCLUSION

Plaintiffs respectfully request that the Court grant the motion for class certification.

---

[137]    *See* Exs. 53-54 (Firm Resumes). Additional information about the firms can be found at www.quinnemanuel.com and www.ruddylaw.com.

DATED:      November 18, 2025          Respectfully submitted,

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

*/s/  Daniel L. Brockett*

Daniel L. Brockett
Thomas J. Lepri
David LeRay
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: danbrockett@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: jeremyandersen@quinnemanuel.com

RUDDY GREGORY, PLLC

*/s/ Mark Ruddy*

Mark Ruddy
1225 15th Street NW
Washington, DC 20005
Telephone: (202) 797-0762
Facsimile: (202) 318-0543
Email: mruddy@ruddylaw.com

ZIGLER LAW GROUP, LLC

*/s/ Aaron Zigler*

Aaron Zigler
308 S. Jefferson
Suite 333
Chicago, IL, 60661
Telephone: (312) 673-8427
Email: aaron@ziglerlawgroup.com

*Counsel for Plaintiffs and the Proposed Class*