# EXHIBIT 1

Filed Under Seal

*Edmar Fin. Co., LLC et al. v. Currenex, Inc.*, No. 21-cv-06598 (S.D.N.Y.)

**EXPERT REPORT OF DR. CRAIG PIRRONG IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

November 18, 2025

Contains Highly Confidential Materials—Subject to Protective Order

## Table of Contents

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND AND QUALIFICATIONS ........................................................2

III.    FX MARKET OVERVIEW ...................................................................................5

        A.      The Trading of FX ....................................................................................5

        B.      Market Participants ...................................................................................6

        C.      Trading Platforms .....................................................................................8

IV.     THE CURRENEX PLATFORM .........................................................................13

        A.      Introduction .............................................................................................13

        B.      Plaintiffs Allege That Currenex Utilized an Undisclosed System of
                Assigned Priority Numbers and Password Sharing .................................15

V.      MARKET MICROSTRUCTURE .......................................................................20

        A.      Theoretical Overview ..............................................................................20

        B.      Emperical Evidence on FX Microstructure .............................................26

                1.      Bid/ask spreads ............................................................................26

                2.      Order flow and price impact ........................................................27

VI.     PLAINTIFFS ALLEGE THAT CURRENEX USED UNDISCLOSED "TIE
        BREAKING" PROCEDURES AND OFFERED AT LEAST ONE TRADING
        DEFENDANT (HC TECH) ADMINISTRATIVE ACCESS TO THE
        CURRENEX PLATFORM WHICH GAVE THIS FIRM A MATERIAL
        INFORMATION ADVANTAGE OVER OTHER USERS .................................29

VII.    MARKET MICROSTRUCTURE PRINCIPLES AND BASIC ECONOMIC
        PRINCIPLES DEMONSTRATE HOW UNDISCLOSED PRIORITIES AND
        PREFERENTIAL ACCESS TO INFORMATION INFLATE TRADING COSTS ........30

        A.      The Alleged Wrongdoing Inflated the Trading Costs of Class Members .............30

                1.      Undisclosed priorities raised Class members' cost of supplying
                        liquidity by exacerbating "adverse selection" ..............................31

                2.      Undisclosed priorities allowed Defendants to engage in parasitic
                        quote matching strategies that raised Class members' costs of
                        supplying liquidity .......................................................................35

                3.      "Skew leakage" from password sharing also would have raised
                        Class members' trading costs ........................................................37

        B.      Basic Economic Principles Imply That Class Members Did Not Profit
                From Wider Spreads Caused by the Challenged Practices, and Indeed
                Were Damaged by Them .............................................................................38

        C.      The Market Microstructure-Based Predictions Are Not Changed by the
                Fact That Class Members Were Also Given a "Number" ..........................41

VIII.   AN EMPIRICAL APPROACH BASED ON CLASS-WIDE EVIDENCE TO QUANTIFY THE EFFECT OF CURRENEX'S SCHEMES ON CLASS MEMBERS' TRADING COSTS ................................................................46

IX.   RESULTS ................................................................................................52

X.   THE EMPIRICAL RESULTS CAN BE USED TO CALCULATE DAMAGES USING A COMMON METHODOLOGY AND COMMON EVIDENCE ....................57

XI.   CLASS MEMBERS WERE DAMAGED BY PAYING COMMISSIONS TO CURRENEX AND THESE DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS USING COMMON EVIDENCE ....................................62

XII.   CURRENEX HAD MARKET POWER ......................................................64

    A.   The Empirical Results Provide Direct Economic Evidence That Currenex Had Market Power ....................................................................64

    B.   There Exists a Relevant Market for FX Electronic Order-Book Platforms That Were Directly Accessible By Buy-Side Traders ................................65

        1.   Industry recognition of a distinct market for buy-side accessible order-book FX trading platforms ....................................................66

        2.   Distinctive product characteristics ..............................................68

        3.   Specialized production facilities and technical barriers ..........................69

        4.   Distinct customer segments and market access............................70

        5.   Specialized market participants and competitive dynamics ......................70

        6.   Distinct prices ..............................................................71

    C.   Currenex Had Market Power in the Market For FX Electronic Order-Book Platforms That Were Directly Accessible By Buy-Side Traders ..........................73

XIII.   CONCLUSIONS ..................................................................................74

I. **INTRODUCTION**

1.      Plaintiffs' counsel have asked my opinion whether there will be common class[1] wide proof available at the merits stage to address the claims of Plaintiffs XTX Markets Limited, DSquare Trading Limited, and other Class members that Currenex and the Trading Defendants harmed the Class members through certain hidden practices.[2]

2.      After a thorough analysis of the data produced by Currenex, and other record evidence, I have reached the following conclusions:

- Currenex implemented a system of undisclosed priorities that benefited the Trading Defendants by allowing them to obtain trades that they would not have obtained under conventional "first in-first out" priorities.

- At a minimum, all Class members suffered, in a way measured through common evidence, by paying fees to a corrupt Platform operator.  Class members paid both when they acted as price or liquidity "makers," and when they acted as price or liquidity "takers."  (The Currenex Platform allows users to act in both roles.)

- Using common evidence—Currenex's data—I estimate Class members paid $1.35 billion in fees, that I understand Plaintiffs allege should be returned to them.

- But that is just a baseline of harm.  Fundamental economic considerations, particularly considerations related to the field of finance referred to as "market

---

[1] I understand the Class that Plaintiffs are seeking certification for as being:  All persons and entities who completed at least one spot foreign exchange trade on the anonymous portion of Currenex, Inc.'s platform using the PROD stack from January 1, 2005, to July 21, 2014, or the PRET stack from July 1, 2007 to September 11, 2015.  The Currenex data indicates there are hundreds of Class members.

[2] I understand the "Trading Defendants" are State Street Bank and Trust Company, Goldman Sachs & Co. LLC, and HC Technologies, LLC.  I understand the complaint also names State Street Global Markets International Limited for, e.g., its role in the disclosures and in "offering" the Platform to certain users.  For convenience, I refer to "Currenex."

microstructure," imply that these undisclosed priorities also increased the adverse selection costs incurred by Class members. Adverse selection is a major component of the cost of supplying liquidity.

- These fundamental economic considerations also imply that the inflated adverse selection costs would be ultimately paid for, at least in part, by Class members in the form of paying higher bid-ask spreads when acting as a "taker."

- Using standard empirical economics techniques, I demonstrate on the basis of evidence common to the Class that the system of undisclosed priorities indeed imposed additional trading costs on class members of at least $668.1 million.

- Standard empirical economics techniques also demonstrate that Class members were harmed by increased movements in the *midpoint* following rejected trades when the wrongful scheme was in effect, versus when it stopped. This represents another category of harm, estimated to be $391.3 million.

- Finally, I believe that the strongest way to show that Currenex had market power is to directly demonstrate that power in action. I have done so with my economic regressions. I understand that courts also consider, as an alternative approach, indirect evidence. I step through the so-called "*Brown Shoe*" factors here and conclude that there exists a relevant market for FX Electronic Order-Book Platforms that were Directly Accessible by Buy-side Traders. I also conclude that Currenex had market power in that relevant market during the Class period.

## II.  BACKGROUND AND QUALIFICATIONS

3.     I am Professor of Finance, and Director of the Global Energy Management Institute at the Bauer College of Business of the University of Houston. Prior to joining the faculty of the University of Houston in January, 2003, I was the Watson Family Professor of  Commodity and

Financial Risk Management at Oklahoma State University. I assumed this endowed professorship in 2001 after holding research and teaching positions at the University of Michigan, the University of Chicago, and Washington University. My *curriculum vitae* is attached as Appendix 1. It lists all of the publications that I have authored in the last ten years. It also lists cases in which I have testified as an expert at trial or by deposition within the preceding four years.

4.    I have researched the economics of financial, futures, and securities markets for most of my academic career. I have published scholarly articles concerning financial, securities, and futures markets. I have written articles on the behavior of derivatives prices, the organization and governance of futures and stock exchanges, trading platforms, and various aspects of financial market regulation, including regulations related to market microstructure and trading practices.

5.    As an academic and consultant, I have been deeply involved for about 25 years in issues relating to financial markets, derivatives prices, and the economics of market microstructure and trading practices. My research has been published in a wide variety of scholarly journals. I have been a peer reviewer for many journals, including the American Economic Review, the Journal of Finance, the Journal of Law and Economics, the Journal of Futures Markets, Economic Inquiry, the Journal of Economic Behavior and Organization, the Journal of Business, and the Journal of Business and Economics Statistics.

6.    I have taught courses on derivatives (including futures, options, and swaps) at the graduate and undergraduate levels for twenty-eight years. These courses have covered the pricing of financial instruments, including foreign exchange instruments, the use of financial instruments for hedging and speculative purposes, and trading practices. I currently teach the PhD course in futures and options in the Bauer College of Business at the University of Houston, and an MBA course in energy derivatives. The PhD course covers currency derivatives, including currency swaps,

swaptions and exotic derivatives, in great detail.

7.      My research has been cited in a 7th Circuit Court of Appeals decision on manipulation.  *Board of Trade of City of Chicago v.  S.E.C.*, 187 F.3d 713, 724 (7th Cir. 1999) (Easterbrook, J.).

8.      The CFTC retained me as an economic expert in a commodity manipulation case. I have also served as an expert in manipulation matters by the Winnipeg Commodity Exchange, pursuant to enforcement actions undertaken by the WCE.    I have provided expert testimony in various cases related to market manipulation.    These include *In re* Soybean Futures Litigation, 892 F. Supp. 1025 (N.D. Ill. 1995), American Agric. Movement v. Board of Trade, 848 F. Supp. 814 (N.D. Ill. 1994), *aff'd in part*, *rev'd in part sub nom*. Sanner v. Board of Trade, 62 F.3d 918 (7th Cir. 1995), Kohen v. Pac. Inv. Mgmt.  Co., 244 F.R.D. 469 (N.D. Ill. 2007), Energy Transfer Partners, L.P (FERC  Docket No. IN06-3-003), Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Electricity et al (FERC Docket No. EL01-10-085), San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange (FERC Docket No. EL00-95-248), and Public Utilities Commission of the State of California v. Sellers of Long-term Contracts to the California Department of Water Resources et al (FERC Docket No. EL-02-007).

9.      I am being compensated at a rate of $1,500 per hour for my work in this litigation, and was assisted by a team working under my direction and control.  My compensation is in no way contingent upon my opinions or the outcome in this matter. A list of the materials that I considered in the preparation of this report is attached as Appendix 2.

## III.    FX MARKET OVERVIEW

### A.    The Trading of FX

10.    Foreign exchange ("FX") generally involves the trading of one currency for another.  A variety of instruments are traded in the FX market.  The most important are: spot FX, FX swaps, FX forwards (and futures) and FX options.

11.    The Currenex trading platform at issue in this case traded spot FX.[3]  The Bank for International Settlements ("BIS") defines a spot transaction as: "single outright transactions involving the exchange of two currencies at a rate agreed on the date of the contract for cash settlement, typically within two business days."[4]  For example, a spot transaction in the US dollar and the euro ("EURUSD") involves one party purchasing dollars and selling euros at a ratio negotiated between them.  The parties to the transaction deliver ("settle") the currencies to one another within two business days.[5]

12.    The other types of FX instruments are not relevant to this case, so I will not discuss them further.

---

[3] Currenex also traded FX swaps and forwards.  Because this case relates to spot currency trading, I will not discuss these.

[4] Michael R. King and Carlos Mallo, A user's guide to the Triennial Central Bank Survey of foreign exchange market activity, *BIS Quarterly Review* (December 2010) 74.

[5] The nomenclature for currencies involves a concatenation of two three letter acronyms for the currencies, *e.g.*, EURUSD (euro-US dollar).  A rate is expressed as the number of units of the second currency in the string (*e.g.*, USD) per unit of the first currency (*e.g.*, EUR).  Thus, a EURUSD rate of .9900 means each euro is exchanged for .99 US dollars.  The term "pip" is frequently used in reference to FX rate movements or spreads.  A basis point is $1/100^{th}$ of one percent, *i.e.*, .0001.  A pip is the 5th significant digit for most currency pairs.  For example, a move in the EURUSD from 1.0801 to 1.0802 is a one-pip move.  For pairs involving the Japanese Yen ("JPY") a pip is the second decimal place.

### B.  Market Participants

13.     Market participants involved in FX trading are conventionally divided into two categories: financial and non-financial.

14.     Non-financial participants are also referred to as "corporates."  These are firms that buy and sell currency pursuant to the purchase and sale of goods and services.  For example, a U.S. firm that sells its product in Europe in exchange for euros may sell these euros for U.S. dollars.

15.     Financial participants fall into multiple subcategories, including liquidity provider banks, liquidity taker banks, leveraged investors, non-leveraged investors, high frequency traders, non-bank liquidity providers, and retail traders.

16.     The BIS defines liquidity provider banks as: "mainly large commercial and investment banks and securities houses that (i) participate in the inter-dealer market and/or (ii) have an active business with large customers, such as large corporate firms, governments and non-reporting financial institutions; in other words, liquidity providers are institutions that actively buy and sell currency and over-the-counter ('OTC') derivatives both for their own account and/or in meeting customer demand."[6]

17.     Liquidity providers, traditionally banks, can be intermediaries who "make markets" and "supply liquidity."  I discuss market making and liquidity *infra*.

18.     Liquidity takers are traditionally commercial and investment banks that transact in FX primarily to serve the needs of their corporate and retail customers.  Over time, non-traditional liquidity providers have played an increasing role in the FX market.

---

[6] Bank for International Settlements, Triennial Central Bank Survey of Foreign Exchange and OTC Derivatives Markets: Reporting guidelines for turnover in April 2022 (March 15, 2022) 6.

19.    Leveraged investors include most prominently hedge funds and commodity trading advisors ("CTAs").  Among the reasons that these entities trade FX is to speculate on currency movements based on a variety of strategies.  The term "leveraged" refers to the fact that these entities finance their activities in part through borrowed funds, or utilize derivative instruments (*e.g.*, futures) that have embedded leverage.

20.    Non-leveraged investors—also referred to as "real money" investors—include pension funds, mutual funds, endowments, family offices, and insurance companies.  These firms assume exposures to FX because they invest internationally, *e.g.*, a US pension fund that invests in European stocks.  They trade FX *inter alia* to acquire funds to make investments in foreign assets, to convert returns or sales of foreign assets into domestic currency, and to hedge the currency risk of their holdings of foreign assets.

21.    High frequency traders ("HFT") are entities that, as the name suggests, trade FX on extremely short time scales.  That is, they execute large numbers of transactions, and quote large numbers of bids and offers to trade, over short time periods.  High frequency traders operate on sub-millisecond scales, and speculate on very short-term price movements, or attempt to exploit pricing disparities across different trading platforms.[7]  In order to trade at such speeds, their trading strategies are encoded into computer algorithms that operate autonomously on specialized computer hardware.  Thus, HFT is a form of algorithmic trading.  HFTs have emerged as important liquidity suppliers in FX markets.

22.    Retail investors are typically individuals who speculate on foreign currency movements.  Moreover, when trading by limit orders (discussed in more detail *infra*), retail traders can supply liquidity as well as consume it.

---

[7] I discuss trading platforms *infra*.

23.     The overview of the academic market microstructure literature *infra* emphasizes the importance of the private (*i.e.*, non-public) information embedded in market participants' orders and transactions.  Academic scholarship has shown that different types of market participants differ in how privately informed they are.  Leveraged traders (hedge funds and CTAs) are relatively well informed.  Real money investors, non-liquidity provider financial institutions, and corporates exhibit little evidence of having private information.  The literature suggests that liquidity provider banks are the best informed, due in large to part their ability to observe and analyze the significant order flow that is private to them.[8]

C.      **Trading Platforms**

24.     There are different ways of trading FX, even electronically.

25.     Users of an electronic trading platform interact through a computer network.  Users of non-electronic platforms interact through other communications modes, including telephone, instant messaging systems, and direct messaging systems.

26.     Electronic platforms can differ on a variety of dimensions, including who can participate, and how the participants interact with the system.

27.     One distinction is between "many-to-many" and "many-to-one" platforms.  In a many-to-many platform, any participant can transact with any other participant.  Traditional exchanges (like the CME, or the New York Stock Exchange) are the canonical examples of many-to-many platforms.

---

[8] Michael R. King, Carol Osler, and Dagfinn Rime, Foreign Exchange Market Structure, Players, and Evolution, Norges Bank working paper (2011).

28.     In many-to-one platforms, a single entity—the operator of the platform—is the counterparty to all trades.  That is, many entities can buy from or sell to the platform operator, but cannot buy or sell from one another.

29.     Another distinction is between "limit order book" ("LOB") markets and "request for quote" ("RFQ") markets.

30.     In a LOB market, participants submit orders to buy ("bids") and orders to sell ("offers" or "asks") to a central computer.  The computer stores and organizes these orders in a computerized "book."  Orders are sorted by price, with higher price bids having priority over lower price bids, and lower price offers having priority over higher price offers.  Since multiple bids and offers can be entered at the same price, many-to-many platforms also promulgate "secondary priority rules" (*e.g.*, first come, first served) that determine which of multiple orders at a given price are executed first.

31.     A transaction occurs on a LOB market when a bid (offer) is entered at a price at or above (at or below) the lowest (highest) offer (bid) resting in the book.  This is referred to as a "marketable limit order," or "market order".  A market order results in a transaction at the best quoted price in the market.  For example, a market buy order is executed at the lowest offer price.[9] These order types were available on the Currenex platform.

---

[9] There are some complications involved here.  A marketable limit order or market order may be executed at multiple prices, depending on its size.  For example, a market buy order for $1 million will be executed at multiple prices if the quantity offered at "top-of-book" is only $500,000.  Moreover, as will be emphasized later, on Currenex a bid crossing an offer is a necessary condition for a transaction to occur at the best quoted price, but not a sufficient one.  Specifically, as discussed *infra*, some liquidity providers on the Currenex platform, namely those streaming prices, had the right to reject trades, i.e., "last look" rights.  (I discuss streaming prices *infra*).  That is, a bid and offer could cross, but the passive party (*e.g.*, the offer matched against a marketable buy order) could reject the trade.  That is, no bid crossing offer—no trade.  Bid crossing offer—possibly a trade.  Currenex had a specific market order type, called a Market Immediate or Cancel ("IOC") order.  These would be executed even if initially rejected.

32.     LOB markets can differ in terms of transactional transparency, *i.e.*, the information the platform provides to users.  Pre-trade transparency means that participants can observe some or all bids and offers in the book.  Post-trade transparency means that transaction details (price and size) are disclosed.  Most LOB markets do not disclose the identities of those whose bids and offers are in the book, or who have transacted.

33.     RFQ markets can be many-to-many or many-to-one, or a hybrid (many-to-some). There is no LOB in an RFQ market.  Instead, someone who wants to transact submits a request to trade a certain amount of an item (*e.g.*, a currency pair).  Other participants (who may be limited to a select group in a many-to-some market) respond by quoting the price at which they are willing to trade that amount.  The request submitter can choose from the quote responses, or choose not to transact at all.

34.     During the 1990s, and increasingly in the 2000s, electronic platforms developed into an important mechanism for trading FX.  Four types of platforms have matured during the 2000s.

35.     The first type was "interdealer provider platforms," Thompson Reuters and Electronic Broking Service Market ("EBS Market," formed by a consortium of liquidity provider banks).  Interdealer provider platforms operate many-to-many LOB markets in myriad currency pairs.

