## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

EDMAR FINANCIAL COMPANY, LLC;
IRISH BLUE & GOLD, INC.; XTX
MARKETS LIMITED; and
DSQUARE TRADING LIMITED,

                      Plaintiffs,

     vs.

CURRENEX, INC.; GOLDMAN SACHS &
CO. LLC; HC TECHNOLOGIES, LLC;
STATE STREET BANK AND TRUST
COMPANY; STATE STREET GLOBAL
MARKETS INTERNATIONAL LIMITED;
and JOHN DOE DEFENDANTS 1-5,

                      Defendants.

Case No. 21-cv-06598

---

**DEFENDANTS CURRENEX, INC., GOLDMAN SACHS & CO. LLC,
HC TECHNOLOGIES, LLC, STATE STREET BANK AND TRUST COMPANY, AND
STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

    A.    Currenex Users Trade Through Individualized Liquidity Packages...................... 4

    B.    Orders Were Matched Based on Best Price, Ties Were Rare, and Defendants' Tiebreaking Designations Almost Never Came into Play................. 6

    C.    Only Two Alleged Misrepresentations Remain........................................... 7

    D.    Named Plaintiffs Are Sophisticated FX Market Participants. ............................. 9

LEGAL STANDARD........................................................................................ 10

ARGUMENT .................................................................................................. 11

I.    PLAINTIFFS CANNOT SATISFY THEIR BURDEN UNDER RULE 23(a)(2) AND RULE 23(b)(3) TO SHOW THAT COMMON QUESTIONS EXIST AND PREDOMINATE. ..................................................................................... 11

    A.    Assessing Whether Each Class Member Was Injured Requires Individualized Inquiries into Its Bespoke Liquidity Package and Each of Its Transactions. ...................................................................... 12

    B.    Individualized Inquiries Are Also Necessary to Determine Whether Each Class Member's Unique Trading Behavior Impacted Whether They Suffered Any Injury. ...................................................................... 16

    C.    Insurmountable Conflicts Within the Class Raise Additional Dispositive Predominance and Adequacy Concerns.................................................. 17

II.    PLAINTIFFS FAIL TO SHOW THAT DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS.................................................................................. 21

    A.    Plaintiffs' Model Measures Harm Not Attributable to the Alleged Conduct. ....................................................................................... 22

    B.    Plaintiffs' Model Masks Uninjured Class Members Through Averaging. ........... 26

    C.    Plaintiffs' Model Yields False Positives................................................... 28

    D.    Plaintiffs' Model Fails to Demonstrate With Scientific Rigor that Classwide Impact Can Be Established Through Common Proof. ....................... 28

III.    INDIVIDUALIZED INQUIRIES ON CORE CLAIMS AND DEFENSES OVERWHELM ANY COMMON FACTUAL OR LEGAL QUESTIONS........................ 31

    A.    Reliance on Alleged Misrepresentations Cannot Be the Subject of General Proof............................................................................................. 31

        1.    Plaintiffs Cannot Establish Common, Classwide Reliance on Affirmative Statements. ............................................................ 32

2. Plaintiffs' Omissions Theory Also Invites a Thicket of Individualized Inquiries. .......................................................... 34

B. Statute of Limitations and Choice of Law Considerations Defeat Predominance ........................................................................... 35

1. Plaintiffs Face Individualized Inquiries on the Statute of Limitations. ................................................................................ 35

2. Complex Choice-of-Law Issues Further Undermine Predominance. ....... 38

IV. THE NAMED PLAINTIFFS ARE ATYPICAL CLASS REPRESENTATIVES .............. 38

A. XTX is An Atypical Class Representative .......................................... 38

B. DSquare Is Also Atypical. ................................................................. 40

CONCLUSION .................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegra v. Luxottica Retail N.A.*,
    341 F.R.D. 373 (E.D.N.Y. 2022) ..........................................................22

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................19

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ................................................... *passim*

*In re Amla Litig.*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) .................................................38

*In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Pracs. Litig.*,
    2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) ....................................33

*Benitez v. Valentino U.S.A.*,
    2025 WL 560748 (S.D.N.Y. Feb. 20, 2025) .......................................13

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013) ................................................................18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...............................................................2, 10, 22

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006) ................................................................39

*In re Currency Conversion Fee Antitrust Litig.*,
    230 F.R.D. 303 (S.D.N.Y. 2004) ........................................................34

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................35

*Edelman v. Starwood Cap. Grp., LLC*,
    70 A.D.3d 246 (1st Dept. 2009) ..........................................................14

*Emergent Cap. Inv. Mgmt. v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ................................................................35

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) ..............................2, 13, 19, 20

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y., 2006) ..................................................................25

*Gatt Commc'ns, Inc. v. PMC Assocs.*,
711 F.3d 68 (2d Cir. 2013)............................................................................40

*George v. China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ................................................11

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
300 F.R.D. 90 (E.D.N.Y. 2014)....................................................................32

*Grumman Allied Indus., v. Rohr Indus.*,
748 F.2d 729 (2d Cir. 1984)..........................................................................39

*In re Int. Rate Swaps Antitrust Litig.*,
2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) .............................................13

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ...............................................20

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015)..........................................................................35

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
2025 WL 3240044 (S.D.N.Y. Nov. 20, 2025) ........................................16, 27

*Kottler v. Deutsche Bank AG*,
607 F. Supp. 2d 447 (S.D.N.Y. 2009)......................................................36, 38

*Langan v. Johnson & Johnson Consumer Cos.*,
897 F.3d 88 (2d Cir. 2018)............................................................................38

*Lavoho, LLC v. Apple, Inc.*,
232 F. Supp. 3d 513 (S.D.N.Y. 2016)...........................................................17

*Levy v. BASF Metals Ltd.*,
755 F. App'x 29 (2d Cir. 2018) .....................................................................36

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)..........................................18, 19, 20, 30

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)..........................................................................17

*In re Lois/USA, Inc.*,
264 B.R. 69 (Bankr. S.D.N.Y. 2001) ............................................................38

*Martin Hilti Family Trust v. Knoedler Gallery, LLC,*
   137 F. Supp. 3d 430 (S.D.N.Y. 2015)....................................................36

*Mazzei v. Money Store,*
   829 F.3d 260 (2d Cir. 2016).................................................................14

*McKoy v. Trump Corp.,*
   2023 WL 6842310 (S.D.N.Y. Oct. 17, 2023) .......................................32

*McLaughlin v. Am. Tobacco Co.,*
   522 F.3d 215 (2d Cir. 2008)............................................................30, 32

*Minpeco, S.A. v. Conticommodity Servs., Inc.,*
   676 F. Supp. 486 (S.D.N.Y. 1987) ......................................................17

*Mogollon v. Bank of N.Y. Mellon,*
   2025 WL 2244796 (N.D. Tex. Aug. 5, 2025)........................................38

*Moore v. PaineWebber, Inc.,*
   306 F.3d 1247 (2d Cir. 2002).............................................................32

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
   169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................20

*Olson v. Major League Baseball,*
   29 F.4th 59 (2d Cir. 2022) ..................................................................34

*Pinks v. M&T Bank Corp.,*
   2017 WL 11773916 (S.D.N.Y. Mar. 31, 2017) ...............................37, 38

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
   *725 F.3d 244* (D.C. Cir. 2013)............................................................28

*In re Rezulin Prods. Liab. Litig.,*
   210 F.R.D. 61 (S.D.N.Y. 2002) ..........................................................38

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.,*
   2018 WL 679495 (S.D.N. Y. Feb. 1, 2018)......................................14, 38

*S.E.C. v. Cavanagh,*
   445 F.3d 105 (2d Cir. 2006).................................................................26

*S.E.C. v. Razmilovic,*
   783 F.3d 14 (2d Cir. 2013)..................................................................27

*Sejin Precision Indus. v. Citibank, N.A.,*
   2017 WL 4350323 (S.D.N.Y. June 28, 2017) ......................................37

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015)..................................................................................31

*Statler v. Dell, Inc.*,
    775 F. Supp. 2d 474 (E.D.N.Y. 2011) ................................................................36

*Tropical Sails Corp. v. Yext, Inc.*,
    2017 WL 1048086 (S.D.N.Y. Mar. 17, 2017) ....................................................35

*Vaccariello v. XM Satellite Radio, Inc.*,
    295 F.R.D. 62 (S.D.N.Y. 2013) ..........................................................................26

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..........................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................11

*Weiner v. Snapple Beverage Corp.*,
    2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ....................................................35

*Wing v. Metropolitan Life Ins. Co.*,
    2007 WL 9814564 (S.D.N.Y. May 31, 2007) ..............................................36, 37

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
    328 F. App'x 695 (2d Cir. 2009) ........................................................................36

**Statutes**

N.Y. CPLR § 202............................................................................................................37

N.Y. CPLR § 213(8)........................................................................................................36

**Rules**

Fed. R. Civ. P. 23(b)(3)..................................................................................................11

**Other Authorities**

*Wright & Miller's Federal Practice and Procedure* § 1768 (4th ed. 2025)...................17

Currenex, Inc. ("Currenex"), Goldman Sachs & Co. LLC ("Goldman Sachs"), HC Technologies, LLC ("HC Tech"), and State Street Bank and Trust Company ("State Street," and, collectively with Goldman Sachs and HC Tech, the "Trading Defendants"), and State Street Global Markets International Limited respectfully submit this opposition to the motion of XTX Markets Limited ("XTX") and DSquare Trading Limited ("DSquare" and, together, the "Named Plaintiffs") for class certification (ECF 390, the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs bill this case as a massive fraud in which, over a decade, secret tiebreaking privileges were assigned to the Trading Defendants so that they would "always win" price ties on the Currenex Platform, resulting in manipulated pricing on FX trades. But the factual premise necessary to that theory—*i.e.*, that Currenex operated a single central limit order book ("CLOB") in which all users of the Currenex Platform traded against all other users, and where the Trading Defendants won trades through secret tiebreaking rights—is false. Currenex did *not* operate a single CLOB; instead, the Platform had hundreds of separate liquidity packages where users traded. As Plaintiffs' own expert acknowledges, every user on the Platform had individualized liquidity packages, meaning each user only saw prices from and interacted with a subset of other users on the Platform depending largely on the user's own preferences. As a result, Trading Defendants were not even involved in the majority of trading activity on the Currenex Platform, because the majority of trading took place within liquidity packages that did not include the Trading Defendants. The Currenex data also conclusively shows that: price ties were rare, nearly all liquidity providers were given priority in the case of ties (not just Trading Defendants), and tiebreaking privileges assigned to Trading Defendants only came into play in a tiny fraction of cases—***less than one percent of trades on the Platform***.

