**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| EDMAR FINANCIAL COMPANY, LLC; IRISH BLUE & GOLD, INC; XTX MARKETS LIMITED; and DSQUARE TRADING LIMITED, <br><br> Plaintiffs, <br><br> vs. <br><br> CURRENEX, INC.; GOLDMAN SACHS & CO. LLC; HC TECHNOLOGIES, LLC; STATE STREET BANK AND TRUST COMPANY; STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED; and JOHN DOE DEFENDANTS 1-5, <br><br> Defendants. | Case No. 21-cv-06598 |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .........................................................................................................................3

I.    COMMON QUESTIONS EXIST AND PREDOMINATE ...........................................3

    A.    Assessing Whether Class Members Were Impacted Does Not Require Individualized Inquiry ...........................................................................4

        1.    Defendants' focus on unimpacted **trades** misses the point—all **class members** were impacted ..............................................................4

        2.    The existence of "bespoke liquidity packages" does not create individual issues ...........................................................................5

        3.    The tiebreaking system went beyond specific Trading Defendant transactions—"privity" is not required ...........................................5

        4.    Tie-breaking advantages incredibly valuable, even absent perfect "top of book" knowledge ...................................................................6

        5.    A reasonable juror could reject the "too small to matter" hypothesis ...........................................................................................7

        6.    Class members were commonly impacted by paying for one thing, but getting something different ...................................................9

    B.    There Was No Way to Avoid Being Impacted By a *Secret*, All-Present System ..............................................................................................9

    C.    There Is No Fundamental Conflict: Makers and Takers *Both* Want to Demonstrate Artificially Wide Spreads ......................................................10

II.    PLAINTIFFS CAN SHOW DAMAGES ON A CLASS-WIDE BASIS ..........................11

    A.    The Regression Reasonably Measures Increased Trading Costs...........................11

    B.    Multiplying Median Rates By Relevant Volume Reasonable Measures Fee-Related Harm ...................................................................................15

III.    THE LEGAL ELEMENTS OF FRAUD CAN BE SHOWN USING COMMON EVIDENCE ...........................................................................................................16

    A.    Class-wide Evidence Demonstrates Reasonable Reliance and Actionable Statements and Omissions...........................................................................16

        1.    This is not a "strict FIFO" case—Reliance is common because no rational trader would tolerate the secret employee-assignment system ...........................................................................................16

        2.    The duty-to-disclose element confirms common issues predominate ...................................................................................18

        3.    Plaintiffs also have viable affirmative-statement claims ...........................18

B.    The Statute of Limitations and Choice of Law Issues Do Not Defeat Predominance ...........................................................................................20

1.    Defendants' limitations argument is exceedingly narrow, only confirming this issue cannot defeat predominance ....................20

2.    There are no choice-of-law issues that defeat predominance ..................21

(a)    New York has the greatest interest in regulating the fraudulent conduct emanating from New York ............................21

(b)    This was so clearly fraud by any definition that no hypothetical differences between (irrelevant) jurisdictions will matter ........................................................................................23

IV.    THE NAMED PLAINTIFFS ARE TYPICAL REPRESENTATIVES ............................25

V.    GOLDMAN'S SEPARATE ARGUMENTS DO NOT WARRANT CARVING THEM OUT OF THE CERTIFIED CLASS ........................................................27

A.    Whether the *FOREX* Release Applies—It Does Not—Is Itself a Common Question ........................................................................................27

B.    Goldman's Trading Does Not Create "Individual Issues" .....................................29

CONCLUSION .........................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*AHW Inv. P'ship v. Citigroup Inc.*,
   980 F. Supp. 2d 510 (S.D.N.Y. 2013), *aff'd sub nom. AHW Inv. P'ship, MFS,
   Inc. v. Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016) ................................................21

*Allapattah Servs., Inc. v. Exxon Corp.*,
   333 F.3d 1248 (11th Cir. 2003) ...........................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ...............................................................................12

*Amusement Indus., Inc. v. Stern*,
   693 F. Supp. 2d 327 (S.D.N.Y. 2010) (Kaplan, J.) ................................................22

*Anwar v. Fairfield Greenwich Ltd.*,
   306 F.R.D. 134 (S.D.N.Y. 2015) ...........................................................................19

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) .....................................................................23

*In re Avon Anti-Aging Skincare Creams & Products Marketing & Sales Practices
   Litig.*,
   2015 WL 5730022 (Sept. 30, 2015) .........................................................................19

*Benitez v. Valentino U.S.A., Inc.*,
   2025 WL 560748 (S.D.N.Y. Feb. 20, 2025)...........................................................8-9

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946) ...............................................................................................11

*City of Philadelphia v. Banc of Am. Sec. LLC*,
   2025 WL 2180607 (2d Cir. Aug. 1, 2025).......................................................3, 9, 14

*In re Cordis Corp. Pacemaker Prod. Liab. Litig.*,
   1992 WL 754061 (S.D. Ohio Dec. 23, 1993) ........................................................24

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ...................................................................23

*In re Currency Conversion Fee Antitrust Litig.*,
   230 F.R.D. 303 (S.D.N.Y. 2004).............................................................................20

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015).............................................................................14

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ................................................................26

*Edelman v. Starwood Capital Group, LLC*,
    70 A.D.3d 246 (2009) ..............................................................................9

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
    2023 WL 3570017 (S.D.N.Y. May 18, 2023) ....................................18, 28

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    Case No. 1:13-cv-07789 (S.D.N.Y. 2019) ................................................27

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) ...................................................8, 11

*Freeland v. AT & T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) ..............................................................12

*Ge Dandong v. Pinnacle Performance Ltd.*,
    2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) .....................................16, 24

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
    300 F.R.D. 90 (E.D.N.Y. 2014) ...............................................................17

*Grace v. Apple, Inc.*,
    328 F.R.D. 320 (N.D. Cal. 2018) .............................................................24

*Hickory Sec. Ltd. v. Republic of Argentina*,
    493 F. App'x 156 (2d Cir. 2012) ..............................................................15

*In re Industrial Diamond Antitrust Litig.*,
    167 F.R.D. 374, 384 (S.D.N.Y. 1996) ......................................................29

*In re Interest Rate Swaps Antitrust Litig.*,
    2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) ............................................9

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ............................................14

*Johnson v. Nextel Commc'ns Inc.*,
    780 F3d 128 (2d Cir. 2015) .....................................................................21

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2025 WL 3240044 (S.D.N.Y. Nov. 20, 2025)............................................9

*Kottler v. Deutsche Bank AG*,
    2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ..........................................26

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................11, 12

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   672 F.3d 155 (2d Cir. 2012) ............................................................................22

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) ............................................................................10

*In re Lois/USA, Inc.*,
   264 B.R. 69 (Bankr. S.D.N.Y. 2001) ..............................................................22

*Mazzei v. Money Store*,
   829 F.3d 260 (2d Cir. 2016) ..............................................................................8

*McKoy v. Trump Corp.*,
   2023 WL 6842310 (S.D.N.Y. Oct. 17, 2023) ..................................................17

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ......................................................................12, 17

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018) ............................................................13

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................ 4, 11, 20

*National Union Fire Ins. Co. of Pittsburgh, PA v. Rudell & Assocs.*,
   215 A.D.3d 595 (2023) ....................................................................................16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................................................14

*Pinks v. M&T Bank Corp.*,
   2017 WL 11773916 (S.D.N.Y. Mar. 31, 2017) ..............................................21

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ........................................................................13

*In re Refco Inc. Sec. Litig.*,
   892 F. Supp. 2d 534 (S.D.N.Y. 2012) ............................................................23

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   335 F.R.D. 1 (E.D.N.Y. 2020) ....................................................................4, 15

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ......................................................................11, 21

*Rodriguez v. It's Just Lunch, Intern.*,
　300 F.R.D. 125 (S.D.N.Y. 2014) ........................................................................ 19, 24

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*,
　2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) ........................................................... 9

*Sec. & Exch. Comm'n v. Sanchez-Diaz*,
　88 F.4th 81 (1st Cir. 2023) .............................................................................. 15-16

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
　806 F.3d 71 (2d Cir. 2015) .................................................................................. 17

*Spencer v. Hartford Fin. Servs. Grp.*,
　256 F.R.D. 284 (D. Conn. 2009) ..................................................................... 24, 25

*In re Takata Airbag Prod. Liab. Litig.*,
　348 F.R.D. 500 (S.D. Fla. 2025) .......................................................................... 25

*TBK Partners, Ltd. v. W. Union Corp.*,
　675 F.2d 456 (2d Cir. 1982) ................................................................................ 28

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
　612 F. Supp. 2d 267 (S.D.N.Y. 2009) .................................................................. 23

*Tsereteli v. Resid. Asset Sec. Trust 2006-A8*,
　283 F.R.D. 199 (S.D.N.Y. 2012) (Kaplan, J.) ....................................................... 25

*Tyson Foods, Inc. v. Bouaphakeo*,
　577 U.S. 442 (2016) ........................................................................................ 3, 14

*In re U.S. Foodservice Inc. Pricing Litig.*,
　729 F.3d 108 (2d Cir. 2013) ................................................................................ 19

*Vaccariello v. XM Satellite Radio, Inc.*,
　295 F.R.D. 62 (S.D.N.Y. 2013) ........................................................................... 16

*Valassis Commc'ns, Inc. v. News Corp.*,
　2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) .......................................................... 4

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
　396 F.3d 96 (2d Cir. 2005) .................................................................................. 28

*Wing v. Metro. Life Ins. Co.*,
　2007 WL 9814564 (S.D.N.Y. May 31, 2007) .................................................... 20, 21

*In re WorldCom, Inc. Sec. Litig.*,
　219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................... 10, 20

**Statutes**

New York General Business Law Section 349 ................................................................................ 16

RICO ............................................................................................................................................ 16

## PRELIMINARY STATEMENT

Defendants attack straw men built on a misrepresentation of what this case is about.  This is a case about *Currenex*, which (i) allowed employees, in secret, to assign priority numbers that determined who won when prices tied, and (ii) gave away passwords to favored traders.  Every user was subject to this system.  Every user paid fees for fair matching—and every user was secretly denied it.  Dr. Pirrong shows that every user faced increased trading costs.

