UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EDMAR FINANCIAL COMPANY, LLC, et al.,

                    Plaintiffs,

       -against-

CURRENEX, INC., et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/2026
```

21-cv-6598 (LAK)

**MEMORANDUM OPINION GRANTING IN PART AND
DENYING IN PART MOTION FOR CLASS CERTIFICATION**

      Appearances:

           Daniel L. Brockett
           David LeRay
           Jeremy D. Andersen
           QUINN EMANUEL URQUHART & SULLIVAN, LLP

           Mark Ruddy
           RUDDY GREGORY, PLLC

           Aaron M. Zigler
           ZIGLER LAW GROUP, LLC

           *Attorneys for Plaintiffs*

           Gregg L. Weiner
           Alexander B. Simkin
           Robert G. Jones
           Samer M. Musallam
           ROPES & GRAY LLP

           Eric A. Kuwana
           Brett D. Jaffe
           Christopher J. Borchert

B. Parker Miller
Jason N. Sigalos
ALSTON & BIRD LLP

*Attorneys for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

Peter G. Wilson
KATTEN MUCHIN ROSENMAN LLP
*Attorney for Defendant HC Technologies, LLC*

Carmine D. Boccuzzi Jr.
Rishi N. Zutshi
CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Defendant Goldman Sachs & Co. LLC*

LEWIS A. KAPLAN, *District Judge*.

This matter now is before the Court on plaintiffs' motion for class certification and appointment of class counsel. Plaintiffs seek to certify as a class "[a]ll persons and entities who completed at least one spot foreign exchange trade on the Executable Streaming Prices portion of Currenex, Inc.'s platform using the PROD stack from January 1, 2005, to July 21, 2014."[1] This purported class includes persons and entities who executed "'FXTrades,' OXO, OXP, and PXO transactions" during the relevant period,[2] but it excludes Caspar Marney and Marney Capital,[3]

---

[1]    Pls.' Reply (Dkt 453) at 2.

[2]    *Id.*

[3]    *Id.* at 2 n.3.

former plaintiffs that have dismissed their claims with prejudice,[4] and defendants and their related corporate entities.[5]

***Facts***

The Court previously detailed the background of this case when granting in part and denying in part defendants' motion to dismiss the amended complaint.[6]  It assumes familiarity with that decision and here limits its account of the facts to those necessary to decide plaintiffs' motion for class certification.

I.      *The FX Market*

Foreign exchange ("FX") generally involves trading one currency, such as U.S. dollars, for another, like euros.[7]  The FX market is the largest and most liquid financial market in the world – involving several trillion dollars worth of currency changing hands each day.[8]  One way to trade on the FX market is spot trading, which involves exchanging one currency for another to

---

[4]     Pls.' Mem. Law (Dkt 403) at 2 n.1.

[5]     *Id.*

[6]     *Edmar Fin. Co., LLC v. Currenex, Inc.*, No. 21-cv-6598, 2023 WL 3570017 (LAK) (S.D.N.Y. May 18, 2023).

[7]     Brockett Decl., Ex. 1 (hereinafter, "Pirrong Expert Report") (Dkt 404-1) ¶ 10.

[8]     Simkin Decl., Ex 1 (hereinafter, "Reiss Expert Report") (Dkt 428-1) ¶ 18.

4

be delivered usually in one to two business days.[9]  Such trades may take place online on electronic communication networks ("ECNs").[10]

There are various ways to describe the different participants in the FX market, but the dichotomy primarily relevant here is between liquidity providers and liquidity takers.  Liquidity providers, or "market makers," post prices at which they are willing to buy or sell, allowing other market participants – liquidity takers – to accept those prices and execute trades.[11]  Liquidity providers tend to be certain financial institutions – traditionally major banks but increasingly high-frequency traders – whereas liquidity takers are more diverse, including commercial and investment banks trading on behalf of their customers, hedge funds executing trading strategies, and even retail investors seeking to invest internationally or speculating on currency movements.[12]  The line between liquidity provider and liquidity taker has blurred over time as market participants have shifted back and forth between roles depending on their business models or trading needs.[13]  In other words, it is common for a market participant to be both a liquidity provider and a liquidity taker.

Like most financial markets, the FX market consists of many smaller markets, or "platforms," through which participants may trade.  Some of these platforms are referred to as limit order book ("LOB") markets in which participants submit orders to buy ("bids") and to sell ("asks")

---

[9] *Id.* ¶ 19; Pirrong Expert Report (Dkt 404-1) ¶ 11.

[10] Reiss Expert Report (Dkt 428-1) ¶ 20.

[11] *Id.* ¶ 21; Pirrong Expert Report (Dkt 404-1) ¶ 72.

[12] Pirrong Expert Report (Dkt 404-1) ¶¶ 17-22.

[13] *Id.* ¶ 72; Reiss Expert Report (Dkt 428-1) ¶ 24.

to a centralized exchange.[14]  The exchange stores and organizes the orders in a computerized "book."[15]  It sorts orders by price, with the most competitively priced orders having priority over less competitively priced orders.[16]  In the event that orders are priced the same, many exchanges will employ secondary priority, or "tiebreaker," rules, such as "first-in, first-out" ("FIFO"), to determine which of multiple orders at a given price to execute first.[17]

At any given time, the best available ask price for a particular currency pair – i.e., how much in one currency, U.S. dollars for example, a seller is charging for a different currency, like euros – is typically higher than the best available bid price for the same currency pair – i.e., how much in U.S. dollars the buyer is offering for euros.[18]  The difference between the best bid price and ask price for a given currency pair is referred to as the "bid-ask spread."[19]  The bid-ask spread in theory measures how much a liquidity provider is compensated for providing liquidity because if the liquidity provider were able to buy and sell the same currency pair simultaneously at the

---

[14] Pirrong Expert Report (Dkt 404-1) ¶ 30.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] Reiss Expert Report (Dkt 428-1) ¶ 25.

[19] *Id.* ¶ 26; Pirrong Expert Report (Dkt 404-1) ¶ 74.

6

prevailing best bid and ask prices, the liquidity provider would pocket the difference between those prices.[20] The bid-ask spread therefore describes also the theoretical cost of taking liquidity.[21]

Unsurprisingly, the FX market, like most financial markets, can function differently in practice. Because prices can move more rapidly than participants can execute trades, the bid-ask spread often does not describe accurately the benefit of providing or the cost of taking liquidity.[22] Intervening price movements may make providing liquidity less profitable (or even costly) and inversely may make taking liquidity less costly (or even profitable).[23] Whether a participant benefits from such price movements often depends on the amount of information it has before it trades – i.e., whether it is able to anticipate the price movements before they happen.[24] When a participant, specifically a liquidity provider, finds itself trading against more informed participants, the liquidity provider risks trading at prices worse than the value implied by the private information known to the more informed liquidity takers, which could cause the liquidity provider to lose money and incur what are known as "adverse selection costs."[25] Liquidity providers can attempt to make up for greater adverse selection costs by increasing the bid-ask spread, thus charging more to provide

---

[20] Reiss Expert Report (Dkt 428-1) ¶ 27; Pirrong Expert Report (Dkt 404-1) ¶¶ 83-84.

[21] Reiss Expert Report (Dkt 428-1) ¶ 27.

[22] *Id.* ¶ 28.

[23] *Id.*

[24] *Id.* ¶ 29; *see* Pirrong Expert Report (Dkt 404-1) ¶ 81.

[25] Pirrong Expert Report (Dkt 404-1) ¶¶ 81-82; Reiss Expert Report (Dkt 428-1) ¶ 29.

liquidity. The greater the adverse selection costs, the greater the bid-ask spread must be for a liquidity provider to remain profitable.[26]

## II.    Currenex's Trading Platform

Founded in 1999, and acquired by defendant State Street Bank and Trust Co. ("State Street") in 2007, defendant Currenex, Inc. ("Currenex") was one of the first companies to develop a spot FX ECN, a segment of which was called "FXTrades."[27] FXTrades included multiple sub-platforms, or "stacks," on which users could trade during the relevant period.[28] One such stack was the "PROD" stack, which was directed primarily at institutional investors.[29] As relevant here, Currenex employed an Executable Streaming Prices ("ESP") model, which streamed from liquidity providers real-time bids and asks in continuous price feeds, enabling high-frequency trading and allowing liquidity takers to trade at any moment.[30] Trades on FXTrades were anonymous, meaning that users could not see the identities of other users.[31] During the relevant period, there were only two other companies that similarly offered anonymous ECN FX trading directly accessible by buy-

---

[26] *See* Pirrong Expert Report (Dkt 404-1) ¶ 87.

[27] *Id.* ¶ 46; Reiss Expert Report (Dkt 428-1) ¶ 30.

[28] Reiss Expert Report (Dkt 428-1) ¶ 32.

[29] *Id.*

[30] *Id.* ¶¶ 31, 33; Pirrong Expert Report (Dkt 404-1) ¶ 47.

[31] Reiss Expert Report (Dkt 428-1) ¶ 40; Pirrong Expert Report (Dkt 404-1) ¶ 46.

side traders – Hotspot FX and FastMatch.[32]  But Currenex by far was the dominant player.  From January 2009 to March 2014, Currenex's share of average daily trading volume in the market of anonymous ECN FX trading directly accessible by buy-side traders varied between 70 and 80 percent.[33]

In addition to the continuously streamed price quotes from liquidity providers, users could submit "market orders" or "limit orders" on FXTrades.  Market orders are executed immediately at the best available price, whereas limit orders are executed at the specified price or better.[34]  If not executed immediately, limit orders "rest" on the book until they are fully matched, expired, or canceled.[35]  An "Order Crosses Price" ("OXP") transaction occurs when a market order is priced inside the bid-ask spread and thus is priced so competitively that it immediately matches with the most competitively priced streamed order on the other side of the market.[36]  An "Order Crosses Order" ("OXO") transaction occurs when a market order matches with a resting limit order on the other side of the market as opposed to a streamed order.[37]  Finally, a "Price Crosses Order"

---

[32]   *See* Pirrong Expert Report (Dkt 391-1) ¶¶ 221, 235.

[33]   *Id.* ¶¶ 241-42.

[34]   Pirrong Expert Report (Dkt 404-1) ¶ 50; Reiss Expert Report (Dkt 428-1) ¶ 35.

[35]   Pirrong Expert Report (Dkt 404-1) ¶ 50.

