**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDMAR FINANCIAL COMPANY, LLC; IRISH BLUE & GOLD, INC.; XTX MARKETS LIMITED; and DSQUARE TRADING LIMITED,<br><br>Plaintiffs,<br><br>vs.<br><br>CURRENEX, INC.; GOLDMAN SACHS & CO. LLC; HC TECHNOLOGIES, LLC; STATE STREET BANK AND TRUST COMPANY; STATE STREET GLOBAL MARKETS INTERNATIONAL LIMITED; and JOHN DOE DEFENDANTS 1-5,<br><br>Defendants. | Case No. 21-cv-06598 |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................1

I. THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT ........................1

  A. The Materiality Question Does Not Bar a Ruling on Duty ....................................1

  B. If Necessary, the Court Can Also Resolve Materiality...........................................3

  C. The Record Establishes the Remaining Requirements for a Duty..........................7

    1. The special facts doctrine is satisfied.........................................................7

    2. The partial disclosure doctrine is also satisfied .........................................8

II. PLAINTIFFS' 56(G) REQUEST IS PROPER AND SHOULD BE GRANTED............10

CONCLUSION....................................................................................................................10

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505 (1986) ....................7

*Beede v. Stiefel Lab'ys, Inc.*,
2016 WL 916418 (N.D.N.Y. Mar. 7, 2016) ....................3

*Certicable Inc. v. Point 2 Point Commc'ns Corp.*,
2025 WL 622547 (E.D.N.Y. Feb. 26, 2025) ....................4

*DeKalb Cnty. Pension Fund v. Allergan PLC*,
2024 WL 677081 (2d Cir. Feb. 20, 2024) (Summary Order) ....................9

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
2026 WL 1693853 (S.D.N.Y. June 11, 2026) ....................6

*First Hill Partners, LLC v. Bluecrest Cap. Mgmt.*,
52 F. Supp. 3d 625 (S.D.N.Y. 2014) ....................2

*Greenman-Pedersen, Inc. v. Berryman & Henigar, Inc.*,
130 A.D.3d 514 (1st Dep't 2015) ....................2

*Hegde v. Montefiore Med. Ctr.*,
2026 WL 17237 (S.D.N.Y. Jan. 2, 2026) ....................8

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) ....................9

*Lapin v. Verner*,
238 A.D.3d 1128 (2d Dep't 2025) ....................2

*MCC Non Ferrous Trading Inc. v. AGCS Marine Ins. Co.*,
2015 WL 3651537 (S.D.N.Y. June 8, 2015) ....................3

*Meyer v. Seidel*,
89 F.4th 117 (2d Cir. 2023) ....................4

*Mohegan Lake Motors, Inc. v. Maoli*,
2018 WL 4278352 (S.D.N.Y. June 8, 2018) ....................2

*Olin Corp. v. Lamorak Ins. Co.*,
332 F. Supp. 3d 818 (S.D.N.Y. 2018) ....................3

*Phillips v. Am. Int'l Grp., Inc.*,
498 F. Supp. 2d 690 (S.D.N.Y. 2007)....................................................................................2

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
460 F. Supp. 3d 481 (S.D.N.Y. 2020)....................................................................................9

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011)....................................................................................2

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993).......................................................................................................2

*In re WorldCom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)....................................................................................4

## INTRODUCTION

This motion presents a narrow question: whether Currenex had a duty to disclose its secret priority rules. Defendants do not dispute that Currenex had superior knowledge of its secret priority system, that it made the website and brochure disclosures at issue, and that it withheld from users that it was using employee-assigned priorities determining who won ties.[1] The Court thus can and should resolve the duty question now.

Defendants principally argue "materiality" prevents a ruling on duty. That argument fails both legally and factually. Duty and materiality present distinct inquiries, and the Court can resolve the former without adjudicating the latter. If the Court concludes otherwise, the record establishes that the undisclosed priority system was material. At a minimum, the Court should enter an order under Rule 56(g) establishing the undisputed facts concerning the system's operation and nondisclosure.

