USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________
DATE FILED: 11/23/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
EDMAR FINANCIAL COMPANY, LLC, et al.,

Plaintiffs,

v.

21-cv-6598 (LAK)

CURRENEX, INC., et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION ON
DEFENDANTS' MOTION TO PRECLUDE**

Appearances:

Daniel L. Brockett
Thomas J. Lepri
J. Sebastian Becker
Jeremy D. Andersen
QUINN EMANUEL URQUHART & SULLIVAN LLP

Mark Ruddy
RUDDY GREGORY PLLC

Aaron Zigler
ZIGLER LAW GROUP, LLC

*Attorneys for Plaintiffs*

Eric A. Kuwana
Brett D. Jaffe
B. Parker Miller
Jason N. Sigalos
Christopher J. Borchert
ALSTON & BIRD LLP
*Attorneys for Defendants Currenex, Inc., State Street Bank and Trust Company, and State Street Global Markets International Limited*

LEWIS A. KAPLAN, *District Judge.*

Defendants (collectively, "Currenex") move to preclude plaintiffs (collectively, "Edmar") from using an audio recording of a pre-litigation conversation in the United Kingdom between a former Currenex employee, a Mr. Sears, and a Mr. Marney, an agent of plaintiffs' lead counsel. Exclusion is appropriate, Currenex argues, because (1) the conversation occurred and was recorded in the UK, (2) Mr. Sears was not informed that it would be recorded as allegedly was required by UK law, and (3) this Court should exercise its discretion to preclude the use of illegally obtained evidence. The purported icing on Currenex's cake is a claim that Edmar misrepresented the contents of the recording to the Court.

The Court assumes without deciding that the Mr. Marney's alleged failure to inform Mr. Sears that the audio of the conversation would be recorded by technical means was an "offense" under UK law and perhaps contravened a different UK privacy regulation. Even on those assumptions, however, one must keep a sense of perspective. Messrs. Sears and Marney, who appear from the transcript to have been well acquainted over the years, discussed at length topics including people in the foreign exchange business whom both men had known, Mr. Sears' knowledge of how the foreign exchange industry in general and Currenex in particular functioned in certain respects, whether Mr. Sears would be willing to consult with Mr. Marney and his clients (including a law firm or firms) in looking at certain industry practices, and whether Mr. Sears could do so without his participation becoming known.[1] As Mr. Sears' solicitor conceded – although in perhaps an unduly understated way – "it might be argued that Mr. Sears[, given the nature of the conversation,] would have understood that the information provided on the call would have been

---

[1] Brockett Decl. Ex. 1 (Dkt 560-1) *passim.*

committed to a record in some way."[2] So the fact that the call's audio was recorded by technical means – as perhaps distinguished from the substance having been summarized after the fact in a writing – possibly was not a surprise to Mr. Sears. Surprise or not, however, the Court would not place too much weight on these alleged violations, even assuming that they were such.

As an initial matter, Currenex does not claim that the use of the audio recording in question would be precluded if offered in litigation in England. Indeed, it appears that it quite likely would not be precluded.

In a recent case in the UK Court of Appeal, a UK defendant sought to overturn on appeal a multimillion judgment against him. The defendant argued that the decision below had been tainted by the improper receipt in evidence of confidential documents obtained through unlawful hacking of the defendant's computer, hacking for which the plaintiff allegedly had been responsible. But the Court of Appeal rejected the contention that the evidence should have been excluded. In so doing, it explained the English view of the use in litigation of improperly obtained evidence:

> "Cases of evidence procured by torture aside, the general rule of English law is that evidence is admissible if it is relevant to the matters in issue. If it is, it is admissible and the court is not concerned with how the evidence was obtained. Relevant evidence is admissible even if it has been stolen: *Kuruma v R* [1955] AC 197. In *Helliwell v Piggott-Sims* [1980] FSR 356 Lord Denning MR said:
>
>> "'I know that in criminal cases the judge may have a discretion. That is shown by *Kuruma v the Queen*. But so far as civil cases are concerned, it seems to me that the judge has no discretion. The evidence is relevant and admissible. The judge cannot refuse it on the ground that it may have been unlawfully obtained in the beginning. I do not say that it was unlawfully obtained. It was obtained under an Anton Piller order which was not appealed against. But, even if it was unlawfully obtained, nevertheless the judge is right to admit it in evidence and to go on with the case as he proposes to do.'