36.     Originally, participation in the interdealer provider platforms was limited to liquidity provider banks and some other banks, hence the name.  Thus, these were many-to-many LOB markets with a limited set of participants.  Reuters (now LSEG) and EBS Market are still

described as interdealer platforms today, and much of their volume serves the inter-dealer segment.[10]

37.    Several "multibank trading systems" ("MBT") were introduced in the late-1990s and early-2000s.  (These are commonly referred to in the industry as "Multi Dealer Platforms," or "MDP").  These are primarily RFQ systems that allow customers (including financial and non-financial firms) to interact with major banks.  In these systems, the customers submit requests for quotes, and the participant banks respond.  An order is executed when the customer accepts one of the quotes provided in response to its request.

38.    The early-2000s also saw the introduction of "single liquidity provider platforms," or "single bank trading systems" ("SBT").  (These are also commonly referred as "single dealer platforms," or "SDPs").  A single liquidity provider platform is operated by a single liquidity provider bank: UBS introduced FX Trader in 2000, and other large liquidity provider banks launched SBTs over the next several years.  In an SBT, the bank "streams" its quotes (*i.e.*, its bids and offers), and customers hit these bids or lift these offers to execute a transaction.  These systems offer pre-trade transparency: the bank's quotes are displayed to all with access to the systems.

39.    The 2000s also saw the creation of what the BIS refers to as electronic brokerage platforms, of which Currenex is one.    These are commonly referred to as Electronic Communications Networks ("ECNs"), and that is the nomenclature I will utilize here.

40.    Currency ECNs operate LOBs to which market participants submit limit orders, *i.e.*, orders with an attached price as described *supra*.  There are currently multiple FX ECNs,

---

[10] In a prime brokerage arrangement, an entity like a hedge fund conducts transactions in the name of the prime broker.  The prime broker imposes various limits on the entity.  According to the BIS, "In an FX prime brokerage relationship, the client trade is normally 'given up' to the prime broker, which is interposed between the third-party bank and the client and therefore becomes the counterparty to both legs of the trade."

including in addition to Currenex *inter alia* Cboe FX (formerly Hotspot) and Euronext FX (formerly FastMatch).

41.    In contrast to dealer platforms, participation on currency ECNs is typically not limited to a particular type or types of traders (*e.g.*, dealer banks).  Instead, they are open access platforms in which anyone can transact if they can meet the technical requirements to access the market (a computer and an Internet connection, basically), satisfy certain financial criteria, and pay the fees charged by the ECN.

42.    Different ECNs have different trading rules and protocols.  In particular, as LOB systems they operate on a price-priority basis, but can offer different secondary priority ("tiebreaker") rules.  As will be seen *infra*, Currenex's actual secondary priority rules differed in material ways from industry norms and the rules that they disclosed to the public.

43.    Although ECNs are many-to-many platforms, they are not typically "all-to-all" platforms like exchanges (*e.g.*, the Chicago Mercantile Exchange) in which each order can be matched with every contra order.  Instead, ECNs typically allow participants to limit their trading counterparties to a set that they choose.[11]  The criteria used to select counterparties might include, *inter alia*, credit considerations and past trading outcomes.

44.    Non-electronic modes of transaction include (a) direct transactions between counterparties other than on electronic brokerage platforms, MBTs, and SBTs (MDPs and SDPs), and (b) transactions intermediated by voice brokers.  Bilateral direct transactions between liquidity providers ("D2D") can be negotiated over the phone, or through direct electronic dealing platforms such as Reuters Dealing.  Direct transactions between liquidity providers and customers ("D2C")

---

[11] This is why these platforms are referred to as "electronic brokerages" or "electronic communications networks," and not "exchanges."  Exchanges are all-to-all trading platforms.

can also be negotiated using these means.  For example, customers can contact liquidity providers, and ask for their quotes in a particular currency for a particular transaction size.  After hearing the quote, the customer can execute or pass.  Direct dealing via these means (either D2D or D2C) is not anonymous.

45.    Liquidity providers communicate with interdealer voice brokers *via* telephone. Liquidity providers verbally submit bids and offers to a voice broker, who in turn disseminates the best bid and offer *via* telephone "squawk boxes" on liquidity provider desks.  Liquidity providers can verbally hit bids or lift offers, at which time the voice broker matches the relevant parties: until they are matched the bidder/offeror and the party hitting/lifting the bid/offer are not known to one another.

## IV.    THE CURRENEX PLATFORM

### A.    Introduction

46.    Currenex was a sophisticated electronic foreign exchange trading platform (ECN) owned by State Street following its acquisition in March 2007.  The platform was one of the most popular for institutional FX.  The centerpiece of Currenex's spot FX offering was FXtrades, an anonymous electronic communications network (ECN) that provided execution through an independent central counterparty.  In a 2011 brochure, Currenex described FXtrades and claimed it offered: matching engine averaging less than 850 microseconds; "low-latency order matching with 'first-in, first-out (FIFO)' prioritizing"; and unthrottled, tick-by-tick market data with full depth of book and tenth pip rounding for precision trading in 65 spot currency pairs.[12]  FIFO is designed to encourage market participants to place limit orders early and provide liquidity to the market, as earlier submissions gained execution priority over later submissions at the same price.

---

[12] CXSSB00037798.

47.     Currenex offered two primary execution methods for spot FX trading: Executable Streaming Prices (ESP), which provided real-time bids and offers for high-frequency trading with continuous price feeds, and Currenex RFQ, which allowed traders to request quotes from more than 60 banks simultaneously.  I am only considering ESP here.

48.     The ESP service delivered: (a) top of book pricing and quantity, (b) market depth visualization through a price ladder, (c) preset order quantity controls, and (d) advanced order entry capabilities.[13]

49.     Typically for a platform of this type, Currenex supported a range of order types ranging from the simple to the complex.  The simple order types are market orders and limit orders.  The complex order types all have conditions associated with them and when all these conditions are met they then become either market orders or limit orders and so I confine my attention to the simple order types.

50.     A market order is immediately executed at the best available current market rate(s) whereas a limit order specifies a price and can only be executed at price or better.[14]  A limit order rests on the book until fully matched, expired, or canceled.

51.     For larger orders, Currenex offered sophisticated execution algorithms that acted as a technical intermediary between the trader and the market.  These split execution over time and were based on standard approaches such as time-weighted average price ("TWAP") and volume-weighted average price ("VWAP").  Again, these algorithms generated either market orders or limit orders for the purpose of execution.  Finally, traders could configure their orders with various

---

[13] CXSSB00037798.

[14] On Currenex market orders were subject to "last look" (discussed both *supra* and *infra*).  A market order matched to a streaming price could be rejected ("last looked") multiple times before being executed.

expiry types but these do not concern us here as they merely determine how long an order can stay on the book.

52.    There were three types of transactions on Currenex relevant to my analysis. "Order Crosses Price" ("OXP") transactions occurred when an order was matched with a streaming price. "Order Crosses Order" ("OXO") transactions occurred when a non-streaming order was matched with a non-streaming limit order. Finally, "Price Crosses Order" ("PXO") transactions occurred when a streaming price crossed and matched with a non-streaming limit order.

**B.    Plaintiffs Allege That Currenex Utilized an Undisclosed System of Assigned Priority Numbers and Password Sharing**

53.    Plaintiffs' allegations in this litigation focus on conduct, specifically undisclosed priorities on the Currenex platform that resulted in inflated bid-ask spreads and improper access sharing. As discussed *infra*, the field of financial economics called "market microstructure" studies theoretically and empirically bid-ask spreads and trading costs. Research in this field demonstrates that rules and protocols on a trading platform can affect these variables. Therefore, to determine how the challenged features of the Currenex platform would be expected (based on market microstructure considerations) to affect Plaintiff trading costs, it is necessary to describe Currenex's rules and protocols. In this section, I describe how the Currenex platform operated, and in particular, how its operation involved undisclosed features relating to priority rules and revelation of information about trader orders.

54.    At any given point in time a system user, referred to as "stream," had a priority attached to them which was indicated by an integer with a lower value indicating higher priority. Most streams had a value of 0 or -1 with only a small minority of streams having -3, which appears to have been the most favorable priority number regularly used (though some other lower numbers occasionally appear). Most entities, such as banks, had multiple streams which perhaps were

linked to different parts of their business or different individual traders *etc*. Different streams from the same entity could, and frequently did, have a different priority level and these priorities were frequently changed.

55. I understand that Plaintiffs allege for many years Currenex used this system of secretly assigned priority rankings—numbers that could be secretly manipulated by Currenex's employees—to break ties on its platform. I understand that Plaintiffs will show this by way of witness testimony[15] and documents.[16] I have reviewed examples of such materials, sufficient to become familiar with allegations that the priority-assignment system did in fact exist, then later stopped. I have also reviewed the data, as well as the relevant portion of the "source code"[17] itself,



56. I understand that Currenex claims ████████████████████████████████████

████.[18] Notably, prior to issuing those "formal" disclosures, Currenex shut the number-

---

[15] *See, e.g.*, Currenex 30(b)(6) (Kelly) Tr. at 21:2-8 (████████████████████████
████████████████████████████); Harmon Tr. at 16:14-17:2 (admitting that "even though [the Platform] advertised that every order was first in/first out," liquidity providers with "priority" would "beat orders to the book"); Rosenwald Tr. at 65:25-66:8 (███████
████████████████████████████).

[16] *See, e.g.*, CXSSB00271742 (████████████████████████████████████
████████████████████████████████).

[17] Produced Currenex source code.

[18] Currenex 30(b)(6) (Kelly) Tr. at 40:9-14.

assignment system down.  As discussed elsewhere in my report, this further buttresses the Plaintiff testimony and my own opinion that, had the system been disclosed, no rational trader would have actually used the Platform.

57.    I understand that there is evidence that the Trading Defendants knew of these systems.

58.    State Street was Currenex's parent, and operated using overlapping personnel.  I also understand ███████████████████████████████████████████████████ ██████.[19]

59.    Goldman documents and testimony also show it knew of the system.  In Goldman's view, ███████████████████████████████████████████████████████ ███████████████████████.[20]  Contemporaneous documents show this to have been understood as a pay-to-play system:  As Schonberg, Goldman's head of e-FX sales, put it at the time: ██████████████████████████████████████████████████████████ ██████████████████████████████████████████.[21]  Even as far back as 2006, Goldman internally acknowledged: ████████████████████████████████ █████████████████████████████████.″[22]

60.    As for HC Tech, I understand it hired away the very Currenex employees who were running the number-assignment system at Currenex, including Cary Rosenwald himself (who

---

[19] *See* ████████████████.

[20] Schonberg Tr. at 83:2-4; *see also* Schonberg Tr. at 62:8-13; GS-EDMAR-00002650 (████████████████████████████████████████████████████ ██████████████████████████████████████ .

[21] GS-EDMAR-00368325 (████████████████████████████████████).

[22] GS-EDMAR-0001574 (emphasis added).

moved from Currenex to HC Tech in 2011), Sean Gilman (Currenex's former Chief Technology

Officer, who moved in 2010), and Romain Rossier (Currenex engineer who moved to HC Tech in

2010). ███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████ ████████████████

███████████████████████████████████████████████████

████████████████████████████████████████. ."[24]

61.    The system log reports the order book at the time of the execution, and the details

of the execution (*inter alia* time, price, and quantity).  The order book information includes an

order number, order time, order price, order amount, a size reduction indicator, the ID of the order

submitter, and crucially, a priority indicator.



62.    The salient events in this example are:

- ███████████████████████████████████
- █████████████████████████████████████████████████████

---

[23] *See* HC Tech 30(b)(6) Dep. at 285:16-286:20; *compare* CXSSB00409573 *with* CXSSB00408379.  It also merits emphasis that HC Tech's CEO, Joe Niciforo, was a golfing buddy of Cliff Lewis, Currenex's CEO; the two played often and discussed business over lunches.  *See* Niciforo Tr. at 91:4-94:15.

[24] HCTECH_0174870.

- 

63.    In fact, a stream with better priority sometimes won a trade despite not having the best price but having higher priority, than those showing the better price, as given in the following example[25]:



64.    The relevant events in this sequence are:

- 

65.    I also understand former Currenex employee Nick Burrlock testified extensively as to how he discovered that HC Tech was using a Russell Sears login to front-run another Currenex user.[26]

---

[25] This is sometimes referred to as "slippage."

[26] Burrlock Tr. at 27:25-32:1.

66.    To be clear, for purposes of my report, I presume the existence of the scheme alleged. But my review of the example evidence does support the view that the alleged schemes existed, then ceased. As I will show *infra*, these undisclosed practices fundamentally altered the economics of the Currenex platform, to the detriment of Class members.

## V.    MARKET MICROSTRUCTURE

### A.    Theoretical Overview

67.    Plaintiffs' allegations in this litigation focus on conduct, the use of Currenex employee-assigned numbers for breaking ties and sharing of employee passwords. Plaintiffs allege that these practices would have made Class members' trading costs higher.

68.    The field of financial economics called "market microstructure" studies theoretically and empirically bid-ask spreads and the price impact of trades and orders (quotes). Therefore, market microstructure provides the essential theoretical and empirical concepts and tools to analyze and test Plaintiffs' allegations.

69.    Market microstructure analyzes the price determination process for financial instruments, and how *inter alia* the composition of market participants, their characteristics, trading protocols, and regulations interact to determine prices, price movements, and trading costs.[27]

---

[27] Market microstructure is "the study of trading mechanisms for financial securities." Joel Hasbrouck, *Empirical Market Microstructure* (2007). It is "the investigation of economic forces affecting trades, quotes, and prices." Bruno Biais, Larry Glosten, and Chester Spatt, Market Microstructure: A Survey of Microfoundations, Empirical Results, and Policy Implications, 8 *J. of Fin. Markets* (2005) 217. Microstructure analyzes "the costs of providing transaction services and the impact of such costs on the short run behavior of securities prices." Hans Stoll, Market Microstructure, in G. M. Constantinides, M. Harris, & R. Stultz (Eds.), *Handbook of the Economics of Finance* (2003).

70.    Foreign exchange markets have been the subject of a substantial body of market microstructure scholarship, and this scholarship has demonstrated that basic microstructure principles explain salient features of FX rates, spreads, and their time series behavior.[28]

71.    Market microstructure is a sprawling subject.  One aspect of the field of specific relevance to this litigation is the determinants of bid-ask spreads.

72.    In brief, market microstructure recognizes that market participants can be divided for analytical purposes into two categories: end users who want to trade FX for speculative or business reasons (*e.g.*, to acquire currency to purchase a good produced in a foreign country), and intermediaries who quote prices. End users are said to "demand liquidity" or be "liquidity takers." This means that they want to buy or sell a currency quickly without moving the price materially against them.  The intermediaries are "liquidity providers."  On Currenex, those streaming prices were liquidity providers.  In addition, non-streamers that posted resting limit orders provided liquidity.  Thus, many Class members acted both as liquidity providers (price makers) and liquidity (price) takers.

73.    What do intermediaries—*i.e.*, liquidity providers—do?  Put succinctly, they "make markets."  That is, they stand willing to accommodate end users' time varying and random demands to trade.  This accommodation of end users' demands to buy and sell a financial instrument is frequently characterized as providing/supplying liquidity.  They do so by quoting prices at which they are willing to buy (bids) and at which they are willing to sell (offers or asks).

---

[28] Thomas K. Lyons, *The Microstructure Approach to Exchange Rates* (2001).  Martin D. D. Evans, *Exchange-Rate Dynamics* (2011).  Martin D. D. Evans and Dagfinn Rime, Microstructure of Foreign Exchange Markets, Norges Bank Working Paper (2019).  For an extensive bibliography, see Dagfinn Rime, Bibliography of Microstructure of Foreign Exchange Markets (2016), BI Norwegian Business School Working Paper.

74. The difference between the best quoted offer/ask and the best quoted bid is the (quoted) bid-ask spread. Liquidity demanders can "hit" a bid, which results in their sale of the instrument. Liquidity demanders can "lift" an offer, which results in their purchase of the instrument. Liquidity demanders are said to "take" liquidity, and I will refer to them as "takers." Relatedly, those who take liquidity by hitting a bid or lifting offer are said to be the "aggressor" in a transaction. Conversely, those whose orders are aggressed against by a taker are liquidity providers/suppliers and are referred to as "makers" (as in making a market).

75. The absolute difference between a traded price and the midpoint (*i.e.*, average) of the best bid and offer represents a trading cost.

76. As in any industry, the terms on which competitive intermediaries—liquidity providers—supply liquidity depend on their costs. Market microstructure has identified three major categories of intermediary costs: inventory costs, trade processing costs, and information/adverse selection costs.[29]

77. With respect to inventory costs, note that end users' buying and selling interests almost never match at any instant of time. For example, at one moment, there may be more end users who want to buy euros/sell dollars than who want to sell euros/buy dollars. At another moment, the reverse will be true. Liquidity providers absorb these order imbalances. They sell when there are more buyers than sellers, in anticipation of buying sometime later when there are more sellers than buyers.

78. To perform this function, liquidity providers must hold inventory. When there are more end user sellers than buyers, liquidity providers purchase and accumulate inventory. When

---

[29] Stoll *supra* note 27.

the reverse is true, liquidity providers' inventories decline, and liquidity providers may actually be short a currency.

79.     Holding inventory (either long or short) imposes costs. Inventory must be financed. Moreover, a liquidity provider with inventory is subject to price risk. The liquidity provider must hold capital to absorb this risk, and this capital is costly.

80.     Trade processing costs include any transaction fees as well as the cost of the labor and capital required to supply liquidity. In modern computerized markets, including those like Currenex, labor includes specialized personnel ("quants") who produce trading algorithms and analyze trading data, and the capital includes the specialized software and hardware necessary to perform these tasks. Liquidity supply in modern computerized markets is far more human-, physical-, and software-capital intensive than was the case in traditional "voice" markets. A liquidity provider's trading revenues must be sufficient to cover these costs, or it will exit the market.[30]

81.     Information/adverse selection costs arise whenever some market participants may have private information (in contrast to public information, like the release of a government report) about the value of a particular currency. Those in possession of private information can use it to trade profitably. Knowing that, less-informed traders realize that a particular trader X may want to buy from them (sell to them) because X has information that the current price of the instrument

---

[30] The terms "taker," "maker," "liquidity provider" can mean different things in different contexts. On the Currenex Platform, a user could be a price-taker on some trades, but a price-maker on another. The general concepts of how costs impact spreads are the same.

is too low (high). Thus, purchases can signal bullish information, and sales can signal bearish information.[31]

82.    When end users or other market participants (*e.g.*, speculators) may have private information, liquidity providers face the risk of trading with those with superior information: when they do, liquidity providers tend to lose on these transactions. That is, when trading with the better-informed, they buy (sell) at prices above (below) the value implied by the private information. The losses from trading with the better-informed are a cost of making markets. These are referred to as adverse selection costs.

83.    The prices that competitive liquidity providers charge depend on these costs. In the FX market (and many others) the "price" of market making/liquidity supply services is reflected in the "bid/ask" (or "bid/offer") spread. The bid is the price at which a liquidity provider stands willing to buy: the ask (or offer) is the price at which the liquidity provider is willing to sell. The liquidity provider "quotes" a bid and offer.

84.    The bid is below the ask. Thus, at any moment in time, a liquidity provider that buys at the bid and sells at the offer captures the spread (buys low and sells high), and this difference is a source of revenue. In a competitive market, this spread must cover all the costs described above. Thus, the greater the costs (*e.g.*, the greater are adverse selection costs) the greater the spread must be.

---

[31] On the importance of private information in FX, *see* Lyons *supra* note 28, Evans *supra* note 28, and King *et al supra* note 8. *See also* Richard G. Payne, Informed Trade in Spot Foreign Exchange Markets: An Empirical Investigation, 61 *J. International Econ*. (2003) 307; Frank McGroarty, Owain ap Gwilym, and Stephen Thomas, The Role of Private Information in Return Volatility, Bid-Ask Spreads and Price Levels in the Foreign Exchange Market, 19 *International Financial Markets, Institutions, and Money* (2009) 387; and Michael J. Moore and Richard Payne, On the Sources of Private Information in FX Markets, 35 *J. of Banking and Fin*. (2011) 1250.