These basic facts inexorably lead to the conclusion that class certification must be denied. *First*, individualized issues overwhelm any common ones, so Plaintiffs cannot satisfy Rule 23(a)(2)'s commonality requirement or Rule 23(b)(3)'s predominance requirement. The highly individualized nature of each user's trading on the Platform means that any claim—including the existence of any purported injury—must be adjudicated on an individual, not a class basis. Assessing whether the challenged tiebreaking rules, which only affected a trivially small amount of trading, had any impact (let alone a negative impact) on each particular Currenex user will raise a host of individualized questions. For example: Was the user even eligible to trade with a Trading Defendant? Were any of its trades impacted by tiebreaking priority settings? If so, how did those settings impact the execution it received on those trades? If the user was a liquidity provider, did its price streams ████████████████████████████ and did it win additional trades based on that priority? Did the user only trade on Currenex when it could obtain a better price on the Platform than was available on other eFX venues (as both Named Plaintiffs testified was their practice)? These individualized inquiries as to whether each class member was even injured would quickly overwhelm any common issues in this case. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 431 (S.D.N.Y. 2019) ("*Forex*") (denying certification based on individualized inquiries needed to assess which class members were impacted by alleged conduct). Accordingly, Plaintiffs cannot satisfy Rule 23's commonality and predominance requirements. *See infra* Section I.

*Second*, Plaintiffs' expert model is fundamentally flawed and cannot satisfy their burden to demonstrate injury to all class members. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 27–28 (2013) (reversing class certification where plaintiffs' damages model failed to isolate damages attributable to the sole surviving theory of liability); *In re Aluminum Warehousing Antitrust Litig.*,

336 F.R.D. 5, 49 (S.D.N.Y. 2020). The model put forth by Plaintiffs' expert suffers from the same fatal defects that courts in this district have identified as bars to class certification: it purports to measure effects on Currenex using data from other platforms, without any justification; it does not attempt to identify whether Defendants' conduct purportedly causing the injury actually occurred; it cannot tie any specific portion of the claimed damages to any particular alleged behavior; and it is otherwise riddled with errors, imprecision, and dubious logic. *See infra* Section II.

*Third*, Plaintiffs' fraud claims are not susceptible to common proof. To assess the validity of Plaintiffs' fraud claims, an individualized inquiry into each class member would be required to: establish class members' reliance on the alleged misrepresentations (which no Named Plaintiff read or saw); determine whether the statute of limitations has run (the two original named plaintiffs in this action ("Original Plaintiffs") voluntarily dismissed their claims to avoid individualized inquiry into their own notice of these claims); and resolve choice of law considerations (where each class member's domicile separately dictates the application of the substantive law of at least 60 different U.S. and foreign jurisdictions for various common law claims). Thus, any trial of this case would devolve into tangled factual and legal questions with respect to each class member's liability claim. *See infra* Section III.

*Fourth*, the Named Plaintiffs are atypical class representatives. XTX was a highly sophisticated and profitable actor which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and DSquare



▮▮▮▮ *See infra* Section IV. This Court should deny the Motion in its entirety.

## FACTUAL BACKGROUND

FX trading involves exchanging one currency for another in pairs at an agreed rate. One way FX trading occurs is on electronic communication networks ("ECNs"), which are electronic platforms that facilitate FX transactions between market participants. Currenex was an early

innovator that helped grow and democratize the electronic FX market by enabling quicker and more reliable trading and empowering a broad spectrum of parties to trade anonymously in FX spot transactions.  From its launch, the Currenex Platform provided its users with a highly customizable and bespoke trading environment that was informed by user preferences, preexisting trading relationships, credit limits, and numerous other factors.  Currenex was able to attract liquidity provider participation—a necessity for any FX platform—through features such as price stream prioritization and last look functionality.  Institutional FX traders of all types (including banks, hedge funds, high-frequency algorithmic traders, and retail investors) used the Platform for a host of reasons, while still trading concurrently on other FX trading venues.  Despite their protestations of harm in this litigation, ███████████████████████████████████ ████████████████████ and XTX ████████████████████.  Ex. 3, XTX 30(b)(6) Tr. at 45:12–18 (████████████████████████████████); Ex. 1, Reiss ¶ 101 (calculating that ████████████████████████████████████ ████████████████████████████████████).[1]

A.    Currenex Users Trade Through Individualized Liquidity Packages.

The Currenex electronic trading platform does not operate as a single CLOB.  Rather, Currenex offers a suite of FX trading products, including a bilateral ECN platform known as "FXTrades" (which the parties have referred to as the "Currenex Platform" or "the Platform") where a few hundred market participants of varying sophistication engage in FX spot transactions.  Orders on the Platform come primarily in two forms: (i) a market order, in which a participant

---

[1]  Unless otherwise noted, "Ex." refers to the exhibits attached to the Declaration of Alexander B. Simkin ("Simkin Decl."), filed herewith.  Unless otherwise indicated, all internal quotation marks and citations are omitted and all emphasis is added.

places an order to buy or sell at the best available price, or (ii) a limit order,[2] in which a participant

sets a maximum acceptable purchase price amount or a minimum acceptable sales price, with an

instruction to execute the order only if the currency pair hits that price. Ex. 1, Reiss ¶¶ 35–36. In

addition to placing orders, Currenex provides certain institutional users with the functionality to

"stream prices" by continuously sending real-time buy (bid) and sell (ask) quotes onto FXTrades

to be transacted against. "Liquidity providers" are market makers who offer to buy or sell at stated

prices, thereby increasing available trading opportunities. "Liquidity takers" place orders to trade

immediately on the Platform, decreasing trading opportunities. Parties, including the Trading

Defendants here, can and did act as both liquidity providers and liquidity takers.

During Plaintiffs' proposed class period (the "Class Period"), Currenex offered trading on

multiple sub-platforms (called "stacks"), including the two stacks that are covered by Plaintiffs'

proposed class definition: "PROD" and "PRET." Ex. 1, Reiss ¶ 32. The PROD stack was directed

primarily at institutional investors while PRET was used primarily by retail investors. *Id.* The

two operated as separate trading platforms, with different prices available on each. *Id.* While the

class definition includes the PRET stack, the data show that over 99% of taker accounts on PRET

received price streams from only a single market maker, so there were virtually no price ties on

the PRET stack and therefore Plaintiffs' allegations in this case would not apply. Ex. 1, Reiss ¶

78. Indeed, Plaintiffs' own expert did not ███████████████████████████████████████

████████████████████████ *Id.*; Ex. 4, Pirrong Tr. at 38:10–18, 40:1–41:1.

When a user created an account on Currenex, the Platform designed for the user a unique

liquidity package based on the user's execution requirements and preferences. Ex. 1, Reiss ¶¶ 42–

---

[2] Limit orders that are not matched immediately are sometimes referred to as "resting limit orders," since, unlike market orders, they may "rest" on the book until the pre-set price is obtained.

43, 48 (quoting Currenex Description of Services, at 8).  Currenex then dynamically updated these liquidity packages over time, in response to requests from the user and from liquidity providers themselves.  *Id.* ¶ 49.

Any Currenex user could see only the bids and offers within the user's unique liquidity package.  Ex. 4, Pirrong Tr. at 47:8–11.  Liquidity providers could not see quotes of other liquidity providers.  Ex. 1, Reiss ¶¶ 39, 84.  Most trades on the Platform took place in liquidity pools that did not include the Trading Defendants.  *Id.* ¶ 47.  On the PROD stack, 57.3% of trades took place in a liquidity package without any Trading Defendant.  Of the 82 liquidity providers streaming prices on Currenex between 2010 and the end of the Class Period, the three Trading Defendants were involved in only 13.8% of trades on either side, meaning 86.2% of trades had class members on both sides of the transaction.  *Id.* ¶ 66.  Only a mere 7.8% of trades on the Platform involved Trading Defendant price streams that had a favorable priority (*i.e.*, -1 or better), and many of those trades consisted of Trading Defendants trading with each other.  *Id.* ¶¶ 47, 57, 66.