Ignoring these core facts, Defendants stress "bespoke liquidity packages," count decimal places, cherry-pick figures like "0.86%," and imply that the rigged priority scheme had little or no effect.  Those efforts to downplay what happened ring hollow given the effort Currenex invested in managing the scheme, the fervor with which Trading Defendants monitored it, and the veil of secrecy surrounding it.  The "too small to matter" narrative also ignores the speed, frequency, and scale of FX trading.  As a famous hedge fund owner once remarked, "We're right 50.75% of the time . . . [Y]ou can make billions that way."[1]  Indeed, here, "only" 0.86% is still *nearly $1 trillion* in trades.  But even that severely understates the problem, as the 0.86% statistic is overly narrow, substantively meaningless, and drawn from a cherry-picked, narrow slice of data.  Dr. Pirrong explains how ties occur 24% of the time, and 100% of the "liquidity packages" involved liquidity providers that faced increased trading costs.

*First*, common questions predominate.  Defendants suggest otherwise by arguing not all *trades* were impacted.  They all were.  But the impact question is about *class members*, and every class member's "liquidity package" was subject to the secret practices at issue.  Defendants also argue a maker/taker "conflict" defeats certification.  But nearly all class

---

[1]  *See* Quartr, "Renaissance Technologies: The Highest-Performing Investment Firm in History," *available at* https://quartr.com/insights/edge/renaissance-technologies-and-the-medallion-fund (last visited Feb. 2, 2026).

members were at various times both makers and takers. Defendants' argument reduces to the claim that class members are conflicted with themselves. More fundamentally, spreads widened due to an increase in *costs*, and as Dr. Pirrong explains, an increase in costs benefits neither buyers or sellers. All class members have a common interest in maximizing aggregate damages.[2]

*Second*, on damages, both the standard before/after regression Dr. Pirrong performs, and a straightforward calculation of fees paid, provide ample basis for a jury to reasonably estimate aggregate damages. Courts routinely reject the generic "missing variable" and similar critiques as issues for the jury, not for certification. All the more so here, given Defendants do not challenge the admissibility of any expert opinion.

*Third*, the elements of Plaintiffs' fraud claim are resolvable with common evidence. To suggest otherwise, Defendants recast this case as one about "pure FIFO" versus "something other than pure FIFO." It is not. It is about Currenex's very specific—and very shocking—decision to empower employees to change the tiebreaking rules at their unfettered discretion, without disclosing such changes to Currenex users. No rational trader would stand for such behavior.

Defendants' remaining arguments fare no better. Certification of the following class should be granted: "All persons and entities who completed at least one spot foreign exchange trade on the Executable Streaming Prices portion of Currenex, Inc.'s platform using the PROD stack from January 1, 2005, to July 21, 2014. For the sake of clarity, this includes 'FXTrades,' OXO, OXP, and PXO transactions."[3]

---

[2] Defendants notably do not dispute superiority requirement. The core purpose of class actions—to ensure justice where individual suits would otherwise be prohibitive—is clearly met here. *See* Mot. 39-40. The complexity and commonality of the issues urge class treatment.

[3] Excluded from the class definition are (i) Caspar Marney; (ii) Marney Capital; and (iii) the exceptions in footnote 1 of the opening motion ("Mot.") (ECF 390).

**ARGUMENT**

**I.    COMMON QUESTIONS EXIST AND PREDOMINATE**

Calling this a "battle of the experts" gives Defendants too much credit.  Only Plaintiffs' economist, Dr. Pirrong, analyzed *years* of data for *multiple* currency pairs, and proffered fulsome, meaningful results.  By contrast, Defendants' expert, Prof. Reiss, used only one pair, from a cherry-picked month, as the basis to assert the usual litany of defense critiques, without showing a single one actually matters.  *See* Ex. 56 ("Pirrong Reply") ¶¶ 5, 36-39.[4]  Only Plaintiffs' industry expert, Mr. Woolcock, actually opines on how industry standards demand disclosure of the specific Currenex systems at issue, and how rational Platform users would react to learning the truth.  By contrast, Defendants' expert, Mr. Ali, testified he is "not here to opine on the Currenex Platform," had never read platform disclosures before this case, and "the first time [he] heard of tie breaking was in this case."  *See* Ex. 57 ("Woolcock Reply") ¶¶ 9, 21.

But the Court's task is not to resolve expert battles, no matter how lopsided they may be. *Defendants do not challenge the admissibility of any expert opinions* under *Daubert*.  Thus, the only question is whether a "reasonable juror could [] believe[]," based on the full record including the opinions of Plaintiffs' experts, that all or virtually all class members were impacted to some degree.  *City of Philadelphia v. Banc of Am. Sec. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.").[5]

---

[4]  "Ex. __" refers to exhibits attached to the February 13, 2026 Declaration of Daniel L. Brockett filed herewith.

[5]  Defendants hardly discuss the password-sharing claims at all.  They thus appear to concede those issues predominate.

### A.    Assessing Whether Class Members Were Impacted Does Not Require Individualized Inquiry

#### 1.    Defendants' focus on unimpacted **trades** misses the point—all **class members** were impacted

Defendants make a series of arguments suggesting a court would need to go trade-by-trade to determine which trades were impacted.  Defendants fail out of the gate for asking the wrong question.  Courts recognize the distinction between the fact of injury and damages; common impact exists so long as all *class members* were impacted on at least one transaction. *See, e.g.*, *Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *11-12 (S.D.N.Y. Feb. 21, 2019).  This means that, for impact, even *one* overcharge (or underpayment) suffices.  *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 29 (E.D.N.Y. 2020) ("there is no sound basis to conclude that any [class member] would not have been injured as it would have paid at least one overcharge").  Courts also recognize that "injury occurs the moment the purchaser incurs an overcharge" even if "injury is later offset."  *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 557 (S.D.N.Y. 2021) (citation omitted).[6]

Accordingly, the relevant inquiry is whether Plaintiffs have proffered evidence from which a reasonable juror could conclude that each *class member* was impacted on *at least* one FX trade.  A reasonable juror could easily reach that conclusion based on the record evidence, Dr. Pirrong's opinions and regression model, Mr. Woolcock's opinions, or any combination thereof.  Because Defendants do not even attempt to show that any class member escaped impact *every single time*, their "trade by trade" arguments go, at most, to damages.

---

[6]  Actually, there can be *some* unimpacted class members.  *Restasis*, 335 F.R.D. at 16 ("The Supreme Court and the Second Circuit have recognized that the existence of uninjured plaintiffs does not bar class certification.").

2.    *The existence of "liquidity packages" does not create individual issues*

Defendants stress that Currenex is not an all-to-all CLOB but instead uses "unique liquidity package[s]."  ECF 420 ("Opp.") at 12.  They argue Dr. Pirrong "misunderstood" this.  *Id.* at 24.  Dr. Pirrong did not "misunderstand" anything—he acknowledged ECNs like Currenex are not full all-to-all systems.  ECF 391-1 ("Pirrong Opening") ¶ 43.  Common impact nonetheless exits because *all* "packages" were subject to the tiebreaking system.  The tiebreaking algorithm was hard-wired into the Currenex source code, and operated Platform-wide.  The "bespoke packages" argument is thus a red herring.

Even ignoring the omnipresence of the tiebreaking system, Defendants fundamentally misconstrue how Currenex's system caused harm.  As Dr. Pirrong explains, economic theory predicts that the unfair tilt of the Platform will increase the adverse selection and other costs incurred by the *liquidity providers* first.  Pirrong Opening ¶¶ 112-116; Pirrong Reply ¶¶ 15, 16, n.2.  They would then carry these extra costs from package to package, spreading harm like a virus.  Pirrong Reply ¶¶ 16-18.  That is not just what the economic theory predicts—it is what Dr. Pirrong's model actually shows.  *E.g.*, Pirrong Reply ¶¶ 16-18, 55-60.

Notably, this causal mechanism also means the relevant question is not how many class members *traded directly with a Defendant*.  It is instead how many liquidity packages *included makers who were in competition with a Defendant*.  Dr. Pirrong estimates, unsurprisingly, that 100% of the so-called "liquidity packages" consisted of liquidity providers who were subjected to increased costs by trading alongside Trading Defendants.  Pirrong Reply ¶¶ 5, 6, 17.

3.    *The tiebreaking system went beyond specific Trading Defendant transactions—"privity" is not required*

Defendants argue there are individual questions as to how often each class member traded with a Trading Defendant.  Indeed, nearly their entire brief presupposes that Plaintiffs'

claims are privity-based.  *E.g.*, Opp. at 1-2, 7, 13, 15-16, 18.  They are not.  For the same reasons "liquidity packages" do not limit impact, neither do non-privity trades.  Again, the unfair tilt of the system raised the cost of rival liquidity providers, and those costs were then spread throughout the Platform.[7]  Because *every* trade has valuable economic information about the cost of providing liquidity, it would have been wholly inappropriate for Dr. Pirrong to limit his regression to just Trading Defendant transactions.  Pirrong Reply ¶¶ 15-17, 56-59.

> **4.**      <u>*Tiebreaking advantages are incredibly valuable, even absent perfect "top of book" knowledge*</u>

Defendants argue the Trading Defendants could not see other liquidity providers' quotes, so they could not "quote match" or "cream skim."  Opp. at 12, 24.  Defendants thus create a false dichotomy:  either traders had perfect knowledge, or the system had no impact.  That is wrong.  Pirrong Reply ¶¶ 22, 29, 40-43.[8]  While perfect knowledge might enable perfect exploitation, it does not follow that imperfect knowledge renders tiebreakers useless.  Even a blind advantage is incredibly valuable:  the casino makes money off roulette because the odds are tilted in its favor, even if it doesn't know in advance the result of every spin.

But Trading Defendants did not act blindly, and quotes are not distributed randomly.  Pirrong Reply ¶¶ 25-28.  Even if they did not know with 100% certainty 100% of the time, Trading Defendants were especially well-positioned to match top-of-book quotes.  This is true because (i) they had access to dozens of streams on the Currenex Platform through their taker

---

[7]   Though counting the connections between takers and Trading Defendants is irrelevant as discussed above, notably ███████████████████████████████████████████  *See* Ex. 58 (CXSSB00562048) at '051 (███████████████████████████████████████████████████ ████████████████).  Moreover, while Prof. Reiss stresses the number of *accounts* that did not trade with a Trading Defendant, he ignores that class members routinely use numerous accounts.