[36]   *Id.* ¶ 52; Reiss Expert Report (Dkt 428-1) ¶ 37.

[37]   Pirrong Expert Report (Dkt 404-1) ¶ 52; Reiss Expert Report (Dkt 428-1) ¶ 37.

("PXO") transaction occurs when a resting limit order matches with a streamed order on the other side of the market.[38]

As well as being anonymous, the orders on FXTrades that were available to each user differed. Each user received only a subset of streamed orders, known as a "liquidity package," which varied based on the user, currency pair, and stack.[39] There were many different liquidity packages on Currenex. For example, on average there were 332 liquidity packages for the euro-U.S. dollar currency pair each day on PROD between 2010 and the end of the relevant period.[40] The best available bid and ask prices (and thus the bid-ask spread) at any given time therefore could differ for different users depending on which orders were included in their liquidity package.[41] Currenex designed these liquidity packages according to its "understanding of the user's 'execution requirements and preferences,' as well as any 'specific instructions provided' by the user and 'restrictions identified to [Currenex] over time by those liquidity providers.'"[42] Users could update their liquidity packages by excluding or requesting certain price streams, and liquidity providers could choose to not stream prices to certain users.[43] Up to eighty-two liquidity providers streamed

---

[38] Pirrong Expert Report (Dkt 404-1) ¶ 52; Reiss Expert Report (Dkt 428-1) ¶ 37.

[39] Reiss Expert Report (Dkt 428-1) ¶ 42.

[40] *Id.* ¶ 44 n.84.

[41] *Id.* ¶ 43.

[42] *Id.* ¶ 48 (quoting *Currenex Description of Services and Conflicts of Interest, Global Markets* (Aug. 10, 2015) at 11).

[43] Reiss Expert Report (Dkt 428-1) ¶ 49.

prices on Currenex on the PROD stack between 2010 and the end of the relevant period, and many liquidity takers also provided liquidity by placing limit orders that competed with price streams.[44]

Not all liquidity packages (and therefore not all trades) included defendants Goldman Sachs & Co. LLC ("Goldman"), HC Technologies, LLC ("HC Tech"), and State Street (collectively, "Trading Defendants"). Indeed, between January 1, 2010, and the end of the relevant period, only 43.7 percent of all PROD orders were submitted by users with liquidity packages that included at least one Trading Defendant.[45] Trading Defendants were parties to only 13.8 percent of all trades on the PROD stack during that period.[46]

As noted above, LOB markets, like Currenex, algorithmically rank orders by price and then employ one or more secondary tiebreaker rules to determine which orders to execute first. On the PROD stack during the relevant period, Currenex priced orders for most currency pairs to five decimal places.[47] After price, it then looked to priority settings as a tiebreaker rule.[48] Priority settings were numeric values that Currenex assigned to each price stream and resting limit order.[49]

---

[44] *Id.* ¶ 66.

[45] *Id.* ¶ 47.

[46] *Id.* ¶ 66 n.137.

[47] *Id.* ¶ 55; *see id.* ¶ 79 n.171 ("As of February 23, 2013 . . . 18 currency pairs had their prices set to three decimal points, four to four decimal points, and 86 to five decimal points.").

[48] Reiss Expert Report (Dkt 421-1) ¶ 55.

[49] *Id.*; Pirrong Expert Report (Dkt 404-1) ¶ 54.

All resting limit orders had a priority of zero.[50]  Price streams, in contrast, could be given negative or non-negative integer values.[51]  The same entity could have multiple price streams linked, for example, to different parts of its business or different traders and thus could have different priority levels for different streams.[52]  The lowest numeric priority – i.e., the most negative – was the highest priority – i.e., it was executed first.[53]  If multiple orders had the same price and the same priority setting, Currenex used FIFO as the next tiebreaker rule.[54]  Between at least September 2011 and July 2014, Currenex dynamically adjusted the priority of different streams from different entities.[55]  In August 2014, however, Currenex set the priority of all price streams to zero, effectively implementing a strict FIFO rule as its tiebreaker rule.[56]  In 2015, it adopted a new tiebreaker rule that prioritized "firm" orders over orders subject to a "last look" – discussed further below – with FIFO again as the next tiebreaker rule.[57]

That Currenex matched orders on opposite sides of the market did not mean necessarily that any given trade would be executed.  Liquidity providers on Currenex (and many

---

[50]  Reiss Expert Report (Dkt 421-1) ¶ 55.

[51]  *Id.*

[52]  Pirrong Expert Report (Dkt 404-1) ¶ 54; Reiss Expert Report (Dkt 428-1) ¶ 58.

[53]  Pirrong Expert Report (Dkt 404-1) ¶ 54; Reiss Expert Report (Dkt 421-1) ¶ 55.

[54]  Reiss Expert Report (Dkt 421-1) ¶ 55.

[55]  *Id.* ¶ 59.

[56]  *Id.* ¶ 60.

[57]  *Id.*; Simkin Decl., Ex. 12 (Dkt 421-12) at 13.

12

other FX-trading platforms) enjoyed a last-look functionality through which they were able to accept or reject an order after it matched with one of their price streams.[58]  If the liquidity provider rejected the proposed transaction, the order would be re-matched, and the next matched liquidity provider would have the same choice.[59]  Last-look functionality gives liquidity providers more time before executing a trade to gain and process information regarding price movements.[60]  It thus could enable liquidity providers to become better informed and exploit their informational advantage to accept favorable trades, reject unfavorable ones, and generate greater profits.[61]  In turn, last-look functionality could leave more informed (and thus lower quality) orders in the market for the other liquidity providers that did not get the chance to deploy their last-look functionality.[62]  "Skimming the cream" refers to the practice of certain liquidity providers taking the uninformed (and more profitable) order flow and leaving other liquidity providers the so-called "toxic" order flow that is disproportionally informed (and therefore less profitable).[63]  Because those liquidity providers left with only toxic orders then would have to increase the bid-ask spread to attempt to remain

---

[58]  Reiss Expert Report (Dkt 428-1) ¶¶ 61-62; Pirrong Expert Report (Dkt 404-1) ¶ 108.

[59]  Reiss Expert Report (Dkt 428-1) ¶ 63; Pirrong Expert Report (Dkt 404-1) ¶ 108.

[60]  *See* Pirrong Expert Report (Dkt 404-1) ¶¶ 110-11.

[61]  *See id.* ¶ 111.

[62]  *See id.* ¶ 112.

[63]  *See id.* ¶ 116.

profitable, skimming the cream effectively increases the cost of providing liquidity and can impact the rest of the market.[64]

### III.    Alleged Misconduct

Plaintiffs have asserted against defendants claims of (a) common law fraud, conspiracy, and aiding and abetting, (b) deceptive acts or practices in the furnishing of a service in violation of state law,[65] (c) a vertical conspiracy in violation of the Sherman Act,[66] (d) unjust enrichment, and (e) racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[67]  These claims center around two of defendants' alleged actions: (1) maintaining a secret practice of using a hidden tiebreaker rule that systematically favored Trading Defendants by assigning their price streams priority over those of other market participants, and (2) providing HC Tech with administrator-level access to the Currenex platform and thus data to which no other user had access.

Specifically, plaintiffs allege that senior employees at Currenex agreed with each Trading Defendant that certain of their price streams would enjoy favorable priorities in exchange for them sharing their profits with Currenex or paying Currenex higher fees.[68]  According to

---

[64]    *See id.* ¶ 117.

[65]    N.Y. GEN. BUS. LAW § 349 (McKinney 2026).

[66]    15 U.S.C. § 1.

[67]    18 U.S.C. § 1962(c)-(d).

[68]    Pls.' Mem. Law (Dkt 390) at 5.

14

plaintiffs, Currenex never disclosed that it could and did manually adjust the priorities of defendants' price streams in exchange for money.[69]  Indeed, plaintiffs allege that Currenex's public disclosures instead falsely represented that it relied on FIFO to break price ties.[70]  For instance, between at least 2004 and 2012, Currenex on its website stated that "[l]imit orders are filled automatically by the first counterparty bank to stream a price that matches the order."[71]  And in a 2011 Currenex product profile promoting its platform, Currenex stated that "FXTrades provides . . . [an] order matching engine with 'first in, first out' (FIFO) prioritizing."[72]  Plaintiffs further allege that a Currenex executive provided his log-in credentials to HC Tech, enabling HC Tech to see other users' orders or identities, which were not visible to the market as a whole, and front run them or otherwise use that informational advantage to its benefit.[73]  Currenex allegedly did not disclose that it provided HC Tech with such access.[74]

## IV.    Alleged Effects on the FX Market

According to plaintiff's proposed expert witness, Dr. Craig Pirrong, the undisclosed priorities and informational advantages that Currenex provided to Trading Defendants, combined

---

[69]    *Id.* at 6.

[70]    Pls.' Mem. Law (Dkt 403) at 8.

[71]    *See, e.g.*, Weiner Decl. Supp. Mot. Dismiss, Ex. D (Dkt 55-4) at 2.

[72]    Brockett Decl., Ex. 5 (Dkt 391-5) at 2.

[73]    *See* Pls.' Mem. Law (Dkt 403) at 6.

[74]    *Id.* at 7.

with the last-look functionality available to all liquidity providers, enabled Trading Defendants to distort the market, garnering greater profits for themselves and harming other market participants. In Dr. Pirrong's account, using their undisclosed priorities, Trading Defendants got the first option, or "first look" at, whether to accept trades, and then, using the last-look functionality – and, in the case of HC Tech, its informational advantage – they skimmed the cream.[75]  Doing so inflated the cost of providing liquidity for other market participants, who then were forced to widen the bid-ask spread to attempt to make up for the higher adverse selection costs they faced.[76]  This in turn increased the costs for those market participants taking liquidity too.[77]

Dr. Pirrong attempted to quantify that alleged effect and test whether the alleged "undisclosed priority-number-assignment system and information access affected spreads/trading costs."[78]  Controlling for other factors, he performed regression analyses of measures of the trading costs against a "dummy," or "indicator," variable to account for when "the undisclosed priorities and privileged information access was in effect."[79]  He ran these regressions across eleven currency

---

[75]

See Pirrong Expert Report (Dkt 404-1) ¶¶ 107-116, 125-28.

[76]

Id. ¶¶ 117-18.

[77]

Id. ¶ 118.

[78]

Id. ¶ 151.

[79]

Id. ¶ 150.