## ARGUMENT

### I. THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT

#### A. The Materiality Question Does Not Bar a Ruling on Duty

Defendants argue that the Court cannot resolve duty without also deciding whether Currenex's omissions were "material." Opp. 8-11. But they identify no such categorical rule. Nor would such a rule make sense, given that a duty to disclose is a matter "of the court" but materiality is a "mixed question."[2]

---

[1] Defs.' 56.1 Resp. ¶¶87-89, 96-101 (undisputed); *see also id.* ¶¶107-11 (raising only insignificant disputes). "Mot." (ECF 503) and "Opp." (ECF 520) are Plaintiffs' opening memorandum and Defendants' opposition. "SUF" (ECF 505) and "Defs.' 56.1 Resp." (ECF 522) are Plaintiffs' Rule 56.1 Statement and Defendants' response. "CSDF" (ECF 548) and "Pls.' 56.1 Resp." (ECF 539) are Plaintiffs' Counterstatement of Disputed Facts and response to Defendants' Rule 56.1 Statement. "Melvin Br." (ECF 491) is Plaintiffs' opening brief in support of their Motion to Exclude Certain Opinions and Testimony of Michael Melvin, Ph.D.

[2] Restatement (Second) of Torts § 551 cmt. m (1977); Opp. 12.

Defendants rely on the discussion of "coalesc[ing]" elements from *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), but that discussion concerned a *duty to update*.[3] Plaintiffs assert no such theory. The relevant distinction is the one *Time Warner* expressly recognized: the Second Circuit has long "drawn a distinction between the concepts of a duty to disclose and materiality," and "where the issue is whether an individual's relationship to information imposed upon him a duty to disclose, the inquiry as to his duty is quite distinct from the inquiry as to the information's materiality." *Id.*

That distinction describes Plaintiffs' special facts theory: Currenex controlled the priority settings and withheld information that ordinary participants could not discover. Plaintiffs' partial disclosure theory likewise presents a distinct duty question: whether Currenex, having described its matching rules, had to disclose the priority system to make those descriptions accurate and complete. The Court can resolve these questions without deciding every element of Plaintiffs' fraud claims.[4]

Defendants' reliance on cases predating the amendment to Rule 56 is equally misplaced. Opp. 8. The current rules expressly authorize summary judgment on "the part of each claim or defense" (Fed. R. Civ. P. 56(a)), and courts grant such relief where a decision "will serve to

---

[3] *See* Opp. 10 (citing *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011) (citing *Time Warner*, 9 F.3d at 267)).

[4] None of Defendants' other cases requires a court to decide materiality before duty. *Lapin v. Verner*, 238 A.D.3d 1128, 1130 (2d Dep't 2025), affirmed the dismissal of a fraud claim for want of any facts suggesting duty or materiality. *First Hill Partners, LLC v. Bluecrest Cap. Mgmt.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014), simply recites that an omission claim needs both a material omission and a duty. The remaining cases mention "material fact" only in passing while reciting the special facts and partial disclosure tests. *Mohegan Lake Motors, Inc. v. Maoli*, 2018 WL 4278352, at *8 (S.D.N.Y. June 8, 2018); *Greenman-Pedersen, Inc. v. Berryman & Henigar, Inc.*, 130 A.D.3d 514, 516 (1st Dep't 2015); *Phillips v. Am. Int'l Grp., Inc.*, 498 F. Supp. 2d 690, 696 (S.D.N.Y. 2007).

focus the issues prior to trial." *MCC Non Ferrous Trading Inc. v. AGCS Marine Ins. Co.*, 2015 WL 3651537, at *4 (S.D.N.Y. June 8, 2015). A ruling on duty would do precisely that.[5]

**B. <u>If Necessary, the Court Can Also Resolve Materiality</u>**

If the Court concludes materiality must also be decided, the record permits only one answer. The rules determining who receives a trade concern the platform's central function. They are hardly a "trifling" matter. Opp. 12. Plaintiffs' opening brief explained that the priority rules were "essential information about how the Platform functioned." Mot. 17. That showing rested on Mr. Woolcock's unrebutted opinion that no rational trader would trade on a platform with Currenex's tiebreaking system,[6] the class representatives' testimony,[7] and industry codes requiring that any purchasable advantage be made "explicitly clear to all participants."[8]

Defendants' own conduct reinforces that evidence. The Trading Defendants paid premium brokerage to obtain priority and protested when they lost it.[9] Currenex drafted conflict-of-interest disclosures explaining that ties could go to the liquidity provider "that has paid additional fees to Currenex,"[10] but shut down the system rather than issue those disclosures. The record thus establishes the significance of the information Currenex withheld. Defendants' responses do not create a genuine dispute.