---

2 Lancaster Decl. (Dkt 527) ¶ 21.

"We add to that the pithy statement by Millett LJ in *Bell Cablemedia Plc v Simmons* [2002] FSR 34 at [42]

> "'The common law has always set its face against preventing a party to civil proceedings from adducing admissible evidence even where it has been improperly obtained: *Calcraft v Guest* [1898] 1 QB 759. Equity has never sought to intervene in this context. It has never sought to mitigate the rule in *Calcraft v Guest,* but on the contrary has applied it to proceedings in its own courts. It is significant that in *Ashburton v Pape* the equitable jurisdiction was firmly based on confidence and not upon any wider principle of fair play in litigation. But in any case the defendant's mistake, as I have already pointed out, is not the kind of mistake in respect of which a court of equity would ever grant relief. It will not protect a dishonest man from the consequences of mistakenly disclosing evidence of his dishonesty.'"

"Under CPR Part 32.1 the court has power 'to exclude evidence that would otherwise be admissible'. That is, of course, a power rather than a duty. If it is established that one party has obtained evidence unlawfully, how is the court to exercise its discretionary power?

"In *Jones v University of Warwick* [2003] EWCA Civ 151, [2003] 1 WLR 954 the claimant in a personal injury action was surreptitiously filmed at home by an inquiry agent posing as a market researcher. The video footage showed that she did not have the injury that she alleged. The question for this court was whether the defendant should be allowed to rely on that footage at trial. Lord Woolf CJ pointed out that there were two potentially conflicting public policies in play: the achieving of justice in a particular case on the one hand; and promoting the observance of the law on the other. At [28] he said:

> "'The court must try to give effect to what are here the two conflicting public interests. The weight to be attached to each will vary according to the circumstances. The significance of the evidence will differ as will the gravity of the breach of article 8, according to the facts of the particular case. The decision will depend on all the circumstances. Here, the court cannot ignore the reality of the situation. This is not a case where the conduct of the defendant's insurers is so outrageous that the defence should be struck out. The case, therefore, has to be tried. It would be artificial and undesirable for the actual evidence, which is relevant and admissible, not to be placed before the judge who has the task of trying the case.'

"In the result, therefore, the balance came down in favour of establishing the truth; and the evidence was held to be properly admissible. Nevertheless, at [30] Lord Woolf suggested that there were other ways in which the court could express its disapproval of unlawful conduct in gathering evidence; most notably by requiring the defendant to pay the costs of the appeals even though it had been the successful

party. In *Dubai Aluminium Co Ltd v Al Alawi* [1999] 1 WLR 1964, for example, Rix J held that documents relating to the unlawful investigation of banking accounts fell outside the scope of litigation privilege and had to be disclosed."[3]

This Court certainly applies US, not UK, law in deciding the question before it. And, as noted, it assumes that its discretion is sufficiently broad to preclude the use of improperly obtained evidence in appropriate circumstances. Nevertheless, the UK view does have a bearing here. It is pertinent to the relative importance of (1) vindicating the UK policies that Currenex invokes in an effort to exclude the audio recording and, at the same time, deterring any misconduct, and (2) placing before this Court whatever part of the audio recording that ultimately may prove relevant and otherwise admissible. In this Court's view, the potential value of having all the facts substantially outweighs vindication of these UK policies. And certainly there are other ways to deter any misconduct, if misconduct there was. They include sanctions on any lawyers who may have been involved in any ethical or regulatory breaches and, indeed, bringing any breaches of UK policies to the attention of the relevant UK authorities. After all, as Currenex correctly notes, failure to comply with the statute and regulations upon which Currenex relies is an offense under Section 3 of the Investigatory Powers Act 2016. In the event the UK Director of Public Prosecutions were to conclude that there was a breach and that the UK public interest would be served, the Director may elect to prosecute.[4]

So far as the claimed mischaracterization in the pleadings and elsewhere in this litigation is concerned, suffice it to say that Edmar denied any mischaracterization. Indeed, it

---

3 *Ras Al Khaimah Invest. Auth. v. Azima*, [2021] EWCA Civ 349, ¶¶ 41-44 (paragraph numbers and underscoring of citations omitted).

4 Investigatory Powers Act 2016, §§ 3(1), 3(7).

arguably implied that any mischaracterization was by Currenex.[5] As this Court made clear in a different case only days ago, this is not the time for this sort of squabble.[6]

In all the circumstances, the Currenex's motion to preclude (Dkt 525) is denied. Insofar as the motion sought relief with respect to the alleged mischaracterization, the denial is without prejudice to renewal on a motion by either side – after the entry of judgment or such earlier time, if any, as the Court may permit – for sanctions.

SO ORDERED.

Dated: November 23, 2026

Lewis A. Kaplan
United States District Judge

---

5 Def. Mem. (Dkt 558) at 18-20.

6 *See Rana v. JPMorgan Chase Bank, N.A.*, No. 26-cv-6351, 2026 WL 3553720, at *2 (S.D.N.Y. Nov.. 18, 2026).