85. These costs may vary over time, and therefore in competitive markets bid/ask spreads may vary as well. For example, the costs of holding inventory are higher (capital needs are greater) when price volatility is high, so spreads tend to increase (decrease) with increases (decreases) in volatility. Volatility may also be correlated with private information flows: that is, volatility may be higher (lower) when there is more (less) private information.[32] This would also tend to induce positive covariation between spreads and volatility.

86. These costs can also depend on the rules and protocols of the trading system. In particular, rules and protocols can affect the severity of adverse selection and thus the adverse selection costs incurred by liquidity providers. As will be shown *infra*, Currenex's undisclosed priorities are an example of rules that can, and did, inflate the costs for Class members providing liquidity on the Platform, costs that market microstructure literature predicts was ultimately borne, at least in part, when Class members acted as price takers.

87. Bid/ask spreads effectively determine the gross revenue of liquidity providers. Holding costs constant liquidity providers benefit from higher spreads. But if spreads are higher ("wider") due to higher liquidity provider costs, higher spreads are associated with *lower* liquidity provider profits.[33] Higher spreads are detrimental to liquidity demanders because they represent a cost of liquidity.

88. Market microstructure scholars frequently say that liquidity providers' bids and asks effectively grant options to liquidity demanders. A liquidity provider bid is analogous to a put option that gives a liquidity demander the right to sell at a fixed price, with the fixed price being the liquidity provider's bid price. Similarly, a liquidity provider offer is analogous to a call

---

[32] Kenneth French and Richard Roll, Stock return variances: the arrival of information and the reaction of traders, 17 J. Financial Econ. (1986) 5.

[33] Except in edge cases discussed *infra*.

option that gives a liquidity demander the right to buy at a fixed price, with the fixed price being the liquidity provider's ask/offer price.

89.    Like all options, those granted through bids and offers by liquidity providers are costly to the grantor because those who have the option (the liquidity demanders, in this instance) will exercise them when it is to their benefit, and hence to the detriment of the grantor (the liquidity providers, in this instance).  That is, when the liquidity demander's information implies that a liquidity provider's bid is too high, the liquidity demander will sell, but will not do so if that information implies that the bid price is too low.  Conversely, when the liquidity demander's information implies that a liquidity provider's ask price is too low, the liquidity demander will buy, but will not do so if that information implies that the ask price is too high.

90.    The value of the options granted by a liquidity provider are a cost of supplying liquidity, and hence bid-ask spreads must cover the cost of these options.  As will be see *infra*, the challenged practices increased the cost of providing liquidity on the Platform, and that increase in costs ultimately fell, at least in part, to Class members when taking prices, in the form of inflated spreads.

**B.    Empirical Evidence on FX Microstructure**

*1.    Bid/ask spreads*

91.    Bid/ask spreads are a primary measure of trading costs.  The "quoted spread" is the difference between the best ask and best bid prices prevailing in the market.  The "realized half-spread" is the absolute value of the difference between the absolute value of the midpoint between the bid and the ask at some time interval (*e.g.*, 30 seconds) after a trade and the trade price (which is typically at the bid or the ask).  The realized spread incorporates the effect of the price impact of a trade, discussed next.

2.    _Order flow and price impact_

92.    One of the most important implications of theoretical microstructure scholarship is that order flow causes prices to move in the direction of the flow.  Order flow is signed trade volume.[34]

93.    In this context, it is sometimes necessary to distinguish between different kinds of orders.  Market orders—orders to buy at the prevailing offer or sell at the prevailing bid—are considered "aggressive" orders.[35]  Liquidity demanding orders are aggressive.  Aggressive order flow in any interval of time is the difference between the number of aggressive (market) buy orders and aggressive (market) sell orders during that interval.

94.    Limit orders—bids to buy at a specified price or offers to sell at a specified price—are "passive" in the sense that the execution of one of these orders is contingent upon the action of another trader, specifically the submission of a market order or a marketable limit order.  Passive order flow in any interval of time is the difference between the number of passive (limit) buy orders and passive (limit) sell orders during that interval.[36]

95.    Both types of orders may convey information, and have implications for liquidity providers' inventory and trade executions.  Therefore, theoretical microstructure scholarship

---

[34] Lyons _supra_ note 28.

[35] Sometimes a market participant may submit a limit order (_i.e._, an order to trade at a particular price or better) that results in an immediate execution.  For example, submitting a bid equal to the prevailing ask price in the market results in an immediate execution.  These are referred to as "marketable limit orders" and are equivalent to market orders in the sense that they result in immediate execution.  Therefore, marketable limit orders are aggressive orders.

[36] One nuance of limit order flow is that limit orders can be placed at any price, and therefore there is typically a "book" of limit orders, with bids at price levels at or below the highest bid currently outstanding, and offers at price levels at or above the lowest ask currently outstanding.  Thus, there are passive order flows associated with different levels of the "book."

implies that order flows cause price movements.  In particular, net buy order flows cause price increases, and net sell order flows cause price decreases.[37]

96.    Market/marketable orders and limit orders have different information content and different implications for liquidity provider inventories, risks, and trade processing costs. Therefore, market/marketable and limit order flows typically have different impacts on prices.

97.    The informational content and inventory and risk implications of order flows may differ systematically over time.  These variations may occur over relatively long time scales, due for instance to changes in underlying economic conditions, *e.g.*, a financial crisis.  There may also be intraday variations as the composition of traders can vary systematically within the day.[38]  For example, it is possible that the nature of order flow around an FX fix is different from the nature of order flow at non-fix times.

98.    There is an extensive body of empirical scholarship that documents that order flow causes price movements in the predicted direction (with net buy (sell) flow causing price increases (decreases)).  Indeed, using a variety of empirical techniques, this literature documents that order flow is a major driver of FX price movements.[39]

---

[37] It is possible that buy orders and sell orders (either active or passive) may have different information content, or different implications for liquidity provider inventories and risks.  Therefore, the price impact of buy order flow may differ from the impact of sell order flow.  It is common, however, to treat buy and sell orders symmetrically, and focus on net order flow.  For expository convenience I will treat buy and sell orders as symmetric, and frame the analysis in terms of net order flow.

[38] Anat R. Amati and Paul Pfleiderer, A Theory of Intraday Patterns: Volume and Price Variability, 1 *Rev. Fin. Stud*. (1988) 3.  Larry Harris, A Transaction Data Survey of Weekly and Intraday Patterns in Stock Returns, 16 *J. of Financial Econ*. (1986) 99.

[39] Lyons *supra* note 28, *esp*. Ch. 5.  Evans and Rime *supra* note 28.  Martin D. D. Evans, FX Trading and Exchange Rate Dynamics, 57 *J. of Fin*. (2002) 2405.  Martin D. D. Evans and Richard K. Lyons, Order Flow and Exchange Rate Dynamics, 110 *J. Political Econ*. (2002) 170. Martin D. D. Evans and Richard K. Lyons, Understanding Order Flow, 11 *International J. of Fin. and Econ*.  (2006) 3. Richard Payne, Informed Trade in Spot Foreign Exchange Markets: An

## VI. PLAINTIFFS ALLEGE THAT CURRENEX USED UNDISCLOSED "TIE BREAKING" PROCEDURES AND OFFERED AT LEAST ONE TRADING DEFENDANT (HC TECH) ADMINISTRATIVE ACCESS TO THE CURRENEX PLATFORM WHICH GAVE THIS FIRM A MATERIAL INFORMATION ADVANTAGE OVER OTHER USERS

99.    Plaintiffs make two primary allegations against Currenex.

100.    The first allegation is that Currenex employees were secretly assigning numbers to streams to use as the secondary prioritization rule, *i.e.*, to break price ties.

101.    *Infra* I discuss in detail how this undisclosed prioritization affected the incentives of market participants and competition between them, and thus affected spreads and trading costs. In brief, this prioritization gave the privileged entities an information advantage over unprivileged ones. The privileged entities—particularly the Trading Defendants, who both knew of the system and disproportionality benefitted from outlier priority assignments—exploited this information advantage to the detriment of takers of liquidity and non-privileged liquidity providers. This exploitation raised the trading costs of Class members.

102.    The second allegation is that Currenex provided at least one Trading Defendant, HC Tech, with administrative access to the Currenex system that it did not provide to others, and did not publicly disclose this fact.

103.    In particular, Plaintiffs allege that as a result of this administrative access, HC Tech (at a minimum) could observe the quotes of other market participants,[40] including so-called "hidden" and "iceberg" orders that were not displayed to other market participants: indeed, the very purpose of these order types was to provide a means for those using them to limit the leakage

---

Empirical Investigation, 61 *J. of International Econ.* (2003) 307. Michael Sager and Mark P. Taylor, Commercially Available Order Flow Data and Exchange Rate Movements: Caveat Emptor, 40 *J. of Money, Credit, and Banking* (2006) 583.

[40]    Burrlock Tr. at 27:25-32:1.

of information about their trading intentions to the marketplace at large. Moreover, HC Tech (at a minimum) had access to certain trader codes that enabled it to learn the identity of the counterparty behind each quote and trade.[41] This allowed HC Tech to perform analyses about the trading performance of each market participant that gave it information that others lacking administrative access did not have, which gave it a decisive information advantage over other Platform users.[42] Furthermore, it allowed HC Tech (at a minimum) to observe the midpoint between the bid and offer quoted by each individual market participant, which provided valuable information about each participant's position and their market view.

104.    Giving HC Tech specialized access to information would be expected to have the effect of widening spreads because it exacerbated the adverse selection problem facing liquidity providers that lacked the same information as HC Tech, and because it allowed HC Tech to use the information incorporated in the orders of others to trade profitably and deprive others the opportunity to profit from their information.

VII.    **MARKET MICROSTRUCTURE PRINCIPLES AND BASIC ECONOMIC PRINCIPLES DEMONSTRATE HOW UNDISCLOSED PRIORITIES AND PREFERENTIAL ACCESS TO INFORMATION INFLATE TRADING COSTS**

A.    **The Alleged Wrongdoing Inflated the Trading Costs of Class Members**

105.    The market microstructure principles laid out *supra* produce predictions of the effects of undisclosed practices on the costs that Class members incurred. Specifically, these principles predict that the challenged practices inflated the costs of providing liquidity on the Platform, by way of lower effectively available volume and more adversely selective volume.

---

[41]    *Id.* at 31:22-32:1 ("Q: And so through this API connection, HC Technologies was able to see information about all orders on the anonymous platform. Is that correct? A: Correct.").

[42]    *Id.* at 129:15-18 ("[I]t was clear that Russell [Sears] had been speaking to HC Tech with regard to the API access that they had that gave them the view of hidden orders").

These principles predict that the increased costs of providing liquidity was ultimately felt, at least in part, by price-takers in the form of wider spreads. These predictions can be tested empirically using class-wide evidence, and the empirically quantified effects on trading costs can be utilized to quantify the damages incurred by Class members on a formulaic basis using class-wide evidence.

106.    There are two basic microstructure mechanisms by which an undisclosed practices can distort the venue's ecosystem. The first is that they exacerbated adverse selection risk. The interaction between undisclosed priorities and "last look" rights (defined below) particularly contributed to this exacerbation. The second is that they allow the opportunistic exploitation of the option embedded in quotes. All of the mechanisms below would be predicted to increase the cost of providing liquidity, costs that, at least in part, would ultimately be paid for by Class members when acting as price-takers by way of inflated spreads.

    1.    *Undisclosed priorities raised Class members' cost of supplying liquidity by exacerbating "adverse selection"*

107.    First consider the adverse selection issue, and in particular, the interaction between undisclosed priorities and the Defendants' last look option. In brief, undisclosed priorities gave Defendant liquidity providers a "first look" that allowed them to exercise their last look rights in a way that increased other liquidity providers' adverse selection costs.

108.    "Last look" refers to the ability of certain liquidity providers on the Currenex platform to reject trades within a certain time interval. The mechanism worked as follows: Currenex matched a liquidity taker attempting to execute an order with a liquidity provider based on the system's priority mechanism (which included the undisclosed priorities). The liquidity provider so matched had the option to execute or reject the transaction during a time interval. If the liquidity provider accepted the order, it was executed at the liquidity provider's bid or offer. If

the liquidity provider rejected the order, the system would match it based on prices and priorities prevailing at the time of the rejection. The liquidity provider matched to the liquidity taker would again have an option to accept or reject. The mechanism is referred to as "last look" because liquidity providers had the opportunity to take a "last look" at a taker's order before deciding whether to execute it. In contrast, in a system without last look, a liquidity provider would be required to execute all taker orders that the system matched it with.

109.     To illustrate how the interaction between undisclosed priorities and last look rights, consider the following scenario. State Street, with a favorable priority setting, joins the bid queue by entering a quote that matches the prevailing best bid. Because of the undisclosed priority setting, an incoming marketable sell order is first matched with State Street's bid. Assume this match occurs at time $T^*$. Under the last look protocol, State Street can decide whether to execute the order or not within a pre-specified time frame, $e.g.$, ███████████ after $T^*$.[43]

110.     Crucially, State Street can use private information to make this decision. This information can include information private to State Street available at $T^*$ and information that arrives within the last look interval.[44]

---

[43] Based on a review of the data, I conclude that ████████████████████████
████████████████████████████████████████████████████████

[44] As noted $supra$, Plaintiffs allege that at least one Defendant, HC Tech, had access to information about activity on the Currenex platform beyond that available to other users, and that this information included the client IDs attached to each order. A liquidity provider in possession of such information can "profile" a client based on the profitability of past trades with that client, which allows liquidity provider to assess the likelihood that the counterparty is likely to be informed: indeed, such a liquidity provider could exploit information about each client's transactions with all counterparties in order to assess the likelihood that client's order flow was privately informed. By exploiting last look, a liquidity provider with this information can reject trades with likely well-informed counterparties.

111. Information available to a liquidity provider at $T*$ can include information about the specific counterparty for the proposed transaction. Information that arrives during the rejection window includes price movements that occur during that window, including price movements that occur on other platforms that State Street can monitor. These include liquidity provider platforms like EBS Market and Reuters Matching/LSEG, and other non-liquidity provider platforms, including any single liquidity provider platform operated by the liquidity provider. In this scenario, if State Street observes that prices have risen on these other platforms, it can accept the trade in anticipation that the trade will be profitable (because the purchase at the bid is below the now-prevailing estimate of the midpoint based on the information that arrives during the rejection window). Conversely, if State Street observes that prices have fallen on these other platforms, it can reject the trade because it is likely to be unprofitable.

112. The use of favorable priority settings to get a "first look" thus has detrimental effects on Class members, because it reduces the quality of the order flow they receive. In essence, the order flow left over for Class members to receive when they act as liquidity providers is more "toxic."

113. The ability to jump-in-line on Currenex can also increase the effective cost of providing liquidity because of the stolen opportunities on other platforms, too. That is, a liquidity provider with a first look privilege could use the rejection window to scan other trading platforms to determine if prices on them presented a riskless trading opportunity.

114. For example, consider if State Street, who due to its jumping the queue and last look privilege, had the option to buy EURUSD at 1.1505. During the last look window State Street could determine whether the bid was higher than 1.1505 on any other platform. If so, State Street could accept the trade on Currenex and immediately execute against the bid on the other platform,

thereby making a riskless profit. That is, priorities allowed Trading Defendants to "pick off" quotes on *other* trading venues, too.

115.    Using priorities to pick off quotes on other platforms denied Class members the ability to do so. This further reduced the profitability of Class member quotes on the Currenex platform, which is economically equivalent to increasing the cost of quoting.

116.    Client profiling by a liquidity provider means that the order flow received by Class members—that passed over by Trading Defendants—is more likely to be informed than all order flow. In the argot of the markets, Trading Defendants could "skim the cream"—the uninformed order flow—leaving Class members acting as liquidity providers with order flow that is disproportionally informed. This means that it is costlier for Class members to supply liquidity than would be the case if the order flow they had a fair shot at included the "cream" of uninformed order flow skimmed by the highly prioritized liquidity providers.

117.    The ability to condition the decision to trade or reject based on information that arrives during the rejection window means that the privileged liquidity provider can keep trades that are more likely to be profitable and reject trades that are more likely to be unprofitable. This, again, leaves Class member providers with trades that are more likely to be unprofitable than the average trade. This is economically equivalent to inflating the cost of providing liquidity.

118.    Both of these sources of higher costs of providing liquidity in a market with undisclosed privileges relative to their costs in a market without such priorities leads to a predictable response in equilibrium: liquidity providers widen their quotes to try to cover their higher costs. These increased costs thus are expected to be ultimately borne, at least in part, by Class members when acting as price takers.

2.    *Undisclosed priorities allowed Defendants to engage in parasitic quote matching strategies that raised Class members' costs of supplying liquidity*

119.    Those who knew they had high priority settings knew they did not have to compete on price—and so did not.  In more economic terms, this ability of Defendant liquidity providers to secure privileged access to order flow without offering better prices than Class members permitted the former to engage in another parasitic form of trading to the detriment of the latter.  Specifically, quote matching per se increased the cost of the option that non-Defendant liquidity providers granted.

120.    The parasitic—and spread/cost inflating—nature of quote matching is well known.[45]  Due to undisclosed priorities, the pernicious effects of quote matching were more severe than in the other contexts which it has occurred.

121.    For example, quote matching (sometimes referred to as "pennying") occurs in electronic stock markets.  This strategy exploits the option granted by liquidity providers in those markets.  In broad outline, it works as follows.  A quote matcher submits a quote (*e.g*., a bid) that has a high likelihood of being executed because it is equal to or slightly better than the quotes submitted by other liquidity providers.  If the trade is executed, the liquidity provider evaluates (based on information including price movements on other platforms, or price movements of related, highly correlated securities) whether the value of the security has moved in a favorable or unfavorable direction.  If it has moved in a favorable direction, the quote matcher keeps the trade.  If it has moved in an unfavorable direction, the quote matcher engages in an offsetting transaction

---

[45] Larry Harris, What to Do about High-Frequency Trading, 69 *Financial Analysts* J. (2013) 6.  Larry Harris, The Quarter-Penny Tick (working paper, 2022).  Larry Harris, Trading and Electronic Markets: What Investment Professionals Need to Know, CFA Institute (2015). Larry Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003).

against the quotes of other liquidity providers. If the other liquidity providers have not adjusted their quotes to reflect fully the information the quote matcher uses, the quote matcher "picks off" these quotes, saddling them with unprofitable trades. That is, the quote matcher opportunistically exploits the options provided by other liquidity providers. This increases the cost of these options. This induces the other liquidity providers to widen their quotes.

122.   In U.S. stock markets, rules and regulations require the quote matcher to beat the same-side quote of other liquidity providers in order to have a high likelihood of execution. For example, in a market with penny price increments and time priority, the quote matcher must offer a bid a penny above the prevailing bid to make execution likely. (That is why this conduct is sometimes referred to as "pennying"). This quote improvement is essentially the cost that the quote matcher incurs to obtain the option granted by other liquidity providers.

123.   The undisclosed priorities in the Currenex system were particularly insidious because a Defendant liquidity provider did not have to improve the bid or offer to secure the options granted by non-Defendant liquidity providers. That is, it was costless for the Trading Defendants to obtain these options. All they had to do was to match Class member liquidity provider quotes and exploit their undisclosed priority in order to execute transactions.