B.  <u>Orders Were Matched Based on Best Price, Ties Were Rare, and Defendants' Tiebreaking Designations Almost Never Came into Play.</u>

When a participant submits an order on Currenex, the Platform's matching algorithm determines the best price available to that participant (*i.e.* within its liquidity package) from either a liquidity provider's price stream (priced on the market) or resting limit orders.  During the Class Period, most prices were set to the fifth decimal point.  Ties were accordingly rare, occurring in just 11% of eligible matches.  Ex. 1, Reiss ¶ 79.  When ties did occur, the Platform's matching algorithm assigned the trade to the liquidity provider with the more favorable priority designation (denoted by a lower numeric value).[3]  Ex. 1, Reiss ¶ 55.  The priority settings were implemented

---

[3]  The tiebreaking rule described was employed starting sometime before September 2011 until July 2014 on the PROD stack and until June 2015 on the PRET stack.  Ex. 8, Currenex 30(b)(6) Tr. (Kelly) at 41:10–22; 59:20–23.  In July 2014, the PROD stack switched to a first-in-first-out

to improve user experience, including by increasing trade execution rates. Ex. 7 (stating that "streams set at -2 and -3 are better performing lower reject streams."); Ex. 8, Currenex 30(b)(6) Tr. (Kelly) at 42:2–8; Ex. 9, State Street Bank 30(b)(6) Tr. at 39:20–40:8, 119:22–120:3 (explaining that poor fill rates make for "a poor experience for the end customers"); Ex. 10, Gilman Tr. at 48:6–16 (explaining that liquidity management "use[ed] priority [] to prioritize streams that work versus streams that don't work").

Critically, the priority designations at the center of Plaintiffs' allegations resulted in Trading Defendants winning a tie in a tiny fraction of trades—***just 0.86% of the time during a representative sample period.*** Ex. 1, Reiss ¶ 107. Notably, every liquidity provider on the Platform, including ████████████████████████████, and those settings varied by stream and changed throughout the Class Period. *Id.* ¶¶ 55, 57–58. Many liquidity providers received more favorable priority settings than the Trading Defendants at various points in time within the Class Period. *Id.* ¶¶ 57, 107, 173. ████████████████████████

████████████████████████████████████████████████████

████████████████.[4] In cases where ties involved liquidity providers with the same priority designation, the algorithm assigned the trade to whichever quote was submitted first in time. *Id.* ¶ 55.

### C.    Only Two Alleged Misrepresentations Remain.

Just two Currenex statements remain at issue in this case: (i) *Website landing page*— According to Plaintiffs, they and other market participants were led astray by a single sentence

___

matching logic, before switching again in 2015 to a "price-firmness-time" logic that prioritized "firm" orders over price streams. Ex. 11 at '306 (April 2015 disclosure); Ex. 12 at '133 (August 2015 disclosure). The PRET stack switched to "price-firmness-time" in June 2015.
[4] Ex. 1, Reiss ¶ 101. ████████████████████████████
████████████████████████████████████

that appeared on a landing page for "Orders" within the Currenex website from 2005 to 2014: "Limit Orders are filled automatically by the first counterparty bank to stream a price that matches the order." Ex. 13, Clarke Dep. Ex. 7. The statement, like the page it appears on, describes the handling of takers' orders, not liquidity providers' price streams. Nothing about the website landing page suggests that it even applies to the FX trading at issue in this case. For example, it does not reference "FXTrades" or the "anonymous" portion of Currenex's business relevant here. Plaintiffs do not dispute that, as accurately described in the statement, limit orders received no priority settings, or that liquidity-consuming orders were executed on a FIFO basis. Ex. 10, Gilman Tr. at 40:9–22. Further, no Plaintiff testified to even reviewing this language (and it does not appear in any document produced by any Plaintiff).

*(ii) 2011 printed brochure titled "Currenex for Active Traders"*—The relevant portion of the brochure (which no Plaintiff had in their files or testified to ever receiving) describes FXTrades as a "low-latency order matching engine with 'first in, first out' (FIFO) prioritizing." Ex. 14. The brochure itself is directed to high-speed traders, not liquidity providers streaming prices, and discovery has confirmed that this statement was directed at takers, not makers. Ex. 15, Smart Tr. (Aug. 27, 2025) at 159:16–23 ("████████████████████████████████████████ ████████████████████████████████████████████████████████"). This sentence, like the website landing page, refers to "order matching" (and not price streams) and it is undisputed that taker "orders" were subject to FIFO tiebreaking on the Currenex Platform at all times during the Class Period.

Discovery has also refuted Plaintiffs' omission theory. Each ECN facilitates transactions using its own proprietary trade execution methodology, which is also referred to in FX industry parlance as a "matching engine." Though Plaintiffs attempt to characterize FIFO tiebreaking as

the default in the industry during the entirety of the Class Period, discovery has shown that to be an inaccurate generalization. In fact, many different flavors of tiebreaking methodology were in use at different ECNs during different parts of the Class Period. Ex. 2, Ali ¶ 19; Ex. 4, Pirrong Tr. at 259:8–19 (explaining that a market participant ██████████████████████████████████ ████████████████████████████████████████████████ Plaintiffs' expert has conceded that ████████████████████████████████ ████████████████████████████████████████████████[5] Ex. 4, Pirrong Tr. at 263:4–14.

     D.    <u>Named Plaintiffs Are Sophisticated FX Market Participants.</u>

    *XTX Markets Limited.*    Named Plaintiff XTX Markets Limited is a market-leading algorithmic trading firm that acts as a liquidity provider and liquidity taker across numerous FX trading platforms. TAC ¶¶ 32–33. XTX is among the largest FX spot traders in the world by volume, TAC ¶ 33, and ██████████████████████████████████ ██████ Ex. 15, Smart Tr. (Aug. 27, 2025) at 72:25–73:6. XTX's ██████████████████████ ████████████████████████████████████████████████ ████████████████████████ Ex. 3, XTX 30(b)(6) Tr. at 111:5–19. XTX first ████████████████████████████████████████████████ Ex. 16. ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ Ex. 17; Ex. 18.

---

[5]  Tellingly, Plaintiffs cite no evidence to support their incorrect speculation that Currenex modified its tiebreaking methodology in the 2014 to 2015 time period in order to avoid disclosing it. Mot. at 1.

Though the crux of this case is alleged harm to liquidity *takers*, XTX ███████████████

███████████████████████████████████ Ex. 1, Reiss ¶ 127. ████████████████

███████████████████████████████████████████████████ *Id.* ¶¶

66, 127, 220. By virtue of its status as a major liquidity provider, XTX ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████[6] Ex. 15, Smart Tr. (Aug. 27, 2025) at 131:2–5; Ex. 1, Reiss ¶¶ 61–63, 101, 222. In

fact, XTX's Founder and CEO Alex Gerko ████████████████████████████

███████████████████████████████ Ex. 19; Ex. 5, Gerko Tr. at 184:6–10.

*DSquare Trading Limited.* Like XTX, Named Plaintiff DSquare Trading Limited is a

sophisticated algorithmic trading firm that ████████████████████████████

██████████████████████████ Ex. 20, DSquare 30(b)(6) Tr. at 173:22–174:7. From

███████████████████████████████████████████████████████████

██████ Ex. 21. █████████████████████ Ex. 20, DSquare 30(b)(6) Tr. 110:13–20.

Neither Named Plaintiff ████████████████████████████████████

███████████████

## LEGAL STANDARD

At the class certification stage, "a party seeking to maintain a class action 'must

affirmatively demonstrate his compliance' with Rule 23." *Comcast*, 569 U.S. at 33 (quoting *Wal-*

---

[6] Named Plaintiff XTX ████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)).  Indeed, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Id.* at 27–28.  Class plaintiffs must satisfy all four components of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *3 (S.D.N.Y. July 3, 2013).  Where, as here, plaintiffs seek certification under Rule 23(b)(3), they must also establish that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3).  Further, the Second Circuit "require[s] that district courts carefully examine, at the class certification stage, the soundness of an expert's model relied upon to establish classwide impact." *In re Aluminum*, 336 F.R.D. at 47.  Indeed, "the onus is on the [Plaintiffs], not defendants, 'to present a damages model that can be used on a class-wide basis based on common proof.'" *Id.* (quoting *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017)).

## ARGUMENT

### I.    PLAINTIFFS CANNOT SATISFY THEIR BURDEN UNDER RULE 23(A)(2) AND RULE 23(B)(3) TO SHOW THAT COMMON QUESTIONS EXIST AND PREDOMINATE.

While "[a]ny competently crafted class complaint literally raises common questions," Rule 23(a)(2) commonality requires that class plaintiffs demonstrate "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc.* 564 U.S. at 349–50.  Satisfying predominance under Rule 23(b)(3) requires proof of classwide injury: Plaintiffs "must 'show that they can prove, through common evidence, that all class members were…injured by the alleged conspiracy.'"  *In re Aluminum*, 336 F.R.D. at 45 (quoting *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 82 (2d Cir. 2015)).  Here, Plaintiffs cannot satisfy the Rule 23(a)(2) commonality or the Rule 23(b)(3) predominance requirements because

determining which class members were actually injured (if any) would entail a cascade of individualized inquiries.

      A.      <u>Assessing Whether Each Class Member Was Injured Requires Individualized Inquiries into Its Bespoke Liquidity Package and Each of Its Transactions.</u>

To show classwide injury, Plaintiffs hypothesize that Currenex's use of priorities was "anticompetitive" because "the Trading Defendants had no incentive to compete on [price]" since they could "watch the screen, and then swoop in at the last moment and grab any trade they wanted." TAC at ¶ 12. This theory fundamentally misunderstands how the Platform operated: Trading Defendants could not actually see and match others' prices on the Platform. Ex. 1, Reiss ¶¶ 76, 90.

Each Currenex user traded through a unique liquidity package, composed of a customized set of counterparties and price streams based on the user's preferences and the preferences of other users on the Platform, and which changed over time. Unlike venues that operate a single central limit order book (or a single market) where all users can see all bids and quotes placed by any other user, on Currenex each user traded only within its bespoke liquidity pool and could not view or access counterparties outside of that specific pool.[7] *See* Ex. 22 at '252—253 ███████

████████████████████████████████████████████████████████

████████████████ Ex. 1, Reiss ¶¶ 42–43. Plaintiffs' own expert, Dr. Craig Pirrong ("Pirrong"), acknowledged these realities of the Platform, but admitted at deposition that he did not perform any analysis of individual liquidity pools.[8] Defendants' expert, Prof. Peter Reiss

---

[7] To illustrate, there were 374 distinct liquidity packages on the average weekday between January 1, 2010 to July 21, 2014 on the PROD stack for trades involving Euros to the United States dollar, just a single currency pair. Ex. 1, Reiss ¶ 44.