[8]   There is substantial evidence that Trading Defendants in fact knew far more about the Platform's operations than other liquidity providers.  *See, e.g.*, Pirrong Reply ¶¶ 30-31, 48-50.

accounts, (ii) they had access to extensive market information from other platforms and their own trading, and (iii) State Street and HC Tech were granted preferential rights. Pirrong Reply ¶¶ 25-28, 31-32, 34. Indeed, while Defendants suggest that five decimals is a too-small target without full visibility (ECF 421-1 (Reiss Report) at 6 n.14), a three-year, ten-currency-pair analysis carried out by Dr. Pirrong confirms ties occurred roughly 26% of the time—with a Trading Defendant at the top 24% of the time. Pirrong Reply ¶¶ 5, 41-44. Defendants' "impossibility" defense cannot be squared with the evidence or the data.

5.    _A reasonable juror could reject the "too small to matter" hypothesis_

Defendants posit that Trading Defendants did not "jump in line" often enough to matter. Opp. at 1, 6. As Dr. Pirrong explains, Prof. Reiss' "0.86%" assertion is blatantly cherry-picked and fundamentally unsound. Pirrong Reply ¶¶ 36-39. Using a multi-year analysis of multiple currency pairs—rather than a few-weeks look at one currency pair—Dr. Pirrong found that ties occur 24% of the time, and ██████████████████████████████████████████

██████████████████████  _Id._ ¶¶ 42-45.[9]  To obtain ████ more volume—on a first-look basis, meaning that was the "cream"—without having to offer any price improvements, matters. Indeed, it is _six times higher_ than the rate at which class members jumped over each other.

Nothing is "small" in the FX market. Across so many transactions, even tiny advantages pile up and cause great distortions in outcomes. Even taking 0.86% as a relevant number—it is not—0.86% of the class-period volume is still nearly _$1 trillion_. Pirrong Reply ¶¶ 44-49. While Defendants suggest Plaintiffs' damages demand is too high, even a full award of $2.4 billion

---

[9]  Goldman insists it did not have favorable priorities during the later years for which this data is available.

would be a mere 0.0022% of the matched volume. *Id.* Defendants' assertion that the advantage here was too small to matter collapses in the face of market realities.

For his part, Prof. Reiss echoed Defendants, claiming ████████████████████ ██████████ Ex. 59 (Reiss Tr.) at 266:16-25; 126:2-6. But he admitted to ███████████ ████████████████████████████████████████████ *Id.* at 266:16-25. As Dr. Pirrong explains, that is junk science—one cannot simply presume a number is "too small" without running any tests. Pirrong Reply ¶¶ 45-48. One who believes that 2 nanograms of botulism is too small to matter would not live to regret the error. Dr. Pirrong's regression finds statistically significant differences when the challenged Currenex practices were in place, versus when they were not. The data thus refutes the notion that tiebreaking "didn't matter."

This is ultimately a question for the jury, who will consider not just dueling numbers, but the manifest disconnect between what Defendants *now say* and how they *actually acted*. A reasonable juror may ask: If the system was impossible to leverage—or too small to matter— why did Currenex invest so much in creating and maintaining it? Why did the Trading Defendants pay higher fees to participate? Why did Rosenwald panic and threaten to pull liquidity when HC Tech's privileged ranking was removed? Most tellingly, *why did Currenex keep it secret*? The obvious answers confirm the system very much mattered. *E.g.*, Mot. at 4-7, 18-21 (gathering cites); Pirrong Reply ¶¶ 50-51 (discussing "revealed preferences").[10]

---

[10]    In each of the cases cited by Defendants, there was a clear—often, undisputed— dispositive element that could not be resolved with common evidence. As discussed above, that simply cannot be said to be true of the "liquidity package" or any other issue. *See Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (claims required showing of privity, but at trial plaintiff failed to show class members were in privity); *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 407 F. Supp. 3d 422, 433-436 (S.D.N.Y. 2019) ("*FOREX*") (undisputed that portions of the transactions were outside the court's jurisdiction, the claims were privity-based, and certain transaction types were immune); *Benitez v. Valentino U.S.A., Inc.*,

6.    *Class members were commonly impacted by paying for one thing, but getting something different*

The arguments above deal with the forms of damage captured by the regression analysis—wider spreads, increased trading costs, etc.  But class members also were injured by paying fees for a fair trading environment, but instead getting a rigged Platform.

Defendants argue (Opp. at 14) that *Edelman v. Starwood Capital Group, LLC*, 70 A.D.3d 246 (2009), requires Plaintiffs to show "no value" was received.  But there, *no* money was paid by the plaintiff to the defendant.  *Id.* at 250.  Here, fees were paid directly by each class member to Currenex.  Defendants' "no value" argument therefore lacks legal footing.  In any event, the fact that each class member paid fees is itself sufficient to establish that every class member was *impacted* at least once.  Whether, legally, Currenex may keep all, some, or none of those fees is a common question that goes, at most, to the amount of damages.

**B.    There Was No Way to Avoid Being Impacted by a *Secret*, Platform-Wide System**

Defendants hypothesize that class members could avoid impact by employing strategies to avoid unfair pricing on Currenex.  Opp. at 16-17.  They cite *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 2025 WL 3240044, at *10 (S.D.N.Y. Nov. 20, 2025), where certain retailers could negotiate away price hikes, such that the plaintiffs' expert admitted that some class members might therefore have avoided any overcharges.  But the tiebreaking

---

2025 WL 560748, at *6 (S.D.N.Y. Feb. 20, 2025) (insufficient showing compensation was set using a common policy); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 2018 WL 679495, at *3 (S.D.N.Y. Feb. 1, 2018) (class failed because many plaintiffs purchased interests in securities at issue *after* the wrongdoing, creating individualized issues of harm ).  Defendants also cite *In re Interest Rate Swaps Antitrust Litigation*, 2023 WL 8675625, at *6 (S.D.N.Y. Dec. 15, 2023), but the court there explicitly resolved disputes between the experts—something the Second Circuit later confirmed is inappropriate.  *City of Philadelphia,* 2025 WL 2180607, at *3.  In any event, the core issue in *In re Interest Rate Swaps* was an analysis of the full dataset which found 23%-29% of the class was unimpacted.  *In re Interest Rate Swaps*, 2023 WL 8675625, at *7.

system was secret—class members could not bargain for its removal. Nor could they devise trading strategies to avoid something they did not know existed. More fundamentally, the omnipresence of the tiebreaking system and the viral nature of its impact means the only way to escape impact was to not trade on Currenex at all. Pirrong Reply ¶¶ 16-17, 58-59.[11]

### C.    There Is No Fundamental Conflict:  Makers and Takers *Both* Want to Demonstrate Artificially Wide Spreads

Defendants trot out a standard maker/taker conflict argument. Opp. at 17-21. But class-disabling conflicts—rarely found—must go to the "very heart of the litigation." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 256 n.9 (2d Cir. 2011) (citation omitted). Courts routinely treat maker/taker differences as an allocation issue, not a disabling conflict. Mot. at 11-12 (gathering cases).[12] But here, there is no tension, let alone a fundamental conflict. Nearly all class members acted at various times as both makers and takers. Opp. at 19. Defendants' argument thus reduces to the assertion that class members are conflicted with themselves.[13]

Defendants assert there is a conflict anyway because wider spreads supposedly represent "gains" to the makers, which would purportedly conflict with the interests of takers who want to prove narrower spreads. Opp. at 19, 20 n.20. But wider spreads do *not* represent "gains" to

---

[11]  Defendants claim the decision to trade on Currenex may indicate the price for that trade was better on Currenex than elsewhere *in the real-world*. Opp. at 17. Even putting aside the false depiction of how XTX operates, *see* ECF No. 246 (XTX "does not use" any system to choose between one platform or another based on price), the relevant comparison is whether class members would have been better *off in the but-for world*. Dr. Pirrong shows just that.

[12]  *See also, e.g., Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258-9 (11th Cir. 2003); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 302 (S.D.N.Y. 2003).

[13]  Defendants also assert that "putative class members engaged in the very same conduct that Plaintiffs challenge." Opp. 20. But this is patently untrue. The challenged conduct is the Currenex tiebreaking system. Trading Defendants' separate liability stems from their knowing trading on and exploitation of that system. That class members *unwittingly* traded on the Platform does not negate Defendants' culpability.

anyone when, as here, they are the result of increased costs.  Pirrong Opening ¶¶ 129-33; Pirrong Reply ¶¶ 19, 66-67.  Increased costs harm buyers *and* sellers.  *Id.*  The assertion that makers would want to "minimize" the measurement of costs makes no sense, as all class members share an interest in *maximizing* recovery tied to increased trading costs.  Plaintiffs have put forth over $1 billion in regression-measured damages.  Do Defendants believe the true number is *higher*?[14]

## II.    PLAINTIFFS CAN SHOW DAMAGES ON A CLASS-WIDE BASIS

### A.    The Regression Reasonably Measures Increased Trading Costs

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946).  Only a "just and reasonable" estimate of damages is required.  *Id.*  In line with such leeway, it is "well-established" that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *Namenda*, 338 F.R.D. at 551 ("Typically, common issues predominate when liability is determinable on a class-wide basis, *even where class members have individualized damages*.") (emphasis in original).

Dr. Pirrong's before-and-after regression demonstrates there is a common way of estimating classwide damages.  Mot. at 21-23.  Defendants level a series of methodological critiques at that regression, but Professor Reiss does not show that any of them materially alters

---

[14]    That all class members here want to *maximize* the spread measurement distinguishes the facts here from the cases Defendants cite.  *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018), concerned "trader-based" rigging of a pricing benchmark.  This benchmark was re-set every day, and different plaintiffs had "conflicting" incentives to establish manipulation in different directions on particular days.  *Id.* at 539.  Similarly, *FOREX* involved allegations that prices were set too high, or too low, on different days—creating conflicts between buyers and sellers.  407 F. Supp. 3d at 439.

the result.  At most, his criticisms amount to alternative specifications, not evidence that a model cannot reasonably estimate classwide harm.[15]

*First*, Defendants argue Dr. Pirrong does not explain a mechanism linking the alleged conduct to the alleged harm.  Opp. at 22, 29-30.  But that is exactly what Dr. Pirrong does.  Mot at 21-22.  The conduct is the system-wide use of the secret priority assignments and password sharing.  Dr. Pirrong explained why market microstructure predicts harm from that conduct, and he uses a standard before/after regression to measure it.  Mot. at 23-24; Pirrong Opening ¶¶ 170-71.  To the extent Defendants mean "what if Currenex had disclosed the scheme," Plaintiffs have done that too—the Platform would have collapsed.  Mot. at 7 & nn. 32-35 (witness testimony); Woolcock Reply ¶ 19.  That does not negate that a reasonable jury could accept a before/after regression tied to the cessation of the tiebreaking and password-sharing systems as reasonably measuring the harm caused by duping people to trade on the Platform anyway.[16]

---

[15]  *Compare with In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 52 (S.D.N.Y. 2020); *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 145-146, 148 (S.D.N.Y. 2006) (post-summary judgment opinion; plaintiffs' report was "essentially worthless"; properly accounting for technological changes from 1990s to 2000s—i.e., the introduction of smart phones—was shown to eliminate the plaintiffs' results).  Indeed, Defendants rely heavily on *Aluminum* despite not only this distinction, but that the court was listing issues that "may" be relevant, was largely discussing impact, and discussed many, many flaws present in that case.  *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 42-46.