Per Dr. Pirrong, the type of regression analyses he performed – Seemingly Unrelated Regressions – "estimates coefficients on all currencies simultaneously in a system of equations, where each equation in the system corresponds to a currency pair . . . . This estimation method takes into account the possibility that the error terms . . . are correlated across currency pairs on a given day," allowing it to "take[] into account more information than ordinary least squares . . . regressions estimated on each currency pair separately.  Due to this additional information [Seemingly Unrelated Regressions] estimates are

16

pairs for OXP transactions on the PROD stack between January 2010 and December 2017.[80]  These

currency pairs accounted for 88 percent of the volume on the PROD stack during that period.[81]  And

the OXP transactions represented approximately 80 percent of trade volume on the PROD stack

during that period.[82]  That period roughly centered around July 2014, which allegedly is when the

challenged conduct ended,[83] allowing Dr. Pirrong to test whether the challenged conduct likely

affected the measured trading costs in the so-called "dirty" period (when the alleged misconduct was

occurring) versus the "clean" period (after the alleged misconduct had ceased).[84]

Dr. Pirrong found that both "[bid-ask] spreads and trading costs were inflated during

the period in which the Currenex platform implemented the challenged practices."[85]  He described

how this was true for both "quoted" bid-ask spreads – including all requested orders – and

"effective" bid-ask spreads – considering only filled, or completed, trades – and for both when a

putative class member matched with a Trading Defendant and when a putative class member

matched with a non-Trading Defendant.[86]  In other words, Dr. Pirrong found evidence of a market-

---

econometrically more efficient."  *Id.* ¶ 166.

[80]

*Id.* ¶ 165.

[81]

*Id.* ¶¶ 164-65.

[82]

*Id.* ¶ 173.

[83]

*Id.* ¶¶ 164-65.

[84]

*Id.* ¶ 170.

[85]

*Id.* ¶ 177.

[86]

*Id.* ¶¶ 178-79.

17

wide impact caused by the alleged undisclosed priorities and informational advantages that Currenex provided to Trading Defendants.[87]  For "[a] large majority" of the results he observed, he determined that there practically was no chance of such results occurring by chance.[88]  To Dr. Pirrong, these "empirical results provide [also] probative direct evidence that Currenex possessed market power" because, according to him, "if [Currenex] had no market power, it would have been highly unlikely to observe the spread inflation quantified by the empirical analysis."[89]

Using the same sample of trades described above (but stopping at the end of the challenged conduct on July 31, 2014), Dr. Pirrong further attempted to quantify the damages from defendants' alleged misconduct incurred by putative class members taking liquidity.  He calculated and aggregated the costs from rejected transactions and those from filled transactions, both with either Trading Defendants or non-Trading Defendants, from January 3, 2010, to July 31, 2014.[90] Dr. Pirrong estimated also the damages to putative class members when they were acting as liquidity takers between 2005 and 2009, by extrapolating from the difference in trade volume between the

---

[87]  *E.g.*, *id.* ¶ 188 ("[T]here is extremely strong empirical evidence that spreads . . . were inflated during the period in which Currenex implemented but did not disclose a system of assigned-number priorities and during which it gave away employee passwords.").

[88]  *Id.* ¶¶ 185-87.

[89]  *Id.* ¶ 216.

[90]  *Id.* ¶¶ 192-93.

Although Dr. Pirrong included the costs of rejected trades that were not filled later, he stated that a common methodology would exist to identify and include only those rejected trades that were followed by a replacement fill.  *Id.* ¶ 193 n.59.

two periods.[91]  He extrapolated similarly for when putative class members were acting as liquidity takers for OXO and PXO transactions.[92]  "Putting this all together, across the PROD stack only, across all years of the alleged wrongdoing, and across 'OXP,' 'OXO,' and 'PXO' volume," Dr. Pirrong estimated "that the [alleged] wrongdoing increased [putative] Class member trading costs [for putative class members acting as liquidity takers] by at least $1.06 billion."[93]

Dr. Pirrong subsequently performed his regression analyses again using a shorter clean period – August 2014 to August 2015.[94]  He did so to limit the clean period to when Currenex implemented a strict FIFO tiebreaker rule, excluding the later period when Currenex prioritized firm orders.[95]  Additionally, he "expand[ed] the temporal scope of the dataset" back to 2006, incorporat[ed] additional currency pairs and product types," including OXO transactions, and adjust[ed] certain control variables."[96]  Dr. Pirrong found that "none of these changes altered [his] fundamental conclusions; if anything, the results were strengthened."[97]

---

[91]  *Id.* ¶¶ 195-99.

According to Dr. Pirrong, limitations in Currenex's data between 2005 and 2009 prevented him from estimating damages in that period directly.  *See id.* ¶ 195.

[92]  *See id.* ¶¶ 203-04.

[93]  *Id.* ¶ 205.

[94]  Brockett Reply Decl., Ex. 56 (hereinafter, "Pirrong Reply Report") (Dkt 454-1) ¶ 109.

[95]  *Id.* ¶¶ 107, 109.

[96]  *Id.* ¶¶ 109-11.

[97]  *Id.* ¶ 109.

19

An additional way that Dr. Pirrong provided to measure alleged damages to both putative class members that were acting as liquidity takers and those that were acting as liquidity providers is by multiplying the median brokerage fees putative class members paid to Currenex during the relevant period by the volume of trading activity putative class members engaged in during that period.[98]  According to Dr. Pirrong, "no rational trader" would have used Currenex had defendants disclosed their alleged practices, and therefore "every dollar . . . spen[t] on the product represents an economic loss" caused by the alleged fraud.[99]  As he did for the trading cost analysis described above, Dr. Pirrong estimated the total fees putative class members paid to Currenex for OXP transactions between 2009 and 2014, and then, "[u]sing the same volume-estimating techniques," extrapolated to the other years and kinds of transactions included in the proposed class definition.[100]   Dr. Pirrong concluded that putative class members paid Currenex fees of approximately $1.35 billion that they otherwise would not have had they known about defendants' alleged practices.[101]

### *Discussion*

Plaintiffs seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and demonstrate that the proposed class action falls within one of the

---

[98] Pirrong Expert Report (Dkt 404-1) ¶¶ 210, 212.

[99] *See id.* ¶¶ 208-11.

[100] *Id.* ¶ 214.

[101] *Id.*

20

subsections of Federal Rule of Civil Procedure 23(b).  Plaintiffs bear the burden of proving compliance with Rule 23 by a preponderance of the evidence.[102]  The court evaluating the motion in turn must "make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement."[103]

> Rule 23(a) requires a putative class to satisfy four prerequisites:
>
> "(1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or questions of the representative parties are typical of the claims or defenses of the cases; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class."

If a putative class meets these prerequisites, it may proceed under Rule 23(b)(3) if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Here, defendants challenge primarily the commonality prong under Rule 23(a)(2) and the predominance prong under Rule 23(b)(3).  They argue that individualized inquiries abound regarding injury, damages, and various claims and defenses.  Defendants contend also that named plaintiffs XTX Markets Limited ("XTX") and DSquare Trading Limited ("DSquare") are atypical

---

[102]
    *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

[103]
    *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (quoting *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).

21

and inadequate to represent the putative class. Although defendants decline to argue numerosity or superiority, plaintiffs here nonetheless bear the burden of satisfying all requirements of Rules 23(a) and 23(b)(3). The Court therefore addresses each requirement in order.

## I.    *Numerosity*

The numerosity requirement demands that joinder of all putative class members would be impracticable.[104] Although its satisfaction "depends on all the circumstances surrounding a case, not [just] on mere numbers,"[105] numerosity nevertheless is presumed when there are at least forty putative class members.[106] Evidence of exact class size or identity of class members is not necessary at this stage.[107]

While the Court is unable here to ascertain an approximate number of putative class members, it appears undisputed that there are hundreds of them.[108] And, given the duration of the alleged misconduct and the volume of trading at issue, that must be true.[109] "Consolidating in a class

---

[104]    Fed. R. Civ. P. 23(a)(1).

[105]    *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

[106]    *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

[107]    *Robidoux*, 987 F.2d at 935.

[108]    *See* Pirrong Expert Report (Dkt 404-1) ¶ 1 n.1 (stating that the "Currenex data indicates there are hundreds of Class members" but there including also "persons and entities who completed at least one spot foreign exchange trade on . . . the PRET stack from July 1, 2007 to September 11, 2015," which no longer are part of the proposed class definition).

[109]    *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 164 (S.D.N.Y. 2000) (LAK) ("Given the duration of the alleged conspiracy and the scope of defendants' activities, however, it is inconceivable that all class members could be joined.").

22

action what could be over 100 individual suits [would] serve[] judicial economy."[110]  Moreover, putative class members resided in "at least 21 U.S. states and territories and 40 foreign jurisdictions during the proposed Class Period."[111]  Consolidating their claims would avoid "potentially inconsistent results" and could enable them all to pursue their claims, which otherwise might be too small to pursue individually.[112]  Accordingly, the numerosity prong of Rule 23(a) is satisfied.

## II.    *Commonality*

Commonality requires that the claims of putative class members "depend upon a common contention," the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."[113]  "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."[114]

The common contention or question here is plain to see.  Plaintiffs contend that Currenex, in exchange for money, secretly assigned more favorable priorities to certain price streams of Trading Defendants and gave HC Tech administrator-level access to the platform.

---

[110]    *Robidoux*, 987 F.2d at 936.

[111]    Defs.' Opp'n (Dkt 427) at 38.

[112]    *Robidoux*, 987 F.2d at 936.

[113]    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

[114]    *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

23

Determining whether that contention is true would be central to the validity of each of putative class members' claims.

Defendants nonetheless argue that the presence of several individual issues with respect to certain putative class members and the defenses that might be asserted against them would overwhelm any common ones. In their view, that would defeat commonality. But there being a common issue is distinct from whether that issue profitably could be tried on a class-wide basis or whether it would be overwhelmed by individual issues.[115] Defendants' arguments properly are considered under the predominance requirement of Rule 23(b)(3). Plaintiffs have established adequately commonality under Rule 23(a).

*III.   Typicality*

Typicality "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"[116] It matters not if there are "minor variations in the fact patterns underlying individual claims."[117] The focus properly is on defendants' alleged actions[118] – i.e., whether "defendants committed the same

---

[115]   *See Johnson*, 780 F.3d 128 at 138.