---

[5] *Beede v. Stiefel Lab'ys, Inc.*, 2016 WL 916418, at *10, 17 (N.D.N.Y. Mar. 7, 2016), the only case Defendants cite that applied current law in declining to decide duty, is another duty to *update* case. *Beede* also acknowledged that duty is "an issue of law entirely independent of the question of materiality." *Id.* at *17.

[6] SUF ¶42. Defendants raise irrelevant testimony on materiality as their only substantive dispute. Defs.' 56.1 Resp. ¶42. Defendants also incorrectly contend that all expert opinions should be disregarded in a Rule 56.1 statement. *Id*. Courts in this Circuit reject such a blanket rule. *See, e.g.*, *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 837-38 (S.D.N.Y. 2018).

[7] *See, e.g.*, SUF ¶44.

[8] SUF ¶¶16-21; Defs.' 56.1 Resp. ¶¶16-21 (disputing only to the extent that the codes were not binding, which is irrelevant as explained in Plaintiffs' opening brief (Mot. 16)).

[9] CSDF ¶¶294, 309-10, 315, 337-38, 342.

[10] CSDF ¶¶280-85; Defs.' 56.1 Resp. ¶70.

*First*, Plaintiffs preserved this issue. Opp. 11. Waiver applies only to arguments made "only perfunctorily" or without "some effort at developed argumentation." *Meyer v. Seidel*, 89 F.4th 117, 128-29 (2d Cir. 2023).[11] Plaintiffs' opening brief identified the omitted information as essential and supported that position with record evidence. Defendants devoted five pages of their opposition to materiality and had ample opportunity to respond. Opp. 11-15.

*Second*, Defendants mischaracterize Plaintiffs' testimony. They contend that Plaintiffs "did not review Currenex disclosures" (Opp. 1), and that testimony identifying other considerations important to traders "refutes any argument" that tiebreaking is "important." Opp. 12-13. Neither proposition follows from the record. Identifying visible, everyday factors such as "price" says nothing about a trader's willingness to accept an undisclosed system of employee-assigned preferences. The witnesses explained that matching logic is "absolutely critical," and that they weighed other considerations *only after* determining that a venue was "fair" and "trustworthy."[12] Plaintiffs also testified that they reviewed platform disclosures, further confirming their interest in how the platform operated.[13]

*Third*, Defendants argue "sophisticated" parties can "evaluate their trading performance—i.e., the information that actually mattered to them." Opp. 13.[14] Defendants relatedly observe that trading was "profitable" for the Plaintiffs. *Id.* But counsel's assertion that

---

[11] Defendants' other authorities (Opp. 11) involved arguments never raised in an opening brief. *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 494 n.32 (S.D.N.Y. 2005); *Certicable Inc. v. Point 2 Point Commc'ns Corp.*, 2025 WL 622547, at *6 (E.D.N.Y. Feb. 26, 2025).

[12] CSDF ¶38; Pls.' 56.1 Resp. ¶159. The priority system also governed those factors by ranking last-look streams, which could reject trades, ahead of firm resting orders, an ordering Defendants' own expert agreed takers would not prefer. CSDF ¶¶167-72, 268, 394.

[13] *See* CSDF ¶¶272-78.

[14] Though they invoke the concept of "sophistication," to be clear Defendants nowhere claim that any class member could have discovered the truth of Currenex's secret systems.

trading performance is all that "actually mattered" cannot displace testimony that fairness and transparency were prerequisites to trading.