124.   This quote matching again increased the cost of providing liquidity on the Platform. Defendant liquidity provider quote matching meant that the trades Class member liquidity providers executed were more likely to be unprofitable than the universe of trades. The quote-matching Trading Defendants intercepted many of the profitable trades, leaving everyone else with trades that were less profitable on average than the universe of trades. Again, the predicted equilibrium response of non-Defendant liquidity providers to facing less-favorable order flow is

to widen their quotes, which again means that economics predicts the increased costs are ultimately placed, at least in part, on Class members when acting as liquidity (price) takers.

   *3.*  *"Skew leakage" from password sharing also would have raised Class members' trading costs*

  125. The privileged information access of at least one Trading Defendant (HC Tech) gave it another information advantage that it could exploit opportunistically to the detriment of Plaintiffs. In particular, it created "spread leakage," also known as "skew leakage." A Trading Defendant who could observe the quotes of each other market participant obtained information about their market view and position.

  126. Consider Class member A who was long a particular currency and wants to reduce that risk. This entity would typically quote an offer price at or close to top-of-book, and a bid price somewhat below, and perhaps well below, the best bid. This is known as a "skewed" price. This would increase the likelihood that A would be able to reduce its inventory position (recall that inventory is costly) and reduce the likelihood that it would increase its inventory position: the competitive offer and uncompetitive bid increased the odds that its next trade would be an inventory-reducing sale and reduced the odds that that trade would be an inventory increasing purchase. This asymmetric support provided by A's quotes increases the odds that the price will decrease in the future.

  127. But an asymmetric quote—which causes A's midpoint in this example to be less than the midpoint of the top-of-book quotes—can signal this information if other users are able to observe the skew. In the example, the asymmetric quote is a signal that A is either long and wants to sell, that A expects the price to decline, or both. If HC Tech could observe this, it utilize A's information to A's detriment. In the example, HC Tech could match A's offer, exploit its priority to get a trade, and profit by the price moving lower, knowing that A still needs to sell. Thus, HC

Tech could not only saddle Class members with more unprofitable trades, it could deprive Class members of trades that their information leads them to believe will be profitable.  The response of competitive liquidity providers to this loss is to, again, widen spreads.

<p style="text-align:center">*        *        *</p>

128.    In sum, the alleged practices gave Trading Defendant liquidity providers an information advantage over Class member liquidity providers.  The Defendants' exploitation of these advantages raised the costs of Class members attempting to provide liquidity on Currenex.  The predicted response would be to widen spreads, meaning the increased costs discussed above were ultimately borne, at least in part, by Class members when taking prices (liquidity).

### B.    Basic Economic Principles Imply That Class Members Did Not Profit From Wider Spreads Caused by the Challenged Practices, and Indeed Were Damaged by Them

129.    As discussed above, one predicted result of Defendants' wrongdoing would be wider spreads, *i.e.*, higher prices when Class members were acting as a price taker and buying, and lower prices when acting as a price taker and selling.  This does not mean, however, that the Class member makers *benefitted* from this system.  To the contrary, basic economic principles show that they were victims, too.  Any assertion to the contrary reflects the "fallacy of arguing from a price change," that is, draws conclusions about the effects of a price change without considering the cause of the price change.

130.    In a competitive market, higher prices are not necessarily good or bad for providers.  Higher prices are beneficial if they are the result of demand increases: they are not if they are the result of cost increases.  Spread widening due to the alleged misconduct fall in the second category, and therefore does not indicate a benefit to the Class members, even when acting as liquidity providers.

131.    This is illustrated by a basic supply and demand (partial equilibrium) analysis straight out of an economics textbook.  Figure 1 depicts the supply and demand for non-Defendant liquidity provider services.  The horizontal axis is the quantity of trades intermediated by non-Defendant liquidity providers.  The vertical axis is the price of execution services—the spread.  In the figure, there is one "liquidity demand curve," *D*.  There are two "NDLP supply curves," *S* and *SUP*.  Curve *S* is the supply curve in the absence of undisclosed practices, and *SUP* is the supply curve when the challenged practices exist.  For the reasons analyzed *supra*, the latter curve is above the former: that is, the latter curve is above the former because non-Defendant liquidity provider costs are higher with undisclosed practices than without them.



132.     In Figure 1, the equilibrium spread without the undisclosed practices is *P*, whereas the spread with the alleged practices is *PUP*.  *PUP* exceeds *P*, but crucially *PUP-P* is less than the distance between *SUP* and *S*, which measures the cost increase cost caused by the alleged wrongdoing.[46]   Thus, the equilibrium spread increase does not fully compensate for the higher costs caused by the alleged wrongdoing.   This shows that the practices priorities damage non-Defendant liquidity providers (i.e., Class members) even despite the widening of spreads.

133.     Indeed, this shows that the that undisclosed practices damaged non-Defendant liquidity providers beyond the amount observable in the widening of spreads.   In Figure 1, this is measured by the area of the triangle between the equilibrium price and the supply curve.[47]   The area of the triangle defined by *PUP* and *SUP* is smaller than the area of the one defined by *P* and *S*.   In other words, Class member liquidity providers were damaged by increased adverse selection costs *greater than* the portion of such costs that became observable in the widened spreads.[48]

---

[46] As drawn, the vertical difference between *SUP* and *S* is 30, and the difference between *PUP* and *P* is 15.

[47] This is also referred to as "producer surplus."

[48] There are two edge cases in which undisclosed priorities did not harm non-Defendant liquidity providers because they caused costs and spreads to change by the same amount.  The first edge case is when the supply curve *S* is perfectly flat (perfectly elastic).  In this case, the equilibrium spread increases by exactly the amount of the cost increase.  Even though non-Defendant liquidity providers' volumes decline in this case, since they earn no surplus given a flat supply curve, their profits do not change.  The second edge case is when the demand curve *D* is vertical (perfectly inelastic).  Here, even if the supply curve slopes up the equilibrium spread increases by the same amount as the increase in non-Defendant liquidity providers' costs, and their volume does not change.  Note that even in these—highly unlikely—edge cases, non-Defendant liquidity providers do not profit from wider spreads.  Instead, they are, even in these extremely unlikely scenarios, at best compensated for their higher costs through higher spreads.  The Class members would still be negatively impacted, though, even in these extreme (unlikely) edge cases, including by way of paying fees to Currenex, and when the same Class members acted as the aggressor on other trades.

C.    **The Market Microstructure-Based Predictions Are Not Changed by the Fact That Class Members Were Also Given a "Number"**

134.    For simplification of discussion, I sometimes refer to the Trading Defendants jumping in line.  I am aware, however, that, apparently as the system evolved, different users were given different numbers.  And these numbers changed over time.  That does not change my conclusions herein, that Class members were injured.

135.    Liquidity providers would all react to their experience on the platform—whether or not they know what is driving that experience.  For instance, a liquidity provider experiencing more "toxic" flow would react by widening spreads—even if it had no idea the reason it was receiving toxic flow was because State Street was skimming the cream off the Platform.

136.    But notably, for Defendants to argue otherwise means they would be doing nothing more than stating a contrary hypothesis to my theory:  They would be hypothesizing that the number-assignment system was *too* haphazard and/or *too* secret, to matter.

137.    As an initial matter, I do not think such a counter-hypothesis makes economic sense.  Why would Currenex have spent so much time creating, maintaining, and adjusting this system, if in the end they did not think it would matter?  Clearly, Currenex was trying to change outcomes in *some* way.  To now hypothesize the system was too messy to have any impact at all, is thus contradicted by the very fact Currenex employees devoted time to the system in the first place.  It is also contradicted by the fact that I understand Trading Defendants paid higher commissions for prioritized streams, both compared to their own non-prioritized streams and compared to other Currenex ████████████████████████████████████████████████

████████████████████████████████████████ as discussed *infra*.[49]

---

[49] GS-EDMAR-00920851 at '854 ████████████████████████████████
████████████████████████████ CXSSB00985671 at '684 (████████████-

138.    But even those considerations aside, ultimately the argument that the number-assignment system was too haphazard and too secret to matter is not just a competing hypothesis with my own.  What matters perhaps even more is that such a defense hypothesis is a *testable* one.  Which is to say, there are in effect three potential impacts of this system:  First, it could be, as Plaintiffs allege, that wrongdoing's distortionary effects had a negative impact on adverse selection costs and thus also on spreads.  Second, it could be that as Defendants may argue, that the system was ineffectual, and so it had no impact whatsoever.  Or, finally, it could be that this was all a benevolent gift—it *improved* things for Class members.

139.    Again, based on my experience and discussion above, a market microstructure approach would predict the first result.  Defendants are likely to argue either of the other two hypotheses are more persuasive.  But the data here can help us resolve any competing predictions along these lines.  That is, the data show, as discussed below, that in fact Defendants' hidden behaviors were causing spreads to be artificially wide.  Which confirms that the first hypothesis above is the right one, and the others must be rejected.

140.    Though Defendants' intent does not matter to this outcome, I do understand some witnesses have hypothesized that the number-assignment system was an attempt to improve the "user experience," particularly with respect to fill rates.[50]  While I do not opine on the relevance of good intentions as a legal matter, they do not change my predictions of what the system would

---

); CXSSB00409793 at '794 (███████)
██████████.  As discussed *supra*, I understand there is evidence ██████████ GS-EDMAR-00001574 (██████
██████████; GS-EDMAR-00368325 ███████)
██████████████████████.

[50] HC Tech 30(b)(6) (Rosenwald) Tr. at 187:11-20.

actually accomplish, nor do they change what the data show in terms of what it actually achieved, discussed below.  Though not necessary to reach my conclusions herein, I further note, however, that the hypothesis that Currenex employees were assigning favorable numbers to the Trading Defendants because Trading Defendants demonstrated superior fill ratios does not accord with the data.

141.    For instance, although non-Trading Defendant liquidity providers exercised last-look rights, they actually deployed those rights to reject trades far less frequently than the Trading Defendants.  Table 1 reports average rejection rates on Currenex by priority level across 25 currency pairs, also organized by whether the taker was matched with State Street, Goldman, or HC Tech ("Matched With Trading Defendant") or someone else ("Matched With Non-Trading Defendant").  Notably, ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████).

Table 1



| Priority of Stream | Matched With-Trading Defendant | Matched With Non-Trading Defendant |
|---|---|---|

142.    In any event, regardless of what Currenex now says it *hoped* would happen, as discussed throughout this report, market microstructure literature would predict here that the scheme reduced competition on the Platform and increased the cost of providing liquidity on the Platform.  Both would be expected to ultimately result in wider spreads paid when Class members acted as price takers.   But as also discussed *supra*, that does *not* mean that Class members benefitted from the system when acting as liquidity providers.  As testified by Alex Gerko, ███ ████████████████████████████████████████████████████.[51]   In other words, as I discuss throughout, what matters is the overall cost of doing business on the Platform, which would have been made higher by the reduced volume other liquidity providers received, and the increase amount of "toxicity" that the other liquidity providers would be left with.   And, as also shown *supra*, Class members acting as liquidity providers were *not* made whole, even as they widened spreads.

143.    The fact that some members of the Class may have received a priority number does not change my opinion that the Class members acting as liquidity providers would have all been negatively impacted by this scheme, even if they were themselves given a number.  The loss of volume and the loss of the "cream" to those with the highest priority setting would far overwhelm any supposed "advantage" other liquidity providers had vis-à-vis each other.

144.    This makes sense given the design of the system.  Indeed, to say all streaming liquidity providers got *a* number may overstate the issue.  While true the numbers fluctuate, there are groups of liquidity providers that tend to always be ahead of the pack, i.e., the receipt of a favorable number has an outsized impact on some makers (the Trading Defendants) rather than others (everyone else).

---

[51] Gerko Tr. at 131:6-16.

145.    For instance, Table 2 reports the fraction of plaintiff taker trade volumes in 25 currency pairs, broken down by the priority number assigned to the liquidity provider who was matched on that trade.  The Table breaks down volumes into With-Trading Defendant trades or Matched With Non-Trading Defendant Trades.  In other words, it breaks out the priority setting of the maker depending on whether the taker was matched with a State Street, Goldman, or HC Tech stream, or if instead whether the taker was matched with someone else.

146.    Notably, as shown in Table 2, a ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████.

Table 2



147.    Take, for example, the experience of Plaintiff XTX.  Defendants are likely to observe that it *for a time* ██████████████    ████████████████████████████████

████████████████████████████████████████████████████████ [52]

That blip in no way shows that XTX was a beneficiary of the scheme in any meaningful sense.

148.    ████████████████████████████████████ [53]

## VIII.   AN EMPIRICAL APPROACH BASED ON CLASS-WIDE EVIDENCE TO QUANTIFY THE EFFECT OF CURRENEX'S SCHEMES ON CLASS MEMBERS' TRADING COSTS

149.    There is a standard econometric approach to test the hypotheses regarding the effects of undisclosed priorities and privileged information access.  Furthermore, this standard econometric approach can be used to quantify the effect of the undisclosed priorities and privileged information access on spreads.  This approach utilizes class wide evidence, and is common to all Class members.

150.    In brief, the econometric approach is to regress a measure of spread or trading cost against variables that control for market-wide factors that influence spreads/trading cost, and "dummy" ("indicator") variables that takes a value of 1.00 during the period in which the undisclosed priorities and privileged information access was in effect, and a value of 0.00 afterwards.

151.    The regression coefficients on the dummy variables can be used to test the hypothesis that the undisclosed priority-number-assignment system and information access affected spreads/trading costs.  They can also be used to quantify the amount by which the challenged conduct inflated spreads.  This measured inflation can be applied to the transaction data

---

[52] *See, e.g.*, CXSSB00239861 (████████████████████████████).

[53] I understand Defendants have claimed Goldman ceased being part of the scheme at some point prior to 2010.  If so, then my numbers herein are likely conservative, as the effects of the scheme could be being diluted by the inclusion of Goldman during a period when it was supposedly using the priority scheme less often.  The same common methodologies set forth herein, however, could be used by removing Goldman's data from the before/after model, for example.

to quantify the economic harm Class members suffered as a result of the impact of Defendants' challenged conduct on adverse selection costs and thus, ultimately, on spreads.

152.    Formally, the analysis involves estimation of equations of the following form:

$$Y_t = \alpha + \boldsymbol{\beta X_t} + \boldsymbol{\gamma D_t} + e_t$$

153.    In this equation $Y_t$ is a spread or trading cost variable on day $t$; $X_t$ is a vector of variables to control for market-wide factors; $\boldsymbol{D_t}$ is a vector of dummy variables discussed *supra*, and $e_t$ is an error term.

154.    I have evaluated four trading cost variables: the quoted half-spread on Currenex, the cost of a rejected trade, the realized spread, and the trading cost, defined as the quoted spread minus the price impact of the trade plus the trade rejection cost.  I will sometimes refer to trading cost as the "effective spread."

155.    The realized spread is the quoted spread minus the price impact of a trade.  The price impact of a trade is the change in the mid-point price from trade inception to some later time (*e.g.*, 1 minute post-trade).  The trade rejection cost reflects the effect of exercise of last look rights, and equals the price change that occurred during the rejection window.  For example, if a buy order is rejected the buyer can resubmit his order.  If the market has moved up in that point in time, the order might be executed at a higher price than that of the rejected order, thereby harming the buyer.  The reject cost is equal to the change in the midpoint price in a time interval following the time of the initial match of a taker to a liquidity provider.  For current purposes, I use the price change over a 250 millisecond interval.

156.    The quoted half-spread is defined as the absolute value of the difference between the trade price and the market midpoint at the time of the trade, divided by the market midpoint at the time of the trade.  This is a quoted spread since the trade price is equal to the bid (for

aggressive/taker sales) or the offer (for aggressive/taker purchases) and the market midpoint. That is, the trade price is a quoted price, hence generating a quoted spread.

157.    Due to the nature of Currenex data, to derive the market midpoint at the time of each transaction I utilize the contemporaneous market midpoint derived from either the EBS Market or Reuters trading platforms. Whether EBS Market or Reuters is employed for a given currency is determined by which platform has the greatest liquidity and trading activity for that currency.

158.    The rejection cost is the product of the rejection rate on trades multiplied by the movement in the market midpoint over some time interval after an eventually rejected trade was initially matched. This window is the last look window, which varied over time.

159.    The idea here is that the cost of a rejection is equal to the change in price before a trade is rejected. This is because trades are typically rejected because the price has moved in favor of the (rejected) taker, or is likely to do so (conditional on the liquidity provider's information). Thus, rejected trades are eventually executed at prices that are typically less favorable to the taker: the movement in the market midpoint measures the amount of such adverse movement.

160.    The traded cost, or effective spread, is the rejection cost plus the realized spread. This measures the cost of an order execution to a taker. When the trade is rejected, the taker incurs the rejection cost. When the trade is eventually executed, the taker pays the realized spread.

161.    The control variables relate to factors known from the empirical literature to influence spreads. In the estimation results reported below, I utilize the natural logarithm of Currenex volume, a measure of currency volatility derived from EBS Market or Reuters data, and the Amihud illiquidity measure derived from EBS Market or Reuters Matching Data.

162.    For technical econometric reasons, the dependent variable ($Y_t$) is the difference between a Currenex trading cost measure and the market quoted spread measure derived from EBS Market or Reuters.  Using the difference between a Currenex transaction cost measure and the "market" quoted spread controls for market factors that affect spreads generally.  These factors impact the market spread.

163.    In the results presented below, $\boldsymbol{D}$ consists of a single dummy variable taking the value of one for dates prior to July 2014 and zero thereafter.  The July 2014 cutoff is based on evidence that undisclosed prioritization ended at that time.[54]

164.    The model is estimated on daily data.  All variables in the regression are daily averages across all transactions for each day in the data set.  The sample period is January 2010-December 2017.  This data set is roughly centered around the assumed July 2014 end date for the challenged conduct.  The data are from the "PROD" stack on Currenex.  The same methodology can be applied to other stacks (*e.g.*, "PRET").

165.    I have estimated the model for the following currency pairs: AUDUSD, EURCHF, EURGBP, EURUSD, GBPUSD, NZDUSD, USDCAD, USDCHF, USDJPY, EURNOK, EURSEK.   These pairs represent 88 percent of the volume on the PROD stack of the Currenex platform.

166.    The regressions are estimated using Seemingly Unrelated Regressions ("SUR").  This method estimates coefficients on all currencies simultaneously in a system of equations,

---

[54] To take into account the possibility that the impact of the Defendants' conduct on spreads varied over time, I have also estimated a model with separate dummy variables for 2010, 2011, 2012, 2013, and January-July, 2014.  If additional information regarding the challenged conduct is obtained, the definition of the dummy variable in the final model presented at trial will be chosen accordingly.

where each equation in the system corresponds to a currency pair and is given by the equation given above.  This estimation method takes into account the possibility that the error terms (the $e_t$) are correlated across currency pairs on a given day.  For example, it is plausible that if the spread for EURUSD is high after controlling for other factors, the spread for GBPUSD is likely to be high as well.  SUR therefore takes into account more information than ordinary least squares ("OLS") regressions estimated on each currency pair separately.[55]  Due to this additional information, SUR estimates are econometrically more efficient.

167.    The SUR method allows coefficient values to differ across currency pairs.  I estimate the model on a partition of the data.  Specifically, I partition the data into Plaintiff-to-Defendant ("PD") trades (a Plaintiff is aggressor/taker; a Trading Defendant is the liquidity provider) and Plaintiff-to-Plaintiff ("PP") trades (a Plaintiff is both taker and maker).  *Infra* I also present results based on pooling all Plaintiff taker data.  The data set consists of OXP trades.

168.    The data employed in the regressions are derived from three basic sources: Currenex, EBS Market, and Reuters (LSEG).  All transaction price-related information is obtained from Currenex, for the simple reason that Currenex is where the affected transactions occurred.  As noted *supra*, market midpoints and some control variables are derived from EBS Market or Reuters.