[8] Ex. 4, Pirrong Tr. at 51:9–51:17 ████████████████████████████████████

████████████████████████████████████████████

("Reiss"), has conducted that analysis and established that most trading (57.3%) occurred in liquidity packages that did not include any Trading Defendant.  Ex. 1, Reiss ¶ 47.

The existence of hundreds of bespoke liquidity pools means that each class member will be differently situated.  Trading Defendants did not transact with all price takers or compete against all liquidity providers.  As a result, individualized inquiry into each user and each transaction will be necessary to assess if and how the alleged conspiracy had any impact on that particular user, particularly given how rarely the Trading Defendants' priority designations came into play.  At a minimum, the Court would need to determine for each user: (i) whether its individual liquidity package (which could change over time) included the Trading Defendants, (ii) whether any of the Trading Defendants' price streams in that liquidity package had favorable priority designations (which could also change over time), (iii) whether and how frequently Trading Defendants won trades based on such designations, (iv) the rate at which such matches were rejected or executed and how the counterparty responded to rejected trades, (v) whether the tiebreaking rules improved its execution quality on the platform, (vi) whether the user itself had favorable priority designations, and (vii) how frequently the user itself won trades based on such designations, among countless other questions.

When these types of individualized inquiries are needed to identify proper class members and affected transactions, courts in this Circuit have denied certification.  *See, e.g.*, *Forex*, 407 F. Supp. 3d at 433 (denying certification on predominance grounds where "individualized inquiries would be required to identify and exclude certain types of trades" which caused no injury to Plaintiffs and therefore could not "serve as a basis for liability"); *Benitez v. Valentino U.S.A.*, 2025 WL 560748, at *5 (S.D.N.Y. Feb. 20, 2025) (commonality not satisfied despite superficial similarities among plaintiffs because "[a] common question is not necessarily indicative of a

-13-

common answer"); *In re Int. Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *8 (S.D.N.Y. Dec. 15, 2023) (denying certification for lack of predominance where "presence of uninjured trades" demonstrated that classwide injury was not subject to common evidence); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 2018 WL 679495, at *5 (S.D.N. Y. Feb. 1, 2018) (denying certification for lack of predominance where the "individualized inquiry necessary to determine standing and class membership would undermine any economies achieved by class treatment"); *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (affirming decertification where "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim").

Plaintiffs tacitly acknowledge their difficulty showing classwide injury and try to circumvent it by arguing that injury can be shown on a classwide basis because "all class members were harmed by unjustly imposed fees." Mot. at 21–22. This approach puts the cart before the horse. If a user executed a transaction on the Platform, paying an agreed-upon fee to Currenex would only be "unjust" if the user received *no* value from the transaction after accounting for any harm attributable to the alleged conspiracy. *See Edelman v. Starwood Cap. Grp., LLC*, 70 A.D.3d 246, 250 (1st Dept. 2009). Far from identifying common evidence that each class member was harmed, as Plaintiffs must under Rule 23(b)(3), Plaintiffs' theory of injury implausibly asks the Court to assume that no class member benefited in any way from a single trade executed on the Platform. The notion that highly sophisticated FX traders, including Named Plaintiffs XTX and DSquare, traded for years on Currenex without receiving any benefit on a single transaction strains credulity.[9] But, even more importantly, proving the assertion that class members received no

---

[9] For example, as noted *supra*, named Plaintiffs ███████████████████████████████████████████ ██████████████████████████████████████████████████ It is unlikely, then, that they would continue to execute on a platform that provided no benefit.

benefit would require an individualized analysis of each trade transacted by each class member to identify the transactions that harmed them.   Further still, there is not even common evidence to establish the fees paid by Currenex users, since fee agreements were individually negotiated and varied considerably.  *See infra* Section II.B.

Plaintiffs' other fallback theories of harm—based on speculation by Plaintiffs' expert Pirrong about decreased competition, increased adverse selection and trade rejection costs that could have resulted from the alleged conspiracy—fare no better in identifying common evidence showing that each class member was actually injured as required under Rule 23(a)(2) and Rule 23(b)(3).  *See* Mot. at 23–26.  That is because Pirrong, by his own admission, performed no analysis of the key structural features of the Currenex platform.  He did not analyze any individual user's liquidity packages, did not analyze the frequency or prevalence of tiebreaking based on priority designations, and did not analyze actual observed spreads within any actual liquidity package.[10]

Pirrong conducts a regression analysis which purportedly demonstrates that spreads on Currenex during the Class Period were artificially wider compared to spreads during a later period due to the priority designations that Plaintiffs challenge in this case.  Pirrong at § IX.  Because Pirrong fails to analyze individual liquidity packages, however, he is not able to accurately assess when priority designations actually affected any individual transaction.  Across the millions of

---

[10]   Ex. 1, Reiss ¶¶ 69, 105, 149; Ex. 4, Pirrong Tr. at 57:10–14 ████

██████████████████████████████████ 1:9–51:17 ████████████████

██████████████████████ 389:25–390:5 ████████

██████████████████████████████████████████████████

transactions in the Currenex data over the decade-long Class Period, Pirrong only purports to identify two examples in his report of the alleged "line-jumping" that forms the basis for Plaintiffs' supposed multibillion-dollar damages claim in this case. Pirrong ¶¶ 61–64. Yet one of those two examples is not an example of line-jumping at all. *Id*. ¶¶ 63–64. That is because, as Reiss shows in his report, the supposedly "jumped" competing price shown by ████████ was not available to the user in question, because ████████ was not in that user's bespoke liquidity package. Ex. 1, Reiss ¶¶ 70–71. When asked about the role of liquidity packages at deposition, Pirrong admitted that priority may not have explained the example and it would be necessary to assess each user's liquidity package to determine when line-jumping had occurred.[11] In short, Pirrong's analysis and opinions ignore or misunderstand essential facts about how the Currenex Platform worked, including the very features that compel the need for individualized inquiry to assess whether each member of the putative class was actually harmed.[12]

B.    <u>Individualized Inquiries Are Also Necessary to Determine Whether Each Class Member's Unique Trading Behavior Impacted Whether They Suffered Any Injury.</u>

A class may not be certified where certain putative class members could have employed individual strategies that avoided any injury through the complained-of conduct, requiring an inquiry into which putative class members did so. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 3240044, at *9 (S.D.N.Y. Nov. 20, 2025) (finding lack of

---

[11] Ex. 4, Pirrong Tr. at 161:10–162:2 ████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[12] Pirrong's regression model also suffers from several methodological flaws which render it unreliable and independently defeat certification for the reasons explained in Section II.

predominance where expert's model "[did] not take into account whether some customers were able to negotiate away the purported overcharges[.]").  Pirrong's model makes no attempt to account for the wide spectrum of trading behaviors and strategies used by putative class members on the Platform that could have enabled them to avoid any harms attributable to the complained-of conduct.  For example, XTX representative



[13] Accordingly, XTX

Similarly, DSquare

[14]  Pirrong's analysis simply ignores

these individualized considerations and offers no way to address them.[15]

    C.    <u>Insurmountable Conflicts Within the Class Raise Additional Dispositive Predominance and Adequacy Concerns.</u>

Under both Rule 23(b)(3)'s predominance inquiry and Rule 23(a)(4)'s adequacy inquiry, class certification is improper where fundamental conflicts of interest divide members of the proposed class.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d

---

[13] *See* Ex. 15, Smart Tr. at 71:11–17 (Aug. 27, 2025)

*id.* at 97:18–20

[14] *See* Ex. 20, DSquare 30(b)(6) Tr. at 126:20–23 (Oct. 14, 2025)

[15] The Court will also need to conduct individualized inquiries to identify members who lack antitrust standing because antitrust injury cannot exist where class members "'actually tended to benefit' from the alleged conduct." *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987) (recognizing that benefits must be offset because plaintiffs "cannot choose to recover for [their] injuries yet retain [their] windfall.").

Cir. 2011); 7A *Wright & Miller's Federal Practice and Procedure* § 1768 (4th ed. 2025). Rule 23(b)(3)'s predominance inquiry tests whether a proposed class is "sufficiently cohesive" to warrant class treatment, holding that common issues of law or fact necessarily cannot predominate where conflicts exist among the class as a whole. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 546 (S.D.N.Y. 2018) ("*LIBOR VII*") ("a class action would be unmanageable given the extent of conflict between class members and the substantial individual questions of intent, causation, and damages."). Rule 23(a)(4)'s adequacy inquiry targets conflicts between named plaintiffs and the putative class, requiring that members of a class possess the same interests. *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013) ("To ensure that all members of the class are adequately represented, district courts must make sure that the members of the class possess the same interests, and that no fundamental conflicts exist among the members"). Here, conflicts preclude class certification under both Rule 23(b)(3) and Rule 23(a)(4).