[16]  Defendants cite *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018), but the expert there did even not "purport" to measure damages in the specific way the court outlined in a prior opinion.  *Id.* at 558.  That prior opinion—about how to measure fraud damages for a bank that extended loans to third parties, where defendants later manipulated a financial benchmark—is obviously irrelevant to the current context.  They also cite *McLaughlin v. American Tobacco Co.*, 522. F.3d 215 (2d Cir. 2008), emphasizing an individual inquiry was necessary there to determine if each person would have quit or continued smoking if a health warning had been issued.  But everyday experience confirms people do, in fact, smoke despite such warnings.  By contrast here, the nigh-unrebutted common evidence shows no rational trader would use a platform with rigged, secret rules.

*Second*, Defendants argue that Dr. Pirrong should have used *only* Currenex midpoint data at *every* step. Opp. at 22. As Dr. Pirrong explains, he chose instead to use EBS and Reuters data to calculate the "midpoints" because those datasets represent an industry-standard, unbiased, untainted view into the "true" value of a given currency at a point in time. Pirrong Reply ¶¶ 91-94. At trial, Defendants are free to present an alternative regression using a "Currenex mid," but that possibility does not defeat certification.[17]

*Third*, Defendants repeat arguments that liquidity packages and privity requirements mean trading *with a Trading Defendant* requires trade-by-trade analysis. Opp. at 1, 6-7, 12-15,. But those arguments again misconstrue the causal mechanisms here: the tiebreaking system was applied system-wide and its effects would cause increased adverse selection costs platform-wide. It would be inappropriate to use only Trading Defendants' trades. Pirrong Reply ¶¶ 53, 57-59.

*Fourth*, Defendants (Opp. at 28) cite *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244, 252-53 (D.C. Cir. 2013), where the plaintiffs' expert *conceded* his model yielded "false positives." By contrast here, Dr. Pirrong's regression does not produce "false positives," and Prof. Reiss's so-called "false positives" rebuttal is not a rebuttal at all—he merely applies Dr. Pirrong's model to a different time period. Pirrong Reply ¶¶ 116-121. Even more damningly, the period Prof. Reiss decided to test *spanned another change in Currenex's tiebreaking rules*, from "strict FIFO" to prioritizing firm liquidity. *Id.* ¶¶ 120-121. Thus, Prof. Reiss' finding that spreads widened between those two periods only confirms that tiebreaking changes matter, and that Dr. Pirrong's regression technique is calibrated to detect changes.

---

[17]  *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig*., 331 F. Supp. 3d 152, 219 (S.D.N.Y. 2018) ("[d]isputes over which forecasts [for expert to consider] are the appropriate forecasts do not discredit [expert's] methodology at the class certification stage [and it] is for the jury to decide whether [expert's] opinions are persuasive").

*Fifth*, Defendants refer generally to missing "controls," note that the original analysis did not use earlier-period data, and complain that Dr. Pirrong's "clean" period spanned the time when Currenex again switched its tiebreaking system, as discussed above. Opp. at 29. But these are textbook battle-of-the-expert type issues.[18] Yet, Prof. Reiss does not even bother with them, except to discuss one—dealing with the temporary floor set for a single currency for a discrete time period. Dr. Pirrong explains that small issue is easily handled, and in fact was already controlled for in his regression. Pirrong Reply ¶¶ 106-110. Dr. Pirrong also re-ran the regression as to address other critiques, and found doing so only made his results *stronger*. Pirrong Reply ¶¶ 107-110. Again, the issue is not whether damage are being perfectly measured now, but whether they are "capable" of showing classwide impact at trial. *Dial Corp. v. News Corp*., 314 F.R.D. 108, 15 (S.D.N.Y. 2015).

*Sixth*, Defendants argue that other traders used "last look." Opp. at 25-26. Plaintiffs do not challenge the use of last look. They allege trading costs increased because of the system-wide tiebreaking system, which is what Dr. Pirrong measured.

---

[18]  *See, e.g.*, *City of Philadelphia*, 2025 WL 2180607, at *3 ("Defendants-Appellants ultimately argue that the district court was required to resolve the disputes between the parties' dueling expert reports at the class certification stage. *But that argument is clearly based on a misreading of Rule 23 and Supreme Court precedent*.") (emphasis added); *Tyson Foods*, 577 U.S. at 459 ("Resolving" a challenge to expert testimony "is the near-exclusive province of the jury. The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing."); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681 (9th Cir. 2022) ("[T]he district court determined that Dr. Mangum's pooled regression model was *capable* of showing that the DPP class members suffered antitrust impact on a class-wide basis, *notwithstanding* Dr. Johnson's critique. This was all that was necessary at the certification stage[.]") (emphasis in original); *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *13 (S.D.N.Y. Dec. 6, 2024) ("After examining the model, the Court finds that it is methodologically sound and capable of proving class-wide impact. That is all that is required at this stage.").

*Finally*, Defendants criticize Dr. Pirrong's inclusion of two example trades. Opp. at 16. That is a transparent distraction. Dr. Pirrong's actual methodology used *multiple years'* of data across *eleven* currency pairs—many *billions* of datapoints. The data screenshots were to show how what was produced in discovery looked; they were not the basis of the analysis and are not necessary to show the tiebreaking system existed. Pirrong Reply ¶¶ 14, 50.

*In sum*, Defendants invoke the standard defense playbook. But that playbook fails here because Defendants do not challenge the admissibility of Dr. Pirrong's opinions, and do not even try to show that altering variables, assumptions, or inputs would make damages disappear. Plaintiffs have met their burden of demonstrating a model that is capable of showing aggregate class-wide damages.[19]

### B.    Multiplying Median Rates by Relevant Volume Reasonably Measures Fee-Related Harm

A reasonable juror could accept that multiplying Currenex's median fee rate by the relevant volume is a valid estimate of aggregate harm. Though unnecessary, Dr. Pirrong confirms Defendants' "representative sample" critique of the median rate was unfounded. Pirrong Reply ¶¶ 136-137. Nor could this technique "mask" unimpacted class members, Opp. at 26-28, since *all* class members paid fees, Section I.A.6, *supra*; Pirrong Reply ¶¶ 134-136.

Defendants argue that Currenex's "costs" must be determined for a "disgorgement" recovery. Opp. 26-28. Costs would be a common issue, but in any event disgorgement refers to a defendant's profits generally.[20] But here, the fees were paid directly from Plaintiffs to

---

[19]    *See, e.g.*, *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 158 (2d Cir. 2012) (amount must only "roughly reflect the aggregate amount owed to class members"); *Restasis*, 335 F.R.D. at 31 ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself.").

[20]    *See generally, e.g.*, *Sec. & Exch. Comm'n v. Sanchez-Diaz*, 88 F.4th 81, 88 (1st Cir.

Currenex, making this an out-of-pocket, restitutionary measure available under numerous claims and without regard to Currenex's "costs."

Defendants cite *Vaccariello v. XM Satellite Radio, Inc.,* 295 F.R.D. 62, 75-76 (S.D.N.Y. 2013), a case challenging an auto-renewal program, which failed because many users may well have desired to keep subscribing to XM Satellite radio. Here, Plaintiffs allege *nobody* would subscribe to Currenex if they knew about the priority-assignment system. As discussed in Section III.A.1 *infra*, that is not just a common issue, but one largely unrebutted.

## III.    THE LEGAL ELEMENTS OF FRAUD CAN BE SHOWN USING COMMON EVIDENCE[21]

### A.    Class-wide Evidence Demonstrates Reasonable Reliance and Actionable Statements and Omissions

#### 1.    *This is not a "strict FIFO" case—Reliance is common because no rational trader would tolerate the secret employee-assignment system*

Defendants argue reliance defeats certification. Opp. at 31. But fraud claims based on uniform representations or omissions are particularly appropriate for certification. *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) ("many courts in this Circuit and beyond have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product"). Circumstantial evidence can establish

---

2023) (disgorgement is "measured by a defendant's unjust gains," rather than the plaintiff's losses). For instance, in *National Union Fire Insurance Company of Pittsburgh, PA v. Rudell & Associates*, 215 A.D.3d 595, 596 (2023), cited by Defendants, the plaintiff sought to be paid an amount equal to the corrupt bribes paid *by one defendant to another defendant*. Again, here, Plaintiffs are seeking the return *of the fees Plaintiffs themselves paid*.

[21]    Defendants do not contend that Plaintiffs' claims for antitrust violations, violations of Section 349 of New York's General Business Law, unjust enrichment, or RICO (Mot. at 27-34) are unsuitable for class-wide treatment. Opp. at 31 (claiming "this case is now essentially a fraud action"). Plaintiffs do not agree that this case is "essentially a fraud action," and Defendants have waived their arguments as to Plaintiffs' non-fraud claims.

reliance, particularly in financial cases where payment itself can suffice. Mot. at 27-28 (gathering cases).