[116]   *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

[117]   *Robidoux*, 987 F.2d at 936-37.

[118]   *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (LAK); *Kottler v. Deutsche Bank AG*, No. 5-cv-7773, 2010 WL 1221809, at *2 (S.D.N.Y. Mar. 29, 2010).

24

wrongful acts in the same manner, against all members of the class."[119]    "The requirement of typicality is 'not demanding.'"[120]

Plaintiffs bring the same claims as would putative class members, and the claims of both would arise from their trading on FXTrades during the relevant period.  Contrary to defendants' half-hearted assertion otherwise, whether that trading was conducted by a putative class member in its current corporate form or a predecessor entity has no legal significance here.[121]  What matters is whether putative class members would make the same argument regarding defendants' liability as do plaintiffs.  Like plaintiffs, all putative class members presumably would argue that they did not know about defendants' alleged secret agreements and Trading Defendants' alleged secret advantages on Currenex.  And, like plaintiffs, they presumably would argue – regardless of whether they ultimately made money on FXTrades during the relevant period – that they were subject to increased trading costs because of defendants' alleged misconduct and that they would not have paid Currenex the brokerage fees that they did had they known about defendants' alleged misconduct.  Plaintiffs thus have demonstrated that they would be typical representatives of the putative class and have satisfied the typicality requirement of Rule 23(a).

---

[119] *Tsereteli*, 283 F.R.D. at 208 (quoting *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 72 (S.D.N.Y. 2009)).

[120] *Tsereteli*, 283 F.R.D. at 208 (quoting *In re Prestige Brands Holdings, Inc.*, No. 5-cv-6924, 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007)).

[121] *See Tsereteli*, 283 F.R.D. at 208 (noting that typicality would not be defeated even if certain plaintiffs could not recover damages so long as they made the same argument regarding liability).

*IV.    Adequacy*

Adequacy of representation in turn requires that (1) the class representatives' attorney "be qualified, experienced and generally able to conduct the proposed litigation," and (2) the class representatives not be likely to collude with the defendants or otherwise have "interests antagonistic to those of the remainder of the class."[122]  Conflicts within a class may be tolerated so long as they are not "fundamental" and could be cured by dividing the class into subclasses.[123]

As for the adequacy of plaintiffs' counsel, plaintiffs state that their counsel are "experienced in complex class actions and have devoted substantial resources to this case."[124] Defendants do not dispute this contention, nor does the Court see any basis for doing so.  Plaintiffs thus have demonstrated the adequacy of their counsel to proceed as representatives of the putative class.

As for the adequacy of plaintiffs to serve as class representatives, defendants contend that XTX and DSquare are inadequate because of the number of trades they conducted against other putative class members during the relevant period and how often they traded using prioritized price streams and last-look functionality.  Goldman claims also that XTX and DSquare are inadequate because their claims are precluded by an earlier settlement in a different class action.  These arguments merely rehash those that defendants advance with respect to predominance, which are addressed more fully below.  In short, there would be no conflict, let alone a fundamental one,

---

[122]
  *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968).

[123]
  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011).

[124]
  Pls.' Mem. Law (Dkt 403) at 13.

26

between XTX or DSquare and other putative class members.  Under plaintiffs' theory of the case, all putative class members, including XTX and DSquare, were harmed by increased trading costs and wrongly incurred fees during the relevant period, regardless of whether they primarily were liquidity providers or liquidity takers.  Plaintiffs do not challenge the mere assignment of priorities to price streams or the use of last-look functionality.  It instead is the alleged *secret* nature of Currenex's priority assignments and information disclosure to Trading Defendants and Trading Defendants' alleged *knowledge* of those advantages that plaintiffs claim were unlawful.  There is no persuasive evidence (at least at this stage of the case) that XTX or DSquare, unlike Trading Defendants, knew that they had prioritized price streams (or other secret informational advantages) as compared to other putative class members or that they knowingly used their prioritized price streams to accept only favorable trades and reject unfavorable ones.  And, for the reasons discussed below, there is no merit to the argument that XTX's or DSquare's claims are precluded by a settlement in an unrelated class action.  Plaintiffs have demonstrated under Rule 23(a) that they would be adequate representatives of the putative class.

## V.     *Predominance*

Though considerably overlapping with the commonality inquiry under Rule 23(a), the predominance requirement under Rule 23(b)(3) is "more demanding."[125]   It requires an additional inquiry into (1) whether material legal or factual questions could be resolved through generalized proof, and (2) whether such common issues would be "more substantial than the issues

---

[125]     *Johnson*, 780 F.3d at 137-38 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

subject only to individualized proof,"[126] where individualized proof refers to "evidence that varies from member to member."[127]   The "predominance inquiry thus tests whether proposed classes [would be] sufficiently cohesive to warrant adjudication by representation."[128]   Predominance is not negated by having to try separately certain "important matters . . . , such as damages or some affirmative defenses peculiar to some individual class members."[129]   And the court's task at the class certification stage is limited to determining whether common questions exist and predominate, "not whether the evidence in fact establishes that plaintiffs would win at trial."[130]

In plaintiffs' telling, the case for predominance is as straightforward as was the case for commonality.  The material factual question common to each of plaintiffs' claims – whether Currenex, in exchange for money, secretly assigned more favorable priorities to certain price streams of Trading Defendants and gave HC Tech administrator-level access to the platform – would be susceptible to common evidence.  Generalized proof, according to plaintiffs, would predominate also with respect to injuries and damages.  Plaintiffs claim that defendants' alleged actions injured each putative class member in the same way due to the market-wide effects of widening bid-ask

---

[126] *In re Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

[127] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50 (5th ed. 2012)).

[128] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[129] *Tyson Foods*, 577 U.S. at 453-54 (quoting 7AA WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1778 (3d ed. 2005)); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

[130] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022).

28

spreads. And plaintiffs contend that these injuries are measurable through Dr. Pirrong's regression analyses comparing trading costs on FXTrades before and after Currenex ceased its alleged misconduct and his calculation of the fees putative class members paid to Currenex during the relevant period.

Defendants tell a different story. On their read, individualized inquiries would be necessary to determine (A) which, if any, putative class members were injured, (B) the extent of the injuries of each such putative class member, (C) whether such injuries, assuming they existed, were caused by defendants' alleged conduct, (D) whether any of putative class members' claims would be subject to a statute of limitations defense, (E) which jurisdiction's laws would govern putative class members' claims, and (F) whether any putative class members already released their claims against Goldman through settlements in other cases. The need for these individualized inquiries, defendants argue, defeats predominance. The Court addresses each of defendants' arguments below.

## A.    Injury

Defendants argue that plaintiffs cannot establish predominance because, according to defendants, (1) not all putative class members traded with, and thus were injured by, defendants, (2) some putative class members could have avoided (and perhaps did avoid) injury by employing certain trading strategies, and (3) there would be insurmountable conflicts between putative class members who primarily were liquidity providers and those who primarily were liquidity takers. None of these arguments, however, is factually correct. Thus, they fail to defeat predominance.

In defendants' view, the only way to determine which putative class members were injured would be to analyze each of their individual liquidity packages to see whether a Trading Defendant was a part of them and, if so, whether that Trading Defendant's assigned priority stream

caused putative class members to lose out on trades they otherwise would have executed. That view, however, loses sight of the forest through the trees. It fails to examine the alleged market-wide effects of the claimed manipulation and fraud, which is what Dr. Pirrong focused on in his analysis and is what serves as the basis for plaintiffs' claims. As Dr. Pirrong explained, the priority and informational advantages Currenex allegedly provided to Trading Defendants enabled Trading Defendants to skim the cream in the liquidity packages of which they were a part. Doing so increased adverse selection costs for the other liquidity providers in those packages. Those liquidity providers in turn attempted to compensate for the higher costs by widening bid-ask spreads in those packages *and across the market*, including liquidity packages of which Trading Defendants were not a part. The economic effects of defendants' alleged actions, per Dr. Pirrong, thus "*propagate[d] across all liquidity packages*" because "likely *100 percent*" of liquidity packages included at least one liquidity provider that – in that liquidity package or elsewhere on FXTrades – was in competition with a Trading Defendant.[131] Dr. Pirrong supported this theoretical framework with his quantitative analysis, demonstrating with a high degree of statistical certainty that defendants' alleged misconduct inflated trading costs on FXTrades as a whole. Plaintiffs' allegation of an injurious, market-wide effect common to each putative class member distinguishes this case from those defendants cite in which some dispositive element of each claim of the putative class members required an individualized inquiry.[132]

---

[131]     Pirrong Reply Report (Dkt 454-1) ¶¶ 16-17 (emphasis added in first quotation).

[132]     *See Mazzei*, 829 F.3d at 272 (requiring privity for breach of contract claims); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 433 (S.D.N.Y. 2019) (requiring transactions to have been within the United States to confer jurisdiction); *Benitez v. Valentino U.S.A., Inc.*, No. 19-cv-11463, 2025 WL 560748, at *5 (S.D.N.Y. Feb. 20, 2025) (requiring each class member to have been overtime eligible); *Royal Park Invs. SA/NV*

To be sure, defendants and their expert, Dr. Peter C. Reiss, on some level engage with plaintiffs' theory of the case, primarily by arguing that price ties were exceedingly rare and "line-jumping" because of altered priorities even rarer and that any informational advantage Trading Defendants received was of little true value. But Dr. Pirrong effectively rebutted these challenges in his reply report. While providing evidence that Trading Defendants' informational advantage and prioritized price streams mattered far more often than defendants claim,[133] he nevertheless described qualitatively and quantitatively (and persuasively) how even a small tiebreaking or informational advantage could have a large market-wide, and thus financial, impact.[134] For instance, even if Trading Defendants used their allegedly secret priorities to jump in line for only 0.86 percent of trades as defendants and Dr. Reiss contend,[135] that would have corresponded to approximately $929 *billion* in trades being diverted to Trading Defendants during the relevant period because of their assigned priorities.[136]

Defendants' claim that XTX, DSquare, and perhaps other putative class members took or could have taken steps to ensure that they traded on Currenex only when it, as compared to several FX exchanges, offered the most favorable prices has minimal bearing on whether the prices

---

*v. HSBC Bank USA, N.A.*, No. 14-cv-8175, 2018 WL 679495, at *3-4 (S.D.N.Y. Feb. 1, 2018) (requiring assignment of claims for standing to sue on behalf of previous holders of securities); *see also In re Int. Rate Swaps Antitrust Litig.*, No. 16-md-2704, 2023 WL 8675625, at *8 (S.D.N.Y. Dec. 15, 2023) (conceding that uninjured trades should be excluded).