Nor does profitability answer whether disclosure would have mattered to a trader's choice of venue. A trader can earn a profit while receiving less favorable executions because of concealed matching rules. Currenex withheld the information users needed to decide whether to trade under those rules in the first place. Users' ability to assess the results of completed trades did not supply that matching information.[15]

Prof. Melvin's opinions do not create a genuine dispute on the relevant question. As explained in Plaintiffs' Rule 702 motion, he considered an *after-the-fact* "disclosure" that still would have left users with a misleading account of how priorities were assigned. He explicitly declined to opine on industry disclosure norms or whether Currenex's systems departed from ordinary tiebreaking processes. His opinions therefore do not answer whether truthful disclosure of Currenex's actual systems would have mattered to a reasonable trader.

Indeed, aspects of Prof. Melvin's testimony support Plaintiffs. The alternative tiebreaking systems he identified were disclosed and objective.[16] He also rejected as unrealistic the prospect that a trading platform would disclose the conduct at issue here, recognizing the adverse implications for Currenex's sales.[17]

*Fourth*, the asserted frequency of ties does not render the systems immaterial. Opp. 13-14. The witnesses explained that transparent and fair matching rules mattered to their choice of

[15] Defendants also argue that Plaintiffs "continued to trade." Opp. 13. *But Currenex never disclosed the truth*. As for the post-complaint trading by XTX, Defendants elide that XTX's trading on the platform has been *de minimis* since the litigation began and has existed only to access market data for pricing information. Pls.' 56.1 Resp. ¶131. XTX also pulled its proprietary pricing from the platform once the complaint was filed. SUF ¶44; Defs.' 56.1 Resp. ¶44 (raising no dispute on the nature of XTX's presence on the platform).

[16] Melvin Br. 3.

[17] CSDF ¶267.

platform; Defendants cannot overcome that testimony simply by characterizing ties as infrequent. Even accepting Defendants' disputed "less than 1%" figure, the trading volume at issue approached $1 trillion, as the Court recognized.[18] That figure measures trading volume, not damages, but it underscores why a small percentage alone cannot establish materiality. Moreover, the "less than 1%" figure is not only irrelevant, but also inaccurate.[19]

*Finally*, Defendants' assertion that XTX was a "net beneficiary" does not resolve materiality. Opp. 14. The question is whether disclosure would have mattered to a reasonable participant deciding whether to trade on the platform, not whether a particular participant supposedly benefitted in hindsight. XTX witnesses consistently testified that fairness and transparency mattered to that decision.[20] The factual premise is also flawed: a priority of -1 was the default for streams generally, not a special preference conferred on XTX.[21] No class member stream received a better setting until 2014, and at least 96% of the volume matched to a stream with priority better than -1 involved HC Tech or State Street.[22] XTX therefore would have lost every tie with the Trading Defendants' favored streams.[23]

---

[18] *Edmar Fin. Co., LLC v. Currenex, Inc.*, 2026 WL 1693853, at *10 (S.D.N.Y. June 11, 2026).

[19] For instance, it counts only "jumps" at the top of the order book (*excluding* those at other levels), then divides that by total platform volume (*including* volume executed at other levels and including transactions where no ties occurred). *See* Pls.' 56.1 Resp. ¶¶31-32. Among trades where a tie existed, line-jumping affected more than 18% of volume even considering only the top-of-the-book ties, and the Trading Defendants captured over 57% of such jump volume. *Id*. Nor were the effects confined to individual liquidity packages (Opp. 13-14); the Trading Defendants' first-look advantage raised adverse-selection costs and widened spreads across the Platform. CSDF ¶¶379-93.

[20] SUF ¶44; Defs.' 56.1 Resp. ¶44 (raising no meaningful disputes as explained *supra* n.15).

[21] Defs.' 56.1 Resp. ¶28 ("[T]he 'default' priority setting for price streams was negative one.").

[22] CSDF ¶373; Defs.' 56.1 Resp. ¶81 (undisputed).

[23] Defendants' focus on Goldman in the post-2011 data, Opp. 14, is just as misleading here as it was on Goldman's summary judgment motion, because HC Tech and State Street held the top settings in that period. CSDF ¶¶365-71.

Accordingly, although a materiality ruling is unnecessary to resolve this motion, the Court should resolve that issue in Plaintiffs' favor if it concludes otherwise.