169.    Exhibit 1 describes the data and the pre-regression processing of the raw data.

170.    The model specification utilized here is standard, and is widely employed in litigation in which challenged conduct is operative over some time period (the "dirty" period) but

---

[55] OLS regressions ignore the cross-sectional correlation in errors.  I have also estimated OLS regressions.  These produce similar results.

not operative over others (the "clean" period(s)).[56]  For example, it is commonly employed in studies of alleged collusion.  In such instances, the left-hand side variable would be the price of the product allegedly subject to a collusive agreement, and the dummy variable would take a value of 1.00 during the period in which evidence suggests collusion occurred, and a value of 0.00 when collusion was not in effect.  The control variables in such an analysis would include variables unrelated to collusion (*e.g.*, cost or demand-related factors) that affect the price.

171.    Finally, I should note some limitations in the data, but how it does not impact my analysis.  For instance, the transactional data was in a different, less usable, changeable, and more inconsistent format for earlier years in the Class period.  Thus, my before/after model only covers the years 2009 to 2017.  However, it is reasonable to use the spread-inflation estimates for earlier years as well.  This is because what matters is not the absolute level of spreads at a given time, but whether there was a *change* after the priority number-assignment system ceased and Currenex stopped sharing employee passwords.  Measuring that change is informative as to the impact of the system on spreads generally, not just in the years for which we have more-parsable data.

172.    I also note that for purposes of this report I focused on the PROD "stack" of transactions.  This refers to trading venue of anonymous takers and anonymous price makers.  The PROD stack represents the largest trading stack in terms of volume out of the four stacks operated by Currenex.  The others are PRET, LOFX, and TKFX.  Given the size of the data produced in this case, I focused my efforts on PROD.  I also made this choice because the quality of the data for the PROD stack was higher than that of the other stacks.  However, there is no reason to expect

---

[56] See Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis* (2010).  An alternative characterization is that the methodology compares transactions cost measures in "treated" and "untreated" samples, where the treated sample consists of the period in which the undisclosed priorities were operative.

that the impact of Currenex assigning priority figures in other "stacks" would have different effects. Thus, the results indicating spread inflation on the PROD stack are a reasonable estimate of spread inflation on the others. But, with the benefit of more time and/or data, my before/after approach before can be used on the other stacks more directly, too. This would be expected to increase the damages to the class beyond the preliminary estimates provided herein, which are based only on the "PROD" stack.

173.    Furthermore, the data employed in the regressions are for so-called "OXP" (order crosses price) transactions. These transactions represent approximately 80 percent of PROD stack volume, and therefore represent a sufficiently large sample for estimating spreads and trading costs on that platform.

174.    Finally, while the terms "liquidity provider," "maker," and "taker" may mean different things in different contexts, I should explain how they are being applied in my modeling. For my purposes, a "Plaintiff Taker" transaction is where a non-Trading Defendant aggresses on a transaction, and is matched with a streaming liquidity provider. A "Plaintiff Maker" transaction occurs when a non-Trading Defendant's resting or streaming price is hit by a taker. Generally speaking, I use "Plaintiff," "Class member," and "Non-Defendant" interchangeably in my discussion below when describing how to view various user pairings.

## IX.    **RESULTS**

175.    Tables 3 and 4 present the results of the regression analyses. These tables present the estimated values of the coefficients on the dummy variables—the $\gamma$—for each currency from the regressions on the various data partitions.

176.    Table 3 presents the estimated trading cost (effective spread) and quoted spread dummy coefficients for Plaintiff Taker-Defendant Maker, Plaintiff Taker-non-Defendant Maker, and Combined Plaintiff. PD_Quote gives the coefficient estimate for the Plaintiff Taker-

Defendant Maker quoted spread regression; PND_Quote gives the coefficient estimate for the Plaintiff Taker-Non-Defendant Maker quoted spread regression; and Combined_Quote gives the coefficient estimate for the Combined Taker Plaintiff-Defendant Maker/Plaintiff Taker-Plaintiff Maker quoted spread regression. PD_Fill gives the coefficient estimate for the Plaintiff Taker-Defendant Maker effective spread regression. PND_Fill gives the coefficient estimate for the Plaintiff Taker-non-Defendant Maker effective spread regression; and Combined_Fill gives the coefficient estimate for the Combined Taker Plaintiff-Defendant Maker/Plaintiff Taker-Non-Defendant Maker effective spread regression.

177. Almost all of the coefficient values are positive, and quantify the quoted and effective spread inflations (measured in basis points) attributable to the undisclosed wrongdoing. That is, the positive coefficients provide powerful evidence that spreads and trading costs were inflated during the period in which the Currenex platform implemented the challenged practices.

178. Thus, for example, on the AUDUSD currency pair, after controlling for other factors, *quoted* spreads were .286 basis points wider when the priority system was in use and a Class member acting as a taker got matched with a Trading Defendant, than when the system stopped. The effective spread—*i.e.*, considering only actually filled trades—was .271 basis points higher when a Plaintiff Taker was matched with a Trading Defendant when the priority system was used, compared to when it was not.

179. Notably, however, both quoted and filled spreads were *also* wider—to a remarkably similar degree—even when the Plaintiff Taker was matched with a non-Defendant. For this pair, quoted spreads were .228 basis points wider when the priorities system was in place, while filled spreads were .267 basis points wider. This confirms that, as predicted by market microstructure

principles, the undisclosed wrongdoings commonly impacted *all* trades, not just those where someone was matched with a Trading Defendant.

Table 3

| Currency | PD_Quote | PND_Quote | Comb_Quote | PD_Fill | PND_Fill | Comb_Fill |
|----------|----------|-----------|------------|---------|----------|-----------|
| AUDUSD | 0.286 | 0.228 | 0.261 | 0.271 | 0.267 | 0.275 |
| EURCHF | 0.374 | 0.422 | 0.365 | 0.415 | 0.468 | 0.393 |
| EURGBP | -0.011 | 0.000 | 0.000 | 0.090 | 0.020 | 0.058 |
| EURUSD | 0.088 | 0.054 | 0.079 | 0.029 | 0.063 | 0.063 |
| GBPUSD | 0.160 | 0.139 | 0.152 | 0.176 | 0.148 | 0.163 |
| NZDUSD | 0.226 | 0.222 | 0.236 | 0.026 | -0.001 | 0.028 |
| USDCAD | 0.225 | 0.123 | 0.160 | 0.205 | 0.150 | 0.176 |
| USDCHF | 0.103 | 0.082 | 0.088 | 0.163 | 0.106 | 0.144 |
| USDJPY | 0.090 | 0.005 | 0.050 | 0.039 | 0.004 | 0.013 |
| EURNOK | 0.277 | 0.170 | 0.205 | 0.410 | 0.158 | 0.277 |
| EURSEK | 0.130 | 0.068 | 0.085 | 0.196 | 0.068 | 0.109 |

180.    These impacts are economically large. This is best demonstrated by converting the coefficients to dollar terms. A basis point is .0001, so $1 million times a basis point is $100. The dollar spread inflation per million dollars transacted is the product of the coefficient in the table by $100. Therefore, based on the combined PD and PP regression, the undisclosed priorities increased the effective half-spread on a $1 million GBPUSD transaction by $16.30. To put this into perspective, the average quoted half-spread for GBPUSD was $43.30/million. Therefore, $16.30 represents a 37.6% overcharge.

181.    Table 4 presents the dummy coefficients for reject costs and realized spreads for Plaintiff Taker-Defendant Maker, Plaintiff Taker-non-Defendant Maker, and Combined Plaintiff. The coefficient values are almost all positive, with the negative coefficient values being relatively small in absolute value. These coefficients quantify the reject cost and realized spread inflation (measured in basis points) attributable to the undisclosed priorities.

Table 4

| Currency | PD_Reject | PND_Reject | Comb_Reject | PD_Realized | PND_Realized | Comb_Realized |
|----------|-----------|------------|-------------|-------------|--------------|---------------|
| AUDUSD | 0.429 | 0.301 | 0.366 | 0.214 | 0.247 | 0.233 |
| EURCHF | 0.420 | 0.317 | 0.318 | 0.452 | 0.509 | 0.426 |
| EURGBP | 0.038 | 0.005 | 0.020 | 0.100 | 0.042 | 0.069 |
| EURUSD | 0.078 | -0.006 | 0.046 | 0.047 | 0.065 | 0.059 |
| GBPUSD | 0.268 | 0.182 | 0.225 | 0.152 | 0.129 | 0.139 |
| NZDUSD | 0.312 | 0.040 | 0.177 | -0.079 | -0.069 | -0.056 |
| USDCAD | 0.317 | 0.230 | 0.290 | 0.100 | 0.064 | 0.087 |
| USDCHF | 0.138 | -0.071 | 0.030 | 0.192 | 0.117 | 0.162 |
| USDJPY | 0.174 | 0.038 | 0.130 | -0.032 | -0.066 | -0.047 |
| EURNOK | 0.696 | 0.245 | 0.417 | 0.249 | 0.162 | 0.219 |
| EURSEK | 0.486 | 0.100 | 0.261 | 0.038 | 0.048 | 0.030 |

182.    As before, these coefficients can be converted to dollars per million by multiplying the coefficients by $100.  Again, these coefficients are economically large.

183.    The estimated dummy variable coefficients (which quantify the impact of the challenged conduct on Plaintiff trading costs) are highly unlikely to have occurred by chance in a competitive market.  A *p*-value represents the probability of observing the estimated coefficient under the null hypothesis that the "true" value of the coefficient is zero.  That is, it is the probability of a "false positive" result—the rejection of a true null hypothesis.

184.    In this analysis, the null hypothesis is that the undisclosed priorities and privileged information access did *not* increase spreads/trading costs.[57]  A positive value of the $\gamma$ coefficient indicates that the challenged conduct inflated spreads/trading costs.  A small *p*-value indicates that this was unlikely to have occurred by chance if, in fact the challenged conduct did *not* inflate trading costs.

---

[57] As discussed *infra*, an element of the null hypothesis is that Currenex had no market power.

185.    A large majority of the positive estimated coefficients have $p$-values less than .01 (one percent).  Many of the $p$-values are zero to many decimal points, indicating that it is extremely unlikely that these values would be observed by chance in a competitive market.

186.    The results when all analyzed trades are combined (by currency pair) are particularly strong.  For most currency pairs the $p$-values are effectively zero for both fill costs and quoted spreads.  The largest $p$-value for fill cost is .035.  There is one coefficient (for EURGBP) with a large $p$-value (.48), but the remainder are effectively zero.

187.    Results for reject costs (based on the combined PD and PP data) are similarly strong.  The largest $p$-value (again for EURGBP) is .11, the second largest (USDCHF) is .08, and the remainder are effectively zero.  With respect to realized spreads based on the combined PD and PP data, eight of the eleven the $p$-values are effectively zero.

188.    Thus, there is extremely strong empirical evidence that spreads—a measure of a portion of the increased cost of providing liquidity on Currenex—were inflated during the period in which Currenex implemented but did not disclose a system of assigned-number priorities and during which it gave away employee passwords.  This represents extremely strong evidence that these undisclosed systems harmed Class members.

189.    Note that I may present different models and/or model estimates at trial, based on, *inter alia*, the receipt of additional information during discovery, further refinement of the data, and/or different choices of control variables.  The results that I present here are sufficient to demonstrate that there is a methodology common to all class members based on class-wide evidence that can be utilized to estimate the effect of the challenged conduct on spreads/trading costs.

## X.    THE EMPIRICAL RESULTS CAN BE USED TO CALCULATE DAMAGES USING A COMMON METHODOLOGY AND COMMON EVIDENCE

190.    The empirical results implemented *supra* can be utilized to calculate damages using a common methodology and common evidence.  The method is very straightforward.

191.    As economic theory predicts that the increased adverse selection costs would ultimately be incurred, at least in part, when Class members took liquidity, transactions where a Class member was acting as the aggressor are identified, *i.e.*, a non-Trading Defendant trader is matched against a resting limit order or streaming price, and therefore hits a bid or lifts an offer.

192.    Specifically, a Plaintiff's damage on any transaction in a given currency in which it was a taker during the period of undisclosed priorities equals the product of (a) the size of the transaction in dollars the value of the dummy coefficient for that currency (b) multiplied by .0001 (the value of a basis point).[58]

193.    Damages are estimated for rejected transactions and completed transactions.  Damages on rejected transactions equal the product of the size of the transaction and the reject cost dummy coefficient multiplied by .0001.  Damages on filled transactions equal the product of the size of the transaction and the realized spread coefficient.[59]

194.    Table 5 presents aggregate damages estimates for the eleven currencies included in the SUR regressions, based on PROD stack OXP volumes traded from January 3, 2010-31 July,

---

[58] The price of the transaction is included because the dummy variable coefficient values are in percentages.  This facilitates comparisons across currencies.

[59] I understand Defendants may argue that, at least under some legal theories, the costs of a reject may only be actionable if it was actually later filled.  I take no position on that as a legal matter.  I do note, however, that if necessary to do so a common methodology exists, using the common Currenex trade data, to identify the subset of rejects that were followed by a replacement fill.  For instance, all Marketable Immediate or Cancel Orders ("Marketable IOC") resulted in an execution, which would provide a baseline.  In addition, for example, it can be determined whether an account (a "tag") whose trade was rejected executed a transaction in the same direction within a time interval (*e.g.*, one minute) following a rejection.

2014.[60]  The Table presents damages attributable to higher reject costs, higher realized spreads, and the sum thereof.  These damages total $429.3 million.

Table 5
OXP Taker Damages 2010-2014 (in Millions of USD)

| Pair | PD_Reject | PND_Reject | PD_Filled | PND_Filled | Total |
|---|---|---|---|---|---|
| AUDUSD | 16.80 | 35.52 | 14.74 | 45.32 | 112.38 |
| EURCHF | 2.72 | 8.88 | 6.17 | 25.62 | 43.40 |
| EURGBP | 0.22 | 0.49 | 1.07 | 4.90 | 6.68 |
| EURUSD | 7.26 | 19.36 | 10.32 | 37.68 | 74.61 |
| GBPUSD | 14.72 | 35.59 | 11.56 | 42.78 | 104.66 |
| NZDUSD | 1.52 | 3.31 | 0.00 | 0.00 | 4.83 |
| USDCAD | 8.13 | 14.95 | 3.19 | 8.62 | 34.89 |
| USDCHF | 0.46 | 0.98 | 2.76 | 8.55 | 12.75 |
| USDJPY | 5.74 | 12.98 | 0.00 | 0.00 | 18.72 |
| EURNOK | 2.08 | 2.85 | 1.48 | 4.92 | 11.32 |
| EURSEK | 1.37 | 2.55 | 0.22 | 0.93 | 5.08 |
| | | | | | 429.31 |

195.    Counsel has requested that I also estimate damages for the 2005-2008 period.  At present, the Currenex data does not permit me to perform the same calculations as reported in Table 5.  Specifically, these data do not permit the estimation of impact coefficients for these years, and do not permit the determination of volumes.  To overcome these constraints, I estimate aggregate damages as follows.

196.    First, for each pair I calculate the average ratio of Currenex volume to the volume for that pair on the main interbank platform (EBS Market or LSEG) for it.  This average is calculated for the 2009-2014 period.

---

[60] These pairs constitute 88 percent of volumes traded on the PROD stack during this period.

197.    Second, I multiply that ratio by the volume for that pair on the main interbank platform for each year 2005-2009.  This produces an estimate of Currenex volume for each pair for those years.  This estimate takes into account variations over time in overall currency trading activity, as measured by EBS Market and LSEG volumes.

198.    Third, I divide these volumes into rejected volumes and filled volumes by multiplying them by the fractions of rejected and filled trades for each pair over the 2010-2014 period.  I then multiply these estimated volumes by the damages per dollar traded implied by Table 5.  Damages per dollar traded are the damages in Table 5 divided by the volume traded in the 2 March, 2009-31 July, 2014 period.  This produces damages for each category (e.g., PD_Reject) for each year 2005-2008.

199.    These results for OXP transactions are reported in Table 6.  These damages total $337.5 million.

Table 6
Damages 2005-2009 (in Millions of USD)

| Pair | PD_Reject | PND_Reject | PD_Filled | PND_Filled | Total |
|---|---|---|---|---|---|
| AUDUSD | 9.51 | 20.11 | 8.34 | 25.66 | 63.63 |
| EURCHF | 3.40 | 11.10 | 7.71 | 32.01 | 54.22 |
| EURGBP | 0.23 | 0.53 | 1.15 | 5.29 | 7.20 |
| EURUSD | 6.39 | 17.04 | 9.09 | 33.17 | 65.68 |
| GBPUSD | 9.93 | 24.02 | 7.81 | 28.88 | 70.64 |
| NZDUSD | 0.89 | 1.95 | - | - | 2.84 |
| USDCAD | 5.47 | 10.05 | 2.15 | 5.80 | 23.47 |
| USDCHF | 0.64 | 1.37 | 3.86 | 11.98 | 17.85 |
| USDJPY | 7.41 | 16.77 | - | - | 24.18 |
| EURNOK | 1.05 | 1.44 | 0.75 | 2.48 | 5.71 |
| EURSEK | 0.58 | 1.07 | 0.09 | 0.39 | 2.13 |
| | | | | | 337.54 |

200.    For the entire set of years, then, this model indicates total damages to takers on OXP transactions of $766.8 million.

201.    Plaintiffs were also damaged on OXO (order crosses order) and PXO (streaming price crosses order) transactions in which they were takers.  I have estimated damages on these trades.

202.    OXO trades result when a limit order crosses a resting limit order (rather than a streaming price).  The taker pays a spread on these transactions, and since resting limit orders compete with streaming prices in the supply of liquidity, spreads on these orders are affected by the undisclosed priorities.  However, OXO transactions cannot result in rejects, so only the realized spread inflation causes damages on these trades.

203.    Table 7 presents damage estimates for OXO and PXO transactions for the 2009-2014 period.  These estimates are produced as follows.  First, I determine total OXO volume by currency pair and year.  Second, the data produced by Currenex permits an estimate of the fraction of OXO volume in which a plaintiff was the taker for the period 2012-2014 by currency pair.  Third, I multiply the OXO volume by pair and by year by the plaintiff taker ratio to determine plaintiff taker OXO volume.  Fourth, I multiply that plaintiff taker OXO volume by the Combined Realized coefficient in Table 4.  I follow the same procedure for PXO, with the additional step of multiplying PXO reject volume by the Combined Reject coefficient in Table 4 to calculate PXO_Reject Damages.

Table 7

| Pair | OXO_Filled | PXO_Reject | PXO_Filled | Total |
|------|-----------|-----------|-----------|-------|
| AUDUSD | 36.70 | 1.68 | 1.73 | 40.10 |
| EURCHF | 16.80 | 0.46 | 0.89 | 18.16 |
| EURGBP | 3.45 | 0.04 | 0.24 | 3.73 |
| EURUSD | 27.14 | 0.73 | 1.63 | 29.50 |

| | | | |
|---|---|---|---|
| GBPUSD | 23.14 | 1.68 | 1.30 | 26.12 |
| NZDUSD | 0.00 | 0.19 | 0.00 | 0.19 |
| USDCAD | 8.81 | 0.93 | 0.34 | 10.08 |
| USDCHF | 9.25 | 0.04 | 0.32 | 9.61 |
| USDJPY | 0.00 | 35.49 | 0.00 | 35.49 |
| EURNOK | 2.36 | 0.31 | 0.19 | 2.86 |
| EURSEK | 0.38 | 0.30 | 0.03 | 0.72 |
| Total | 128.03 | 41.85 | 6.67 | 176.55 |

204.    For the 2005-2008 period, I estimate OXO volumes using the same method described above for OXP transactions. I then multiply that volume by the Combined Realized coefficient in Table 4. This produces damages on OXO transactions for these 11 pairs for this period of $116 million.[61]

205.    Putting this all together, across the PROD stack only, across all years of the alleged wrongdoing, and across "OXP," "OXO," and "PXO" volume, I estimate that the wrongdoing increased Class member trading costs by at least $1.06 billion. My methodologies above could be deployed at trial on the other Currenex "stacks" to identify further sources of damages.