The Trading Defendants took part in just 14% of transactions on the Platform during the putative Class Period. In the remaining 86% of trades during the Class Period, putative class members stood on both sides of the transaction and traded with each other. In FX trading, liquidity providers profit by capturing the spread between a currency pair's bid and ask prices. Pirrong ¶ 84; Ex. 1, Reiss ¶¶ 27, 66, 123. Therefore, each time one class member traded against another, the class member acting as liquidity *provider* captured the spread, and therefore would have *benefited* if spreads had widened artificially due to Defendants' alleged conduct. XTX ███████

████████████████████████████████████████████

████████████████████████████████████████████

Ex. 1, Reiss ¶ 130. Class members on opposite sides of the same trade would have directly conflicting incentives. Liquidity takers would argue that Defendants' conduct artificially widened

spreads greatly.  Meanwhile, liquidity makers, who benefited from wider spreads, would need to advance a theory of harm that treats spread-widening as an offsetting gain and therefore would seek to minimize any effect of Defendants' alleged conduct on spreads.  This trade-by-trade conflict is rampant, with only 2% of the trading volume on the Platform done by users who operated as takers only.  Ex. 1, Reiss ¶ 130.

Two recent cases from this district—both conspicuously absent from Plaintiffs' brief—confirm that the Court may not certify a putative class that features members that have "oppositional" trading positions.  First, *Libor VII* found that class members "with opposite net trading positions will have directly conflicting incentives." 299 F.Supp.3d at 539. Because "[d]irectional differences are particularly corrosive of adequacy in that they create directly conflicting incentives," the court declined to certify the class.  *Id.*  Second, in *Forex*, the court considered allegations that sophisticated FX trading counterparties had engaged in artificial spread-widening.  *Id.* at 426–27.  Judge Schofield declined to certify an "Exchange Class" due to the *exact same* conflict that is present here, finding: "oppositional trading positions taken by the Named Plaintiffs and class members would create fundamental conflicts that preclude class certification," and explaining that because a liquidity maker profits from wider spreads while a liquidity taker pays the spread, they have fundamentally misaligned incentives.  *Id.* at 439.  Courts elsewhere faced with conflicts among putative class members have done the same.  *See, e.g.*, *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) ("No circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the

-19-

named representatives of the class, let alone where some named plaintiffs derive such a benefit.").[16]

Beyond oppositional trading, conflicts exist because putative class members engaged in the very same conduct that Plaintiffs challenge in this action. Pirrong asserts that the Trading Defendants' use of priority rankings to break ties in combination with the exercise of last look rejection rights resulted in costs to others trading on the Platform. Ex. 1, Reiss ¶¶ 83, 133. But the Trading Defendants were far from the only ones with prioritized price streams and rejection rights. Scores of class members, ▇▇▇▇▇▇▇ had prioritized price streams and vigorously exercised last look rejections of their own to selectively reject millions upon millions of trades on the Platform that they deemed unfavorable.[17] Approximately 70% of the measurable trades rejected on the PROD stack using last look rights were attributable to members of the putative class, not to any of the Trading Defendants.[18] Ex. 1, Reiss ¶ 89, n. 199. That number is even

---

[16] Plaintiffs rely on two inapposite cases—*In re NASDAQ* and *Iowa Public Employees*, Mot. at 11—that do not feature the type of directly divergent interests present. In *In re NASDAQ*, the inclusion of both purchasers and sellers did not defeat certification because both groups claimed that they were harmed by larger spreads when buying or selling securities *directly with* the defendant market-makers. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 513 (S.D.N.Y. 1996). Similarly, in *Iowa Public Employees*, class-member borrowers and lenders *who transacted with the prime broker defendants* claimed that they faced higher operating costs regardless of their trading posture due to the alleged market-structure conspiracy. *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *9–10 (S.D.N.Y. Dec. 6, 2024). Here, by contrast, the putative class is not so limited, and instead sweeps up *all trades* by *all Platform users* including trades involving no Trading Defendant and even those who were never opposite the Trading Defendants at all. Under Plaintiffs' theory, any taker buying from any maker has every incentive to prove spreads were artificially widened (increasing the taker's damages), while the maker has the opposite incentive (because wider spreads increase the maker's gains). This class-member-versus-class-member conflict is fundamental—like in *Forex* and *LIBOR VII*—and bars certification.

[17] For example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[18] The trading data does not allow for reliable identification of last look rejections in the transaction data until April 2012. As a result, these figures reflect rejections between April 2012 and the end of the Class Period for each stack.

higher on the PRET stack, where 93.2% of trades rejected through last look were attributable to class members.  Ex. 1, Reiss ¶ 89, n. 199.  The fact that class members jumped *each other* in line to create increased adverse selection costs—the very conduct that Plaintiffs now complain of— creates a clear conflict that counsels against class certification.  *See In re Aluminum*, 336 F.R.D. at 39–40 (denying certification and observing that since class members "benefitted on the whole from—or *themselves engaged in*—the alleged conduct[,]" the plaintiffs "at a minimum … do not comfortably clear the Rule 23(a)(4) hurdle.").  Indeed, the principal for the Original Plaintiffs testified ███████████████████████████████████████████████████████████████ ███████████████████    Ex. 24, Edwards Tr. at 49:3–10.

## II.    PLAINTIFFS FAIL TO SHOW THAT DAMAGES CAN BE MEASURED ON A CLASSWIDE BASIS.

Pirrong purports to show classwide injury by conducting a statistical analysis of four metrics of Currenex "trading costs" during the Class Period as compared to a later period, across eleven currency pairs.  Pirrong at § VIII; Ex. 1, Reiss at § IX.  Pirrong's "trading cost" metrics purport to measure the spreads on Currenex, but none are based on actual bid-ask spreads quoted on the Platform.  Pirrong ¶ 154–160; Ex. 1, Reiss ¶ 148.  Ultimately, Pirrong concludes that Currenex spreads were wider during the Class Period.  Pirrong at § IX.  Pirrong speculates that the wider spreads were caused by the Trading Defendants' conduct, but he does not actually examine whether the Trading Defendants engaged in the behaviors that he describes.  Pirrong ¶ 106; Ex. 1, Reiss ¶ 80.

As Judge Engelmayer explained in *In re Aluminum*, "[a] flawed model may result in denial of class certification" for several reasons, including if the model "[1] measures harm not attributable to the conspiracy," [2] "masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class," [3] "yields false positives," or "[4] otherwise fails

to demonstrate with scientific rigor that classwide impact can be established through common proof[.]" 336 F.R.D. at 46. Any one of these flaws defeats class certification, and Pirrong's model suffers from all four.[19]

    A.    <u>Plaintiffs' Model Measures Harm Not Attributable to the Alleged Conduct.</u>

Plaintiffs' motion fails because Pirrong's model "measures harm not attributable to the conspiracy." *In re Aluminum*, 336 F.R.D. at 49. "[T]his inability to isolate the effects of the conspiracy at each point disqualifies the model from serving as classwide proof that the conspiracy caused antitrust impact at all relevant times." *Id*. at 57 (citing *Comcast*, 569 U.S. at 35).

*First*, Pirrong's analysis not only fails to engage with the way the Currenex Platform actually worked (as discussed above), it does not even attempt to measure the actual bid-ask spreads on the Platform itself. As Reiss explains, Currenex produced extensive data showing the bid and ask prices streamed by liquidity providers; as a result, it is possible to measure the actual spreads that Trading Defendants and other liquidity providers on Currenex were charging on each of the hundreds of different price streams that they provided on the Platform. Ex. 1, Reiss ¶¶ 150–151. Pirrong concedes, however, that he chose not to perform any such analysis.[20] Instead, his entire regression analysis is based on comparing prices on the Currenex Platform with midpoint

---

[19] Any argument that a defendant's choice not to file a *Daubert* motion at the Rule 23 stage somehow waives that defendant's ability to challenge an expert's opinions was raised and squarely rejected in *Comcast*. 569 U.S. at 32 n.4 (holding, as a preliminary matter, that petitioners' decision not to file a *Daubert* motion did not forfeit their objection that damages were not susceptible to classwide determination). In any event, the *Daubert* inquiry presents "a different issue from whether the [expert] opinion satisfies *Comcast*." *Allegra v. Luxottica Retail N.A.*, 341 F.R.D. 373, 445 (E.D.N.Y. 2022).

[20] Ex. 4, Pirrong Tr. at 374:9–23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pirrong claimed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. at 388:1–5.

prices drawn from two other eFX venues: EBS and Reuters.  Ex. 4, Pirrong Tr. at 400:19–401:19; *id.* at 389:20–390:16; Ex. 1, Reiss ¶¶ 151–152.

That comparison of prices across different venues introduces fundamental errors in the spread measurements in Pirrong's analysis.  There is no reason to believe that the EBS and Reuters prices would move in lockstep with Currenex prices at the exact same millisecond or that changes in prices on Currenex would instantaneously drive price movements on EBS and Reuters.  Pirrong himself testified that prices on these venues ████████████████████████████████ ██████████████████████████████████ Ex. 4, Pirrong Tr. at 418:23–419:2. Pirrong conceded he was ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████ Ex. 4, Pirrong Tr. at 403:8–12; 402:8–13.

Pirrong also conceded that the EBS and Reuters venues (which he asserts are not even within the same relevant market as Currenex, Pirrong ¶ 225) were subject to a variety of other market dynamics and market structure changes over the multi-year period that he analyzes.  For example, EBS and Reuters each had different user bases than Currenex, which changed significantly over time, and employed different rules (including tiebreaking rules and tick sizes), which also changed over time.  Pirrong conceded that he did nothing to exclude the possibility that such market structure changes contributed to the purported differences in spreads shown in his regression model.  Ex. 4, Pirrong Tr. at 419:3–10.  In short, as Reiss explains, Pirrong's regression analysis says nothing about what spreads existed on the Currenex Platform or if and how spreads changed after the end of the Class Period.  Ex. 1, Reiss ¶¶ 151–152.