There is ample factual and expert evidence that, if Currenex disclosed it was sharing passwords and allowing salespeople to decide queue-priority, the Platform would collapse as traders fled. *See* Mot. at 29; Pirrong Opening ¶ 209; ECF 391-2 ("Woolcock Opening") ¶ 39. Given the severity of Currenex's behavior, that is true *regardless* of how often a trader would think about "tiebreaking" on a typical day. Woolcock Reply ¶¶ 21-23.[22] Defendants may argue otherwise, but a reasonable juror could credit Plaintiffs' evidence, resolving the reasonable-reliance issue for all class members. Mot. at 29; Woolcock Reply ¶¶ 17, 25. Indeed, given the complete inability of Defendants' expert Mr. Ali to even engage with this claim, Plaintiffs' assertion that all rational traders would have fled the Platform is largely unrebutted. *See* Woolcock Reply ¶¶ 18-21; Mot. at 7 & nn. 32-33 (witness testimony).

Arguing that reliance is an individualized issue, Defendants claim the jury will need to decide whether each class member "assum[ed], reasonably, that the Platform followed 'strict FIFO.'" Opp. at 34-35. But this Court already found Plaintiffs' claims are *not* about "strict

---

[22] The extreme nature of Currenex's behavior, such that the Platform would have collapsed as everyone fled, distinguishes the cases Defendants cite, where individual decision-making would have more realistically mattered. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 94 (2d Cir. 2015) (individualized reasons third-party physicians (i.e., who were not the audience for the misrepresentation) may have had for prescribing the drug outweighed inference that prescriptions were written in reliance on the misrepresentation); *McKoy v. Trump Corp.*, 2023 WL 6842310, at *4-5 (S.D.N.Y. Oct. 17, 2023) (personal reasons for enrolling in multi-level marketing scheme outweighed inference that enrollment was in reliance on misrepresentations that "straddle[d] the line between representation and puffery"); *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 108 (E.D.N.Y. 2014) (individualized reasons for investing in the portfolios outweighed inference that investment was in reliance of the belief that a certain entity was managing the portfolio); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) (individualized reasons for buying light cigarettes outweighed inference of classwide reliance on marketing materials).

FIFO." *Edmar Fin. Co., LLC v. Currenex, Inc.*, 2023 WL 3570017, at *8 (S.D.N.Y. May 18, 2023). Indeed, that this case is not about "strict FIFO" but is instead about the specific practices at issue—employees setting tiebreakers and sharing passwords—is plain on the face of the operating pleading, Plaintiffs' opening motion, and nearly every Court filing in between. ECF No. 184 ¶ 17. Defendants' insistence on continuing with their "strict FIFO" charade only confirms the claims Plaintiffs *actually* brought are, in fact, resolvable with common evidence.

2.    *The duty-to-disclose element confirms common issues predominate*

Nor are there individualized issues concerning fraud by omission. This Court recognized duties to disclose where (i) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge"; and (ii) "a party has "made a partial or ambiguous statement," that requires full disclosure to avoid misleading. *Edmar*, 2023 WL 3570017, at *7. Defendants also invoke the "basic facts" doctrine, which may apply where the omitted fact is "shocking" under "community" standards. Opp. at 34. All these theories turn on common evidence: what Currenex knew, what it said, what it withheld, and what community/industry standards are. The duty to disclose thus reinforces predominance.[23]

3.    *Plaintiffs also have viable affirmative-statement claims*

Citing the affirmative misrepresentations, Defendants assert it is "undisputed that taker 'orders' were subject to FIFO." Opp. at 8. But that *is* disputed. From that false premise, Defendants add another: that their disclosures can be read as speaking only to taker "orders" and nothing else. Opp. at 33. But a taker order cannot be processed in isolation—it must be

---

[23]    Though not before the Court, on the ultimate merits, all three tests are easily met: *Of course* Currenex had superior knowledge about its systems and knew users were relying on the understanding of a Platform ran within industry norms. That Currenex was instead letting employees decide ties and give away passwords was incredibly shocking to the FX community. And Defendants did not just speak partial truths, but outright falsehoods, as discussed below.

matched.  What it is matched with is both the subject of this case and the plain import of

Currenex's statements that "orders are *filled automatically by* the *first* counterparty bank to

stream a price," and that "Currenex uses a "*matching engine* with 'first in, first out (FIFO)'

prioritizing."  Defendants' attempt to deny the plain meaning of their own statements does not

create individualized issues regarding how class members would understand them.

Defendants also argue affirmative-representation claims require individualized proof that

every class member received and read each statement.  Opp. at 34.  Not so.  The Second Circuit

has held that "while each plaintiff must prove reliance, he or she may do so through . . .

legitimate inferences based on the nature of the alleged misrepresentations at issue."  *In re U.S.

Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citation omitted).  Here, the

same facts that show no reasonable trader would tolerate a rigged platform also give rise to the

inference that no reasonable trader would sign up for Currenex *without reading even the basic

website description* as to what "Currenex" was.[24]

Finally, Defendants argue that Currenex sales staff's conversations with class members

create individualized issues about whether each class member reasonably expected "strict FIFO."

---

[24]    *See, e.g.*, *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 140 (S.D.N.Y. 2014)
(certifying nationwide fraud class and finding class-wide reliance where record reflected that
plaintiffs relied on uniform misrepresentations about defendants' online matchmaking service
when deciding to enroll); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 145 (S.D.N.Y.
2015) (reasonable to infer class-wide reliance on fraudulent audit reports "even if some
individual plaintiffs have stated that they did not receive" them).  *Compare with In re Avon Anti-
Aging Skincare Creams & Products Marketing & Sales Practices Litig.*, 2015 WL 5730022, at
*4 (Sept. 30, 2015) (cited at Opp. at 33; materially different versions of brochures were
published every week, leading the court to conclude it was "not a case in which the
misrepresentation at issue was made to all consumers"); *In re Currency Conversion Fee Antitrust
Litig.*, 230 F.R.D. 303, 306, 311 (S.D.N.Y. 2004) (cited at Opp. at 33; declining to certify
because of individualized questions of whether class members were deceived by banks' failure to
separately break out currency conversion fees on statements).

Opp. at 33.  But again, strict FIFO is not at issue.  Currenex does not and cannot claim it

disclosed *employee-assigned priorities and password sharing* in any such conversation.[25]

### B.    The Statute of Limitations and Choice of Law Issues Do Not Defeat Predominance

#### 1.    *Statute of limitations*

Defendants argue they can assert a limitations defense to the fraud claim under a two-

years-from-discovery rule.  Opp. at 35-37.[26]  For many reasons, "[s]tatute of limitations defenses

. . . rarely defeat class certification."  Newberg on Class Actions § 4:57 (6th ed. 2025).  Even a

potentially meritorious statute of limitations defense (there is none) will not defeat certification

where there is a "sufficient constellation of common issues" binding the class.  *In re Namenda*

*Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 573 (2021); *see also In re Worldcom, Inc.*

*Sec. Litig.*, 219 F.R.D. 267, 303-304 (S.D.N.Y. 2003); Mot. at 35-37 (gathering cases).

Crucially, Defendants do not argue that individual levels of sophistication or diligence

would result in a different application of the discovery rule for each and every person.  Instead,

they focus solely on the "need to identify the putative class members with whom the consulting

firm Velador communicated."  Opp. at 37.  That narrow defense confirms the defense cannot

defeat predominance.  "Who did Velador talk to?" is a discrete question that could be resolved

either before or at trial.  As Defendants' own authority explains, "[i]n making predominance

determinations, district courts must predict how the evidence will "play out" at trial."  *Wing v.*

*Metro. Life Ins. Co.*, 2007 WL 9814564, at *6 (S.D.N.Y. May 31, 2007).  Even if Defendants

presented the narrow question about Velador's contacts, it would be greatly outweighed by the

---

[25]   The documents Defendants cite to suggest named Plaintiffs knew something special about "matching" in the uselessly generic sense of that word are discussed in Section IV below.

[26]   Defendants identify no jurisdiction with a *shorter* period than the two-from-discovery already being applied under New York law, making the "borrowing statute" irrelevant.

"more substantial" common issues. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). By contrast, in the cases Defendants cite, the plaintiffs were *unable* to establish liability through common evidence, so there were no common issues to weigh.[27]

Defendants also fail to show resolution of this narrow issue will impact a material number of class members. *See* Mot. at 38 (defenses that merely pick off small numbers of class members do not defeat predominance). Having waited until after fact discovery to pursue relevant depositions, Defendants cannot now invoke their own ignorance as a reason to defeat certification. *See, e.g.*, ECF No. 372 at 4-8 (noting belated nature of Velador-related discovery requests). To be clear, however, Velador would not have—and did not—indiscriminately disseminate the fraud to the market. *See* ECF No. 375 (Marney Dec.) at ¶ 7.

        2.    <u>Choice-of-law</u>

        (a)    *New York has the greatest interest in regulating the fraudulent conduct emanating from New York*

Defendants argue predominance is defeated because Plaintiffs' fraud claim (but not its other claims) is governed by the law of each class member's domicile. Opp. at 38. But New York uses an "interest analysis," a "flexible approach intended to give controlling effect to the law of the jurisdiction which . . . has the greatest concern with the specific issue raised in the litigation." *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 523 (S.D.N.Y. 2013), *aff'd sub nom. AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016) (citations

---

[27]    *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138, 146 (2d Cir. 2015) (no class-wide evidence of liability as "the trier of fact will have to determine whether the conflict of interest presented by the DRSA was knowingly waived on a case-by-case basis"); *Wing*, 2007 WL 9814564 (no class-wide evidence of liability in breach-of-contract case because the contract terms varied by class member); *Pinks v. M&T Bank Corp.*, 2017 WL 11773916, *5 (S.D.N.Y. Mar. 31, 2017) (no common evidence of liability because the "multi-state nature of this putative class action creates many individualized issues that require the Court to look into the laws of twenty jurisdictions").

omitted).  Given the flexibility of the inquiry, "where the loss was suffered is not conclusive and does not trump a full interest analysis." *AHW Inv. P'ship*, 980 F. Supp. 2d at 523 (citing authorities).  Indeed, "[c]ourts considering claims of fraud and negligent misrepresentation have instead focused on the place where the fraud was centered and where misrepresentations were made." *Id*. (emphasis added).[28]

The Second Circuit's decision in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012), is instructive.  The plaintiffs asserted a negligence claim against American Express Bank Ltd. for facilitating wire transfers to Hezbollah.  The Second Circuit did *not* simply look to the location of the victims (Israel).  It recognized that, because, like here, the rule in question (concerning the scope of a bank's duty to protect third parties against intentional torts committed by the bank's customers) was a "conduct-regulating" rule, the place where most of the conduct occurred (New York) had the greatest interest:

> Applying the interest-analysis test, we conclude that New York has the greatest interest in this litigation.  All of the challenged conduct undertaken by AmEx occurred in New York, where AmEx is headquartered and where AmEx administers its correspondent banking services.  Although the plaintiffs' injuries occurred in Israel, and Israel is also the plaintiffs' domicile, those factors do not govern where, as here, the conflict pertains to a conduct-regulating rule .…  We conclude that New York, not Israel, has the stronger interest in regulating the conduct of New York-based banks operating in New York.