[133] Pirrong Reply Report (Dkt 454-1) ¶¶ 22-30, 40-43.

[134] *Id.* ¶¶ 44-49.

[135] Reiss Expert Report (Dkt 428-1) ¶ 107.

[136] Pirrong Reply Report (Dkt 454-1) ¶ 48.

available on FXTrades nevertheless were distorted by defendants' alleged actions.  Again, there is no persuasive evidence at this stage of the case that putative class members knew about defendants' alleged secret agreements or that they could have done anything to avoid the alleged effects of those agreements besides ceasing to trade on Currenex.

Finally, defendants' suggestion that some putative class members may have benefitted from trading on Currenex during the relevant period because of the widened bid-ask spreads is overly simplistic and inconsistent with basic economic theory.  As Dr. Pirrong explained, a wider bid-ask spread would not benefit a liquidity provider necessarily.[137]  It instead would depend on the costs of providing liquidity, which would be increased if the bid-ask spread widened artificially due to increased adverse selection.  That in turn would decrease the volume of liquidity provided in the same way that monopolistic pricing restricts output, creating deadweight loss.  The claimed market-wide effects of defendants' alleged misconduct thus extended to all trades on FXTrades during the relevant period, not just those on the liquidity-taking side of the market.  Furthermore, a liquidity provider could be harmed doubly by increased bid-ask spreads if it simultaneously was acting as a liquidity taker, which defendants acknowledge was the case close to 98 percent of the time.[138]  Defendants' argument additionally fails to account for the brokerage fees that plaintiffs claim were improperly paid to Currenex to participate in what putative class members believed would be a fair market.  In these circumstances, putative class members therefore

---

[137]    Pirrong Expert Report (Dkt 404-1) ¶ 87 ("Holding costs constant liquidity providers benefit from higher spreads.  But if spreads are higher ('wider') due to higher liquidity provider costs, higher spreads are associated with *lower* liquidity provider profits.").

[138]    Reiss Expert Report (Dkt 428-1) ¶ 130 n.273 ("Between January 1, 2010 and the end of the Class Period, only 1.9% of volume on PROD was traded by class members who were exclusively liquidity takers.").

32

appear to share an interest in "maximizing the aggregate amount of classwide damages."[139]  Even if that were not the case, the possibility that the proposed class might contain some members who were uninjured would not bar class certification as a matter of law, nor would it defeat predominance given the substantial common issues in this case.[140]

In sum, plaintiffs have established sufficiently that putative class members claim common injury from paying inflated prices to Currenex, Trading Defendants, or both, that such claims would be subject to generalized proof, and that common issues associated with putative class members' claimed injuries would be more substantial than any issues subject to only individualized proof.

### B.    Damages

With respect to damages incurred by putative class members, it bears mentioning at the outset that even if there were individualized issues as to damages, such issues generally would not defeat predominance when liability could be determined on a class-wide basis.[141]  More to the

---

[139]  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 513 (S.D.N.Y. 1996); *accord Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17-cv-6221, 2024 WL 5004632, at *10 (S.D.N.Y. Dec. 6, 2024); *see Auction Houses*, 193 F.R.D. at 165; *NYSE Specialists*, 260 F.R.D. at 73.

[140]  *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 16 (E.D.N.Y. 2020) (collecting cases).

[141]  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796, 798 (10th Cir. 1970); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003).

33

point, however, plaintiffs, through their proposed expert, have demonstrated how damages could be calculated on a class-wide basis. Dr. Pirrong described three categories of alleged damages: (1) fraudulently collected fees, (2) artificially inflated adverse selection costs, and (3) artificially inflated trade rejection costs. He calculated the fees by multiplying the median brokerage fee putative class members paid to Currenex by the volume of their trading conducted during the relevant period.[142] He calculated the adverse selection costs by multiplying putative class members' trading volume by the measured increase in bid-ask spreads during the relevant period compared to after defendants ceased their alleged misconduct.[143] And, he calculated the trade rejection costs by multiplying putative class members' trading volume by the measured movement in the market "midpoint" (the price between the bid and the ask at a given time) over a set time interval after an eventually rejected trade initially was matched.[144]

Defendants argue that the flaws in Dr. Pirrong's analysis are more fundamental than failing to attempt to approximate class-wide damages. They claim that his analysis improperly attributed to defendants' alleged misconduct damages that were not the result of the alleged misconduct, even assuming it occurred. They claim it did this in several ways.

First, defendants state that Dr. Pirrong's analysis failed to account for the undisclosed priority settings Currenex assigned to users other than non-Trading Defendants and to disaggregate the harms allegedly caused by each of the various trading strategies, such as cream skimming, Trading Defendants supposedly employed during the relevant period. In defendants' view, that

---

[142]    See Pirrong Expert Report (Dkt 404-1) ¶¶ 208-14.

[143]    See id. ¶¶ 2, 192-205.

[144]    See id. ¶¶ 2, 155-59, 193-205.

34

failure makes it impossible to measure defendants' liability and "reliably exclude the purported impact of [any] unproven conduct."[145]   That view, however, mistakes plaintiffs' claims for strawmen.

Plaintiffs do not allege that either the mere assignment of priority numbers to users or the trading strategies Trading Defendants may have used were unlawful in their own right. Rather, plaintiffs claim that it was illegal for defendants secretly to assign priority to certain price streams of favored users and share certain information inaccessible to the rest of the market with those users.  Plaintiffs allege that Trading Defendants enjoyed an unfair (and unlawful) advantage on FXTrades because they *knew* that they had more favorable priority than other liquidity providers, more information than other liquidity providers, or both.  The market, according to plaintiffs' claims, was rigged in favor of Trading Defendants because they could trade at more favorable prices with less informed market participants and reject trades with more informed market participants. And the damages, according to Dr. Pirrong's analysis, can be measured using the widened bid-ask spreads and greater rejection rates (and their associated costs) that putative class members experienced because of defendants' alleged misconduct and the brokerage fees putative class members paid to Currenex that they would not have had they known about defendants' alleged misconduct.  Plaintiffs' damages case thus is "consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."[146]

---

[145]   Defs.' Opp'n (Dkt 427) at 25.

[146]   *Comcast*, 569 U.S. at 35 (quoting ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES 62 (2d ed. 2010)).

Perhaps recognizing the need to confront plaintiffs' actual claims, defendants respond that Dr. Pirrong failed to run his regression analyses using a true clean period, which, according to them, would be one where the "so-called tiebreaking rules were the same, but those rules were understood by all participants."[147]  Defendants relatedly claim that Dr. Pirrong failed to account for other potentially confounding market dynamics during the supposed clean period, such as the rise of high-frequency trading, the length of the last look window on Currenex changing among liquidity providers and over time, and the Swiss franc being pegged to the euro.  Yet, it is entirely unclear how defendants expect Dr. Pirrong to have conjured data from such a theoretically "pure" clean period that never existed.  It would not be appropriate to hold plaintiffs to such an unattainable standard of exactitude, particularly in an antitrust case as here.[148]  Dr. Pirrong nevertheless re-ran his analysis to address some of defendants' critiques and found that doing so only validated his results and reinforced his conclusions.[149]

Second, defendants claim that Dr. Pirrong used averaging assumptions – namely, a median brokerage fee and a daily measure of trading costs – to mask uninjured class members.  But the harms plaintiffs allege were market-wide, impacting every market participant on FXTrades during the relevant period.  This case thus is distinct from one involving discrete and disparate anticompetitive actions, the impact of which each would need to be isolated to prevent "elid[ing]

---

[147]   Defs.' Opp'n (Dkt 427) at 29.

[148]   *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) ("[E]xcusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury" and "a degree of uncertainty" in damages issues in such cases are justified in part because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.").

[149]   *See* Pirrong Reply Report (Dkt 454-1) ¶¶ 109-11.

salient differences" between "conduct which is conspiratorial and conduct which is not."[150]  That a trade here or there may have been executed at the same price as it would have been had the alleged misconduct not occurred does not mean that putative class members did not incur higher trading costs overall or pay more to Currenex in brokerage fees than they otherwise would have.  "In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."[151]  That averaging assumptions smooth out the noise associated with a large dataset is a feature, not a bug, when the representative trend is what matters.

These disputes in any event fail to demonstrate that issues of individualized proof would predominate upon class certification.  Rather, they all appear to be subject to generalized proof.  The validity of Dr. Pirrong's assumptions and methodology, and thus the admissibility of his opinions and the weight they should be accorded, rise and fall with the proposed class as a whole.  No challenge to Dr. Pirrong's analysis under *Daubert* having been filed here, the Court may deny class certification based on a supposed flaw in his analysis only if it concludes that no reasonable juror could believe it.[152]  The Court draws no such conclusion.

Third, defendants contend that Dr. Pirrong improperly relied on FX prices from platforms other than Currenex when setting a benchmark for daily trading costs.  According to

---

[150] *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020).

[151] *Olean*, 31 F.4th at 677 (collecting cases).

[152] *Tyson*, 577 U.S. at 459; *City of Philadelphia v. Banc of Am. Secs. LLC*, No. 24-297, 2025 WL 2180607, at *10 (2d Cir. Aug. 1, 2025) (summary order); *Olean*, 31 F.4th at 678.

defendants, doing so is inaccurate given the different market dynamics and structures of other platforms. Dr. Pirrong, meanwhile, argued that his selected benchmarks were more administrable and provided reliable estimates of price movements untainted by defendants' alleged misconduct.[153]

Again, defendants' argument boils down to the idea that Dr. Pirrong should have used different inputs in his model, not that his model is incapable of measuring class-wide damages. Class certification is not the appropriate stage of a case to resolve such disputes.[154] At the class-certification stage, all that is necessary is showing that Dr. Pirrong's regression model is "*capable* of showing that the [putative] class members suffered antitrust impact on a class-wide basis."[155] As with the averaging assumptions Dr. Pirrong employed and the clean period that he tested, his choice to use data from other FX platforms as a neutral estimate of benchmark value goes towards the weight of his expert opinion rather than its admissibility and thus fails to negate the existence of a common methodology to determine class-wide damages.[156]

Finally, as proof of some or all of these supposed fundamental flaws, defendants point out that their expert, Dr. Reiss, found that Dr. Pirrong's regression model generated

---

[153] *See* Pirrong Reply Report (Dkt 454-1) ¶¶ 90-94.