### C. The Record Establishes the Remaining Requirements for a Duty

#### 1. *The special facts doctrine is satisfied*

Defendants argue that the Currenex system was not "inherently unfair" because ties are rare and Plaintiffs principally cared about prices. Opp. 15, 17. These recycled arguments fail for the reasons set forth above. They also miss the point: Currenex secretly allowed employees to determine which participants received priority, while users understood the platform to apply transparent, objective matching rules. The frequency with which those preferences determined an execution does not eliminate that informational disparity or make the practice fair.[24] Notably, neither of Defendants' industry experts has defended the employee-assigned priority system as consistent with industry norms.

Defendants next argue that Currenex did not know class members were mistaken about its tiebreaking rules. Opp. 15. But Currenex certainly knew that users understood *a* tiebreaking system was an essential component of how platforms operate. It also knew that first-in, first-out ("FIFO") was the industry default and that venues departing from it disclosed the departure, as the fact testimony and Mr. Woolcock's opinion confirm.[25] Currenex's knowledge that people care about tiebreaking, and knowledge people expected FIFO, is confirmed by its own

---

[24] Defendants' claimed "business purpose" of favoring "better performing lower reject streams" (Opp. 4) changes nothing, as the Trading Defendants paid for their favorable settings. *See supra* n.9. State Street's auditors also found that management could not show the settings were "set in the best interest of the client" and that platform users "may be disadvantaged." CSDF ¶¶192-94, 200-05.

[25] SUF ¶¶11-12, 15. Defendants attempt to cast testimony acknowledging the existence of other tiebreaking mechanisms as a dispute of fact (Defs.' 56.1 Resp. ¶¶11-12, 15), but such testimony is not sufficiently probative to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505 (1986) ("If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

disclosures. Its website, product profile, and brochures described first-come, first-served matching. Mot. 17. Its Global Head told a customer that "earlier arrival gets priority" and that Currenex "will match against whatever price arrived in the Currenex book server first."[26]

Prof. Melvin's observation that traders care about prices does not answer this evidence. Opp. 16-17. A preference for competitive prices says nothing about whether users understood that employees secretly assigned priorities or whether Currenex knew its descriptions of matching would leave users mistaken about the actual rules.

Defendants' distinction between an "absence" of knowledge and "mistaken" knowledge fares no better. Opp. 17. Plaintiffs indisputably understood that the platform necessarily had rules for breaking ties and believed those rules were transparent, objective, and fair. Currenex's own descriptions reinforced that understanding. The undisclosed employee-assignment system contradicted it. This was a mistaken understanding of how the platform operated, not merely an absence of information.[27]

2. *The partial disclosure doctrine is also satisfied*

Currenex *also* had a duty to disclose the full truth when it described its matching process in misleading terms. Mot. 18-19.

Defendants argue that Currenex's website "accurately described how orders were matched on the RFQ portion of the Platform." Opp. 18. But the challenged statements expressly addressed ESP trading: "ESP™ Limit Orders are filled automatically by the first counterparty

[26] CSDF ¶255.

[27] This case is thus nothing like *Hegde v. Montefiore Med. Ctr.*, 2026 WL 17237, at *3 (S.D.N.Y. Jan. 2, 2026) (Opp. 17), where a *pro se* plaintiff argued that a prospective employer had a duty to disclose its receipt of negative comments from a prior employer, when the plaintiff did not even allege he knew *any* reference was being gathered.

bank to stream a price that matches the order."[28] "ESP"—"Executable Streaming Prices"—is the functionality expressly covered by the class definition.[29] That the website also had disclosures about RFQ trading does not make the false statements about ESP trading any less misleading.