206.    I reserve the right to adjust these aggregate damages calculations if I receive additional data in a form that permits alternative calculations to those reported in Table 7. Indeed, to be clear, I am herein demonstrating how a reasonable methodology can be used to demonstrate impact and damages using common evidence. But the model can be adjusted, if necessary, as the facts and arguments eventually require.

---

[61] The data show no PXO volume prior to 2012, so I assume that the PXO volume, and hence PXO damages, were zero in the 2005-2008 period.

XI.    **CLASS MEMBERS WERE DAMAGED BY PAYING COMMISSIONS TO CURRENEX AND THESE DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS USING COMMON EVIDENCE**

207.    Due to Currenex's undisclosed wrongful behaviors, Class members received a lower-quality service than they believed based on Currenex's public disclosures.  Class members did not realize that they were subject to greater adverse selection risk (*i.e*., greater trading cost) due to the undisclosed priorities, and that their intellectual property would be put at risk by way of password-sharing.  When acting as a taker, Class members did not realize that due to the undisclosed priorities they received a higher cost, lower quality service than they believed based on Currenex's public disclosures.

208.    The economic cost of fraud is attributable to overconsumption/overuse of a fraudulent product.  It is possible that someone would not consume a fraudulent product if they knew its true quality regardless of the price.  Thus, every dollar it spends on the product represents an economic loss.

209.    I understand Plaintiffs seek to prove that, if the truth had been known, no reasonable trader would have used the Currenex Platform.[62]  Based on my experience, I agree with that hypothesis.  In my opinion, no rational trader would want to play on a system that is not just un-level, but whose tilt could be changed by the venue operator without any notice.  That conclusion is also supported by the fact that, when Currenex published a longer set of disclosures, it chose to shut these systems down rather than disclosing them.  That choice is consistent with the hypothesis

---

[62] *See, e.g.*, Gerko Tr. at 203:22-24; Amrolia Tr. at 62:22-63:2; Clarke Tr. at 59:8-18, 108:19-109:7; XTX Markets Ltd. 30(b)(6) (Smart) Tr. at 175:24-176:14; Smart (Day 2) Tr. at 232:17-233:11.

that Currenex and State Street believed that to disclose an assigned-number system would lead the Platform to collapse.

210.    Thus, a reasonable measure of additional damages incurred by Class members— whether acting as a maker or a taker—is the fees paid to Currenex during the class period.   Indeed, I find this to be, if anything, a very *conservative*, baseline measure of damages, as for instance it ignores the amount of lost trading opportunities that were effectively unavailable to non-Defendants, and given only to the Trading Defendants.   And, unless combined with my other measures above, it would also ignore the impact of adverse selection costs leading to higher trading costs, reflected in part by wider spreads.   Though I do not opine on the available remedies, this would also be a conservative measure of how much Defendants were unjustly enriched—as this would represent the fees paid unjustly *to Currenex*, but not the illicit profits of the Trading Defendants.

211.    As an economist, it is reasonable to infer from Currenex's conduct that it was likely foreseeable that the trading fees that Currenex collected would have been lower if it had disclosed the priorities.   Currenex's revenues and profits were derived from trading fees.   It would have made economic sense not to disclose these practices if such disclosure would have led to lower trading activity and hence lower trading fees.   Indeed, as discussed above, I believe above fees would have been zero because the Platform would have collapsed.

212.    A common methodology to estimate this baseline amount of damages is merely to take the median fees paid to Currenex—which are expressed in dollars per million traded—and multiply it by the volume of trading activity engaged in by Class members.   In other words, the total volume of trading on the Platform during the Class period—for both makers and takers— minus the total volume of trading by the Trading Defendants.

213.    Based on a review of agreements produced in the case, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Based on my experience, I also believe that to

represent a reasonable estimate of the rate of brokerage fees paid during the Class period.

214.    For the 2009-2014 period for which the data quality is better, using Currenex's

trade data I estimate the total fees paid by Class members in OXP transactions in those years to be

$634.3 million.[63]  Using the same volume-estimating techniques described above for the earlier

part of the class period, I estimate the total fees paid by Class members in 2005-2008 to be

$308.9.[64]  With respect to OXO and PXO, I estimate fees paid by Class members from 2009-2014

to equal $200 million, and the fees by Class members from 2005-2008 to equal $206.5 million.

Thus, merely the fees unjustly paid to and retained by Currenex represents a baseline level of

damages, demonstrable with common evidence, of $1.35 billion.

## XII.    CURRENEX HAD MARKET POWER

### A.    The Empirical Results Provide Direct Economic Evidence That Currenex Had Market Power

215.    I understand from counsel that under the law, it is possible to demonstrate market

power under Section 1 of the Sherman Act either by an analysis of a defendant's market share in

the relevant market or by direct evidence of market power.  The regression analyses provide direct

empirical documentation that Currenex had market power, and thus could inflate its customers'

trading costs through anticompetitive conduct, including undisclosed priorities and undisclosed

privileged access to information.

---

[63] This consists in the data of $193.6 million where a class member was the "maker" in
OXP trades, $240.5 as a "taker" in OXP trades, $188.8 million in class member OXO trades, and
$11.4 millions in class member PXO trades.

[64] This consists in the data of $143 million where a class member was the "maker" in
OXP trades, and $165.9 million where it was the "taker" in OXP trades.

216.    The empirical analysis provides direct evidence that Currenex had market power. The analysis tests a joint null hypothesis and one element of that joint hypothesis is that Currenex has no market power.  Evidence rejecting the null hypothesis, as was found in the empirical results presented *supra*, is probative evidence in favor of the alternative hypothesis that Currenex in fact possessed market power.  Thus, the empirical results provide probative direct evidence that Currenex possessed market power: if it had no market power, it would have been highly unlikely to observe the spread inflation quantified by the empirical analysis.

217.    In my opinion as an economist, direct evidence is preferred and sufficient to support my opinions on market power.  Indirect analyses are employed because the data they require is more readily obtainable.  It is, in some respects, an illustration of the old joke about looking for your keys under a lamppost because the light is better there.

**B.    There Exists a Relevant Market for FX Electronic Order-Book Platforms That Were Directly Accessible By Buy-Side Traders**

218.    As discussed *supra*, my regression analysis provides *direct* evidence of market power.  I do not need to engage in any further economic analysis to reach the conclusion that Defendants' conduct had anticompetitive effects and that the Defendants' conspiracy had a significant effect on the prices Class members paid and the costs they incurred during the Class period.  However, I offer the opinions in this section to show a qualitative analysis of the market structure here aligns with my results showing direct, quantitative evidence of antitrust impact and effects on the class members in this case.

219.    I have been instructed by counsel that in defining the relevant antitrust market, courts sometimes apply the framework established by the Supreme Court in the case *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The Court articulated that "the boundaries of such a submarket may be determined by examining such practical indicia as industry or public

recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

220.    I apply these recognized practical indicia to the facts and circumstances of the case to reach my opinion that there exists a relevant market for FX electronic order-book platforms that were directly accessible by buy-side traders.  The geographical scope of this relevant market is worldwide, as electronic platforms are generally accessible by participants from around the globe.

      *1.*    *Industry recognition of a distinct market for buy-side accessible order-book FX trading platforms*

221.    The foreign exchange industry recognizes a distinct market for buy-side accessible order-book FX trading platforms.  This market is distinct from interdealer platforms that historically excluded or restricted buy-side access.[65] ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████[66]

222.    ███████████████████████████████████████████████

██████████████████████████████████████"[67]

---

[65] John Gallaugher and Nigel Melville, Electronic Frontiers in Foreign Exchange Trading, 47 *Communications of the ACM* 8 (2004)("electronic brokering systems open exclusively to dealer banks"); FlexTrade, "Buy-Side FX Shifts in Evolving Market Structure," https://flextrade.com/resources/buy-side-fx-shifts-in-evolving-market-structure-3/ (September 8, 2015) (discussing how "buy-side firms" historically lacked "access to interdealer (IDB) platforms like EBS").

[66] Currenex 30(b)(6) (Kelly) Tr. at 266:11-19 (████████████████████████████████ ███████).

[67] Currenex 30(b)(6) (Kelly) Tr. at 248:7-14.  Currenex sometimes described itself as an "ECN" which had two components—the order book platform and the RFQ platform.  Currenex 30(b)(6) (Kelly) Tr. at 248:7-14.

████████.[68] Other sources confirm limit order books are generally viewed as distinct from RFQ platforms.[69] Based on my experience derived from analyzing a wide variety of trading platforms in numerous markets, I agree with this conclusion. Electronic platform trading in general—e.g. RFQ trading and limit order book trading—is also distinct from OTC trading, where class members must solicit quotes from individual dealers based on established dealer-client relationships.[70]

223. Industry sources confirm this market segmentation. Currenex markets itself as providing "tailored access to disclosed and undisclosed liquidity together on a single screen" for buy-side institutions including "Fund Managers," "Hedge Funds," "Corporate Treasurers," and broker-dealers.[71]

224. Similarly, Hotspot FX describes itself as bringing "the powerful benefits of an independent, transparent ECN marketplace structure to institutional foreign exchange trading" with services designed specifically for buy-side entities such as "hedge funds, commodity trading advisors (CTAs), corporate treasuries, and institutional asset managers."[72] FastMatch was

---

[68] Currenex 30(b)(6) (Kelly) Tr. at 252:7-14.

[69] In a limit order book system, offers to buy or sell are stored in a queue and filled in a priority sequence, usually by price and time of entry, whereas in RFQ systems requests for a price quotation are sent from a trading platform member to another member. *See* Bank for International Settlements, *BIS Quarterly Review* (Dec. 2016) (comparing central limit order books to request for quote systems); CFTC, https://www.cftc.gov/LearnAndProtect/Advisories AndArticles/CFTCGlossary/index.htm (stating that central limit order books and order books are synonymous).

[70] *See* Bank for International Settlements, *supra* note 69.

[71] Currenex, "Clients," https://www.currenex.com/clients.

[72] Crunchbase, "Hotspot FX," https://www.crunchbase.com/organization/hotspot-fx.

launched in 2012 specifically to "offer customers access to a large and transparent pool of diversified liquidity" and positioned itself to serve buy-side participants.[73]

225.    Industry participants distinguish these buy-side accessible platforms from interdealer platforms EBS Market (now part of CME Globex) and Reuters (now part of London Stock Exchange Group's FX Matching service). ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████.[74]

226.    Industry recognition of these distinct platform categories is further evidenced by how market participants classify execution venues.  Industry reports distinguish between dealer-to-dealer interbank platforms (EBS Market, Reuters) and dealer-to-client platforms (Currenex, Hotspot, FXall).[75]

227.    Currenex's acknowledgment that ████████████████████████████████████ ███████████  confirms industry recognition of this discrete competitive space of buy-side accessible order book platforms.[76]

### 2.    *Distinctive product characteristics*

228.    FX electronic platforms using limit-order book matching possess several distinctive characteristics that differentiate them from other methods of foreign exchange execution.  In order

---

[73] PR Newswire, "FastMatch and Former CEO, Dmitri Galinov, Confirm Settlement Agreement," https://www.prnewswire.com/news-releases/fastmatch-and-former-ceo-dmitri-galinov-confirm-settlement-agreement-300795411.html (February 14, 2019).

[74] Currenex 30(b)(6) (Kelly) Tr. at 251:19-252:2.

[75] Celent, "Electronic Platforms in Foreign Exchange Trading," https://www.celent.com/insights/412061134 (2025).

[76] Currenex 30(b)(6) (Kelly) Tr. at 252:3-6.

book trading, 

.”[77]

229.    ███████████████████████ .[78]  In RFQ systems, a trader must request (the "R" in "RFQ") quotes from various dealers.  In an order book, all dealers competing for a given instrument or trade type will have resting bids and offers available on the platform without request.

230.    The multilateral nature of these platforms represents another distinguishing characteristic. ███████████████████████

███████████████████████.[79]

231.    Additionally, the anonymous matching functionality characterizes these platforms.

███████████████████████

███████████████████████[80] This anonymity feature distinguishes platforms available within the market for buy-side accessible anonymous electronic communication network (ECN) FX trading platforms that utilize limit-order book matching from other alternatives.

3.    _Specialized production facilities and technical barriers_

232.    Electronic order book platforms require highly specialized technological infrastructure that creates significant barriers to entry. ███████████████

---

[77] Currenex 30(b)(6) (Kelly) Tr. at 248:15-23.

[78] Currenex 30(b)(6) (Kelly) Tr. at 248:24-249:3.

[79] Currenex 30(b)(6) (Kelly) Tr. at 253:24-254:3.

[80] Currenex 30(b)(6) (Kelly) Tr. at 248:7-14.



4.     _Distinct customer segments and market access_

233.     ████████████████████████████████████

███████████████████████████████████████

████[83]████████████████████████████████████

███████████████████████████████████████

██[84]████████████████████████████████████████

████████████"[85]

234.     ████████████████████████████████████

██████████████████.[86] This internal segmentation by Currenex demonstrates

recognition that order book and RFQ platforms serve distinct customer populations with different

needs.

5.     _Specialized market participants and competitive dynamics_

235.     Certain firms specialized in providing anonymous ECN order book trading

platforms for FX, distinguishing themselves from general FX execution providers. ████████



████████████████████████.[87]

---

[81] Currenex 30(b)(6) (Kelly) Tr. at 264:18-265:6.

[82] Currenex 30(b)(6) (Kelly) Tr. at 264:18-265:17.

[83] Currenex 30(b)(6) (Kelly) Tr. at Dep. 254:17-20.

[84] Currenex 30(b)(6) (Kelly) Tr. at 255:20-256:11.

[85] Currenex 30(b)(6) (Kelly) Tr. at 256:17-20.

[86] Currenex 30(b)(6) (Kelly) Tr. at 256:12-16.

[87] Currenex 30(b)(6) (Kelly) Tr. at 250:6-252:6.

236. 

.[88] This reveals that Currenex recognized itself as operating in two distinct markets: one for order book execution and another for RFQ execution, with different competitive dynamics and specialized competitors in each.

237. As mentioned above, FX ECNs with order book trading for the buy-side are also distinguished from platforms that serve the inter-dealer market. 

.[89]

### 6. *Distinct prices*

238. The business models for order book trading and RFQ trading are distinct. In LOB platforms, customers benefit from transparent, competitive pricing because trade execution costs are lower when more market participants can compete for order flow.[90] ECN order book platforms typically charge commission-based fees—commonly ranging from $3 to $7 per round-turn lot ($1 million)—while offering raw spreads starting from 0.0 pips on major currency pairs.[91] The order book model creates competitive pricing pressure as more market participants can compete for order

---

[88] Currenex 30(b)(6) (Kelly) Tr. at 255:20-256:11.

[89] Currenex 30(b)(6) (Kelly) Tr. at 251:20-252:2.

[90] *See* Nasdaq, "Demystifying the Central Limit Order Book," https://www.nasdaq.com/articles/demystifying-the-central-limit-order-book-clob-everything-you-need-to-know.

[91] ECN Execution, "Top ECN Brokers and their ECN Accounts," https://ecnexecution.com/top-ecn-brokers-and-their-ecn-accounts/ (Apr. 18, 2025) (noting commission structures of $3-$7 per round-trip lot with spreads from 0.0 pips).

flow versus when orders are routed to a limited number of market makers with (potentially) non-competitive quotes.[92]

239.    In contrast, RFQ systems employ an asymmetric pricing model where a finite set of participant market makers control the flow of trading information to their clients.[93]   RFQ platforms typically incorporate costs into wider spreads rather than charging separate commissions, with studies showing that "ETF spreads on RFQ platforms were between 50% and more than 200% wider than the corresponding spreads measured by" exchange best bid-offer prices for smaller trade sizes.[94]   The fundamental distinction is that order book pricing emerges from multilateral competition among all participants posting prices, while RFQ pricing reflects bilateral negotiations with a limited set of dealers who control the quoted spreads.

240.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████.[95]

---

[92] *See* Nasdaq *supra* note 90.

[93] *See* Bank for International Settlements *supra* note 69; King *et al supra* note 8 (describing the enhanced transparency of systems where customers can monitor developments in FX markets directly rather than relying on their dealers).

[94] ETF Stream, "Question Marks for ETF Trading Costs on Popular RFQ Platforms," https://www.etfstream.com/articles/question-marks-for-etf-trading-costs-on-popular-rfq-platforms.

[95] Currenex 30(b)(6) (Kelly) Tr. at 263:24-264:6.

### C.    Currenex's Market Share Confirms it Had Market Power in the Market For FX Electronic Order-Book Platforms That Were Directly Accessible By Buy-Side Traders

241.    Figure 2 depicts Currenex's share of Average Daily Volume in the relevant market for the 2009-2014 period.[96]  In addition to Currenex, the firms in the relevant market are Hotspot and Fastmatch.

Figure 2



---

[96] CXSSB00489607; CXSSB00424565; CXSSB00061194; CXSSB00102955; CXSSB00061194; CXSSB00102955; DSQ0061830; DSQ0125451; DSQ0127006; DSQ0134653; DSQ0135489; DSQ0189697; DSQ0191649; DSQ0222978; DSQ0234551; DSQ0234738; DSQ0235518; DSQ0236990; DSQ0237155; DSQ0248069; DSQ0248234; DSQ0304741; DSQ0319274; DSQ0320529; DSQ0320858; DSQ0371255; DSQ0374142; DSQ0380558; FX Markets, "FastMatch launches matching engine in London," https://www.fx-markets.com/technology/trading-systems/2268765/fastmatch-launches-matching-engine-in-london (May 17, 2013); FX Markets, "FX platforms switch off ruble trading," https://www.fx-markets.com/foreign-exchange/trading/2387192/fx-platforms-switch-off-ruble-trading (December 17, 2014).

242. Note that ███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████.

243. Thus, Currenex represented a large share of the relevant market. This share is so large as to provide indirect evidence of market power. This finding reinforces the conclusion based on direct evidence analyzed *supra*.

## XIII.  **CONCLUSIONS**

244. After a thorough analysis of the data produced by Currenex, and other record evidence, I have reached the following conclusions:

- Currenex implemented a system of undisclosed priorities that benefited the Trading Defendants by allowing them to obtain trades that they would not have obtained under conventional "first in-first out" priorities.

- At a minimum, all Class members suffered, in a way measured through common evidence, by paying fees to a Platform operator that provided a service materially worse than what Currenex represented and disclosed to Class members. Class members paid fees both when they acted as price or liquidity "makers," and when they acted as price or liquidity "takers." (The Currenex Platform allows users to act in both roles.) Thus, all Class members were harmed by paying excessive fees.

- Based on Currenex data (which is common evidence) I estimate Class members paid $1.35 billion in fees.

- Fundamental economic considerations, particularly considerations related to the field of finance referred to as "market microstructure," imply that these undisclosed priorities also increased the adverse selection costs incurred by Class members. Adverse selection is a major component of the cost of supplying liquidity.

- These fundamental economic considerations also imply that the inflated adverse selection costs would be ultimately paid for, at least in part, by Class members in the form of paying higher bid-ask spreads when acting as a "taker."

- Using standard empirical economics techniques, I show using evidence common to the Class that the system of undisclosed priorities imposed additional trading costs on Class members of at least $668.1 million.