*Second*, Pirrong admitted that his analysis cannot measure the portion of damages caused by Defendants' allegedly unlawful conduct.  Pirrong claims that Defendants imposed costs on class

members through three "channels" or types of improper behavior: (i) "cream skimming," whereby unfavorable trades were rejected using last look rights; (ii) "quote matching," whereby prices were streamed to tie, but not beat, an already-posted price on the Platform; and (iii) "skew leakage," whereby HC Tech purportedly gained informational advantages from its alleged use of a shared password to access the Platform.[21]   But Pirrong acknowledged at his deposition that he never assessed whether Trading Defendants actually engaged in any of these behaviors that purportedly caused the injury he sought to measure.[22]   As discussed above, the design of the Currenex platform—which Pirrong either misunderstood or ignored—actually made it impossible for Trading Defendants to engage in the behaviors that Pirrong speculates about.  For example, his "cream skimming" and "quote matching" theories are premised on the misunderstanding that the Trading Defendants could see the "best" prevailing bid and ask and thus tie the best price quoted by another liquidity provider so that they could "jump in line" ahead of that liquidity provider and "skim" only the most favorable trades.  In reality, the accounts that Trading Defendants used to stream prices could not see what prices were being streamed by any other liquidity providers, and the Trading Defendants' price-taker accounts only saw the prices being streamed to them by those in their individualized liquidity packages.  Ex. 1, Reiss ¶ 94.  It simply was not possible for any Trading Defendant (or, for that matter, any other liquidity provider) to identify the actual highest

---

[21]   Pirrong at § VII.A; Ex. 4, Pirrong Tr. at 325:17–25 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[22]   Ex. 4, Pirrong Tr. at 119:5–12 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

bid and lowest ask available across the Platform and therefore it also was not possible for them to "quote match" or "cream skim" in the way that Pirrong describes those behaviors.

Unsurprisingly (given that quote-matching and cream-skimming were impossible), Pirrong conceded that he also could not identify what portion of his damages calculations were attributable to each of the improper behaviors he hypothesizes in his report.[23]  There is every possibility that one or more of the three "channels" of harm identified by Pirrong will be discredited and rejected at summary judgment or trial.  In that event, Plaintiffs will be left with a proposed damages methodology that cannot reliably exclude the purported impact of the unproven conduct. Crucially, *any* attempt to disentangle those factors (which Pirrong himself articulated as the basis for *his* analysis) would require a highly individualized inquiry that should foreclose class certification. *See, e.g.*, *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 151 (S.D.N.Y., 2006) (denying certification where plaintiffs "offered no methodology that could prove that the price of a particular model of handset has increased as a result of defendants' tying and locking practices.").

*Third*, Plaintiffs' damages model does not isolate the economic impact of alleged undisclosed priority settings assigned only to the Trading Defendants.  Scores of other traders, ███████████████ and dozens of other liquidity providers who are putative class members, had streams with assigned priority and also exercised last look rights to reject trades on the Platform in the same manner that the Trading Defendants did.  If Plaintiffs' theory is to be credited, "jumping in line" activity and last look rejections by all of those traders *necessarily* impacted the remaining transaction flows on the Currenex Platform while they were in place.

---

[23]  Ex. 4, Pirrong Tr. at 330:20–24 ██████████████████ 40:16–341:1 ████████████████████████████████████████

Yet Pirrong does nothing to assess what portion of the purported damages he measures could have been caused by class members who were liquidity providers and received priority designations for their price streams, as compared to the portion allegedly caused by Trading Defendants. Instead, he simply attributes 100% of the purported harm he calculates to the three Trading Defendants. This, despite the fact that *70%* of the measurable trade rejections on the PROD stack during the Class Period resulted from class member last look rejections; *more than 93%* of the measurable trade rejections on the PRET stack resulted from class member last look rejections; and the three Trading Defendants accounted for just *22.3%* of total trades with class members on the PROD stack and *6.2%* on the PRET stack during the measurable period. Ex. 1, Reiss ¶¶ 66, 89, n. 199

B.    Plaintiffs' Model Masks Uninjured Class Members Through Averaging.

Class certification is precluded where a "flawed model . . . masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class." *In re Aluminum*, 336 F.R.D. at 49. Plaintiffs assert, without evidence, that all class members are entitled to disgorgement damages in the amount of brokerage fees paid to Currenex. Mot. at 22; Pirrong ¶ 210. In making that determination, Pirrong uses averages to mask uninjured class members.

On the claims here, disgorgement would only be available, if at all, under Plaintiffs' unjust enrichment count. *See S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (disgorgement is available not as compensatory damages but "to prevent wrongdoers from unjustly enriching themselves"). But unjust enrichment claims are ill-suited for class treatment because they entail myriad individualized inquiries that cannot be answered by common evidence. *See, e.g.*, *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68–69 (S.D.N.Y. 2013) (denying certification and finding that unjust enrichment claims created unwieldy individual inquiries). In order to assess whether any particular class member is eligible to receive disgorged profits, it must

be established that Defendants received a benefit at that class member's expense, which requires showing that a class member's trading activity on the Platform and costs of trading resulted in an overall loss, not an overall gain. *Rudell & Assocs., Inc.*, 215 A.D.3d at 596. Thus, a reliable disgorgement calculation would require: inquiry into each putative class member's year-by-year fee agreements—including any volume tiering, fee waivers, discounts/credits, staggered pricing for making and taking; a mapping of those fee structures to each class member's actual trading; and then a method for somehow backing out Currenex's associated costs to calculate any relevant Platform profits.[24] *S.E.C. v. Razmilovic*, 783 F.3d 14, 31 (2d Cir. 2013) (disgorgement applies to "illegally derived profits," not revenue).

In lieu of performing any of this work, Pirrong purports to calculate a "median estimate" fee among all Class Members (without taking any steps to confirm that the small subset of data that he relied upon for calculating that median was a representative sample), and applies that fee to the total dollar value (in the trillions) of transactions on the Platform. Pirrong ¶¶ 212–14. This approach impermissibly averages contract costs across Plaintiffs, "mask[ing] uninjured class members." *In re Aluminum*, 336 F.R.D. at 49; *see also In re Keurig*, 2025 WL 3240044, at *9–10 ("[A]veraging mechanisms" of this sort "cannot provide common answers to the question of whether class members were in fact harmed.").

Pirrong also masks uninjured Class Members through his regression analysis. Pirrong does not analyze "trading cost" for individual transactions, but instead analyzes average trading costs for each day, lumping together thousands of trades by hundreds of class members (using measures

---

[24] Pirrong considered just 35 cherry-picked agreements for his analysis, only 13 of which were with class members. He ignored the remainder of the more than 1,000 service agreements produced in this case, which reflect a wide variety of fee structures. Simkin Decl. ¶¶ 28–30; *see also, e.g.*, Ex. 25 at '7984 ████ Ex. 26 at '7315 ████ Ex. 27 at '8598 ████

of "trading costs" that do not reflect actual trading costs on Currenex, as explained).  Ex. 1, Reiss ¶ 149.  Further, Pirrong handpicks "outlier" trades to exclude from this averaging and even excludes full trading days from his analysis where he considers them to be "outlier" days.  *Id.*  As Reiss shows, averaging these trades masks the actual user-by-user variation which existed on the Currenex platform.  *Id.*  Pirrong's approach also assumes that all class member takers suffered harm equal to a fixed, constant percentage of their order prices at all times.  *Id.* ¶ 72.  By averaging across trades and across class members, Pirrong ignores variation among the class members.  Considering such variation would inevitably show that some class members were uninjured.

       C.      <u>Plaintiffs' Model Yields False Positives.</u>

Plaintiffs' motion must also fail because Pirrong's model yields false positives.  Where plaintiffs' methodology "detect[s] injury where none could exist . . . [it] would shred the plaintiffs' case for certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, *725 F.3d 244*, 252–53 (D.C. Cir. 2013).  Reiss demonstrates that Pirrong's model produces such false positives by applying Pirrong's regression to compare two halves of the "clean period."  Ex. 1, Reiss ¶¶ 184–185.  Applied in this way, Pirrong's model estimates statistically significant harm occurred to Plaintiffs during the clean period when, according to him, the at-issue conduct did not occur.  *Id.* at ¶ 184.  Because Pirrong's model generates false positives, his methodology is incapable of reliably identifying the effects of the alleged conduct.

       D.      <u>Plaintiffs' Model Fails to Demonstrate With Scientific Rigor that Classwide Impact Can Be Established Through Common Proof.</u>

Finally, class certification is precluded where a "flawed model… otherwise fails to demonstrate with scientific rigor that classwide impact can be established through common proof."  *In re Aluminum*, 336 F.R.D. at 49.  As laid out in the Reiss Report, Pirrong commits a host of other methodological errors in constructing his regression analysis, rendering it essentially meaningless.

As discussed more fully below, these failures include: a "clean" period that does not measure a "pure FIFO" system or capture the correct "but for world," and a failure to control or otherwise account for market environment changes and other technical FX trading variables. In short, Pirrong fails to control for obvious factors other than priorities that could have affected spreads and rejection rates on the Platform.

As an initial matter, Pirrong's claim that his analysis permits a comparison between the Class Period's "priority" system and a post-Class Period "pure FIFO" system (without priority) is demonstrably wrong. After the Class Period, Currenex did not move to a pure FIFO system at all. Instead, it implemented a *different* system that also employed priority settings to prioritize "firm liquidity" (*i.e.*, resting limit orders that did not have last look rights) over price streams that did have last look rights. Ex. 4, Pirrong Tr. at 123:15–22; 255:10–14. Pirrong claims that his analysis ██████████████████████████████████████████████████████████████████████████
████████ *Id.* at 84:7–19. But the baseline he uses is not a FIFO system either.