*Id*. at 158 (internal citations omitted).  So, too, here.  Currenex operated from New York, the fraud was designed and implemented in New York, and the harm flowed from a platform operated in New York.  Under *Licci* and numerous other cases, New York law applies.  *See*

---

[28]  It is true that courts have applied the place of domicile, such as in the bankruptcy case Defendants cite, *In re Lois/USA, Inc.*, 264 B.R. 69, 108 (Bankr. S.D.N.Y. 2001).  But it does not follow that the place of domicile governs in tort actions, always.  As discussed above, the Second Circuit in fact says the interest analysis for conduct-regulating tort rules will usually point towards the place of the conduct.

*Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) (Kaplan, J.) (applying New York law because "[a]lthough the plaintiffs felt economic harm in California, New York was the site of virtually all the conduct at issue in the transaction").[29]

New York's superior interest is even clearer when one considers that the scheme was not targeted to any particular state; Currenex took victims wherever they happened to be. Courts also find that New York has a greater interest where the bad acts are concentrated here, but the victims are dispersed. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 400 (S.D.N.Y. 2010) (applying New York law where plaintiffs were dispersed throughout the world in "locations with only limited connection to the conduct at issue"); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (applying New York law where other countries had "limited and dispersed contacts with the fraud" and New York was "the jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed").

> *(b)*    *Because this case involves fraud by any definition, hypothetical differences between jurisdictions will not matter*

Even if the fraud laws of other jurisdictions governed—they do not—they would not defeat predominance. There is no relevant jurisdiction that does not recognize a *fraud* cause of action. Plaintiffs intend to prove, using common—and presently unrebutted—evidence that no rational trader would knowingly participate in a platform where employees could secretly alter tiebreaking rules and distribute administrative-level passwords to other Platform users. *See* Mot.

---

[29]    *See also In re Refco Inc. Sec. Litig.*, 892 F. Supp. 2d 534, 537-538 (S.D.N.Y. 2012) (noting "whether a broker has a duty to disclose" is "clearly a conduct regulating rule," such that interest analysis focuses on "conduct carried out in New York" as opposed to the investors' location); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009) ("[w]hen the conflict involves rules that regulate conduct—as here—the site of the tort, not the place of the loss, governs"); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (governing law is that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed").

at 7-8 (gathering fact cites); Woolcock Reply ¶¶ 19, 27.  The conduct alleged is so egregious that it satisfies the core elements of fraud regardless of minor variations in phrasing across jurisdictions.  Courts routinely certify nationwide fraud classes where, as here, the claims are based on uniform, centrally-directed conduct.[30]

In any event, Defendants only assert, in passing, that class members were located in "at least 21 states and 40 foreign jurisdictions."  Opp. 38.  But they do not identify which jurisdictions matter, how much trading was done in each, or how many allegedly different legal standards would alter the outcome.  Such surface-level assertions do not show that individualized issues will predominate.  Predominance is not defeated by merely invoking the number of jurisdictions potentially implicated.  *See Grace v. Apple, Inc.*, 328 F.R.D. 320, 345-46 (N.D. Cal. 2018) (assertion other laws might apply "not enough" when not shown other laws might actually preclude claims).  This is for numerous reasons, including that any fair balancing would consider *how many* claims fall in jurisdictions that would *actually require* specialized treatment.

Plaintiffs' review of more than 1,000 Currenex service agreements shows that nearly *half* are concentrated in a small number of predictable financial centers:  New York, Illinois, and the United Kingdom.[31]  And that tally counts each agreement once; if weighted by trading volume, those jurisdictions would dominate even more substantially.  As seen in Appendix A, the fraud

---

[30]    *See, e.g.*, *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 140 (S.D.N.Y. 2014) (certifying national fraud and New York unjust enrichment claims "without regard to possible variations in state laws"); *Ge Dandong*, 2013 WL 5658790, at *8, 11 (S.D.N.Y. Oct. 17, 2013) (certifying "all persons" class after analyzing the elements of "common law fraud or fraudulent inducement under New York law" without any analysis of differing jurisdictions); *Spencer v. Hartford Fin. Servs. Grp.*, 256 F.R.D. 284, 301 (D. Conn. 2009) ("the fundamental elements of fraud are substantially similar from state to state"); *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, 1992 WL 754061, at *14-15 (S.D. Ohio Dec. 23, 1993) (certifying nationwide class action, noting "the similarities outweigh the differences" on state-law elements of fraud).

[31]    Many had a term agreeing to the use of New York or U.K. law, though Plaintiffs need not rely on that for all the reasons set forth above.

law of those dominant jurisdictions reflects the same core principles.  There is no meaningful divergence that would affect the analysis in this case.

If *that* were not enough to confirm predominance, Appendix A *also* surveys the remaining, less relevant jurisdictions referenced in the service agreements.  There, too, Defendants identify no differences that would alter the outcome or require mini-trials.

Even if some marginal difference were eventually identified in a peripheral jurisdiction, that would *still* not defeat predominance.  The underlying factual proof—Currenex's uniform, undisclosed conduct—will be the same for all class members.  And, as also seen in Appendix A, even if differences in wording was seen to nonetheless be relevant, such issues could easily be resolved with jury instructions or verdict forms.  *See In re Takata Airbag Prod. Liab. Litig.*, 348 F.R.D. 500, 521 (S.D. Fla. 2025) (state law differences "can adequately be addressed with a verdict form"); *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 301 (D. Conn. 2009) ("because the underlying factual proof is the same," state law differences "could be adequately addressed with a verdict form").

## IV.    THE NAMED PLAINTIFFS ARE TYPICAL REPRESENTATIVES

Defendants' "typicality" arguments are asking the wrong legal question.  The typicality requirement is "not demanding."  *Tsereteli v. Resid. Asset Sec. Trust 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (Kaplan, J.).  Typicality does not require factual identity, only that the disputed issues of law or fact occupy "essentially the same degree of centrality" to the named plaintiffs' claim as to that of other members of the proposed class."  *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267 (S.D.N.Y. 2014); *see also Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010) (focus of the typicality inquiry is not the plaintiff's behavior, but rather the defendants' actions).  Here, typicality is established because the same

alleged course of conduct by the Defendants caused injuries to the named plaintiffs and the members of the class, and liability for this conduct is predicated on the same legal theories.

None of the Defendants' arguments show XTX or DSquare are atypical in *any* sense, let alone in the relevant, legal sense.[32] *First*, Defendants argue the named Plaintiffs are sophisticated. Opp. at 9. But this is a class of FX traders—they are *all* sophisticated.

*Second*, Defendants argue that the named Plaintiffs could communicate with Currenex employees. *Id.* at 38-40. But Currenex's sales and support staff existed for the very purpose of answering questions and selling services to all customers, not just these two.

*Third*, Defendants argue there are XTX and DSquare documents that supposedly will strengthen Defendants' arguments that Plaintiffs "knew or should have known that Currenex was not using pure FIFO." *Id.* at 39, 40. But that is not a relevant issue, since this case is not about "pure FIFO." *See* Section III.A.1, *supra*. Even if it were, the type of generic communications Defendants proffer—about irrelevant, industry-standard topics such as "lit orders" and "last look" functionality—certainly occurred with all class members. Indeed, Defendants effectively concede that their arguments here apply equally to all class members, as they assert that the truth was supposedly "observable to everyone." Opp. at 39.[33]

---

[32]    Defendants suggest in passing that ████████████████████████████ ████ during the class period. Opp. at 38, 40. Both suggestions are misleading for similar reasons: both named plaintiffs hold the rights to claims from predecessor entities that had different names. Ex. 60 (Smart 30(b)(6) Tr.) at 26:2-6 (Green Park Trading 1 Limited was a predecessor entity to XTX); Ex. 61 (Mitchell 30(b)(6) Tr.) at 62:22-65:22 (████████████ ██████████████████████).

[33]    None of the materials cited by Defendants suggest knowledge of *the employee-assigned priorities* or *employee-password-sharing* schemes at issue. For instance, as for an email about ████████████████████████ (Opp. at 39), putting bold on the word "priority" does not change that the email was about ████████████████████████████████████████ and not with employee-assigned, discretionary figures. Mot. at 37; Ex. 62 (Gerko Tr.) at 234:13-25. As for an email about ██████ (Opp. at 39), this case is not about

*Fourth*, Defendants argue that ███████████████████████████. Opp. at 39.  So

what?  Even by Defendants' own citation, the inquiry is whether the plaintiff was "worse off" by

the wrongdoing.  *Id.* at 39-40.   Paying higher costs in the actual world than the but-for world

makes a victim worse off, even if the victim managed to still ████████████████████.  XTX

is surely not unique for having ████████████████████ despite the fraud.

*Finally*, Defendants observe DSquare ███████████████.  Opp. at 40.  That

strategy is hardly unique, and did *not* shield it from harm.  *See* Pirrong Reply ¶¶ 148, 149 n.27.

## V.    GOLDMAN'S SEPARATE ARGUMENTS DO NOT WARRANT CARVING THEM OUT OF THE CERTIFIED CLASS

### A.    Whether the *FOREX* Release Applies—It Does Not—Is Itself a Common Question

Goldman argues it should be carved out of any certification order because of releases in

*In re Foreign Exch. Benchmark Rates Antitrust Litigation*, Case No. 1:13-cv-07789 (S.D.N.Y.

2019) ("*FOREX*").  This is a frivolous argument.