[154] *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100-03 (D. Conn. 2009) (explaining how defendants' contention that plaintiffs' regression analysis "done a slightly different way . . . does not prove what [plaintiffs] claim it proves" is a merits question not appropriate to resolve at the class-certification stage).

[155] *Olean*, 31 F.4th at 681; *accord Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1032-34 (9th Cir. 2024) (Rakoff, J.) (affirming class certification based on expert's proposed *yet unexecuted* damages model demonstrating that damages were susceptible to common proof).

[156] *See Dial Corp. v. News Corp.*, 314 F.R.D. 108, 116 (S.D.N.Y. 2015) (finding that although defendants' regression analysis may have "diminished [the] probative value" of that of plaintiffs, plaintiffs' model nonetheless suggests that common proof predominates).

statistically significant results for increased trading costs between two intervals of a supposedly clean period after defendants' alleged misconduct had ended.[157]  In defendants' and Dr. Reiss's view, this "false positive" demonstrates the unreliability of Dr. Pirrong's analysis.  But, as Dr. Pirrong explained in his reply report, that conclusion does not follow necessarily because a false positive instead could be a product of a confounding, intervening change in underlying market structure.[158]  Indeed, Dr. Reiss's so-called "false positive" actually may have reinforced the validity of Dr. Pirrong's model by measuring inadvertently the effect of Currenex's 2015 shift in tiebreaker rules from strict FIFO to prioritizing firm liquidity.[159]

To conclude, even if individualized issues as to damages tended to defeat predominance (they do not), that would not be the case here where plaintiffs' proposed damages model appears capable of calculating class-wide harm.

### C.    *Causation*

Defendants next argue that plaintiffs' allegations of fraud (and presumably their RICO claim for which mail and wire fraud serve as the predicate acts) are ill-suited for  class certification because those claims would require individualized inquiries with respect to reliance.[160]

---

[157]    *See* Reiss Expert Report (Dkt 428-1) ¶¶ 184-88.

[158]    *See* Pirrong Reply Report (Dkt 454-1) ¶ 114.

[159]    *Id.* ¶¶ 115-17.

[160]    Defendants for the most part decline to argue against plaintiffs' antitrust claim resting on common questions of fact, law, or both with respect to causation.  *See* Defs.' Opp'n (Dkt 427) at 31 (describing the case as "essentially a fraud action"); *see also* Pls.' Reply (Dkt 453) at 16 n.21 (arguing that defendants "waived their arguments as to Plaintiffs' non-fraud claims").

According to defendants, reliance on alleged affirmative misrepresentations cannot be the subject of generalized proof, meaning that it would be necessary here to determine which putative class members viewed Currenex's website or product profile containing the allegedly false statements and which putative class members reasonably relied on those statements to their detriment.

Defendants' arguments have some force with respect to plaintiffs' fraud claims premised on affirmative misrepresentations. Given that Currenex's alleged misrepresentations were published on its website and in its promotional materials, plaintiffs have established that the alleged misrepresentations were materially uniform in their content to the extent putative class members viewed them.[161] But plaintiffs have failed to establish that all, most, or even some putative class members in fact "personally received a material misrepresentation."[162] Plaintiffs argue that no such showing is required, but almost every case plaintiffs cite in support of that argument involved uniform misrepresentations *being provided to each class member in the same way*.[163] Plaintiffs'

---

[161]

> *See Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.) ("[F]raud claims based on uniform misrepresentations made to all members of the class . . . . are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.").

[162]

> *Id.*

[163]

> *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (describing how plaintiffs received inflated invoices concealing alleged fraud); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 134 (S.D.N.Y. 2014) (concluding that defendant's "staff were instructed to, and in fact did, read the [allegedly false] control points to all prospective members"); *Osberg v. Foot Locker, Inc.*, No. 7-cv-1358, 2014 WL 5800501, at *3 (S.D.N.Y. Nov. 7, 2014) ("[P]laintiffs have proffered extensive evidence that all class members were exposed to the uniform misrepresentations in a similar manner: through presentations, and mandatory and statutorily required distribution of the materials containing the misrepresentations."); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008) ("[P]ayment may constitute circumstantial proof of reliance *upon a financial representation*.") (emphasis added), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

unsupported assertion that "no reasonable trader would sign up for Currenex *without reading even the basic website description* as to what 'Currenex' was"[164] is insufficient to establish that putative class members actually read Currenex's website description, let alone relied on the specific misrepresentation to which plaintiffs point.

Nevertheless, defendants overstate the law and their case, failing to rebut plaintiffs' fraud-by-omission theory. "Fraud by omission, at its core, requires a showing (1) that plaintiff and defendant have a relationship giving rise to a duty to disclose, and (2) that the concealed information is material."[165] The need to establish reliance, or materiality in the case of fraud by omission,[166] "does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate."[167] Individualized inquiries into materiality will not predominate "if 'circumstantial evidence' generates a sufficiently strong inference that all class members"[168] would have "attach[ed] importance to the alleged omissions in determining [their]

---

[164]    Pls.' Reply (Dkt 453) at 19.

[165]    *Olson v. Major League Baseball*, 29 F.4th 59, 80 (2d Cir. 2022).

[166]    *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) ("Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure . . . it is of course impossible to demonstrate reliance, and resort must perforce be had to materiality, i.e., whether a reasonable man would attach importance to the alleged omissions in determining his course of action.").

[167]    *U.S. Foodservice*, 729 F.3d at 119; *accord Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-cv-8086, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2023).

[168]    *See Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015) (quoting *McLaughlin*, 522 F.3d at 225 n.7).

course of action."[169]  Such an inference "may well be reasonable" if the putative class members "all

faced 'the same more-or-less one-dimensional decisionmaking process.'"[170]  On the other hand, it

would not be reasonable to draw such an inference where putative class members likely had varied

motivations to take a certain action.[171]  To prove materiality in such instances would require

individualized inquiries of each putative class member's decision-making, thus defeating

predominance.

Here, putative class members all sought to trade on Currenex to buy or sell foreign

currency at fair prices set by an efficient market undistorted by manipulation.  Plaintiffs persuasively

contend, supported by expert and fact witness testimony,[172] that no putative class member would

---

[169]    *Titan Grp.*, 513 F.2d at 239.

[170]    *Sergeants Benevolent Ass'n*, 806 F.3d at 88 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 121 (2009)); *see Ge Dandong*, 2013 WL 5658790, at *9 ("[R]eliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product.").

[171]    *See Sergeants Benevolent Ass'n*, 806 F.3d at 94 (impact of a drug company's safety disclosures on physicians prescribing a particular mediation); *McLaughlin*, 522 F.3d at 223-24 (impact of a cigarette marketing campaign on consumers buying those cigarettes); *Goodman v. Genworth Fin. Wealth Mgt., Inc.*, 300 F.R.D. 90, 108-09 (E.D.N.Y. 2014) (impact of a renowned investor's advertised role in portfolios on clients investing in those portfolios); *McKoy v. Trump Corp.*, No. 18-cv-9936, 2023 WL 6842310, at *4 (S.D.N.Y. Oct. 17, 2023) (impact of a prominent celebrity and politician's promotion of a multilevel marketing operation on business owners enrolling in that operation); *Tropical Sails Corp. v. Yext, Inc.*, No. 14-cv-7582, 2017 WL 1048086, at *14 (S.D.N.Y. Mar. 17, 2017) (impact of one of "three primary benefits" of service promised on business subscribing to that service); *Weiner v. Snapple Beverage Corp.*, No. 7-cv-8742, 2010 WL 3119452, at *10-11 (S.D.N.Y. Aug. 5, 2010) (impact of "All Natural" labeling on consumers purchasing beverage).

[172]    *See* Pirrong Expert Report (Dkt 404-1) ¶ 209; Brockett Decl., Ex. 2 (hereinafter, "Woolcock Expert Report") (Dkt 404-2) ¶¶ 36-39; Brockett Decl., Ex. 32 (Dkt 391-32) at 203:22-24; Brockett Decl., Ex. 33 (Dkt 391-33) at 59:8-18, 108:19-109:7; Brockett Decl., Ex. 35 (Dkt 391-35) at 232:17-233:11; Brockett Decl., Ex. 36 (Dkt 391-36) at 62:22-63:2; Brockett

have expected Currenex systematically and secretly to favor a select few market participants and tilt the FX market in their favor.  Plaintiffs state that putative class members would not have traded on Currenex had they expected or known that.[173]   That putative class members nevertheless continued to trade on Currenex constitutes "circumstantial proof of reliance based on the reasonable inference that" they "would not have done so absent reliance upon the [platform]'s implicit representation that" it was a fair market governed by objective, disclosed rules.[174]   In other words, provided that putative class members are successful in proving that defendants created an uneven playing field, proof of ongoing trading would constitute "circumstantial evidence that the plaintiffs *lacked* knowledge of the scheme."[175]   Combined with the "generalized proof of [Currenex]'s *concealment* of its" priority adjustments and password sharing, there would be common evidence of materiality that would be more substantial than any individual issues with respect to whether a given putative class member viewed Currenex's website or promotional materials before trading on the platform.

Confronted with plaintiffs' fraud-by-omission theory, defendants argue that the alleged secret priority assignments, as an infrequently used tiebreaker rule, could not be a "'fact[]

---

[173]   Decl., Ex. 37 (Dkt 391-37) at 172:6-15, 181:9-12; Brockett Decl., Ex. 55 (Dkt 391-55) at 158:4-22.

[174]   Brockett Decl., Ex. 32 (Dkt 391-32) at 203:22-24; Brockett Decl., Ex. 33 (Dkt 391-33) at 59:8-18, 108:19-109:7; Brockett Decl., Ex. 35 (Dkt 391-35) at 232:17-233:11; Brockett Decl., Ex. 36 (Dkt 391-36) at 62:22-63:2; Brockett Decl., Ex. 37 (Dkt 391-37) at 172:6-15, 181:9-12; Brockett Decl., Ex. 55 (Dkt 391-55) at 158:4-22; *see* Pirrong Expert Report (Dkt 404-1) ¶ 209; Woolcock Expert Report (Dkt 404-2) ¶¶ 36-39.

[175]   *U.S. Foodservice*, 729 F.3d at 120.