Defendants next argue that the description of a "[l]ow-latency order matching engine with 'first in, first out' (FIFO) prioritizing," and similar statements, referred only to "orders." Opp. 18. This is nonsensical. A representation that the matching engine uses FIFO leaves out critical information if undisclosed employee-assigned priorities determine which counterparty gets the trade. Even if FIFO governed some aspects of matching, Currenex still had to disclose the qualifications necessary to make its statements accurate. A half-truth "state[s] the truth only so far as it goes, while omitting critical qualifying information." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 494 (S.D.N.Y. 2020). Describing FIFO matching while concealing a priority system that displaced FIFO presents precisely that problem.[30]

Finally, Defendants again invoke Plaintiffs' supposed failure to review Currenex's disclosures. Opp. 6, 12-13. But the evidence is clear that Plaintiffs *did* review Currenex's disclosures.[31] More fundamentally, whether a particular plaintiff reviewed a statement concerns reliance, if it is has any relevance at all in an omissions case; it does not answer whether Currenex, having described its matching process, had to make that description accurate.[32]

---

[28] Defs.' 56.1 Resp. ¶98 (undisputed); CSDF ¶4.

[29] CSDF ¶¶234-35.

[30] Defendants argue that some representations were "aimed" at certain types of users. Opp. 18-19. But that does not change that the only reasonable interpretation is that Currenex followed FIFO. The argument is also unavailing given near-identical representations were made by other means, such as the website and a trading brochure, for which Defendants do not make an audience-based argument.

[31] CSDF ¶¶272-78.

[32] Defendants cite cases where no duty was found, but they involved statements that did not address the subject of the omission. *DeKalb Cnty. Pension Fund v. Allergan PLC*, 2024 WL 677081, at *2-4 (2d Cir. Feb. 20,

## II. PLAINTIFFS' 56(g) REQUEST IS PROPER AND SHOULD BE GRANTED

If the Court declines to grant partial summary judgment, it should establish under Rule 56(g) the undisputed facts concerning Currenex's operation and nondisclosure of the challenged systems. Mot. 19-23.

Defendants do not dispute that those facts are true. Instead, they argue that Rule 56(g) "does not authorize an independent motion to establish certain facts as true." Opp. 20. But Plaintiffs seek alternative relief on a proper summary judgment motion. That is the very function Defendants' authority identifies: to "salvage some constructive result" when a motion is denied. Opp. 20. Defendants relatedly suggest the requested facts are "untethered" from Plaintiffs' motion. *Id*. Not so. The existence of the concealed system and Currenex's failure to disclose it are central factual predicates of Plaintiffs' asserted duty.

Defendants concede there is no dispute as to "Fact 1." As to "Fact 2," Defendants agree Plaintiffs were left in the dark, but stress to the Court that there is a triable issue as to what the *Trading Defendants* knew. Opp. 21-23. Plaintiffs agree. When Plaintiffs sought confirmation that "Currenex did not disclose the priority system to Platform participants *other than the Trading Defendants*," Mot. 24, they merely meant to clarify that, of course, a "fact" that Currenex did not disclose the system *generally* would *not* resolve the issue of whether Currenex disclosed the system to the *Trading Defendants*. Plaintiffs agree Trading Defendants' knowledge is a triable issue, even as the ignorance of class members is not.

## CONCLUSION

Plaintiffs respectfully request that their motion be granted.

---

2024) (summary order) (challenged statements "did not even purport to speak to" the "topic" of the product at issue); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153-56 (2d Cir. 2013) ("nothing" in press release discussed the omitted facts alleged). Currenex's statements directly addressed its matching process—the very "context and manner of presentation" in which omission renders the description misleading. *Id*. at 153.

DATED: October 26, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP
/s/ *Daniel L. Brockett*
Daniel L. Brockett
Thomas J. Lepri
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: danbrockett@quinnemanuel.com
Email: thomaslepri@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: jeremyandersen@quinnemanuel.com

RUDDY GREGORY, PLLC
/s/ *Mark Ruddy*
Mark Ruddy
1225 15th Street NW
Washington, DC 20005
Telephone: (202) 797-0762
Facsimile: (202) 318-0543
Email: mruddy@ruddylaw.com

ZIGLER LAW GROUP, LLC
/s/ *Aaron Zigler*
Aaron Zigler
308 S. Jefferson St.
Suite 333
Chicago, Illinois 60661
Telephone: (312) 673-8427
Email: aaron@ziglerlawgroup.com

*Counsel for Plaintiffs and the Class*