- Standard empirical economics techniques also demonstrate that Class members were harmed by increased movements in the *midpoint* following rejected trades when the wrongful scheme was in effect, as compared when it ceased. This represents another category of harm, estimated to be $391.3 million.

- Finally, the regressions which show the impact of Defendants' conduct provide direct evidence of Currenex's market power.

- Based on "*Brown Shoe*" factors that Counsel informs me courts sometimes use to determine if there is indirect evidence of market power, I conclude that the market for FX Electronic Order-Book Platforms that were Directly Accessible by Buy-side Traders is a relevant market. I also show that Currenex had a large share of this relevant market, and conclude that Currenex had market power in that relevant market during the Class period.

245.    I reserve the right to supplement or revise this report and opinions based receipt of additional information.

Craig Pirrong
November 18, 2025

# APPENDIX 1

# CRAIG PIRRONG

Professor of Finance
Director, Global Energy Management Institute
Bauer College of Business
University of Houston
Houston, TX 77204
713-743-4466
cpirrong@uh.edu

## EDUCATION

Ph.D., UNIVERSITY OF CHICAGO, December, 1987.
    Thesis:  An Application of Core Theory to the Study of the Organization of Ocean
        Shipping Markets.

M.B.A., UNIVERSITY OF CHICAGO, March, 1983.
    Concentrations in finance, economics and econometrics.

B.A., THE UNIVERSITY OF CHICAGO, June, 1981.
    Major in economics.

THE UNITED STATES NAVAL ACADEMY, July, 1977-August, 1979.

## EMPLOYMENT

BAUER COLLEGE OF BUSINESS, UNIVERSITY OF HOUSTON, Houston, TX.  Professor
    of Finance and Director, Gutierrez Energy Management Institute, 2003-present.

COMMODITY FUTURES TRADING COMMISSION, Washington, DC.  Consultant, Office of
    the Inspector General, 2023-2024.

OKLAHOMA STATE UNIVERSITY, Stillwater, OK.  Watson Family Professor of Commodity
    and Financial Risk Management and Director, Center for Risk Management, 2001-2003.

WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS, St. Louis, MO.
    Assistant Professor of Finance, 1996-2001.

UNIVERSITY OF CHICAGO, GRADUATE SCHOOL OF BUSINESS, Chicago,
    IL. Visiting Assistant Professor of Finance (October, 1994-August, 1996).

UNIVERSITY OF MICHIGAN, SCHOOL OF BUSINESS ADMINISTRATION,
    Ann Arbor, Michigan.  Assistant Professor of Business Economics and Public
    Policy (January, 1989-June, 1996).

LEXECON, INC., Chicago, Illinois.  Economist (November 1987-December, 1988).

GNP COMMODITIES, Chicago, Illinois.  Senior Investment Strategist (1986-1987).

**PUBLICATIONS**

**Articles**

"Commodity Market Financialization: A Beneficial Consequence of Reduced Barriers to the Trading of Risk," *Journal of Applied Corporate Finance*, forthcoming.

"Fear and loathing in the market for US Treasuries and the clearing nostrum," *Journal of Applied Corporate Finance*, 2024.

"Strategic Trading and Manipulation in Trade at Settlement Contracts," *Journal of Futures Markets*, 2023.

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li.  *Journal of Banking and Finance*, 2022.

"Sheep in Wolves Clothing: Using False Signals of Demand to Execute a Market Power Manipulation." *Journal of Futures Markets*, 2022.

"Apocalypse Averted: The COVID-Caused Liquidity Trap, Dodd-Frank, and the Fed."  *Journal of Applied Corporate Finance*, 2020.

"Oil Jump Risk," with Nima Ebrahimi,.  *Journal of Futures Markets*, 2020.

"Will Blockchain Be a Big Deal? Reasons for Caution." *Journal of Applied Corporate Finance*, 2019

"The Economics of Commodity Market Manipulation: A Survey." *Journal of Commodity Markets*, 2017.

"Liquefying a Market: Contracting Dynamics in LNG." *Journal of Applied Corporate Finance*, 2017.

"Bund for Glory, or, It's a Long Way to Tip a Market." *Journal of Applied Corporate Finance*, 2016.

"Risk Management by Commodity Trading Firms: The Case of Trafigura." *Journal of Applied Corporate Finance*, 2015.

"Pick Your Poison-Fragmentation or Market Power? An Analysis of RegNMS, High Frequency Trading, and Securities Market Structure." *Journal of Applied Corporate Finance*, 2014.

"Bill of Goods: Central Counterparties and Systemic Risk." *Journal of Financial Market Infrastructure*, 2014.

"Clearing and Collateral Mandates: A New Liquidity Trap?" *Journal of Applied Corporate Finance*, 2012.

"The Cost of Collateral Management in a New CCP Environment."  *DerivSource,* 2012.

 "Competition and Vertical Integration in Financial Exchanges." *Competition Policy International*, 2011.

"The Economics of Central Clearing: Theory and Practice." ISDA Discussion Papers Series, 2011.

"Squeeze Play: The Dynamics of the Delivery End Game." *Journal of Alternative Investments*, 2011 (working paper predecessor titled "The Economics of the Manipulation End Game with Private Information About Positions").

"Energy Market Manipulation: Definition, Diagnosis, and Deterrence." *Energy Law Journal*, 2010.

"The Inefficiency of Clearing Mandates." *Cato Policy Studies*, 2010.

"Derivatives Clearing Mandates: Cure or Curse?**"** *Journal of Applied Corporate Finance,* Vol. 22, Issue 3, pp. 48-55, Summer 2010.

"No Evidence?  No Theory?  No Problem!: The Inefficiency of Speculative Position Limits." *Regulation*, 2010.

"Comment on Stout, Regulate OTC Derivatives by Deregulating Them." *Regulation*, Fall 2009.

"The Clearinghouse Cure." (Lead article.) *Regulation*, 2009.

"Clearing Up Misconceptions on Clearing." *Regulation*, 2008.

"The Price of Power: The Valuation of Power and Weather Derivatives." *Journal of Banking and Finance*, 2008.

"Just Say No To Gazprom." *World Energy*, July 2007.

"The Thirty Years War." *Regulation*, 2005.

 "Detecting Manipulation in Futures Markets: The Ferruzzi Soybean Episode." *American Law and Economics Review*, 2004.

"Price Discovery and Data Hubs." *The Utility Project*, 2004.

"Got a Match?  The Right Way to Report Energy Prices." *World Energy*, 2003.

"The Case for an Independent Gas Price Repository." *World Energy*, 2003.

"Securities Market Macrostructure: Property Rights and the Efficiency of Securities Trading." *Journal of Law, Economics, and Organization*, 2002.

"Securities Market Regulation: A Twenty-five Year Retrospective." *Regulation,* 2002.

"The Clinton Regulatory Legacy: Securities Regulation." *Regulation*, 2001.

"Manipulation of Cash-Settled Futures Contracts." *Journal of Business*, 2001.

"A Positive Theory of Financial Exchange Organization." *Journal of Law and Economics*, 2000.

"The Organization of Financial Exchange Markets: Theory and Evidence." *Journal of Financial Markets*, 1999 (lead article).

"Electronic Exchanges Are Inevitable and Beneficial." *Regulation*, 1999.

"Self-Regulation of Private Organized Markets." *New Palgrave Dictionary of Economics and the Law*, 1998.

"The Inefficiency of U.S. Commodity Manipulation Law: Diagnosis and a Proposed Cure." *Research in Law and Economics*, 1997.

"Metallgesellschaft: A Prudent Hedger Ruined or a Wildcatter on NYMEX?" *Journal of Futures Markets*, 1997.

"Liquidity and Depth on Open Outcry and Automated Exchanges: A Comparison of the LIFFE and DTB Bund Contracts." *Journal of Futures Markets*, 1996.

"Price Dynamics in Physical Commodity Spot and Futures Markets: Spreads, Spillovers, Volatility and Convergence in Refined Petroleum Products," with Victor Ng. *Journal of Empirical Finance*, 1996.

"The Self-Regulation of Commodity Exchanges: The Case of Market Manipulation." *The Journal of Law and Economics*, April, 1995.

"The Welfare Costs of Arkansas Best: the Pareto Inefficiency of Asymmetric Taxation of Hedging Gains and Losses." *The Journal of Futures Markets*, April, 1995.

"Mixed Manipulation Strategies in Commodity Futures Markets." *The Journal of Futures Markets*, February, 1995.

"The Efficient Scope of Private Transactions Cost Reducing Institutions: The Case of Commodity Exchanges." *The Journal of Legal Studies*, January, 1995.

"Commodity Futures Market Regulation: The Inefficiency of the Anti-Manipulation Provisions of the

Commodity Exchange Act." *Regulation*, Fall, 1994.

"Commodity Market Manipulation Law: A (Very) Critical Analysis of the Existing Doctrine and A Proposed Alternative." *Washington and Lee University Annual Review of Securities and Commodities Law*, September, 1994.

"Fundamentals and Volatility: Storage, Spreads, and the Dynamics of Metals Prices," with Victor Ng. *The Journal of Business,* April, 1994.

"Regulation: Futures Trading and Institutional Investors." *The American Enterprise,* January-February, 1994.

"Multiple Delivery Points, Pricing Dynamics, and Hedging Effectiveness in Futures Markets for Spatial Commodities." *The Journal of Futures Markets,* August, 1994.

"Contracting Practices in Bulk Shipping Markets: A Transactions Cost Explanation." *Journal of Law and Economics*, October, 1993.

"Manipulation of the Commodity Futures Market Delivery Process." *Journal of Business*, July 1993 (lead article).

"Reforming the Contract Designation Process." *Journal of Financial Engineering*, March 1993.

"Removing Undue Regulatory Impediments to the Use of Futures and Options by Institutional Investors." *Journal of Financial Engineering*, March 1993.  (Reprinted in Futures International Law Letter, October, 1992.)

"Application of Core Theory to the Analysis of the Ocean Shipping Industry." *Journal of Law and Economics*, April 1992.

"The Economic Geography of Grain Markets and Futures Delivery Specification:  Manipulation, Price Discovery, and Hedging Effectiveness." *Review of Futures Markets,* 1992.

"Resolving the Thrift Crisis" with V. Bernard, R. Kormendi and E.Snyder.  *Journal of Applied Corporate Finance*, Autumn 1989.

**Newspaper Articles***

"Outside Opinion: High-frequency trading will pay off in time" *Chicago Tribune*. (June 2, 2013).

"Restricting Speculators will not reduce oil prices." *Wall Street Journal*, July 11, 2008.

"Cox in the Crucible." *Orange County Register*, 2005.

**Contributions to Books**

Craig Pirrong. Regulate in Haste, Repent at Leisure: Private and Public Orderings in OTC Derivatives Markets. In E. Brousseau and J. M. Glachant (eds.), *Oxford Handbook on International Economic Governance*. Oxford, 2017 .

"Exchanges: The Ultimate Manufactured Markets."  In E. Brousseau and J. M. Glachant (eds.), *The Manufacturing of Markets*, Cambridge, 2014.

"Structural Models of Commodity Price Dynamics." In H. Geman (ed.), *Encyclopedia of Quantitative Finance*; *Risk Management in Commodity Markets*, Wiley, 2008.

"Lattice Approaches to Pricing Derivatives." In R. Kolb and J. Overdahl (eds.), *Companion to Financial Derivatives*.

"Energy Derivatives." In R. Kolb and J. Overdahl (eds.), *Companion to Financial Derivatives,* (republicshed in 2013).

"Pricing Power Derivatives: Theory and Matlab Implementation."  In J. London, *Modeling Derivatives Applications in Matlab, C++, and Excel*. Financial Times Press, 2006.

"Market Microstructure Issues."  In A. Kleit (ed.), *Electric Choices: Deregulation and the Future of Electric Power*. Rowan and Littlefield, 2006.

"The New Economy: Implications for the Organization and Structure of Securities Markets." In D. Jones (ed.), *The New Economy Handbook*. The Academic Press, 2003.

"Pricing Forwards and Options Using the Mesh-Based Partial Differential Equation Approach." R. Jameson (ed.), *Energy Modelling and the Management of Uncertainty*. Risk Publications, 1999.  (Republished in 2005).

"Pricing Energy Derivatives," with Kaushik Amin and Victor Ng.  Chapter 4 in R. Jameson (ed.), *Managing Energy Price Risk*. Risk Magazine Publications, 1994.  (Republished in 1999 and 2004).

"The Market for Treasury Securities: Microstructure and Market Power."  Chapter 1 in P. Knapp (ed.), *The Treasury Securities Market*: *The Scholars' Assessment*. Homewood, IL: Business One Irwin, 1994.

"The Economics of Risk Based Capital Requirements." Chapter 33 in K. Lehn and R. Kamphuis (eds.), *Modernizing U.S. Securities Regulation*. Homewood, IL:  Business One Irwin, 1993.

**Books**

*Commodity Price Dynamics: A Structural Approach*, Cambridge University Press, 2011.

*Corners and Squeezes: The Economics, Law, and Public Policy of Financial and Commodity Market Manipulation*. Kluwer Academic Publishers, 1996.

*Grain Futures Contracts:  An Economic Appraisal*. With R. Kormendi and D. Haddock.  New York: Kluwer Academic Publishers, 1993.

*The Origins and Resolution of the Thrift Crisis*. With V. Bernard, R. Kormendi and E. Snyder. New York:  Kluwer Academic Publishers, 1989.

**Amicus briefs\***

*NRG Power Mktg. v. Maine PUC*, 2008 U.S. Briefs 674 (U.S. July 14, 2009)\*

*Morgan Stanley capital Grp v. Public Util. Dist. No. 1 of Snohomish County*, Washington 2006 U.S. Briefs 1457 (U.S. Nov. 28, 2007)\*

**PAPERS PRESENTED**

"Learning From Liquidation: The Commodity Futures Convergence Process."  Commodity and Energy Markets Association Meetings, 2019.

"Limited Only by the Ingenuity of Man." Commodity and Energy Markets Association Meetings, 2019. (Keynote lecture).
"Limited Only by the Ingenuity of Man." J.P. Morgan Commodities Center, 2019. (Keynote lecture).

"Limited Only by the Ingenuity of Man." ESSEC, 2018. (Keynote lecture).

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li.  University of Oklahoma Energy Conference, 2018.

"Commodity Market Financialization, Indexation, and Correlation."  Commodity and Energy Markets Association Meetings, 2017.

"A Bill of Goods: Clearing and Systemic Risk."  Oxford University Conference on Derivatives After the Crisis, 2013.  Bank of England, Banque de France, and European Central Bank Conference on OTC Derivatives, 2013.

"The Industrial Organization of Execution, Clearing, and Settlement in Financial Markets." Haas/Sloan Conference on the Law & Economics of Organization, University of California, Berkeley, 2012.

"The Mutualization of Default Risk, Fungibility, and Moral Hazard: The Economics of Default Risk Sharing in Cleared and Bilateral Markets."  ISNIE Annual Conference, Scotland, 2010.  Notre Dame Financial Regulation Conference, 2010.

"Stochastic Volatility and Commodity Price Dynamics."  Texas A&M University, 31 October, 2008. Institute of Financial Mathematics Conference, Champuloc, Italy, 21 January 2008.

"The Price of Power."  Commodities 2007.  University of London, 17 January, 2007.

"Modeling Issues in Commodity Markets."  Commodities 2007.  University of London, 18 January, 2007.

"Momentum In Futures Markets."  2005 European Finance Association Meetings, Moscow, Russia, 25 August, 2005. University of Illinois, September, 2006.

"Upstairs, Downstairs."  2003 European Finance Association Meetings, Glasgow, 27 August, 2003.

"Upstairs, Downstairs."  2003 Midwest Finance Association Meetings, St. Louis, March 2003.

"The Price of Power."   2002 European Finance Association Meetings, Berlin, 28 August, 2002.

"The Price of Power."  2002 Bachelier Finance Society Second World Congress, Crete, 12 June, 2002.

"Technological Change, For-Profit Exchanges, and the Self-Regulation of Financial Markets."  American Law and Economics Association Meetings, New York, 7 May, 2000.

"Manipulation in Power Markets."  University of California Energy Institute Restructuring Conference, Berkeley, 17 March, 2000.

"A Positive Theory of Financial Exchange Organization."  International Society of the New Institutional Economics Meetings, Paris, 18 September, 1998.

"A Positive Theory of Financial Exchange Organization."  American Law and Economics Association Meetings, Berkeley.  8 May, 1998.

"Efficient Deterrence of Manipulation in Futures Markets."  American Law and Economics Association Meetings, Chicago.  6 May, 1996.

"Raising Revenue in the Worst Way: The Economic Effects of Asymmetric Hedge Taxation." Virginia Tech Symposium on "Hedge Taxation After *Arkansas Best*: Law, Economics, and Public Policy."  21 July, 1993.

"Fundamentals and Volatility: Storage, Spreads, and the Dynamics of Metals Prices."  National Bureau of Economic Research Summer Institute Workshop on Asset Pricing.  20 July, 1993.  American Finance Association Meetings, 3 January, 1993.

"Price Dynamics in Physical Commodity Spot and Futures Markets."  Econometric Society Meetings, 7 January, 1993.  Western Finance Association Meetings, June, 1993.  ORSA/TIMS Meetings, November, 1993.

"Still Nature's Metropolis?"  Kalo Hineman Symposium on Grain Futures Market Delivery Issues at the Commodity Futures Trading Commission, 15 September, 1991.

"Maintaining the Integrity of the Futures Delivery Process: The Economics of Manipulation and its Deterrence."  American Bar Association/Virginia Tech Conference on Market Manipulation, 9 November, 1990.

"Multiple Delivery Points: Manipulation, Liquidity, and Basis Risk."  American Bar Association/Virginia Tech Conference on Market Manipulation, 10 November, 1990.

Seminar presentations at North Carolina State University, Vanderbilt University, Southern Methodist University, the Federal Reserve Bank of Atlanta, the University of Missouri, the University of Kansas, Arizona State University, Babson University, Yale University Law School, the Michigan Business and Law Schools, the University of Chicago, the Tuck School of Business at Dartmouth University, North Carolina State University, the University of Alberta, Virginia Tech University, Washington University, Columbia University Law School, and the Commodity Futures Trading Commission.

## CURRENT RESEARCH ACTIVITY

### Papers Under Review

"Rocket Science, Default Risk, and the Organization of Derivatives Markets."  First round, *Journal of Law and Economics*.

### Selected Working Papers

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li.

"Sheep in Wolves Clothing: Using False Signals of Demand to Execute a Market Power Manipulation."

"Learning From Liquidation: The Commodity Futures Convergence Process."

"Derived Pricing: Fragmentation, Efficiency, and Manipulation."

"Commodity Market Financialization, Indexation, and Correlation."

"The Mutualization of Default Risk, Fungibility, and Moral Hazard: The Economics of Default Risk Sharing in Cleared and Bilateral Markets."

"The Economics of Clearing in Derivatives Markets: Netting, Asymmetric Information, and the Sharing of Default Risk Through a Central Counterparty."

"The Industrial Organization of Trading, Clearing, and Settlement in Financial Markets."

"The Valuation of Power Options in a Pirrong-Jermakyan Model."

"Momentum in Futures Markets"

"Bund for Glory, or, It's a Long Way to Tip a Market."

"Upstairs, Downstairs: Electronic vs. Open Outcry Markets."

"The Macrostructure of Electronic Financial Markets."

"The Organization of Electronic Financial Markets."

"Third Markets and the Second Best."

"The Price of Power: Valuation of Power and Weather Derivatives."

"Manipulation of Power Markets."