Just as fundamentally, Pirrong's regression analysis does not actually measure the impact of Currenex's supposed misrepresentation (*i.e.*, the alleged failure to disclose the use of priority to break ties). Calculating damages caused by a purported misrepresentation (or omission) requires measuring trading on the Platform in the "but-for" world (or "clean period") where the so-called tiebreaking rules were the same, but those rules were understood by all participants (*i.e.*, a world where there had been no alleged misrepresentations). Instead, Pirrong measures trading on the Platform against a supposed "clean period" where the tiebreaking rules—not the disclosure—differed. *See* Ex. 4, Pirrong Tr. at 206:8–17 (testifying that ████████████████████████████ ███████████████████████████████████████████████████████ is ██████████████ to his analysis); 205:18–206:7. In other words, Pirrong mistakenly measures the supposed "harm"

-29-

from using priority settings, not any harm from failing to disclose the use of priority settings, which is the basis of any fraud theory. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) (decertifying class because proving damages would require but-for inquiry into each consumer's behavior had it been disclosed that cigarettes were not as healthy as advertised); *LIBOR VII*, 299 F. Supp. 3d at 558–59, 573 (denying certification where damages model failed to identify the terms plaintiffs would have used in the but-for world where the truth was disclosed).

Pirrong also fails to control for overall changes in the market environment. At his deposition, Pirrong described how the eFX market changed in the years between the dirty and clean periods, for example through the introduction of hedge funds and high-frequency traders.[25] Pirrong specifically stated that ████████████████████████████████████ ██████████ Ex. 4, Pirrong Tr. at 414:14–16. However, defying logic, Pirrong does not control for this factor, or other changes to market structure between the dirty and clean periods, in his analysis.[26] It is entirely possible that the differences between the two periods could be attributable to market structure.

Pirrong's regression also fails to control for a host of additional potentially relevant technical variables. For example, Pirrong fails to control for the fact that, as his own report states, the "last look window" (*i.e.* the time in which liquidity providers could reject a trade) shortened

---

[25]  Ex. 4, Pirrong Tr. at 412:19–413:7 ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[26]  Ex. 4, Pirrong Tr. at 416:7–12
████████████████████████████████████████████████████

during the "clean" period.[27]  As Reiss explains, Pirrong's conclusion could be just as plausibly explained by the fact that, during the "dirty" period, liquidity providers had significantly more time to evaluate whether  to reject a trade.  Pirrong also fails to control for Swiss franc being pegged to the Euro from 2011 to 2015.  As Reiss demonstrates, controlling for that peg entirely reverses Pirrong's results for the USD/CHF currency pair.[28]

As a result of these errors, Pirrong's analysis fails entirely to isolate and identify any impact that might be attributable to the priority rules.  His calculations wholly fail to draw the comparison he claims between the alleged priority system and a but-for world in which those rules were absent.

## III.    INDIVIDUALIZED INQUIRIES ON CORE CLAIMS AND DEFENSES OVERWHELM ANY COMMON FACTUAL OR LEGAL QUESTIONS.

### A.    Reliance on Alleged Misrepresentations Cannot Be the Subject of General Proof

Despite its original framing as an antitrust violation, this case is now essentially a fraud action, which courts in this Circuit have long recognized are not well-suited for class adjudication (absent a "fraud on the market"-like presumption that has no application here).  *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) (affirming denial of certification and holding that certification in fraud-based cases is "quite difficult").  Chief among the reasons that courts routinely refuse certification in the fraud context is that the "element of reliance in a cause of action makes establishing predominance quite difficult."  *McKoy v. Trump Corp.*, 2023 WL 6842310, at *3 (S.D.N.Y. Oct. 17, 2023) (denying class certification on fraud claim); *see also Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 107 (E.D.N.Y. 2014) ("[T]he Second Circuit has required that the inference of reliance . . . be almost inescapable in order to support class certification of a fraud case.").  This

---

[27]  Pirrong also does not account for the fact that the last look period actually employed by liquidity providers varied from one liquidity provider to the next.  Decl. of B. Kelly, filed herewith, ¶ 30.

[28]  Reiss's Report cites other relevant controls that Pirrong's analysis omits.  Ex. 1, Reiss ¶ 183.

difficulty arises because, as the Second Circuit has held in decertifying a class that had already put forward "proof of . . . widespread and uniform misrepresentation," the "reliance on the misrepresentation[] *cannot be the subject of general proof.*"  *McLaughlin*, 522 F.3d at 223 (decertifying class on RICO claim).

            1.     *Plaintiffs Cannot Establish Common, Classwide Reliance on Affirmative Statements.*

From the outset, Plaintiffs have framed this case around purported affirmative misrepresentations that rely exclusively on egregious mischaracterizations of the record evidence. *See, e.g.*, ECF No. 1, Compl., ¶ 3 ("At various times during the class period, Currenex expressly represented to Plaintiffs and class members that the Platform's matching algorithm operated on a FIFO basis.").  While that theory was, predictably, undermined by discovery, it is in all events one that is not susceptible to classwide resolution.  Plaintiffs' core theory requires individualized inquires to evaluate (i) which members of the putative class—if any—so much as saw either of the two alleged misstatements left in the case; (ii) which members of the class interpreted them in the same (incorrect) way, as Plaintiffs here claim they did; and (iii) which members of the class even considered statements concerning the processing of price ties (which impacted a surpassingly small percentage of trades overall) material to their decision to trade on the Platform.

*First*, class certification of fraud claims is inappropriate absent classwide proof that each member of the putative class "personally received a material misrepresentation."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002).  Here, there is no documentary record of even any Named Plaintiff reviewing either challenged statement and no witness testified to any recollection of doing so; the most either Named Plaintiff could muster is that ███████████████

████████████████████████████████████████████████████████████

█████████████████  Ex. 23, Smart Tr. (Aug. 28, 2025) at 225:3–14; Ex. 20, DSquare 30(b)(6)

Tr. at 228:18–25; 238:15–22.  There is *no evidence* that *any* putative class member, let alone *every* putative class member, actually received the two alleged misstatements at issue and no possible way to establish whether they did or did not on a classwide basis.

    *Second*, determining what each plaintiff understood the statements to mean and what each plaintiff did in reliance on them requires individualized inquiry.  The statements describe *orders*, not price streams, and they cannot reasonably have been relied upon by the Named Plaintiffs to mean otherwise.  XTX's CEO, Alex Gerko, ███████████████████████████████

███████████████  Ex. 5, Gerko Tr. at 206:18–19.  XTX's Head of Distribution, Jeremy Smart,

███████████████████████████████████████████████████████████████

███████████████████████████████  *See* Ex. 15, Smart Tr. (Aug. 27, 2025) at 160:3–8.  Discovery has shown that Currenex made *other* statements regarding the Platform's order matching methodology in client-specific emails or meetings, necessitating an individualized inquiry into each putative plaintiff's engagement with Defendants.[29]  *See, e.g.*, *In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Pracs. Litig.*, 2015 WL 5730022, at *2 (S.D.N.Y. Sept. 30, 2015) (denying class certification when brochures with misrepresentations were not distributed uniformly to customers); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004) (denying class certification where examination of each cardholder's "understanding [of defendant's conversion fees disclosure] and whether it was justified" would entail individualized inquiries).

---

[29] *See, e.g.*, Ex. 28 ███████████████████████████████████████████
████████████████ Ex. 19 (Sears emailing ███████████████████████████ Ex. 29 ███████
Ex. 32 ████████████████████████████████████████████████

2.    *Plaintiffs' Omissions Theory Also Invites a Thicket of Individualized Inquiries.*

In the face of these difficulties, Plaintiffs appear to pivot to an omission theory of fraud. But Plaintiffs cannot seriously maintain that the tiebreaking methodology—which sampling has shown was used in less than 1% of FX transactions during the Class Period—is a "fact[] basic to the transaction" such that it was "assumed by the parties as a basis for the transaction itself" as is required to state a claim of "liability for non-disclosure" under New York law (especially in the face of an actual contract that is silent on tiebreaking). *Olson v. Major League Baseball*, 29 F.4th 59, 80–82 (2d Cir. 2022) (duty to disclose a "basic fact" applies only where plaintiff's ignorance "is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling" (quoting Restatement (Second) of Torts § 551(2))).

For starters, Plaintiffs' claimed assumption that the Platform was using FIFO was not a reasonable one under the circumstances. *See* Ex. 4, Pirrong Tr. at 259:13–19 ███████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ Many participants *prefer* ████████████████████ ███████████████████████████████████████████████████████████████████████ ████ Ex. 24, Edwards Tr. at 210:11–24; 238:23–239:3; 243:10–13; 299:20–300:18.  While Plaintiffs' other expert (who has not traded FX since 2003), David Woolcock, makes much of his (unsupported) guess that "[h]ad Currenex disclosed the use of employee-assigned ranking system, I would expect the platform to have collapsed," Woolcock Rpt., Ex. 2 to ECF No. 391 at ¶ 39, Pirrong has previously acknowledged that a system whereby ███████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████ Ex. 4, Pirrong Tr. at 274:3–7; 274:23–275:7.  For this reason, certification of "basic fact" omissions cases has been limited to the most egregious facts, such as when a product

containing *no* olive oil featured a clear "100% olive oil" label. *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 569 (S.D.N.Y. 2014). Courts have *declined* to certify in omissions cases where, for example, a service promising new business contacts "generated 'zero calls, zero inquiries, or zero leads,'" *Tropical Sails Corp. v. Yext, Inc.*, 2017 WL 1048086, at *7 (S.D.N.Y. Mar. 17, 2017), or where a product marketed as "All Natural" included high fructose corn syrup, *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010).