As in many class settlements, the release was given by all *FOREX* class members who

did not opt out, *regardless* of whether they filed a claim or received money.[34]  Thus, the only

---

knowledge of last look—which was, in any event, a known feature of the industry anyway.  Mot.
at 38.  Elsewhere (Opp. at 33 n.29), Defendants cite ███████████████████████████
██████████████████████ as purported evidence of unique knowledge (Opp. at 33
n.29), but that too refers only to ███████ ECF 421-19 (XTX2468832).  Finally, XTX's stream
assignment of ██████████████████████████████████████████████████████████
*See* ECF 391-6 (CXSSB00899734) (███████████████████████████████████████████
███).  Defendants also misrepresent DSquare's emails by conflating any and every use of the
word "priority" with the claims at issue in this case.  In the cited exhibit, ECF 421-32
(DSQ0409014), ███████████████████████████████████████████████████████
████████ which has nothing to do with employee-assigned tiebreakers.

   [34]  *See, e.g.*, *FOREX* Notice, at 2 (if class members "do nothing" they are "automatically
part of a Settlement Class" and "will be bound by … settlement releases") (*available at*
http://www.fxantitrustsettlement.com/docs/FEX_DB_Notice.pdf).

relevant issue is not who filed a claim form,[35] but whether the release covers the claims asserted here. That presents a common question: whether the two cases share an "identical factual predicate."[36] An identical factual predicate exists "where there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members." *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982).

The identical-predicate issue is not just common, but is also easily resolved. The *FOREX* case concerned a horizontal conspiracy in which bank employees used chatrooms to coordinate the timing of trades to manipulate publicly-observed reference prices. *See, e.g.*, ECF 425-4 ¶¶ 1-13. This case concerns Goldman knowingly benefitting from tiebreaking advantages conferred by an FX trading platform. As Defendants previously argued successfully, that is at most a *vertical* arrangement. *Edmar*, 2023 WL 3570017, at *11. It has nothing to do with bank traders coordinating benchmark manipulation through chatrooms. The cases do not share an identical factual predicate or an identity of issues, and class members would not have foreseen that claims based on Currenex's tiebreaking and password-sharing scheme were being released.

Goldman emphasizes the release language referring to "the establishment, calculation, communication, manipulation, or use of the price, spread, or rate of any FX Instrument." ECF 426 ("Goldman Opp.") at 3. But the conduct alleged here does not concern the establishment or calculation of prices, spreads, or rates of any FX instrument. The conduct alleged here is the

---

[35]    Even if dates of trading and claim filing were the dispositive facts—they are not, due to the "identical factual predicate" doctrine—such issues would not defeat predominance. For instance, they could be handled as part of claims administration.

[36]    The "identical factual predicate test" is a function both of absent class members' due process rights, and the express terms of the Goldman settlement. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106-107 (2d Cir. 2005) (releases only cover claims "as long as the released conduct arises out of the identical factual predicate as the settled conduct").

sharing of passwords and the discretionary assignment of priority values by Currenex. True, the word "spreads" appears in connection with this case. But that changes nothing. The widening of spreads is simply the way the resulting increase in trading costs is being measured.[37] Under Goldman's logic, two "price fixing" cases would automatically share the same factual predicate, merely because both sets of plaintiffs discussed "prices" and "U.S. dollars."

The Court should reject Goldman's misguided effort to treat the *FOREX* settlement as granting it immunity for any case that mentions the word "spreads."[38]

### B.    Goldman's Trading Does Not Create "Individual Issues"

Goldman repeats the "trade by trade" and "privity-only" arguments advanced in the joint opposition.[39] But because neither common impact nor damages must be proven trade-by-trade, *see* Sections I, II, *supra*, Goldman's assertion that early year data is insufficient for such an exercise is irrelevant. Goldman Opp. at 9. In any event, Dr Pirrong has now put the earlier-year data into this model. Pirrong Reply ¶ 38 n.7.

Currenex appears to have destroyed the granular *priority* data from the earlier years. But that does not absolve Goldman. A reasonable juror could find Goldman bargained for and

---

[37]  Because this case and *FOREX* do not share an identical factual predicate, there is no risk of "double recovery." Goldman Opp. at 8. If Goldman both manipulated benchmark rates generally and increased costs of trading on Currenex, it can and should be expected to pay for each harm caused by each distinct wrongdoing.

[38]  Defendants' reference to the opt-out case *Allianz* changes nothing, as the factual predicate of that case was the same as *FOREX*.

[39]  Goldman primarily relies on the same cases as the joint opposition to make these claims, which are inapposite for the same reasons discussed in Sections I and II. Goldman's only unique citation, *In re Industrial Diamond Antitrust Litigation* is also distinguishable. The *Diamond* court could not find common impact because the products at issue did not have listed prices, requiring the court to individually examine each transaction to determine if the purchaser had paid a supracompetitive price. 167 F.R.D. 374, 384 (S.D.N.Y. 1996). This is not the case here, where the prices paid by class members are transparent and recorded in centralized data. As discussed in Section I above, impact can easily be established through common proof.

obtained favorable rankings, even without an Excel sheet listing the numbers. Goldman's own documents and testimony ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Mot. at 19.

It is for the jury to decide if the record evidence is sufficient, despite the destruction of early-year priority-setting data. It is also for the jury to decide whether any alleged reduction in favoritism should affect the *extent* of Goldman's liability. All such questions would turn on common evidence. Thus, Goldman's attempt to distinguish itself from the other Defendants only presents another reason to grant certification, not to deny it.

## CONCLUSION

Plaintiffs respectfully request that the Court grant the motion for class certification and appoint Quinn Emanuel Urquhart & Sullivan, LLP and Ruddy Gregory PLLC as Interim Co-Lead Class Counsel.

DATED:     February 13, 2026                Respectfully submitted,

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
*/s/ Daniel L. Brockett*

Daniel L. Brockett
Thomas J. Lepri
David LeRay
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: danbrockett@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: jeremyandersen@quinnemanuel.com

RUDDY GREGORY, PLLC
*/s/ Mark Ruddy*

Mark Ruddy
1225 15th Street NW
Washington, DC 20005
Telephone: (202) 797-0762
Facsimile: (202) 318-0543
Email: mruddy@ruddylaw.com

ZIGLER LAW GROUP, LLC
*/s/ Aaron Zigler*

Aaron Zigler
308 S. Jefferson
Suite 333
Chicago, IL, 60661
Telephone: (312) 673-8427
Email: aaron@ziglerlawgroup.com

*Counsel for Plaintiffs and the Proposed Class*

# APPENDIX A

## APPENDIX A.1:  All Jurisdictions Recognize Fraud

| Jurisdiction | Cause of Action for Fraud |
|---|---|
| Arkansas | In Arkansas, fraud is actionable where: (1) the defendant made a false representation of material fact; (2) the defendant knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered damage as a result of the false representation.  *Breshears v. City of Little Rock*, 2020 WL 3477134, at *15–16 (E.D. Ark. June 25, 2020). |
| California | In California, the elements of a fraud action are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.  *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 974 (1997). |
| Connecticut | In Connecticut, fraud is actionable where: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. *DiMichele v. Perrella*, 158 Conn. App. 726, 730-31, 120 A.3d 551, 554 (2015). |
| Florida | In Florida, the elements of a fraud action are: (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.  *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984). |
| Georgia | In Georgia, the elements of a fraud action are: (1) a false representation by the defendant; (2) with scienter, or knowledge of the falsity; (3) with intent to deceive the plaintiff or to induce the plaintiff into acting or refraining from acting; (4) on which the plaintiff justifiably relied; (5) with the proximate cause of damages to the plaintiff.  *Williams v. Dresser Industries*, 120 F.3d 1163 (11th Cir. 1997). |
| Illinois | In Illinois, the elements of fraud are: (1) a false statement of a material fact; (2) knowledge or belief of falsity by the party making it; (3) intention to induce the other party to act or refrain from acting; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.  *Newton v. Aitken*, 260 Ill. App. 3d 717, 720, 198 Ill. Dec. 751, 633 N.E.2d 213 (1994). |
| Japan | In Japan, fraud is established where: (1) there is fraudulent conduct, such as the communication of false facts; (2) the fraudulent conduct is unlawful; (3) the party accused of fraud intended to deceive; (4) the fraudulent act caused the other party to fall into error; and (5) the other party manifested its intent in reliance on that error. *E.g.* Professor Takashi Uchida, *Civil Law I-1 General Provisions*. 5th Edition. Tokyo University Press (2025). |
| Kansas | In Kansas, actionable fraud includes: (1) an untrue statement of fact, (2) known to be untrue by the party making it, (3) made with the intent to deceive or recklessly made with disregard for the truth, (4) where another party justifiably relies on the statement and acts to his injury.  *Nordstrom v. Miller*, 227 Kan. 59, 59, 605 P.2d 545, 552 (Kan. 1980). |
| Massachusetts | In Massachusetts, the elements of fraud consist of: (1) a false representation (2) of a matter of material fact (3) with knowledge of its falsity (4) for the purpose of inducing action thereon, and (5) that the plaintiff relied upon the representation as true and acted upon it to his or her damage.  *Balles v. Babcock Power, Inc.*, 476 Mass. 565, 573, 70 N.E.3d 905 (2017). |