       *Id.*

43

basic to the transaction' such that it was 'assumed by the parties as a basis for the transaction itself.'"[176] In defendants' view, it would have been unreasonable for each putative class member to rely on a "presumption of strict FIFO."[177] Therefore, according to defendants, Currenex need not have disclosed the alleged secret priority assignments. But, as the Court noted at the motion to dismiss stage, "plaintiffs' fraud claims do not rely on any belief that the Platform used a 'strict FIFO' tiebreaking procedure."[178] Plaintiffs instead allege that defendants created an arbitrary, unpredictable, and uneven playing field that they misrepresented as a fair game governed by objective, disclosed rules.[179]

In any event, the Court need not, and does not, decide here, as a matter of law, that defendants had a duty to disclose their alleged practices or that the element of materiality would be satisfied for each putative class member. "Instead, the Court concludes, based on the evidence in the record at this stage of the proceedings, that 'a reasonable factfinder [could] conclude beyond a preponderance of the evidence that" defendants' nondisclosure was material to "each individual plaintiff" who traded on Currenex.[180] "That is, 'while each plaintiff must prove [materiality], he or

---

[176]    Defs.' Opp'n (Dkt 427) at 34 (quoting *Olson*, 29 F.4th at 80-82).

[177]    Defs.' Opp'n (Dkt 427) at 35.

[178]    *Edmar*, 2023 WL 3570017, at *9.

[179]    *See* Brockett Reply Decl., Ex. 57 (hereinafter, "Woolcock Reply Report") (Dkt 454-2) ¶ 18 ("[T]he secret Currenex system was far outside industry norms, which made it even more important for it to be disclosed."); *id.* ¶ 19 ("By contrast to what Currenex was doing, legitimate systems use objective, disclosed criteria, which is important because market participants in FX demand a level playing field.") (cleaned up).

[180]    *Ge Dandong*, 2013 WL 5658790, at *11 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated in part on other grounds by Bridge*, 553 U.S. 639).

44

she may do so'—in *this* case—'through common evidence (that is, through legitimate inferences based on the nature of the alleged [omissions] at issue).'"[181]

### D.       Statute of Limitations

Moving to the "elements of the claims and defenses to be litigated," which the Court must assess in examining predominance,[182] defendants argue that their likely statute of limitations defense would require individualized inquiries into when each putative class member discovered the alleged conduct.  According to defendants, a former Currenex user, Caspar Marney, and his current employer, Velador Associates Ltd. ("Velador"), reached out to various market participants several years ago to solicit them to file this case.  Such outreach, defendants contend, would have revealed the alleged conduct to these participants more than two years before the instant suit, thus placing their claims outside New York's statute of limitations for actions based upon fraud.[183]

Again, defendants' argument has some force.  There indeed may be statute of limitations issues in this case that may require some individualized inquiry.  But defendants continue to overstate the law and their case.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to

---

[181]

        *Ge Dandong*, 2013 WL 5658790, at *11 (quoting *U.S. Foodservice*, 729 F.3d at 120 (quoting *Klay*, 382 F.3d at 1259)).

[182]

        *Johnson*, 780 F.3d at 138 (quoting JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 5:23 (11th ed. 2014)).

[183]

        *See* N.Y. C.P.L.R. § 213(8) (McKinney 2026).

predominate."[184]   Now-dismissed plaintiffs Edmar Financial Company, LLC's and Irish Blue &

Gold, Inc.'s decision to drop their claims after production of the "Velador Emails"[185] supports this

notion at least in part.   That decision – and the narrow (albeit contentious) discovery dispute

preceding it – neither altered the claims at issue in this case nor the generalized proof underpinning

them.   And where "a sufficient constellation of common issues binds class members together,

variations in the sources and application of a defense will not automatically foreclose class

certification."[186]   Should defendants assert at a later date that plaintiffs or other putative class

members had knowledge of defendants' alleged conduct outside the limitations period, those

arguments can and will be dealt with then.[187]   Absent evidence *now*, however, that statute of

limitations defenses "in fact [would] cause the litigation to devolve into multiple individualized

---

[184]

*Halliburton*, 573 U.S. at 276; *see Petrobras*, 862 F.3d at 271 (The predominance "analysis is 'more [] qualitative than quantitative,' and must account for the nature and significance of the material common and individual issues in the case.") (internal citation omitted) (alteration in original) (quoting RUBENSTEIN, *supra*, § 4:50).

[185]

*See generally* Mem. Endorsement (Dkt 397).

[186]

*In re Nassau Cnty. Strip Search Case*, 461 F.3d 219, 225 (2d Cir. 2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) (Sotomayor, J.), *abrogated on other grounds by Initial Pub. Offerings*, 471 F.3d 24); *see In re WorldCom, Inc. Secs. Litig.*, 219 F.R.D. 267, 303-04 (S.D.N.Y. 2003).

[187]

*In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 573 (S.D.N.Y. 2021) ("If all or part of the claims of particular members of the certified class are time-barred under relevant state laws, those defenses can and will be raised at a later date."); *see also Wing v. Metro. Life Ins. Co.*, No. 4-cv-8558, 2007 WL 9814564, at *6 (S.D.N.Y. May 31, 2007) (denying class certification in part on the basis of individualized statute of limitations issues because of how such defenses *would "'play out' at trial"*) (quoting *Waste Mgt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)) (emphasis added).

hearings," the Court "reject[s] the contention that statute of limitation defenses, on their face, preclude a finding of predominance."[188]

####    E.    Choice of Law

Defendants next argue that any individualized inquiries regarding plaintiffs' claims or defendants' affirmative defenses would be compounded by the choice-of-law issues associated with certifying a class here. Under New York's borrowing statute,[189] according to defendants, the Court would need to determine if any states where the cause of action accrued had shorter statutes of limitations than New York. Defendants, without offering examples, suggest too that the Court might need to resolve other choice-of-law issues with respect to plaintiffs' substantive claims.

First, as noted above, should a statute of limitations issue arise with respect to a certain plaintiff or group of putative class members, it could be dealt with readily at a later (and more appropriate) stage of the litigation.[190] Second, defendants' gesture towards the possibility that a relevant jurisdiction might have a shorter statute of limitations period for actions based upon fraud or require different elements to be shown for plaintiffs' fraud claims does not make it so.[191]

---

[188] 2 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:57 (6th ed. 2026).

[189] N.Y. C.P.L.R. § 202 (McKinney 2026).

[190] See Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 301 (D. Conn. 2009) (finding that any insubstantial differences in state law "could be adequately addressed with a verdict form and do not defeat predominance").

[191] See Pls.' Reply (Dkt 453) at 20 n.26 ("Defendants identify no jurisdiction with a *shorter* period than the two-from-discovery already being applied under New York law, making the 'borrowing statute' irrelevant."); id. at 24 (Defendants "do not identify which jurisdictions matter, how much trading was done in each, or how many allegedly different legal standards

47

The Court nevertheless "must undertake a considered analysis of the differences in [relevant] state laws" before certifying a class.[192] It therefore does so with respect to plaintiffs' fraud and unjust enrichment claims as they arise under state law as opposed to federal statutes.

A federal court sitting in diversity applies the choice-of-law rules of the forum state in which it sits.[193] Here, that state is New York. Under New York law, the first step in a conflicts-of-law analysis is to determine whether there is any conflict of law between the laws of the jurisdictions involved.[194]

With respect to plaintiffs' fraud claims, the Court assumes that an actual conflict would exist between New York laws and the relevant laws of any one of the "at least 21 U.S. states and territories and 40 foreign jurisdictions during the proposed Class Period" in which putative class members resided.[195] It does so in part because it is unclear which jurisdictions' laws might be relevant here. Many or perhaps all putative class members entered into service agreements with Currenex, many or perhaps all of which included a choice-of-law provision.[196] Under New York law, courts generally defer to choice-of-law provisions absent violation of a fundamental state

---

would alter the outcome.").

[192] *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 97 (2d Cir. 2018).

[193] *Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487, 496-97 (1947).

[194] *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006).

[195] *See* Simkin Decl. (Dkt 428) ¶ 37.

[196] See Pls.' Reply (Dkt 453) at 24 n.31 (noting that many service agreements "had a term agreeing to the use of New York or U.K. law").

48

policy.[197]  But contractual choice-of-law provisions cover only claims arising under the contract absent contractual language stating otherwise.[198]  Here, neither party contends that the choice-of-law provisions in the Currenex service agreements were sufficiently broad to require applying the selected forum's laws to the tort claims at issue.  Upon review of one such service agreement – which the Court presumes to be representative – the Court agrees that the scope of the choice-of-law provision was limited to disputes "arising under [the] Agreement,"[199] which does not include plaintiffs' fraud claims.

Having assumed that a conflict would exist, New York conflicts law would direct that the Court apply the law of the jurisdiction having the greatest interest in the litigation.[200]  If conduct-regulating rules were at issue, the jurisdiction in which the tort took place generally would have the greatest interest.[201]  After all, that jurisdiction generally would have "the greatest interest in regulating behavior within its borders."[202]  If loss-allocating rules were at issue, meanwhile, the

---

[197]

  *E.g.*, *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987); *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 265 n.* (1977).

[198]

  *E.g.*, *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties.") (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir. 1994)).

[199]

  Simkin Decl., Ex. 21 (Dkt 421-21) ¶ 23.

[200]

  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).

[201]

  *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999).

[202]

  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006) (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)).

analysis could be more complicated.[203]  But laws prohibiting fraud typically govern primary conduct

and thus are conduct-regulating rules.[204]  That primary conduct is at issue in this case is evident, for

example, since plaintiffs' fraud claims concern an FX platform's alleged misrepresentations to its

users and its obligation to disclose allegedly secret agreements it made with certain other users.  It

therefore is evident also that the jurisdiction in which the alleged fraud occurred would have the

greatest interest here, and its laws thus would govern.

Defendants rely on *In re Lois/USA, Inc.*,[205] for the mistaken notion that, "[f]or tort

claims like fraud, New York courts apply the substantive law of the jurisdiction where the economic

loss was sustained."[206]  But the court in *Lois* got that notion from a flawed reading of the Second

Circuit's decision in *Sack v. Low*.[207]  There, rather than conducting a conflict-of-laws analysis as the

Court does here, the Second Circuit interpreted New York's borrowing statute to determine whether

an action alleging violation of federal securities laws was based upon a cause of action that accrued

within New York.[208]  In doing so, it acknowledged that the analysis of which state's "law is chosen

to govern a defendant's conduct" – which was not at issue there – may well be different than the

---

[203]  *See Lee*, 166 F.3d at 545 (citing *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128 (1972)).