"The Economic Implications of *Arkansas Best*: Asymmetric Tax Treatment of Hedge Income, Hedging Effectiveness, and Price Discovery."

"The Effects of *Arkansas Best* on Hedge Ratios."

"Brave New World?  The Prospects for Computerized Futures Trading."

"A Structural Model of Cross Hedging Risk."

"Two Cheers for Follow-on Research in Pharmaceutical Markets."

"The Asset Management Incentives Implicit in FSLIC Assisted Acquisition Agreements."

"Futures Markets as Implicit Loan Markets: The Case of Grains."

**Research in Progress**

Momentum in Futures Markets.

Storable Commodity Price Dynamics and Commodity Derivatives Pricing.

Power Price Dynamics.

Pricing Contingent Claims on Power and Weather.

Clearing Mechanisms in Derivatives Markets: Efficiency and Distributive Issues.

Rights Aspects of Commodity Exchanges

**Reports**

"Not Too Big to Fail: Systemic Risk, Regulation, and the Economics of Trading Firms." Trafigura, 2015.

"The Economics of Commodity Trading Firms." Trafigura, 2014.

"Market oversight for cap and trade: efficiently regulating the carbon derivative market." Brookings Institute, 2009.

"An Evaluation of the Performance of Oil Price Benchmarks During the Financial Crisis."  WTI Report U. of Houston, 2009.

 "Woodpulp Futures: Establishing the Essential Facts."  Report to OM Stockholm, 1996.

"Agricultural Futures Exchange in Germany for Europe: Feasibility-Design-Implementation." Report to the Warentermiborse, 1995.

"Strengthening the Winnipeg Commodity Exchange Canola Futures Franchise."  Report to the Winnipeg Commodity Exchange, 1995.

"The Costs and Benefits of Adding Local Traders to the Deutsche Terminbörse."  Report to the Deutsche Terminbörse, 1994.

"Derivatives Exchanges, Liquidity, and Locals: A Look to the Future." Catalyst Institute Report, 1994.

"Is There a Future for Stock Branch Indices?"  Catalyst Institute Report, 1994.

"The Contribution of Dual Trading to the Liquidity of New York Mercantile Exchange Energy Contracts" (with NERA).  Report for the New York Mercantile Exchange submitted to the Commodity Futures Trading Commission in support of NYMEX's application for a waiver from the dual trading ban contained in the 1992 CFTC re-authorization bill.

"Political Rhetoric and Stock Price Volatility: A Case Study."  Catalyst Institute Report, 1993.

"The Relation Between Oil and Gasoline Futures and Spot Prices" (with Victor Ng).  Report submitted to the New York Mercantile Exchange, 1992.

"An Economic Analysis of the Grain and Oilseed Delivery Mechanism at the Chicago Board of Trade."  Report submitted to the Chicago Board of Trade, 1991.

"Crisis Resolution in the Thrift Industry: Beyond the December Deals" (with Victor Bernard, Roger Kormendi, and Ted Snyder).  Reported submitted to the Federal Home Loan Bank Board, 1989.

**Refereeing Activities**

*American Economic Review*; *Economic Inquiry*; *International Journal of Law and Economics*; *Journal of Business*; *Journal of Economic Dynamics and Control*; *Journal of Economics and Finance*; *Journal of Finance*; *Journal of Financial Markets*; *Journal of Futures Markets*; *Journal of Industrial Organization*; *Journal of Law and Economics*; *Journal of Quantitative Financial Analysis*; *Journal of Risk*; *Review of Financial Studies*; *Journal of Economic Behavior and Organization*; *Journal of Business and Economic Statistics*; *Managerial and Decision Economics*; *Journal of Economics and Business*.

## FELLOWSHIPS

Oscar Mayer Fellow, University of Chicago (1983-1986)

## RESEARCH GRANTS

Montreal Exchange grant to evaluate feasibility of introducing new commodity futures contracts. OM Stockholm and OMLX, London grant to study the feasibility of a pulp futures market and to design pulp futures and futures options contracts, 1996.

Winnepeg Commodity Exchange grant to study the contracts, rules, and bylaws of the WCE, with the objective of making recommendations to revise them in order to improve the performance of the Exchange's markets, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the effects of attracting local traders to the DTB, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the feasibility of new currency derivatives contracts, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the feasibility of stock branch index derivatives, 1994.

Virginia Tech Center for Study of Futures and Options Markets grant to study the economic implications of the Internal Revenue Service policy on the taxation of hedging gains and losses 1993.

Warner Lambert Corporation grant for the study of competition in pharmaceutical markets 19901991.

Chicago Board of Trade grant to study grain futures market delivery issues 1990-1991.

## EXECUTIVE TEACHING

Bayerische Vereinsbank, 1995

Anheuser-Busch, 1996.

Energy Power and Risk Management Courses and Conferences, March, June, September, and December, 1999, May 2000.

Peabody Coal Co., 2000.

HSM II Program, Olin School of Business, Washington University, Spring 2000.

**PERSONAL**

Married to Terry Lehman Pirrong. Two children: Renee Elise and Genevieve Corinne. Hobbies: history (especially U.S. Civil War), agonizing over Chicago sports teams, and exercise.

# DR. CRAIG PIRRONG
## EXPERT TESTIMONY and RETENTIONS
### 2005-2013

Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy, et al FERC Docket No. EL01-10-085.

San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation And the California Power Exchange. FERC Docket No. EL00-95-248.

In re Amaranth Natural Gas Commodity Litigation, S.D.N.Y. 07-C-6377.

Randy Schaefer et. al. vs. Bayer AG et. al., 2010 (Written report).  Circuit Court of Lonoke County, AR CV2006-413.

In re Natural Gas Commodity Litigation, S.D. NY 03-CV-6186(VM).

In re BP Propane Indirect Purchaser Antitrust Litigation, N.D. IL Eastern Division 06-C-3541.

Lenny Joe Kyle et. al. vs. Bayer AG et. al.  Circuit Court of Woodruff County, AR.  CV-2008-107.

Energy Trading Partners L.P. et al v. Federal Energy Regulatory Commission. Docket Number IN06-3-003.

RCG v. Trading Technologies, International, Inc., N.D. IL Eastern Division 95-C-4088.

Asarco LLC v. American Mining Corp.  Bankruptcy Court Southern District of Texas, 05-21270.

Energy Trading Partners L.P. et al v. Federal Energy Regulatory Commission. Docket Number IN06-3-003.

Trading Technologies International, Inc. v. eSpeed, Inc., N.D. IL Eastern Division 04-C-5312.

Trading Technologies International, Inc. v. GL Trade, N.D. IL Eastern Division 05-C-4120.

Trading Technologies International, Inc. v. Future Path Trading LLC., N.D. IL Eastern Division 05-C-5164.

Trading Technologies International, Inc. v. CQGT, LLC and CQG, Inc., N.D IL Eastern Division 05-CV-4811.

Power Authority of the State of New York v. Entergy Nuclear Indian Point 3, LLC and Entergy Nuclear Fitzpatrick, LLC, 7:00-cv-06346-CM

Josef A Kohen, Breakwater Trading LLC, and Richard Hershey v. Pacific Investment Management Co. et al.  N.D. IL 05-C-4681.

In re Williams Securities Litigation, 2006.  N.D. OK 02-CV-72-SPF-FHM.

AEP Energy Services v. Bank of Montreal, 2005. S.D. OH Eastern Division C2-03-335.

In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation, N.D. IL 09-cv-03690.

In re: Optiver Commodities Litigation, S.D.N.Y. 08-cv-6842.

In re: Platinum and Palladium Commodities Litigation, S.D.N.Y. 10-cv-3617.

Lehman Brothers International (Europe) v. AG Financial Products, Inc. CPLR Sections 501, 503, 509 and GOL-1402 (Supreme Court of the State of New York, County of New York).

PJM Up To Congestion Transactions FERC Docket Number IN10-5-000.

Fifth Market Inc. v. CME Group Inc. et al. D. Del. 08-cv-520.

Chicago Mercantile Exchange, Inc. v. 5th Market Inc., CBM2013-00027 (PTAB 2013) .

# APPENDIX 2

## APPENDIX 2:  DOCUMENTS CONSIDERED

| Deposition Testimony |
| --- |
| Deposition of Alex Gerko |
| Deposition of Brian Kelly |
| Deposition of Cary Rosenwald |
| Deposition of Clifford Lewis |
| Deposition of Damian Mitchell |
| Deposition of Damian Mitchell (30(b)(6)) |
| Deposition of Gregory Fortuna |
| Deposition of Jeremy Smart (30(b)(6)) |
| Deposition of Jeremy Smart (Day 1) |
| Deposition of Jeremy Smart (Day 2) |
| Deposition of Jermaine Harmon |
| Deposition of Jim Foster |
| Deposition of Joe Niciforo |
| Deposition of Matthew Clarke |
| Deposition of Nick Burrlock |
| Deposition of Rick Schonberg |
| Deposition of Sean Gilman |

| Deposition Testimony |
| --- |
| Deposition of Tom Liconte |
| Deposition of Zar Amrolia |

| Literature |
| --- |
| Anat R. Amati and Paul Pfleiderer, A Theory of Intraday Patterns: Volume and Price Variability, 1 *Rev. Fin. Stud.* (1988) |
| Bank for International Settlements, Triennial Central Bank Survey of Foreign Exchange and OTC Derivatives Markets: Reporting guidelines for turnover in April 2022 (March 15, 2022) |
| Bank for International Settlements, BIS Quarterly Review  (Dec. 2016) |
| Bruno Biais, Larry Glosten, and Chester Spatt, Market Microstructure: A Survey of Microfoundations, Empirical Results, and Policy Implications, *8 J. of Fin. Markets* (2005) |
| Dagfinn Rime, Bibliography of Microstructure of Foreign Exchange Markets, BI Norwegian Business School Working Paper (2016) |
| Frank McGroarty, Owain ap Gwilym, and Stephen Thomas, The Role of Private Information in Return Volatility, Bid-Ask Spreads and Price Levels in the Foreign Exchange Market, 19 *International Financial Markets, Institutions, and Money* (2009) |
| Hans Stoll, Market Microstructure, in G. M. Constantinides, M. Harris, & R. Stultz (Eds.), *Handbook of the Economics of Finance* (2003) |
| Joel Hasbrouck, *Empirical Market Microstructure* (2007) |
| John Gallaugher and Nigel Melville, Electronic Frontiers in Foreign Exchange Trading,  47 *Communications of the ACM* 8 (2004) |
| Kenneth French and Richard Roll, Stock return variances: the arrival of information and the reaction of traders, 17 *J. Financial Econ.* (1986) |

| **Literature** |
| --- |
| Larry Harris, A Transaction Data Survey of Weekly and Intraday Patterns in Stock Returns, 16 *J. of Financial Econ.* (1986) |
| Larry Harris, The Quarter-Penny Tick (working paper, 2022) |
| Larry Harris, Trading and Electronic Markets: What Investment Professionals Need to Know, CFA Institute (2015) |
| Larry Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003) |
| Larry Harris, What to Do about High-Frequency Trading, *69 Financial Analysts J.* (2013) |
| Martin D. D. Evans and Dagfinn Rime, Microstructure of Foreign Exchange Markets, Norges Bank Working Paper (2019) |
| Martin D. D. Evans and Richard K. Lyons, Order Flow and Exchange Rate Dynamics, 110 *J. Political Econ.* (2002) |
| Martin D. D. Evans and Richard K. Lyons, Understanding Order Flow, 11 *International J. of Fin. and Econ.* (2006) |
| Martin D. D. Evans*, Exchange-Rate Dynamics* (2011) |
| Martin D. D. Evans, FX Trading and Exchange Rate Dynamics, *57 J. of Fin.* (2002) |
| Michael J. Moore and Richard Payne, On the Sources of Private Information in FX Markets, 35 *J. of Banking and Fin.* (2011) |
| Michael R. King and Carlos Mallo, A user's guide to the Triennial Central Bank Survey of foreign exchange market activity, *BIS Quarterly Review* (December 2010) |
| Michael R. King, Carol Osler, and Dagfinn Rime, Foreign Exchange Market Structure, Players, and Evolution, Norges Bank working paper (2011) |

| Literature |
|---|
| Michael Sager and Mark P. Taylor, Commercially Available Order Flow Data and Exchange Rate Movements: Caveat Emptor, 40 *J. of Money, Credit, and Banking* (2006) |
| Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis* (2010) |
| Richard G. Payne, Informed Trade in Spot Foreign Exchange Markets: An Empirical Investigation, 61 *J. International Econ.* (2003) |
| Thomas K. Lyons, *The Microstructure Approach to Exchange Rates* (2001) |

| Publicly Available Websites |
|---|
| Celent, "Electronic Platforms in Foreign Exchange Trading," https://www.celent.com/insights/412061134 (2025) |
| CFTC, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm |
| Crunchbase, "Hotspot FX," https://www.crunchbase.com/organization/hotspot-fx |
| Currenex, "Clients," https://www.currenex.com/clients |
| ECN Execution, "Top ECN Brokers and their ECN Accounts," https://ecnexecution.com/top-ecn-brokers-and-their-ecn-accounts/ (Apr. 18, 2025) |
| ETF Stream, "Question Marks for ETF Trading Costs on Popular RFQ Platforms," https://www.etfstream.com/articles/question-marks-for-etf-trading-costs-on-popular-rfq-platforms |
| Finextra, "Knight Capital Buys Hotspot FX for $77.5m," Knight Capital buys Hotspot FX for $77.5m |
| FlexTrade, "Buy-Side FX Shifts in Evolving Market Structure," https://flextrade.com/resources/buy-side-fx-shifts-in-evolving-market-structure-3/ (September 8, 2015) |

| **Publicly Available Websites** |
| --- |
| FX Markets, "FastMatch launches matching engine in London," https://www.fx-markets.com/technology/trading-systems/2268765/fastmatch-launches-matching-engine-in-london (May 17, 2013) |
| FX Markets, "FX platforms switch off ruble trading," https://www.fx-markets.com/foreign-exchange/trading/2387192/fx-platforms-switch-off-ruble-trading (December 17, 2014) |
| Nasdaq, "Demystifying the Central Limit Order Book (CLOB): Everything You Need to Know," https://www.nasdaq.com/articles/demystifying-the-central-limit-order-book-clob-everything-you-need-to-know (April 21, 2023) |
| PR Newswire, "FastMatch and Former CEO, Dmitri Galinov, Confirm Settlement Agreement," https://www.prnewswire.com/news-releases/fastmatch-and-former-ceo-dmitri-galinov-confirm-settlement-agreement-300795411.html (February 14, 2019) |
| Wikipedia, "Central Limit Order Book," https://en.wikipedia.org/wiki/Central_limit_order_book |

| **Company Documents** |
| --- |
| *Currenex* |
| CXSSB00001181 |
| CXSSB00037798 |
| CXSSB00049646 |
| CXSSB00061194 |
| CXSSB00088874 |
| CXSSB00102955 |
| CXSSB00214236 |
| CXSSB00220161 |

| Company Documents |
| --- |
| CXSSB00239861 |
| CXSSB00256122 |
| CXSSB00261652 |
| CXSSB00271742 |
| CXSSB00408379 |
| CXSSB00409573 |
| CXSSB00409793 |
| CXSSB00424565 |
| CXSSB00489607 |
| CXSSB00546068 |
| CXSSB00571709 |
| CXSSB00571894 |
| CXSSB00572158 |
| CXSSB00719802 |
| CXSSB00738151 |
| CXSSB00754381 |
| CXSSB00899614 |
| CXSSB00899625 |

| Company Documents |
|---|
| CXSSB00899734 |
| CXSSB00985671 |
| *Goldman Sachs* |
| GS-EDMAR-00001574 |
| GS-EDMAR-00002650 |
| GS-EDMAR-00336920 |
| GS-EDMAR-00368325 |
| GS-EDMAR-00827316 |
| GS-EDMAR-00920851 |
| *HC Tech* |
| HCTECH_0030378 |
| HCTECH_0090647 |
| HCTECH_0174508 |
| HCTECH_0174870 |
| HCTECH_0174871 |
| *Dsquare* |
| DSQ0061830 |
| DSQ0125451 |

| Company Documents |
|---|
| DSQ0127006 |
| DSQ0134653 |
| DSQ0135489 |
| DSQ0189697 |
| DSQ0191649 |
| DSQ0222978 |
| DSQ0234551 |
| DSQ0234738 |
| DSQ0235518 |
| DSQ0236990 |
| DSQ0237155 |
| DSQ0248069 |
| DSQ0248234 |
| DSQ0304741 |
| DSQ0319274 |
| DSQ0320529 |
| DSQ0320858 |
| DSQ0371255 |

| Company Documents |
|---|
| DSQ0374142 |
| DSQ0380558 |
| *XTX Markets* |
| XTX0618894 |

| Data Sources |
|---|
| Currenex transaction data |
| Currenex system logs |
| EBS transaction and volume data |
| Reuters/LSEG transaction and volume data |
| Produced Currenex source code |

# EXHIBIT 1

**Exhibit 1**

1. <u>**Description of data**</u>

████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████

**/yyyy/mm/dd/&lt;stack&gt;/&lt;log category&gt;/&lt;subdivision&gt;/{00, 01, 02…}.bz2**

The types ██████████████████████

▪ ████████████████████████████
▪ ██████████████████████████████

▪ █████████████████████████
▪ ██████████████████████████████

████████████

██████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

█████████████████████

██████████████████████████████████

███████████████████████████████



**2. <u>Quantities and Sizes of Files</u>**

**3. <u>File Formats and Parsing</u>**

---

[1] The original, human-readable form of the software before it is compiled into an executable program.

2



**4. Stacks**

---

[2] JavaScript Object Notation; a simple text-based industry-standard file format for data interchange.
[3] Apache Avro: https://avro.apache.org/

| Name | Description | Location | Start date |
|------|-------------|----------|------------|
| ██ | ████████████████████████ | ████████ ██ | ████████ |
| ██ | ████████████████████████ | ████████ ██ | ████████ |
| ██ | ████████ | ████████ █ | ████████ |

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████

5. **Third-party Data**

   *A.    Exchange rate data: Bank of International Settlements*

The Bank of International Settlements (BIS) provides historical exchange rate data which can be conveniently queried via an API.  For example, the following link allows one to download daily exchange rates (i.e. average of observations for each day) for all currencies, between 2001-01-01 and 2023-01-01 in CSV format:

████████████████████████████████████████

This data is used to normalize all trade volumes to USD.

   *B.    Market data*

LSEG and EBS were used as a source for independent historical spot fx market data. The tables below indicate the currency pairs that I employed in my analysis.



6.  **Data Processing**

The data was processed in several stages:

- Trade data, quote, and persistence files are parsed for trade, stream, liquidity pool, price, priority information, and accepted or rejected trades. USD amounts are calculated and amounts in base and quote currency conventions are treated properly.

- Based on information provided by Currenex, counterparties for all trades are mapped according to their CX ids and whether they are in the Defendant or Plaintiff class. The trade types can be OXP, OXO, and PXO, and volumes identified.

- Using Currenex and either EBS or LSEG data (depending on the currency pair), post trade mark outs were constructed on time horizons ranging from milliseconds to hundreds of seconds for every trade. The trade inception half spread was used to identify and remove outliers using a robust statistical technique.

- Trades were grouped by date and assigned to a group as PD, PP, DD, DP, where "P" is Plaintiff, and "D" is Defendant. The vwap markouts were calculated for each group and currency pair, by NY trading session date. The same robust outlier technique was used to remove any dates for any of the classes.

- Rare economic events and extreme volatility days were identified with a range volatility estimator as well as an exponential moving average of Parkison volatility. These days were removed from the analysis.

- Once the data was extracted into a more manageable file format, it was checked against a parallel effort in KDB+ where results matched.