Even if some putative members were operating under the presumption of pure FIFO, the record indicates that many were not. Ex. 2, Ali ¶¶ 16, 19. At a minimum, the Court would need to inquire, as to each class member, whether any such presumption was reasonable based on what else they knew and what access they had. *See Emergent Cap. Inv. Mgmt. v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (when assessing reasonableness of reliance, the court must consider the "entire context of the transaction, including factors such as . . . the sophistication of the parties, and the content of any agreements between them."). Determining whether each class member reasonably relied on any presumption of strict FIFO would require an *ad hoc* inquiry on a member-by-member basis, defeating predominance.

B.    Statute of Limitations and Choice of Law Considerations Defeat Predominance.

1.    *Plaintiffs Face Individualized Inquiries on the Statute of Limitations.*

The Second Circuit has made clear that an assessment of predominance requires consideration of the "elements of the claims *and defenses* to be litigated." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015). As is now undisputed, the alleged conduct at issue stopped in July 2014 on the main "PROD" stack and June 2015 on the white-label "PRET" stack. Thus, *none of the alleged conduct* occurred within six years prior to bringing this lawsuit and the *only path* for the class members' fraud claims to fall within the statute of limitations period is for them to prove that they only discovered or could have discovered the alleged conduct within

two years of the instant suit.  N.Y. CPLR § 213(8).[30]  Application of such discovery rules "yields

splintering individualized questions."  *Wing v. Metropolitan Life Ins. Co.*, 2007 WL 9814564, at

*10 (S.D.N.Y. May 31, 2007).

　　That the statute of limitations defense requires an individualized inquiry in this case is laid

bare by the fact that the Original Plaintiffs in this action dismissed all their claims with prejudice

precisely because their belatedly produced emails with Velador (the "Velador Emails") proved

they had actual knowledge about the allegations in their complaint by no later than August 2018.

ECF No. 352, at 2.  The Court has already acknowledged that these Velador Emails bear on the

"viability of class certification" and may have "contributed, at least in part, to the now-dismissed

plaintiffs' decision to drop their claims."  *See* ECF No. 397.  The claims of at least one other

putative class member are clearly time-barred: those of Marney Capital Ltd., a Currenex Platform

user controlled by ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

---

[30]  Putative class members' claims under the other remaining causes of action are either clearly
untimely or otherwise would require individualized inquiry into their discovery efforts.  *See
Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (statute of limitations
period for aiding-and-abetting fraud is the same as that for fraud); *Martin Hilti Family Trust v.
Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 466 (S.D.N.Y. 2015) (unjust enrichment—three
years from the "occurrence of the wrongful act giving rise to a duty of restitution."); *Statler v. Dell,
Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) (claims under N.Y. GBL § 349—three years from
the time of injury); *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir.
2009) (civil RICO claims—four years from the time of discovery); *Levy v. BASF Metals Ltd.*, 755
F. App'x 29, 30 (2d Cir. 2018) (Sherman Act claims—four years from when "defendant
commit[ed] an act that injures [plaintiff]").

Plaintiffs recently submitted an affidavit from Mr. Marney in the UK that effectively

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Ex. 30 ¶ 5.  The need to identify the putative class members with whom Velador communicated and then examine the contents and timing of those discussions only exacerbates Plaintiffs' predominance problems.  *Wing*, 2007 WL 9814564, at *10.[31]

Moreover, the complexities of the statutes of limitations inquiries here would be exponentially compounded by the need to apply New York's "borrowing statute" to Plaintiffs' common law claims.  N.Y. CPLR § 202.  Under the borrowing statute, for each putative class member, the Court must apply the statutes of limitations of both New York and "the state where the cause of action accrued," *id.*, including the alternate state's "judicial interpretations of its limitation period and tolling doctrines," *Pinks v. M&T Bank Corp.*, 2017 WL 11773916, at *6 (S.D.N.Y. Mar. 31, 2017), *R. & R. adopted,* 2017 WL 11913847 (S.D.N.Y. July 17, 2017) (Kaplan, J).  Claims based on alleged economic losses (such as Plaintiffs') accrue "where the plaintiff resides," including for ex-U.S. plaintiffs.  *Sejin Precision Indus. v. Citibank, N.A.*, 2017 WL 4350323, at *3 (S.D.N.Y. June 28, 2017).  "[D]etermining an individual plaintiff's residence and then analyzing the law of the plaintiff's residence can quickly become an involved inquiry."  *Royal Park Invs.*, 2019 WL 652841, at *7; *Pinks*, 2017 WL 11773916, at *6; *see also Mogollon v. Bank of N.Y. Mellon*, 2025 WL 2244796, at *6 (N.D. Tex. Aug. 5, 2025) (denying class certification

---

[31]  Despite the Court directing such discovery in its November 3, 2025 Order, ECF No. 366, Velador has not produced a single document, and Plaintiffs have not offered dates for the deposition of any employee of Velador. Instead, Plaintiffs are resisting discovery in the UK, relying on the same privilege and relevance arguments this Court has already twice rejected.

where borrowing statute "would require fact-intensive discovery for the locations where each of the Plaintiffs resided at the time").

### 2.     Complex Choice-of-Law Issues Further Undermine Predominance.

For tort claims like fraud, New York courts apply the substantive law of the jurisdiction where the economic loss was sustained—*i.e.*, the plaintiff's domicile.  *In re Lois/USA, Inc.*, 264 B.R. 69, 108 (Bankr. S.D.N.Y. 2001) (applying New York law).  Courts in this district—including this Court—have denied class certification where the court would need to analyze the common law of an overwhelming number of jurisdictions to assess whether a putative class member had a claim.  *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70 (S.D.N.Y. 2002) (Kaplan, J.) (denying certification in part due to individualized inquiries in applying multiple jurisdictions' state law).  Platform service agreements reflect that class members resided in at least 21 U.S. states and territories and 40 foreign jurisdictions during the proposed Class Period.  *See* Simkin Decl. ¶ 38.  Plaintiffs' pivot to an omissions-based theory (driven by their attempt to avoid the intractable challenge of proving reliance on a classwide basis) only heightens the choice-of-law issues.  *In re Amla Litig.*, 282 F. Supp. 3d 751, 762 (S.D.N.Y. 2017) (denying certification because plaintiffs failed to harmonize differences in state law over whether and when a duty to disclose an omission exists); *see also Kottler*, 2010 WL 1221809, at *3 ("[V]ariations in State law regarding the elements and defenses of the underlying claims are fatal to class certification."); *see also Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 98–99 (2d Cir. 2018) (reversing and remanding for failure to consider choice-of-law issues in Rule 23 analysis).

## IV.     **THE NAMED PLAINTIFFS ARE ATYPICAL CLASS REPRESENTATIVES.**

### A.     XTX is An Atypical Class Representative.

XTX ██████████████████████████████ but, even assuming it can bring claims on behalf of putative predecessors, it is subject to the unique defense that—██████

-38-

███████████████████████████████████████ and as one of the most sophisticated FX traders in the world—it knew or should have known that Currenex was using "queue priority" to break ties. *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234–35 (2d Cir. 2006); *Grumman Allied Indus., v. Rohr Indus.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."). Below is a sampling of facts ██████████████████████████████████████████



As one of the most sophisticated and profitable algorithmic FX trading entities in the world, XTX ████████████████████████████████████████. Ex. 31, Schonberg Tr. at 121:23–122:24 ███████████████████████████████████████ ██████████████████████

Moreover, XTX's CEO and Head of Distribution ████████████████████████ ██████████████████ Ex. 15, Smart Tr. (Aug. 27, 2025) at 156:14–157:3; Ex. 5, Gerko Tr. at 41:1–6. It will therefore be subject to the argument that it is not eligible to represent a class of those who suffered only losses. *See Gatt Commc'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 76 (2d Cir. 2013) (to establish antitrust injury, plaintiffs must be able to demonstrate that they are "in a

'worse position' as a consequence of the defendant's conduct.") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977)).

B.    <u>DSquare Is Also Atypical.</u>

DSquare ███████████████████████████████████ but even assuming it can bring claims on behalf of putative predecessors, ████████████████████████████ ████████████████████████████████████████████████████████ ███████ *See* Ex. 32 ██████████████████████████████████ ████████████████████████████████████████████████████████ DSquare also is atypical ████████████████████████████████ ███████ Ex. 20, DSquare 30(b)(6) Tr. at 180:15–17. ██████████████ ████████████████████████████████████████ Ex. 1, Reiss ¶ 226. ████████████████████████████████████████████████████████ █████████████████████████████████████ The artificial spread widening alleged by Plaintiffs in this action would tend to *create* those currency misalignments, Ex. 20, DSquare 30(b)(6) Tr. at 126:24–127:8, thus allowing DSquare to *benefit* at the expense of class members. ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ Ex. 1, Reiss ¶ 128.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that this Court deny Plaintiffs' Motion.

DATED:  January 13, 2026
       New York, New York

ROPES & GRAY LLP

/s/ Alexander B. Simkin
Gregg L. Weiner
Alexander B. Simkin
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-5000
Facsimile: (212) 596-9090
Email: gregg.weiner@ropesgray.com
Email: alexander.simkin@ropesgray.com

Robert G. Jones (*pro hac vice*)
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951 7000
Facsimile: (617) 951 7050
Email: robert.jones@ropesgray.com

Samer Musallam (*pro hac vice*)
2099 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
Email: samer.musallam@ropesgray.com

*Counsel for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

KATTEN MUCHIN ROSENMAN LLP

/s/ Peter G. Wilson
Peter G. Wilson
525 W Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Email: peter.wilson@katten.com

*Counsel for Defendant HC Technologies, LLC*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Carmine D. Boccuzzi Jr.
Carmine D. Boccuzzi Jr.
Rishi N. Zutshi
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Email: cboccuzzi@cgsh.com
Email: rzutshi@cgsh.com

*Counsel for Defendant Goldman Sachs & Co. LLC*