A-1

| Michigan | In Michigan, the elements of fraud are: (1) a material representation which is false; (2) known by defendant to be false, or made recklessly without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury. *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 517, 309 N.W.2d 645, 649 (1981). |
|---|---|
| Missouri | In Missouri, the elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *OS33 v. CenturyLink Commc'ns, L.L.C.*, 350 F. Supp. 3d 807, 815 (E.D. Mo. 2018). |
| Netherlands | In the Netherlands, fraud is actionable where a party induces another party to perform a juridicial act "by deliberately making an incorrect statement, by deliberately concealing a fact that had to be revealed or by another artifice." Art. 3:44(3) Dutch Civil Code. |
| New Hampshire | In New Hampshire, fraud is actionable where: (1) the defendant intentionally made a misrepresentation to the plaintiff, (2) for the purpose of inducing the plaintiff to act, (3) the plaintiff justifiably relied on the misrepresentation, and (4) as a result the plaintiff suffered harm. *Webber v. Deck*, 2020 WL 200614, at *8 (D.N.H. Jan. 13, 2020). |
| New Jersey | In New Jersey, the elements of fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350, 367 (N.J. 1997). |
| New York | In New York, the elements of fraud are: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury. *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). |
| North Carolina | In North Carolina, the elements of fraud are: (a) that the defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury. *Freese v. Smith*, 110 N.C. App. 28, 34, 428 S.E.2d 841, 846 (1993). |
| Ohio | In Ohio, fraud is actionable where: (1) there was a representation or, where there is a duty to disclose, concealment of a fact, (2) the representation was material to the transaction, (3) the representation was made falsely, with knowledge of its falsity, or with such disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) the representation was made with the intent of misleading another into relying on it, (5) there was justifiable reliance on the representation or concealment, and (6) there was an injury proximately caused by the reliance. *Cline v. Brancato*, 2019 WL 7604764, at *2 (S.D. Ohio Sept. 27, 2019). |
| Pennsylvania | In Pennsylvania, the elements of fraud are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by the reliance. *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). |
| Rhode Island | In Rhode Island, fraud is actionable where the defendant made (1) a false representation (2) intending thereby to induce plaintiff to rely thereon and that (3) the plaintiff justifiably relied thereon (4) to his or her damage. *Parker v. Byrne*, 996 A.2d 627, 634 (R.I. 2010). |

| Singapore | In Singapore, fraud is actionable where the defendant (1) knowingly makes a false representation of fact, (2) with the intent it would be acted upon, (3) the plaintiff does act upon it, and (4) suffers damage. *Panatron Pte Ltd and another v Lee Cheow Lee and another* [2001] SGCA 49 at [14]. |
|---|---|
| Switzerland | In Switzerland, fraud is actionable as a tortious act under Article 41 of the Swiss Code of Obligations. *See* Swiss Federal Supreme Court decision 4A_59/2009, September 8, 2009, para. 6. |
| Texas | In Texas, fraud is actionable where: (1) a material representation was made; (2) it was false when made; (3) the defendant either knew it was false or made it recklessly without any knowledge of its truth; (4) the defendant made the false material representation with the intent that it should be relied upon by the plaintiff; (5) the plaintiff relied on the representation; and (6) the plaintiff suffered injury. *Smith v. BCE Inc.,* 225 Fed.Appx. 212, 217 (5th Cir. 2007). |
| United Kingdom | In the United Kingdom, fraud is actionable as a tort of deceit where: (i) the defendant makes a false representation to the claimant; (ii) the defendant knows that the representation is false, or alternatively he is reckless as to whether it is true or false, (iii) the defendant intends that the claimant should act in reliance on it, and (iv) the claimant does act in reliance on the representation and in consequence suffers loss. *Eco 3 Capital Ltd and others v Ludsin Overseas Ltd* [2013] EWCA Civ 413 at [77]. |
| Utah | In Utah, the elements of fraud are: (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage. *Armed Forces Ins. Exch. v. Harrison,* 70 P.3d 35, 40 (Utah 2003). |
| Virginia | In Virginia, the elements of fraud are: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Dev. Pros. Inc.-Making Cents Int'l LLC v. Bank of Am., N.A.,* 805 F. Supp. 3d 680, 690 (E.D. Va. 2025). |
| Washington | In Washington, the elements of fraud are: (1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it shall be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; and (9) his consequent damage. *Williams v. Joslin,* 65 Wash. 2d 696, 697, 399 P.2d 308, 308 (1965). |

**APPENDIX A.2:  All Jurisdictions Recognize Fraud By Half-Truths/Omission**

| Fraud Theory[1] | Description | Example Jury Question | Applicable Jurisdictions | Example Common Evidence |
|---|---|---|---|---|
| **Partial or Ambiguous Statements** | Even true statements can be misleading. Moreover, a half-truth or partial disclosure regarding a material fact is actionable fraud in jurisdictions that recognize a duty to disclose arising "where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure."[2] | Was what Currenex *did* say misleading without more fulsome disclosures?<br><br>Was what Currenex said a half-truth that gave rise to a duty to disclose the entirety of the truth? | All jurisdictions recognize misleading statements as fraud.  *See* Appendix A.1.  As for "half truth" duty to disclose, *e.g.*, California, Connecticut, Florida, Illinois, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Texas, Utah, UK, Virginia.  *See* Endnote 1. | Currenex's disclosures/website.<br><br>Currenex's efforts to conceal/lack of disclosures.<br><br>Evidence of how tiebreaking actually worked.<br><br>Evidence of how password sharing actually worked.<br><br>Industry standards and practices regarding disclosures.<br><br>Industry standards and practices regarding information confidentiality.<br><br>Industry standards and practices regarding tiebreaking procedures. |
| **Basic Facts** | Omission of a basic material fact is actionable fraud in jurisdictions that recognize a duty to disclose "facts basic to the transaction, where [one party] knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."[3] | Was Currenex's lack of disclosures an omission of a fact so basic that Plaintiffs, because of their relationship with Currenex, and industry standards and norms, would have reasonably expected a disclosure of those facts? | *E.g.*, Georgia, Massachusetts, New York, Pennsylvania, Utah.  *See* Endnote 2. | |
| **Superior Knowledge** | Omission of a material fact by a party with specialized knowledge is actionable fraud in jurisdictions that recognize a duty to disclose where one party "possesses superior knowledge not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."[4] | Did Currenex, as a platform provider, have superior knowledge as to the priority tiebreaking system that would give rise to a duty to disclose? | *E.g.*, Arkansas, California, Florida, Kansas, Michigan, Missouri, New York, North Carolina, Rhode Island, Virginia, Washington.  *See* Endnote 3. | |
| **Active Concealment** | Omission of a material fact is actionable fraud in jurisdictions that recognize that active concealment gives rise to a duty to disclose.[5] | Did Currenex actively conceal the truth of the priority tiebreaking system? | *E.g.*, California, Illinois, Japan, Netherlands, North Carolina, Singapore, Switzerland.  *See* Endnote 4. | |

**Endnote 1 (partial or ambiguous statements).** *See, e.g.*, *Immobilare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 888-89 (E.D. Cal. 2019) (California); *NovaFund Advisors, LLC v. Capitala Grp., LLC*, 2022 WL 624524, at *21 (D. Conn. Mar. 3, 2022) (Connecticut); *Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. Dist. Ct. App. 1994) (Florida); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397–98 (7th Cir. 2009) (Illinois); *Athru Grp. Holdings, LLC v. SHYFT Analytics, Inc.*, 2021 WL 3355273, at *3 (Mass. Super. Mar. 22, 2021), judgment entered sub nom. *Athru Grp. Holdings LLC v. Shyft Analytics Inc* (Mass. Super. 2021), and aff'd, 100 Mass. App. Ct. 1130, 184 N.E.3d 818 (2022) (Massachusetts); *Ingaharro v. Blanchette*, 122 N.H. 54, 57, 440 A.2d 445, 447 (1982) (New Hampshire); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (New Jersey); *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995) (NY); *Oro BRC4, LLC v. Silvertree Apartments, Inc.*, 2021 WL 184686, at *8 (S.D. Ohio Jan. 19, 2021) (Ohio); *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 705 (E.D. Pa. 2021) (Pennsylvania); *Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 745 (N.D. Tex. 2014) (TX); *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1330-31 (Utah 1990) (Utah); *Potts v. Chapin*, 133 Mass. 276, 282 (1882) (citing *Peek v. Gurney* (1873) L.R. 6 H.L. 377 at 403) (United Kingdom); *White v. Potocska*, 589 F. Supp. 2d 631, 642 (E.D. Va. 2008).

**Endnote 2 (basic facts).** *See, e.g.*, *Bolling v. Mercedes-Benz USA, LLC*, 2025 WL 83826, at *5 (N.D. Ga. Jan. 10, 2025) (Georgia); *Athru Grp. Holdings, LLC v. SHYFT Analytics, Inc.*, 2021 WL 3355273, at *3 (Mass. Super. Mar. 22, 2021), judgment entered sub nom. *Athru Grp. Holdings LLC v. Shyft Analytics Inc* (Mass. Super. 2021), and aff'd, 100 Mass. App. Ct. 1130, 184 N.E.3d 818 (2022) (Massachusetts); *Olson v. Major League Baseball*, 29 F.4th 59, 81 (2d Cir. 2022) (New York); *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 705 (E.D. Pa. 2021) (Pennsylvania); *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1330-31 (Utah 1990) (Utah).

**Endnote 3 (superior knowledge).** *See, e.g.*, *Farm Bureau Policy Holders & Members v. Farm Bureau Mut. Ins. Co. of Arkansas*, 335 Ark. 285, 302, 984 S.W.2d 6, 14 (Ark. 1998) (Arkansas); *Immobilare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 888-89 (E.D. Cal. 2019) (California); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 335 (Bankr. S.D. Fla. 2014) (Florida); *Kestrel Holdings I, L.L.C. v. Learjet Inc.*, 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004) (Kansas); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 553 (W.D. Mich. 1998) (Michigan); *Littlefield v. Edmonds*, 172 S.W.3d 903, 907 (Mo. Ct. App. 2005) (Missouri); *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995) (NY); *McKee v. James*, 2013 WL 3893430, at *8 (N.C. Super. July 24, 2013) (North Carolina); *Alex & Ani, LLC v. Elite Level Consulting, LLC*, 31 F. Supp. 3d 365, 377 (D.R.I. 2014) (Rhode Island); *White v. Potocska*, 589 F. Supp. 2d 631, 642 (E.D. Va. 2008) (Virginia); *Favors v. Matzke*, 53 Wash. App. 789, 796, 770 P.2d 686, 690 (1989) (Washington).

**Endnote 4 (active concealment).** *See, e.g.*, *Immobilare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 888-89 (E.D. Cal. 2019) (California); *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 269, 613 N.E.2d 805, 814 (1993) (Illinois); Art. 709 Japanese Civil Code (Japan); Art. 3:44(3) Dutch Civil Code (Netherlands); *Harton v. Harton*, 81 N.C. App. 295, 298, 344 S.E.2d 117, 119 (1986) (North Carolina); *Trans-World (Aluminium) Ltd v Cornelder China (Singapore)* [2003] 3 SLR(R) 501 at [66] (Singapore); Swiss Federal Supreme Court decision 4A_59/2009, September 7, 2009, para. 6 (Switzerland); *see generally United States v. Colton*, 231 F.3d 890, 900 (4th Cir. 2000) (citing *Strong v. Repide*, 213 U.S. 419, 430, 29 S.Ct. 521 (1909); *Tyler v. Savage*, 143 U.S. 79, 98, 12 S.Ct. 340 (1892); *Stewart v. Wyoming Cattle-Ranche Co.*, 128 U.S. 383, 388, 9 S.Ct. 101 (1888)).