[204]  *See Licci*, 672 F.3d at 158.

[205]  264 B.R. 69, 108 (Bankr. S.D.N.Y. 2001).

[206]  Defs.' Opp'n (Dkt 427) at 38.

[207]  478 F.2d 360 (2d Cir. 1973).

[208]  *Id.* at 365.

analysis of "where the cause of action accrued for purposes of [New York's] borrowing statute."[209] The goal of the former, per the Second Circuit, "was to afford New York residents the protection of those rules of substantive law underlying which New York had significant policies or as to which New York had important interests," whereas "the policy behind the borrowing statute [and the analysis the Second Circuit conducted there] is to protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations in other states where non-resident-plaintiffs could have brought suit."[210]  In other words, the Second Circuit in *Sack* simply did not address the question at issue here of which jurisdiction generally would have the greatest interest in litigation involving common law fraud.

Applying the correct conflicts-of-law test, New York would have the greatest interest in this litigation if its fraud laws conflicted with those of another jurisdiction.  "All of the challenged conduct undertaken by [Currenex] occurred in New York, where [Currenex was] headquartered and where [Currenex] administer[ed] its correspondent [platform]."[211]  New York, as opposed to putative class members' domiciles – even if that is where putative class members were injured – "has the stronger interest in regulating the conduct of New York-based [exchanges] operating in New York."[212]  Accordingly, even if a conflicts-of-law analysis were necessary, it would require

---

[209]     *Id.* at 366-67.

[210]     *Id.* at 367.

[211]     *Licci*, 672 F.3d at 158.

[212]     *Id.*; *see In re Refco Inc. Secs. Litig.*, 892 F. Supp. 2d 534, 539 (S.D.N.Y. 2012) (concluding in conflicts-of-law analysis that New York has greatest interest in regulating fraudulent conduct that occurred within the state); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009) (Lynch, J.) (same).

51

application of New York law to putative class members' fraud claims.  Any theoretical differences between New York laws governing fraud and those of the jurisdictions in which putative class members resided when they were injured therefore fail to defeat predominance.

The same cannot be said, however, with respect to plaintiffs' unjust enrichment claim.  State laws governing unjust enrichment claims, unlike those concerning fraud, are loss-allocating rules because they "prohibit, assign, or limit liability after the tort occurs."[213]  Assuming that New York unjust enrichment laws would conflict with those of other relevant jurisdictions, determining in each case which jurisdiction would have the greatest interest in the claim would require application of the so-called *Neumeier* principles.[214]  Additionally, plaintiffs' unjust enrichment claim, at least in part, appears to fall within the scope of the service agreements that each Currenex user likely signed with Currenex.  At a minimum, each putative class member paid to Currenex the brokerage fees (unjustly, in plaintiffs' view) under the agreements.[215]  Those agreements included a choice-of-law provision in which putative class members agreed to "submit to the exclusive jurisdiction of the [specified court] . . . adjudication of any case or controversy arising under" the service agreements to "be governed by and construed in accordance with [the specified jurisdiction's] law."[216]  In sum, it appears that putative class members' unjust enrichment claim would be governed by the laws of numerous states and foreign jurisdictions and would need

---

[213]

*Licci*, 672 F.3d at 158 (quoting *DeMasi v. Rogers*, 826 N.Y.S.2d 106, 108 (2d Dep't 2006)).

[214]

*See Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998).

[215]

*See* Simkin Decl., Ex. 21 (Dkt 421-21) ¶ 8 ("The Client agrees to pay the fees set forth on Exhibit D for use of the Services.").

[216]

*Id.* ¶ 23; *see also* Pls.' Reply (Dkt 453) at 24 n.31 (stating that many service agreements had a term agreeing to the use of New York or U.K law).

to be evaluated on a case-by-case basis.  Here, the Court need go no further and determine, for instance, which jurisdictions' laws would govern the unjust enrichment claims or whether those laws would conflict with those of New York.[217]  That burden appropriately was on plaintiffs as the ones seeking class certification.  Because they failed to "demonstrate, through an 'extensive analysis' of state law variances, 'that class certification [on their unjust enrichment claim would] not present insuperable obstacles,'"[218] the Court cannot certify the proposed class with respect to plaintiffs' unjust enrichment claim.[219]

### F.    Releases in Other Cases

Separately from other defendants, Goldman argues also that settlements in two other cases – *In re Foreign Exchange Benchmark Rates Antitrust Litigation*[220] and *Allianz Global Investors GmbH v. Bank of America Corp.*[221] – defeat predominance because, according to Goldman, the Court would have to make individualized inquiries to determine whether each putative class

---

[217]

*See Choi v. Tower Rsch. Cap. LLC*, No. 14-cv-9912, 2022 WL 4484485, at *6 (S.D.N.Y. Sept. 27, 2022) (denying motion to certify class in part because "[t]here are notable differences between the unjust enrichment laws of various states . . . and other countries in which Plaintiffs might reside").

[218]

*U.S. Foodservice*, 729 F.3d at 127 (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)); *accord In re Amla Litig.*, 282 F. Supp. 3d 751, 762 (S.D.N.Y. 2017).

[219]

*See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 601-02 (S.D.N.Y. 2018) (declining to certify national class on unjust enrichment claims), *modified on other grounds*, 801 F. Supp. 3d 330 (S.D.N.Y. 2025); *Rodriguez*, 300 F.R.D. at 142-43 (same); *Kottler*, 2010 WL 1221809, at *4  ("Additionally, variations in state law have generally precluded nationwide class certifications based on unjust enrichment theories.").

[220]

No. 13-cv-7789 (S.D.N.Y. Nov. 1, 2013) ("*Forex*").

[221]

No. 18-cv-10364 (S.D.N.Y. Nov. 7, 2018).

member already had released their claims asserted here.  Goldman's argument essentially is that since those cases "dealt with FX price manipulation in the same time period at issue in this case,"[222] it could not be held liable here too.  Goldman nevertheless encourages the Court not to "decide the scope and effect of" the releases in those cases.[223]  It is enough, it claims, that those defenses would be "meritorious enough to require the plaintiff to devote considerable time to rebut" them.[224]

The trouble for Goldman with respect to this argument is that it is not meritorious enough to require plaintiffs or any putative class member to devote considerable time to rebut it. Neither of the releases in *Forex* or *Allianz* absolved Goldman of *all liability* with respect to *any manipulative conduct* in which it allegedly engaged in the FX market during the relevant period. Goldman instead was released from only claims that share an "identical factual predicate" with the settled claims, where there also was adequate representation of the settled claims prior to settlement.[225]  As plaintiffs argue, this case does not appear to share an identical factual predicate with *Forex* or *Allianz*.  Those cases involved horizontal conspiracies in which different market participants coordinated trades to manipulate prices.  No such facts are alleged here.[226]

---

[222]

Goldman's Opp'n (Dkt 432) at 1.

[223]

*Id.* at 7 n.12.

[224]

*Id.* (quoting *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 97 (S.D.N.Y. 2017)).

[225]

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005), *superseded on other grounds by rule*, Fed. R. Civ. P. 23(e)(2).

[226]

*See Edmar*, 2023 WL 3570017, at *11-12 (holding that "plaintiffs have presented a plausible claim of a vertical, but not a horizontal, antitrust conspiracy").

54

Individualized inquiries into whether each putative class member released its claims in either case therefore would be unnecessary.  Goldman's argument fails to defeat predominance.[227]

\*       \*       \*

This case concerns conduct that occurred up to over two decades ago.  It has been pending for close to five years.  No doubt significant amounts of time, resources, and money already have been invested in it.  Given the nature of the claims, the market, and the parties at issue, no doubt more of the same is in store.  Defendants understandably want to stop this case where it stands, or, barring that, at least prevent it from becoming bigger.  But the Court's task at this stage, at least with respect to the predominance inquiry under Rule 23(b)(3), is limited to determining whether common questions exist and predominate.  Plaintiffs have established that they do.

## VI.    *Superiority*

Like the predominance inquiry, the superiority inquiry is a comparative, fact-specific test.[228]  Although the two often are collapsed into one test and evaluated together, they are distinct requirements.[229]  Indeed, the four non-exhaustive factors provided by Rule 23(b)(3) that courts

---

[227]

To be sure, Goldman argues also that individualized issues would predominate with respect to whether and when each putative class member traded with it.  *See* Goldman's Opp'n (Dkt 432) at 8-10.  Goldman contends that it could be held liable, if at all, only for trades to which it was a counter-party during the two years when certain of its price streams had secret priority.  This argument fails for the same reason that defendants' equivalent argument fails.

[228]

*Petrobras*, 862 F.3d at 268;  *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016).

[229]

*See Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015).

should consider in assessing predominance and superiority "more clearly implicate the superiority inquiry."[230]  They are:

> "(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action."[231]

Manageability, including geographic convenience for the parties, "is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication."[232]

As repeatedly noted, putative class members share an interest in pursuing this action as a class.  Doing so would be necessary to pursue their claims economically.  And there are no fundamental conflicts among them.  Nor, to the Court's knowledge, is there litigation elsewhere concerning the claims at issue here.  Furthermore, given that many of the parties and putative class members are financial institutions, it would be geographically convenient for the proposed class action to proceed in this district, especially given that all defendants either are headquartered here or have offices here.   Finally, class certification plainly would promote considerations of judicial economy.  Plaintiffs thus have demonstrated under Rule 23(b)(3) that a class action would be a

---

[230]  *Id.*; *see Visa Check/MasterMoney*, 280 F.3d at 133 (describing Rule 23(b)(3) factors as "[f]actors relevant to the superiority of a class action").

[231]  Fed. R. Civ. P. 23(b)(3).

[232]  *Sykes*, 780 F.3d at 82 (quoting RUBENSTEIN, *supra*, § 4:72).

56

superior means of adjudication as compared to forcing each putative class member to pursue its claims independently.

### *Conclusion*

For the foregoing reasons, plaintiffs' motion to certify a class and appoint class counsel (Dkt 389) is granted save that it is denied with respect to plaintiffs' unjust enrichment claim. The Clerk is directed to terminate as moot defendants' motion for oral argument (Dkt 459).

SO ORDERED.

Dated:        June 11, 2026

_____
Lewis A. Kaplan
United States District Judge